IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **In re:** | : | **Chapter 11** |
| | : | |
| **RELIANT ENERGY CHANNELVIEW, LP,** | : | **Case No. 07-11160 (MFW)** |
| **et al. ,** | : | |
| | : | **(Jointly Administered)** |
| **Debtors.** | : | |
| | : | **Re: Docket No. 319 and 479** |
| | : | |

**NOTICE OF APPEAL**
**OF KELSON CHANNELVIEW LLC (F/K/A KELSON ENERGY IV LLC) FROM**
**ORDER APPROVING DEBTOR'S PROPOSED BID PROTECTIONS (Dk. No. 319),**
**AND ORDER AUTHORIZING (I) THE SALE OR TRANSFER OF CERTAIN ASSETS**
**OF RELIANT ENERGY CHANNELVIEW LP AND RELIANT ENERGY SERVICES**
**CHANNELVIEW LLC FREE AND CLEAR OF LIENS, CLAIMS AND**
**ENCUMBERANCES AND OTHER INTERESTS, (II) THE ASSUMPTION AND**
**ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED**
**LEASES IN CONNECTION THEREWITH, (III) ASSUMPTION OF CERTAIN**
**LIABILITIES, AND (IV) GRANTING RELATED RELIEF (Dk. No. 479)**

Kelson Channelview LLC (f/k/a Kelson Energy IV LLC) (the "Appellant"), pursuant to

28 U.S.C. §158(a), hereby appeals from the "Order Approving Debtor's Proposed Bid

Protections" (Dk. No. 319) (the "Bid Order") and the "Order Authorizing (I) the Sale or Transfer

of Certain Assets of Reliant Energy Channelview LP and Reliant Energy Services Channelview

LLC Free and Clear of Liens, Claims and Encumbrances and Other Interests, (II) the Assumption

and Assignment of Certain Executory Contracts and Unexpired Leases in Connection Therewith,

(III) Assumption of Certain Liabilities, and (IV) Granting Related Relief" (Docket No. 479) (the

"Sale Order"). The Bid Order was entered on March 18, 2008 and the Sale Order was entered on

June 9, 2008. Both orders were entered by The Honorable Mary F. Walrath.[1]

---

[1] The identification of any party on this pleading and service of this pleading to any party shall not be deemed as consent to the standing of such party to contest this appeal.

The names of all parties to the Bid Order and the Sale Order appealed from and the

names, addresses and telephone numbers of their respective attorneys are as follows:

|  |  |
|---|---|
| **Debtor** | Mark D. Collins, Esquire<br>Paul N. Heath, Esquire<br>Jason M. Madron, Esquire<br>Richards Layton & Finger, P.A.<br>One Rodney Square P.O. Box 551<br>Wilmington, DE 19899<br>Telephone: 302-651-7700<br>Fax : 302-651-7701 |
| **United States Trustee** | Mark S. Kenney, Esquire<br>Office of the U.S. Trustee<br>844 King Street, Suite 2207<br>Lock Box 35<br>Wilmington, DE 19801<br>Telephone:  302-573-6491 |
| **Official Committee of**<br>**Unsecured Committee** | David B. Stratton, Esquire<br>Evelyn J. Meltzer, Esquire<br>Pepper Hamilton LLP<br>Hercules Plaza<br>Suite 5100, 1313 N. Market Street<br>Wilmington, DE 19899<br>Telephone:  302-777-6500<br>Fax:  302-421-8390 |

Dated: June 13, 2008

Respectfully submitted,

BIFFERATO GENTILOTTI LLC

BY:  /s/ Garvan F. McDaniel
    Garvan F. McDaniel, Esquire (#4167)
    800 North King Street
    Wilmington, DE 19801
    (302) 429-1900

    and

2

Andrew K. Glenn, Esquire
Kasowitz, Benson, Torres & Friedman LLP
1633 Broadway
New York, New York 10019
(212) 506-1747

*Attorneys for Appellant*

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

C.A. No.:
Bankruptcy Case No.: **07-11160**
Appeal No.: BAP **08-41**

Bankruptcy Appeal Transmittal Sheet

Name of Appellant(s): Kelson Channelview, LLC

Counsel for Appellant(s): Bifferato, Gentilotti, LLC
800 N. King Street, Plaza Level
Wilmington, DE 19801
302-429-1900
icb@bgbde,com

Name of Appellee: Reliant Energy Channel View, LP

Counsel for Appellee and Debtor:    **Robert J. Stearn Jr.**
Richards, Layton & Finger, P. A.
One Rodney Square
P. O. Box 551
Wilmington, DE 19899
usa
302-651-7700
Fax : 302-651-7701
Email: stearn@rlf.com

Enclosed Items:

511

**Electronically Filed on 6/13/08**

**Notice of Appeal:  (Docket #486)**

**Appealable Order:  (Docket #479)**

**Appellants Designation of Record on Appeal:  (Docket # 493)**

**Appellees Designation: (Docket #508)**

**Transmittal letter: (Docket #511)**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>RELIANT ENERGY<br>CHANNELVIEW LP, *et al.,*[1]<br><br>         Debtors. | Chapter 11<br><br>Case No. 07-11160 (MFW)<br><br>Jointly Administered<br><br>**Re: Docket No. 277** |

## ORDER APPROVING DEBTORS' PROPOSED BID PROTECTIONS

This matter coming before the Court on the motion (the "Motion") of the above-captioned debtors and debtors-in-possession (collectively, the "Debtors") for entry of an order approving certain bid protections in connection with the proposed transfer and sale of substantially all of the assets of certain Debtors to Kelson pursuant to the terms and conditions of that certain asset purchase agreement, dated February 25, 2008 (the "Asset Purchase Agreement"). The Court has reviewed the Motion and finds that (a) the Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, (b) this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), (c) notice of this Motion having been provided to, inter alia, the Office of the United States Trustee for the District of Delaware; counsel for the Official Committee of Unsecured Creditors; counsel to the administrative agent for the Debtors' pre-petition lenders (the " Pre-Petition Lenders"); counsel to the Buyer; counsel to Reliant Energy; counsel to Equistar; and all potentially interested purchasers contacted by the Debtors or HLHZ regarding the sale of the Debtors' assets; and all parties requesting notice in these cases pursuant to Bankruptcy Rule 2002; (d) any objections to the Motion have been withdrawn, resolved, or overruled; and (e) capitalized terms not otherwise defined herein have the meaning given to them

in the Motion; and the Court having determined that the legal and factual bases set forth in the

Motion establish just cause for the relief granted herein, and it appearing that the relief requested

is in the best interests of the Debtors' estates and creditors, and other parties in interest;

**IT IS HEREBY ORDERED THAT:**

1.      The Motion is GRANTED, as set forth herein.

2.      The Bid Protections set forth in Schedule 8.1(d) to the Asset Purchase
Agreement, ~as modified and~ attached hereto as <u>Exhibit A</u>, which contain, <u>inter</u> <u>alia</u>, provisions concerning the
~Break Up Fee and~ Expense Reimbursement, are hereby approved.

~3.      Subject to the provisions of paragraph 6 below, the Debtors are authorized~
~to pay the Buyer a break-up fee in the amount of $15,000,000 (the "Break Up Fee") upon closing~
~of an Alternative Transaction~.

4.      Subject to the provisions of paragraph 6 below, the Debtors are authorized
to reimburse the Buyer for reasonable, documented out of pocket expenses not to exceed
$2,000,000 (the "<u>Expense Reimbursement</u>") upon closing of an Alternative Transaction.

5.      Once due, and until paid, the ~Break-Up Fee and the~ Expense
Reimbursement shall be allowed as an administrative claim pursuant to section 503(b)(1)(A) of
the Bankruptcy Code.

6.      Notwithstanding anything to the contrary in the Motion, the Asset
Purchase Agreement or the Sale Motion, for purposes of determining whether the ~Break Up Fee~
~and/~or Expense Reimbursement are required to be paid under the terms of this Order, an
Alternative Transaction shall not include any conveyance or transfer of Acquired Assets to the

---

[1] The Debtors are Reliant Energy Channelview LP, Reliant Energy Channelview (Texas) LLC ("<u>General</u>
<u>Partner</u>"), Reliant Energy Channelview (Delaware) LLC ("<u>Limited Partner</u>, and together with the General Partner,
the "<u>Partners</u>"), and Reliant Energy Services Channelview LLC.

Pre-Petition Lenders in full or partial satisfaction of the outstanding obligations under the Secured Credit Facility, including, without limitation, by way of foreclosure, distribution under a chapter 11 plan, or credit bid under section 363(k) of the Bankruptcy Code; provided that it is understood and agreed that an Alternative Transaction shall include the sale of the Acquired Assets to the Pre-Petition Lenders for consideration consisting of a credit bid and additional consideration that is a Topping Bid. In addition, the ~~Break-Up Fee and~~ Expense Reimbursement shall not become payable until after all allowed secured claims of the Pre-Petition Lenders are satisfied in full.

7.     To the extent that any competing bids are made in connection with the Sale of the Acquired Assets, such bids must be submitted on or before 5 : 00 p.m. (Eastern Time) on April 3, 2008 (the "Bid Deadline"), and must be in an amount ~~sufficient to cover~~ equal to the Base Purchase Price ~~fully the Bid Protections afforded to Kelson (inclusive of the Break-Up Fee and Expense Reimbursement)~~, plus $5 million, and must also be accompanied by (a) evidence of such competing bidder's financial wherewithal; (b) a marked copy of the Asset Purchase Agreement of Kelson reflecting all changes made; (c) a clean, executed copy of the Asset Purchase Agreement; and (d) a good faith deposit in the amount of $40 million (collectively, a "Qualifying Bid").

8.     To the extent that any Qualifying Bids are received by the Bid Deadline, an auction of the Acquired Assets will be held at 10:00 a.m. (Eastern Time) on April 7, 2008 at the offices of Richards, Layton & Finger, P.A., One Rodney Square, 920 North King Street, Wilmington, Delaware 19801.

9.     This Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation of this Order.

Dated: March 18 , 2008
      Wilmington, Delaware

THE HONORABLE MARY F. WALRATH
CHIEF UNITED STATES BANKRUPTCY JUDGE

RLF1-3263436-3

# EXHIBIT A

Schedule 8.1(d)

Bid Protections

1. ~~Break fee payable on closing of Alternative Transaction[2]; $15,000,000.~~  ~~ₐ~~

2. Reimbursement of out of pocket expenses on closing of Alternative Transaction, up to an aggregate of $2,000,000.

3. Topping bid: The initial topping bid must be no less than $5,000,000 higher than an amount equal to the Base Purchase Price, ~~plus (i) the $15,000,000 break fee, and (ii) the amount of out of pocket expenses to be reimbursed to Buyer in connection with Item 2 above~~.

4. Sellers will use commercially reasonable efforts to file a motion for the Bidding Procedures Order within 48 hours of the Bankruptcy Court ordering the auction.

5. Sellers will require that as a condition of any Alternative Transaction that such transaction close within 45 days of the date of signing of a definitive Alternative Transaction agreement.

6. Sellers will request that the auction be held within 10 days of the entry of the Bidding Procedures Order.

7. This Agreement remains open as a backup bid if Sellers enter into an agreement for an Alternative Transaction until the earlier of the Termination Date and the closing of the Alternative Transaction, and to the extent that Buyer has provided a deposit, such deposit shall accrue interest until the Alternative Transaction is terminated or the deposit is returned to Buyer.

8. All bids remain open until the closing.

9. The winning bidder must provide a deposit equal to or greater than stalking horse deposit

10. All bids must be accompanied by evidence of committed financing or other ability to perform.

11. All bids must be accompanied by a contract in execution form and a copy marked against this Agreement.

---

[2] For the purpose of this Schedule 8.1(d), "Alternative Transaction" shall mean: (i) any direct or indirect sale or disposition of all or substantially all of the Acquired Assets (except as expressly permitted under the Agreement) or the capital stock or other equity interests of either Seller, or (ii) any merger, consolidation, business combination, recapitalization, reorganization or other extraordinary business transaction involving or otherwise relating directly or indirectly to either Seller

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | ) | |
| | ) | **Chapter 11** |
| **RELIANT ENERGY** | ) | |
| **CHANNELVIEW LP,** *et al.,* | ) | **Case No. 07-11160 (MFW)** |
| | ) | |
| Debtors. | ) | **(Jointly Administered)** |
| | ) | |
| | ) | Re: Docket No. 251 |
| | ) | |

### ORDER AUTHORIZING (I) THE SALE OR TRANSFER OF CERTAIN ASSETS OF RELIANT ENERGY CHANNELVIEW LP AND RELIANT ENERGY SERVICES CHANNELVIEW LLC FREE AND CLEAR OF LIENS, CLAIMS AND ENCUMBRANCES AND OTHER INTERESTS, (II) THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES IN CONNECTION THEREWITH, (III) ASSUMPTION OF CERTAIN LIABILITIES, AND (IV) GRANTING RELATED RELIEF

Upon consideration of the motion dated February 26, 2008 (the **"Sale Motion"**) of Reliant Energy Channelview LP, a Delaware limited partnership (**"Channelview LP"**) and Reliant Energy Services Channelview LLC, a Delaware limited liability company (**"RESC"** and collectively with Channelview LP, the **"Sellers"**), as debtors and debtors-in-possession,[1] pursuant to sections 105(a), 363 and 365 of Title 11 of the United States Code (the **"Bankruptcy Code"**), and Rules 2002, 6004, 6006, 9007 and 9014 of the Federal Rules of Bankruptcy Procedure (the **"Bankruptcy Rules"**): (A) approving the terms and conditions of, and authorizing the Sellers to consummate the transactions contemplated by, the asset purchase agreement dated as of April 3, 2008, among Sellers and GIM Channelview Cogeneration, LLC, a Delaware limited liability company (the **"Buyer"**), substantially in the form attached hereto as Exhibit A (the **"Asset Purchase Agreement"**); (B) authorizing (i) the sale or transfer (the

---

[1] The debtors and debtors-in-possession in the above-captioned chapter 11 cases are (i) Channelview LP, (ii) RESC, (iii) Reliant Energy Channelview (Texas) LLC, a Delaware limited liability company and (iv) Reliant Energy Channelview (Delaware) LLC, a Delaware limited liability company (collectively, the **"Debtors"**).

"Sale") of certain assets of the Sellers, as set forth in the Asset Purchase Agreement, free and clear of all liens, claims, encumbrances, interests, debts, mortgages, security interests, pledges, charges, demands, options, rights of first refusal, restrictions, or adverse claims of any kind or nature whatsoever (collectively, **"Liens"**) and liabilities of any Person, other than any Permitted Exceptions and Assumed Liabilities under the Asset Purchase Agreement, (ii) the assumption by the Sellers and assignment to the Buyer of certain executory contracts and unexpired leases of the Sellers (the **"Assigned Contracts"**),[2] and (iii) the assumption of certain liabilities as specifically identified and described in the Asset Purchase Agreement (the **"Assumed Liabilities"**); and (C) granting certain related relief; and the Court having heard statements of counsel and the evidence presented in support of the relief requested in the Sale Motion and at a hearing before the Court on April 9, 2008 (the **"Sale Hearing"**); and the Court having considered the (a) Preliminary Objections of Equistar Chemicals, LP (the **"Equistar Objection"**) to Debtors' Motion for an Order Authorizing (i) the Sale or Transfer of Certain Assets of the Debtors Free and Clear of Liens, Claims and Encumbrances, (ii) the Assumption and Assignment of Certain Executory Contracts and (iii) Granting Related Relief (Docket No. 349), (b) the Objection of Siemens Power Generation to the Debtors' Sale Motion (Docket No. 258), (c) the Preliminary Response of the Official Committee of Unsecured Creditors to the Debtors' Motion, Inter Alia, to Sell Assets and Assume and Assign Executory Contracts (Docket No. 277), (d) the Debtors' Reply in Further Support of the Debtors' Sale Motion and Motion to Establish Cure (Docket No. 362) and (e) the Response of the Administrative Agent to the Secured Lenders to the Debtors' Sale Motion (Docket No. 363); and following mediation to resolve the Equistar Objection in light of the Court's ruling on April 9, 2008 wherein the Court

---

[2] The Assigned Contracts consist of the (i) Real Estate Leases, (ii) Supplier Contracts, (iii) Entitled Real Property constituting Contracts, and (iv) Other Contracts.

held that the Second Amended and Restated Cash Flow Participation Agreement[3], dated December 15, 1999, between Equistar and Channelview LP (**"CFPA"**) was integrated with certain other Project Agreements identified on Exhibit A to the Equistar Objection and the Project Agreements could not be assumed and assigned without the CFPA, and the Debtors, Equistar, Reliant Energy Power Generation Inc., Reliant Energy Services, Inc. and Reliant Energy Inc. entered into a Stipulation Regarding the Sale Motion (the **"Stipulation"**); and all of Equistar's objections to the Sale Motion having been resolved pursuant to the terms of the Stipulation; and all other objections to the Sale Motion having been overruled, resolved or withdrawn; and the Court having jurisdiction over this matter; and it further appearing that the legal and factual bases set forth in the Sale Motion and at the Sale Hearing establish just cause for the relief granted herein; and after due deliberation thereon,

IT IS HEREBY FOUND AND DETERMINED THAT:[4]

### Jurisdiction, Final Order and Statutory Predicates

A.    This Court has jurisdiction to hear and determine the Sale Motion pursuant to 28 U.S.C. §§ 157(b)(1) and 1334(a).    This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (N) and (O).    Venue is proper in this District and in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

B.    This Order constitutes a final and appealable order within the meaning of 28 U.S.C. § 158(a).    Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), and to any extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure,

---

[3]    Certain terms not otherwise defined herein are defined in the Sale Motion, the Asset Purchase Agreement, the Stipulation or the Equistar Objection.

[4]    The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Fed. R. Bankr. P. 7052, made applicable to this proceeding pursuant to Fed. R. Bankr. P. 9014. Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when appropriate. See Fed. R. Bankr. P. 7052.

as made applicable by Bankruptcy Rule 7054, the Court expressly finds there is no just reason to stay the implementation of this Order, and expressly directs that this Order shall be immediately effective.

C.    The statutory predicates for the relief requested in the Sale Motion are sections 105, 363(b), (f), and (m), and 365 of the Bankruptcy Code and Bankruptcy Rules 2002(a)(2), 6004, 6006, 9006(c), 9007 and 9014.

### Notice of Sale and Cure Amounts

D.    Actual written notice of the Sale Hearing and the Sale Motion, and a reasonable opportunity to object or be heard with respect to the Sale Motion and the relief requested therein has been afforded to all interested persons and entities, including, but not limited to:  (i) the United States Trustee for the District of Delaware; (ii) counsel to the Official Committee of Unsecured Creditors; (iii) counsel to the administrative agent and collateral agent for the Debtors' prepetition and postpetition secured lenders; (iv) the Securities and Exchange Commission; (v) all taxing authorities having jurisdiction over any of the Acquired Assets, including, without limitation, the Internal Revenue Service; (vi) all parties that have requested notice pursuant to Bankruptcy Rule 2002; (vii) the Buyer and its respective counsel; (viii) all persons or entities known or reasonably believed by the Debtors to have asserted a Lien in any of the Acquired Assets; (ix) all non-Debtor parties to the Assigned Contracts; (x) the Attorneys General in the States where the Acquired Assets are located; (xi) the United States Environmental Protection Agency; (xii) all parties contacted by the Debtors or Houlihan, Lokey, Howard & Zukin regarding the sale of the Debtors' assets; (xiii) counsel to Equistar; and (xiv) counsel for Reliant Energy, Inc., Reliant Energy Power Generation, Inc. and Reliant Energy Services, Inc.

4

E.     The Sellers published notice of the Sale and the time and place of the Sale Hearing in the Houston Chronicle on March 4, 2008.

F.     The Debtors have served notice of the cure amounts (the **"Cure Notice"**) upon each non-debtor counter-party to an Assigned Contract that the Sellers seek to assume and assign to the Buyer on the Closing Date. The service of such Cure Notice was good, sufficient and appropriate under the circumstances and no further notice need be given in respect of establishing a cure amount for the respective Assigned Contract. Non-debtor counter-parties to the Assigned Contracts have had an opportunity to object to the assumption and assignment of the Assigned Contracts and to the cure amounts set forth in the Cure Notice.

G.     As evidenced by the affidavits of service previously filed with this Court, proper, timely, adequate and sufficient notice of the Sale Motion and the Sale Hearing has been provided in accordance with sections 102(1), 363 and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006 and 9014. The Debtors also have complied with all obligations to provide notice of the Sale Motion and the Sale Hearing as required by the Bankruptcy Code or by an order of the Court. The foregoing described notice was good, sufficient and appropriate under the circumstances, and no other or further notice of the Sale Motion, the Sale Hearing, the Sale or the assumption and assignment of the Assigned Contracts is required.

## Good Faith Buyer

H.     The Buyer is not an "insider" of any of the Debtors, as that term is defined in section 101(31) of the Bankruptcy Code.

I.     Buyer is purchasing the Acquired Assets in good faith and is a good faith buyer within the meaning of section 363(m) of the Bankruptcy Code, and is therefore entitled to the protection of that provision, and otherwise has proceeded in good faith in all respects in

RLFI-3270975-13

connection with this proceeding in that: (a) the Sellers and their advisors diligently and in good faith analyzed all other available options in connection with the disposition of the Acquired Assets; (b) a reasonable opportunity has been given to any interested party to make a higher and better offer for the Acquired Assets; (c) all payments to be made by the Buyer and other agreements or arrangements entered into by the Buyer in connection with the Sale have been disclosed; (d) Buyer has not violated section 363(n) of the Bankruptcy Code by any action or inaction; (e) no common identity of directors or controlling stockholders exists between the Buyer and any of the Debtors; and (f) the negotiation and execution of the Asset Purchase Agreement and any other agreements or instruments related thereto was without collusion, at arm's-length and in good faith.

J.       It is not a principal purpose of any Person entering into the Asset Purchase Agreement or any transactions contemplated by the Asset Purchase Agreement to evade liability to which such Person would be subject under Subtitle D of Title IV of ERISA.

## Highest and Best Offer

K.       The Sellers and their advisors determined that the terms and conditions set forth in the Asset Purchase Agreement, and the sale and transfer to Buyer of the Acquired Assets pursuant thereto, represent a fair and reasonable purchase price and constitute the highest or otherwise best value obtainable for the Acquired Assets.  At the conclusion of the marketing of the Acquired Assets and an auction conducted in connection therewith, the Sellers selected Buyer as the prevailing buyer, subject to the terms and conditions of the bid Buyer proffered.

L.       The Acquired Assets have been the subject of a full and robust marketing and sale and auction process conducted prior to entry into the Asset Purchase Agreement, and the Debtors' determination that the Asset Purchase Agreement constitutes the highest and best offer

6

for the Acquired Assets constitutes a valid and sound exercise of the Debtors' business judgment. No other person or entity or group of entities has offered to purchase the Acquired Assets for greater economic value to the Debtors' estates than the Buyer, and the terms set forth in the Asset Purchase Agreement are fair and reasonable and constitute the highest and best offer for the Acquired Assets, and will provide a greater recovery for the Debtors' estates than would be provided by any other available alternative. The purchase price under the Asset Purchase Agreement is sufficient to satisfy in full all claims against the Debtors' estates, and no other or further sale process or auction is required.

M.     Approval of the Sale Motion and the Asset Purchase Agreement and the consummation of the transactions contemplated thereby is in the best interests of the Debtors, their creditors, their estates and other parties in interest.

N.     The Debtors have demonstrated compelling circumstances and a good, sufficient and sound business purpose and justification for the Sale prior to, and outside of, a plan of reorganization.

### Validity of Transfer

O.     The Sellers have full corporate power and authority to execute and deliver the Asset Purchase Agreement and all other documents contemplated thereby, and no further consents or approvals are required for the Sellers to consummate the transactions contemplated by the Asset Purchase Agreement, except as otherwise set forth in the Asset Purchase Agreement.

P.     The transfer of each of the Acquired Assets to the Buyer will be as of the Closing Date a legal, valid and effective transfer of such assets, and vests or will vest the Buyer with all right, title and interest of the Sellers and their estates in and to the Acquired Assets free and clear

7

of all Liens accruing, arising or relating to any time prior to the Closing Date, except as agreed under the Asset Purchase Agreement.

## Section 363(f) Is Satisfied

Q.    The Sellers may sell the Acquired Assets free and clear of all Liens against the Debtors, their estates or any of the Acquired Assets (except for any Permitted Exceptions and Assumed Liabilities under the Asset Purchase Agreement), including but not limited to (i) Liens for property taxes in respect of the Acquired Assets for the period through the Closing Date (whether or not assessed) and (ii) any Liens, claims or interests of Equistar under the CFPA, because, in each case, one or more of the standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code has or have been satisfied. Those holders of Liens against the Debtors, their estates or any of the Acquired Assets who did not object, or who withdrew their objections, to the Sale or the Sale Motion are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code. Those holders of such Liens who did object fall within one or more of the other subsections of section 363(f) and are adequately protected by having their Liens, if any, in each instance against the Debtors, their estates, or any of the Acquired Assets, attach to the cash proceeds of the Sale ultimately attributable to the Acquired Assets in which such creditor alleges an interest, in the same order of priority, with the same validity, force and effect that such creditors had prior to the Sale, subject to any claims and defenses the Debtors and their estates may possess with respect thereto.

## No Successor

R.    Neither the Buyer nor its affiliates, successors or assigns, as a result of any action taken in connection with the purchase of the Acquired Assets:  (a) are a successor to any of the

8

Debtors; (b) have, de facto or otherwise, merged with or into any of the Debtors; or (c) are a continuation or substantial continuation of any of the Debtors or any enterprise of the Debtors.

### The Stipulation By and Between Debtors, Equistar, Reliant Energy Power Generation, Inc., Reliant Energy Services, Inc. and Reliant Energy, Inc.

S.     Representatives for the Debtors, Equistar, Reliant Energy Power Generation, Inc. and Reliant Energy Inc. participated in mediation and such parties, together with Reliant Energy Services, Inc., entered into and filed with the Court the Stipulation setting forth in full the terms of the agreements reached in the mediation.  The Stipulation has been entered into in good faith by the parties thereto and reviewed by counsel for the Committee, the Lenders, and the Buyer.  The Court finds that the Stipulation resolves the Equistar Objection and having been reviewed by all the necessary parties in interest, no further notice is required.  The Stipulation avoids prolonged and costly litigation, disruption to the sale process and is in the best interests of the Debtors and their estates, creditors and other parties in interest, and represents the reasonable exercise of sound and prudent business judgment by the Debtors.   Court approval of the Stipulation is necessary to enable the sale to the Buyer to proceed to closing free of any rights, claims, interests or obligations related to the CFPA as to the Buyer.

### Assumption and Assignment of the Assigned Contracts

T.     The assumption and assignment of the Assigned Contracts pursuant to the terms of this Order is integral to the Asset Purchase Agreement and is in the best interest of the Debtors and their estates, creditors and other parties in interest, and represents the reasonable exercise of sound and prudent business judgment by the Debtors.

U.     Except as set forth herein, the respective amounts set forth in (i) Exhibit A annexed to this Court's Order Establishing Cure Amounts, dated March 28, 2008 (Docket No.

9

RLF1-3270975-13

337), if any, together with applicable interest, and (ii) the Steam Supply Settlement Agreement are the sole amounts necessary under sections 365(b)(1)(A) and (B) and 365(f)(2)(A) of the Bankruptcy Code to cure all defaults and pay all actual pecuniary losses under the Assigned Contracts (the **"Cure Amounts"**).

V.      The Sellers have: (i) cured and/or provided adequate assurance of cure of any default existing prior to the Closing Date under any of the Assigned Contracts, within the meaning of section 365(b)(1)(A) of the Bankruptcy Code; and (ii) provided compensation or adequate assurance of compensation to any party for actual pecuniary loss to such party resulting from a default prior to the Closing Date under any of the Assigned Contracts, within the meaning of section 365(b)(1)(B) of the Bankruptcy Code. The Buyer has provided adequate assurance of its future performance under the Assigned Contracts within the meaning of sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code.

<div align="center">

**Compelling Circumstances for an Immediate Sale**

</div>

W.      To maximize the value of the Acquired Assets and preserve the viability of the business to which the Acquired Assets relate, it is essential that the Sale of the Assets occur within the time constraints set forth in the Asset Purchase Agreement.

NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:

1.      The relief requested in the Sale Motion is GRANTED and APPROVED, and the Sale contemplated thereby is approved as set forth in this Order.

2.      All objections to the Sale Motion or the relief requested therein that have not been withdrawn, waived or settled as announced to the Court at the Sale Hearing or by stipulation filed with the Court, and all reservations of rights included therein, are hereby overruled on the

<div align="center">

10

</div>

merits with prejudice or the interests of such objections have been otherwise satisfied or adequately provided for.

### Approval of the Stipulation

3.     The Stipulation including Schedule "A" and the form of Mutual Release are hereby approved, and the Debtors are authorized and directed to comply with the terms of the Stipulation. Upon entry of this Order, the Stipulation shall be binding on all the parties thereto in accordance with its terms.[5]  A copy of the Stipulation is attached hereto as Exhibit B.

### Approval of the Asset Purchase Agreement

4.     The Asset Purchase Agreement and all other ancillary documents, and all of the terms and conditions thereof, are hereby authorized and approved.  No other or further consents or approvals of this Court are required for the Debtors to consummate or effectuate the Asset Purchase Agreement or the Sale.

5.     Pursuant to section 363(b) of the Bankruptcy Code, the Sellers are authorized and empowered to take any and all actions necessary or appropriate to:  (i) consummate the Sale of each of the Acquired Assets to the Buyer pursuant to and in accordance with the terms and conditions of the Asset Purchase Agreement; (ii) close the Sale as contemplated in the Asset Purchase Agreement and this Order; and (iii) execute and deliver, perform under, consummate, implement and close fully the Asset Purchase Agreement, together with all additional instruments and documents that may be reasonably necessary or desirable by Buyer or Sellers to implement the Asset Purchase Agreement and the Sale, including any other ancillary documents, or as may be reasonably necessary or appropriate to the performance of the obligations as contemplated by the Asset Purchase Agreement and such other ancillary documents.

---

[5]     To the extent there are any conflicts between the Stipulation and the terms of this Order, this Order shall govern.

RLF1-3270975-13

6.     The terms and provisions of this Order shall be binding in all respects upon the Buyer and the Debtors, their estates and any trustees thereof, and all creditors and shareholders of the Debtors, all interested parties and their respective successors and assigns, including, but not limited to, any creditor asserting a Lien in the Acquired Assets.

### Sale and Transfer of Acquired Assets

7.     Pursuant to sections 105(a), 363 and 365 of the Bankruptcy Code, the Sellers are authorized to transfer the Acquired Assets on the Closing Date. Such Acquired Assets shall be transferred to the Buyer upon and as of the Closing Date and such transfer shall constitute a legal, valid, binding and effective transfer of such Acquired Assets and, upon Buyer's payment of the amounts due at Closing in accordance with the Asset Purchase Agreement, shall fully and irrevocably vest Buyer with all right, title and interest of the Sellers and their estates in the Acquired Assets free and clear of all Liens, including but not limited to: (i) Liens for property taxes (including, but not limited to, ad valorem taxes) in respect of the Acquired Assets for the period through the Closing Date (whether or not assessed) and (ii) any Liens, claims or interests of Equistar under the CFPA with all such Liens to attach to the net proceeds of the Sale with the same validity, priority, force and effect that they now have as against such Acquired Assets, subject to any claims and defenses the Sellers and their estates may possess with respect thereto.

8.     Except as expressly permitted or otherwise specifically provided by the Asset Purchase Agreement or this Order, all persons and entities (including governmental, taxing and regulatory authorities) holding Liens or other interests in the Acquired Assets (other than Permitted Exceptions and the Assumed Liabilities) arising under or out of, in connection with, or in any way relating to the Debtors, the Acquired Assets, the operation of the Debtors' businesses prior to the Closing Date or the transfer of the Acquired Assets to the Buyer, hereby are forever

12

barred, estopped and permanently enjoined from asserting against the Buyer or its successors or assigns, their property or the Acquired Assets, such persons' or entities' Liens or other interests in and to the Acquired Assets. On the Closing Date, subject to the provisions of this Order, each creditor is authorized and directed as may be reasonably requested by Buyer or Sellers to execute such documents and take all other actions as may be necessary to release Liens (except Permitted Exceptions) on the Acquired Assets, if any, as provided for herein, as such Liens may have been recorded or may otherwise exist.

9.      Except as expressly provided in the Asset Purchase Agreement, Buyer is not acquiring or assuming any of Sellers' or any other Person's liabilities, debts or obligations.

10.     All persons and entities are hereby forever prohibited and enjoined from taking any action that would interfere with the ability of the Sellers to sell and transfer the Acquired Assets to the Buyer in accordance with the terms of the Asset Purchase Agreement and this Order.

11.     All persons and entities that are in possession of some or all of the Acquired Assets on the Closing Date are directed to surrender possession of such Acquired Assets to the Buyer or its assignee at the Closing in accordance with the Asset Purchase Agreement.

12.     A certified copy of this Order may be filed with the appropriate clerk and/or recorded with the recorder to act to cancel the Liens and other encumbrances of record with respect to the Acquired Assets except the Permitted Exceptions.

13.     If any person or entity which has filed statements or other documents or agreements evidencing Liens on, or interests in, the Acquired Assets shall not have delivered to the Debtors prior to the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of liens and easements, and

13

any other documents necessary for the purpose of documenting the release of all Liens which the person or entity has or may assert with respect to the Acquired Assets, the Debtors are hereby authorized and directed, and the Buyer is hereby authorized, to execute and file such statements, instruments, releases and other documents on behalf of such person or entity with respect to the Acquired Assets.

14.     Except as provided in the Asset Purchase Agreement, the consummation of the Asset Purchase Agreement shall not subject the Buyer to any claims, liabilities, debts or obligations whatsoever with respect to the operation of the business by the Debtors through the Closing Date, including, without limitation, by reason of any theory of successor or transferee liability or pursuant to, among other things and without limitation, claims, liabilities, debts or obligations arising from (i) any employment or labor agreements, consulting agreements, severance arrangements, change in control agreements or other similar agreements to which the Debtors are or were a party, (ii) any pension, welfare, compensation or other employee benefit plans, agreements, practices, and programs, including without limitation, any pension plan of the Debtors, (iii) the cessation of the Debtors' operations, dismissal of employees, or termination of employment or labor agreements or pension, welfare, compensation or other employee benefit plans, agreements, practices and programs and any obligations with respect thereto that arise from the Employee Retirement Income Security Act of 1974, the Fair Labor Standard Act, Title VII of the Civil Rights Act of 1964, the Age Discrimination and Employment Act of 1967, the Federal Rehabilitation Act of 1973, the National Labor Relations Act, the Consolidated Omnibus Budget Reconciliation Act of 1985 or the Worker Adjustment and Retraining Notification Act, (iv) workmen's compensation, occupational disease or unemployment or temporary disability insurance claims, (v) any bulk sales or similar law, (vi) any liabilities, debts, or obligations of or

14

required to be paid by the Debtors for any taxes of any kind for any period, (vii) any claims, liabilities, debts or obligations of the Debtors for taxes arising from the sale of the Assigned Contracts, (viii) any litigation of or against the Debtors and (ix) any other claims, debts, obligations or liabilities, whether pursuant to any state or any federal laws or otherwise. For the avoidance of doubt, the claims, debts, obligations and liabilities set forth in this paragraph are Liens for all purposes herein and the Acquired Assets shall be sold free and clear of all such Liens.

15.     This Order is and shall be binding upon and govern the acts of all persons and entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any lease; and each of the foregoing persons and entities is hereby directed to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the transactions contemplated by the Asset Purchase Agreement.

## Assigned Contracts

16.     Upon the Closing of the Sale, the Sellers are authorized and directed to assume and assign each of the Assigned Contracts to the Buyer free and clear of all Liens. The payment of the applicable Cure Amounts (if any) shall: (i) effect a cure of all defaults existing thereunder as of the Closing Date; (ii) compensate for any actual pecuniary loss to such non-Debtor party resulting from such default; and (iii) together with the assumption of the Assigned Contracts by

15

the Buyer, constitute adequate assurance of future performance thereof. The Buyer shall then have assumed the Assigned Contracts and, pursuant to section 365(f) of the Bankruptcy Code, the assignment by the Sellers of such Assigned Contracts shall not be a default thereunder. After the Closing Date, neither the Sellers nor the Buyer shall have any liabilities or obligations to the non-Debtor parties to the Assigned Contracts other than the Buyer's obligations under the Assigned Contracts that are required to be performed on or after the Closing Date.

17.     Any provisions in any Assigned Contract that prohibit or condition the assignment of such Assigned Contract or allow the party to such Assigned Contract to terminate, recapture, impose any penalty, condition on renewal or extension or modify any term or condition upon the assignment of such Assigned Agreement, constitute unenforceable anti-assignment provisions under the Bankruptcy Code that are of no force and effect in connection with the assignment of the Assigned Contracts to the Buyer. Further, the termination of the CFPA, in accordance with the terms of the Stipulation, shall not constitute or trigger a default under any of the Project Agreements (as defined in the Stipulation). All other requirements and conditions under sections 363 and 365 of the Bankruptcy Code for the assumption by the Sellers and assignment to the Buyer of the Assigned Contracts have been satisfied. Upon the Closing, in accordance with sections 363 and 365 of the Bankruptcy Code, the Buyer shall be fully and irrevocably vested with all rights, title and interest of the Sellers and their estates under the applicable Assigned Contracts.

18.     The Assigned Contracts shall, as of the Closing Date, be valid and binding on the Buyer and the other non-debtor counter-parties thereto, and in full force and effect and enforceable in accordance with their respective terms. Following such assignment, the Sellers

16

shall be relieved, pursuant to section 365(k) of the Bankruptcy Code, from any further liability under the Assigned Contracts that arise after the Closing Date.

19.     Upon Closing, Buyer shall be obligated to perform its obligations pursuant to Section 7.17 of the Asset Purchase Agreement in accordance with the terms thereof. In the event the final judgment attached as Exhibit B to the Settlement Agreement is entered:  (a) such final judgment shall be applicable to the Steam Agreement in accordance with its terms; and (b) the Project Company (as defined in the Steam Agreement) and its assignees shall be deemed to have invoked their right under Section 3.6(b) thereof to a one-time excused breach of three days duration during the initial term of such agreement.

20.     The RES Assignment and Assumption Agreement, attached hereto as Exhibit C, is hereby approved.

21.     The Buyer has provided adequate assurance of its future performance under the relevant Assigned Contracts within the meaning of sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code.

22.     There shall be no rent accelerations, assignment fees, increases (including advertising rates) or any other fees charged to Buyer or the Debtors as a result of the assumption and assignment of the Assigned Contracts.

23.     Pursuant to sections 105(a), 363 and 365 of the Bankruptcy Code, all parties to the Assigned Contracts are forever barred and enjoined from raising or asserting against Buyer any assignment fee, default, breach or claim or pecuniary loss, or condition to assignment, arising under or related to the Assigned Contracts existing as of the Closing Date or arising by reason of the Closing, regardless of whether such assignment fee, default, breach or claim or

RLF1-3270975-13

pecuniary loss, or condition to assignment is matured or unmatured, fixed or contingent, or liquidated or unliquidated.

24.     Notwithstanding anything to the contrary herein, (i) the cure amount due to Equistar under the Second Amended and Restated Steam Supply Agreement (**"Steam Supply Agreement"**), to be paid by the Sellers and for which Buyer shall have no liability, shall be the amount set forth in the Steam Supply Settlement Agreement, specifically the sum of $10 million, provided however that notwithstanding anything in a confirmed plan of reorganization or liquidation no interest shall be paid on account of this cure payment, and (ii) following the assignment of the Assigned Contracts with Equistar to the Buyer, the terms and conditions of such   Assigned Contracts with Equistar, including but not limited to any conditions to assignment contained therein, shall remain in effect in accordance with their terms.

## Other Provisions

25.     Notwithstanding anything to the contrary herein, nothing in this Order shall relieve the Sellers from any obligation or liability to Siemens Power Generation, Inc. (**"Siemens"**) arising or incurred prior to the Closing Date pursuant to any Assigned Contracts by and between the Sellers and Siemens (the **"Siemens Contracts"**), including, without limitation, interest as set forth in the Siemens Contracts. Any such additional obligation or liability of the Sellers to Siemens under the Siemens Contracts, whether or not due under the terms of such Siemens Contracts, shall be either: (i) added to Siemens' Cure Amount and cured pursuant to 11 U.S.C. § 365(b)(1) prior to assumption and assignment of the Siemens Contracts, or (ii) paid by Sellers to Siemens in the ordinary course of business as an administrative expense prior to assumption and assignment of the Siemens Contracts. To the extent the Sellers and Siemens cannot agree on such additional amounts to be cured or paid pursuant to this paragraph, either

18

party may submit the dispute for resolution by this Court on an expedited basis. In addition, notwithstanding anything to the contrary herein or in the Asset Purchase Agreement, the Sellers and the Buyer expressly acknowledge that title to all Program Parts, Generator Program Parts, and Miscellaneous Hardware (as those terms are defined in the Siemens Contracts) and any other equipment and materials being provided under the Siemens Contracts shall convey as provided in the Siemens Contracts. Subject to the terms and conditions of this paragraph, the Cure Amount applicable to the Siemens Contracts is $5,793,038.19 as of May 19, 2008.

26. Effective upon the Closing Date, all persons and entities are forever prohibited and enjoined from commencing or continuing in any manner any action or other proceeding, whether in law or equity, in any judicial, administrative, arbitral or other proceeding against the Buyer, its successors and assigns, or the Acquired Assets, with respect to any (a) Lien (other than a Permitted Exception) arising under, out of, in connection with or in any way relating to the Debtors, the Buyer, the Acquired Assets, or the operation of the Acquired Assets prior to the Closing of the Sale, or (b) successor liability, including, without limitation, the following actions: (i) commencing or continuing in any manner any action or other proceeding against the Buyer, its successors and assigns, assets or properties; (ii) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order against the Buyer, its successors and assigns, assets or properties; (iii) creating, perfecting or enforcing any Lien or other encumbrance against the Buyer, its successors and assigns, assets or properties; (iv) asserting any setoff, right of subrogation or recoupment of any kind against any obligation due the Buyer or its successors and assigns; (v) commencing or continuing any action, in any manner or place, that does not comply or is inconsistent with the provisions of this Order or other orders of the Court, or the agreements or actions contemplated or taken in respect thereof; or (vi) revoking,

19

terminating or failing or refusing to issue or renew any license, permit or authorization to operate any of the Acquired Assets or conduct any of the businesses operated with the Acquired Assets.

27.    Except as otherwise expressly provided for in this Order or the Asset Purchase Agreement, the Buyer shall not have any liability or other obligation of or to the Debtors arising under or related to the Acquired Assets. Without limiting the generality of the foregoing, and except as otherwise specifically provided herein or in the Asset Purchase Agreement, the Buyer shall not be liable for any claims against the Debtors or any of their respective predecessors or affiliates, and the Buyer shall have no successor or vicarious liabilities of any kind or character, including, but not limited to, any theory of antitrust, environmental, successor or transferee liability, labor law, de facto merger or substantial continuity, whether known or unknown as of the Closing Date, now existing or hereafter arising, whether fixed or contingent, matured or unmatured, or liquidated or unliquidated with respect to the Debtors or any obligations of the Debtors arising prior to the Closing Date, including, but not limited to, liabilities on account of any taxes arising, accruing or payable under, out of, in connection with, or in any way relating to the operation of the Acquired Assets prior to the Closing.

28.    The transactions contemplated by the Asset Purchase Agreement are undertaken by the Buyer without collusion and in good faith, as that term is defined in section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale shall not affect the validity of the Sale (including the assumption and assignment of the Assigned Contracts), unless such authorization and such Sale are duly stayed pending such appeal. The Buyer is a good faith buyer within the meaning of section 363(m) of the Bankruptcy Code and, as such, is entitled to the full protections of section 363(m) of the Bankruptcy Code.

RLF1-3270975-13

29.     The consideration provided by the Buyer for the Acquired Assets purchased by the Buyer pursuant to the Asset Purchase Agreement shall be deemed to constitute reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession, or the District of Columbia. The sale of the Acquired Assets to Buyer pursuant to the Asset Purchase Agreement and this Order is free from any fraudulent intent, purpose or desire on the part of the Buyer or the Debtors to escape liability for any obligations of the Debtors.

30.     Pursuant to Bankruptcy Rules 7062, 9014, 6004(h) and 6006(d), this Order shall be effective immediately upon entry and the Sellers and Buyer are authorized to close the Sale immediately upon entry of this Order.

31.     The Debtors are directed to pay, at or prior to Closing, the undisputed portion of all valid real property and ad valorem tax claims asserted against the Debtors and due as of Closing that have given rise to Liens with respect to the Acquired Assets. The Sellers shall make provision at Closing for the payment of all taxes and other obligations related to the Debtors' operation of business through the Closing Date.

32.     Nothing in this Order or the Asset Purchase Agreement approves or provides for the transfer to Buyer of any avoidance claims (whether under chapter 5 of the Bankruptcy Code or otherwise) of the Debtors' estates.

33.     No bulk sales law or any similar law of any state or other jurisdiction applies in any way to the Sale.

34.     There are no brokers involved in consummating the Sale and no brokers' commissions are due.

35.    The failure specifically to include any particular provision of the Asset Purchase Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Asset Purchase Agreement be authorized and approved in its entirety.

36.    The Asset Purchase Agreement and any related agreements, documents or other instruments may be modified, amended or supplemented by the parties thereto in writing and in accordance with the terms thereof, without further order of the Court, provided that any such modification, amendment or supplement does not have a material adverse effect on the Debtors' estates.  Notice of any such modifications, amendments or supplements shall be provided to counsel for the Administrative Agent, counsel to the Committee, counsel for Equistar and counsel for Reliant Energy, Inc.

37.    In accordance with paragraph 38 below, at the Closing, Buyer shall pay the amount due under the Asset Purchase Agreement in accordance with joint written instructions signed by the Debtors, Equistar and Reliant Energy Inc. and delivered to counsel for (i) Buyer, (ii) the Committee, and (iii) the Administrative Agent for the Pre-Petition Lenders (a) no later than three (3) business days prior to the Closing Date and (b) with respect to the Make Whole Amount (as defined in the Credit Agreement) payable at Closing to the Tranche B-1 Lender as defined in the Credit Agreement, no later than one (1) business day prior to the Closing Date.  To the extent no such joint written instructions are delivered by such dates, Buyer will pay the amount due at Closing under the Asset Purchase Agreement to the Debtors.

38.    Subject to the Lenders' delivery of lien terminations and releases with respect to the Acquired Assets and the funding of each of the (i) Cure Cost Reserve Amount (as defined in the Asset Purchase Agreement), and (ii) the Indemnity Escrow Account, the Debtors are

22

authorized and directed to pay from the proceeds of the Sale: (a) all amounts then outstanding under that certain Credit Agreement, dated December 15, 1999 (as amended, modified or supplemented and in effect from time to time, the **"Credit Agreement"**) to the Lenders under the Credit Agreement including, without limitation, the Fee (as defined in that certain Order, dated January 11, 2008, with respect to the Debtors use of cash collateral), which shall be paid to each of the Lenders on a pro rata basis after reservation of proceeds sufficient to satisfy all third-party unsecured claims, and then (b) the funding of the Reserve (as defined in the Stipulation) and (c) all other amounts payable at Closing under the Stipulation.

39.    All amounts payable under the Indemnity Escrow Account may be made without further order of this Court.

40.    Notwithstanding anything to the contrary contained herein or in the Stipulation, upon the Buyer's payment of the amounts due at Closing in accordance with the Asset Purchase Agreement, the Buyer shall not be responsible for any rights, claims, obligations or interests arising from or related to the CFPA or the Stipulation.

41.    Upon the Closing of the Sale, any and all claims or liens asserted against the Debtors' estates, or that could be asserted against the Debtors' estates, pursuant to the Credit Agreement will attach only to the proceeds of the Sale, and any other amounts payable to the Debtors under the Asset Purchase Agreement, in the same amount and to the same extent, validity and priority as presently exists with respect to the Acquired Assets. Upon entry of this Order, the security interest granted in the proceeds of the Sale hereby shall be properly perfected without the need for further filings or further documentation.

42.    Upon the date the obligations pursuant to the Credit Agreement are paid in full in cash pursuant to the terms of this Order, the Debtors shall execute for the benefit of (i) the

Lenders party to the Credit Agreement, (ii) The Bank of New York as successor Administrative Agent and Collateral Agent under the Credit Agreement, and (iii) Teachers Insurance and Annuity Association of America as Institutional Agent under the Credit Agreement, and their respective trustees, agents, executors, sureties, insurers, attorneys, advisors, officers, directors, representatives, predecessors, affiliates, delegates, successors and/or assigns, a general release of any and all claims and causes of action that could have been asserted or raised under or in connection with the Credit Agreement.

43.    The Asset Purchase Agreement and the transactions and instruments contemplated thereby shall be specifically enforceable against and binding upon, and not subject to rejection or avoidance by, each Seller or any trustee of a Seller and its applicable estate.

44.    Notwithstanding anything to the contrary herein, the Debtors shall not file, nor seek to confirm, any plan of reorganization or liquidation in these cases that impairs Buyer's rights and remedies under the Asset Purchase Agreement, or take any other action that is inconsistent with the Asset Purchase Agreement.

45.    The Court shall retain jurisdiction to, among other things, interpret, implement, and enforce the terms and provisions of this Order, the Stipulation and the Asset Purchase Agreement, all amendments thereto and any waivers and consents thereunder and each of the agreements executed in connection therewith to which the Sellers are a party or which has been assigned by the Sellers to the Buyer, and to adjudicate, if necessary, any and all disputes concerning or relating in any way to the Sale.

46.    All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

24

47.     To the extent that this Order is inconsistent with any prior order or pleading with respect to the Sale Motion in this chapter 11 case, the terms of this Order shall govern.  The provisions of this Order are non-severable and mutually dependent.

Dated: June 9 , 2008
       Wilmington, Delaware

_____
UNITED STATES BANKRUPTCY JUDGE

RLF1-3270975-13

# Exhibit A to the Order

EXECUTION COPY

ASSET PURCHASE AGREEMENT

By and Among

RELIANT ENERGY CHANNELVIEW LP

And

RELIANT ENERGY SERVICES CHANNELVIEW LLC

AS SELLERS

And

GIM CHANNELVIEW COGENERATION, LLC

AS BUYER

Dated as of April 3, 2008

# TABLE OF CONTENTS

Page

ARTICLE 1   DEFINITIONS AND CONSTRUCTION ............................................................1
   1.1   Definitions ................................................................................................1
   1.2   Construction ...........................................................................................13

ARTICLE 2   14

PURCHASE AND SALE OF THE ACQUIRED ASSETS ...............................................14
   2.1   Transfer of Acquired Assets .................................................................14
   2.2   Excluded Assets .....................................................................................15
   2.3   Assumption of Liabilities ......................................................................17
   2.4   Excluded Liabilities ...............................................................................18
   2.5   Non-Assignment of Assigned Contracts ...............................................18

ARTICLE 3   CONSIDERATION ......................................................................................20
   3.1   Purchase Price ........................................................................................20
   3.2   Deposit ...................................................................................................20
   3.3   Post-Closing Adjustment .......................................................................20
   3.4   Allocation of Purchase Price .................................................................21
   3.5   Equistar Payment ...................................................................................21

ARTICLE 4   CLOSING AND DELIVERIES ...................................................................22
   4.1   Closing ...................................................................................................22
   4.2   Closing Deliveries by Sellers to Buyer .................................................22
   4.3   Closing Deliveries by Buyer ..................................................................23
   4.4   RES Fuel Purchase Transactions ...........................................................24

ARTICLE 5   REPRESENTATIONS AND WARRANTIES REGARDING THE
           ACQUIRED ASSETS .................................................................................24
   5.1   Organization and Qualification; Authority ............................................24
   5.2   No Conflicts; Consents and Approvals ..................................................25
   5.3   Subsidiaries ............................................................................................25
   5.4   Financial Statements ..............................................................................25
   5.5   Absence of Undisclosed Liabilities; Certain Developments .................26
   5.6   Litigation ................................................................................................26
   5.7   Compliance with Laws ...........................................................................26
   5.8   Permits ...................................................................................................26
   5.9   Contracts ................................................................................................27
   5.10  Taxes ......................................................................................................28
   5.11  Employee Benefit Plans; ERISA ...........................................................29
   5.12  Labor and Employment ..........................................................................30
   5.13  Environmental Matters ...........................................................................31
   5.14  Intellectual Property ..............................................................................32
   5.15  Real Estate .............................................................................................32

i

| | | |
|---|---|---|
| 5.16 | Insurance | 32 |
| 5.17 | Federal Regulation | 32 |
| 5.18 | Brokers | 32 |
| 5.19 | Conduct of Business and Operations | 32 |
| 5.20 | Sufficiency of Assets | 32 |

**ARTICLE 6    REPRESENTATIONS AND WARRANTIES OF BUYER** .................................33

| | | |
|---|---|---|
| 6.1 | Organization and Qualification | 33 |
| 6.2 | Authority | 33 |
| 6.3 | No Conflicts; Consents and Approvals | 33 |
| 6.4 | Legal Proceedings | 34 |
| 6.5 | Compliance with Laws and Orders | 34 |
| 6.6 | Brokers | 34 |
| 6.7 | Financial Resources | 34 |
| 6.8 | No Knowledge of a Sellers' Breach | 34 |
| 6.9 | Opportunity for Independent Investigation | 34 |

**ARTICLE 7    COVENANTS** .....................................34

| | | |
|---|---|---|
| 7.1 | Access. | 34 |
| 7.2 | Conduct of Business Pending the Closing. | 36 |
| 7.3 | Use of Certain Names | 38 |
| 7.4 | Support Obligations. | 38 |
| 7.5 | Termination of Certain Services, Contracts | 39 |
| 7.6 | Insurance | 39 |
| 7.7 | Tax Matters. | 40 |
| 7.8 | Confidentiality. | 41 |
| 7.9 | Employee and Benefit Matters | 42 |
| 7.10 | Public Announcements | 45 |
| 7.11 | Expenses and Fees | 46 |
| 7.12 | Regulatory and Other Approvals | 46 |
| 7.13 | Further Assurances | 47 |
| 7.14 | Schedule Update | 47 |
| 7.15 | PUCT Matters | 48 |
| 7.16 | Equistar Consents | 48 |
| 7.17 | Boiler Feedwater Pump | 48 |
| 7.18 | Fulfillment of Conditions | 48 |
| 7.19 | Cure of Defaults | 48 |
| 7.20 | 2007 Financial Statements | 49 |

**ARTICLE 8    BANKRUPTCY PROCEDURES** .................................49

| | | |
|---|---|---|
| 8.1 | Bankruptcy Actions. | 49 |

**ARTICLE 9    CONDITIONS TO THE CLOSING** .................................50

| | | |
|---|---|---|
| 9.1 | Conditions to the Obligations of Each Party | 50 |
| 9.2 | Conditions to the Obligations of Buyer | 51 |
| 9.3 | Conditions to the Obligations of Sellers | 51 |

ARTICLE 10   TERMINATION..................................................................................................52

    10.1   Termination...............................................................................................52
    10.2   Effect of Termination................................................................................53
    10.3   Termination Fees. ....................................................................................53

ARTICLE 11   INDEMNIFICATION..........................................................................................54

    11.1   Survival ....................................................................................................54
    11.2   Indemnification.........................................................................................54
    11.3   Waiver of Other Representations..............................................................56
    11.4   Waiver of Remedies; Certain Limitations ...............................................58
    11.5   Procedures for Indemnification................................................................59
    11.6   Manner of Payment..................................................................................60

ARTICLE 12   MISCELLANEOUS ...........................................................................................60

    12.1   Notices .....................................................................................................60
    12.2   Headings ..................................................................................................61
    12.3   Assignment ..............................................................................................61
    12.4   Governing Law .........................................................................................62
    12.5   Jurisdiction...............................................................................................62
    12.6   Counterparts.............................................................................................62
    12.7   Amendments; Extensions.........................................................................62
    12.8   Entire Agreement.....................................................................................62
    12.9   Severability ..............................................................................................63
    12.10  Joint and Several ......................................................................................63

## EXHIBITS

| | |
|---|---|
| Exhibit A | Form of Bill of Sale |
| Exhibit B | Form of Assignment and Assumption Agreement (Contracts) |
| Exhibit C | Form of Assignment and Assumption Agreement (Lease) |
| Exhibit D | Form of RES Assignment and Assumption Agreement |
| Exhibit E | Form of Sale Order |
| Exhibit F | Interim Period Capital Expenditures |
| Exhibit G-1 | Administrative Services Transition Services Agreement |
| Exhibit G-2 | Fuel and Power Transition Services Agreement |
| Exhibit H | Form of Escrow Agreement |

## DISCLOSURE SCHEDULES

| | |
|---|---|
| Schedule 1.1(x) | Knowledge of Sellers |
| Schedule 1.1(y) | Knowledge of Buyer |
| Schedule 1.1(z) | Buyer's Energy Manager |
| Schedule 2.1(a) | Real Estate Leases |
| Schedule 2.1(b) | Entitled Real Property |
| Schedule 2.1(c) | Equipment |
| Schedule 2.1(d) | Supplier Contracts |
| Schedule 2.1(e) | Other Contracts |
| Schedule 2.1(f) | Inventory |
| Schedule 2.1(g) | Intellectual Property |
| Schedule 2.1(h) | Permits |
| Schedule 2.1(i) | Business Records |
| Schedule 2.2(m) | Reliant Marks |
| Schedule 2.2(p) | Excluded Assets |
| Schedule 2.4 | Excluded Liabilities |
| Schedule 4.2(i) | RES Agreements |
| Schedule 5.2(b) | Company Consents |
| Schedule 5.2(c) | Sellers' Governmental Approvals |
| Schedule 5.4 | Financial Statements |
| Schedule 5.5 | Undisclosed Liabilities |
| Schedule 5.6 | Litigation |
| Schedule 5.7 | Compliance with Laws |
| Schedule 5.8(i) | Permits |
| Schedule 5.8(ii) | Permits in Violation |
| Schedule 5.9(a) | Contracts |
| Schedule 5.9(d) | Excluded Contracts |
| Schedule 5.10 | Taxes |
| Schedule 5.11(a) | Seller Affiliate Plans |
| Schedule 5.11(c) | Favorable Determination Letters |
| Schedule 5.12(f) | Seller Affiliate Plan Increases or Acceleration |
| Schedule 5.13 | Environmental Matters |
| Schedule 5.14 | Intellectual Property |
| Schedule 5.15 | Real Estate |

Schedule 6.3(c)      Buyer's Governmental Approvals
Schedule 7.2         Conduct of Business Pending the Closing
Schedule 7.4(a)      Support Obligations
Schedule 7.9(b)      Non-Collective Bargaining Contract Employees
Schedule 8.1(b)      Publications
Schedule 9.1(c)      Certain Consents

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this *"Agreement"*), dated as of April 3, 2008 (the *"Execution Date"*), is made by and between Reliant Energy Channelview LP, a Delaware limited partnership (*"Channelview LP"*) and Reliant Energy Services Channelview LLC, a Delaware limited liability company (*"RESC"* and together with Channelview LP, the *"Sellers"*) and GIM Channelview Cogeneration, LLC, a Delaware limited liability company (the *"Buyer"*).

## RECITALS

WHEREAS, Channelview LP owns the Channelview Facility and certain other Acquired Assets;

WHEREAS, on August 20, 2007, Channelview LP filed a voluntary petition for relief under the Bankruptcy Code in the Bankruptcy Court;

WHEREAS, RESC owns certain Acquired Assets;

WHEREAS, on August 20, 2007, RESC filed a voluntary petition for relief under the Bankruptcy Code in the Bankruptcy Court;

WHEREAS, on the terms and subject to the conditions set forth in this Agreement, Buyer desires to purchase from Sellers, and Sellers desire to sell to Buyer, the Acquired Assets, in a sale authorized by the Bankruptcy Court pursuant to, *inter alia*, sections 105, 363, and 365 of the Bankruptcy Code;

WHEREAS, Buyer also desires to assume, and Sellers desire to assign and transfer to Buyer, the Assumed Liabilities.

NOW, THEREFORE, in consideration of the foregoing and their respective representations, warranties, covenants and undertakings herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Sellers and Buyer hereby agree as follows:

## ARTICLE 1

## DEFINITIONS AND CONSTRUCTION

1.1    Definitions.    As used in this Agreement, the following terms shall have the following meanings:

*"2007 Financial Statements"* has the meaning set forth in Section 7.20.

*"Accounts Payable"* has the meaning set forth in Section 2.4.

*"Accounts Receivable"* has the meaning set forth in Section 2.2(c).

*"Acquired Assets"* has the meaning set forth in Section 2.1.

"*Administrative Services Transition Services Agreement*" (means that certain Transition Services Agreement, to be dated as of the Closing Date, by and among Operator and Buyer, in substantially the form of Exhibit G-1 hereto.

"*Adverse Ruling*" means relief granted by the Bankruptcy Court to a third party that the Buyer in good faith believes, based on the advice of counsel, would adversely impact the relief provided in the Sale Order under Section 363(m) of the Bankruptcy Code.

"*Affiliate*" means any Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, the Person specified; provided, that neither General Electric Company nor Credit Suisse Group, or any of their respective wholly- or partially-owned direct or indirect subsidiaries, shall be deemed to be "Affiliates" of Buyer for any purpose of this Agreement. For purposes of this definition, control of a Person means the power, direct or indirect, to direct or cause the direction of the management and policies of such Person whether through ownership of voting securities or ownership interests, by contract or otherwise, and specifically with respect to a corporation, partnership, trust or limited liability company, shall include direct or indirect ownership of more than 50% of the voting securities in such corporation or of the voting interest in a partnership or limited liability company or of the beneficial interest in a trust.

"*Agreement*" has the meaning set forth in the Recitals to this Agreement.

"*Assigned Contracts*" has the meaning set forth in Section 2.1(e).

"*Assumed Liabilities*" has the meaning set forth in Section 2.3.

"*Assumption Agreements*" has the meaning set forth in Section 4.2(b).

"*Bankruptcy Code*" means Title 11 of the United States Code.

"*Bankruptcy Court*" means the United States Bankruptcy Court for the District of Delaware or such other court having jurisdiction over the Chapter 11 Cases originally administered in the United States Bankruptcy Court of the District of Delaware.

"*Base Purchase Price*" has the meaning set forth in Section 3.1(a).

"*Benefit Plan*" means: (a) each "employee benefit plan," as such term is defined in Section 3(3) of ERISA, (b) each plan or program that would be an employee benefit plan if it were subject to ERISA, such as foreign plans and plans for directors, (c) each stock bonus, stock ownership, stock option, stock purchase, restricted stock, stock appreciation rights, phantom stock, or other equity plan (whether qualified or nonqualified), (d) each bonus, deferred compensation or incentive compensation plan, and (e) any other material employee benefit plan, program, contract, commitment, policy, agreement or arrangement of any kind (including, any employment, consulting, retention, disability, accident, savings and thrift, unemployment compensation, post-retirement, fringe benefits, cafeteria plans, change in control or severance plan, policy, arrangement or agreement providing compensation or benefits to any employee (whether active or on leave of absence) and/or former employee of the Operator, Sellers, their Affiliates or any Commonly Controlled Entity); provided, that such term shall not include (1)

2

routine employment policies and procedures, including wage, vacation, holiday, and sick or other leave policies, (2) workers compensation insurance, and (3) directors and officers liability insurance.

"*Business*" means the business of generating and selling steam, electric power, capacity and ancillary services from the Channelview Facility, as managed by Channelview LP, or its Affiliates, on the date hereof; or, as applicable, RESC's business of purchasing power from third-parties and selling power to Equistar pursuant to the Energy Supply Agreement, and any business activities of Channelview LP or RESC incidental to the foregoing.

"*Business Day*" means a day other than Saturday, Sunday or any day on which banks located in the State of New York and the State of Texas are authorized or obligated to close.

"*Business Records*" means all books, files and records (whether in paper or electronic format) to the extent they apply to the Acquired Assets or the Business, including customer lists, historical customer files, reports, plans, data, accounting and tax records, test results, product specifications, drawings, diagrams, training manuals, procedures manuals, logs, engineering data, safety and environmental reports and documents, maintenance schedules, operating and production records, inventory records, business plans, and marketing and all other studies, documents and records but excluding any Retained Books and Records.

"*Buyer*" has the meaning set forth in the Recitals to this Agreement.

"*Buyer Governmental Approvals*" has the meaning set forth in Section 6.3(c).

"*Buyer Indemnified Group*" means Buyer and Buyer's Affiliates and their respective officers, directors, managers, members, employees and agents.

"*Buyer Savings Plan*" has the meaning set forth in Section 7.9(g).

"*Capital Expenditures*" means expenditures for capital additions to, or replacements of, property, plant and equipment included in the Channelview Facility and other expenditures for repairs on property, plant and equipment included in the Channelview Facility that would be capitalized by Sellers in accordance with their normal capitalization policies, which are in accordance with GAAP.

"*Change of Law*" means the adoption, implementation, promulgation, repeal, modification or reinterpretation of any Law of or by any Governmental Authority which occurs subsequent to the Execution Date.

"*Channelview Facility*" means the 830 MW combined cycle, cogeneration facility located in Channelview, Texas, and facilities and equipment owned or leased by Channelview LP in connection with the Business.

"*Channelview Facility Employees*" has the meaning set forth in Section 5.12(a).

"*Channelview LP*" has the meaning set forth in the Recitals to this Agreement.

3

"*Channelview September 30 Balance Sheet*" has the meaning set forth in <u>Section 5.5</u>.

"*Chapter 11 Cases*" means collectively, the cases commenced under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court by Channelview LP and RESC, and which are jointly administered under case no. 07-11160 (MFW).

"*Charter Documents*" means, with respect to any Person, the articles of incorporation or organization and by-laws, the limited partnership agreement, the partnership agreement or the limited liability company agreement, and/or such other organizational documents of such Person, including those that are required to be registered or kept in the place of incorporation, organization or formation of such Person and which establish the legal personality of such Person.

"*Claims*" has the meaning set forth in <u>Section 2.2(j)</u>.

"*Closing*" has the meaning set forth in <u>Section 4.1</u>.

"*Closing Date*" has the meaning set forth in <u>Section 4.1</u>.

"*Code*" means the Internal Revenue Code of 1986, as amended.

"*Collective Bargaining Contract*" means that certain Agreement, effective as of January 1, 2004, between Reliant Energy Corporate Services, LLC, as successor by merger to Reliant Energy Power Operations I, Inc., and the International Brotherhood of Electrical Workers Local Union No. 66 Houston, Texas.

"*Commonly Controlled Entity*" means any trade or business, whether or not incorporated, that, together with either Seller, would be a "single employer" within the meaning of Section 4001(b) of ERISA.

"*Company Consents*" has the meaning set forth in <u>Section 5.2(b)</u>.

"*Confidentiality Agreement*" has the meaning set forth in <u>Section 7.8(a)</u>.

"*Consent*" means any consent, approval, authorization, qualification, waiver or notification of a Governmental Authority or other Person.

"*Continuing Employee*" means each individual who accepts an offer of employment from Buyer or its designee as provided in <u>Section 7.9(b)</u>, reports to work with Buyer or its designee, and is hired by Buyer or its designee.

"*Contract*" means any written contract, agreement, instrument, bond, commitment, lease, license, evidence of indebtedness, mortgage, indenture, purchase order, binding bid, letter of credit, security agreement or other written legally binding arrangement.

"*Credit Agreement*" means that certain Credit Agreement, dated as of December 15, 1999, as amended, among Channelview LP, the Lenders parties thereto, The Bank of New York,

4

as successor Administrative Agent and Collateral Agent, and Teachers Insurance and Annuity Association of America, as Institutional Agent.

"*Credit Rating*" means, with respect to any Person, each rating given by Standard & Poor's or Moody's, as applicable, to such Person's long-term, unsecured, unsubordinated debt obligations not supported by third party credit enhancement.

"*Cure Cost Reserve Amount*" has the meaning set forth in Section 7.19.

"*Cure Costs*" means all (i) cure costs required to be paid and all defaults required to be cured as a condition to assumption and assignment of the Assigned Contracts pursuant to Section 365 of the Bankruptcy Code and (ii) all contingent, unliquidated or unmatured liabilities under such Assigned Contracts or under any subcontracts related thereto (whether or not such subcontracts are Assigned Contracts) arising prior to the Closing Date.

"*Deposit*" has the meaning set forth in Section 3.2.

"*Disclosure Schedules*" has the meaning set forth in Section 2.1(a).

"*Emission Allowances*" means authorizations to emit specified units of substances, whether those authorizations are described as allowances, offsets, credits or by another term, from the Channelview Facility that are allocated to the Channelview Facility and owned by Channelview LP as of the time of Closing or to which the Channelview Facility becomes entitled to after Closing, which units are established by any Governmental Authority with jurisdiction over the Channelview Facility.

"*Energy Manager*" means (i) any one of the entities set forth on Schedule 1.1(z) or (ii) another energy manager, which may be an Affiliate of Buyer, reasonably satisfactory to Sellers or RES as applicable, or (iii) another energy manager selected by Buyer, provided that such alternate energy manager has and maintains an investment grade rating with Standard & Poor's and Moody's.

"*Energy Supply Agreement*" means that certain Second Amended and Restated Energy Supply Agreement, dated as of December 15, 1999, by and between Equistar and RESC.

"*Entitled Real Property*" has the meaning set forth in Section 7.19.

"*Environmental Law*" means any federal, state, or local law, statute, ordinance, rule, regulation, code, directive, judicial or administrative order, judgment, decree, injunction, or requirement of any Governmental Authority, relating to (a) pollution or the protection, preservation or restoration of the environment (including air, water vapor, surface water, groundwater, surface land, subsurface land and natural resources), as the same may be amended or adopted as of the Closing Date or any date prior to the Closing Date, (b) Releases or threatened Releases (including, without limitation, Releases into the ambient air, surface water, groundwater, land, surface and subsurface strata) or otherwise relating to Hazardous Substances; or (c) the use, storage, recycling, treatment, generation, transportation, processing, handling, labeling, testing, discharge, control, cleanup, production, or disposal of Hazardous Substances.

5

"*Equipment*" has the meaning set forth in <u>Section 2.1(c)</u>.

"*Equistar*" means Equistar Chemicals LP, a Delaware limited partnership.

"*ERCOT*" means the Electric Reliability Counsel of Texas.

"*ERISA*" means the Employee Retirement Income Security Act of 1974, as amended.

"**Escrow Agent**" means Wilmington Trust Company the escrow agent under the Escrow Agreement.

"*Escrow Agreement*" means the escrow agreement by and between Sellers, Buyer and the Escrow Agent, in substantially the form of <u>Exhibit H</u>.

"*Estimated Purchase Price*" has the meaning set forth in <u>Section 4.3(a)</u>.

"*Excluded Assets*" has the meaning set forth in <u>Section 2.2</u>.

"*Excluded Liabilities*" has the meaning set forth in <u>Section 2.4</u>.

"*Execution Date*" has the meaning set forth in the Recitals to this Agreement.

"*FERC*" means the Federal Energy Regulatory Commission.

"*Final Purchase Price*" has the meaning set forth in <u>Section 3.3(c)</u>.

"*Fuel and Power Transition Services Agreement*" means that certain Transition Services Agreement, to be dated as of the Closing Date, by and among RES and Buyer, in substantially the form of <u>Exhibit G-2</u> hereto.

"*Fuel Purchase and Sale Agreement*" means that certain Fuel Purchase and Sale Agreement, dated as of December 15, 1999, by and among RES, Channelview LP and Equistar.

"*Fuel Supply Agreement*" has the meaning set forth in <u>Section 2.5</u>.

"*FutureCare Program*" has the meaning set forth in <u>Section 7.9(b)</u>.

"*GAAP*" means generally accepted accounting principles in the United States of America.

"*Generator Operator*" has the meaning set forth in <u>Section 5.7</u>.

"*Governmental Authority*" means (i) any federal, state, local, or foreign government, (ii) any court, tribunal, arbitrator, authority, agency, administrative body, taxing authority, commission, official or other instrumentality of the United States or any state, county, city, municipality, local authority or other political subdivision or similar governing entity, and (iii) any governmental, quasi-governmental or non-governmental body administering, regulating or having general oversight over gas, electricity, power or other markets, including ERCOT, the Texas Regional Entity and NERC.

*"Hazardous Substance"* means any chemical, material or substance in any form, whether solid, liquid, gaseous, semisolid, or any combination thereof, whether waste material, raw material, chemical, finished product, byproduct, or any other material or article, listed, defined, designated, regulated or classified as a pollutant, contaminant, hazardous substance, toxic substance, hazardous waste, solid waste, or special waste, or that is otherwise listed or regulated, or as to which liability could be imposed under any Environmental Law; including without limitation, petroleum products, and toxic mold.

*"HSR Act"* means the Hart-Scott-Rodino Antitrust Improvements Act of 1976.

*"Indemnified Party"* has the meaning set forth in Section 11.5.

*"Indemnifying Party"* has the meaning set forth in Section 11.5.

*"Indemnity Security"* has the meaning set forth in Section 11.2(c).

*"Intellectual Property"* means any and all (a) patents and patent applications, (b) marks (including trademarks, service marks, certification marks, collective marks, registered or unregistered), trade names, designs, expressions and works of authorship, logos, slogans, trade dress and applications for registration of the foregoing, (c) copyrights, mask works and applications for registration of the foregoing, and (d) trade secrets and confidential information, including confidential know-how and any other similar property, whether or not embodied in tangible form (including but not limited to technical drawings and specifications, shop drawings, manuals, forms, working notes and memos, technical and laboratory data, notebooks, samples, engineering prototypes and computer software.

*"Interest Rate"* means the prime per annum rate of interest as published by *The Wall Street Journal.*

*"Interim Period"* means the period of time from the Execution Date until the earlier of the Closing Date or termination of this Agreement.

*"Inventory"* has the meaning set forth in Section 2.1(f).

*"Investment Grade"* means an entity having long term, unsecured, unsubordinated debt not supported by third party credit enhancement that is rated "BBB-" or higher by Standard & Poor's and "Baa3" or higher by Moody's and that in either case is not on negative credit watch.

*"IRS"* means the U.S. Internal Revenue Service.

*"Knowledge"* means, in the case of Sellers, the actual knowledge (as opposed to any constructive or imputed knowledge) of the individuals listed on Schedule 1.1(x), and in the case of Buyer, the actual knowledge (as opposed to any constructive or imputed knowledge) of the individuals listed on Schedule 1.1(y), in each case without inquiry.

*"Laws"* means all laws, codes, statutes, rules, regulations, ordinances, orders and other legally-binding pronouncements having the effect of law of any Governmental Authority.

7

"*Leased Real Property*" has the meaning set forth in <u>Section 2.1(a)</u>.

"*Lenders*" means the lenders party to the Credit Agreement.

"*Lien*" means any mortgage, pledge, hypothecation, assessment, levy, imposition, charge, claim, assignment, security interest, easement, deed, restriction, transfer restriction, lien or other similar restriction or encumbrance of any kind.

"*Losses*" means any and all judgments, losses, liabilities, amounts paid in settlement, damages, fines, penalties, supplemental environmental project costs, deficiencies, losses and expenses (including interest, court costs, reasonable fees of attorneys, accountants and other experts and other reasonable expenses of litigation, settlement, judgment or other proceedings or of any claim, default or assessment).

"*LTMA Adjustment*" shall mean any adjustment to the purchase price for prorated availability bonuses or credits made in accordance with Item 6 on <u>Schedule 2.4</u>.

"*LTMA Support Obligations*" shall mean any Support Obligations arising under that certain Guaranty Agreement, dated as of September 30, 2002, by and between Reliant Energy Power Generation, Inc. and Siemens Power Generation, Inc,

"*Material Adverse Effect*" means any change, event or effect that is materially adverse to the Acquired Assets, taken as a whole, in each case, except for any such change, event or effect resulting from or arising out of (a) changes in economic conditions generally or in the industry in which the Channelview Facility operates, (b) changes in international, national, regional, state or local wholesale or retail markets for electric power or fuel or related products, including those due to actions by competitors (excluding any such change to the extent it only or disproportionately affects the Acquired Assets relative to other combined-cycle cogeneration facilities in ERCOT), (c) changes in general regulatory or political conditions, including any acts of war or terrorist activities, (d) changes in national, regional, state or local electric transmission or distribution systems, (e) strikes, work stoppages or other labor disturbances, (f) increases in costs of commodities or supplies, including fuel, (g) effects of weather or meteorological events, (h) any Change of Laws, (i) any actions to be taken pursuant to or in accordance with this Agreement, (j) any changes, events, or effects to which Sellers have cured prior to or as of Closing, and (k) the Chapter 11 Cases.

"*Material Contracts*" has the meaning set forth in <u>Section 5.9</u>.

"*Moody's*" means Moody's Investors Services, Inc., and its successors.

"*Multiemployer Plan*" has the meaning set forth in ERISA § 3(37).

"*NERC*" means North American Electric Reliability Corporation.

"*Operator*" means Reliant Energy Corporate Services, LLC, a Delaware limited liability company.

"*Other Contracts*" has the meant set forth in <u>Section 2.1(e)</u>.

*"Parties"* means each of Buyer and Sellers.

*"Permits"* means all licenses, permits, authorizations, approvals, registrations, variances, exemptions, concessions, franchises and similar consents granted or issued by any Governmental Authority.

*"Permitted Exceptions"* means (i) all Liens and any defects, exceptions, restrictions, easements, rights of way and encumbrances (x) disclosed in the title commitment referenced in Schedule 5.15, (y) which are shown on that certain TSPS Category 5 Survey made by Carter Burgess, dated September 26, 2002, or (z) which a search of the public records would reveal; (ii) statutory liens for Taxes, assessments or other governmental charges not yet due and payable; (iii) mechanics', carriers', workers', repairers' and similar Liens arising or incurred in the ordinary course of business that are not yet delinquent or, if delinquent, that are being contested in good faith; (iv) zoning, entitlement and other land use and environmental regulations by any Governmental Authority; (v) such other Liens, imperfections in title and easements, restrictions and encumbrances which do not materially detract from the value of, or materially interfere with the present use of, the Channelview Facility in the aggregate; (vi) Liens arising under fuel procurement arrangements; (vii) any encumbrances or liens arising under the Credit Agreement in favor of the Lenders which will be satisfied by Sellers as of, and released upon, Closing; (viii) liens for pre-petition ad valorem Taxes which will be satisfied by Sellers upon Closing; and (ix) any rights of Equistar to purchase the partnership interests of Channelview LP, pursuant to the Second Amended and Restated Agreement Steam Supply Agreement, dated as of December 15, 1999, between Channelview LP and Equistar.

*"Person"* means any natural person, corporation, general partnership, limited partnership, limited liability company, proprietorship, other business organization, trust, union, association, entity or Governmental Authority.

*"Pre-Closing Portion"* has the meaning set forth in Section 7.7(b).

*"Prudent Industry Practice"* means those practices, methods, equipment, specifications and standards of safety and performance as the same may change from time to time, as are commonly used in the North American electric utility industry by independent operators of electric generation stations of a type and size similar to those constituting the Channelview Facility during a particular time period as good, safe and prudent engineering practices in connection with the operation, maintenance, repair and use of gas turbines, electrical generators and other equipment and facilities with commensurate standards of safety, performance, dependability, efficiency and economy, and consistent with applicable Laws and Regulations. Prudent Industry Practices are not intended to be limited to the optimum practice or method to the exclusion of others, but rather to be a spectrum of possible but reasonable practices and methods generally accepted in the North American electric utility industry during the relevant time period in light of the circumstances.

*"PUCT"* means the Public Utility Commission of Texas.

*"Pump Payments"* has the meaning set forth in Section 7.17.

*"Purchase Price Allocation"* has the meaning set forth in Section 3.4.

*"QF"* has the meaning set forth in Section 5.17.

*"QSE"* means a qualified scheduling entity qualified by ERCOT in accordance with ERCOT Protocol Section 16, Registration and Qualification of Market Participants, to submit Balanced Schedules and Ancillary Services bids and settle payments with ERCOT.

***"Real Estate Leases"*** has the meaning set forth in Section 2.1(a).

***"Real Property"*** has the meaning set forth in Section 2.1(b).

***"Related Person"*** means, with respect to any Person, all past, present and future directors, officers, members, managers, stockholders, employees, controlling persons, agents, professionals, attorneys, accountants, investment bankers, Affiliates or representatives of any such Person.

***"Release"*** means any release, spill, leak, discharge, abandonment, disposal, pumping, pouring, emitting, emptying, injecting, leaching, dumping, depositing, dispersing, allowing to escape or migrate into or through the environment (including ambient air, surface water, ground water, land surface and subsurface strata or within any building, structure, facility or fixture) of any Hazardous Substance, including the abandonment or discarding of Hazardous Substances in barrels, drums, or other containers.

***"Reliant Energy"*** has the meaning set forth in Section 2.2(d).

***"Reliant Marks"*** has the meaning set forth in Section 2.2(m).

***"Representatives"*** means officers, directors, employees, counsel, accountants, financial advisers or consultants of either Sellers or Buyer, as applicable.

***"RES"*** means Reliant Energy Services, Inc.

***"RES Agreements"*** has the meaning set forth in Section 4.2(i).

***"RES Assignment and Assumption Agreement"*** has the meaning set forth in Section 4.2(i).

***"RES Fuel Purchase Transactions"*** shall mean those fuel purchase transactions listed on Schedule 2 of the Fuel and Power Transition Services Agreement or entered into after the date hereof in accordance with such Schedule 2.

***"RES"*** has the meaning set forth in the Recitals to this Agreement.

***"Retained Books and Records"*** means: (i) all corporate seals, minute books, charter documents, corporate stock record books, original tax and financial records and such other files, books and records to the extent that any of the foregoing relates primarily to any of the Excluded Assets or Excluded Liabilities or the organization, existence, capitalization or debt financing of a Seller or of any Affiliate of a Seller; (ii) all books, files and records that would otherwise constitute a Business Record but for the fact that disclosure of books, files or records could (v)

disclose information related to a Seller or any of its Affiliates concerning public utility regulatory matters, including matters before ERCOT, the FERC, or other similar bodies, (w) violate any legal constraints or obligations regarding the confidentiality thereof, provided that such Seller shall use its commercially reasonable efforts to obtain a waiver of any such confidentiality restrictions in order to permit such disclosure, (x) waive any attorney client, work product or like privilege, (y) disclose information about such Seller or any of its Affiliates that is unrelated to the Channelview Facility or the Business or (z) disclose information about such Seller or any of its Affiliates pertaining to energy or project evaluation, energy or natural gas price curves or projections or other economic predictive models; or (iii) all books and records prepared in connection with or relating in any way to the transactions contemplated by this Agreement, including bids received from other parties and analyses relating in any way to the Acquired Assets or the Assumed Liabilities.

"*Rule*" or "*Rules*" means the Federal Rules of Bankruptcy Procedure.

"*Sale Order*" means an order: (i) (x) in substantially the form of Exhibit E hereto, or (y) in such other form which is in form and substance reasonably acceptable to Sellers and Buyer approving this Agreement and all of the terms and conditions hereof, and approving and authorizing Sellers to consummate the transactions contemplated hereby. Without limiting the generality of the foregoing, such order shall find and provide, among other things, that (a) other than Permitted Exceptions, the Acquired Assets sold to Buyer pursuant to this Agreement shall be transferred to Buyer free and clear of all Liens and liabilities of any Person, such Liens and liabilities to attach to the Purchase Price, (b) Buyer has acted in good faith within the meaning of Section 363(m) of the Bankruptcy Code, and, as such, is entitled to the protections afforded thereby, (c) this Agreement was negotiated, proposed and entered into by the parties without collusion, in good faith and from arm's length bargaining positions, (d) Buyer is not acquiring or assuming any of Sellers' or any other Person's liabilities except as expressly provided in this Agreement, (e) all Assigned Contracts shall be assumed by Sellers and assigned to Buyer pursuant to Section 365 of the Bankruptcy Code, (f) the Bankruptcy Court shall retain jurisdiction to resolve any controversy or claim arising out of or relating to this Agreement, or the breach hereof as provided in Section 8.1 hereof during the pendency of the Chapter 11 Cases, (g) this Agreement and the transactions and instruments contemplated hereby shall be specifically enforceable against and binding upon, and not subject to rejection or avoidance by, each Seller or any trustee of a Seller and its applicable estate, (h) is it not a principal purpose of any Person entering into this Agreement or any transactions contemplated by this Agreement to evade liability to which such Person would be subject under Subtitle D of Title IV of ERISA, and (i) the provisions thereof are non-severable and mutually dependent; and (ii) that does not require the assignment and assumption of the Cash Flow Participation Agreement, dated as of December 15, 1999, by and between Channelview LP and Equistar.

"*Schedule Update*" has the meaning set forth in Section 7.14.

"*Seller Affiliate Plan*" means each Benefit Plan that is sponsored, administered, maintained or contributed to as of the date of this Agreement by any Affiliate of either Seller and which Benefit Plan provides benefits with respect to employees of the Operator who are employed at the Channelview Facility.

11

"*Seller Affiliate Savings Plans*" means the Reliant Energy, Inc. Savings Plan and the Reliant Energy, Inc. Union Savings Plan.

"*Seller Indemnified Group*" means each Seller and such Seller's Affiliates and their respective officers, directors, employees and agents.

"*Sellers*" has the meaning set forth in the Recitals to this Agreement.

"*Sellers' Governmental Approvals*" has the meaning set forth in Section 5.2(c).

"*Sellers' Post-Closing Estimate*" has the meaning set forth in Section 3.3(a).

"*Settlement Agreement*" means that certain Settlement Agreement, dated as of July 10th, 2007, by and between Channelview LP, RESC, and Equistar.

"*Severance Plan*" means the Reliant Energy, Inc. 2003 Involuntary Severance Benefits Plan for Employees With Annual Base Pay Less Than $150,000 As Amended and Restated Effective June 1, 2004.

"*Standard & Poor's*" means Standard & Poor's Ratings Group (a division of McGraw Hill, Inc.), and its successors.

"*Straddle Period*" has the meaning set forth in Section 7.7(b).

"*Supplier Contracts*" has the meaning set forth in Section 2.1(d).

"*Support Obligations*" has the meaning set forth in Section 7.4(a).

"*Tax*" or "*Taxes*" means any federal, state, local, or foreign income, profits, franchise, withholding, ad valorem, personal property (tangible and intangible), employment, payroll, sales and use, social security (or similar), disability, occupation, real property, severance, excise, gross receipts, utility, severance, license, transfer, stamp, premium, windfall profits, environmental (including taxes under Code § 59A), customs duties, capital stock unemployment, registration, utility, production, value added, alternative or add-on minimum, estimated, and other taxes imposed by a Taxing Authority of any kind whatsoever whether computed on a separate or consolidated, unitary or combined basis or in any other manner, including any interest, penalty or addition thereto, whether disputed or not.

"*Tax Proceeding*" has the meaning set forth in Section 7.7(e).

"*Tax Returns*" means any and all returns, reports, statements, information returns or other similar filings filed or required to be filed with respect to any Taxes, including any supporting information, schedules, attachments or amendments thereof.

"*Taxing Authority*" means, with respect to any Tax, the Governmental Authority or political subdivision thereof that administers such Tax, and the agency (if any) charged with the collection of such Tax for such entity or subdivision.

*"Termination Date"* has the meaning set forth in Section 10.1.

*"Texas Regional Entity"* means the Texas Regional Entity, a Division of ERCOT.

*"Third-Party Claim"* has the meaning set forth in Section 11.5.

*"Transfer Taxes"* means all transfer, Real Property transfer, goods and services, value added, recordation, documentary, stamp, duty, excise and conveyance Taxes and other similar Taxes, duties, fees or charges, as levied by any Taxing Authority in connection with the transactions contemplated by this Agreement, provided, however, that for the avoidance of doubt, the term Transfer Taxes shall not include any income Taxes based on or measured by net income, including the Texas franchise or margins tax.

*"Transition Services Agreements"* means the Administrative Services Transition Services Agreement and the Fuel and Power Transition Services Agreement.

*"Union"* has the meaning set forth in Section 7.9(c).

*"WARN Act"* means the Worker Adjustment and Retraining Notification Act of 1988, as amended and any similar foreign, state or local law, regulation or ordinance.

*"Welfare Benefits"* has the meaning set forth in Section 7.9(h).

1.2     Construction.

(a)     All Article, Section, Subsection, Schedule and Exhibit references used in this Agreement are to Articles, Sections, Subsections, Schedules and Exhibits to this Agreement unless otherwise specified. The Exhibits and Schedules attached to this Agreement constitute a part of this Agreement and are incorporated herein for all purposes.

(b)     If a term is defined as one part of speech (such as a noun), it shall have a corresponding meaning when used as another part of speech (such as a verb). Unless the context of this Agreement clearly requires otherwise, words importing the masculine gender shall include the feminine and neutral genders and vice versa. The words "includes" or "including" shall mean "includes without limitation" or "including without limitation," the words "hereof," "hereby," "herein," "hereunder" and similar terms in this Agreement shall refer to this Agreement as a whole and not any particular Section or Article in which such words appear and any reference to a Law shall include any amendment thereof or any successor thereto and any rules and regulations promulgated thereunder. Currency amounts referenced herein are in U.S. Dollars.

(c)     Time is of the essence in this Agreement. Whenever this Agreement refers to a number of days, such number shall refer to calendar days unless Business Days are specified. Whenever any action must be taken hereunder on or by a day that is not a Business Day, then such action may be validly taken on or by the next day that is a Business Day.

(d)     Sellers may, at their option, include in the Schedules items that are not material, and any such inclusion, or any references to dollar amounts, shall not be deemed to be

an acknowledgment or representation that such items are material or would be reasonably expected to cause a Material Adverse Effect, to establish any standard of materiality or to define further the meaning of such terms for purposes of this Agreement. Information disclosed in each Schedule of the Sellers' Disclosure Schedules shall be deemed to be disclosed in each other Schedule therein, if it is disclosed in such a way as to make reasonably apparent its relevance or applicability to another Section of this Agreement or any other Schedule (or subparts thereof) in order to avoid a misrepresentation hereunder.

(e)    Each Party acknowledges that it and its attorneys have been given an equal opportunity to negotiate the terms and conditions of this Agreement and that any rule of construction to the effect that ambiguities are to be resolved against the drafting Party or any similar rule operating against the drafter of an agreement shall not be applicable to the construction or interpretation of this Agreement.

## ARTICLE 2

## PURCHASE AND SALE OF THE ACQUIRED ASSETS

2.1    <u>Transfer of Acquired Assets.</u> At the Closing, and upon the terms and conditions herein set forth, each Seller (as applicable) shall sell to Buyer (or Buyer's designee, in the case of the Energy Supply Agreement), and Buyer (or Buyer's designee, in the case of the Energy Supply Agreement) shall acquire from Sellers, all of each Seller's right, title and interest in, to and under the Acquired Assets free and clear of Liens, claims and other interests (except for Permitted Exceptions) pursuant to sections 105, 363 and 365 of the Bankruptcy Code. *"Acquired Assets"* shall mean all of each Seller's right, title and interest in, to and under all property (tangible or intangible), rights, goodwill, claims and assets to the extent relating to or used in or held for use in connection with the Business (except for the Excluded Assets) as the same exist on the Closing Date including:

(a)    subject to the receipt of any necessary consents or approvals, all of Sellers' rights under the leases of real property (the *"Real Estate Leases"*), listed on <u>Schedule 2.1(a)</u> of the disclosure schedules accompanying this Agreement (the *"Disclosure Schedules"*) and the real property leased by Channelview LP pursuant to the Real Estate Leases, together with any improvements and fixtures owned by Channelview LP erected on the real property subject to the Real Estate Leases (the *"Leased Real Property"*);

(b)    subject to the receipt of any necessary consents or approvals, all of Sellers' rights under the easements, rights of way, real property licenses, and other real property entitlements used in the Business or listed on <u>Schedule 2.1(b)</u> (the *"Entitled Real Property"* and, together with the Leased Real Property, the *"Real Property"*);

(c)    all of (i) Sellers' owned and leased equipment, spare parts, machinery, furniture, materials, supplies, fixtures, and other personal property used in the Business, and in connection with Channelview LP, located on the Real Property or listed on <u>Schedule 2.1(c)</u> (the *"Equipment"*); and (ii) any rights of Sellers to the warranties and licenses received from third parties with respect to the Equipment;

(d)    subject to the receipt of any necessary consents or approvals, all of Sellers' rights under outstanding purchase orders or other similar Contracts used exclusively in the Business entered into by Channelview LP with any supplier that are listed on Schedule 2.1(d) of the Disclosure Schedules (*"Supplier Contracts"*);

(e)    subject to the receipt of any necessary consents or approvals, all of Sellers' rights under the Contracts that are listed on Schedule 2.1(e) of the Disclosure Schedules (the *"Other Contracts"* and, together with the Real Estate Leases, the Entitled Real Property constituting Contracts, and the Supplier Contracts, the *"Assigned Contracts"*);

(f)    all (i) inventories of fuel, chemicals and gas wherever located (including in transit to the Channelview Facility) and owned by Channelview LP on the Closing Date, or listed on Schedule 2.1(f) (the *"Inventory"*), and (ii) any rights of Channelview LP to the warranties received from third parties with respect to such Inventory;

(g)    any Intellectual Property, including any computer software or systems (i) located at the Real Property, the offices of RESC or listed on Schedule 2.1 (g) and (ii) owned exclusively by either Seller and licenses held exclusively by either Seller, to the extent transferable, in each case that pertain solely to the Business;

(h)    to the extent transferable under applicable Law, all rights of either Seller under the Permits relating exclusively to the Business including those listed on Schedule 2.1(h);

(i)    copies of all Business Records (including those listed on Schedule 2.1(i) to the extent they apply to the Acquired Assets) and the right to receive mail and other communications addressed to the Sellers that pertain to the Channelview Facility or the Business;

(j)    all accounts, rights or allowances involving Emissions Allowances, and all rights to any future Emission Allowances, if any, that will be granted or allocated with respect to the Channelview Facility (other than those Emission Allowances expended in the ordinary course of operation of the Channelview Facility prior to the Closing);

(k)    subject to Section 2.2(o), all claims, causes of action, choses in action, rights of set-off of any kind, rights of recovery, whether known or unknown, in favor of any of the Sellers, and pertaining to, arising out of or relating to, the Acquired Assets or offsetting any Assumed Liabilities, but excluding any of the same relating to any Affiliate of the Sellers, or relating to any matter covered by the Settlement Agreement; and

(l)    all of Channelview LP's right, title and interest in the Channelview Facility.

2.2    Excluded Assets.  Notwithstanding anything to the contrary in this Agreement, the Acquired Assets do not include the following (collectively, the *"Excluded Assets"*):

(a)    any right, title or interest of any Person other than a Seller in any property or asset;

15

(b)     all of Sellers' cash and cash equivalents, marketable securities, prepaid expenses, advance payments, surety accounts, deposits and other similar prepaid items (including for the purchase of natural gas), checks in transit and undeposited checks to the extent attributable to the period prior to the Closing Date;

(c)     all of Sellers' accounts and notes receivable to the extent attributable to the period prior to 11:59 pm on the day prior to the Closing Date (the *"Accounts Receivable"*);

(d)     other than assets, property, and other rights specifically identified in any Schedule referenced in <u>Section 2.1</u> above, any assets, property and other rights held or owned by Reliant Energy, Inc. (*"Reliant Energy"*) or its Affiliates to the extent not used in the operation of the Business;

(e)     financial information or financial statements and proprietary manuals (except rights to use manuals specific to and necessary for the operation of the Business) prepared by or used by either Seller or their Affiliates to the extent not relating exclusively to the Business;

(f)     all of Sellers' rights under Contracts that are not Assigned Contracts;

(g)     all rights to Claims, refunds or adjustments with respect to Excluded Assets, relating to any proceeding before any Governmental Authority relating to the period prior to the Closing, and all rights to insurance proceeds or other insurance recoveries: (i) that are reimbursement for, either Seller's or such Seller's Affiliate's expenditures made prior to the Closing Date for which insurance proceeds are available or due to a Seller or such Affiliates or (ii) to the extent relating to Excluded Assets or Excluded Liabilities;

(h)     any asset of a Seller that would constitute an Acquired Asset (if owned by such Seller on the Closing Date) that is conveyed or otherwise disposed of during the period from the date hereof until the Closing Date either:  (i) in the ordinary course of business of the Sellers, (ii) at the direction of the Bankruptcy Court or (iii) as otherwise permitted by the terms of this Agreement;

(i)     all losses, loss carry forwards and rights to receive refunds, credits and loss carry forwards with respect to any and all Taxes of Sellers incurred or accrued on or prior to the Closing Date, including interest receivable with respect thereto;

(j)     any and all rights, demands, claims, credits, allowances, rebates, causes of action, known or unknown, pending or threatened (including all causes of action arising under sections 510, 544 through 551 and 553 of the Bankruptcy Code or under similar state Laws, including fraudulent conveyance claims, and all other causes of action of a trustee and debtor-in-possession under the Bankruptcy Code) or rights of set-off (collectively, *"Claims"*), of a Seller or any Affiliate of a Seller: (i) in respect of the Excluded Assets or the Excluded Liabilities, or (ii) arising out of or relating in any way to the Chapter 11 Cases or any of the transactions contemplated thereby or entered into as a consequence thereof; including any claims (as defined in Section 101(5) of the Bankruptcy Code) filed, scheduled or otherwise arising in the Chapter 11 Cases;

16

(k)    all shares of capital stock or other equity interests of either Seller and all Affiliates of Sellers;

(l)    all rights of either Seller arising under this Agreement and under any other agreement between either Seller and Buyer entered into in connection with this Agreement;

(m)    all rights to or goodwill represented by or pertaining to all names, marks, trade names, trademarks and service marks incorporating the name Reliant Energy or any other name set forth on Schedule 2.2(m) (the *"Reliant Marks"*) and any brand names or derivatives thereof no matter how used, whether as a corporate name, domain name or otherwise and including the corporate design logo associated with any Reliant Mark or variant of any Reliant Mark;

(n)    all Retained Books and Records; provided, however, that Seller will grant Buyer reasonable access to all such Retained Books and Records under clause (i) of the definition thereof, but excluding Retained Books and Records which fall under clauses (ii) or (iii) of such definition, necessary to operate the Channelview Facility in the ordinary course and consistent with past practices, and subject to execution of a customary confidentiality undertaking;

(o)    all rights and Claims of a Seller against any Affiliate of such Seller relating to the Assigned Contracts that arose prior to the Closing Date; and

(p)    any assets set forth on Schedule 2.2(p) of the Disclosure Schedules.

2.3    Assumption of Liabilities.  At the Closing, Buyer shall assume, and Buyer shall thereafter pay, perform and discharge when due, the following liabilities and obligations (collectively, the *"Assumed Liabilities"*):

(a)    all liabilities and obligations of Sellers under the Assigned Contracts, other than Excluded Liabilities;

(b)    all liabilities and obligations of Sellers under the Permits;

(c)    to the extent provided in Section 7.7(a), Transfer Taxes;

(d)    all liabilities and obligations of Sellers, any of their Affiliates or any of their respective Related Persons arising under or relating to any environmental matter (including any liability or obligation arising under any Environmental Law) relating to the Acquired Assets;

(e)    any liability for any Taxes attributable to the Acquired Assets to the extent arising or accruing (on a pro rata daily basis in the case of Taxes other than income Taxes) with respect to a period (or any portion thereof) beginning, or events occurring, after the Closing Date; and

(f)    all other liabilities and obligations relating to or arising from the operation of the Business or the ownership of the Acquired Assets (other than the Excluded Liabilities), but for purposes of clarity, excluding liabilities or obligations under the Credit Agreement, and any

other Contract (written or oral) which is not an Assigned Contract, including those obligations of Sellers associated with that certain Channel Area Industrial District Agreement between Lyondell Petrochemical Company and the City of Houston, dated as of June 17, 1997.

Notwithstanding the foregoing, Assumed Liabilities does not include any liabilities or obligations for which Buyer is entitled to indemnity pursuant to this Agreement.

2.4     Excluded Liabilities.  Buyer is assuming only the Assumed Liabilities, and all liabilities of Sellers not expressly assumed by Buyer pursuant to Section 2.3, whether or not incurred or accrued, whether asserted before, on or after the Closing Date, shall be assumed or retained, as the case may be, by Sellers, who shall be responsible for paying, performing and discharging such liabilities and Buyer shall not have any responsibility for such liabilities (such liabilities are hereinafter referred to as the *"Excluded Liabilities"*), including: (i) all Cure Costs; (ii) all liabilities and obligations with respect to accounts payable accrued under Assigned Contracts as of 11:59 pm on the day prior to the Closing Date (the *"Accounts Payable"*); (iii) liabilities to the extent arising in connection with Excluded Assets; (iv) any liability for any Taxes attributable to the Acquired Assets to the extent arising or accruing (on a pro rata daily basis in the case of Taxes other than income Taxes) with respect to a period (or any portion thereof) ending on or before the Closing Date, and any other liability for any Taxes attributable to Sellers (except such Taxes described in Section 2.3(e)); (v) liabilities with respect to Benefit Plans (including Seller Affiliate Plans); (vi) all liabilities and obligations of Sellers or any Affiliate thereof representing indebtedness for money borrowed (or any refinancing thereof); (vii) liabilities with respect to loans made by and, other than with respect to transactions under the Transition Services Agreements, accounts payable arising from transactions with Affiliates; (viii) any liability of any of the Sellers for (a) transaction fees and expenses and fees and expenses payable to lenders, brokers, financial advisors, legal counsel, accountants and other professionals, and (b) except as provided otherwise in Section 7.7(a), Transfer Taxes; (ix) those listed on Schedule 2.4 of the Disclosure Schedules; (x) all liabilities arising out of any exchange act or securities liability; (xi) all costs and expenses associated with the Chapter 11 Cases; (xii) all liability for any claims discharged pursuant to the Chapter 11 Cases or for claims against either of the Sellers which are filed after the bar date or disallowed by the Bankruptcy Court; (xiii) all liability for any rejection damages claim filed in the Chapter 11 Cases; and (xiv) all interests and liabilities that have not been otherwise assumed pursuant to this Agreement, to the extent that applicable law permits this sale under Section 363 of the Bankruptcy Code to be free and clear of such interests and liabilities.

2.5     Non-Assignment of Assigned Contracts.  Anything contained herein to the contrary notwithstanding, (i) this Agreement shall not constitute an agreement to assign any Assigned Contracts if, after giving effect to the provisions of Sections 363 and 365 of the Bankruptcy Code, an attempted assignment thereof, without obtaining a Consent, would constitute a breach thereof or in any way negatively affect the rights of Sellers or Buyer, as the assignee of such Assigned Contracts and (ii) unless Sellers have otherwise violated the provisions of this Section 2.5, no breach of this Agreement or failure of a closing condition shall have occurred by virtue of such nonassignment.  Sellers shall use commercially reasonable efforts to obtain the consent of the counterparties to each Assigned Contract, to the extent that after giving effect to the provisions of Sections 363 and 365 of the Bankruptcy Code, such Consent is required; provided, that nothing in this Section 2.5 shall (x) require Sellers to make

any significant expenditure or incur any significant obligation on its own or on Buyer's behalf or (y) prohibit Sellers from ceasing operations or winding up its affairs following the Closing. Any assignment to Buyer of any Assigned Contracts that shall, after giving effect to the provisions of Sections 363 and 365 of the Bankruptcy Code, require the Consent of any third party for such assignment as aforesaid shall be made subject to such Consent being obtained. Without limiting the foregoing, the Parties agree that, if any required consent to the assignment or release of RES' obligations under the Fuel Purchase and Sale Agreement is not timely obtained prior to the Closing Date or the date of termination of Gas Services under the Fuel and Power Transition Services agreement, as applicable, Buyer and Buyer's Energy Manager will enter into an agreement (the *"Fuel Supply Agreement"*) in form and substance reasonably acceptable to the Parties, in relation to the Fuel Purchase and Sale Agreement, pursuant to which (i) RES shall consult with Buyer (or Buyer's Energy Manager) with respect to transactions occurring under the Fuel Purchase and Sale Agreement and keep Buyer and Buyer's Energy Manager advised of all transactions thereunder, and not take any material discretionary action thereunder without Buyer or Buyer's Energy Manager's consent, not to be unreasonably withheld; (ii) RES shall not modify, amend or terminate the Fuel Purchase and Sale Agreement without Buyer's consent, which consent shall not be unreasonably withheld or delayed; (iii) RES shall continue to perform and act such that the gas sold to RES under such agreement shall be resold to the Buyer through the Buyer's Energy Manager; (iv) RES shall agree that Buyer's Energy Manager may be replaced from time to time in Buyer's sole discretion with a new Energy Manager, and (v) RES shall use commercially reasonable efforts to obtain the execution and delivery by Equistar of the RES Assignment and Assumption Agreement. The Parties agree further that if RES continues to be directly obligated to purchase gas from Equistar under the Fuel Purchase and Sale Agreement after the Closing Date or the date of termination of Gas Services under the Fuel and Power Transition Services Agreement, as applicable, Buyer's Energy Manager shall, pursuant to the Fuel Supply Agreement, accept and purchase from RES all such gas accepted and purchased by RES from Equistar. The price for such gas shall be equal to the price paid for such gas by RES, and the terms and conditions of Buyer's Energy Manager's purchase of such gas shall be substantially identical to the terms and conditions on which RES purchased such gas from Equistar, and, in turn, such gas shall be resold to the Buyer on such terms and conditions. The Fuel Supply Agreement shall require RES to indemnify, defend and hold Buyer (and Buyer's Energy Manager) harmless from and against any and all claims, losses, damages, liabilities, suits, payments, costs and expenses, including reasonable attorneys' fees and costs of investigation arising out of (i) the performance or breach of the Fuel Purchase and Sale Agreement by RES except to the extent that a liability arises out of the breach by Buyer or Buyer's Energy Manager of the Fuel Supply Agreement, and (ii) any breach or alleged breach of the Fuel Purchase and Sale Agreement as a result of the Fuel Supply Agreement (except to the extent that a liability arises out of the breach by Buyer or Buyer's Energy Manager of the Fuel Supply Agreement). Buyer shall indemnify defend and hold RES harmless from and against any and all claims, losses, damages, liabilities, suits, payments, costs and expenses, including attorneys' fees and costs of investigation arising out of Buyer's (or Buyer's Energy Manager's) breach of the Fuel Supply Agreement. Notwithstanding anything in this Section 2.5 to the contrary in using commercially reasonable efforts to obtain any consent described above, RES shall not be obligated to commence litigation or expend any sums of money to obtain such consent.

## ARTICLE 3

## CONSIDERATION

3.1    <u>Purchase Price</u>.  The purchase price to be paid by Buyer to Sellers for the Acquired Assets is equal to:

(a)    Five Hundred Million Dollars ($500,000,000) (the *"Base Purchase Price"*), plus

(b)    the amount of Capital Expenditures paid by the Sellers for work done during the period beginning on February 25, 2008 and ending on the Closing Date, subject to and in accordance with the budget for which is provided on <u>Exhibit F</u> hereto, plus or minus (as applicable)

(c)    the amount of the LTMA Adjustment calculated in accordance with Item 6 on <u>Schedule 2.4</u>.

3.2    <u>Deposit</u>.  Buyer has deposited with the Escrow Agent cash in the amount of Forty Million Dollars ($40,000,000).  Buyer shall have the option to substitute for such cash deposit a letter of credit in the amount of Forty Million Five Hundred Fifty Thousand Dollars ($40,550,000) in a form reasonably acceptable to Sellers, naming the Sellers as beneficiary (and held by Sellers with draws being deposited with the Escrow Agent) (such cash deposit or letter of credit, the *"Deposit"*).  The Deposit shall be held and disbursed pursuant to the terms of the Escrow Agreement and this Agreement.  The Parties shall use commercially reasonable efforts to cause the execution and delivery of the Escrow Agreement as soon as possible after the date hereof.

3.3    <u>Post-Closing Adjustment</u>.

(a)    As soon as practicable after the Closing, but no later than 90 days after the Closing Date, Sellers shall determine the actual adjustment to the Base Purchase Price pursuant to <u>Section 3.1</u> as of the Closing Date.  Sellers and Buyer shall cooperate and provide each other access to their respective books and records and those of Channelview LP as are reasonably requested in connection with the matters addressed in this <u>Section 3.3</u>.  Sellers shall provide Buyer with written notice of such determinations within such 90 days, along with reasonable supporting information (the *"Sellers' Post-Closing Estimate"*).

(b)    If Buyer objects to any determinations set forth in Sellers' Post-Closing Estimate, then it shall provide Sellers written notice thereof within 20 Business Days after receiving Sellers' Post-Closing Estimate.  Such notice shall specify in reasonable detail Buyer's objections to specific determinations, along with reasonable supporting documentation.  Any objections not so specified shall be deemed waived, and Sellers' determinations to which specific objections were not so made shall prevail.  If the Parties are unable to agree on the disputed amounts as of the Closing Date within 120 days after the Closing Date or such longer time as may be agreed by the Parties, the Parties shall refer such dispute to an internationally recognized accounting firm that is not the principal accounting firm of Buyer or either Seller, mutually acceptable to Buyer and Sellers, which firm shall make a final and binding determination as to

all such matters in dispute (and only such matters) on a timely basis (and such accounting firm shall be instructed to make such determination within 45 days of such engagement or as soon thereafter as reasonably practicable) and promptly shall notify the Parties in writing of its resolution. Such firm shall not have the power to modify or amend any term or provision of this Agreement. The fees and disbursements of the accounting firm shall be allocated between Buyer and Sellers in inverse proportion as they shall prevail on the amounts of such disputed items so submitted (as finally determined by such accounting firm).

(c)    If the Base Purchase Price adjusted using such actual values (as agreed or determined by the above-referenced accounting firm) (the **"Final Purchase Price"**) is greater than the Estimated Purchase Price, then Buyer shall pay Sellers within 10 Business Days after such actual values are agreed or determined, by wire transfer of immediately available funds, the difference between the Final Purchase Price and the Estimated Purchase Price plus interest thereon at the Interest Rate from the Closing Date through and including the date of such payment. If the Final Purchase Price is less than the Estimated Purchase Price, then Sellers shall pay Buyer within 10 Business Days after such actual values are agreed or determined, by wire transfer of immediately available funds, the difference between the Estimated Purchase Price and the Final Purchase Price plus interest thereon at the Interest Rate from the Closing Date through and including the date of such payment. In each case, the recipient Party shall designate the account to which such payment is to be made at least two Business Days prior to the date such payment is due.

3.4    Allocation of Purchase Price. Within thirty (30) days after the determination of the Final Purchase Price, Sellers and Buyer shall agree upon an allocation of the purchase price (as determined in accordance with US federal income tax principles) among the Acquired Assets in accordance with Section 1060 of the Code and the Treasury Regulations promulgated thereunder (the **"Purchase Price Allocation"**); provided that the purchase price shall not be increased by or otherwise reflect the obligations under any of the Assigned Contracts. Buyer and Sellers shall work in good faith to resolve any disagreements regarding the Purchase Price Allocation. If the Parties fail to agree within such 30-day period upon Purchase Price Allocation, such dispute shall be resolved by an independent accounting firm mutually acceptable to Buyer and Sellers, and the decision of such independent accounting firm shall be final and binding on the Parties. Sellers together shall bear and pay one-half of such fees and other costs charged by such accounting firm and Buyer shall bear and pay one-half of such fees and other costs. Sellers and Buyer shall each prepare and timely file IRS Form 8594 "Asset Acquisition Statement Under Section 1060" and any other similar statements or forms as are prescribed under federal, state, local or foreign Tax Law (including any exhibits thereto) to report the Purchase Price Allocation. The Parties agree that they shall not, and shall not permit their Affiliates to take a position on any Tax Return or for any Tax purpose that is inconsistent with the Purchase Price Allocation unless otherwise required by applicable laws; provided, however, that neither Sellers nor Buyer shall be obligated to litigate any challenge to the Purchase Price Allocation by any Governmental Authority. The Parties agree to provide, and shall cause their Affiliates to provide, each other promptly with any information required to complete such Tax forms or statements as are required under applicable law to report the Purchase Price Allocation.

3.5    Equistar Payment. In accordance with the Settlement Agreement and provided the Settlement Agreement is then still in effect, Channelview LP agrees to apply $10,000,000 of

its portion of the Purchase Price payable at Closing either to (in Channelview LP's discretion): (i) Equistar pursuant to paragraphs 2 and 6 of the Settlement Agreement, or (ii) into the escrow account contemplated by paragraph 6 of the Settlement Agreement.

<div align="center">

**ARTICLE 4**

**CLOSING AND DELIVERIES**

</div>

4.1   Closing.  Subject to satisfaction or waiver of the conditions to the Closing set forth herein, unless the Parties mutually agree otherwise in writing, the closing of the transactions contemplated by this Agreement (the *"Closing"*) shall take place at the offices of Reliant Energy, Inc., 1000 Main Street, 21st Floor, Houston, Texas 77002 at 10:00 A.M. local time, on the second Business Day after the conditions to the Closing set forth in ARTICLE 9 (other than actions to be taken or items to be delivered at the Closing) have been satisfied or waived by the applicable Party or Parties or such other date and at such other time and place as may be mutually agreed to in writing (the *"Closing Date"*); provided, that notwithstanding any provision herein to the contrary, the Closing Date shall not occur prior to the later of (a) thirty (30) days following the date of entry of the Sale Order and (b) forty (40) days following the Execution Date. All actions listed in Section 4.2 and Section 4.3 that occur on the Closing Date shall be deemed to occur simultaneously at the Closing.

4.2   Closing Deliveries by Sellers to Buyer.  At the Closing, the appropriate Seller shall deliver, or shall cause to be delivered, as applicable, to Buyer the following:

(a)   subject to the receipt of the applicable Company Consents and Sellers' Governmental Approvals, a bill of sale with respect to the Acquired Assets, duly executed by the appropriate Seller and substantially in the form of Exhibit A hereto;

(b)   subject to the receipt of the applicable Company Consents and Sellers' Governmental Approvals, one or more assignment and assumption agreements (the *"Assumption Agreements"*), in the form attached as Exhibit B hereto, duly executed by the appropriate Seller or Related Person with respect to the Assigned Contracts and Assumed Liabilities;

(c)   subject to the receipt of the applicable Company Consents and Sellers' Governmental Approvals, assignments of the Real Estate Leases and all Entitled Real Property interests held by Channelview LP, in the form attached as Exhibit C hereto, including, without limitation, all such interests set forth on Schedules 2.1(a) and 2.1(b), each duly executed by Channelview LP and in recordable form;

(d)   the Business Records (either at Closing or as soon as practicable thereafter);

(e)   (i) an executed copy of the Administrative Services Transition Services Agreement (to the extent Buyer notifies Sellers at least ten (10) days prior to the Closing Date that it intends to enter into the Administrative Services Transition Services Agreement), and (ii) subject to Section 4.4, an executed copy of the Fuel and Power Transition Services Agreement.

<div align="center">22</div>

(f)    a duly executed affidavit of non-foreign status that complies with Section 1445 of the Code;

(g)    duly executed certificates referenced in Section 9.2(c);

(h)    a copy of the Sale Order that has been entered on the docket by the clerk of the Bankruptcy Court;

(i)    unless Buyer has elected Gas Services under the Fuel and Power Transition Services Agreement (which services would include the sale of gas purchased by RES under the Fuel Purchase and Sale Agreement), either (i) an assignment and assumption agreement executed by RES (the *"RES Assignment and Assumption Agreement"*), in substantially the form attached as Exhibit D hereto, assigning to Buyer's designee the agreements which RES is a party as set forth in Schedule 4.2(i) hereto (the *"RES Agreements"*), or (ii) if required by Section 2.5, the Fuel Supply Agreement executed by RES; if Buyer has elected such Gas Services, then Sellers shall deliver the RES Assignment and Assumption Agreement or the Fuel Supply Agreement, as applicable, at the time such Gas Services terminate; and

(j)    a joint direction letter executed by Sellers instructing the Escrow Agent to (i) transfer $40,000,000 of the funds held in the Deposit Escrow Account (as defined in the Escrow Agreement) into the Indemnity Escrow Account (as defined in the Escrow Agreement) and (ii) to transfer all interest earned in the Deposit Escrow Account as directed by Sellers.

4.3    Closing Deliveries by Buyer.    At the Closing, Buyer shall deliver to Sellers the following:

(a)    a wire transfer of immediately available funds (to such accounts as Sellers shall have notified Buyer of at least two Business Days prior to the Closing Date) in an amount equal to the Base Purchase Price, reduced by the amount of the Deposit together with any interest earned thereon, as adjusted pursuant to Sections 3.1(b) and 3.1(c), as estimated in good faith by Sellers (the *"Estimated Purchase Price"*). Sellers shall deliver the Estimated Purchase Price in writing to Buyer at least two Business Days prior to the Closing Date and shall attach to the calculation of the Estimated Purchase Price a schedule showing the estimated adjustments to the Base Purchase Price pursuant to Sections 3.1(b) and 3.1(c);

(b)    an executed counterpart to the Assumption Agreements relating to the Assigned Contracts and Assumed Liabilities;

(c)    (i) an executed copy of the Administrative Services Transition Services Agreement (to the extent Buyer notifies Sellers at least ten (10) days prior to the Closing Date that it intends to enter into the Administrative Services Transition Services Agreement), and (ii) subject to Section 4.4, an executed copy of the Fuel and Power Transition Services Agreement;

(d)    Except to the extent that Buyer has delivered a letter of credit or guarantee pursuant to Section 7.4(b)(iv), a release of the LTMA Support Obligations (other than with respect to amounts owing prior to Closing) and unless Buyer has elected Gas Services under the Fuel and Power Transition Services Agreement either (i) RES Assignment and Assumption

23

Agreement executed by Buyer in substantially the form attached as <u>Exhibit D</u> hereto, assigning to Buyer's designee the RES Agreements, or (ii) if required by <u>Section 2.5</u>, the Fuel Supply Agreement executed by Buyer and Buyer's Energy Manager; if Buyer has elected such Gas Services, then Buyer shall deliver the RES Assignment and Assumption Agreement or the Fuel Supply Agreement, as applicable, at the time such Gas Services terminate;

> (e)    a joint direction letter executed by Buyer instructing the Escrow Agent to (i) transfer $40,000,000 of the funds held in the Deposit Escrow Account into the Indemnity Escrow Account and (ii) to transfer all interest earned in the Deposit Escrow Account as directed by Sellers; and

> (f)    a duly executed certificate as described in <u>Section 9.3(c)</u>.

    4.4    <u>RES Fuel Purchase Transactions</u>.  If Buyer does not intend to utilize RES' services under the Fuel and Power Transition Services Agreement, the Parties shall nonetheless enter into the Fuel and Power Transition Services Agreement with respect to the sale to Buyer of the fuel purchased by RES under the RES Fuel Purchase Transactions from and after the Closing Date in accordance with the terms and conditions of the Fuel and Power Transition Services Agreement (including without limitation under ARTICLE 6 thereto concerning the supplying of credit support) but without payment of the monthly fee set forth in Section 2.1 of the Fuel and Power Transition Services Agreement.  The Parties agree that no fees will be paid to Sellers except to the extent required under and pursuant to the terms of the Transition Services Agreements.  Notwithstanding the foregoing, if as of Closing or at anytime thereafter, the Parties are able to cause one or more of the RES Fuel Purchase Transactions to be novated directly to Buyer's Energy Manager, then such transactions shall be excluded from the Fuel and Power Transition Services Agreement.  Each of the Parties shall use commercially reasonable efforts to cause such novations to occur.  Each such novation shall include the acknowledgment of the counterparty under such RES Fuel Purchase Transaction that it will look solely to RES for the payments of amounts arising or accruing under such RES Fuel Purchase Transaction prior to the effective time of such novation.

<div align="center">

**ARTICLE 5**

**REPRESENTATIONS AND WARRANTIES
REGARDING THE ACQUIRED ASSETS**

</div>

    Each Seller hereby represents and warrants to Buyer, for itself, and with respect to the Acquired Assets owned by such Seller that:

    5.1    <u>Organization and Qualification; Authority</u>.  Each Seller is duly formed and existing under the laws of the State of Delaware.  Each Seller has the requisite power and authority to enter into this Agreement, to perform its obligations hereunder and to consummate the transactions contemplated hereby and to own, lease and operate its assets and properties and to carry on its business as it is now being conducted or as contemplated herein and in accordance with Sections 363, 1107 and 1108 of the Bankruptcy Code.  Each Seller is qualified to transact business and, where applicable, is in good standing in each jurisdiction in which the nature of the business conducted by it makes such qualification necessary, except in the jurisdictions where

<div align="center">24</div>

the failure to be so qualified or licensed would not, in the aggregate, be reasonably expected to have a Material Adverse Effect on such Seller's ability to perform its obligations hereunder. The execution and delivery by Sellers of this Agreement and the performance by each Seller of its respective obligations hereunder have been duly and validly authorized by all necessary limited partnership or limited liability company (as applicable) action on behalf of such Seller. This Agreement has been duly and validly executed and delivered by each Seller and constitutes the legal, valid and binding obligation of such Seller enforceable against such Seller in accordance with its terms except as the same may be limited by bankruptcy, insolvency, reorganization, arrangement, moratorium or other similar Laws relating to or affecting the rights of creditors generally or by general equitable principles.

5.2     No Conflicts; Consents and Approvals.   The execution and delivery by each Seller of this Agreement and each of the documents contemplated hereby does not, and the performance by such Seller of its obligations under this Agreement and each of the documents contemplated hereby and the consummation of the transactions contemplated hereby and thereby will not:

(a)     conflict with or result in a violation or breach of any of the terms, conditions or provisions of the Charter Documents of such Seller;

(b)     assuming the consents set forth on Schedule 5.2(b) (the *"Company Consents"*) have been obtained, require the consent of, notice to or approval of any Person under any Material Contract which is an Assigned Contract, be in violation of or result in a default (or give rise to any notice requirement or right of termination, cancellation or acceleration) under any Material Contract that is an Assigned Contracts except for any such violations or defaults (or rights of termination, cancellation or acceleration), as would not reasonably be expected to, individually or in the aggregate, result in a Material Adverse Effect;

(c)     assuming all required filings, approvals, consents, authorizations and notices set forth on Schedule 5.2(c) (collectively, the *"Sellers' Governmental Approvals"*) including the Sale Order have been made, obtained or given, (i) conflict with or result in a violation or breach of any term or provision of any Law or writ, judgment, order or decree applicable to Sellers or (ii) require the consent of notice to or approval of any Governmental Authority under any applicable Law, except in each case such conflicts, violations or breaches, or the failure to obtain such consents or approvals, which would not reasonably be expected to, individually or in the aggregate, have a Material Adverse Effect; and

(d)     result in the imposition or creation of a Lien upon or with respect to the Acquired Assets.

5.3     Subsidiaries.   Sellers have no subsidiaries and do not own equity interests in any Person.

5.4     Financial Statements.   Attached as Schedule 5.4 are copies of (i) the audited financial statements of Channelview LP for the years ended December 31, 2005 and December 31, 2006; and (ii) the unaudited balance sheet and statements of income and cash flow of Channelview LP as of and for the quarter ended September 30, 2007. The December 31, 2006

financial statements fairly present, in all material respects and in accordance with GAAP, the financial position and the results of operations, as the case may be, of Channelview LP as of the dates and for the periods indicated, except in the case of the interim financial statement for footnote disclosure and year-end audit adjustments.

5.5    Absence of Undisclosed Liabilities; Certain Developments.  Except as recorded in the September 30, 2007 Balance Sheet included in Schedule 5.4 (the "*Channelview September 30 Balance Sheet*") or the notes thereto or as disclosed on Schedule 5.5, and except such liabilities that do not and would not reasonably be expected to, individually or in the aggregate, have a Material Adverse Effect, to their Knowledge, neither Seller has aggregate liabilities that would be required to be recorded in a balance sheet prepared in accordance with GAAP, excluding (i) liabilities under Material Contracts, (ii) liabilities under this Agreement, (iii) liabilities incurred in the ordinary course of business since September 30, 2007, (iv) liabilities that will be repaid or extinguished on or prior to the Closing, or not assumed by Buyer pursuant to the terms hereof, (v) liabilities incurred after the date of this Agreement, in accordance with ARTICLE 8, and (vi) to the extent not otherwise included in (i) - (iii) and (v) above, administrative expenses in the Chapter 11 Cases.

5.6    Litigation.  Except as disclosed on Schedule 5.6, there is no litigation pending, or, to either Seller's Knowledge, threatened in writing against such Seller before any Governmental Authority or any arbitrator, except for litigation that would not reasonably be expected to, individually or in the aggregate, have a Material Adverse Effect Except as disclosed on Schedule 5.6, neither Seller is subject to any judgment, writ, decree, injunction, rule or order of any Governmental Authority (whether preliminary or final) that prohibits the consummation of the transactions contemplated by this Agreement or otherwise detracts from the value of, or interferes with the present use of, the Acquired Assets, other than, in each case, those that would not reasonably be expected to, individually or in the aggregate, have a Material Adverse Effect.

5.7    Compliance with Laws.  Except as disclosed on Schedule 5.7, neither Seller nor Reliant Energy Power Supply LLC, as registered with NERC and the Texas Regional Entity, as Generator Operator of the Channelview Facility (in such capacity the "*Generator Operator*"), is in violation of or has been given written notice of any current violation of any Law, except violations that would not reasonably be expected to, individually or in the aggregate, have a Material Adverse Effect.  Except as disclosed on Schedule 5.7, with respect to the Channelview Facility, to Sellers' Knowledge, no investigation, audit or review relating to Sellers, the Channelview Facility, the Generator Operator or any of the other Acquired Assets by any Governmental Authority is pending or threatened, other than, in each case, those that would not reasonably be expected to, individually or in the aggregate, have a Material Adverse Effect.  For the avoidance of doubt, the representation above, insofar as it relates to the Generator Operator, is only made with respect to any Law applicable to it in its capacity as Generator Operator.

5.8    Permits.  Each material Permit used with respect to the operation of the Channelview Facility and the conduct of the Business is set forth on Schedule 5.8(i).  Except as disclosed on Schedule 5.8(ii), neither Seller is in violation of the terms of any Permit used to conduct their respective businesses as currently conducted, except for violations which would not reasonably be expected to, individually or in the aggregate, have a Material Adverse Effect.

To Sellers' Knowledge, such Permits are in full force and effect, except as would not reasonably be expected to have a Material Adverse Effect.

5.9    Contracts.

(a)    Excluding Assigned Contracts, any Benefit Plans and any Contracts with respect to which Buyer will not be bound or have any liability after the Closing, Schedule 5.9(a) sets forth a list as of the date of this Agreement of the following Contracts to which either Seller is bound (collectively, the **"Material Contracts"**):

(i)    Contracts for the future purchase, exchange or sale of electric power, steam or ancillary services or fuel;

(ii)    Contracts for the future transmission of electric power or fuel or for the storage of fuel;

(iii)    interconnection Contracts;

(iv)    other than Contracts of the nature addressed by Section 5.9(a)(i)-5.9(a)(ii), Contracts that grant a right or option to purchase any asset of Sellers, other than in each case, Contracts entered into in the ordinary course of business consistent with past practices relating to assets with a value of less than $500,000 individually or $2,000,000 in the aggregate;

(v)    other than Contracts of the nature addressed by Section 5.9(a)(i)-5.9(a)(ii), Contracts for the future provision of goods or services requiring payments in excess of $500,000 for each individual Contract, excluding any such Contracts that are terminable by Sellers without penalty on not more than 30 days' notice;

(vi)    Contracts under which such Seller has created, incurred, assumed or guaranteed any outstanding indebtedness for borrowed money or any capitalized lease obligation, or under which such Seller has imposed a security interest on any of its assets, tangible or intangible, which security interest secures outstanding indebtedness;

(vii)    letters of credit or outstanding agreements of guaranty, surety or indemnification, direct or indirect, by Channelview LP, or by a Seller or any Affiliate of a Seller for the benefit of Channelview LP;

(viii)    Contracts with Reliant Energy or any Affiliate of Reliant Energy relating to the future provision of goods or services;

(ix)    Contracts under which Channelview LP has advanced or loaned money outside of the ordinary course of business;

(x)    employment, consulting or separation Contracts and any Contract that will result in the payment of any severance, termination, "golden parachute," or similar payments to any present or former personnel following termination of employment or otherwise as a result of the consummation of the transactions

27

contemplated by this Agreement and each of the agreements executed in connection therewith;

(xi)    any collective bargaining agreement;

(xii)    outstanding futures, swap, collar, put, call, floor, cap, option or other Contracts that are intended to benefit from or reduce or eliminate the risk of fluctuations in the price of commodities, including electric power, fuel or securities;

(xiii)    Contracts that purport to limit either Sellers' freedom to compete in any line of business or in any geographic area;

(xiv)    partnership, joint venture or limited liability company agreements; and

(xv)    leases for real property.

(b)    Sellers have provided Buyer with, or access to, true and complete copies of all Material Contracts.

(c)    Other than as affected by the Chapter 11 Cases or as would not have a Material Adverse Effect, each Material Contract constitutes the legal, valid and binding obligation of the applicable Seller and, to such Seller's Knowledge, of the other Person party thereto, enforceable against such Seller and, to such Seller's Knowledge, such other Person party thereto in accordance with its terms, except as the same may be limited by Laws relating to or affecting the rights of creditors generally, or by general equitable principles.

(d)    Except as a result of the filing of the Chapter 11 Cases or as set forth on Schedule 5.9(d) hereto, neither Seller is, and to Sellers' Knowledge, no counterparty is, in default in the performance or observance of any term or provision of, and no event has occurred which, with lapse of time or action by a third party, would result in such a default under any Assigned Contracts to which either Seller is a party other than as would not reasonably be expected to, individually or in the aggregate, have a Material Adverse Effect.

5.10    Taxes.  Except as set forth on Schedule 5.10:

(a)    Each Seller has duly filed with the appropriate Taxing Authorities all Tax Returns required to be filed by it, and such Tax Returns are true, correct, and complete in all material respects.

(b)    Each Seller has duly paid in full any and all Taxes owed by it (whether or not shown or required to be shown on any Tax Return, except in each case where the failure to file such Tax Returns or pay such Tax would not reasonably be expected to, in the aggregate, have a Material Adverse Effect).

(c)    There are no liens for Taxes upon any Acquired Asset, except for liens for Taxes not yet due.

(d)    As of the date hereof, to Sellers' Knowledge, there are no pending or threatened in writing, Tax audits, examinations, actions, suits, claims, investigations or proceedings with respect to the ownership of the Acquired Assets and no outstanding written deficiencies or assessments for any amount of Tax have been assessed by any Taxing Authority with respect to Taxes relating to the ownership of the Acquired Assets that have been received by Sellers.

(e)    There are no outstanding agreements extending or waiving the statutory period of limitations applicable to any claim for, or the period for the collection or assessment or reassessment of, Taxes due from either Seller for any taxable period and no request for any such waiver or extension is currently pending.

(f)    Neither Seller is a party to or bound by any agreement relating to the sharing or allocation of Taxes, Tax benefits or credits, any Tax indemnity agreement, or any other similar arrangement.

(g)    Neither Seller is a party to any agreement, Contract, arrangement or plan that (i) has resulted or could result, separately or in the aggregate, in the payment of any "excess parachute payment" within the meaning of Section 280G of the Code (or any similar provision of state, local or foreign Law) or any amount that would not be fully deductible as a result of Section 162(m) of the Code (or any similar provision of state, local or foreign Law), or (ii) could provide for the deferral of compensation subject to Section 409A of the Code (or any similar provision of state, local or foreign Law).

(h)    Neither Seller currently is the beneficiary of any extension of time within which to pay any Tax or to file any Tax Return.

(i)    Neither Seller is required to include any item of income in, or exclude any item of deduction or loss from, taxable income for any taxable period or portion thereof beginning on or after the Closing Date as a result of (A) a change in method of accounting for a taxable period beginning on or before the Closing Date, (B) any "closing agreement" described in Section 7121 of the Code (or any similar provision of state, local or foreign Law) executed on or before the Closing Date, (C) any installment sale or open transaction disposition made on or before the Closing Date, or (D) any prepaid amount received on or before the Closing Date.

(j)    All Taxes required to be withheld or collected by Sellers have been duly withheld and collected and have been properly paid or deposited as required by applicable Laws.

(k)    RESC, at all times since its formation, has been classified and treated for federal income tax purposes as a disregarded entity, and not as a corporation.

(l)    Channelview LP, at all times since its formation, has been classified and treated for federal income tax purposes as a partnership, and not as a corporation.

5.11    Employee Benefit Plans; ERISA.

(a)    Schedule 5.11(a) sets forth a true, correct and complete list, as of the Execution Date, of all Seller Affiliate Plans. No Continuing Employee is entitled to, or may

become eligible to receive, any benefit from a Benefit Plan other than a Seller Affiliate Plan. On or before the Execution Date, Sellers have made available to Buyer copies (including amendments) of (i) each of the Seller Affiliate Plans, including any plan documents, trust agreements, annuity contracts, insurance contracts or other funding documents related to a Seller Affiliate Plan, (ii) the latest determination letter obtained from the IRS with respect to any Seller Affiliate Plan intended to be qualified or exempt under Section 401 or 501 of the Code, and (iii) census data for the Channelview Facility Employees for each Seller Affiliate Plan.

(b)    None of Sellers, Sellers' Affiliates, or any Commonly Controlled Entity contribute to, have an obligation to contribute to, or have ever contributed to, or ever had an obligation to contribute to, any multiemployer plan (within the meaning of Section 3(37) of ERISA).

(c)    All Seller Affiliate Plans and related trust agreements are and have been maintained in compliance both as to form and operation with all Laws, including the Code and ERISA, except to the extent that any such non-compliance would not reasonably be expected to have a Material Adverse Effect.  Except as set forth in Schedule 5.11(c), a favorable determination letter as to qualification under Section 401 of the Code has been issued with respect to any Seller Affiliate Plan intended to be qualified under Section 401 of the Code, and the related trust has been determined to be exempt from taxation under Section 501 of the Code. The Sellers and their Affiliates know of no events or circumstances that have occurred that would adversely affect the qualified status of any such plans or trusts.

(d)    Other than as provided under the Collective Bargaining Contract, no individual listed on Schedule 7.9(b) has ever received employer-subsidized health care or any other non-pension benefits with respect to employment at the Channelview Facility for more than 31 days after his or her employment is terminated (other than as required by part 6 of subtitle B of title I of ERISA) and has never been promised such employer-subsidized post-termination benefits with respect to employment at the Channelview Facility.

5.12    Labor and Employment.

(a)    With respect to each individual employed by Operator who performs services for the Channelview Facility (the *"Channelview Facility Employees"*), except for the Collective Bargaining Contract, Operator is not a party to, nor is bound by, the terms of any collective bargaining agreement or any other Contract with any labor union or representative of employees. To Sellers' Knowledge, there are no union organization campaigns or attempts to organize or establish any employee association underway or threatened involving employees of either Seller.

(b)    Channelview LP is in compliance with all laws, rules and regulations relating to labor relations and employment with respect to the Continuing Employees, except to the extent that any such non-compliance would not reasonably be expected to, individually or in the aggregate, have a Material Adverse Effect.

(c)    To Sellers' Knowledge no Channelview Facility Employees are in violation of any term or provision of any employment contract, confidentiality or other

proprietary information disclosure agreement or other contract relating to the right of any such Person to be employed or engaged by a Seller which would reasonably be expected to have a Material Adverse Effect.

  (d) To Sellers' Knowledge, none of Operator's employment policies or practices applicable to the Channelview Facility Employees are currently being audited or investigated by any Governmental Authority which would reasonably be expected to have a Material Adverse Effect. To Sellers' Knowledge there are no current, nor have there been since four (4) years prior to the Closing Date, any, charges, claims, or demands filed with any Governmental Authority from any current or former Channelview Facility Employees regarding their employment or former employment at the Channelview Facility which would reasonably be expected to have a Material Adverse Effect including claims or charges of employment discrimination, sexual harassment or unfair labor practices.

  (e) With respect to the Channelview Facility Employees, Operator has complied with all applicable Laws respecting employment and employment practices, terms and conditions of employment, wages and hours and other Laws, regulations and requirements related to employment, except to the extent that any such non-compliance would not reasonably be expected to have a Material Adverse Effect.

  (f) Except as set forth on Schedule 5.12(f), neither the execution and delivery of this Agreement or the documents contemplated hereby by the Sellers, the performance by the Sellers of their obligations hereunder and thereunder, nor the consummation of the transactions contemplated hereby and thereby will (i) materially increase or enhance any benefits payable to a Continuing Employee under any Seller Affiliate Plan, or (ii) materially accelerate the time of payment or vesting, or increase the amount, of any compensation due to any Continuing Employee under a Seller Affiliate Plan.

  5.13 Environmental Matters. Except for such matters as disclosed on Schedule 5.13 or for such matters that would not reasonably be expected to, individually or in the aggregate, have a Material Adverse Effect:

  (a) With respect to the Acquired Assets, Sellers are in compliance with all applicable Environmental Laws;

  (b) All Permits required under Environmental Laws for conducting the operations of the Channelview Facility, as such facility is currently being operated, have been obtained or applied for and, to the extent obtained, are currently in full force and effect;

  (c) Neither Channelview LP nor any of its Affiliates, with respect to the Channelview Facility, have received any written notice of a pending Claim from any Governmental Authority or other Person alleging that it or the Channelview Facility is in violation of, or has liability under, any applicable Environmental Law;

  (d) To Channelview LP's Knowledge, there has been no disposal or Release by Sellers or their Affiliates at, on, under or from the Channelview Facility, except in compliance with Environmental Laws; and

(e)    Neither Channelview LP nor any of its Affiliates have received any written notice from any Governmental Authority or other Person alleging that Channelview LP or the Channelview Facility have liability under applicable Environmental Laws with respect to the disposal or transportation, or the arrangement for disposal or transportation of Hazardous Substances from the Channelview Facility by Channelview LP or any of its Affiliates at or to any off-site location.

Notwithstanding any other provision of this Agreement to the contrary, this Section 5.13 contains the sole and exclusive representations and warranties of Sellers on environmental matters with respect to Sellers and the Acquired Assets.

5.14    Intellectual Property.    Except as set forth on Schedule 5.14, or as would not reasonably be expected to have a Material Adverse Effect, (a) each Seller owns or has the right to use all Intellectual Property used in the operations of its respective business as currently conducted; (b) to the Knowledge of Sellers, no Person has or is infringing or misappropriating any Intellectual Property of Channelview LP that is exclusively used in the operation of the Channelview Facility; and (c) to the Knowledge of Sellers, no Person has or is infringing or misappropriating any Intellectual Property of RESC that is used exclusively in the running of RESC's Business.    Except for such violations which would not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect, neither the Sellers nor the Channelview Facility have infringed or misappropriated, and the operation of the Channelview Facility does not infringe or misappropriate any valid rights of third parties with respect to Intellectual Property.

5.15    Real Estate.    Channelview LP has delivered or otherwise made available to Buyer true, correct and complete copies of the surveys, title reports and the ground lease set forth on Schedule 5.15.    Channelview LP does not own any real property or interest in real property other than pursuant to the Real Estate Leases or with respect to the Entitled Real Property.

5.16    Insurance.    The Channelview Facility and Sellers are covered by valid policies of insurance as part of Reliant Energy's corporate insurance program.    Such insurance coverage shall not survive the Closing.

5.17    Federal Regulation.    As of the Closing Date, the Channelview Facility meets the requirements for a "Qualifying Cogeneration Facility" as defined in Section 3(18)(B) of the Federal Power Act, as amended, and the rules and regulations thereunder and the Public Utility Regulatory Policies Act of 1978, as amended (a "QF").

5.18    Brokers.    Neither Seller has any liability or obligation to pay fees or commissions to any broker, finder or agent with respect to the transactions contemplated by this Agreement.

5.19    Conduct of Business and Operations.    To Channelview LP's Knowledge, since December 31, 2006, Channelview LP has operated and maintained the Channelview Facility in accordance with Prudent Industry Practice, except as would not, in the aggregate, reasonably be expected to have a Material Adverse Effect.

5.20    Sufficiency of Assets.    Except for the Excluded Assets and assets consumed in the ordinary course of business, the Acquired Assets include all of the assets (whether tangible or

32

intangible) used by the Channelview Facility to conduct the business of the Channelview Facility as conducted as of each of the date hereof except as would not reasonably be expected to have a Material Adverse Effect. Except as would not reasonably be expected to have a Material Adverse Effect, the Sellers have good title to, or valid license or right to use, free and clear of all Liens (other than Liens that will be discharged prior to Closing or pursuant to the Chapter 11 Cases, or Permitted Exceptions), all of the tangible personal property described in the preceding sentence.

## ARTICLE 6

## REPRESENTATIONS AND WARRANTIES OF BUYER

In order to induce Sellers to enter into this Agreement and consummate the transactions contemplated hereby, Buyer hereby represents and warrants to Sellers that:

6.1    <u>Organization and Qualification</u>.  Buyer is a limited liability company duly formed and existing under the Laws of the State of Delaware.  Buyer is qualified to transact business and, where applicable, is in good standing in each jurisdiction where the nature of the business conducted by it makes such qualification necessary, except in those jurisdictions where the failure to be so qualified or licensed would not, in the aggregate, be reasonably expected to result in a material adverse effect on Buyer's ability to perform its obligations hereunder.

6.2    <u>Authority</u>.  Buyer has all requisite limited liability company power and authority to enter into this Agreement, to perform its obligations hereunder and to consummate the transactions contemplated hereby.  The execution and delivery by Buyer of this Agreement and the performance by Buyer of its obligations hereunder have been duly and validly authorized by all necessary limited liability company action on behalf of Buyer.  This Agreement has been duly and validly executed and delivered by Buyer and constitutes the legal, valid and binding obligation of Buyer enforceable against Buyer in accordance with its terms except as the same may be limited by bankruptcy, insolvency, reorganization, arrangement, moratorium or other similar Laws relating to or affecting the rights of creditors generally or by general equitable principles.

6.3    <u>No Conflicts; Consents and Approvals</u>.  The execution and delivery by Buyer of this Agreement and each of the documents contemplated hereby do not, and the performance by Buyer of its obligations hereunder and under each of the documents contemplated hereby and the consummation of the transactions contemplated hereby and thereby will not:

(a)    conflict with or result in a violation or breach of any of the terms, conditions or provisions of its Charter Documents;

(b)    be in violation of or result in a default (or give rise to any right of termination, cancellation or acceleration) under any material Contract to which Buyer is a party or by which any of its assets may be bound except for any such violations or defaults (or rights of termination, cancellation or acceleration) which would not, in the aggregate, be reasonably expected to result in a material adverse effect on Buyer's ability to perform its obligations hereunder; or

(c)    assuming all required filings, approvals, consents, authorizations and notices set forth in Schedule 6.3(c) (collectively, the *"Buyer Governmental Approvals"*) have been made, obtained or given, (i) conflict with or result in a violation or breach of any term or provision of any Law or writ, judgment, order or decree applicable to Buyer or any of its assets or (ii) require the consent or approval of any Governmental Authority under any applicable Law, except in each case such conflicts, violations or breaches, or the failure to obtain such consents or approvals, which would not reasonably be expected to result in a material adverse effect on Buyer's ability to perform its obligations hereunder.

6.4    Legal Proceedings.  Buyer has not been served with written notice of any Claim, and to Buyer's Knowledge, none is threatened against Buyer which seeks a writ, judgment, order or decree restraining, enjoining or otherwise prohibiting or making illegal any of the transactions contemplated by this Agreement.

6.5    Compliance with Laws and Orders.  Buyer is not in violation of or has been given written notice of any current violation of any Law applicable to Buyer or its assets the effect of which, in the aggregate, would reasonably be expected to result in a material adverse effect on Buyer's ability to perform its obligations hereunder.

6.6    Brokers.  Buyer does not have any liability or obligation to pay fees or commissions to any broker, finder or agent with respect to the transactions contemplated by this Agreement for which Sellers or any of their Affiliates could become liable or obligated.

6.7    Financial Resources.  Buyer at Closing will have sufficient funds to satisfy its obligations required to be performed at Closing.

6.8    No Knowledge of a Sellers' Breach.  Buyer has no Knowledge of any breach by either Seller of any representation or warranty made hereunder which breach would reasonably be expected to result in a Material Adverse Effect, of which the Buyer has not advised Sellers.

6.9    Opportunity for Independent Investigation.  Prior to its execution of this Agreement, Buyer has conducted to its satisfaction an independent investigation and verification of the current condition and affairs of the Sellers and the Channelview Facility without reliance on Sellers or any of their Affiliates; provided that such independent investigation and verification shall not affect the express representations, warranties, covenants or other obligations of Sellers contained in this Agreement Buyer has had reasonable and sufficient access to documents, other information and materials as it considers appropriate to make its evaluations.

## ARTICLE 7

## COVENANTS

The Parties hereby, as applicable, covenant and agree as follows:

7.1    Access.

(a)    During the Interim Period, to the extent within their reasonable control in light of the commencement of the Chapter 11 Cases, each Seller (as applicable) will provide, and

34

will cause its Affiliates to provide, Buyer and its Representatives with reasonable access during normal business hours to the Channelview Facility, and the officers and management employees of Sellers and their Affiliates who are responsible for the Channelview Facility in such a manner so as not to unreasonably interfere with the business or operations of Sellers or their Affiliates; provided, that each Seller shall have the right to (i) have a Representative present for any communication with employees or officers of such Seller or its Affiliates, and (ii) impose reasonable restrictions and requirements for safety or operational purposes; provided further, that the right of access granted hereunder shall not include physical testing or sampling. Notwithstanding the foregoing, neither Seller shall be required to provide any information or allow any inspection which (i) such Seller reasonably believe contravenes applicable Law, (ii) constitutes or allows access to information protected by attorney/client privilege, or (iii) such Seller or its Affiliates is required to keep confidential or prevent access to by reason of any Contract with third parties; provided, however, that Sellers shall advise Buyer of the existence of such Contracts at Closing. Following the Closing, Sellers shall be entitled to retain copies of all books and records relating to the ownership and/or operation of their respective businesses (as applicable) and at Buyer's request after the Closing, to the extent such books and records have not been disposed of, Sellers shall at Buyer's sole cost and expense, provide Buyer with a copy of any such books and records.

(b)    Buyer agrees to indemnify, defend and hold harmless Sellers, their Affiliates and their Representatives from and against any and all Losses incurred by Sellers, their Affiliates, their Representatives or any other Person arising out of the access rights under this Section 7.1, including any Claims by any of Buyer's Representatives for any injuries or Losses while present at the Channelview Facility, **EVEN IN INSTANCES OF THE NEGLIGENCE OF SELLERS, THEIR AFFILIATES OR THEIR REPRESENTATIVES, BUT NOT TO THE EXTENT CAUSED BY THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF SELLERS, THEIR AFFILIATES OR THEIR REPRESENTATIVES.**

(c)    Each Party agrees that, for a period of three years following the Closing Date, it will use its commercially reasonable efforts to cooperate with and make available to the other Party and its Representatives for reviewing and making copies or taking extracts, upon reasonable notice and during normal business hours, books and records and information of or relating to the Acquired Assets which are necessary or useful in connection with any investigation, dispute or proceeding or audit by a Governmental Authority, or any claim by or against a third party involving the Acquired Assets (other than in connection with disputes between the Parties); provided that no such Party shall be required to make available any information, books or records, the disclosure of which would cause a waiver of any applicable privilege or breach of an obligation of confidentiality to a third- party and either party may make access to such information, books and records conditioned upon execution and delivery of a confidentiality agreement reasonably satisfactory to the party requesting disclosure. Further, after the Closing, Buyer shall grant to Sellers or their Representatives the access and right to make copies or take extracts described in the preceding sentence for such other purpose as may be reasonably requested by either Seller. The Party requesting any such books and records, information or cooperation shall bear all of the out-of-pocket costs and expenses of the other Party reasonably incurred in connection therewith (including out-of-pocket expenses to third parties incurred by any Party).

7.2   Conduct of Business Pending the Closing.

(a)   Except as otherwise contemplated by this Agreement or set forth in Schedule 7.2, during the Interim Period, Sellers will, to the extent within their reasonable control in light of the commencement of the Chapter 11 Cases:

(i)   use their commercially reasonable efforts to operate and maintain the Channelview Facility and the Business in the ordinary course of business consistent with past practices and in accordance with Prudent Industry Practice;

(ii)   use their commercially reasonable efforts to (A) preserve its present business operations, organization (including management) and goodwill with respect to the Channelview Facility and (B) preserve its present relationship with Persons having business dealings with respect to the Channelview Facility;

(iii)   provide to Buyer copies of invoices paid or to be paid during or attributable to the Interim Period; and

(iv)   provide to Buyer copies of the monthly operations reports delivered to Lenders.

(b)   Except as otherwise contemplated by this Agreement, as set forth in Schedule 7.2, as required by any Material Contract or material Permit of either Seller, or as consented to by Buyer, which consent shall not be unreasonably withheld, conditioned or delayed (except in respect of clause (iii) below, for which Buyer's consent shall be given or withheld in its sole discretion), during the Interim Period, each Seller (as applicable) will, to the extent within its reasonable control (and as applicable in light of the Chapter 11 Cases) with respect to the Business, the Channelview Facility or the other Acquired Assets, not:

(i)   other than any Permitted Exceptions, permit or allow any Lien securing indebtedness for borrowed money against any of the Acquired Assets;

(ii)   except in the ordinary course of business consistent with past practice, terminate, amend or renegotiate in any material respect or grant a waiver of any material term of, or give any material consent with respect to, any Material Contract which is an Assigned Contract or Permit, or enter into a Contract after the Execution Date that would be a Material Contract if entered into prior to the Execution Date (other than Contracts that will be fully performed prior to Closing or renewals of Contracts in place on the Execution Date);

(iii)   other than accounts payable incurred in the ordinary course of business consistent with past practices or otherwise incurred pursuant to the Material Contracts (or Contracts entered into in accordance with clause (ii) above, after the Execution Date that would be Material Contracts if entered into prior to the Execution Date), incur, create, assume or otherwise become liable for indebtedness for borrowed money or issue any debt securities or assume or guarantee the obligations of any other Person unless in any such case paid in full and discharged at or before the Closing;

           (iv)    fail to maintain their limited partnership or limited liability company existence or merge or consolidate with any other Person or acquire all or substantially all of the assets of any other Person;

           (v)    issue or sell any membership interests, partnership interests or securities or rights convertible into membership interests, partnership interests or securities;

           (vi)    liquidate, dissolve, recapitalize, reorganize or otherwise wind up its business or operations if any such action would impact the transactions contemplated hereby;

           (vii)    except in the ordinary course of business, sell, assign, license, transfer, convey, lease or otherwise dispose of any assets with a value in excess of $500,000;

           (viii)    make or change any material election with respect to Taxes;

           (ix)    make any material change in its accounting principles, methods or policies, except as otherwise required by GAAP or applicable Law;

           (x)    make any loans or purchase any securities of any Person, except for short-term investments or cash equivalents made in the ordinary course of business consistent with past practices;

           (xi)    cancel, terminate or allow any material property or liability insurance policy to lapse;

           (xii)    cancel any debts, discount any receivables or waive any claims in excess of $500,000;

           (xiii)    amend or modify its Charter Documents if such amendment or modification would affect such Seller's ability to perform its respective obligations hereunder or under the documents contemplated hereby; or

           (xiv)    agree or commit to do any of the foregoing.

    Notwithstanding the foregoing, each Seller may take commercially reasonable actions in accordance with Prudent Industry Practice with respect to emergency situations and to comply with applicable Law so long as such Seller shall, and with respect to Channelview LP, to the extent within its reasonable control in light of the commencement of the Chapter 11 Cases, promptly (but no later than two (2) Business Days after the taking of any such action) inform Buyer of such actions.

    For purposes of clarification, it is understood and agreed that Capital Expenditures made by Sellers for the items and in the amounts set forth in the budget attached hereto as Exhibit F shall be deemed to have been commercially reasonable and

made by Sellers to operate and maintain the Channelview Facility and the Business in the ordinary course of business.

7.3     Use of Certain Names.  Within 30 days following the Closing, Buyer shall cease using the Reliant Marks, including eliminating the Reliant Marks from all Acquired Assets and disposing of any unused stationery and literature including the Reliant Marks and thereafter, Buyer shall not, and shall cause the Channelview Facility not to, use the Reliant Marks or any logos, trade names, patents or other Intellectual Property rights belonging to Sellers or any of their Affiliates, or which Sellers or any of their Affiliates have the right to use, and Buyer acknowledges that it, its Affiliates and the Channelview Facility have no rights whatsoever to use such Intellectual Property.  Sellers hereby agree not to object to Buyer's use of any Reliant Marks in connection with the operation of the Channelview Facility during the aforementioned thirty (30) day period.

Without limiting the foregoing, within 30 days after the Closing Date, Buyer shall provide evidence to Sellers, in a format that is reasonably acceptable to Sellers, that Buyer has provided notice to all applicable Governmental Authorities and all counterparties to the Assigned Contracts regarding the sale of the Acquired Assets to Buyer and the new addresses for notice purposes.

7.4     Support Obligations.

(a)     (i) Prior to the Closing, Buyer shall use commercially reasonable efforts to effect the full and unconditional release, effective as of the Closing, of Sellers and their Affiliates from the LTMA Support Obligations and (ii) following the Closing, Buyer shall use commercially reasonable efforts to effect the full and unconditional release, effective as of the date contemplated in paragraph 2 of Schedule 7.4(a), of Sellers and their Affiliates from their obligations to post collateral under the RES Fuel Purchase Transactions (collectively, the *"Support Obligations"*), in each case, including by offering within a reasonable time in advance of such release replacement bonds, guaranties, letters of credit, cash collateral and/or escrow arrangements, as needed, to effect the replacement of such Support Obligations, in accordance with the applicable requirements of such Support Obligations.  Sellers shall reasonably cooperate with Buyer in such effort.

(b)     If Buyer is not successful, following the use of commercially reasonable efforts, in obtaining the full and unconditional release of Sellers and their Affiliates from the LTMA Support Obligations as of Closing, then Sellers shall have the right to waive the condition to Closing set forth in Section 9.3(a) (provided that such condition shall be deemed satisfied in respect of Buyer's obligation under clause (a)(i) above to the extent that Buyer delivers to Sellers at the Closing either the letter of credit or guaranty contemplated in Section 7.4(b)(iv) below); and

(i)     from and after the Closing, Buyer shall continue to use commercially reasonable efforts to obtain promptly the full and unconditional release of Sellers and their Affiliates from the LTMA Support Obligations;

(ii)    Buyer shall indemnify Sellers (as applicable) and their Affiliates for any liabilities, losses, costs or expenses incurred by Sellers or their Affiliates in connection with the LTMA Support Obligations arising or accruing after the Closing (excluding any such liabilities, losses, costs or expenses resulting from any breach of the LTMA Support Obligations) by Sellers and their Affiliates;

(iii)    Buyer shall not, shall cause its Affiliates not to, effect any amendments or modifications or any other changes to the contracts or obligations to which any of the LTMA Support Obligations relate, or to otherwise take any action that in either case would reasonably be expected to increase, extend or accelerate the liability of either Seller or their Affiliates under the LTMA Support Obligations, without such Seller's prior written consent; and

(iv)    Buyer shall deliver to Sellers at the Closing and maintain at all times thereafter until the full and unconditional release of the LTMA Support Obligations in accordance with this <u>Section 7.4</u>, at Sellers' election, either (A) an irrevocable, standby letter of credit in the amount of the maximum amount of exposure under the LTMA Support Obligations, in form and substance and from an issuing bank reasonably satisfactory to Sellers or (B) a guaranty of the Buyer's obligations hereunder with respect to the LTMA Support Obligations from a Person with a Credit Rating of Investment Grade, which guarantee shall be in form and substance reasonably satisfactory to Sellers.

7.5    <u>Termination of Certain Services, Contracts</u>. Except as otherwise provided in the Transition Services Agreements and for purposes of clarity, Buyer shall be responsible for providing all administrative, operating and energy management services, including tax, legal, insurance, financial reporting, operations and maintenance services, technical support and banking services for the Acquired Assets from and after the Closing, and any and all arrangements under which such services are provided by Reliant Energy or an Affiliate shall not be assigned to Buyer and/or shall be terminated, as applicable, including serving as a QSE or a "Retail Electric Provider" with respect to the Channelview Facility.

7.6    <u>Insurance</u>. Sellers shall be solely responsible for providing insurance to the Channelview Facility and the Business for periods prior to the Closing. Buyer shall be solely responsible for providing insurance to the Channelview Facility and the Business for all periods after the Closing. Buyer acknowledges that no insurance coverage or policy maintained for the Channelview Facility or the Business will extend beyond the Closing for the benefit of Buyer. Buyer shall provide evidence of such independent coverage to Sellers as of Closing. Notwithstanding any provision hereof to the contrary, if, before the Closing, all or any material portion of the Acquired Assets is (a) condemned or taken by eminent domain or is the subject of a pending or threatened condemnation or taking which has not been consummated, or (b) materially damaged or destroyed by fire or other casualty, Sellers shall notify Buyer promptly in writing of such fact, and (i) in the case of condemnation or taking, Sellers shall assign or pay, as the case may be, any proceeds thereof to Buyer at the Closing and (ii) in the case of a fire or other casualty, Sellers shall either restore such Acquired Asset to substantially the same condition as before such casualty or assign the insurance proceeds therefrom to Buyer at Closing. In the event of clause (i) or (ii) above, and to the extent Sellers receive any proceeds thereof after

Closing, Sellers shall distribute those proceeds to Buyer immediately upon receipt except to the extent paid or payable by Sellers in the repair or restoration of such casualty.

7.7    Tax Matters.

(a)    Transfer Taxes.    Notwithstanding anything in this Agreement to the contrary, all Transfer Taxes shall be paid one-half by Buyer and one-half by Sellers. Buyer shall file all Tax Returns required to be filed to report Transfer Taxes.

(b)    Responsibility for Pre-Closing Taxes.    Sellers shall be responsible for all Taxes relating to the Acquired Assets with respect to any period (or portion thereof) ending on or before the Closing Date. Sellers shall pay, and shall indemnify Buyer, for any such Taxes. For this purpose, in the case of any taxable period that includes (but does not end on) the Closing Date (a *"Straddle Period"*), Taxes (including any applicable withholding obligations) other than income or franchise Taxes will be allocated between the portion of the Straddle Period ending on the Closing Date (*"Pre-Closing Portion"*) and the portion of the Straddle Period beginning on the day after the Closing Date. The amount of such Taxes allocable to the Pre-Closing Portion will be determined on the basis of a deemed closing of the books of Sellers as of the close of business on the Closing Date; provided, that in the case of ad valorem Taxes and any other Tax that is a fixed amount for the entire taxable period, the amount of each such Tax allocable to the Pre-Closing Portion will be equal to the product of each such Tax multiplied by a fraction, the numerator of which is the number of days in the Straddle Period from the commencement of such period through and including the Closing Date, and the denominator of which is the number of days in the entire Straddle Period. The amount of Taxes (other than income or franchise Taxes) for a Straddle Period not allocable to the Pre-Closing Portion shall be allocable to the portion of the Straddle Period beginning the day after the Closing Date.

(c)    Income and Franchise Taxes.    Notwithstanding anything in this Agreement to the contrary, each Seller shall be responsible for reporting for any income or franchise Taxes for which it may be liable. Without limiting the foregoing, Sellers shall be responsible for reporting and paying the Texas franchise Tax and any associated penalties and interest with respect to the total revenues of Sellers attributable to the Business through and including the Closing Date, Buyer shall be responsible for reporting and paying the Texas franchise Tax with respect to the total revenues of the Acquired Assets after the Closing Date.

(d)    Texas Temporary Credits.    Buyer (i) acknowledges and agrees that a purchaser of the Acquired Assets will not be entitled to any Channelview Texas temporary credits; and (ii) agrees that the Sellers shall have no obligation to the Buyer from and after the Closing, with respect thereto.

(e)    Cooperation.    Buyer and Sellers shall cooperate fully as and to the extent reasonably requested by either Party, in connection with the filing of Tax Returns relating to the Acquired Assets and any audit, litigation or other proceeding (each a *"Tax Proceeding"*) with respect to such Tax Returns. Such cooperation shall include, the retention and (upon request and until the expiration of the applicable statute of limitations,) the provision of records and information relating solely to the Acquired Assets which are reasonably relevant to any such Tax Return or Tax Proceeding and making employees available on a mutually convenient basis to

provide additional information and explanation of any material provided hereunder. Promptly following receipt of any notice of a Tax Proceeding relating to the Acquired Assets with respect to a taxable period (or portion thereof) ending on or before the Closing Date, the appropriate Seller or Buyer, as the case may be, shall inform the other Party of such Tax Proceeding. The Buyer and Sellers further agree, upon reasonable request, to use their commercially reasonable efforts to obtain any certificate or other document from any Taxing Authority or any other Person, or make any election, as may be necessary to mitigate, reduce, or eliminate any Tax that could be imposed (including, but not limited to, with respect to the transactions contemplated hereby). To the extent that Sellers are in receipt of any Tax assessment notice issued by a Governmental Authority with respect to the Acquired Assets, Sellers agree to provide Buyer copies of such Tax assessment notice and at Buyer's request and direction, Sellers hereby agree to timely appeal any such Tax assessment and to continue to prosecute such appeal, in good faith, until the Closing, provided, however, that to the extent that such claim adversely affects the value of the Acquired Assets, Buyer's ownership and operations thereof or result in any liability to Buyer, Sellers agree not to settle any claims with respect to such appeal without the prior written consent of Buyer, not to be unreasonably withheld, conditioned or delayed.

(f)   Notice. If prior to Closing, Sellers receive notice that the property tax appraised and/or tax rate applicable to the Acquired Assets (or any portion thereof) are or may be increased or otherwise modified in a manner that could be adverse to Buyer or the Acquired Assets or any portion thereof, then Sellers shall (i) promptly so advise Buyer and provide Buyer with all notices and documents relating thereto, (ii) meet with Buyer and its representatives to discuss potential responses to any such increase or modification and otherwise cooperate with Buyer in developing a response with respect thereto and (iii) promptly and in good faith take such actions as Buyer may from time to time reasonably request to challenge any such increase or modification, including timely filing applicable notices of protest to any such increases or modification.

7.8   Confidentiality.

(a)   All nonpublic information provided to, or obtained by, Buyer or its Representatives in connection with the transactions contemplated hereby shall be "Evaluation Material" for purposes of the letter dated May 15, 2007 between Channelview LP and Fortistar LLC (the *"Confidentiality Agreement"*), the terms of which shall continue in force until the Closing; provided, that Buyer may disclose such information as may be necessary in connection with seeking Buyer Governmental Approvals.

(b)   Notwithstanding anything to the contrary set forth herein or in any other agreement to which the Parties hereto are parties or by which they are bound, the obligations of confidentiality contained herein and therein, as they relate to the Acquired Assets, shall not apply to the U.S. federal tax structure or U.S. federal tax treatment of the Acquired Assets and the Parties hereto (and any employee, Representative, or any party hereto) may disclose to any and all persons, without limitation of any kind, the U.S. federal tax structure and U.S. federal tax treatment of the Acquired Assets. The preceding sentence is intended to cause the Acquired Assets not to be treated as having been offered under conditions of confidentiality for purposes of Section 1.6011-4(b)(3) (or any successor provision) of the Treasury Regulations promulgated under Section 6011 of the Internal Revenue Code of 1986, as amended, and shall be construed in

41

a manner consistent with such purpose. In addition, each Party hereto acknowledges that it has no proprietary or exclusive rights to the tax structure of the Acquired Assets or any tax matter or tax idea related to the Acquired Assets.

       7.9     <u>Employee and Benefit Matters</u>.

          (a)     On or before the Closing, Channelview LP shall take, or shall cause to be taken, all actions necessary to cause the Continuing Employees to cease to accrue any additional benefits on or after the Closing Date under all Seller Affiliate Plans (except as set forth in the Transition Services Agreement to the extent applicable). Prior to the Closing Date, Sellers shall provide Buyer or its designee with census information for the Continuing Employees and all Seller Affiliate Plan documents as necessary for Buyer to construct and implement the benefit plans required by this <u>Section 7.9</u>.

          (b)     Within 30 days after the Execution Date, but effective as of the Closing Date, Buyer or its designee shall offer employment (which shall be contingent on the occurrence of the Closing to each individual who is (i) eligible for employment under applicable law, (ii) actively at work on the Closing Date, and (iii) listed as "actively at work" on <u>Schedule 7.9(b))</u>. Sellers shall not, and shall cause their affiliates to not, discourage such employees from accepting, or otherwise interfere with, the offers made by Buyer or its designee, although such employees may, on their own initiative, post for and be considered for open position with Sellers' Affiliates. For purposes of this <u>Section 7.9</u>, an employee is not "actively at work" if the employee applied for long-term disability benefits or is receiving long-term disability benefits under any long-term disability plan or program established or maintained by Sellers, Sellers' Affiliates or any Commonly Controlled Entity as of the Closing Date. All employees described in the preceding sentence shall be listed as "not actively at work" on <u>Schedule 7.9(b)</u>. The list of employees identified as "not actively at work" on <u>Schedule 7.9(b)</u> shall be updated as of the Closing Date. Each offer of employment shall be consistent with the provisions of this <u>Section 7.9</u> and shall remain open for a period of at least 10 days. For a period of at least one year beginning on the Closing Date and subject to the Collective Bargaining Contract (for covered Continuing Employees) and the remaining paragraphs of this <u>Section 7.9</u> and such individual's continued employment with Buyer or its designee, Buyer or its designee shall cause each such Continuing Employee to be provided with compensation (including annual incentive compensation) on a substantially equivalent basis to the compensation provided to such employee by the Operator immediately prior to the Closing and benefits (including severance benefits and worker's compensation benefits) on a basis substantially similar in the aggregate to those provided to such employee by the Operator immediately prior to the Closing (but excluding participation in a defined benefit plan, any right to employer contributions to a defined contribution plan, participation in an employee stock purchase plan, and participation in any stock-based compensation program, in each case, to the extent not offered to other similarly situated employees of Buyer or its designee). Notwithstanding the foregoing sentence, Buyer shall not be required to provide post-retirement medical benefits to any Continuing Employee except for (i) amounts required to be contributed on an annual basis under the Collective Bargaining Contract to accounts of eligible Continuing Employees established by Buyer or its designee to replicate amounts referred to as "Basic Credits", "Additional Credits" and "Interest" under the Reliant Energy FutureCare program as of the date hereof (***"FutureCare Program"***), (ii) providing access to accounts under the FutureCare Program for eligible Continuing

Employees as required under the Collective Bargaining Contract, and (iii) as required under part 6 of subtitle B of title I of ERISA. After Closing, subject to the Collective Bargaining Contract (for covered Continuing Employees), the employment policies and practices of Buyer or its designee shall apply to the Continuing Employees. Individuals listed on Schedule 7.9(b) who are not actively at work on the Closing Date will not become employees of Buyer or its designee until such time as they are medically certified to return to work, provided such release is within 6 months of the Closing Date. Offers of employment by Buyer or its designee to these employees will be made consistent with the conditions outlined in this Section 7.9.

(c)    Buyer acknowledges and agrees that (i) certain employees employed at the Channelview Facility are represented by the International Brotherhood of Electrical Workers and its Local Union No. 66 (the *"Union"*) pursuant to the terms of the Collective Bargaining Contract, (ii) Buyer, or its designee, as applicable, will continue to recognize the Union as the exclusive bargaining representative of the employees whose employment is covered by the Collective Bargaining Contract, (iii) the Collective Bargaining Contract will continue to be effective until it expires by its own terms or is renegotiated, and (iv) Buyer or its designee will assume and be bound by the terms, conditions and provisions of the Collective Bargaining Contract. Buyer further acknowledges that, subject to the terms of the Collective Bargaining Contract and applicable Law, Buyer or its designee shall offer employment (which shall be contingent on the occurrence of the Closing) to the employees covered by the Collective Bargaining Contract. The employment policies and practices of Buyer or its designee shall apply to the Continuing Employees covered by the Collective Bargaining Contract to the extent consistent with the Collective Bargaining Contract. Nothing herein is intended to restrict or prohibit the ability of Buyer or its designee to negotiate modifications of the Collective Bargaining Contract with the Union.

(d)    Buyer shall cause the employee benefit plans and programs maintained after the Closing by Buyer or its designee to recognize each Continuing Employee's years of service and level of seniority prior to the Closing Date with the Operator (including service and seniority with any other employer that was previously recognized by the Operator) for purposes of terms of employment and eligibility, vesting and benefit determination (but not for benefit accrual under any defined benefit plan) under such plans and programs. Buyer shall cause each group health plan or program sponsored by Buyer or its designee in which a Continuing Employee may be eligible to participate on or after the Closing Date to waive any preexisting condition exclusion with respect to participation and coverage requirements applicable to such Continuing Employee, to the extent that a Continuing Employee provides Buyer with a certificate of creditable coverage (as defined in Section 701(c)(1) of ERISA) reflecting prior coverage sufficient to eliminate any such provision that would otherwise be applicable .

(e)    To the extent consistent with the Collective Bargaining Contract, as applicable, Buyer shall cause, or as applicable shall cause its designee to cause, each Continuing Employee and his or her eligible dependents (including all such Continuing Employee's dependents covered immediately prior to the Closing Date by a Seller Affiliate Plan that is a group health plan) to be offered coverage under a group health plan maintained by Buyer or its designee that (i) provides medical and dental benefits to the Continuing Employee and such eligible dependents effective immediately upon the Closing Date and (ii) credits such Continuing Employee, for the year during which such coverage under such group health plan begins, with

43

any deductibles and co-payments already incurred during such year under a Seller Affiliate Plan that is a group health plan.

(f)     Buyer expressly agrees that it assumes all obligations to provide any required notice under the WARN Act, or other applicable Laws, and to pay all severance payments, damages for wrongful dismissal and related costs, with respect to the termination of any Continuing Employee that occurs on or after the Closing Date. Sellers, as applicable, shall remain liable for any such liabilities that may arise as a result of any action taken by Seller with respect to any employee of the Operator employed at the Channelview Facility who is not a Continuing Employee.

(g)     Sellers (as applicable) shall cause each Continuing Employee to be permitted to elect on the Closing Date (or as soon thereafter as reasonably practicable) a direct rollover of his/her account balance under a Seller Affiliate Savings Plan to a defined contribution plan designated by Buyer (the *"Buyer Savings Plan"*), and Sellers shall cause the applicable Seller Affiliate Savings Plan to deliver to the Buyer Savings Plan as soon as reasonably practicable after such date the promissory notes and other loan documentation, if any, of each Continuing Employee who has elected such a direct rollover in accordance with the procedures as determined by Sellers and Buyer. Buyer and Sellers shall cooperate and take such actions, if any, as are necessary to permit the continuation of loan repayments by Continuing Employees to the Seller Affiliate Savings Plans by payroll deductions during the 90-day period beginning on the Closing Date; provided, however, that if a Continuing Employee makes a direct rollover election as described in this Section (g) within such 90-day period, then the applicable Seller Affiliate Savings Plan shall continue to accept loan repayments from such Continuing Employee by payroll deduction until the date of such direct rollover. Buyer shall cause the Buyer Savings Plan to accept the direct rollover of electing Continuing Employees' benefits in cash and, if applicable, promissory notes that are not accelerated from the Seller Affiliate Savings Plans. Sellers represent, warrant and agree with respect to the Seller Affiliate Savings Plans, and Buyer represents warrants and agrees with respect to the Buyer Savings Plan, that, as of each date of a rollover described in this Section (g), such plan (i) is intended to satisfy the requirements of Sections 401(a), (k), and (m) of the Code and (ii) will have received, or a pending application will have been timely filed for, a favorable determination letter from the IRS regarding such qualified status and covering amendments required to have been adopted prior to the expiration of the applicable remedial amendment period. Except as required by Law or as required by the Collective Bargaining Contract, Buyer or its designee shall not be required to provide any particular benefit under the Buyer Savings Plan.

(h)     Claims of Continuing Employees and their eligible beneficiaries and dependents for medical, dental, prescription drug, life insurance, and/or other welfare benefits (*"Welfare Benefits"*) (other than long-term disability benefits) that are incurred before the Closing Date shall be the sole responsibility of the Seller Affiliate Plans. Claims of Continuing Employees and their eligible beneficiaries and dependents for Welfare Benefits (other than long-term disability benefits) that are incurred on or after the Closing Date shall be the sole responsibility of Buyer or its designee. Claims for workers compensation and unemployment compensation arising prior to Closing shall be the sole responsibility of Sellers and their Affiliates. For purposes of the preceding provisions of this paragraph, a medical/dental claim shall be considered incurred on the date when the medical/dental services are rendered or

medical/dental supplies are provided, and not when the condition arose or when the course of treatment began. Claims for long-term disability benefits that are made under a Seller Affiliate Plan prior to the Closing Date, or that relate to any condition of a Continuing Employee existing as of the Closing Date as a result of which such Continuing Employee is not actively at work on the Closing Date, shall be the sole responsibility of the Seller Affiliate Plan. Except as provided in the preceding sentence, claims of Continuing Employees and their eligible beneficiaries and dependents for long-term disability benefits that are incurred from and after the Closing Date shall be the sole responsibility of Buyer or its designee. For purposes of the preceding provisions of this paragraph, claims for long-term disability benefits based on an injury or illness occurring prior to the Closing Date will be deemed to have been incurred prior to the Closing Date. In the case of any claim for benefits other than a medical/dental claim or a long-term disability claim, a claim will be deemed to have been incurred upon the occurrence of the event giving rise to such claim.

(i)     Except to the extent required by applicable Law, Sellers shall not pay Continuing Employees their accrued and unused vacation, and Buyer or its designee, as applicable, shall provide, without duplication of benefits, all such Continuing Employees with vacation time rather than cash in lieu of vacation time for all unused vacation accrued through the Closing Date.

(j)     If, within the one-year period beginning on the Closing Date, (i) a Continuing Employee voluntarily terminates his or her employment with Buyer or its designee within 30 days after the date upon which he or she is notified that the principal place of his or her employment is changing to a location that is 25 miles or more from the location of such employee's principal place of employment immediately prior to the Closing Date, or (ii) the employment of a Continuing Employee is terminated by Buyer or its designee for a reason other than cause (as that term is defined in the Severance Plan as of the Closing Date, but based on the terms of the plan as in effect on the Execution Date), then, in any such case, Buyer or its designee, as applicable, shall provide such Continuing Employee with severance benefits at least equal to the severance benefits which such Continuing Employee would have received under the Severance Plan had the employment of such Continuing Employee been terminated under circumstances entitling him or her to benefits under such plan. Such severance benefits shall be determined based on the terms of the Severance Plan in effect on the Execution Date, but Buyer or its designee shall take into account such Continuing Employee's aggregate service with Buyer or its designee and his or her pre-Closing Date service recognized pursuant to Section 7.9(d). Notwithstanding the foregoing, the provisions of this Section 7.9(k) shall not apply to any Continuing Employee who is covered by the Collective Bargaining Contract.

(k)     No assets or liabilities of any Seller Affiliate Plan shall be transferred to, or assumed by, Buyer or its designee.

7.10    Public Announcements. Sellers and Buyer will consult with each other before issuing, and provide each other a reasonable opportunity to review and make reasonable comment upon, any press release or making any public statement with respect to this Agreement and the transactions contemplated hereby and, except as may be required by applicable Law or any listing agreement with the NYSE, will not issue any such press release or make any such public statement prior to such consultation; provided, that each of the Parties may issue a press

release or make any public statement in response to specific questions by the press, analysts, investors or those attending industry conferences or financial analyst conference calls; provided further, that (i) each Party may make disclosures to Persons bound by a confidentiality obligation to the disclosing Party that covers such disclosed information, and (ii) Buyer may make disclosures to any of its direct and indirect equity owners subject to compliance with the Confidentiality Agreement.

7.11    Expenses and Fees.  Except as expressly provided otherwise herein, all costs and expenses incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the Party incurring such expenses.

7.12    Regulatory and Other Approvals.  During the Interim Period:

(a)    The Parties will, in order to consummate the transactions contemplated hereby, (i) take all commercially reasonable steps necessary, and proceed diligently and in good faith and use all commercially reasonable efforts, as promptly as practicable, to obtain or make, as applicable, all necessary or appropriate waivers, consents, approvals and authorizations of, filings with and notices to all third parties and Governmental Authorities required in order to consummate the transactions contemplated by this Agreement and (ii) provide such other information and communications to such Governmental Authorities or other Persons as such Governmental Authorities or other Persons may reasonably request in connection therewith.

(b)    The Parties will provide prompt notification to each other when any such waiver, consent, approval, authorization, filing or notice referred to in Section 7.13 is obtained, taken, made, given or denied, as applicable, and will advise each other of any material communications with any Governmental Authority or other Person regarding any of the transactions contemplated by this Agreement.

(c)    In furtherance of the foregoing covenants:

(i)    Each Party shall prepare, as soon as is practical following the execution of this Agreement, all necessary filings in connection with the transactions contemplated by this Agreement that may be required by FERC, the PUCT or other Governmental Authority or under the HSR Act or any other federal, state or local Laws. Each Party shall submit such filings as soon as practicable, but (A) in no event later than ten (10) Business Days after the execution hereof for filings with the FERC, and (B) in no event more than five (5) Business Days after the Bankruptcy Court enters the Sale Order for filings under the HSR Act. The Parties shall request expedited treatment of any such filings, shall promptly furnish each other with copies of any notices, correspondence or other written communication from the relevant Governmental Authority, shall promptly make any appropriate or necessary subsequent or supplemental filings and shall cooperate in the preparation of such filings as is reasonably necessary and appropriate (provided that HSR Act filings and attachments need not be exchanged or preapproved by the other party and provided that any exchange of information between Sellers and Buyer in connection with any filings shall be done in a manner that complies with applicable antitrust laws).  Buyer and Sellers shall each pay 50% of the filing fees in connection with submissions by the Parties pursuant to the HSR Act.  Except as

described in the immediately preceding sentence, each Party shall bear its own costs incurred in connection with the filing.

(ii)    The Parties shall not, and shall cause their respective Affiliates not to, take any action that could reasonably be expected to adversely affect the approval of any Governmental Authority of any of the aforementioned filings. Without limiting the foregoing, Buyer agrees that except as may be agreed in writing by Sellers or as may be expressly permitted pursuant to this Agreement, it shall not, and shall not permit any of its subsidiaries or Affiliates to, acquire, develop or construct any electric generation or transmission facility, enter into any Contract with respect to any electric generation or transmission facility, or otherwise obtain control over any electric generation or transmission facility, located within the State of Texas or the control areas operated by ERCOT or take any action with any Governmental Authority relating to the foregoing, or agree, in writing or otherwise, to do any of the foregoing, in each case which could reasonably be expected to materially delay the consummation of the transactions contemplated hereby or result in the failure to satisfy any condition to consummation of the transactions contemplated hereby.

(iii)    Buyer shall cooperate in good faith with the Governmental Authorities and undertake promptly any and all action required to complete lawfully the transactions contemplated by this Agreement, including proffering and consenting to a governmental order providing for the sale or other disposition, or the holding separate, of particular Acquired Assets or of any other assets or lines of business of Buyer or its Affiliates in order to remedy any competition concerns that any Governmental Authority may have. The entry by any Governmental Authority in any legal proceeding of a governmental order permitting the consummation of the transactions contemplated hereby but requiring any of the assets or lines of business of Buyer or its Affiliates to be held separate or sold or disposed of thereafter (including the Acquired Assets) shall not be deemed a failure to satisfy any condition to Closing.

(d)    Each Party agrees that after the Closing Date, it will cooperate in good faith with the other Parties to complete in a timely manner all post-closing filings and notices required by FERC or any other Governmental Authorities.

7.13    Further Assurances. Subject to the terms and conditions of this Agreement, at any time or from time to time after the Closing, at any Party's request and without further consideration, the other Party shall execute and deliver to such Party such other instruments of sale, transfer, conveyance, assignment and confirmation, provide such materials and information and take such other actions and execute and deliver such other documents as such Party may reasonably request in order to consummate the transactions contemplated by this Agreement.

7.14    Schedule Update. From time to time, but no less than 15 days prior to the Closing Date, either Seller may, at its option, deliver updates to the Disclosure Schedules (each a *"Schedule Update"*) that are necessary to complete or correct any information in such Schedules or in any representation or warranty of such Seller; provided, that, except as expressly set forth in the following sentence, no such Schedule Update will be deemed to amend or supplement the Disclosure Schedules or to prevent or cure any misrepresentation or breach of any representation,

warranty or covenant herein; and further provided, however, that no Schedule Update shall be permitted with respect to <u>Schedule 1.1(x)</u>, <u>Schedules 2.1(a)</u>, <u>(b)</u>, <u>(c)</u>, <u>(e)</u>, <u>(g)</u>, and <u>(h)</u>, <u>Schedule 2.2(p)</u>, <u>Schedule 2.4</u>, <u>Schedule 7.2</u> and <u>Schedule 7.4(a)</u>. If Buyer has the right to terminate the Agreement pursuant to <u>Section 10.1(c)</u> as a result of such Schedule Update and does not exercise such right by the tenth day after delivery of the Schedule Update then such Schedule Update shall be deemed to have amended the appropriate Schedule or Schedules as of the date of this Agreement, to have qualified the representations and warranties contained in <u>ARTICLE 5</u> as of the date of this Agreement and to have cured any misrepresentation or breach of warranty that otherwise might have existed hereunder by reason of the existence of such matter.

7.15    <u>PUCT Matters</u>. Buyer understands and acknowledges that RESC is certificated by the PUCT to provide retail electric service to Channelview LP and Equistar under Certificate No. 10044. Buyer acknowledges and accepts the obligation to take all steps required prior to Closing to engage each of a "Retail Electric Provider" and a QSE to act on Buyer's behalf with regard to sales of electricity at retail.

7.16    <u>Equistar Consents</u>. Buyer will act in good faith and cooperate with Sellers in obtaining any and all consents of Equistar required for the transaction contemplated by this Agreement.

7.17    <u>Boiler Feedwater Pump</u>. Provided such installation is not completed prior to Closing, and pursuant to paragraph 4.B of the Settlement Agreement (as in effect on the date hereof), Buyer agrees to complete the installation of the Pump (as defined in the Settlement Agreement) in accordance with the terms and conditions of the Settlement Agreement. Sellers shall pay to Buyer amounts incurred by Buyer, to the extent such amounts are reimbursable by Equistar, and at the time such amounts would otherwise be due from Equistar in accordance with Section 4.B of the Settlement Agreement, for its share of the work performed after the Closing Date in connection with the installation of the Pump as required by the Settlement Agreement, subject to receipt by Sellers of an appropriate invoice and supporting documentation (the *"Pump Payments"*).

7.18    <u>Fulfillment of Conditions</u>. Subject to the terms and conditions herein, each of the Parties hereto shall use its commercially reasonable efforts to consummate and make effective, as soon as reasonably practicable, the transactions contemplated hereby, including the satisfaction of all conditions thereto set forth herein, to the extent it can reasonably do so.

7.19    <u>Cure of Defaults</u>. At or prior to Closing, each Seller shall (i) cure any and all defaults under the Assigned Contracts required to be cured under the Bankruptcy Code in order to assign such Contract to Buyer pursuant to Section 365 thereof, and (ii) pay all Cure Costs that are required to be paid as a condition to the assumption and assignment of such Assigned Contracts under Section 365 of the Bankruptcy Code. At Closing, Sellers shall establish a reserve of cash in a bank account (the *"Cure Cost Reserve Amount"*) in an amount sufficient to satisfy any disputed Cure Costs and any Cure Costs not settled or paid (whether or not then due and payable) prior to Closing. After Closing, Sellers shall promptly resolve, settle and/or pay from the Cure Cost Reserve Amount all remaining Cure Costs.

7.20    2007 Financial Statements.  It is understood and agreed between Buyer and Sellers that if the audit of the financial statements of Channelview LP for the period ended December 31, 2007 (the *"2007 Financial Statements"*) is completed on or prior to Closing, a true, correct and complete copy of the audited 2007 Financial Statements shall be promptly provided to Buyer.  If the audit of the 2007 Financial Statements is not completed prior to Closing (i.e., the auditors have not completed their review and approval thereof), Sellers shall provide at Closing (and, to the extent necessary, at any time thereafter that further information is reasonably requested by Buyer, provided that such information has to such date been retained by Sellers or their Affiliates) to Buyer the current form of the 2007 Financial Statements that are under review by the auditors, contact information for such auditors, all correspondence to and from such auditors relating to the 2007 Financial Statements which does not contain confidential information about the Sellers' Affiliates, and any other relevant documentation and/or materials in Sellers' possession or control that is reasonably requested by Buyer in order for the auditors to complete the audit of the 2007 Financial Statements.  Buyer, acknowledges that Sellers' auditors are under no obligation to, and may opt not to, complete an audit of the 2007 Financial Statements.

## ARTICLE 8

## BANKRUPTCY PROCEDURES

8.1    Bankruptcy Actions.

(a)    The approval of this Agreement by the Bankruptcy Court is required for the Agreement to be binding and enforceable against the Sellers.

(b)    Each Seller shall promptly provide Buyer with drafts of all documents, motions, orders, filings or pleadings, that such Seller proposes to file with the Bankruptcy Court that relate to (i) this Agreement or the transactions contemplated hereunder; (ii) entry of the Sale Order; or (iii) the Buyer, and will provide Buyer with a reasonable opportunity to review such documents in advance of their service and filing.  Each Seller shall consult and cooperate with Buyer, and consider in good faith the views of Buyer with respect to all such filings.  Buyer covenants and agrees that it shall cooperate with Channelview LP in connection with furnishing information or documents to Channelview LP to satisfy the requirements of adequate assurance of future performance under Section 365(f)(2)(B) of the Bankruptcy Code.

(c)    Seller shall promptly make any filings, take all actions, and use all reasonable efforts to obtain any and all other approvals and orders of the Bankruptcy Court necessary or appropriate for consummation of the transactions contemplated hereby, subject to Seller's obligations to comply with any order of the Bankruptcy Court and other applicable Laws.  Buyer will, if requested by Sellers, reasonably cooperate with the Sellers with respect to the Chapter 11 Cases in order to consummate the transactions contemplated hereunder, and will not take any action opposing or attempting to delay or hinder the transactions contemplated hereby in the Chapter 11 Cases

(d)    As inducement for and in consideration of the Purchase Price, Sellers hereby agree to the following bid protections and procedures in respect of the auction relating to

the sale of the Acquired Assets to be held by Sellers on or about April 7. 2008 in accordance with the Order Approving Debtors' Proposed Bid Protections dated March 18, 2008 (the "Auction"):

(i)     Any qualifying overbid of the Purchase Price shall equal $505,000,000 in cash in immediately available funds (the "Initial Overbid");

(ii).     Upon receipt of an Initial Overbid, each successive bid thereafter shall be in increments of no less than $1,000,000, and shall not accept any bid that is not in compliance therewith;

(iii)     To the extent that there is no Initial Overbid, Sellers agree to accept the terms and conditions of this Agreement and deem Buyer to be the "winning bidder" for purposes of the Auction; and

(iv)     To the extent that Sellers, acting in accordance with the terms of this Section, select a Person other than Buyer as the "winning bidder" for purposes of the Auction (an :"Alternate Buyer"), Sellers shall reimburse Buyer for its out of pocket expenses relating to its due diligence and the negotiation of this Asset Purchase Agreement and related documents upon closing of the purchase and sale of the Acquired Assets with the Alternate Bidder, up to an aggregate amount of $2,000,000.

## ARTICLE 9

## CONDITIONS TO THE CLOSING

9.1     Conditions to the Obligations of Each Party.  The obligations of the Parties to proceed with the Closing are subject to the satisfaction on or prior to the Closing Date of all of the following conditions, any one or more of which may be waived in writing (other than the condition contained in Section 9.1(d), the satisfaction of which cannot be waived), in whole or in part, as to a Party by such Party:

(a)     no judgment, injunction, order or decree of a court or other Governmental Authority of competent jurisdiction or other condition arising under Law shall be in effect which has the effect of making the transactions contemplated by this Agreement illegal or otherwise restraining or prohibiting the consummation of the transactions contemplated by this Agreement (each Party agreeing to use its commercially reasonable efforts, including appeals to higher courts, to have any judgment, injunction, order or decree lifted);

(b)     (i) any waiting period applicable to consummation of the transactions contemplated by this Agreement under the HSR Act shall have expired or been terminated, and (ii) all Sellers' Governmental Approvals designated with an asterisk on Schedule 5.2(c) and Buyer's Governmental Approvals designated with an asterisk on Schedule 6.3(c) shall have been filed, made or obtained, as the case may be;

(c)     Subject to Section 2.5, the consents, waivers and approvals listed on Schedule 9.1(c) shall have been obtained (with no conditions that would reasonably be expected to materially and adversely impact the rights and obligations under the applicable Assigned

Contract for which such consent, waiver or approval is provided) either from the applicable third party or through entry of the Sale Order; and

(d)    the Bankruptcy Court shall have entered the Sale Order, and the Sale Order shall not have been stayed, and no Adverse Ruling shall be in effect.

9.2    Conditions to the Obligations of Buyer.   The obligation of Buyer to proceed with the Closing is subject to the satisfaction on or prior to the Closing Date of the following further conditions, any one or more of which may be waived, in whole or in part, by Buyer:

(a)    Sellers shall have performed their obligations hereunder required to be performed by such Seller at or prior to the Closing Date, unless the failure to perform would not reasonably be expected to have a Material Adverse Effect (except for Channelview LP's obligations contained in Section 3.5, which, assuming the Settlement Agreement is then still in effect, shall have been performed in full through an application of a portion of the payment of the Purchase Price in accordance with Section 3.5);

(b)    the representations and warranties of each Seller contained in this Agreement (without regard to "materiality", "material adverse effect", Material Adverse Effect or similar qualifiers) shall be true and correct as of the Closing Date (except to the extent such representations and warranties expressly relate to an earlier date, in which case as of such earlier date), except for failures to be true and correct that would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect;

(c)    Buyer shall have received certificates signed on behalf of each Seller by an executive officer of each Seller indicating that the conditions provided in Section 9.2(a) and Section 9.2(b) have been satisfied;

(d)    Sellers shall have complied with their obligations under Section 7.19 in all material respects;

(e)    Sellers shall have delivered each of the items required by Section 4.2;

(f)    Buyer shall have received a letter from URS consenting to Buyer's reliance on the Phase I Environmental Site Assessment, dated as of November 2007, as updated December 20, 2007, in form and substance reasonably acceptable to Buyer; and

(g)    since the Execution Date, no Material Adverse Effect shall have occurred and be continuing.

9.3    Conditions to the Obligations of Sellers.  The obligation of Sellers to proceed with the Closing is subject to the satisfaction on or prior to the Closing Date of the following further conditions, any one or more of which may be waived, in whole or in part, by Sellers:

(a)    Buyer shall have performed in all material respects all of its obligations hereunder required to be performed by it at or prior to the Closing Date;

(b)    the representations and warranties of Buyer contained in this Agreement (without regard to "materiality", "material adverse effect", or similar qualifiers) shall be true and correct as of the Closing Date (except to the extent such representations and warranties expressly relate to an earlier date, in which case as of such earlier date), except for failures to be true and correct that would not reasonably be expected, individually or in the aggregate, to have a material adverse effect on Buyer's ability to perform its obligations hereunder;

(c)    Sellers shall have received a certificate signed on behalf of Buyer by an executive officer of Buyer indicating that the conditions provided in Section 9.3(a) and 9.3(b) have been satisfied;

(d)    Except to the extent that Buyer has delivered a letter of credit or guarantee pursuant to Section 7.4(b)(iv), Sellers shall have received the complete and unconditional release of Sellers and their Affiliates from the LTMA Support Obligations (other than with respect to amounts owing prior to Closing); and unless Buyer has elected Gas Services under the Fuel and Power Transition Services Agreement, either (i) the full execution of the RES Assignment and Assumption Agreement, or (ii) or if required by Section 2.5, the Fuel Supply Agreement shall have been executed by Buyer and Buyer's Energy Manager; and

(e)    Buyer shall have delivered each of the items required by Section 4.3.

## ARTICLE 10

## TERMINATION

10.1    Termination.    This Agreement may be terminated and the consummation of the transactions contemplated hereby may be abandoned at any time prior to the Closing only under one of the following circumstances:

(a)    by mutual written consent of Sellers and Buyer;

(b)    by either Sellers or Buyer:

(i)    if the Closing has not occurred on or before August 25, 2008 (such date, the *"Termination Date"*) provided, that the right to terminate this Agreement pursuant to this Section 10.1(b)(i) shall not be available to any Party whose breach of any provision of this Agreement has been the cause of, or resulted in, the failure of the Closing to occur by the Termination Date; or

(ii)    if any court of competent jurisdiction in the United States or other United States Governmental Authority shall have issued a final order, decree or ruling or taken any other final action restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated by this Agreement and such order, decree, ruling or other action is or shall have become final and nonappealable;

(c)    by Buyer, if there has been a material breach by either Seller of any representation, warranty, covenant or agreement contained in this Agreement which individually or in the aggregate (x) would result in a failure of a closing condition set forth in Section 9.2(a)-

9.2(e) (which is not waived) and (y) cannot be cured prior to the Termination Date; provided that Buyer is not then in breach in any material respect of any representation, warranty, covenant or agreement contained herein;

      (d)    by either Seller, (i) if Buyer has not made the Deposit on the date required to be made pursuant to Section 3.2, or (ii) if there has been a material breach by Buyer of any representation, warranty, covenant or agreement contained in this Agreement which (x) would result in a failure of a closing condition set forth in Section 9.3(a) - 9.3(e) (which is not waived) and (y) cannot be cured prior to the Termination Date; provided that Sellers are not then in breach in any material respect of any representation, warranty, covenant or agreement contained herein; and

      (e)    by either Seller, if the Closing has not occurred within 45 days following the entry of the Sale Order; provided that Sellers are not then in breach in any material respect of any representation, warranty, covenant or agreement contained herein.

The Party desiring to terminate this Agreement pursuant to Section 10.1 (other than pursuant to Section 10.1(a)) shall give notice of such termination to the other Party.

      10.2    Effect of Termination.  In the event of termination of this Agreement by either Sellers or Buyer prior to the Closing pursuant to the provisions of Section 10.1, this Agreement shall forthwith become void, and there shall be no liability or further obligation on the part of Buyer or Sellers or their respective officers or directors (except pursuant to Section 7.1(b), Section 7.8, Section 7.11, Section 10.2, Section 10.3, ARTICLE 11, Section 12.4 and Section 12.5, all of which shall survive the termination); *provided*, that nothing in this Section 10.2 shall relieve any Party from liability for any willful breach of this Agreement by such Party prior to termination of this Agreement,  Notwithstanding any provision to the contrary herein, in the event of a termination pursuant to the provisions of Section 10.1(a), 10.1(b), 10.1(c) or 10.1(e), the Deposit shall be released and delivered to Buyer immediately upon such termination.

      10.3    Termination Fees.

      (a)    If this Agreement is terminated pursuant to Section 10.1(d), then in lieu of all other claims and remedies that might otherwise be available with respect thereto, including elsewhere hereunder and notwithstanding any other provision of this Agreement, Buyer shall pay immediately to Sellers as liquidated damages in connection with such termination, an amount in immediately available funds equal $40,000,000, and Sellers shall have the right immediately to draw on the Deposit to satisfy such payment obligation of Buyer.

      (b)    The provision for payment of liquidated damages in this Section 10.3 has been included because, in the event of a termination of this Agreement pursuant to Section 10.1(d), the actual damages to be incurred by Sellers can reasonably be expected to approximate the amount of liquidated damages called for herein and because the actual amount of such damages would be difficult if not impossible to measure accurately.

      (c)    If this Agreement is terminated pursuant to Section 10.1(c), Sellers shall pay (and shall be jointly and severally responsible for the payment thereof) to Buyer all of

Buyer's reasonable third-party costs and expenses (including reasonable attorneys' and accountants' fees and related expenses) incurred by Buyer in connection with the transactions contemplated by this Agreement, including: (i) Buyer's due diligence review with respect to the Acquired Assets (including costs and expenses for third party consultants and related reports); (ii) the negotiation of this Agreement, the exhibits attached hereto and the documents to be executed pursuant hereto; and (iii) analysis of securities, Tax and other transaction related issues. Provided, however, that in the event this Agreement is terminated pursuant to Section 10.1(c), Sellers shall only be responsible for Buyer's third-party expenses to the extent such expenses do not exceed $2,000,000; provided further that in the event this Agreement is terminated pursuant to Section 10.1(c) as a result of a willful breach of this Agreement by Sellers, Sellers shall pay immediately to Buyer as liquidated damages in connection with such termination, $15,000,000 in immediately available funds. Any obligation of Sellers to pay damages hereunder shall be an administrative expense under Section 507(a)(1) of the Bankruptcy Code and shall be payable as specified herein and not be subject to any defense, counterclaim, offset, recoupment or reduction of any kind whatsoever.

## ARTICLE 11

## INDEMNIFICATION

11.1     Survival. All representations, warranties, covenants and agreements contained herein, and the right to commence any Claim with respect thereto, shall terminate upon the Closing Date, except that (a) the representations and warranties of Sellers and Buyer contained herein shall survive until the first anniversary of the Closing Date, (b) the representations and warranties contained in Section 5.10 shall survive until thirty (30) days after the expiration of the applicable statute of limitations, and (c) the covenants and agreements of the Parties contained herein that by their terms are to be performed after the Closing Date, shall survive and continue in effect in accordance with their terms; *provided*, that in the event written notice of any Claim for indemnification under Section 11.2(a)(i), Section 11.2(a)(ii), Section 11.2(d)(i) or Section 11.2(d)(ii) shall have been given in accordance herewith within the applicable survival period setting forth such Claim in reasonable detail (including a reasonable specification of the legal and factual basis for such Claim and the Loss incurred), the representations, warranties, covenants and agreements that are the subject of such indemnification Claim shall survive with respect to that Claim until such time as the Claim is fully and finally resolved.

11.2     Indemnification.

(a)     Subject to the provisions of this ARTICLE 11, from and after the Closing, Sellers shall jointly and severally indemnify, defend and hold the Buyer Indemnified Group harmless from and against any and all Losses, whether arising out of the contract, tort, strict liability, other Law or otherwise, actually incurred by any of them to the extent arising out of or resulting from:

(i)     any breach as of the Closing Date of a representation or warranty made by either Seller herein (including the related Schedules) or under the officer's certificate delivered pursuant to Section 9.2(c) ;

(ii)    any breach of any covenant or agreement of either Seller herein;

(iii)    the Excluded Liabilities; and

(iv)    any failure of Sellers to make the Pump Payments to Buyer in accordance with Section 7.17.

(b)    Notwithstanding anything to the contrary in this Agreement, Sellers shall not be liable for any Losses with respect to the matters set forth in Section 11.2(a) unless (x) a Claim is timely asserted during the survival period specified in Section 11.1, (y) the Loss with respect to the particular act, circumstance, development, event, fact, occurrence or omission exceeds $500,000 (aggregating all Losses arising from substantially identical facts) and (z) the aggregate of all Losses under Section 11.1 exceeds, on a cumulative basis, 2% of the Final Purchase Price and then only to the extent of such excess.  Notwithstanding anything to the contrary in this Agreement, the aggregate liability of Sellers to the Buyer Indemnified Group arising under or related to the matters set forth in this Agreement, whether based in contract, tort, strict liability, other Law or otherwise, shall not exceed 15% of the Final Purchase Price, provided that the foregoing limitations shall not apply to the Excluded Liabilities and the Pump Payments.

(c)    In connection with Sellers' obligations under this Section 11.2, upon Closing, pursuant to Sections 4.2(j) and 4.3(e), Forty Million Dollars ($40,000,000) will be transferred into the Indemnity Escrow Account (the *"Indemnity Security"*) to be held and disbursed pursuant to the terms of the Escrow Agreement and this Agreement; provided, however, the Sellers may at any time and in their sole discretion, withdraw the Indemnity Security so long as Reliant Energy simultaneously provides Buyer with a guaranty of all of Sellers' obligations under this Section 11.2, in form and substance reasonably satisfactory to Buyer, such guaranty to terminate one (1) year from the Closing Date.  It is further agreed that at any time, beginning one (1) year from the Closing Date, if Sellers have not replaced the Indemnity Security with a guaranty of Reliant Energy, Sellers may withdraw the entire amount of the Indemnity Security and any accrued interest without providing any replacement security, provided, however, if a claim has been made on the Indemnity Security, the amount remaining in the Indemnity Escrow Account may not be less than the amount of such claim (if the amount of such claim is indeterminate, the amount remaining in the Indemnity Escrow Account shall be the highest reasonable estimate for such claim in the reasonable judgment of Buyer),

(d)    Subject to the provisions of this ARTICLE 11, from and after the Closing, Buyer hereby agrees to indemnify, defend and hold the Seller Indemnified Group harmless from and against any and all Losses, whether arising out of contract, tort, strict liability, other Law or otherwise, actually incurred by any of them to the extent arising out of or resulting from:

(i)    any breach as of the Closing Date of a representation or warranty made by Buyer herein or under the officer's certificate delivered pursuant to Section 9.3(c);

(ii)    any breach of any covenant or agreement of Buyer herein; and

(iii)    the Assumed Liabilities.

(e)    THE PARTIES INTEND AND AGREE THAT THE INDEMNITY OBLIGATIONS SET FORTH IN THIS SECTION 11.2 ARE INTENDED TO AND SHALL EXTEND TO AND COVER ANY AND ALL LOSSES RESULTING FROM OR CAUSED IN WHOLE OR IN PART BY ANY ACTIVE, PASSIVE, AFFIRMATIVE, SOLE, CONCURRENT OR OTHER NEGLIGENCE, STRICT LIABILITY OR OTHER FAULT OF, REGARDLESS OF WHETHER SUCH LOSSES RESULT FROM OR ARE CAUSED IN WHOLE OR IN PART BY ANY ALLEGED OR ACTUAL NEGLIGENCE OR OTHER FAULT OF, (I) ANY OF THE BUYER INDEMNIFIED PARTIES WITH RESPECT TO SECTION 11.2(a), AND (II) ANY OF THE SELLER INDEMNIFIED PARTIES WITH RESPECT TO SECTION 11.2(d); and shall be the sole and exclusive remedy of the parties hereunder from and after the Closing.

(f)    Notwithstanding anything to the contrary contained in this Agreement, for purposes of determining whether there has been a breach and the amount of any Losses that are the subject matter of a claim for indemnification hereunder, each representation and warranty in this Agreement and each certificate or document delivered pursuant to this Agreement shall be read without regard and without giving effect to the term(s) "material" or "Material Adverse Effect", or any derivation thereof, in each instance where the effect of such term(s) would be to make such representation and warranty less restrictive (as if such standard or qualification were deleted from such representation and warranty).

(g)    The indemnification obligations set forth in this Section 11.2(a) are made notwithstanding any investigation by or on behalf of Buyer or the result of any investigation and notwithstanding the participation of Buyer in the Closing.

11.3    Waiver of Other Representations.

(a)    NOTWITHSTANDING ANYTHING IN THIS AGREEMENT TO THE CONTRARY, IT IS THE EXPLICIT INTENT OF EACH PARTY HERETO, AND THE PARTIES HEREBY AGREE, THAT NONE OF SELLERS OR ANY OF THEIR AFFILIATES OR REPRESENTATIVES HAS MADE OR IS MAKING ANY REPRESENTATION OR WARRANTY WHATSOEVER, EXPRESS OR IMPLIED, WRITTEN OR ORAL, INCLUDING ANY IMPLIED REPRESENTATION OR WARRANTY AS TO THE CONDITION, MERCHANTABILITY, USAGE, SUITABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE WITH RESPECT TO THE ACQUIRED ASSETS, OR ANY PART THEREOF, EXCEPT THOSE EXPRESS REPRESENTATIONS AND WARRANTIES CONTAINED IN ARTICLE 5. NOTWITHSTANDING ANYTHING IN THIS AGREEMENT TO THE CONTRARY, IT IS THE EXPLICIT INTENT OF EACH PARTY HERETO, AND THE PARTIES HEREBY AGREE, THAT NEITHER BUYER NOR ITS AFFILIATES OR REPRESENTATIVES HAS MADE OR IS MAKING ANY REPRESENTATION OR WARRANTY WHATSOEVER, EXPRESS OR IMPLIED, WRITTEN OR ORAL, INCLUDING ANY IMPLIED REPRESENTATION OR WARRANTY, EXCEPT THOSE EXPRESS REPRESENTATIONS AND WARRANTIES CONTAINED IN ARTICLE 6. IN PARTICULAR, AND WITHOUT IN ANY WAY LIMITING THE FOREGOING, (I) NEITHER SELLER MAKES ANY REPRESENTATION OR WARRANTY REGARDING ANY ENVIRONMENTAL MATTERS EXCEPT AS EXPRESSLY SET FORTH IN SECTION 5.13, (II) NEITHER SELLER MAKES ANY REPRESENTATION OR WARRANTY TO

BUYER WITH RESPECT TO ANY FINANCIAL PROJECTIONS OR FORECASTS RELATING TO THE ACQUIRED ASSETS, AND (III) NEITHER SELLER MAKES ANY REPRESENTATION OR WARRANTY TO BUYER WITH RESPECT TO INFORMATION PROVIDED TO BUYER IN RESPONSE TO QUESTIONS PRESENTED BY BUYER OR OTHER INFORMATION PROVIDED TO BUYER RELATING TO THE ACQUIRED ASSETS; PROVIDED, THAT THIS SENTENCE SHALL NOT LIMIT THE EXPRESS REPRESENTATIONS AND WARRANTIES CONTAINED IN ARTICLE 5.

(b)    EXCEPT FOR THOSE EXPRESS REPRESENTATIONS AND WARRANTIES CONTAINED IN ARTICLE 5, THE ACQUIRED ASSETS ARE BEING TRANSFERRED "AS IS, WHERE IS, WITH ALL FAULTS," AND SELLERS EXPRESSLY DISCLAIM ANY REPRESENTATIONS OR WARRANTIES OF ANY KIND OR NATURE, EXPRESS OR IMPLIED, AS TO THE CONDITION, VALUE OR QUALITY OF THE ACQUIRED ASSETS OR THE PROSPECTS (FINANCIAL OR OTHERWISE), RISKS AND OTHER INCIDENTS OF THE ACQUIRED ASSETS.

(c)    BUYER ACKNOWLEDGES THAT IT HAS INVESTIGATED TO ITS SATISFACTION, THE CONDITION AND SUITABILITY OF ALL ASPECTS OF THE ACQUIRED ASSETS AND ALL MATTERS AFFECTING THE VALUE OR DESIRABILITY OF THE ACQUIRED ASSETS, INCLUDING, BUT NOT LIMITED TO, THE OPERATIONAL ASPECTS OF THE CHANNELVIEW FACILITY, POTENTIAL ENVIRONMENTAL HAZARDS ARISING FROM THE PRESENCE ON OR ABOUT THE PROPERTY OF HAZARDOUS SUBSTANCES, INCLUDING ASBESTOS, FORMALDEHYDE, RADON GAS, LEAD-BASED PAINT, OTHER LEAD CONTAMINATION, FUEL OR CHEMICAL STORAGE TANKS, CAVERNS, PIPELINES, ELECTROMAGNETIC FIELDS, PHOSPHO-GYPSUM OR POLYCHLORINATED BIPHENYLS; PROVIDED, HOWEVER, THAT SELLERS ACKNOWLEDGE THAT BUYER WAS NOT PERMITTED TO PERFORM ANY ENVIRONMENTAL TESTING OF ANY KIND. EXCEPT AS EXPRESSLY PROVIDED HEREIN, NEITHER THE SELLERS, NOR THEIR AFFILIATES OR REPRESENTATIVES MAKES OR HAS MADE ANY REPRESENTATIONS OR WARRANTIES OF ANY KIND, EXPRESS OR IMPLIED, WRITTEN OR ORAL, AS TO THE PHYSICAL CONDITION OF THE ACQUIRED ASSETS, THE USES OF THE ACQUIRED ASSETS OR ANY LIMITATIONS THEREON, THE INCOME TO BE DERIVED THEREFROM, THE COSTS OF OPERATION, COMPLIANCE WITH LAW, AND/OR ANY REQUIREMENTS FOR ALTERATIONS OR IMPROVEMENTS TO COMPLY WITH LAW, INCLUDING ANY REPRESENTATIONS OR WARRANTIES PERTAINING TO ZONING, ENVIRONMENTAL OR OTHER LAW; THE UTILITIES, PIPELINES OR OTHER PHYSICAL EQUIPMENT OR FIXTURES ON THE REAL PROPERTY COMPRISING OR ASSOCIATED WITH THE ACQUIRED ASSETS OR ANY OTHER ASPECT OF THE ECONOMIC OPERATIONS ON SUCH REAL PROPERTY; THE CONDITIONS OF THE SOILS, WATER OR GROUNDWATER OF, OR IN THE VICINITY OF, SUCH REAL PROPERTY; THE PRESENCE OR ABSENCE OF ELECTROMAGNETIC FIELDS, TOXIC MATERIALS OR HAZARDOUS SUBSTANCES ON OR UNDER SUCH REAL PROPERTY OR IN THE VICINITY OF SUCH REAL PROPERTY; OR ANY OTHER MATTER BEARING ON THE USE, VALUE OR CONDITION OF THE ACQUIRED ASSETS.

11.4   <u>Waiver of Remedies; Certain Limitations.</u>   Notwithstanding anything in this Agreement to the contrary:

(a)     the Parties hereby agree that no Party shall have any liability, and no Party shall make any Claim, for any Loss or other matter, under, relating to or arising out of this Agreement or any other document, agreement, certificate or other matter delivered pursuant hereto, whether arising out of contract, tort, strict liability, other Law or otherwise, except as expressly set forth in <u>Section 3.3</u>, <u>Section 7.1(b)</u>, <u>Section 7.7(b)</u>, <u>ARTICLE 10</u> and this <u>ARTICLE 11</u>.

(b)     NO PARTY SHALL BE LIABLE FOR SPECIAL, PUNITIVE, EXEMPLARY, INCIDENTAL, CONSEQUENTIAL OR INDIRECT DAMAGES OR LOST PROFITS, WHETHER BASED ON CONTRACT, TORT, STRICT LIABILITY, OTHER LAW OR OTHERWISE AND WHETHER OR NOT ARISING FROM THE OTHER PARTY'S SOLE, JOINT OR CONCURRENT NEGLIGENCE, STRICT LIABILITY OR OTHER FAULT, EXCEPT SUCH DAMAGES THAT ARE PAYABLE TO A THIRD PARTY WITH RESPECT TO A THIRD PARTY CLAIM FOR WHICH ANY PERSON IS SEEKING INDEMNIFICATION HEREUNDER;

(c)     in calculating any amount of Losses recoverable pursuant to <u>Section 11.2(a)</u> or <u>Section 11.2(d)</u>, the amount of such Losses shall appropriately take into account Tax consequences and be reduced by (i) any insurance proceeds actually received relating to such Loss, net of any related deductible and any expenses to obtain such proceeds, and (ii) any recoveries from third parties pursuant to indemnification (or otherwise) with respect thereto, net of any expenses incurred by the Indemnified Party in obtaining such third party payment. The Parties agree to treat any indemnification payment pursuant to this <u>ARTICLE 11</u> as an adjustment to the Purchase Price for all Tax purposes unless otherwise required by applicable Law. The Indemnified Party shall use its commercially reasonable efforts to seek insurance recoveries in respect of Losses to be indemnified hereunder. In the event any insurance proceeds or other recoveries from third parties (described in clause (ii) of this <u>Section 11.4(c)</u>) are actually realized (in each case net of expenses of such recoveries) by an Indemnified Party subsequent to the receipt by such Indemnified Party of an indemnification payment hereunder in respect of the claims to which such insurance proceedings or third party recoveries described in clause (ii) of this <u>Section 11.4(c)</u> relate, appropriate refunds shall be made promptly to the Indemnifying Party regarding the amount of such indemnification payment (net of reasonable attorney's fees and other expenses incurred in connection with such recoveries);

(d)     no Representative or Affiliate of either Seller shall have any personal liability to Buyer or any other Person as a result of the breach of any representation, warranty, covenant, agreement or obligation of such Seller in this Agreement and no Representative or Affiliate of Buyer shall have any personal liability to Sellers or any other Person as a result of the breach of any representation, warranty, covenant, agreement or obligation of Buyer in this Agreement;

(e)     no member of the Buyer Indemnified Group shall be entitled to indemnification under this <u>ARTICLE 11</u> if the facts and circumstances giving rise to such claim for indemnification would result in a breach of <u>Section 6.8</u> hereof;

(f)    each Party shall have a duty to use commercially reasonable efforts to mitigate any Loss suffered by such Party in connection with this Agreement;

(g)    No Seller shall have any liability for any Losses that represent the cost of repairs, replacements or improvements which enhance the value of the repaired, replaced or improved asset above its value on the Closing Date or which represent the cost of repair or replacement exceeding the reasonable cost of repair or replacement;

(h)    Buyer, on behalf of itself and its Affiliates, hereby releases, waives and discharges forever each Seller and its Affiliates from all present and future Claims and from all Losses, present and future, that are or may be attributable to the matters described in <u>Section 11.3</u>;

(i)    From and after Closing, Buyer, on behalf of itself and its Affiliates, agrees to release and indemnify and hold harmless Sellers, their Affiliates and the managers, officers, directors and employees of Channelview LP and RESC (acting in their capacity as such) from and against any Losses for controlling member liability or breach of fiduciary duty or other duty relating to any pre-Closing actions or failures to act (including negligence or gross negligence) in connection with the Business prior to the Closing; provided that nothing in this <u>Section 11.4(h)</u> shall effect Sellers' obligations under <u>Section 11.2(a)-11.2(c)</u>. **THE PARTIES INTEND AND AGREE THAT THE INDEMNITY OBLIGATIONS SET FORTH IN THIS <u>SECTION 11.4(i)</u> ARE INTENDED TO AND SHALL EXTEND TO AND COVER ANY AND ALL LOSSES RESULTING FROM OR CAUSED IN WHOLE OR IN PART BY ANY ACTIVE, PASSIVE, AFFIRMATIVE, SOLE, CONCURRENT OR OTHER NEGLIGENCE, STRICT LIABILITY OR OTHER FAULT OF, REGARDLESS OF WHETHER SUCH LOSSES RESULT FROM OR ARE CAUSED IN WHOLE OR IN PART BY ANY ALLEGED OR ACTUAL NEGLIGENCE OR OTHER FAULT OF ANY OF THE PERSONS TO BE INDEMNIFIED PURSUANT TO THIS <u>SECTION 11.4(i)</u>;**

(j)    THE REMEDIES FOR ENVIRONMENTAL CLAIMS SET FORTH IN THIS AGREEMENT SHALL BE THE BUYER'S SOLE AND EXCLUSIVE REMEDIES AND BUYER EXPRESSLY WAIVES ALL OTHER RIGHTS OF RECOVERY AGAINST SELLERS UNDER ANY ENVIRONMENTAL LAW INCLUDING, BUT NOT LIMITED TO, THE COMPREHENSIVE ENVIRONMENTAL RESPONSE, COMPENSATION, AND LIABILITY ACT (CERCLA) AND THE RESOURCE CONSERVATION AND RECOVERY ACT (RCRA).

11.5    <u>Procedures for Indemnification</u>.    Whenever a Claim shall arise for indemnification resulting from or in connection with a Claim by a third party (a "Third-Party Claim"), the Person entitled to indemnification (the *"Indemnified Party"*) shall promptly notify the Party from which indemnification is sought (the *"Indemnifying Party"*) of such Claim and, when known, the facts constituting the basis of such Claim, *provided*, that failure to notify the Indemnifying Party shall not relieve the Indemnifying Party of any liability it may have to the Indemnified Party, except to the extent that the Indemnifying Party has been prejudiced by such failure. Following receipt of notice of any such Third-Party Claim, and unless the assumption of such defense by the Indemnifying Party would be inappropriate due to a conflict of interest, the Indemnifying Party shall have the option, at its cost and expense, to assume the defense of such

Third-Party Claim and to retain counsel (not reasonably objected to by the Indemnified Party) to defend any such claim or legal proceeding, and the Indemnifying Party shall not be liable to the Indemnified Party for any fees of other counsel or any other expenses (except as expressly provided to the contrary herein) with respect to the defense of such Claim, other than reasonable fees and expenses of counsel employed by the Indemnified Party for any period during which the Indemnifying Party has not assumed the defense thereof. In the defense of such Claim, the Indemnifying Party shall act in good faith and conduct the defense actively and diligently, and in the event the Indemnifying Party is not complying with the foregoing, the Indemnified Party shall have the right to assume the defense of such Claim. The Indemnified Party shall have the option of joining the defense of such Claim (which shall be at the sole cost and expense of the Indemnified Party) with counsel not reasonably objected to by the Indemnifying Party and counsel for each party shall, to the extent consistent with such counsel's professional responsibilities, cooperate with the other party and any counsel designated by that party. In effecting the settlement or compromise of, or consenting to the entry of any judgment with respect to, any such Third-Party Claim with respect to which the Indemnifying Party has assumed the defense in accordance with this <u>Section 11.5</u>, the Indemnifying Party, or the Indemnified Party, as the case may be, shall act in good faith, shall consult with the other party and shall enter into only such settlement or compromise or consent to the entry of any judgment as the other party shall consent, such consent not to be unreasonably withheld, conditioned or delayed; provided that no such consent shall be required if (a) there is a full release of the Indemnified Party and (b) the sole relief provided is monetary damages that are paid in full by the Indemnifying Party. An Indemnifying Party shall not be liable for any settlement, compromise or judgment entered into by the Indemnified Party not made in accordance with the preceding sentence. Notwithstanding the rights of Sellers under this <u>Section 11.5</u> with respect to the defense of claims, the Buyer shall control any environmental remediation performed at the Channelview Facility, and shall have the right to take any action required, in Buyer's reasonable judgment, by prudent environmental management and plant operation. Notwithstanding anything to the contrary in this <u>Section 11.5</u>, the Parties shall jointly control any Tax Proceeding involving Taxes attributable to a Straddle Period.

     11.6   <u>Manner of Payment</u>. Except as otherwise provided herein, any payment with respect to an indemnification obligation owing hereunder shall be made by wire transfer of immediately available funds to an account designated by such indemnified party, within ten (10) days after determination thereof.

<div align="center">

**ARTICLE 12**

**MISCELLANEOUS**

</div>

     12.1   <u>Notices</u>. All notices and other communications hereunder shall be in writing and shall be deemed given if delivered personally to, or mailed by registered or certified mail (return receipt requested) if and when received by, or sent via facsimile if and when received by, the Parties at the following addresses (or at such other address for a Party as shall be specified by like notice):

        If to Sellers, to:

Reliant Energy Channelview LP
Reliant Energy Services, Inc.
1000 Main Street, 12th Floor
Houston, Texas 77002
Attention:      General Counsel
Facsimile:      (713) 537-7465

With a copy to:

Stroock & Stroock & Lavan LLP
180 Maiden Lane
New York, NY 10038
Attention:      Michael S. Shenberg
Facsimile:      (212) 806-6006

If to Buyer, to:

GIM Channelview Cogeneration, LLC
c/o Global Infrastructure Partners - A, L.P.
315 Park Avenue South, 8th Floor
New York, NY 10010
Attention:      Salim G. Samaha
Facsimile:      (212) 448-3526

Fortistar LLC
One North Lexington Avenue
White Plains, NY 10601
Attention:      Mark Comora
Facsimile:      (914) 421-0052

With a copy to:

Hunton & Williams LLP
1900 K Street, NW
Washington, D.C. 20006
Attention:      Jeremy R. Schwer
Facsimile:      (202) 778-2201

12.2    Headings. The headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

12.3    Assignment. This Agreement (including the documents and instruments referred to herein) shall not be assigned by operation of Law or otherwise by any Party hereto without the prior written consent of the other Parties hereto, which consent shall not be unreasonably withheld or delayed; provided that Buyer may assign its rights and interests hereunder (but not any of its obligations) to (i) any Affiliate, or (ii) any persons providing financing to Buyer in connection with the transactions contemplated hereby. This Agreement shall be binding upon

and inure to the benefit of the Parties hereto and their respective successors and permitted assigns.

12.4    Governing Law.    THIS AGREEMENT SHALL BE GOVERNED IN ALL RESPECTS, INCLUDING VALIDITY, INTERPRETATION AND EFFECT, BY THE LAWS OF THE STATE OF NEW YORK (WITHOUT GIVING EFFECT TO ANY CONFLICT OF LAWS PRINCIPLES OTHER THAN SECTION 5-1401 OF THE GENERAL OBLIGATIONS LAW OF THE STATE OF NEW YORK).

12.5    Jurisdiction.    For so long as Sellers are subject to the jurisdiction of the Bankruptcy Court, the parties hereto irrevocably elect as the sole judicial forum for the adjudication of any matters arising under or in connection with the Agreement, and consent to the exclusive jurisdiction of, the Bankruptcy Court. After Sellers are no longer subject to the jurisdiction of the Bankruptcy Court, any legal action or proceeding with respect to this Agreement or the transactions contemplated hereby shall be brought exclusively in the courts of the State of New York sitting in New York County or of the United States for the Southern District of New York, and by execution and delivery of this Agreement, each of the Parties consents to the jurisdiction of those courts. Each of the Parties irrevocably waives any objection, including any objection to the laying of venue or based on the grounds of *forum non conveniens*, which it may now or hereafter have to the bringing of any action or proceeding in such jurisdiction in respect of this Agreement or the transactions contemplated hereby.

12.6    Counterparts.    This Agreement may be executed in two or more counterparts, and by facsimile and/or electronic transmission, each of which shall be deemed to be an original, but all of which shall constitute one and the same agreement.

12.7    Amendments; Extensions.

    (a)    This Agreement may not be amended except by an instrument in writing signed on behalf of each of the Parties.

    (b)    At any time a Party may (i) extend the time for the performance of any of the obligations or other acts of the other Party, (ii) waive any inaccuracies in the representations and warranties of the other Party contained herein or in any document delivered pursuant hereto and (iii) waive compliance with any of the covenants or agreements of the other Party contained herein. Any agreement on the part of a Party to any such extension or waiver shall be valid only if set forth in a written instrument signed on behalf of such Party. The failure or delay of any Party to assert any of its rights under this Agreement or otherwise shall not constitute a waiver of those rights.

12.8    Entire Agreement.    This Agreement, the Confidentiality Agreement and the other agreements contemplated hereby constitute the entire agreement between the Parties with respect to the subject matter hereof and supersede all prior agreements, understandings and negotiations, both written and oral, between the Parties with respect to the subject matter of this Agreement. No representation, inducement, promise, understanding, condition or warranty not set forth herein has been made or relied upon by any Party. Neither this Agreement nor any provision hereof is intended to confer upon any Person other than the Parties hereto any rights or remedies

hereunder except as expressly provided otherwise in <u>Section 7.1(b)</u>, <u>Section 7.5</u>, <u>Section 7.10</u>, <u>Section 7.14</u> and ARTICLE 11.

12.9    <u>Severability</u>. If any term or other provision of this Agreement is invalid, illegal, or incapable of being enforced by any rule of applicable Law, or public policy (including any term or provision of <u>Section 12.5</u>), then such term or provision shall be severed from the remaining terms and provisions of this Agreement (including the remaining terms and provisions of <u>Section 12.5</u>), and such remaining terms and provisions shall nevertheless remain in full force and effect.

12.10   <u>Joint and Several</u>.  Each Seller shall be jointly and severally liable for the payment and performance of all "Seller" obligations and liabilities hereunder.

[Remainder of Page Intentionally Left Blank]

IN WITNESS WHEREOF, the Parties have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

RELIANT ENERGY CHANNELVIEW LP

By:  Reliant Energy Channelview (Texas) LLC,
*General Partner of Reliant Energy*
*Channelview LP*

By:    _____
Name: _____
Title:  _____

**RELIANT ENERGY SERVICES**
**CHANNELVIEW LLC**

By:  Reliant Energy Services, Inc.,
*Manager of Reliant Energy Services*
*Channelview LLC*

By:    _____
Name: _____
Title:  _____

**GIM CHANNELVIEW COGENERATION,**
**LLC**

By:  Global Infrastructure Partners - A, L.P.
*Member of GIM Channelview Cogeneration, LLC*

By: Global Infrastructure GP, L.P., its general
partner

By: Global Infrastructure Investors, Limited, its
general partner

By:    _____
Name: _Jonathan Bram_____
Title:  _Partner_____

[Signature page to Asset Purchase Agreement]

# **Exhibit B to the Order**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

In re:                              :    Chapter 11
                                    :
RELIANT ENERGY                      :    Case No. 07-11160 (MFW)
CHANNELVIEW LP, *et al.*,           :
                                    :    Jointly Administered
                   Debtors.         :    **Re:  Dkt. No. 251**
                                    :
                                    :

-----------------------------------------------------

### STIPULATION REGARDING MOTION OF THE DEBTORS AND
### DEBTORS-IN-POSSESSION PURSUANT TO SECTIONS 105(A), 363
### AND 365 OF THE BANKRUPTCY CODE AND BANKRUPTCY
### RULES 2002, 6004, 6006, 9007 AND 9014 FOR AN ORDER AUTHORIZING
### (I) THE SALE OR TRANSFER OF CERTAIN ASSETS OF THE DEBTORS
### FREE AND CLEAR OF LIENS, CLAIMS AND ENCUMBRANCES, AND OTHER
### INTERESTS, (II) THE ASSUMPTION AND ASSIGNMENT OF CERTAIN
### <u>EXECUTORY CONTRACTS, (III) AND GRANTING RELATED RELIEF [D.I. 251]</u>

The undersigned parties (the "Stipulating Parties") have considered the motion dated

February 26, 2008 (the "Sale Motion") of Reliant Energy Channelview LP, a Delaware limited

partnership ("Channelview LP") and Reliant Energy Services Channelview LLC, a Delaware

limited liability company ("RESC" and collectively with Channelview LP, the "Sellers"), as

debtors and debtors-in-possession,[1] pursuant to sections 105(a), 363, and 365 of Title 11 of the

United States Code (the "Bankruptcy Code"), and Rules 2002, 6004, 6006, 9007 and 9014 of the

Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") (D.I. 251), the Preliminary

Objections of Equistar Chemicals, LP ("Equistar") to Debtors' Motion for an Order Authorizing

(i) the Sale or Transfer of Certain Assets of the Debtors Free and Clear of Liens, Claims and

---

[1] The debtors and debtors-in-possession in the above-captioned chapter 11 cases are (i) Channelview LP, (ii) RESC, (iii) Reliant Energy Channelview (Texas) LLC, a Delaware limited liability company and (iv) Reliant Energy Channelview (Delaware) LLC, a Delaware limited liability company (collectively, the "Debtors").

Encumbrances, (ii) the Assumption and Assignment of Certain Executory Contracts and (iii) Granting Related Relief (D.I. 251), the Preliminary Response of the Official Committee of Unsecured Creditors to the Debtors' Motion, inter alia, to Sell Assets and Assume and Assign Executory Contracts (D.I. 343), the Debtors' Reply in Support of the Debtors' Sale Motion and Motion to Establish Cure Amounts (D.I. 362), and the Response of the Administrative Agent to the Secured Lenders to the Debtors' Motion Pursuant to Sections 105(a), 363 and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006, 9007 and 9014 for an Order Authorizing (I) the Sale or Transfer of Certain Assets of the Debtors Free and Clear of Liens, Claims and Encumbrances, (II) the Assumption and Assignment of Certain Executory Contracts, (III) and Granting Certain Relief (D.I. 363); and the statements and rulings of the Court (the "Court" or the "Bankruptcy Court") in response to the evidence presented at the hearing on April 9, 2008 (the "Sale Hearing");

In connection with the above, the Stipulating Parties hereby agree and stipulate as follows:

1.      The Stipulating Parties will jointly submit to the Court under Certification of Counsel this Stipulation and an Sale Order approving this Stipulation and the Sale Motion (the "Sale Order"). This Stipulation is to be attached to the Sale Order.

2.      The Sale Order shall approve the sale of the assets that are the subject of the Sale Motion (the "Acquired Assets") in accordance with the terms of the Asset Purchase Agreement dated as of April 3, 2008 (the "APA") to GIM Channelview Cogeneration, LLC ("GIM") as the successful bidder

2

(the "GIM Transaction.")  Nothing in this Stipulation shall be deemed to amend, alter, or otherwise modify the APA or the Sale Order.  To the extent there are any conflicts between this Stipulation and the Sale Order, the Sale Order shall control.

3.   Notwithstanding anything in this Stipulation to the contrary, the Stipulation and all agreements contained herein are conditioned upon the closing of the GIM Transaction (the "Closing") and the payments due at Closing to Equistar and Reliant Energy, Inc. ("REI") or its designees being paid at Closing in accordance with the terms of this Stipulation.

4.   The Sale Motion, as originally filed, excluded the Second Amended and Restated Cash Flow Participation Agreement[2] ("CFPA") from those agreements with Equistar that were to be assumed by the Debtors and then assigned to the successful bidder ("the Project Agreements"); however, the Stipulating Parties agree that the CFPA shall be treated in accordance with the terms set forth further in this Stipulation.

5.   Effective upon the Closing, the CFPA shall be deemed assumed by Channelview LP but not assigned to GIM, directly or indirectly.  The Acquired Assets shall be conveyed to GIM free and clear of any liens, claims, obligations or interests under or related to the CFPA.  The Project Agreements, excluding the CFPA, including, without limitation, the Steam Supply Agreement, Site Lease, Energy Supply Agreement, and Services

[2] Capitalized terms used but not defined herein shall have the meanings set forth in the Sale Motion.

3

Agreement, and the specified Letter Agreements, as identified in the schedules to the APA, shall be assumed and assigned under the Sale Order as part of the GIM Transaction. For the avoidance of doubt, in no event shall Equistar have any liens, claims, rights or other interests in the Acquired Assets or against GIM arising from or related to the CFPA and GIM shall have no duties or obligations to Equistar under the CFPA and shall not be deemed to have assumed the CFPA or any duties or obligations under or related to the CFPA.

6.    At Closing, and provided Equistar is paid at Closing those payments due at Closing in accordance with the terms of this Stipulation, Equistar shall be deemed to have terminated its interests under and waived all rights in or related to the CFPA upon the terms set forth further in this Stipulation. There shall be no cure payment obligation arising from the Debtors' assumption of the CFPA.

7.    In return for Equistar's termination of its rights under the CFPA, Equistar and REI or such affiliates of REI as it designates prior to Closing shall receive the following. All funds that become available for distribution in accordance with subparagraphs 7a, 7b and 7c below, after the payment of or reserve for all Required Obligations (as defined below) of the Debtors ("Available Cash") will be paid to Equistar and REI in the following ratios: Available Cash up to and including $71.7 million shall be paid 80% to Equistar and 20% to REI or its designees, and Available Cash in excess of $71.7 million shall be paid 60% to Equistar and 40% to REI or

4

its designees.  In accordance with subparagraphs 7d and 7e below, and except as otherwise provided therein, additional funds (from the Escrow and funds from sources other than from Net Sales Proceeds, Cash on Hand at Closing, and Amounts Received from Operations, as such terms are defined below) will be paid 12.5% to Equistar and 87.5% to REI.  To effectuate the agreed payments of Available Cash to them, Equistar and REI shall share in Net Sales Proceeds, Cash on Hand, Amounts Received from Operations and in addition, shall share funds disbursed from the Escrow, as follows:

a.      At Closing, Net Sale Proceeds (up to $71.7 million) shall be paid 80.0% to Equistar and 20.0% to REI. "Net Sale Proceeds" are defined as the funds available at the Closing after payments required under the APA and the Sale Order to the Lenders, taxes due, payments of cure amounts and the establishment and funding of the Escrow and the Reserve (defined in subparagraph 7c below), as illustrated in Schedule A attached hereto.

b.      At Closing, the operating cash on hand (net of any amounts required for the Reserve) ("Cash on Hand"), (when combined with Net Sale Proceeds) up to $71.7 million shall be paid 80.0% to Equistar and 20.0% to REI.

c.      At Closing, in addition to $40 million deposited into escrow in accordance with the APA (the "Escrow"), there shall be a reserve (the "Reserve") created for amounts payable upon confirmation of a plan of liquidation (the "Confirmed Plan"), including, without limitation, administrative

5

expenses, priority claims, secured claims, unsecured claims, any amount for administrative claims or expenses arising and/or incurred between the entry date of the Sale Order and the Closing and post-confirmation wind down expenses, including, without limitation, amounts described in paragraphs 8, 9, 10, 11 and 12 below ("Required Obligations"). At Closing, in order to determine the amount to be deposited into the Reserve, all Required Obligations and accounts receivable arising from the operation of the Debtors' business prior to the Closing Date ("Accounts Receivable") shall be netted against one another as of the Closing Date, and adjusted, as necessary, for any timing differences of anticipated cash receipts versus anticipated cash disbursements, and the Reserve shall be funded at Closing with the net amount reasonably needed (including a reasonable allowance for unexpected variations in amounts and timing) in order to pay the Required Obligations to the extent they are in excess of the Accounts Receivable. Any funds not required to be deposited into the Reserve shall be considered Cash on Hand, and distributed in accordance with subparagraph 7b. In addition, all funds received after the Closing from Debtors' operations, including all amounts received in the ordinary course of business from deliveries of goods or services occurring prior to the Closing, and any underpayments or overpayments, whenever received, whether before or after the effective date of the Confirmed Plan but excluding any amounts pursuant to subparagraph 7d and 7e ("Amounts Received from Operations"), shall be deposited solely into the Reserve, to

6

be disbursed in accordance with the next succeeding sentence. Amounts in the Reserve, including all Amounts Received from Operations, shall be disbursed to pay, without limitation, administrative expenses, priority claims, unsecured claims, and administrative claims or expenses of operations arising and/or incurred between the entry date of the Sale Order and the Closing, and post-confirmation wind down expenses. On the effective date under the Confirmed Plan, all Available Cash shall then be disbursed from the Reserve, to be paid (i) 80% to Equistar and 20% to REI or its designees until the aggregate paid to Equistar in accordance with subparagraphs 7a, 7b and 7c equals 80% of $71.7 million and the aggregate paid to REI equals 20% of $71.7 million, and (ii) amounts of Available Cash in excess of the aggregate amount of $71.7 million shall be paid 60% to Equistar and 40% to REI or its designees. After the Closing no less often than on a monthly basis, Debtors shall report to Equistar and REI, and shall pay to Equistar and REI, in the appropriate sharing ratios, all Available Cash. Interest earned on funds in the Reserve shall be paid pro rata to Equistar and REI in accordance with their sharing ratios. By way of example, if Equistar receives $50 million from the Net Sales Proceeds and Cash on Hand at Closing, then Equistar shall continue to receive 80% of Available Cash until it has received $57.36 million (80% of $71.7 million), and then it shall receive 60% of Available Cash, without limitation on the amounts to which it is entitled under subparagraphs 7d and 7e. In the event the Reserve is insufficient to pay in

7

full the Required Obligations, Equistar and REI shall disgorge such amounts as are necessary to fund the insufficiency, if any, provided such disgorgement shall be solely from funds actually disbursed to them at Closing under subparagraphs 7a and 7b, and in the same ratio as funds were actually disbursed to them; and provided further, that—except for amounts payable for goods and services provided prior to the Closing, including the recovery of any overpayments or underpayments, but then only with respect to amounts invoiced or paid after the date that is nine (9) months prior to Closing—(i) no claim of Equistar or Equistar's affiliates or professionals, (ii) no claim of Debtors, (iii) no claim of REI or REI's professionals, and (iv) no claim of REI's non-Debtor affiliates (other than the RES Claim, as allowed herein) or REI's non-Debtor affiliates' professionals, shall be included within the amounts giving rise to the disgorgement required by this subparagraph 7c. To the extent Equistar or REI is required to disgorge any amounts under this subparagraph, it shall be entitled to be reimbursed such amounts from any amounts thereafter distributed from the Reserve, and in the same ratio as disgorgement.

d.    From the amounts thereafter released from the Escrow in accordance with Article 11 of the APA, 12.5% shall be paid to Equistar and 87.5% shall be paid to REI, subject to the following: Equistar shall receive in the aggregate from the payments in subparagraphs 7a, 7b, 7c and 7d the sum of at least $60 million, and to the extent such payments to Equistar are less than $60 million, before any payments to REI from the Escrow, Equistar

8

shall receive payments from REI's 87.5% share of the Escrow until Equistar has received the total of $60 million. By way of example, if Equistar receives $50 million pursuant to subparagraphs 7a, 7b and 7c, then after payment to Equistar from the Escrow (at 12.5%, assume $5 million), Equistar shall receive an additional $5 million from Reliant's share of the Escrow before any distributions to REI.

e.    Other than Net Sales Proceeds, Cash on Hand, Amounts Received from Operations, or Available Cash in the Reserve, if there are amounts recovered by the bankruptcy estates (for example, without limitation, insurance recoveries, tax refunds or avoided transfers) that are available after payments to all unsecured creditors under the Confirmed Plan, 12.5% shall be paid to Equistar and 87.5% shall be paid to REI, with payment to be made within ten (10) business days of the later of the effective date of the Confirmed Plan or receipt of such funds.

f.    To the extent REI and Equistar cannot agree on amounts to be paid pursuant to this paragraph 7, either party may submit the dispute for resolution by this Court on an expedited basis.

8.    All Obligations under the Secured Credit Facility, as defined in the Sale Motion, that are due at Closing shall be paid in full at Closing. Obligations, if any, under the Secured Credit Facility arising after Closing shall be paid in full pursuant to the Confirmed Plan.

9

9.      All cure payments (including those cure amounts that are to be paid from the sale proceeds, namely: (i) Equistar's damages under the Steam Supply Settlement Agreement as defined below in the amount of $10 million, provided, however, notwithstanding anything in the Confirmed Plan, no interest shall be paid on account of the payment under the Steam Supply Settlement Agreement; and (ii) the amounts due Siemens, plus applicable interest under Siemen's contract) shall be paid at Closing.

10.     To the extent not paid at Closing, all priority property taxes (including those priority tax claims that are identified on Schedule A) shall be paid in full in accordance with the APA and the Confirmed Plan.

11.     All allowed, non-insider administrative expense claims will be paid in full pursuant to the Confirmed Plan. These amounts are exclusive of any payments asserted by the professionals employed by REI in connection with these cases. Such professionals shall not be paid from the Debtors' estates.

12.     The net claim of Reliant Energy Services, Inc. ("RES") for fuel supplied to the Debtors pre-petition (the "RES Claim") shall be and hereby is allowed as an unsecured claim in the amount of $7,569,392. All allowed unsecured creditor claims including the RES Claim will be paid upon confirmation pursuant to the Confirmed Plan; provided, however, notwithstanding anything in the Confirmed Plan, no interest shall be paid on the RES Claim. The claims asserted by REI or its subsidiaries for an

10

unpaid development fee of approximately $4.3 million under a certain Development Agreement and an incentive fee of approximately $3.6 million under a certain Power Marketing Agreement are disallowed and shall not be paid from the Debtors' estates.

13.    Upon the Closing and the payments due at Closing being made at Closing to Equistar and REI or its designees in accordance with the terms of this Stipulation, all issues concerning the characterization of Equistar's interest as equity, or as an "equity-like" interest, the severability of the CFPA from the other Project Agreements, and all other legal issues presented at the Sale Hearing, shall be deemed to have been determined finally by the Court, and the Debtors and related Stipulating Parties shall waive all challenges to and rights to appeal those issues.

14.    Upon entry of the Sale Order, the Settlement Agreement between Equistar and the Debtors relating to the Steam Supply Agreement (the "Steam Supply Settlement Agreement") shall be deemed reinstated and its term shall be extended automatically, without the need for the parties to sign further amendments extending its term, through and including the Termination Date as that term is defined in the APA. If the Closing does not occur by the Termination Date, then the Steam Supply Settlement Agreement shall terminate.

15.    The Debtors shall conduct their business in the ordinary course until the Closing and, except in the case of emergencies, no extraordinary payments

11

shall be made absent an order of the Court. For the avoidance of doubt, nothing in this paragraph is intended to modify, alter, or amend section 7.2 of the APA.

16.    a.  All figures used in the waterfall as the basis for Schedule A herein (with the exception of the RES Claim which has been verified by Alvarez & Marsal) shall be reviewed and verified by Alvarez & Marsal, the financial advisers for the Official Committee of Unsecured Creditors, and the Debtors shall provide all reasonable and necessary access and assistance to Alvarez & Marsal to enable them to do so and report their findings to the Stipulating Parties.  Notwithstanding anything to the contrary, it is understood and agreed that the Administrative Agent and the Lenders and GIM have not agreed to the figures set forth on Schedule A and reserve all rights with respect to the same.

b.  Debtors shall prepare and not less than five (5) business days prior to the Closing, shall deliver at the same time to counsel for REI, Equistar, the Administrative Agent for the Pre-Petition Lenders, and the Committee, a complete closing statement indicating all funds available or anticipated to be available at Closing, and all disbursements or anticipated disbursements to be made at Closing, including, without limitation, all amounts to be funded into the Escrow and the Reserve, and all amounts to be disbursed at Closing to the Administrative Agent for the Pre-Petition Lenders (except as provided in clause (c) below), taxing authorities, Siemens, REI and Equistar.  Not less than four (4) business days prior to the Closing,

12

REI, Equistar, Debtors, the Administrative Agent for the Pre-Petition Lenders and the Committee shall meet and confer (including by e-mail and telephone) and shall use good faith efforts to prepare and reach agreement upon a single joint written instruction specifying the amounts and payees to be paid by GIM at Closing in accordance with the Asset Purchase Agreement, and, if agreement is reached, the joint written instruction shall then be signed by the Debtors, Equistar and REI, and delivered to counsel for (i) GIM, (ii) the Committee, and (iii) the Administrative Agent for the Pre-Petition Lenders no later than three (3) business days prior to the Closing Date.

c.   With respect to the Make Whole Amount (as defined in the Credit Agreement (as defined in the Sale Order)) payable at Closing to the Tranche B-1 Lender as defined in the Credit Agreement, pursuant to the Credit Agreement, the Tranche B-1 Lender shall give notice two (2) business days prior to the Closing of the Make Whole Amount (including the details of such computation) at the same time to counsel for the Debtors, REI, Equistar, the Administrative Agent for the Pre-Petition Lenders and the Committee, and, if the Debtors agree with the terms of such notice, a joint written instruction with respect to the payment of the Make Whole Amount to the Tranche B-1 Lender shall be signed by the Debtors, Equistar and REI and delivered to counsel for (i) GIM, (ii) the Committee, and (iii) the Administrative Agent for the Pre-Petition Lenders no later than one (1) business day prior to the Closing Date.

13

d.  The parties shall consult with Alvarez & Marsal, as necessary to accomplish the foregoing.  If agreement is not reached on the joint written instructions referred to in clauses (b) or (c) above, GIM will pay the respective amount due at Closing under the APA to the Debtors.

17.     Equistar, the Debtors, and the other Stipulating Parties agree to execute and deliver at Closing the Mutual Release in the form annexed hereto as Exhibit B.

18.     The Debtors' motion for the appointment of a trustee (the "Trustee Motion") shall be continued until the entry of the Sale Order whereupon the Trustee Motion shall be deemed withdrawn.

19.     The Debtors shall promptly prepare and file a plan of liquidation and disclosure statement, consistent with the terms of this Stipulation.

20.     Equistar (a) hereby approves the assumption and assignment of all its contracts contemplated by the APA and hereby consents to all such assignments required by the APA and (b) shall provide any other consents necessary to effectuate the GIM Transaction, including, without limitation, executing together with RES and GIM, the RES Assignment and Assumption Agreement with respect to the Fuel Purchase and Sale Agreement annexed to the Sale Order as Exhibit C.

14

21.     This Stipulation represents the entire agreement and understanding of the
Stipulating Parties and, upon entry of the Sale Order, shall be binding on
the Stipulating Parties, their successors and assigns.

15

22.    The Bankruptcy Court shall retain exclusive jurisdiction to resolve any

disputes under this Stipulation.

Date: _____ June 6 _____, 2008

Reliant Energy Channelview LP

By: Reliant Energy Channelview (Texas) LLC, general partner

By: _____    DFS
Its: _____ Andrew Johannesen _____
     Vice President and Treasurer

Reliant Energy Channelview (Texas) LLC

By: _____    DFS
Its: _____ Andrew Johannesen _____
     Vice President and Treasurer

Reliant Energy Channelview (Delaware) LLC

By: _____    DFS
Its: _____ Andrew Johannesen _____
     Vice President and Treasurer

Reliant Energy Services Channelview LLC

By: _____    DFS
Its: _____ Andrew Johannesen _____
     Vice President and Treasurer

Reliant Energy Power Generation Inc.

By: _____    DFS
Its: _____ Andrew Johannesen _____
     Vice President and Treasurer

Reliant Energy Services, Inc.
By: _____    DFS
Its: _____ Andrew Johannesen _____
     Vice President and Treasurer

Reliant Energy, Inc.
By: _____    DFS
Its: _____ Andrew Johannesen _____
     Vice President and Treasurer

Equistar Chemicals, LP

By: _____
Its: _____

15

22.    The Bankruptcy Court shall retain exclusive jurisdiction to resolve any disputes under this Stipulation.

Date: _____, 2008

Reliant Energy Channelview LP

By: Reliant Energy Channelview (Texas) LLC,
      general partner

By: _____
Its: _____

Reliant Energy Channelview (Texas) LLC

By: _____
Its: _____

Reliant Energy Channelview (Delaware) LLC

By: _____
Its: _____

Reliant Energy Services Channelview LLC

By: _____
Its: _____

Reliant Energy Power Generation Inc.

By: _____
Its: _____

Reliant Energy Services, Inc.
By: _____
Its: _____

Reliant Energy, Inc.
By: _____
Its: _____

Equistar Chemicals, LP

By: _Caula Ott Tibbitts_____     <85
Its: _VP, Utilities & Gases_____

15

# **Exhibit A to the Stipulation**

## Schedule A
**All amounts are estimates and subject to change**

| | | |
|---|---|---|
| 12.5% | | Escrow % to Equistar |
| 80.0% | | Base % to Equistar (on up to $71.7 million) |
| 60.0% | | % to Equistar on amounts over $71.7 million |
| | | |
| $500,000,000.00 | | Gross Sale Proceeds from GIM Sale |
| $4,000,000.00 | | Estimated Purchase Price Adjustments [#] |
| $504,000,000.00 | | Gross Proceeds from GIM Sale after Adjustments |
| | | |
| -$374,508,261.00 | | Total Lenders' Claim (includes estimated make whole and accrued interest) |
| -$438,384.00 | | Contingent payment to Lenders (unless paid from cash flow) |
| | | |
| $129,053,355.00 | | Net Proceeds from GIM Sale after payment(s) to Lenders |
| | | |
| -$1,500,000.00 | | Professional Fees (not including insiders' professionals) |
| -$2,000,000.00 | | Kelson |
| -$6,338,586.00 | | 2007 Property Taxes (past due including 13% penalty) |
| -$1,150,000.00 | | 2007 Property Taxes (due June 2008) |
| -$5,793,038.19 | | Siemens |
| -$7,569,392.00 | | REI Gas Claim[*] |
| -$243,032.00 | | Other Unsecured Claims[*] |
| -$750,000.00 | | Post-Closing Wind Down |
| -$10,000,000.00 | | Equistar Settlement |
| Unknown | | Reserve for Administrative expenses or claims arising after the Sale Order[**] [#] |
| -$40,000,000.00 | | Escrow |
| $53,709,306.81 | | Net Sales Proceeds after Escrow and Reserve (as defined in para 7a of the Stipulation) |
| $18,000,000.00 | | Cash on Hand at close (Illustrative) |
| $71,709,306.81 | | Total Cash at close |

| | | |
|---|---|---|
| -$57,360,000.00 | 80% Proceeds to Equistar | 80.0% |
| -$14,340,000.00 | 20% Proceeds to Reliant | 20.0% |
| -$5,584.09 | 60% Proceeds to Equistar | 60.0% |
| -$3,722.72 | 40% Proceeds to Reliant | 40.0% |
| | | |
| **-$57,365,584.09** | **Payment to Equistar at closing** | |
| **-$14,343,722.72** | **Payment to Reliant at closing** | |
| | | |
| $10,000,000.00 | Post-closing funds available for distribution from Reserve (illustrative) | |
| $0.00 | 80% Proceeds to Equistar | 80.0% |
| $0.00 | 20% Proceeds to Reliant | 20.0% |
| -$6,000,000.00 | 60% Proceeds to Equistar | 60.0% |
| -$4,000,000.00 | 40% Proceeds to Reliant | 40.0% |
| | | |
| $40,000,000.00 | Return of Escrow (assumed) | |
| -$5,000,000.00 | Escrow to Equistar | 12.5% |
| -$35,000,000.00 | Escrow to Reliant (subject to adjustment per para. 7d of the Stipulation) | 87.5% |
| | | |
| **-$68,365,584.09** | **Total to Equistar[***]** | |
| **-$53,343,722.72** | **Total To Reliant[***]** | |

## Schedule A

\* The numbers marked with an asterisk are general unsecured, non-priority claims.

\* \* This line is a place-keeper to reserve for other administrative expenses or claims arising between the date of the Sale Order and the Confirmed Plan that might not be covered by anticipated cash flow.

\* \* \* The numbers set forth above are not an admission and are subject to revision, but material changes are not expected and all amounts remain subject to verification.

[#] An allowance for pre-closing 2008 property taxes will be made at close.

# <u>Exhibit B to the Stipulation</u>

# MUTUAL RELEASE

This Mutual Release ("Release") is made and entered into as of _____, 2008 by and between Reliant Energy Channelview LP, Reliant Energy Services Channelview LLC, Reliant Energy Channelview (Texas) LLC and Reliant Channelview (Delaware) LLC, debtors and debtors in possession under the United States Bankruptcy Code (collectively, the "Debtors") in cases pending in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), Case No. 07-11160 (MFW), jointly administered, (the "Bankruptcy Case"), Reliant Energy Power Generation Inc., Reliant Energy Services, Inc., and Reliant Energy, Inc. (collectively, together with the Debtors, the "Debtor and Reliant Entities"), on the one hand, and Equistar Chemicals, LP ("Equistar"), on the other hand, (the Debtor and Reliant Entities and Equistar shall be collectively referred to as the "Parties").

## R E C I T A L S

Certain disputes and controversies exist between the Parties in the Bankruptcy Case.

The Parties have agreed to settle and resolve all issues in dispute pursuant to a Stipulation Regarding Motion of the Debtors and Debtors-In-Possession Pursuant to Sections 105(a), 363 and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006, 9007 and 9014 for an Order Authorizing (i) the Sale or Transfer of Certain Assets of the Debtors Free and Clear of Liens, Claims and Encumbrances, (ii) the Assumption and Assignment of Certain Executory Contracts, (iii) and Granting Related Relief which has been approved by the Bankruptcy Court (the "Stipulation"). Terms not otherwise defined herein shall have the meaning set forth in the Stipulation.

In consideration of the premises and the mutual covenants contained in this Release and the Stipulation, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1.    **Releases.**

    A.    <u>Release by the Debtor and Reliant Entities</u>. In consideration of the promises herein, the execution of this Release and in further consideration of the Stipulation, each of the Debtor and Reliant Entities, for itself, its successors, assigns, and any party claiming by, through, or under them, do hereby release, acquit, and forever discharge Equistar, and all of its past or present officers, directors, shareholders, employees, agents, partners, insurers, attorneys, divisions, affiliated, parent or subsidiary companies, assigns, or successors in interest (collectively, the "Equistar Released Parties"), from any and all claims, demands, actions, causes of action, liabilities, obligations, or judgments arising out of any personal, property or financial injuries to, or damages incurred by, the Debtor and Reliant Entities, together with anyone acting by, through, or under the Debtor and Reliant Entities caused by any act, omission, or fault, or any alleged act, omission, or fault of any one or more of the Equistar Released Parties in connection with any of the matters brought, or that might have been brought, whether or not asserted, in connection with the Channelview Project and the contracts related thereto (collectively, the "Claims"). This Release includes, but is not limited to, Claims asserted or capable of assertion by the Debtor and Reliant Entities under statutory law, common law, strict products liability, negligence, contract, warranty,

consumer relations law, intentional or other tort law, or any other law, statute, regulation, or theory of law or equity that permits or allegedly permits recovery of any form of monetary or other damages or relief of whatsoever nature, whether in contract or in tort, whether contingent or absolute, which the Debtor and Reliant Entities ever had, may now have, or may ever claim to have against the Equistar Released Parties.  The release extinguishes Claims for actual damages, economic or pecuniary losses, mental anguish damages, expenses, and/or attorneys' fees, which the Debtor and Reliant Entities may now have, might ever have had in the past, or might ever have in the future, based in whole or in part upon or arising out of any fact, transaction, or occurrence that was alleged or that could have been alleged in connection with the Channelview Project and the contracts related thereto, at any time, from the beginning of time, through and including the Closing, as defined in the Stipulation, other than (i) those for breach of this Release, the Stipulation or the Steam Supply Settlement Agreement, (ii) amounts payable for goods and services provided prior to the Closing, including the recovery of any overpayments or underpayments, but only with respect to amounts invoiced or paid after the date that is nine (9) months prior to Closing, or (iii) any claims exclusively arising out of events occurring after the execution of the Stipulation and asserted in writing prior to the Closing, which are hereby expressly reserved and not released. Claims, if any, asserted under (iii) are listed on Exhibit "A" attached hereto, which each of the Parties shall initial at Closing.

B.    Release by Equistar.  In consideration of the promises herein, the execution of this Release, and in further consideration of the Stipulation, Equistar, for itself, its successors, assigns, and any party claiming by, through, or under them, does hereby release, acquit, and forever discharge the Debtor and Reliant Entities, and all of their past or present officers, directors, shareholders, employees, agents, partners, insurers, attorneys, divisions, affiliated, parent or subsidiary companies, assigns or successors in interest, (collectively, the "Debtor and Reliant Entities' Released Parties"), from any and all claims, demands, actions, causes of action, liabilities, obligations, or judgments arising out of any personal, property or financial injuries to, or damages incurred by, Equistar, or anyone acting by, through, or under Equistar, whether caused by any act, omission, or fault, or any alleged act, omission, or fault of the Debtor and Reliant Entities' Released Parties in connection with any of the matters brought, or that might have been brought, whether or not asserted, in connection with the Channelview Project and the contracts related thereto (collectively, the "Claims"). This Release includes, but is not limited to, Claims asserted or capable of assertion under statutory law, common law, negligence, contract, warranty, consumer relations law, intentional or other tort law, or any other law, statute, regulation, or theory of law or equity that permits or allegedly permits recovery of any form of monetary or other damages or relief of whatsoever nature, whether in contract or in tort, whether contingent or absolute, which Equistar ever had, may now have, or may ever claim to have against the Debtor and Reliant Entities' Released Parties. The release extinguishes Claims for actual damages, economic or pecuniary losses, mental anguish damages, expenses, and/or attorneys' fees, which Equistar may now have, might ever have had in the past, or might ever have in the future, based in whole or in part upon or arising out of any fact, transaction, or occurrence that was alleged or that could have been alleged in connection with the Channelview Project and the contracts related thereto, at any time, from the beginning of time, through and including the Closing, other than (i) those for breach of this Release, the Stipulation or the Steam Supply Settlement Agreement, (ii) amounts payable for goods and services provided prior to the Closing, including the recovery of any overpayments or underpayments, but only with respect to amounts invoiced or paid after the date that is nine (9) months prior to Closing, or (iii) any claims

Page 2

arising out of events occurring after the execution of the Stipulation and asserted in writing prior to the Closing, which are hereby expressly reserved and not released. Claims, if any, asserted under (iii) are listed on Exhibit "A" attached hereto, which each of the Parties shall initial at Closing.

2.    **Releases Unconditional.** THE RELEASES IN PARAGRAPH 1 ABOVE ARE SPECIFICALLY INTENDED TO OPERATE AND BE APPLICABLE EVEN IF IT IS ALLEGED, CHARGED, OR PROVED THAT SOME OR ALL OF THE CLAIMS OR DAMAGES RELEASED ARE SOLELY AND COMPLETELY OR PARTIALLY CAUSED BY THE NEGLIGENCE, NEGLIGENCE PER SE, GROSS NEGLIGENCE, BREACH OF WARRANTY, VIOLATION OF STATUTE OR COMMON LAW, OR OTHER ACTIONABLE CONDUCT OF ANY OF THE RELEASED PARTIES AND/OR CLAIMANTS AND/OR ANY THIRD PARTY.

3.    **Advice of Counsel.** Each Party acknowledges to each other-Party that they have executed this Release acting upon its independent judgment or upon the advice of his legal counsel, without representation, expressed or implied, of any kind or nature from any party except as specifically set forth herein. Each of the Parties acknowledge that it has read this Release, that it has reviewed all terms and conditions herein, that it understands the meaning and effect thereof, and, after discussing this Release with its legal counsel, it has willingly entered into and executed this Release for the above-stated consideration.

4.    **Joint Preparation.** It is agreed that this Release has been jointly prepared and, therefore, the authorship hereof shall not affect the construction hereof.

5.    **Modification/Amendment.** This Release cannot be modified, changed, or terminated orally. Any modification, change or termination of this Release must be in writing and signed by authorized representatives of all parties.

6.    **Parties.** Each of the Parties agree that this Release shall inure to the benefit of, and be binding upon, each of the Parties and their respective affiliates, officers, directors, shareholders, partners (general and limited), agents, heirs, legal representatives, executors, administrators, successors and assigns, and any who might attempt to claim by, through or under them.

7.    **Applicable Law, Jurisdiction and Venue.** This Release shall be governed by, construed and enforced in accordance with, and subject to, the laws of the State of Texas except to the extent that federal statutory or common law may pre-empt or overrule such laws. Any claim arising out of a breach of this Release shall be brought in the Bankruptcy Court or, in the event the Bankruptcy Court does not have or declines to exercise jurisdiction, in the District Court of Harris County, Texas, without limiting any party's right of removal to Federal District Court.

8.    **Counterparts.** This Release may be executed in a number of identical counterparts, each of which shall be deemed an original for all purposes.

9.    **Authorization.** Each of the Parties warrant and represent to each other that they have the full lawful right, power and authority, without joinder of any other party, to execute this Release through the persons whose signatures are subscribed below, and to consummate the undertakings specified in this Release.

10. **Waiver.** Any failure by the parties to exercise any rights under this Release shall not be construed as a waiver of its right to exercise the same or any other right at any time or from time to time. No waiver of any of the terms of this Release shall be valid unless in writing and signed by the parties.

EXECUTED by duly authorized signatories of the parties as of the date hereof.

Reliant Energy Channelview LP

By: Reliant Energy Channelview (Texas) LLC, general partner

By:_____
Its: _____

Reliant Energy Channelview (Texas) LLC

By:_____
Its: _____

Reliant Energy Channelview (Delaware) LLC

By:_____
Its: _____

Reliant Energy Services Channelview LLC

By:_____
Its: _____

Reliant Energy Power Generation Inc.

By:_____
Its: _____

Reliant Energy Services, Inc.
By:_____
Its:_____

Reliant Energy, Inc.
By:_____
Its: _____

NY 71498851v2

Equistar Chemicals, LP

By:_____
Its:_____

NY 714988S1v2

EXHIBIT A to Mutual Release

The claims listed below are excepted from this Release.

      OR

There are no claims excepted from this Release.

Initialed on behalf of each of the Parties:

REC        REC (TX)      REC (DE)      RESC      REPG      RES      REI

EQUI

NY 71498851v2

# **<u>Exhibit C to the Order</u>**

## RES ASSIGNMENT AND ASSUMPTION AGREEMENT

This ASSIGNMENT AND ASSUMPTION AGREEMENT (this "*Agreement*"), dated as of _____, 2008, is made by and between Reliant Energy Services, Inc., a Delaware corporation (the "*Assignor*") and GIM Channelview Cogeneration, LLC, a Delaware limited liability company (the "*Assignee*"). Unless otherwise defined herein, capitalized terms have the meanings ascribed to them in the Purchase Agreement defined below.

<u>RECITALS:</u>

WHEREAS, Reliant Energy Channelview LP, Reliant Energy Services Channelview LLC and GIM Channelview Cogeneration, LLC have entered into that certain Asset Purchase Agreement, dated as of April 3, 2008 (the "*Purchase Agreement*");

WHEREAS, pursuant to the Purchase Agreement, that certain Fuel Purchase and Sale Agreement, dated as of December 15, 1999, by and among Assignor, Reliant Energy Channelview LP and Equistar Chemicals, LP (the "*Fuel Purchase and Sale Agreement*") is required to be assigned to and assumed by Buyer's designee.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and pursuant to the terms and conditions of the Purchase Agreement, the parties hereto hereby agree as follows:

1.    <u>Assignment of Fuel Purchase and Sale Agreement</u>. Subject to the terms and conditions hereof, Assignor does hereby sell, convey, transfer, assign, set over and deliver to Assignee all of Assignor's rights, title and interest in and to and obligations under, the Fuel Purchase and Sale Agreement, free and clear of all Liens, Claims and other interests (except Permitted Exceptions).

2.    <u>Assumption</u>. Assignee hereby assumes and agrees to perform all of Assignor's obligations and liabilities arising out of the Fuel Purchase and Sale Agreement.

3.    <u>Subject to Purchase Agreement</u>. Nothing contained herein shall itself change, amend, extend or alter (nor shall it be deemed or construed as changing, amending, extending or altering) the terms or conditions of the Purchase Agreement in any manner whatsoever. In the event of any conflict or other difference between the Purchase Agreement and this Agreement, the provisions of the Purchase Agreement shall control.

4.    <u>Binding Effect; Third Party Beneficiaries</u>. This Agreement shall be binding upon the parties hereto and their respective successors and permitted assigns and shall inure to the benefit of, and be enforceable by, the parties hereto and their respective successors and permitted assigns. This Agreement is not intended, and shall not be construed, to give any Person other than the parties signatory hereto and their respective successors and permitted assigns any interest or rights (including third party beneficiary rights) with

respect to or in connection with any agreement or provision herein or any matter contemplated hereby.

5.    Headings.  The headings contained in this Agreement are included for purposes of convenience only and shall not affect the meaning or interpretation of this Agreement.

6.    Governing Law.  THIS AGREEMENT SHALL BE GOVERNED IN ALL RESPECTS, INCLUDING VALIDITY, INTERPRETATION AND EFFECT, BY THE LAWS OF THE STATE OF NEW YORK (WITHOUT GIVING EFFECT TO ANY CONFLICT OF LAWS PRINCIPLES OTHER THAN SECTION 5-1401 OF THE GENERAL OBLIGATIONS LAW OF THE STATE OF NEW YORK).

7.    Further Assurances.  At any time or from time to time after the date hereof, each party hereto shall execute, acknowledge and deliver any further agreements, instruments or documents and take all such further action as the other party may reasonably request in order to evidence the assignment by Assignor to Assignee of the Fuel Purchase and Sale Agreement in accordance with the terms hereof.

8.    Notices.  All notices and other communications hereunder shall be in writing and shall be deemed given if delivered personally to, or mailed by registered or certified mail (return receipt requested) if and when received by, or sent via facsimile if and when received by, the parties at the following addresses (or at such other address for a party as shall be specified by like notice):

If to Assignor, to:

Reliant Energy Services, Inc.
1000 Main Street, 12th Floor
Houston, Texas 77002

Attention:     General Counsel
Facsimile:     713-537-7465

With a copy to:

Stroock & Stroock & Lavan LLP
180 Maiden Lane
New York, NY 10038

Attention:     Michael S. Shenberg
Facsimile:     212-806-6006


If to Assignee, to:

If to Buyer, to:

NY 71502871v3

GIM Channelview Cogeneration, LLC
c/o Global Infrastructure Partners - A, L.P.
315 Park Avenue South, 8th Floor
New York, NY 10010
Attention:    Salim G. Samaha
Facsimile:    (212) 448-3526

Fortistar LLC
One North Lexington Avenue
White Plains, NY 10601
Attention:    Mark Comora
Facsimile:    (914) 421-0052

With a copy to:

Vinson & Elkins LLP
The Willard Office Building
1455 Pennsylvania Avenue NW
Suite 600
Washington, D.C. 20004-1008
Attention:    Mark S. Laufman
Facsimile:    (202) 879-8869

9.   Interpretation.  Capitalized terms used but not defined herein shall have the meaning set forth in the Purchase Agreement.

10.  Counterparts.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

**[Signature page follows this page.]**

NY 71502871v3

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

ASSIGNOR:

RELIANT ENERGY SERVICES, INC.

By: _____
Name:
Title:

ASSIGNEE:

**GIM CHANNELVIEW COGENERATION, LLC**

By:  Global Infrastructure Partners - A, L.P.
*Member of GIM Channelview Cogeneration, LLC*

By: Global Infrastructure GP, L.P., its general partner

By: Global Infrastructure Investors, Limited, its general partner

By   : _____
Name: _____
Title: _____

-4-

Equistar Chemicals, LP ("Equistar") hereby (i) consents to the assignment of the Fuel Purchase and Sale Agreement from Reliant Energy Services, Inc., Assignor ("Assignor") to GIM Channelview Cogeneration LLC, Assignee, or its designee ("Assignee"), (ii) acknowledges that to its knowledge, Assignor is not in default in keeping, observing or performing any term, covenant, agreement, provision, condition or limitation set forth in the Fuel Purchase and Sale Agreement, (iii) releases Assignor from all of the duties, covenants, provisions, conditions and obligations of the Assignor in the Fuel Purchase and Sale Agreement, excluding, however, from such release the payment of amounts arising or accruing for deliveries occurring prior to the date hereof, as provided in the Mutual Release to be executed by Equistar, Assignor, and others at the Closing ("Pre-Closing Amounts"), and (iv) from and after the date hereof, agrees to look solely to Assignee for payment under and performance of the Fuel Purchase and Sale Agreement arising or accruing on or after the date hereof (excluding Pre-Closing Amounts, for which Equistar agrees to look solely to Assignor for such payment and performance).

EQUISTAR CHEMICALS, LP


By: _____
Name:
Title:


Reliant Energy Services, Inc., Assignor ("Assignor"), desiring to make an assignment of its rights and obligations under the Fuel Purchase and Sale Agreement from Assignor to GIM Channelview Cogeneration LLC, Assignee or its designee ("Assignee"), (i) acknowledges that to its knowledge, Equistar Chemicals, LP ("Equistar") is not in default in keeping, observing or performing any term, covenant, agreement, provision, condition or limitation set forth in the Fuel Purchase and Sale Agreement, (ii) releases Equistar from all of the duties, covenants, provisions, conditions and obligations of Equistar in the Fuel Purchase and Sale Agreement, excluding, however, from such release the payment of amounts arising or accruing for deliveries occurring prior to the date hereof, as provided in the Mutual Release to be executed by Equistar, Assignor, and others at the Closing ("Pre-Closing Amounts"), and (iii) from and after the date hereof, Assignor relinquishes all rights and interests in the Fuel Purchase and Sale Agreement and agrees that it has no right to payment or performance under the Fuel Purchase and Sale Agreement as a third party beneficiary or otherwise (excluding Pre-Closing Amounts, for which Assignor agrees to look solely to Equistar for such payment and performance).

RELIANT ENERGY SERVICES, INC.


By: _____
Name:
Title:

NY 71502871v3