# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| RELIANT ENERGY CHANNELVIEW | ) | |
| LP, *et al.*, | ) | Case No. 07-11160 (MFW) |
| | ) | |
| | ) | |
| Kelson Channelview LLC, | ) | |
| | ) | |
| Appellants, | ) | |
| | ) | |
| v. | ) | Civil Action No. 08-409 (JJF) |
| | ) | |
| Reliant Energy Channelview, LP, *et al.*, | ) | |
| | ) | Bankruptcy Appeal No. 08-41 |
| Appellee. | ) | |
| | ) | |

## DEBTORS' OPENING BRIEF IN SUPPORT OF THEIR MOTION TO DISMISS APPEAL OF KELSON CHANNELVIEW LLC (f/k/a KELSON ENERGY IV LLC)

Mark D. Collins (No. 2981)
Robert J. Stearn, Jr. (No. 2915)
Paul N. Heath (No. 3704)
Marcos A. Ramos (No. 4450)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701
Email: collins@rlf.com
        stearn@rlf.com
        heath@rlf.com
        ramos@rlf.com

ATTORNEYS FOR DEBTORS
AND DEBTORS IN POSSESSION

July 18, 2008
Wilmington, Delaware

## TABLE OF CONTENTS

NATURE AND STAGE OF THE PROCEEDINGS .......................................................1

SUMMARY OF ARGUMENT ...........................................................................................1

STATEMENT OF FACTS .................................................................................................2

ARGUMENT .......................................................................................................................6

    I.    KELSON'S APPEAL SHOULD BE DISMISSED AS
        UNTIMELY ...........................................................................................................6

        A.    Final Orders Of The Bankruptcy Court Must Be Appealed
                Within 10 Days ..................................................................................6

        B.    The Order Was A Final Order ..........................................................7

                1.    Impact On The Assets Of The Bankruptcy Estate ............ 8

                2.    The Order Fully And Finally Resolved A Discrete
                        Legal Issue ..........................................................................8

                3.    The Order Required No Additional Fact-Finding ..............9

                4.    Judicial Economy Supports Finality Of The Order ..........10

CONCLUSION ..................................................................................................................12

# TABLE OF AUTHORITIES

## CASES

*Abrahams v. Kindred Healthcare Inc. (In re Vencor, Inc.),*
2004 WL 843283 (3d Cir. Apr. 21, 2004) ..............................................................11

*Belgrave v. Plan Administrator (In re Brac Group, Inc.),*
2006 U.S. Dist. LEXIS 57022 (D. Del. Mar. 9, 2002) ...............................................6

*Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.),*
181 F.3d 527 (3d Cir. 1999).......................................................................................8

*Century Glove, Inc. v. First Am. Bank of New York,*
860 F.2d 94 (3d Cir. 1988)......................................................................................6-9

*In re Collated Prods. Corp.,*
121 B.R. 195 (D. Del. 1990).......................................................................................8

*DDJ Capital Mgmt., LLC v. Fruit of the Loom, Inc. (In re Fruit of the Loom, Inc.),*
274 B.R. 631 (D. Del. 2002)....................................................................................7, 9

*In re F/S Airlease, II, Inc.,*
844 F.2d 99 (3d Cir. 1988)......................................................................................6, 8

*Hylland v. Northwestern Corp. (In re Northwestern Corp.),*
319 B.R. 68 (D. Del. 2005).....................................................................................7, 9

*Official Bondholders Comm. v. Chase Manhattan Bank (In re Marvel Entm't Group, Inc.),*
209 B.R. 832 (D. Del. 1997)....................................................................................7, 9

*In re Owens Corning,*
419 F.3d 195 (3d Cir. 2005)...................................................................................9, 10

*Professional Ins. Mgmt. v. Ohio Cas. Group of Ins. Cos. (In re Professional Ins. Mgmt.),*
285 F.3d 268 (3d Cir. 2002)...................................................................................9, 10

*Proteon Inc. v. Memorex Telex Corp. (In re Memorex Telex Corp.),*
241 B.R. 841 (D. Del. 1999).......................................................................................6

*In re Universal Minerals Inc.,*
755 F.2d 309 (3d Cir. 1985).......................................................................................6

## STATUTES AND RULES

28 U.S.C. § 158(a)(1)................................................................................................6

Fed. R. Bankr. P. 8002(a) ........................................................................................6

The grounds for this motion are simple: appellant Kelson Channelview LLC (f/k/a Kelson Energy IV LLC) ("Kelson") did not file its notice of appeal until 87 days *after* entry of the final order at issue. Kelson's appeal is not timely and should be dismissed.

## NATURE AND STAGE OF THE PROCEEDINGS

On June 13, 2008, Kelson filed its *Notice of Appeal of Kelson Channelview LLC (f/k/a Kelson Energy IV LLC) from Order Approving Debtor's Proposed Bid Protections (Dk. No 319), and Order Authorizing (I) the Sale or Transfer of Certain Assets of Reliant Energy Channelview LP and Reliant Energy Services Channelview LLC Free and Clear of Liens, Claims and Encumbrances and Other Interests, (II) the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection Therewith, (III) Assumption of Certain Liabilities, and (IV) Granting Related Relief (Dk. No 479)* (the "Notice of Appeal"). The Notice of Appeal was docketed in this Court on July 7, 2008. [Dkt. No. 4]

On July 18, 2008, Debtors filed their *Motion to Dismiss Appeal of Kelson Channelview LLC (f/k/a Kelson Energy IV LLC)* (the "Motion"). This is Debtors' opening brief in support of their Motion.

## SUMMARY OF ARGUMENT

Kelson's appeal is based on the Bankruptcy Court's March 18, 2008 Order, which denied Debtors' request for authority to pay Kelson a substantial break-up fee in connection with the sale of Debtors' assets. Under established Third Circuit and District of Delaware precedent, that Order was final and immediately appealable, and the Bankruptcy Rules required that any appeal be filed within 10 days. Because this appeal was not filed until almost three months after the Order was entered, the appeal is not timely and should be dismissed.

## STATEMENT OF FACTS

On August 20, 2007 (the "Petition Date"), Reliant Energy Channelview LP, Reliant Energy Channelview (Texas) LLC, Reliant Energy Channelview (Delaware) LLC and Reliant Energy Services Channelview LLC (collectively, "Debtors") each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases"). Debtors have continued to operate their business as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

Debtors' business was the ownership and operation of an approximately 830 MW 4x1 combined cycle cogeneration plant located in Channelview, Texas (the "Channelview Facility"). Prior to and after commencing the Chapter 11 Cases, Debtors pursued a sale of the Channelview Facility.

On February 26, 2008, Debtors filed their *Motion of the Debtors and Debtors-in-Possession Pursuant to Sections 105(a), 363 and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006, 9007 and 9014 for an Order Authorizing (I) the Sale or Transfer of Certain Assets of the Debtors Free and Clear of Liens, Claims and Encumbrances, (II) the Assumption and Assignment of Certain Executory Contracts, (III) and Granting Related Relief* (the "Sale Motion").[1] Pursuant to the Sale Motion, Debtors moved the Bankruptcy Court to approve the sale of substantially all of their assets to Kelson for approximately $468 million under the terms of an asset purchase agreement between Debtors and Kelson. See Sale Motion, ¶¶ 3, 11, 15.

Debtors and Kelson agreed that, if the Bankruptcy Court required Debtors to conduct an open auction for their assets, then Debtors separately would move the Bankruptcy Court for approval of certain procedures incident to such auction. See Bid

---

[1] A copy of the Sale Motion is attached hereto as Ex. A

2

Motion (defined below), ¶ 8. On March 7, 2008, Debtors filed their *Motion of the Debtors and Debtors-in-Possession to Approve Certain Bid Protections in Connection with the Debtors Proposed Sale of Substantially all of their Assets to Kelson Energy IV LLC* (the "Bid Motion").[2] In the Bid Motion, Debtors asked the Bankruptcy Court to approve procedures for the auction of their assets, including payment of a $15 million break-up fee to Kelson (the "Break-Up Fee") if Kelson was not the winning bidder. See Bid Motion, ¶ 19.

On March 18, 2008, the Bankruptcy Court heard the Bid Motion. See Transcript of March 18, 2008 Hearing ("March 18, 2008 Transcript" or "3/18 Tr.").[3] At the hearing, Debtors proffered testimony from one of their senior officers and a financial advisor, each in support of the Bid Motion and Debtors' request for authority to pay the Break-Up Fee. See, e.g., 3/18 Tr., pp. 23:4-25:7, 32:3-25. Debtors also argued in favor of their Bid Motion and the Break-Up Fee, as did several other parties in interest. See 3/18 Tr., p. 34:3-35:12, 40:13-17, 41:11-15, 43:8-44:15. Kelson, however, offered no evidence, testimony or argument in support of the Break-Up Fee. See, e.g., 3/18 Tr., p. 48:13-24. Fortistar LLC ("Fortistar"), an interested purchaser for the Channelview Facility with whom Debtors had negotiated both before and after the Petition Date (see, e.g., 3/18 Tr., pp. 17:21-20:10, 26:14-27:3, 32:15-20), objected to Debtors' request for authority to pay the Break-Up Fee. See, e.g., 3/18 Tr., p. 35:14-37:4.

At the conclusion of the hearing the Bankruptcy Court approved certain procedures for Debtors' conduct of an auction, including a deadline for the submission of qualified bids, but specifically denied Debtors' request for authority to pay the Break-Up

---

[2] A copy of the Bid Motion is attached hereto as **Ex. B**.
[3] A copy of the March 18, 2008 Transcript is attached hereto as **Ex. C**.

Fee. See 3/18 Tr., p. 46:20-47:17. The Bankruptcy Court entered its *Order Approving Debtors' Proposed Bid Procedures* (the "Order") that same day.[4]

In accordance with the Order, on April 3, 2008, GIM Channelview Cogeneration, LLC ("GIM Channelview"), in affiliation with Fortistar, submitted a qualified bid for the Debtors' assets. On April 8, 2008, Debtors held the auction. At the conclusion of the auction, Debtors announced that GIM Channelview was the highest and best bidder, with a winning bid of approximately $500 million. See, e.g., Transcript of April 9, 2008 Hearing ("April 9, 2008 Transcript" or "4/9 Tr."), pp. 5:8-10:13.[5]

On April 9, 2008, the Bankruptcy Court held a hearing to consider the sale to GIM Channelview and various related (and contested) sale issues. See April 9, 2008 Transcript. While the Bankruptcy Court approved GIM Channelview's bid as the highest and best bid at the auction (see 4/9 Tr., pp. 51:15-53:5), the Bankruptcy Court rejected Debtors' request to exclude certain contracts from the proposed sale. See Sale Motion, ¶¶ 52-78; 4/9 Tr., pp. 265:17-266:11. Thereafter, following discussion, negotiation and mediation, Debtors and other parties-in-interest (but not Kelson) resolved the outstanding issues concerning the sale to GIM Channelview, including a financial settlement concerning distribution of the sale proceeds to creditors and equity holders that presumed the absence of the $15 million Break-Up Fee (the "Settlement"). See Transcript of May 14, 2008 Hearing ("May 14, 2008 Transcript" or "5/14 Tr.").[6] The sale could not have occurred in the absence of the Settlement.

On June 9, 2008, the Bankruptcy Court entered its *Order Authorizing (I) the Sale of Transfer of Certain Assets of Reliant Energy* Channelview *LP and Reliant Energy*

---

[4] A copy of the Order is attached hereto as **Ex. D**.
[5] A copy of the April 9, 2008 Transcript is attached hereto as **Ex. E**.
[6] A copy of the May 14, 2008 Transcript is attached hereto as **Ex. F**.

*Services Channelview LLC Free and Clear of Liens, Claims and Encumbrances and*

*Other Interests, (II) the Assumption and Assignment of Certain Executory Contracts and*

*Unexpired Leases in Connection Therewith, (III) Assumption of Certain Liabilities, and*

*(IV) Granting Related Relief* (the "Sale Order").[7]   Pursuant to the Sale Order, the

Bankruptcy Court approved the sale of substantially all of Debtors' assets to GIM

Channelview.  See id.[8]  Kelson's Notice of Appeal followed.

The Notice of Appeal was filed 87 days after entry of the Order.   While the

Notice of Appeal states that Kelson is appealing from the Order and the Sale Order (see

Notice of Appeal, p. 1), as Kelson admits, the only issue on appeal is the Bankruptcy

Court's March 18, 2008 denial of Debtors' request to pay the Break-Up Fee to Kelson:

> Whether the United States Bankruptcy Court for the District of Delaware
> incorrectly denied the award of a break-up fee in the amount of
> $15,000,000 to Appellant upon the closing of an Alternative Transaction.

*Statement of Issue and Designation of Record on Appeal of Kelson Channelview LLC*

*(f/k/a Kelson Energy IV LLC) from Order Approving Debtor's Proposed Bid Protections*

*(Dk. No. 319), and Order Authorizing (I) the Sale or Transfer of Certain Assets of Reliant*

*Energy Channelview LP and Reliant Energy Services Channelview LLC Free and Clear*

*of Liens, Claims and Encumbrances and Other Interests, (II) the Assumption and*

*Assignment of Certain Executory Contracts and Unexpired Leases in Connection*

*therewith, (III) Assumption of Certain Liabilities, and (IV) Granting Related Relief (Dk.*

*No. 479)* (the "Statement of Issue"), pp. 1-2.[9]  No provision of the Sale Order is at issue

on this appeal.

---

[7] A copy of the Sale Order is attached hereto as **Ex. G**.
[8] The sale approved by the Sale Order has closed.
[9] A copy of the Statement of Issue is attached hereto as **Ex. H**.

## ARGUMENT

## I.    KELSON'S APPEAL SHOULD BE DISMISSED AS UNTIMELY.

### A.    Final Orders Of The Bankruptcy Court Must Be Appealed Within 10 Days.

While the District Court has jurisdiction to hear appeals from "final judgments, orders, and decrees" of the Bankruptcy Court, 28 U.S.C. § 158(a)(1), any such appeals must be "filed with the clerk within 10 days of the date of the entry of the judgment, order, or decree appealed from." Fed. R. Bankr. P. 8002(a). Rule 8002(a)'s ten day mandate "has been strictly construed. . . ." In re Universal Minerals Inc., 755 F.2d 309, 311 (3d Cir. 1985). Indeed, failure to file the appeal within the prescribed time period deprives the appellate court of jurisdiction to hear the appeal. See, e.g., Belgrave v. Plan Administrator (In re Brac Group, Inc.), 2006 U.S. Dist. LEXIS 57022, at *4 (D. Del. Mar. 9, 2002) (Rule 8002(a) "is jurisdictional in effect . . . [and f]ailure to file a timely notice of appeal thus deprives the district court of jurisdiction to review the bankruptcy court's order or judgment."); Proteon Inc. v. Memorex Telex Corp. (In re Memorex Telex Corp.), 241 B.R. 841, 843 (D. Del. 1999) ("a district court lacks jurisdiction to review an order of a bankruptcy court if the notice of appeal is untimely.").

Kelson contends that its appeal is timely because the Order purportedly was interlocutory and did not become final until the Bankruptcy Court entered the Sale Order on June 9, 2008. As demonstrated below, as it relates to the Break-Up Fee, the Order was final and subject to the 10 day requirement of Rule 8002(a). [10]

---

[10] The mere fact that the Order also dealt with other issues (which may or may not have been final) does not affect the finality of the Bankruptcy Court's denial of Debtors' request for authority to pay the Break-Up Fee. See, e.g., Century Glove, Inc. v. First Am. Bank of New York, 860 F.2d 94, 97 (3d Cir. 1988) (court considered appeal of one matter decided by bankruptcy court as final order while deciding that other matter contemporaneously decided by bankruptcy court was not final order); In re F/S Airlease, II, Inc., 844 F.2d 99, 104 (3d Cir. 1988) ("The district court's remand of the portion of the bankruptcy court's

6

**B.    The Order Was A Final Order.**

This Court already has determined that Bankruptcy Court rulings on requests for break-up fees are final, immediately appealable orders. See DDJ Capital Mgmt., LLC v. Fruit of the Loom, Inc. (In re Fruit of the Loom, Inc.), 274 B.R. 631, 632 (D. Del. 2002) (order approving request for break-up was "final under the pragmatic test used by the United States Court of Appeals for the Third Circuit to determine the finality of orders entered in bankruptcy proceedings."). This should end the inquiry. Even if this Court undertakes its own analysis of the finality of the Order, however, Third Circuit precedent makes clear that the Bankruptcy Court's denial of the Break-Up Fee was a final order.

In light of the unique characteristics of bankruptcy cases, the Third Circuit favors a pragmatic and functional approach to determine finality. See, e.g., Century Glove, 860 F.2d at 97 ("This court takes a pragmatic view of the finality of bankruptcy appeals."); Official Bondholders Comm. v. Chase Manhattan Bank (In re Marvel Entm't Group, Inc.), 209 B.R. 832, 835 (D. Del. 1997) ("The Third Circuit has repeatedly emphasized that considerations unique to bankruptcy proceedings require courts to adopt a pragmatic approach in determining the finality of bankruptcy orders."). The Court may consider a variety of factors, including:

> whether the order leaves additional work to be done by the Bankruptcy Court; . . . whether the order implicates purely legal issues . . . . the necessity for further fact-finding on remand to the Bankruptcy Court . . . . [and] . . . the furtherance of judicial economy."

Hylland v. Northwestern Corp. (In re Northwestern Corp.), 319 B.R. 68, 72 (D. Del. 2005). The Court also may consider the "impact on the assets of the bankruptcy estate . . ." Century Glove, 860 F.2d at 97 (citation omitted). Indeed, the impact on the

---

order dealing with the amount of Simon's compensation does not affect our jurisdiction over the portion of its order approving Simon's *nunc pro tunc* employment")

bankruptcy estate has been described as the "'first and most important' factor in considering finality." Id. Under the Third Circuit's pragmatic test, the Order was final.

### 1.    Impact On The Assets Of The Bankruptcy Estate.

The Order had a substantial and material impact on the assets of Debtors' estates: denial of the Break-Up Fee preserved $15 million for distribution to creditors and equity holders. Compare F/S Airlease, 844 F.2d at 102-104 (order approving $450,000 payment to broker was final because it, inter alia, had a "significant impact on the assets of the bankruptcy estate"); In re Collated Prods. Corp., 121 B.R. 195, 200-201 (D. Del. 1990) (order pertaining to $329,767 in debtor's account was of sufficient impact on debtor's estate to support finality of order). The Third Circuit also has noted that a Bankruptcy Court order is final when it is "likely to affect the distribution of the debtor's assets, or the relationship among the creditors. . . ." Century Glove, 860 F.2d at 98 (internal quotation omitted). Here, it is indisputable that the Order preserved substantial assets for distribution to the Debtors' creditors and equity holders, and had a material impact on Kelson's relative standing among Debtors' creditors.[11]    This supports finality.

### 2.    The Order Fully And Finally Resolved A Discrete Legal Issue.

The Order also resolved a "discrete legal issue". Debtors asked the Bankruptcy Court to approve the Break-Up Fee under the "benefit to the estate" test of Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.), 181 F.3d 527 (3d Cir. 1999). See Bid Motion, ¶ 24. Debtors submitted testimony and argument in support of their motion. See, e.g., 3/18 Tr., pp. 23:4-25:7, 34:17-35:3, 43:9-44:12. However, the Bankruptcy Court specifically rejected Debtors' request for authority to pay the Break-

---

[11] In the Order, the Bankruptcy Court did approve expense reimbursement to Kelson of up to $2 million. See Order, ¶ 4

Up Fee:

> I will authorize an auction. I think the standard of determining what those
> terms are though is not to approve anything that is standard. I have to
> consider whether the specific terms that the parties are proposing are
> designed to enhance or chill bidding. The Third Circuit has made it even I
> think more specific whether in fact this specific term will benefit the
> estate. It's hard generally to consider how bid protections or break-up fees
> protect the estate. I've heard the arguments and have approved them in
> the case where the Court, the parties have convinced me that it is the only
> way to get other bidders, any bidder to the table. But I'm not convinced in
> this case that that is the case. There are other bidders, at least one other
> bidder. And I have in the past denied break-up fees in circumstances
> where another party has appeared and expressed an intention to bid at the
> auction. . . . *I will not approve any break-up fee.*

3/18 Tr., pp. 46:20-47:16 (emphasis supplied). The Bankruptcy Court's express denial of

the Break-Up Fee resolved a discrete legal issue, which supports finality. See <u>DDJ</u>

<u>Capital</u>, <u>supra</u> at 7; <u>see also</u>, e.g., <u>Professional Ins. Mgmt. v. Ohio Cas. Group of Ins. Cos.</u>

<u>(In re Professional Ins. Mgmt.</u>), 285 F.3d 268, 280-281 (3d Cir. 2002) ("orders in

bankruptcy cases finally disposing of discrete disputes within the larger case may be

immediately appealed"); <u>Marvel Entm't Group</u>, 209 B.R. at 836 (order final because the

"bankruptcy court's order addresses a discrete legal issue").

### 3.    The Order Required No Additional Fact-Finding.

The Bankruptcy Court's denial of Debtors' request to pay the Break-Up Fee was

not conditioned or dependent on further factual investigation or findings. See <u>supra</u>, pp.

3-4. The Order is final for this reason as well. <u>See</u>, e.g., <u>In re Owens Corning</u>, 419 F.3d

195, 204 (3d Cir. 2005) (final order where "there is no need for additional fact-finding");

<u>Century Glove</u>, 860 F.2d at 98 ("This order leaves nothing more for either the bankruptcy

court or the district court to decide. No more factfinding is needed. No later decision by

either court will affect the order. If we affirm the district court's order, preventing

liability, our decision will end the litigation over this issue."); <u>Northwestern Corp.</u>, 319

B.R. at 73 ("the passage of time will not change the Bankruptcy Court's conclusion that the proceeding is core. . . . The Bankruptcy Court's decision is not conditioned on additional factual findings . . . [and] no further work is left for the Bankruptcy Court to do with respect to Appellant's motion").[12]

### 4.    Judicial Economy Supports Finality Of The Order.

Finally, principles of judicial economy favor finality of the Order. The Order approved specific procedures for an auction of Debtors' assets. After the 10 day appeal period on the Order had lapsed, and on the assumption that the $15 million Break-Up Fee was not payable, Debtors conducted their auction and agreed to sell their assets to another bidder at a specific price, based on their belief that $15 million would not be deducted from that price. See 4/9 Tr., pp. 5:8-10:13. The Debtors and other parties-in-interest also agreed to the Settlement based on the assumption that the $15 million Break-Up Fee would not be paid out of the assets of the Debtors' estates. The Bankruptcy Court subsequently approved the sale, which has closed.

The Third Circuit favors finality where subsequent proceedings in the Bankruptcy Court are premised on the Bankruptcy Court's earlier findings. See, e.g., Owens Corning, 419 F.3d at 204 ("A later reversal of such an order risks rendering meaningless any proceedings premised on the viability of a plan that calls for a consolidation (even if for only a temporary period)"); Century Glove, 860 F.2d at 98 ("Postponing consideration of the issue may result in the waste of time and bankruptcy proceedings this court has previously sought to avoid."). Effectively, Kelson is trying to re-write the

---

[12] The Order is final even if Debtors and Kelson had other matters pending before the Bankruptcy Court. See, e.g., Professional Ins. Mgmt., 285 F.3d at 281 ("It is true that the Bankruptcy Court is still considering the resolution of significant issues between these two parties . . . However, we agree with the District Court that this appeal is entirely distinct and that the issues noted above are unaffected by our resolution of this appeal.")

10

terms under which the auction was conducted, after failing to act prior to the auction and sitting idle while Debtors conducted the auction and reached agreements premised on the absence of the Break-Up Fee. Such a result would not be fair to Debtors or their estates. Id.

At the end of the day, Kelson is the *only* party responsible for its predicament. Kelson chose not to offer any evidence, testimony or argument in support of the Break-Up Fee and chose not to timely appeal from the Court's March 18 Order. See supra, pp. 3-4. Instead, months after the Bankruptcy Court's resolution of the Bid Motion, Kelson apparently decided that it had nothing to lose -- and everything to gain -- by casting a $15 million shadow over Debtors and their estates. This Court should not countenance Kelson's bald attempt to avoid the consequences of its delay by trying to commingle the Order with the later Sale Order. See Abrahams v. Kindred Healthcare Inc. (In re Vencor, Inc.), 2004 WL 843283, at *2 (3d Cir. Apr. 21, 2004) ("We will not allow Appellants to avoid the consequences of their failure [to timely appeal a confirmation order] by considering issues related to the confirmation order on appeal from an order disallowing proofs of claim.").

\* \* \*

In summary, the Bankruptcy Court's Order denying the Break-Up Fee had a substantial impact on the assets of the Debtors' estates, fully and finally resolved a discrete legal issue and required no additional fact finding. Moreover, judicial economy supports finality of the Bankruptcy Court's ruling. Under the Third Circuit's pragmatic approach to determining finality of Bankruptcy Court orders, the Bankruptcy Court's denial of the Break-Up Fee was a final, immediately appealable order. Because Kelson

did not file its appeal within 10 days of entry of the Order, this appeal should be dismissed as untimely.

## CONCLUSION

For all of the foregoing reasons, Debtors respectfully ask the Court to (i) grant their Motion, (ii) dismiss this appeal, (iii) enter an Order substantially consistent with the form of order attached as Exhibit A to their Motion and (iv) grant Debtors such other and further relief as is just and proper.

Dated: July 18, 2008
    Wilmington, Delaware

    Mark D. Collins (No. 2981)
    Robert J. Stearn, Jr. (No. 2915)
    Paul N. Heath (No. 3704)
    Marcos A. Ramos (No. 4450)
    RICHARDS, LAYTON & FINGER, P.A.
    One Rodney Square
    920 North King Street
    Wilmington, Delaware 19801
    Telephone: (302) 651-7700
    Facsimile: (302) 651-7701
    Email: collins@rlf.com
            stearn@rlf.com
            heath@rlf.com
            ramos@rlf.com

    Attorneys for the Debtors

12

**EXHIBIT A**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| RELIANT ENERGY CHANNELVIEW LP, *et al.*,[1] | Case No. 07-11160 (MFW) |
| Debtors. | Jointly Administered |
| | **Objection Deadline: March 11, 2008 at 4:00 p.m.** **Hearing Date: March 18, 2008 at 10:30 a.m.** |

### MOTION OF THE DEBTORS AND DEBTORS-IN-POSSESSION PURSUANT TO SECTIONS 105(a), 363 AND 365 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULES 2002, 6004, 6006, 9007 AND 9014 FOR AN ORDER AUTHORIZING (I) THE SALE OR TRANSFER OF CERTAIN ASSETS OF THE DEBTORS FREE AND CLEAR OF LIENS, CLAIMS AND ENCUMBRANCES, (II) THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS, (III) AND GRANTING RELATED RELIEF

The above-captioned debtors and debtors-in-possession (collectively, the "Debtors"), by and through their undersigned counsel, hereby submit this motion (the "Motion") seeking entry of an order (the "Order") in substantially the form attached hereto, pursuant to sections 105(a), 363 and 365 of title 11 of the United States Code (as amended from time to time, the "Bankruptcy Code"), Rules 2002, 6004, 6006, 9007 and 9014 of the Federal Rules of Bankruptcy Procedure (as amended from time to time, the "Bankruptcy Rules"), and Local Rule 6004-1 of the Local Rules for the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), (a) authorizing the sale or transfer of certain assets (the "Sale") of debtor Reliant Energy Channelview LP ("Channelview") and debtor Reliant Energy Services Channelview LLC ("RESC" and collectively with Channelview, the "Sellers"), under the terms and conditions of that certain asset purchase agreement, dated February 25, 2008, by and

---

[1] The Debtors are Reliant Energy Channelview LP, Reliant Energy Channelview (Texas) LLC ("General Partner"), Reliant Energy Channelview (Delaware) LLC ("Limited Partner, and together with the General Partner, the "Partners"), and Reliant Energy Services Channelview LLC.

between the Sellers and Kelson Energy IV LLC (the "Buyer" and collectively with the Sellers, the "Parties"), attached hereto as Exhibit A (the "Asset Purchase Agreement"); (b) authorizing the assumption and assignment to the Buyer of certain executory contracts of the Sellers; (c) authorizing and approving the sale and transfer of certain assets free and clear of Liens and Interests (as defined below); (d) approving the form and manner of notice of the Sale; (e) waiving the 10-day stay under Bankruptcy Rules 6004(h) and 6006(d); and (f) granting such other and further relief as the Court deems necessary and appropriate. In support of this Motion, the Debtors respectfully represent as follows:

## JURISDICTION

1.      This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The bases for the relief requested herein are sections 105(a), 363 and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006, 9007 and 9014, and Local Rule 6004-1.

## PRELIMINARY STATEMENT

3.      The Sale of the Channelview Facility (as defined below) pursuant to the terms of the Asset Purchase Agreement will enable the Debtors to recognize proceeds sufficient to pay all creditors in full and provide a substantial recovery to all interest holders. The proposed Sale confirms the Debtors' long held belief that the value of their assets justified the time, effort and expense associated with these chapter 11 cases.

2

4.    Over the course of the nearly 10 month long sale process, the Debtors'
management and Houlihan Lokey Howard & Zukin ("HLHZ")[2] contacted over 115 potentially
interested purchasers for the Debtors' business.[3]    Approximately 38 parties executed
confidentiality agreements and 24 parties conducted due diligence.  The Debtors considered
nearly a dozen bids in the first round of bidding and several bids in subsequent rounds of
bidding.

5.    Clearly, the assets have been the subject of a full and robust marketing and
sale process, stretching from April 2007 through nearly six full months of these bankruptcy
cases.  The result is beyond dispute.  Having canvassed the marketplace, the Debtors and HLHZ
firmly believe that the Asset Purchase Agreement represents the highest and best offer available
for the Debtors' assets and that further marketing of the assets will not result in a higher purchase
price.  Accordingly, the Debtors request approval of the Sale as expeditiously as possible and
without the need for another round of bidding or an auction process.

6.    Proceeding to closing on the Sale as soon as possible will allow the
Debtors' creditors and interest holders to benefit from the extraordinary results of the Debtors'
sale efforts without further delay.

## BACKGROUND

7.    On August 20, 2007 (the "Petition Date"), each of the Debtors filed a
voluntary petition for relief under chapter 11 of the Bankruptcy Code.

---

[2]  HLHZ was engaged by the Debtors' parent company, Reliant Energy, Inc., to market the Debtors' assets

[3]  The Debtors and Reliant Energy (as defined below) originally proposed a sale of Reliant Energy's equity interests in the Debtors, but once these chapter 11 cases were commenced, the structure of the proposed transaction changed to a sale of the Debtors' assets pursuant to section 363 of the Bankruptcy Code.

8.    The Debtors have continued in possession of their respective properties and have continued to operate their business as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

9.    On August 30, 2007, an official committee of unsecured creditors (the "Committee") was appointed in these cases.

10.    Channelview is a Delaware limited partnership among the General Partner and the Limited Partner.  Each of the Partners is a limited liability company formed under the laws of the State of Delaware.  The General Partner owns a 1% interest, and the Limited Partner a 99% interest, in Channelview pursuant to that certain Agreement of Limited Partnership of Reliant Energy Channelview LP dated as of June 29, 1999.  The Partners are wholly-owned subsidiaries of Reliant Energy Power Generation, Inc., a Delaware corporation ("REPG"). RESC is a wholly-owned subsidiary of Reliant Energy Services, Inc., a Delaware corporation ("RES").  REPG and RES are wholly-owned subsidiaries of Reliant Energy, Inc., a Delaware corporation ("Reliant Energy").

11.    The Debtors' business is the ownership and operation of an approximately 830 MW 4x1 combined cycle cogeneration plant located in Channelview, Texas (the "Channelview Facility").  The Project was constructed adjacent to a chemical plant (the "Equistar Plant") owned by Equistar Chemicals, LP, a Delaware limited partnership ("Equistar"), and was completed in 2002.  Reliant Energy Corporate Services, LLC, a subsidiary of Reliant Energy, operates the Channelview Facility under an operations and maintenance agreement.

12.    Pursuant to certain agreements, RES purchases all the electric output of the Channelview Facility and supplies all the fuel used by the Channelview Facility. Approximately 293 MW of the electric output is resold by RES to RESC, and in turn sold to

4

Equistar for use at the Equistar Plant and at other Equistar facilities in Texas. In addition, Equistar purchases steam from Channelview for use at the Equistar Plant.

        13.     Construction of the Channelview Facility was financed by a $475 million credit agreement (the "Secured Credit Facility"). Following repayment of a $92 million bridge loan in November 2002, the Secured Credit Facility consists of (i) $369 million in term loans with scheduled maturities from 2002 to 2024, and (ii) a $14 million revolving credit facility that matured on August 20, 2007.[4] The Secured Credit Facility is secured by substantially all of the assets of Channelview, as well as pledges of the partnership interests in Channelview owned by the Partners. As of the Petition Date, approximately $341.4 million was outstanding under the Secured Credit Facility.

        14.     Additionally, based on the Debtors' books and records and on the proofs of claims filed in these chapter 11 cases to date, the Debtors estimate unsecured claims against their estates total approximately $20,000,000.

## RELIEF REQUESTED

        15.     By and through this Motion, the Debtors seek to sell all of the Acquired Assets (as defined in the Asset Purchase Agreement)[5] to the Buyer for an estimated purchase price of $468,000,000. To that end, the Debtors seek an order of this Court approving the Sellers' entry into, and performance under, the Asset Purchase Agreement, including the Sellers' assumption and assignment of the Assigned Contracts (as defined below) to the Buyer, and the sale, assignment and transfer of the Acquired Assets to the Buyer.

---

[4] The revolving credit facility actually matured on August 15, 2007, however, the credit instrument provides a three business day grace period prior to the occurrence of an Event of Default (as defined in the Secured Credit Facility).

[5] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Asset Purchase Agreement.

16.    The Debtors have devoted a substantial amount of time and effort over the past several months to marketing the Acquired Assets. The Debtors, with the assistance of HLHZ, entered into discussions with more than 115 potential buyers. Of those potential buyers, 38 non-disclosure agreements were entered into, 24 parties commenced due diligence and 11 bids were received in the initial round of bidding in connection with the Sale of the Acquired Assets.

17.    The Debtors have thoroughly evaluated the terms of the proposed Asset Purchase Agreement, as well as all reasonably available alternatives, and believe the Asset Purchase Agreement represents the highest and best offer reasonably available for the Acquired Assets. Moreover, the Debtors believe that the consideration to be received from the Buyer for the Sale of the Acquired Assets will be sufficient to satisfy fully the obligations owed to the Debtors' pre-petition lenders, all unsecured creditors, and provide for a substantial return to interest holders.

18.    As the Asset Purchase Agreement contemplates the expeditious consummation of the Sale, any unnecessary delay in effectuating the Sale could severely impact the value of the Debtors' estates. Additionally, pursuant to the terms of that certain Settlement Agreement entered into between Channelview, RESC, and Equistar (as defined above), many important provisions of the Settlement Agreement will terminate if the Sale is not consummated by March 31, 2008, or such later date as may be agreed upon by the Debtors and Equistar. As Equistar is seeking damages in the amount of approximately $37 million in connection with the

6

subject Litigation (as defined below), termination of the Settlement Agreement could also negatively impact the Debtors' estates and creditors.[6]

19.    Based on the foregoing, the Debtors do not believe that additional marketing of the Acquired Assets or conducting yet another round of bidding will result in higher or better offers or is necessary given that the proposed Sale will result in all creditors being paid in full, and thus, request that the Court approve the Sale without the need for a formal auction process. The Debtors will serve this Motion and the Asset Purchase Agreement on all interested parties, including all potentially interested purchasers contacted by the Debtors or HLHZ regarding the sale of the Debtors' assets. Given that the Sellers are not seeking to establish an auction process, the Buyer has agreed not to seek approval of customary bid protections. If, however, the Court requires the Sellers to conduct a formal auction, the Asset Purchase Agreement requires the Debtors to file a motion seeking approval of bid procedures and bid protections within forty-eight (48) hours of such ruling.

---

[6] In or about November 2007, Channelview, RESC (the "Debtor Parties"), and Equistar (collectively with the Debtor Parties, the "Settlement Parties") entered into an amended settlement agreement (the "Settlement Agreement"). On November 15, 2007, the Debtors filed a *Motion for Entry of a Order Approving Amended Settlement Agreement with Equistar Chemicals, LP, Pursuant to Bankruptcy Rule 9019* [Docket No. 147] (the "9019 Motion"). On December 11, 2007, this Court entered an order approving the 9019 Motion [Docket No. 178].

Pursuant to Settlement Agreement, the Debtor Parties agreed to pay or cause to be paid the sum of $10 million to Equistar, representing a settlement payment (the "Settlement Payment") resolving certain litigation initiated by Equistar against the Debtor Parties in the District Court of Harris County, Texas, 129th Judicial District, Case No. 2006-70522 (the "Litigation"). Also, under the Settlement Agreement, Equistar agreed to cooperate in good faith in the Sale process in order to facilitate the advantageous and prompt sale of the Assets.

Additionally, the Settlement Agreement requires that Channelview (or a Channelview affiliate) will have entered into a binding purchase and sale agreement with a third party for the sale of either Channelview (as a direct or indirect equity sale) or substantially all of the assets of Channelview and close such sale by December 31, 2007 or such later date as may be agreed to by the Settlement Parties. On January 31, 2008, the Settlement Parties extended the sale agreement deadline to March 31, 2008 pursuant to that certain Amendment No. 3 to the Settlement Agreement.

A.    **The Buyer**

20.    Buyer is a limited liability company duly formed and existing under the Laws of the State of Delaware. Buyer is an affiliate of Kelson Holdings LLC ("Kelson"), a leading independent power producer engaged in the business of owning and operating electric generating facilities. Kelson currently owns or leases four combined-cycle gas-fired facilities having an aggregate total capacity of 4,002 MWs. Kelson is indirectly and wholly-owned by the Harbinger Capital Partners Funds, New York-based hedge funds with combined assets under management of approximately $18 billion.

B.    **The Asset Purchase Agreement**

21.    Subject to the Court's approval, the Asset Purchase Agreement contemplates the following transactions:[7]

> a.    The Buyer will acquire Channelview's business of generating and selling steam, electric power, capacity and ancillary services from the Channelview Facility, as managed by Channelview, or its Affiliates; or, as applicable, RESC's business of purchasing power from Affiliates and selling power to Equistar pursuant to an Energy Supply Agreement, and any business activities of Channelview or RESC incidental to the foregoing (the "Business").

> b.    The Buyer will acquire the Sellers' rights, title and interests in, to and under all property, rights, goodwill, claims and assets to the extent relating to or used in or held for use in connection with the Business (except for the Excluded Assets) as the same exist on the Closing Date, including: (i) Real Estate Leases, including the Site Lease (as defined below); (ii) Entitled Real Property; (iii) Equipment; (iv) Supplier Contracts; (v) Assigned Contracts; (vi) Inventory; (vii) any Intellectual Property (including certain computer software or systems, and certain licenses held exclusively by either Seller, to the extent transferrable); (viii) Permits relating to the Business, to the extent transferrable; (ix) copies of all Business Records and the right to receive mail and other communications addressed to the Sellers that pertain to the

---

[7] The following description is intended as a summary only and is subject to and qualified in all respects by the terms of the Asset Purchase Agreement and all related documents.

Channelview Facility or the Business; (x) all accounts, rights, or allowances involving Emissions Allowances, and all rights to any future Emissions Allowances, if any, that will be granted or allocated with respect to the Channelview Facility; (xi) all claims, causes of action, choses in action, rights of set-off of any kind, rights of recovery, whether known or unknown, in favor of any of the Sellers, and pertaining to, arising out of or relating to, the Acquired Assets or offsetting any Assumed Liabilities; and (xii) all of Channelview's right, title and interest in the Channelview Facility.

c.    At Closing, the Buyer will assume certain Assumed Liabilities -- namely: (i) all liabilities and obligations of the Sellers under the Assigned Contracts; (ii) all liabilities and obligations of Sellers under the Permits; (iii) to the extent provided in Section 7.7(a) of the Asset Purchase Agreement, Transfer Taxes; (iv) all liabilities and obligations of Sellers arising under or relating to any environmental matter relating to the Acquired Assets; (v) any liability for Taxes attributable to the Acquired Assets to the extent they arise or accrue after the Closing Date; (vi) all other liabilities and obligations relating to or arising from the operation of the Business or the ownership of the Acquired Assets, as set forth in the Asset Purchase Agreement. All other liabilities of Sellers not expressly assumed by the Buyer under the Asset Purchase Agreement will remain the responsibility of the Sellers. A non-exhaustive list of those Excluded Liabilities is set for in section 2.4 of the Asset Purchase Agreement.

d.    The Sellers shall be responsible for all Taxes relating to the Acquired Assets (including ad valorem taxes) with respect to any period (or portion thereof) ending on or before the Closing Date. Additionally, all Transfer Taxes shall be paid one-half by the Buyer and one-half by the Sellers, and the Buyer will file all Tax Returns required to be filed to report Transfer Taxes.

e.    In addition to the Buyer assuming the Assumed Liabilities, on or before the later of (i) February 28, 2008, and (ii) the first Business Day after the Escrow Agreement is executed, the Buyer will have deposited the sum of $40 million with the Escrow Agent, which sum shall be held and disbursed pursuant to the terms of the Escrow Agreement and the Asset Purchase Agreement.

f.    Also, as consideration for the sale and transfer of the Acquired Assets, the Buyer will remit: (i) the Base Purchase Price of $468 million, plus the amount of Capital Expenditures paid or payable by the Sellers for work done during the Interim Period, plus or minus the amount of the LTMA Adjustment calculated in

accordance with the Asset Purchase Agreement. The Asset Purchase Agreement contemplates a potential Post-Closing Adjustment to the purchase price.

g. Channelview will apply $10 million of its portion of the Purchase Price payable at Closing to satisfy its obligations to Equistar under the Settlement Agreement, provided it remains in effect.

h. The Asset Purchase Agreement also contemplates the Parties' entry into and performance under transition services agreements -- an Administrative Services Transition Services Agreement and a Fuel and Power Transition Services Agreement (the "Transition Services Agreements"), pursuant to which the Affiliates of the Sellers shall provide the Buyer with administrative, technical and support services as described therein.

## C.    Notice of the Sale

22.    As set forth below, the Debtors have served notice of this Motion, contemporaneously with the filing hereof, upon the following entities:

i.    the Office of the United States Trustee for the District of Delaware;

ii.    counsel to the Official Committee of Unsecured Creditors;

iii.    counsel to the administrative agent for the Debtors' pre-petition lenders;

iv.    counsel to the Buyer;

v.    all parties that have entered a notice of appearance in these chapter 11 cases;

vi.    all relevant taxing authorities;

vii.    all parties to Assigned Contracts;

viii.    all potentially interested purchasers contacted by the Debtors or HLHZ regarding the sale of the Debtors' assets; and

ix.    counsel to Equistar.

## D.    Local Rule 6004-1 Requirements

23.    Pursuant to Local Rule 6004-1(b)(i)-(ii), and as noted herein, the Asset Purchase Agreement is attached hereto as Exhibit A, and a proposed form of sale order is

10

attached hereto as   Exhibit C.   Further, the Debtors do not believe that the appointment of a

consumer privacy ombudsman is necessary in this instance, because the Sale does not involve

the dissemination of any private consumer information.   See Local Rule 6004-1(b)(iii).

24.   In accordance with Local Rule 6004-1, the Debtors respectfully represent

the following:

i. **Sale to an Insider:** The prospective Buyer is not an insider of the Debtors within the meaning set forth in section 101(31) of the Bankruptcy Code.

ii. **Agreements with Management:** No agreements with management have been entered into in connection with the Sale.

iii. **Releases:** No releases have been entered into in connection with the Sale.

iv. **Private Sale/No Competitive Bidding:** As noted above in section paragraphs 4 and 16, supra, the Debtors have solicited competing bids over the past ten months, and do not believe that further marketing of the assets or conducting an auction will result in a higher purchase price. Accordingly, the Debtors herein have requested to undertake the Sale without holding an auction.

v. **Closing and Other Deadlines:** As set forth in the Asset Purchase Agreement, Closing is scheduled to occur on or before six (6) months after the Buyer and Sellers execute the Asset Purchase Agreement. (See section 10.1 of the Asset Purchase Agreement).

vi. **Good Faith Deposit:** As set forth in the Asset Purchase Agreement, the proposed Buyer will submit a good faith deposit in the amount of $40 million. (See section 3.2 of the Asset Purchase Agreement).

vii. **Interim Arrangements with Proposed Buyer:** As set forth in paragraph 21(h), supra, the Buyer and the Affiliates of the Sellers are planning to enter into certain Transition Services Agreements to facilitate the smooth transition of the Acquired Assets to the Buyer.

viii. **Use of Proceeds:** At closing, the Debtors intend to (a) remit $10 million of the Sale proceeds to Equistar in connection with that certain Settlement Agreement, provided it is still effective (see supra, n.6), (b) satisfy all obligations arising under the Secured Credit Facility, and (c)

11

as requested herein, prior to Closing, pay certain taxing authorities for tax claims asserted against the Debtors.

ix. **Tax Exemption:**  No tax exemptions under section 1146(a) of the Bankruptcy Code are contemplated in connection with the Sale.

x. **Record Retention:**  Pursuant to the Asset Purchase Agreement, the Buyer is purchasing the Sellers' records relating to the Channelview Facility or the Business. The Sellers will continue to have access to said records in accordance with section 7.1 of the Asset Purchase Agreement. (See section 7.1 of the Asset Purchase Agreement).

xi. **Sale of Avoidance Actions:**  The Sale does not involve the sale of any chapter 5 causes of action. (See section 2.2(j) of the Asset Purchase Agreement).

xii. **Requested Findings as to Successor Liability:**  The Buyers are undertaking certain Assumed Liabilities pursuant to the Asset Purchase Agreement. The Buyer is assuming only those liabilities, and all other liabilities not expressly assumed by the Buyer under the Asset Purchase Agreement, whether or not incurred or accrued on or after the Closing Date, shall be retained by the Sellers. The Sale Order provides that Buyer shall have no liability for successor liability claims. (See paragraphs 20 and 21 of the Sale Order).

xiii. **Sale Free and Clear of Unexpired Leases:**  The Debtors are not seeking to sell property free and clear of a possessory leasehold interest, license or other right.

xiv. **Credit Bid:**  None of the Debtors' secured creditors are seeking to credit bid secured claims pursuant to section 363(k) of the Bankruptcy Code.

xv. **Relief from Bankruptcy Rule 6004(h):**  As noted in section F, _infra_, the Debtors are requesting relief from the 10-day stay imposed by Rule 6004(h).

E.      **Assumption and Sale and Assignment of Agreements and Other Assets**

25.    The Debtors seek authority, effective upon the Closing, to assume and assign to the Buyer, pursuant to sections 363 and 365 of the Bankruptcy Code, the Assigned Contracts, which include the Equistar Agreements (as defined below).

26.    Specifically, the Asset Purchase Agreement contemplates that the Debtors will assume and assign to the Buyer the Assigned Contracts, including, but not limited to, the following agreements entered into by and between Equistar and the Debtors:  (a) the Second Amended and Restated Site Lease (the "Site Lease"); (b) the Second Amended and Restated Steam Supply Agreement (the "Steam Supply Agreement"); (c) the Second Amended and Restated Energy Supply Agreement (the "Energy Supply Agreement") ; (d) the Second Amended and Restated Services Agreement between Channelview LP and Equistar Chemicals, LP (the "Services Agreement"); and (e) the Fuel Purchase and Sale Agreement between Reliant Energy Services, Inc., Equistar Chemicals, LP and Reliant Energy Channelview LP (the "Fuel Agreement," and collectively with the Site Lease, the Steam Supply Agreement, the Energy Supply Agreement, and the Services Agreement, the "Equistar Agreements," and collectively with other contracts to be assumed and assigned pursuant to the Asset Purchase Agreement, the "Assigned Contracts").

**F.    Waiver of the 10-Day Stay Under Bankruptcy Rules 6004(h) and 6006(g).**

27.    Because the Parties wish to close the proposed Sale as soon as practicable, the Debtors respectfully request that the Court waive the ten (10) day stay required pursuant to Bankruptcy Rules 6004(h) and 6006(d) to permit the Sale to close immediately after the issuance of the Order approving the Sale.

**G.    Payment of Certain Tax Claims.**

28.    Certain taxing authorities have asserted tax claims against the Debtors that have given, or may give, rise to liens against the Acquired Assets.  The Debtors request authority to pay any such claims at or prior to closing to satisfy the claims and extinguish any lien rights related thereto.  The approximate aggregate amount of the claims is $5.4 million.  In addition to

the principal amount, the claims are accruing interest at statutory rates that will significantly

increase the amount of the claims. The Debtors request authority to pay the claims in order to

resolve any issues related to liens arising from the claims and to stop the continued accrual of

interest with respect to the claims. As noted above, the proceeds from the sale are more than

sufficient to pay all creditors in full. Additionally, the claims are entitled to priority treatment

under section 507 of the Bankruptcy Code and, therefore, would need to be paid in full before

any distribution to unsecured creditors. Accordingly, the requested relief will only affect the

timing of payment with respect to such claims and the Debtors submit that paying the claims as

soon as possible will inure to the benefit of all creditors because it will limit the interest

obligation with respect to such claims.

## BASES FOR RELIEF

### A.    The Sale is Authorized by Section 363 as a Sound Exercise of the Debtors' Business Judgment.

29.    Section 363 of the Bankruptcy Code provides that a debtor, "after notice

and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of

the estate." 11 U.S.C. § 363(b). Although section 363 of the Bankruptcy Code does not specify a

standard for court authorization of the use, sale or lease of property of the estate, virtually all

courts have held that a sale of substantially all of a debtor's assets outside of the ordinary course

and prior to confirmation of a plan of reorganization is appropriate if the court finds that the sale

represents a reasonable business judgment on the part of the trustee or debtor-in-possession. See

In re Abbotts Dairies of Pennsylvania, 788 F.2d 143 (3d Cir. 1986); In re Delaware & Hudson

Ry. Co., 124 B.R. 169, 176 (D. Del. 1991); In re Stroud Ford, Inc., 164 B.R. 730, 732 (Bankr.

M.D. Pa. 1993); Titusville Country Club v. Pennbank (In re Titusville Country Club), 128 B.R.

396, 399 (Bankr. W.D. Pa. 1991); In re Indus. Valley Refrigeration & Air Conditioning Supplies,

Inc., 77 B.R. 15, 21 (Bankr. E.D. Pa. 1987); In re Lionel Corp., 77 F.2d 1063 (2d Cir. 1983); Stephens Indus., Inc. v. McClung, 789 F.2d 386, 391 (6th Cir. 1986); In re Ionosphere Clubs, Inc., 100 B.R. 670, 675 (Bankr. S.D.N.Y. 1989); In re Phoenix Steel Corp., 82 B.R. 334, 335-36 (Bankr. D. Del. 1987) (stating that elements necessary for approval of a section 363 sale in a chapter 11 case are "that the sale is fair and equitable, that there is a good business reason for completing the sale and the transaction is in good faith").

30.    The "sound business reason" test requires that a trustee or debtor-in-possession establish four elements: (1) that a sound business purpose justifies the sale of assets outside the ordinary course of business, (2) that accurate and reasonable notice has been provided to interested persons, (3) that the trustee or debtor in possession has obtained a fair and reasonable price, and (4) good faith. Titusville Country Club, 128 B.R. at 399; In re Sovereign Estates, Ltd., 104 B.R. 702, 704 (Bankr. E.D. Pa. 1989); Phoenix Steel Corp., 82 B.R. at 335-36; see also Stephens Indus., 789 F.2d at 390; Lionel Corp., 722 F.2d at 1071.

31.    Additionally, courts have permitted the sale of all or substantially all of a debtor's assets by a trustee or debtor-in-possession if such sale is necessary to preserve the value of the assets for the estate, its creditors and its other interest holders. See Abbotts Dairies, 788 F.2d at 143; Lionel Corp., 722 F.2d at 1063.

32.    The proposed Sale satisfies the "sound business purpose" test. The Debtors believe that the prompt sale of the Acquired Assets presents the best opportunity to realize the maximum value of their assets for the benefit of the Debtors' creditors, stakeholders and other parties in interest.

33.    More specifically, the anticipated gross proceeds of the Sale are expected to exceed the total amount of claims existing against the Debtors' estates. As noted above, as of

15

the Petition Date, approximately $341.1 million remained outstanding under the Secured Credit Facility. Additionally, the Debtors estimate priority and general unsecured claims against the estates total approximately $20 million. Therefore, the Debtors anticipate the Sale to generate net proceeds in excess of all claims asserted against their estates and the excess to be shared by the Partners (as equity holders) and Equistar, pursuant to the terms of the CFPA (as defined and discussed in detail below).

34.     Second, the expeditious sale of the Acquired Assets will facilitate compliance with the Settlement Agreement and resolution of the Litigation, thereby avoiding time-consuming participation in contentious and costly litigation.

35.     Third, the Debtors have provided all requisite notice to their creditors and all other parties-in-interest. As set forth below, the Debtors' notice procedures satisfy the requirements of Bankruptcy Rule 2002 and are reasonably calculated to provide timely and adequate notice of the sale to all of the Debtors' creditors and other parties-in-interest.

36.     Fourth, the Debtors submit that the Sale is for a fair and reasonable price. The proposed Sale is the end result of a protracted sale process during which the Debtors have evaluated their strategic alternatives and solicited interest from numerous parties. The Debtors do not believe that any other transaction with a reasonable likelihood of closing has offered, or will offer, the amount of consideration provided for in the Asset Purchase Agreement.

37.     Finally, the proposed Sale satisfies the good faith requirements of Abbotts Dairies. The Debtors submit that the terms and provisions of the Asset Purchase Agreement were the product of good faith, arm's length negotiations between the Sellers and the Buyer.

**B.**    **Sale and Transfer of the Acquired Assets and the Inventory Free and Clear of All Liens and Interests is Authorized by Section 363(f).**

38.    The Debtors submit that it is appropriate to sell and transfer the Acquired Assets, free and clear of all liens, pledges, charges, claims and security interests of any nature, including in each case all "interests" as such term is defined in section 363(f) of the Bankruptcy Code (collectively, "Liens and Interests"). Section 363(f) of the Bankruptcy Code authorizes a debtor-in-possession to sell assets free and clear of Liens and Interests if:

(1)    applicable nonbankruptcy law permits sale of such property free and clear of such interests;

(2)    such entity consents;

(3)    such interest is a lien and the price at which such property is to be sold is greater than the value of all liens on such property;

(4)    such interest is in bona fide dispute; or

(5)    such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. §363(f).

39.    Because Bankruptcy Code section 363(f) is drafted in the disjunctive, satisfaction of any one of its five requirements will suffice to permit the sale of the Acquired Assets "free and clear" of all Liens and Interests. See, e.g., In re Kellstrom Indus., Inc., 282 B.R. 787, 793 (Bankr. D. Del. 2002) (noting that section 363(f) "is written in the disjunctive, not the conjunctive, and if any of the five conditions are met, the debtor has the authority to conduct the sale free and clear of all liens."). Section 363(f) is supplemented by section 105(a) of the Bankruptcy Code, which provides that "[t]he Court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a).

17

40.     The Debtors believe that one or more of the tests of section 363(f) are satisfied with respect to the sale and transfer of the Acquired Assets pursuant to the Asset Purchase Agreement.  For example, the consideration to be paid under the terms of the Asset Purchase Agreement greatly exceeds the value of all liens on the property and such liens will attach to the Sale proceeds.  Accordingly, the Debtors can utilize section 363(f) to transfer the Acquired Assets to the Buyer free and clear of all Liens and Interests.

41.     Although section 363(f) of the Bankruptcy Code provides for the sale of assets "free and clear of any interests," the term "any interest" is not defined anywhere in the Bankruptcy Code.  Folger Adam Security v. DeMatteis/MacGregor JV, 209 F.3d 252, 257 (3d Cir. 2000).  In the case of In re Trans World Airlines, Inc., 322 F.3d 283, 288-89 (3d Cir. 2003), the Third Circuit specifically addressed the scope of the term "any interest."  The Third Circuit observed that while some courts have "narrowly interpreted that phrase to mean only in rem interests in property," the trend in modern cases is towards "a more expansive reading of 'interests in property' which 'encompasses other obligations that may flow from ownership of the property.'"  Id. at 289 (citing 3 Collier on Bankruptcy 363.06[l]).  As determined by the Fourth Circuit in In re Leckie Smokeless Coal Co., 99 F.3d 573, 581-82 (4th Cir. 1996), a case cited approvingly by the Third Circuit in Folger, the scope of section 363(f) is not limited to in rem interests.  Thus, the Third Circuit in Folger found that Leckie held that the debtors "could sell their assets under § 363(f) free and clear of successor liability that otherwise would have arisen under federal statute."  Folger, 209 F.3d at 258.

42.     Similarly, courts have consistently held that a purchaser of a debtor's assets pursuant to a section 363 sale takes free from successor liability resulting from pre-existing claims.  See Ninth Ave. Remedial Group v. Allis-Chalmers Corp., 195 B.R. 716, 732

18

(Bankr. N.D. Ind. 1996) (stating that a bankruptcy court has the power to sell assets free and clear of any interest that could be brought against the bankruptcy estate during the bankruptcy); MacArthur Co. v. Johns-Manville Corp. (In re Johns-Manville Corp.), 837 F.2d 89, 93-94 (2d Cir. 1988) (channeling of claims to sale proceeds consistent with intent of sale free and clear under section 363(f) of the Bankruptcy Code; In re New England Fish Co., 19 B.R. 323, 329 (Bankr. W.D. Wash. 1982) (transfer of property in free and clear sale included free and clear of Title VII employment discrimination and civil rights claims of debtor's employees); In re Hoffman, 53 B.R. 874, 876 (Bankr. D.R.I. 1985) (transfer of liquor license free and clear of any interest permissible even though the estate had unpaid taxes); Am. Living Sys. v. Bonapfel (In re All Am. of Ashburn, Inc.), 56 B.R. 186, 190 (Bankr. N.D. Ga. 1986) (product liability claims precluded in a sale of assets free and clear); WBQ P'ship v. Virginia Dept. of Med. Assistance Servs. (In re WBQ P'ship), 189 B.R. 97, 104-05 (Bankr. 22 E.D. Va. 1995) (Commonwealth of Virginia's right to recapture depreciation is an "interest" as used in section 363(f)).

43.     The purpose of an order purporting to authorize the transfer of assets free and clear of all "interests" would be frustrated if claimants could thereafter use the transfer as a basis to assert claims against the Buyer arising from the Debtors' pre-sale conduct.  Under section 363(f) of the Bankruptcy Code, the Buyer is entitled to know that the Acquired Assets are not affected by any latent Liens and Interests that will be asserted against the Buyer after the proposed transaction is consummated.

### C.     The Proposed Notice of the Sale is Appropriate.

44.     Under Bankruptcy Rules 2002(a) and (c)(1), the Debtors are required to notify their creditors of any proposed sale of their assets, including a disclosure of the terms and conditions of any private sale, and the deadline for filing any objections to such sale.  Local Rule

2002(b) limits notice of a motion to use, seal or lease property of the estate to counsel for the debtor, the United States Trustee, counsel for all official committees, all parties who file a request for service of notices under Bankruptcy Rule 2002(i) and all parties whose rights are affected by the motion. Notably, Local Rule 2002-1(b) does not require notice to all creditors of the Debtors. This Motion, and the notice hereof, fully complies with Bankruptcy Rule 2002 and Local Rule 2002-1(b) and is reasonably calculated to provide timely and adequate notice of the terms and conditions of the Sale to all of the Debtors' creditors and other parties-in-interest entitled to notice in these cases.

**D.**     **The Assumption and Assignment of the Assigned Contracts Should be Authorized.**

45.     Under section 365(a) of the Bankruptcy Code, a debtor "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). In turn, section 365(f)(2) of the Bankruptcy Code provides in pertinent part:

> The trustee may assign an executory contract or unexpired lease of the debtor only if –
>
> (A) the trustee assumes such contract or lease in accordance with the provisions of this section; and
>
> (B) adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

11 U.S.C. § 365(f)(2).

46.     Section 365(b)(1) of the Bankruptcy Code, in turn, codifies the requirements for assuming an unexpired lease or executory contract of a debtor. This subsection provides:

> (b)(1) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee -

(A) cures, or provides adequate assurance that the trustee will promptly cure, such default ... ;

(B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and

(C) provides adequate assurance of future performance under such contract or lease. 11 U.S.C. § 365(b)(1).

47.    By and through this Motion, the Debtors are seeking to assume and assign the Assigned Contracts, including the Site Lease, the Steam Supply Agreement, and the Energy Supply Agreement, but are not assuming and assigning the Second Amended and Restated Cash Flow Participation Agreement between Channelview and Equistar (the "CFPA") for the reasons set forth below.[8]

### 1.    Adequate Assurance.

48.    There are no incurable defaults under any of the Assigned Contracts, including the Equistar Agreements. The Debtors do believe, however, that there are certain amounts due under the Assigned Contracts, and consistent with the Asset Purchase Agreement, will cure such defaults prior to Closing or establish a Cure Cost Reserve Amount pursuant to the terms of the Asset Purchase Agreement.

49.    Moreover, the Debtors submit that the Sale provides all parties to the Assigned Contracts, including Equistar, with adequate assurance of future performance. The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." EBG Midtown South Corp. v. McLaren/Hart Env. Eng'g Corp. (In re Sanshoe Worldwide Corp.), 139 B.R. 585, 593

---

[8] The Debtors believe that Equistar may argue that the CFPA is an executory contract that is integrated and not severable from the other Equistar Agreements. For the reasons set forth herein, the Debtors disagree with that potential assertion. In addition, the Buyer has made it clear that it will not proceed with the Sale if it is required to take on the obligations contained in the CFPA.

(S.D.N.Y. 1992); <u>In re Prime Motor Inns Inc.</u>, 166 B.R. 993, 997 (Bankr. S.D. Fla. 1994) ("[a]lthough no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance"); <u>Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.)</u>, 103 B.R. 524, 538 (Bankr. D.N.J. 1988).

50.    Among other things, adequate assurance may be provided by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. <u>See, e.g.</u>, <u>In re Bygaph, Inc.</u>, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when prospective assignee of lease from debtor has financial resources and has expressed willingness to devote sufficient funding to business in order to give it strong likelihood of succeeding).

51.    If necessary, the Debtors will produce facts at the hearing on this Motion to support the Buyer's willingness and ability to perform under the Assigned Contracts. The hearing will thus provide the Court and other interested parties with the opportunity to evaluate and, if necessary, challenge the ability of the Buyer to provide adequate assurance of future performance under the Assigned Contracts, as required under section 365(b)(1)(C) of the Bankruptcy Code. The Court should therefore authorize the Debtors to assume and assign the Assigned Contracts as set forth herein.

**2.    The Debtors are Not Assuming and Assigning the CFPA Because its Economic Effect is an Equity Participation Right in Channelview and the CFPA is a Contract to Pay Money.**

52.    As noted above, the Debtors intend to assume and assign a limited number of contracts in connection with the Sale. One prepetition contract which the Debtors are <u>not</u>

22

assuming and assigning to the Buyer is the CFPA.[9]  As described more fully below, pursuant to the CFPA, the Debtors and Equistar agreed to share Channelview's free cash flow.  In form as well as substance, the CFPA most resembles an agreement among "equity holders" to govern their respective participation in Channelview's free cash flow.  The CFPA also is a contract for the payment of money.  Accordingly, the Debtors do not believe that the CFPA is a contract subject to assumption and/or assignment by the Debtors.

<strong>a.     The CFPA's Economic Effect is an Equity Participation Right in Channelview.</strong>

53.     It is well-settled that an "equity" interest is characterized by a return on investment which depends on the profit generated from the entity's enterprise.  See Shenandoah Life Ins. Co. v. Valero Energy Corp., 1988 WL 63491, at *9, n.4 (Del. Ch. June 21, 1988) (element of equity interest includes payment tied to earnings); Lasker v. McDonnell & Co., Inc., 1975 WL 1950, at *10 (Del. Ch. July 9, 1975) (return on investment which depends on earnings "is a clear characteristic of equity securities"); see also In re Atl. Littleneck Clamfarms, Inc., 211 B.R. 827, 835 (Bankr. D.S.C. 1997) (payment which was "tied to the fortunes of the business, [is] a characteristic of an equity advance"); In re 4 C Solutions, Inc., 302 B.R. 592, 597 (Bankr. C.D. Ill. 2003) (share of profits is primary characteristic of equity).

54.     Here, the parties entered into the CFPA as of December 15, 1999 in order to memorialize Equistar's rights to participate in Channelview's free cash flow -- which the CFPA defines as "Project Cash Flow."[10]  See CFPA, p. 1 (the parties entered into the CFPA "in order to set forth Equistar's participation in the cash flow of the Project").   The specific

---

[9]  Pursuant to section 6.11 of the CFPA, the CFPA must remain confidential.  Accordingly, simultaneously herewith, the Debtors are filing a motion seeking authority to file the CFPA under seal.

provisions relating to Equistar's right to participate in the free cash flow of Channelview are set forth in Article II of the CFPA (entitled "Priority of Payments"). As set forth in Article II, the parties agreed that Channelview's free cash flow first would be distributed to the Partners and Equistar for the repayment of certain fees, expenses and other contributions made by each of the parties. See CFPA, § 2.1(a) (providing that the Partners first would receive payment of $20 million, an amount the Partners previously paid to Equistar) and CFPA, § 2.1(b) (providing that the Partners and Equistar will receive *pro rata* distributions from Channelview's free cash flow equal to their respective contributions relating to development costs and other expenses). Thereafter, the CFPA requires that Channelview distribute its free cash flow to Equistar as a "Royalty Payment" and to the Partners as "distributions," as set forth in the CFPA. See CFPA, § 2.1(d) (providing that Channelview will distribute its free cash flow to "Equistar as Royalty Payments" and to the Partners as "distributions").

55.    The parties agreed that Equistar would receive between 10% and 50% of Channelview's free cash flow. See Schedule X ("'Royalty Payment' means, as of any Royalty Calculation Date, Project Cash Flow as of such date multiplied by the Applicable Percentage as of such date"); Definitions, Applicable Percentage (the "Applicable Percentage" is between 10-50%). Equistar and Channelview also agreed that the Partners and Equistar would share equally any of Channelview's free cash flow that was derived from certain potential project cost savings. See CFPA, § 2.2 (providing that "the Parties shall mutually agree on the manner in which the Project Company should use such Project Cash Flow to provide each of Equistar and the Partners fifty percent (50%) of the economic benefit of such Project costs savings. . . ."). Under the

---

[10] "'Project Cash Flow' means Project Company cash which, under the terms of the Financing Agreements, is freely available to the Project Company for distribution to the Partners.    " See Second Amended and Restated Schedule X, p. 20, a true and correct copy of which is attached hereto as Exhibit B.

24

CFPA, Channelview was required to make a Royalty Payment to Equistar at the same time as any equity distribution to the Partners. See CFPA, § 3.1 ("The Project Company shall not make a distribution to the Partners unless it has made a corresponding Royalty Payment to Equistar").

56.    These provisions demonstrate that the CFPA is an agreement under which the Debtors and Equistar pre-determined their respective rights to enjoy the fruits of Channelview's operations. Indeed, as further discussed below, the CFPA by its terms *only* concerns the accounting for, calculation and distribution of Channelview's free cash flow. If there was any doubt regarding the CFPA's limited focus -- and there is none -- any such doubt is dispelled by the CFPA's plain statement that Equistar's interest (i.e., its "Royalty Payment") is one which is wholly dependent on Channelview's free cash flow. See CFPA, § 4.2 ("Equistar's Royalty Payment is determined by the profitability of the Project Company's operations. . . .").

57.    Of course, the CFPA itself does not expressly state that Equistar's right to receive a "Royalty Payment" is an equity interest. See generally CFPA. The parties' choice of language in the CFPA, however, is not controlling on this Court. While parties often have valid reasons to structure their investments in ways other than equity -- including tax and other considerations -- it is well-settled that a bankruptcy court is not governed by the parties' statement of their respective economic interests. Instead, bankruptcy courts routinely examine the purported nature of a party's interest and, if appropriate, recharacterize that interest to more accurately reflect the party's true economic stake. Indeed, the Third Circuit has advised bankruptcy courts to exercise their equitable authority to ensure that "substance will not give way to form" and that "substantial justice" will be done. See Cohen v. KB Mezzanine Fund II, LP (In re Submicron Sys. Corp.), 432 F.3d 448, 454 (3d Cir. 2006).

58.    In exercising its equitable authority, the Court must make its own determination of a party's economic interest, judged in light of the specific facts at issue and without regard to the parties' characterizations. See Official Cmt. of Unsecured Creditors v. Tennenbaum Capital Partners, LLC (In re Radnor Holdings Corp.), 353 B.R. 820, 838 (Bankr. D. Del. 2006) (when deciding a party's true interest the court can consider the terms of the documents, surrounding circumstances and the economic reality of the circumstances); United States Trustee v. Lombardozzi (In re RJS Indus.), 368 B.R. 845, 852 (M.D. Pa. 2006) ("the overarching inquiry as to whether an advance should be considered an infusion of equity is the intent of the parties gleaned from what they say, what they do, and the economic reality of the situation"). The Third Circuit has noted that the Court's inquiry is:

> to discern whether the parties called an instrument one thing when in fact they intended it as something else. That intent may be inferred from what the parties say in their contracts, from what they do through their actions, and from the economic reality of the surrounding circumstances. Answers lie in facts that confer context case-by-case.

Submicron Sys., 432 F.3d at 456.

59.    The Third Circuit also has rejected the use of an analytical framework that relies on the mechanistic weighing of particular factors. See id. ("No mechanistic scorecard suffices. And none should, for Kabuki outcomes elude difficult fact patterns."). Instead, the Third Circuit requires that courts take a practical view that focuses on the precise financial interests and whether the interest in question is based on a share of profits or a fixed return:

> Which course a court discerns is typically a commonsense conclusion that the party infusing funds does so as a banker (the party expects to be repaid with interest no matter the borrower's fortunes; therefore the funds are debt) or as an investor (the funds infused are repaid based on the borrower's fortunes; hence, they are equity). Form is no doubt a factor, but in the end it is no more than an indicator of what the parties actually intended and acted on.

26

Id.

60.     Here, the CFPA clearly provides that Equistar's interest in Channelview depends on Channelview's free cash flow, the hallmark of an equity-like interest, and surely not an interest or obligation that must travel to the Buyer as a purchaser solely of assets. See supra, ¶¶ 53-56. As an equity-like instrument, the Court readily can conclude that Equistar does not have any direct interest in Channelview's assets. See, e.g., 11 WILLIAM MEADE FLETCHER ET AL., FLETCHER CYCLOPEDIA OF THE LAW OF PRIVATE CORPORATIONS § 5321 (perm rev. ed. 2003) ("the assets of a corporation belong to the corporation and not to its shareholders"). Indeed, this basic principle of corporate law is mirrored in relevant state-specific limited partnership statutes. See 6132a-1 TEX. CIV. CODE ANN. § 7.01 ("A partner has no interest in specific limited partnership property"); DEL. CODE ANN. tit. 6 § 17-701 ("A partner has no interest in specific limited partnership property"). Instead, the CFPA's plain economic terms support the conclusion that Equistar rights under the CFPA are limited to its right to participate in the free cash flow derived by Channelview (if any); and prevailing corporate and other authority support this characterization. See, e.g., Buechner v. Farbenfabriken Bayer Aktiengesellschaft, 38 Del. Ch. 490, 493 (Del. Ch. 1959) ("[t]he shareholder's essential right is to share in the profits and in the distribution of assets on liquidation. . . . He has no interest in any specific assets of the corporation"); du Pont v. du Pont, 42 Del. Ch. 246, 251 (Del. Ch. 1965) ("We think the law clear that shares of stock do not have any specific or aliquot interest in the assets of the corporation. The shareholder has essential rights to share in the profits and in the distribution of assets on liquidation, but no specific interest in the corporate assets"); 6132a-1 TEX. CIV. CODE ANN. § 6.05 ("a partner, regardless of the nature of the partner's contribution, may not demand or receive a distribution from a limited partnership in any form other than

27

cash"); DEL. CODE ANN. tit. 6 § 17-605 ("a partner, regardless of the nature of the partner's

contribution, has no right to demand and receive any distribution from a limited partnership in

any form other than cash.").

      61.     Channelview is selling substantially all of its assets as a going concern.

Accordingly, as with other equity interests in bankruptcy, Equistar's interest under the CFPA

rests in its right to receive its fair share of Channelview's net proceeds (after payment of all

allowed claims of creditors) from the sale of Channelview's assets in satisfaction of this interest.

See CFPA. This common-sense application of the CFPA not only satisfies the terms and intent

of, and the economic rights under, the CFPA, but also is in accordance with general bankruptcy,

corporate and partnership law.  See In re Insilco Tech., Inc., 480 F.3d 212, 218 (3d Cir. 2007)

("Equity investment brings not a right to payment, but a share of ownership in the debtor's assets

-- a share that is subject to all of the debtor's payment obligations.  Thus, if a filed claim is

rejected on the ground that it is not a claim at all, but an interest, then the holder of that interest is

relegated to the end of the line, where any recovery is unlikely"); 6132a-1 TEX. CIV. CODE ANN.

§ 6.04 ("on withdrawal any withdrawing limited partner is entitled to receive, within a

reasonable time after withdrawal, the fair value of that limited partner's interest in the limited

partnership as of the date of withdrawal"); DEL. CODE ANN. tit. 6 § 17-604 ("if not otherwise

provided in a partnership agreement, such [withdrawing] partner is entitled to receive, within a

reasonable time after withdrawal, the fair value of such partner's partnership interest in the

limited partnership as of the date of withdrawal based upon such partner's right to share in

distributions from the limited partnership").

      62.     Accordingly, because the nature of Equistar's interests under the CFPA is

more akin to an equity participation interest in Channelview, the Debtors are not assuming and

assigning the CFPA to the Buyer. In fact, the Debtors believe that the Buyer would not pursue the Sale if it is required to share its future operating cash flow with Equistar pursuant to the terms of the CFPA. To do otherwise would all but force the Buyer to have Equistar be its going forward equity partner in this transaction. Just as a buyer of partnership assets is not required to share its future operating cash flow with such selling partnership's partners, the Buyer has no obligation to share its future operating cash flow with Equistar. Thus, following consummation of the Sale, the Debtors intend to distribute to Equistar whatever amount it is legally entitled to under the terms of the CFPA.

### b.    The CFPA is a Contract for the Payment of Money.

63.    The Debtors are not assuming and assigning the CFPA for another reason: the only material obligation remaining under the CFPA is for Channelview to pay Equistar (and the Partners) their share of the Project Cash Flow following the Closing of the Sale. A "contract is not executory if the only remaining obligation is the payment of money by the debtor." In re Waste Sys. Int'l, Inc., 280 B.R. 824, 827 (Bankr. D. Del. 2002); see also Indian River Homes, Inc. v. Sussex Trust Co., 108 B.R. 46, 56 (D. Del. 1989); Choate v. Norvell & Assocs. (In re Choate), 184 B.R. 270, 273 (Bankr. N.D. Tex. 1995) ("A contract where the only thing left to do is payment of money is not an executory contract"); Clarendon Nat'l Ins. Co. v. Coal Stripping, Inc. (In re Coal Stripping, Inc.), 215 B.R. 500, 502-03 (Bankr. W.D. Pa. 1997) (obligation to pay money is not executory contract); Levinson Steel Co. v. Early Sunrise Constr., Inc. (In re Levinson Steel Co.), 1993 WL 293213, at *7 (Bankr. W.D. Pa. April 6, 1993).

64.    As noted above, the only material obligation under the CFPA relates to Channelview's payment of money to the Partners and Equistar following the Closing of the Sale. See supra, ¶¶ 53-56. In fact. aside from certain typical miscellaneous provisions (see CFPA,

29

Article VI), the balance of the CFPA's articles directly address accounting, calculation and distribution issues related to Channelview's free cash flow, Equistar's Royalty Payment and the Partners' distribution.  See CFPA Article II (addressing priority of payment) and Article III (addressing payment and calculation of Royalty Payment).

65.    While Article IV (entitled "Project Company Operations") does include certain provisions which purport to limit Channelview's ability to make certain business decisions without Equistar's consent (which consent is fairly typical for equity-type investments) -- such as filing for bankruptcy, or increasing particular expenses which would increase Channelview's costs -- these rights are not material or on-going obligations sufficient to render the CFPA executory.  Indeed, the CFPA is clear that these provisions exist solely to protect Equistar's economic interest in Channelview's net cash flow.  See, e.g., CFPA, § 4.2 (purporting to proscribe Channelview's ability to unilaterally undertake certain actions because "Equistar's Royalty Payment is determined by the profitability of the Project Company's operations"); CFPA, § 4.4 ("Equistar, at its expense, shall have the right to audit the books and records of the project company for the purpose of determining that the Royalty Payment for the preceding calendar year has been properly calculated and paid . . . .").

66.    Moreover, the CFPA confirms that none of these purported obligations are reciprocal, and that the Debtors or Equistar's failure to perform would not excuse the other party's performance under the CFPA.  See CFPA.  Accordingly, for this reason as well the CFPA is not executory.  See Waste Sys. Int'l, 280 B.R. at 826 (contract is executory only where the "obligations of both the bankrupt and other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing performance of the other"); TTS, Inc. v. Citibank, N.A. (In re TTS, Inc.), 158 B.R. 583, 588 (D.

Del. 1993) (there is no executory contract if material obligations are not mutually owing); Kaye v. A.R.E. Distrib. (In re Value Music Concepts, Inc.), 329 B.R. 111, 122 (Bankr. N.D. Ga. 2005) (a contract is executory only if "the obligation of both the debtor and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing the performance of the other"); In re Garrison-Ashburn, L.C., 253 B.R. 700, 708-09 (Bankr. E.D. Va. 2000) (operating agreement which provides no obligation to provide additional capital, no obligation to participate in management and no obligation to provide personal expertise or services to company was not executory contract); In re Placid Oil Co., 72 B.R. 135, 138-139 (N.D. Tex. 1987) ("The common element of all executory contracts appears to have been defined as reciprocal obligations. . . . Absent in this case is the reciprocal nature of the obligations").

    67.    As a non-executory contract relating to the payment of money, Equistar's claim under the CFPA (once liquidated) can be satisfied from the proceeds received by Channelview from the sale of the Acquired Assets. See In re Heritage Leasing Corp., 1998 WL 2016851, at *5 (Bankr. D. S.C. Sept. 17, 1998) ("regardless of the nature of the contract (executory or non-executory), if at the time of the bankruptcy filing the debtor has an obligation under the contract to pay money to the non-debtor party, that obligation is handled as a prepetition claim in the bankruptcy proceedings. . . . [and] the fact that the payments became due after the bankruptcy filing does not alter the conclusion that the payments are prepetition obligations"); Waste Sys. Int'l, 280 B.R. at 827, 828 (Bankr. D. Del. 2002) (obligation to make royalty payment arose when the underlying agreement was executed and "[t]he fact that the pre-petition obligation is dependent upon the occurrence of a post-petition event does not make the obligation an administrative claim. . . . Instead, the obligation is a contingent claim.").

31

68.    Accordingly, for all of these reasons, the Debtors are not assuming and assigning the CFPA in connection with the Sale and, instead, expect to satisfy Equistar's equity-like economic interest in Channelview by distributing to Equistar its fair share of the net proceeds (i.e., sale proceeds remaining after satisfaction of all other claims against the Debtors), derived from the Sale of the Acquired Assets in accordance with the terms of the CFPA.

c.    **Even if the CFPA is an Executory Contract, it is a Separate Agreement and is Severable from the Other Equistar Agreements.**

69.    Under bankruptcy law, an executory contract must be assumed or rejected *in toto*. Cinicola v. Scharfenberger, 248 F.3d 110, 119-20 (3d Cir. 2001). "However, '[i]f a single contract contains separate, severable agreements[,] the debtor may reject one agreement and not another.'" Mirant Corp. v. Potomac Elec. Power Co. (In re Mirant Corp.), 197 Fed. Appx. 285, 289 (5th Cir. July 19, 2006); (Stewart Title Guar. Co. v. Old Republic Nat'l Title Ins. Co., 83 F.3d 735, 741 (5th Cir. 1996)). The question as to whether a contract is divisible for section 365 purposes is governed by state law. In re Cafeteria Operators, L.P., 299 B.R. 384, 389 (Bankr. N.D. Tex. 2003). The agreements between the Debtors and Equistar at issue in this case are governed by Texas law.[11]

70.    Under Texas law, a contract's severability turns on three factors: "1) the intent of the parties; 2) the subject matter of the agreement; and 3) the conduct of the parties." In re Wolfin Oil, L.L.C., 318 B.R. 392, 397 (Bankr. N.D. Tex. 2004); accord Amtech Lighting Servs. Co. v. Payless Cashways (In re Payless Cashways, Inc.), 230 B.R. 120, 135 (B.A.P. 8th Cir. 1999). Of the three factors, the intent of the parties carries the greatest weight. Id.; Stewart Title, 83 F.3d at 740 (noting that the clear intent of the parties is far more compelling than the

RLF1-3254665-7

subject matter of the leases). That being said, at least one court has considered whether the presence of the second and third factors may override the intent factor. Wolfin Oil, 318 B.R. at 398.

71. Additionally, when examining a contract's subject matter for severability purposes, Texas courts consider whether separate, apportionable consideration is present in the agreements. Wolfin Oil, 318 B.R. at 398 (noting that the standard is whether "'the performance by one party consists of several distinct and separate items and [whether] the price paid by the other is apportioned to one item'")(citing In re Convenience USA, Inc., 2002 WL 230772, at *3 (Bankr. M.D.N.C. Feb. 12, 2002)); see also Stewart Title, 83 F.3d at 740 (quoting In re Ferguson, 183 B.R. 122, 126 (Bankr. N.D. Tex. 1995)(noting that "[w]here the subject matter of the contract is divisible and the consideration is apportioned, these qualities are consistent with and indicative of a severable contract'"); accord Payless Cashways, 230 B.R. at 135. Thus, the existence of separate, apportionable consideration speaks in favor of severability. See, e.g., Wolfin Oil, 318 B.R. at 398.

72. Further, where "a contract can be divided into two or more separate agreements that can be performed independent of each other [it] weighs in favor of a finding that the contract is divisible." Convenience USA, 2002 WL 230772 at *6. Also, courts have found that the fact that several instruments were executed as part of the same overall transaction is not dispositive in terms of severability. See, e.g., In re Adelphia Bus. Solutions, Inc., 322 B.R. 51, 60 (Bankr. S.D. N.Y. 2005)(quoting Howard v. Nicholson, 556 S.W.2d 477, 480 (Mo. Ct. App. 1977)).

---

[11] See, e.g., Site Lease, § 22.5(a), Steam Supply Agreement, § 15.4(a), Energy Supply Agreement, § 15.4(a); see also CFPA, § 6.6(a)

73.     As noted above, the Asset Purchase Agreement contemplates the assumption and assignment of the Equistar Agreements, but not the CFPA, through this Motion.

74.     As further noted above, the Debtors believe that the CFPA is not an executory contract, and is therefore incapable of assumption and assignment under section 365 of the Bankruptcy Code. That being said, for the reasons set forth below, even if the CFPA were executory, CFPA is severable from the other Equistar Agreements under Texas law and, not surprisingly, the Buyer does not want to be assigned the Debtors' obligations under the CFPA. Accordingly, should the Court determine that the CFPA is an executory contract capable of assumption or rejection, the Debtors hereby seek to reject the CFPA.[12]

75.     First, the Equistar Agreements and the CFPA are each capable of being performed independent of one another, and indeed, were performed separately. Second, the Equistar Agreements contain different termination dates. For instance, the Site Lease expires on midnight on the December 31st immediately following the 40th anniversary of the COD[13] or such later expiration of the Steam Supply Agreement, while the CFPA terminates on the 23rd anniversary of the COD. See Site Lease, § 7.1(a); CFPA, § 6.1.

76.     Third, the Equistar Agreements and the CFPA each cover a different subject matter. For instance, the Steam Supply Agreement concerns Equistar's steam supply

---

[12] The Equistar Agreements and the CFPA contain what appear to be integration clauses. See, e.g., CFPA, § 6.8 (providing that "[t]his Agreement and the other Project Agreements contain the complete agreement of the Parties hereto with respect to the matters contained herein and supersedes all other agreements, understandings and negotiations, whether written or oral, with respect to the matters contained herein."). This provision is far from controlling, however. In fact, at least one court has found the presence of an integration clause to be wholly irrelevant to the issue of severability. Plitt Amusement, 233 B.R. at 845 (noting that the purpose of the integration clause was to preclude entry of parol evidence or other unrelated agreements, which was "a wholly separate issue from whether the various instruments constitute a single agreement for the purposes of assumption or rejection. Thus this position is irrelevant to the dispute before the court.").

[13] The term "COD" means "the date on which the Project Company notifies Equistar that the Project Company is commencing to deliver, and Equistar will commence receiving, the On Purpose Steam Requirements in accordance with Section 3.2 of the Steam Supply Agreement." Schedule X, p. 4.

34

requirements, while the Site Lease concerns the lease of the premises upon which the Channelview Facility is operated. Moreover, the Equistar Agreements contain separate, apportionable consideration and payment structures, which indicates that the Equistar Agreements cover different subject matters. Specifically, Equistar invoices the Debtors separately under each of the Equistar Agreements. Further, the Energy Supply Agreement contains a unique payment structure. Equistar separately invoices RES on a monthly basis, and RES in turn nets the revenues from Equistar against energy sales to third-parties. When the cost of energy exceeds the revenues for a particular month, RES bills Channelview, and when the reverse is true, it results in a receivable for Channelview. However, as described in detail in section 2(a), supra, the CFPA contains its own very unique equity participation payment structure, wherein the Debtors and Equistar agree to share Channelview's free cash flow. Accordingly, the subject matter of the CFPA most closely resembles an agreement among equity holders. Whereas the subject matter of the Equistar Agreements covers the provision of goods and services by the Debtors to Equistar and vice versa (and in some instances, third parties).

77.    Fourth, several of the Equistar Agreements initially were executed on different dates. For example, the Site Lease was executed originally on July 15, 1999, while the Steam Supply Agreement was initially executed on September 20, 1999.

78.    Therefore, based on the foregoing, even if the CFPA is an executory contract, the Debtors are entitled to reject the CFPA because the CFPA and other Equistar Agreements are severable under Texas law, and the Buyer obviously has not interest in being assigned the Debtors' obligations under the CFPA. To do otherwise would all but require the Buyer to take on an equity partner in its go forward business venture.

**E.**    **Relief from the Ten Day Waiting Period Under Bankruptcy Rules 6004(h) and 6006(d) is Appropriate.**

79.    Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 10 days after entry of the order, unless the court orders otherwise." Similarly, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease . . . is stayed until the expiration of 10 days after the entry of the order, unless the court orders otherwise." The Debtors request that the Order be effective immediately by providing that the ten (10) day stays under Bankruptcy Rules 6004(h) and 6006(d) are waived.

80.    The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to appeal before an order can be implemented. <u>See</u> Advisory Committee Notes to Fed. R. Bankr. P. 6004(h) and 6006(d). Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the ten (10) day stay period, Collier suggests that the ten (10) day stay period should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure." 10 <u>Collier on Bankruptcy</u> 15th Ed. Rev., ¶ 6064.09 (L. King, 15th rev. ed. 1988). Furthermore, <u>Collier on Bankruptcy</u> provides that if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal. <u>Id.</u>

81.    The Debtors hereby request that the Court waive the ten-day stay period under Bankruptcy Rules 6004(h) and 6006(d) or, in the alternative, if an objection to the Buyer Sale is filed, reduce the stay period to the minimum amount of time needed by the objecting party to file its appeal.

**NOTICE**

82.     No trustee or examiner has been appointed in these chapter 11 cases. Notice of this Motion has been provided to: (1) the Office of the United States Trustee for the District of Delaware; (2) counsel for the Official Committee of Unsecured Creditors; (3) counsel to the administrative agent for the Debtors' pre-petition lenders; (4) counsel to the Buyer; (5) counsel to Reliant Energy; (6) counsel to Equistar; and (7) all potentially interested purchasers contacted by the Debtors or HLHZ regarding the sale of the Debtors' assets. In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is required.

**NO PRIOR REQUEST**

83.     No previous motion for the relief sought herein has been made to this or any other Court.

WHEREFORE, the Debtors respectfully request that the Court grant the relief requested herein and such other and further relief as the Court may deem proper.

Dated: February 26, 2008          Respectfully submitted,
       Wilmington, Delaware

                                  Mark D. Collins (No. 2981)
                                  Paul N. Heath (No. 3704)
                                  Marcos A. Ramos (No. 4450)
                                  Jason M. Madron (No. 4431)
                                  RICHARDS, LAYTON & FINGER, P.A.
                                  One Rodney Square
                                  920 North King Street
                                  Wilmington, Delaware 19801
                                  Telephone: (302) 651-7700
                                  Facsimile: (302) 651-7701

                                  *Attorneys for Debtors and Debtors-in-Possession*

37

**<u>EXHIBIT B</u>**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| RELIANT ENERGY CHANNELVIEW LP, *et al.*,[1] | Case No. 07-11160 (MFW) |
| Debtors. | Jointly Administered |
| | **Objection Deadline: March 14, 2008 at 12:00 p.m. Hearing Date: March 18, 2008 at 10:30 a.m.**[2] |

**MOTION OF THE DEBTORS AND DEBTORS-IN-POSSESSION TO
APPROVE CERTAIN BID PROTECTIONS IN CONNECTION WITH
THE DEBTORS' PROPOSED SALE OF SUBSTANTIALLY
ALL OF THEIR ASSETS TO KELSON ENERGY IV LLC**

The above-captioned debtors and debtors-in-possession (collectively, the "Debtors"), by and through their undersigned counsel, hereby submit this motion (the "Motion") seeking entry of an order (the "Order") in substantially the form attached hereto as Exhibit B, pursuant to sections 105(a), 363, 365 and 503 of title 11 of the United States Code (as amended from time to time, the "Bankruptcy Code"), Rules 2002, 6004, 6006, 9007 and 9014 of the Federal Rules of Bankruptcy Procedure (as amended from time to time, the "Bankruptcy Rules"), and Local Rule 6004-1 of the Local Rules for the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), approving certain bid protections in connection with the proposed transfer and sale of substantially all of the assets of the Debtors (the "Sellers") to Kelson Energy IV LLC ("Kelson" or the "Buyer," and collectively with the Sellers, the "Parties"), pursuant to a certain asset purchase agreement dated as of February 25, 2008 (the

---

[1] The Debtors are Reliant Energy Channelview LP, Reliant Energy Channelview (Texas) LLC ("General Partner"), Reliant Energy Channelview (Delaware) LLC ("Limited Partner, and together with the General Partner, the "Partners"), and Reliant Energy Services Channelview LLC

[2] On March 7, 2008, the Court entered its *Order (Modified) (A) Granting Expedited Motion of Equistar Chemicals, LP to Continue Hearing on and Objection Deadline for Debtors' Sale Motion and (B) Continuing Certain Hearing Dates and Objection Deadlines* [Docket No. 275] (the "Scheduling Order"). Pursuant to the Scheduling Order, the Court adjourned the hearing on the Sale Motion (as defined below) until April 9, 2008 at 9:30
(Continued)

"Asset Purchase Agreement").³  In support of this Motion, the Debtors respectfully represent as follows:

## JURISDICTION

1.      This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The bases for the relief requested herein are sections 105(a), 363, 365 and 503 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006, 9007 and 9014, and Local Rule 6004-1.

## PRELIMINARY STATEMENT

3.      On February 25, 2008, the Debtors filed the *Debtors' Motion for an Order Authorizing (I) the Sale or Transfer of Certain Assets of the Debtors Free and Clear of Liens, Claims and Encumbrances, (II) the Assumption and Assignment of Certain Executory Contracts and (III) Granting Related Relief* [Docket No. 251] (the "Sale Motion").⁴  A hearing on the Sale Motion has been rescheduled for April 9, 2008 at 9:30 a.m. (the "Sale Hearing").

4.      As set forth in the Sale Motion, the Debtors propose to sell substantially all of the assets of the Sellers to Kelson pursuant to the terms of the Asset Purchase Agreement. The proposed Sale will enable the Debtors to recognize proceeds sufficient to pay all creditors in full and provide a substantial recovery to all interest holders.

---

a.m. (Eastern Time) and approved shortened notice periods with respect to this Motion
      ³ A copy of the Asset Purchase Agreement was attached to the Debtors' Sale Motion (as defined herein) as Exhibit A.

      ⁴ Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Sale Motion or the Asset Purchase Agreement, as applicable.

5.    Over the course of the nearly 10 month long sale process, the Debtors'
management and Houlihan Lokey Howard & Zukin ("HLHZ")[5] contacted over 115 potentially
interested purchasers for the Debtors' business.[6]    Approximately 38 parties executed
confidentiality agreements and 24 parties conducted due diligence.  The Debtors considered
nearly a dozen bids in the first round of bidding and several bids in subsequent rounds of
bidding.

6.    Clearly, the assets have been the subject of a full and robust marketing and
sale process, stretching from April 2007 through nearly six full months of these bankruptcy
cases.  The result is beyond dispute.  The Debtors and HLHZ believe that the Asset Purchase
Agreement reflects the highest and best offer available for the Acquired Assets, and
accordingly, the Debtors have requested pursuant to the Sale Motion that the Court approve the
Sale without the need for further bidding or an auction process.

7.    As set forth in the Sale Motion, the Debtors believe that proceeding to
closing on the Sale as soon as possible, without conducting an auction, will allow the Debtors'
creditors and interest holders to benefit from the extraordinary results of the Debtors' sale efforts
without further delay.

8.    In the event, however, that the Court determines that an auction should be
held in connection with the Sale, consistent with the requirements of the Asset Purchase
Agreement and in order to facilitate the prompt sale of the Acquired Assets as under the Asset
Purchase Agreement, the Debtors are seeking to have certain bid protections (the "Bid
Protections," attached hereto as Exhibit A) approved at this time so that such protections are in

---

[5] HLHZ was engaged by the Debtors' parent company, Reliant Energy, Inc , to market the Debtors' assets.

place prior to any auction or determination that an auction is warranted. The Bid Protections were negotiated at arm's length by the Buyers and the Sellers in conjunction with the Asset Purchase Agreement and were required by the Buyer as a condition to it agreeing to the Asset Purchase Agreement. Pursuant to the Asset Purchase Agreement, in the event the Court determines that an auction of the Acquired Assets should be held, the Sellers are required to file a motion seeking approval of the Bid Protections set forth on Schedule 8.1(d) of the Asset Purchase Agreement. See Asset Purchase Agreement at § 8.1(d). In connection with the adjournment of the hearing to consider the Sale Motion,[7] the Buyer has agreed to an extension of the requirement under the Asset Purchase Agreement that the Debtors use commercially reasonable efforts to obtain approval of the Sale Motion within 30 days, but has required that the Debtors seek approval of the Bid Protections set forth in the Asset Purchase Agreement prior to the Sale Hearing. Based upon the fact that the original hearing on the Sale Motion has been adjourned, thereby delaying the Buyer's receipt of the negotiated protections and potentially prejudicing their interests, the delivery of the Bid Protections to the Buyer is appropriate at this time to protect the Buyer from the added risk associated with the adjournment and provide just compensation.

9.    The Debtors believe that having the Bid Protections in place in advance of the Sale Hearing will also help avoid costly delays and the accrual of additional administrative expenses, and preserve the value of the Debtors' estates for the benefit of their creditors.

---

[6] The Debtors and Reliant Energy (as defined below) originally proposed a sale of Reliant Energy's equity interests in the Debtors, but once these chapter 11 cases were commenced, the structure of the proposed transaction changed to a sale of the Debtors' assets pursuant to section 363 of the Bankruptcy Code.

[7] See supra, note 2.

## BACKGROUND

10.    On August 20, 2007 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

11.    The Debtors have continued in possession of their respective properties and have continued to operate their business as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

12.    On August 30, 2007, an official committee of unsecured creditors (the "Committee") was appointed in these cases.

13.    Channelview is a Delaware limited partnership among the General Partner and the Limited Partner. Each of the Partners is a limited liability company formed under the laws of the State of Delaware. The General Partner owns a 1% interest, and the Limited Partner a 99% interest, in Channelview pursuant to that certain Agreement of Limited Partnership of Reliant Energy Channelview LP dated as of June 29, 1999. The Partners are wholly-owned subsidiaries of Reliant Energy Power Generation, Inc., a Delaware corporation ("REPG"). RESC is a wholly-owned subsidiary of Reliant Energy Services, Inc., a Delaware corporation ("RES"). REPG and RES are wholly-owned subsidiaries of Reliant Energy, Inc., a Delaware corporation ("Reliant Energy").

14.    The Debtors' business is the ownership and operation of an approximately 830 MW 4x1 combined cycle cogeneration plant located in Channelview, Texas (the "Channelview Facility"). The Project was constructed adjacent to a chemical plant (the "Equistar Plant") owned by Equistar Chemicals, LP, a Delaware limited partnership ("Equistar"), and was completed in 2002. Reliant Energy Corporate Services, LLC, a subsidiary of Reliant Energy, operates the Channelview Facility under an operations and maintenance agreement.

15.    Pursuant to certain agreements, RES purchases all the electric output of the Channelview Facility and supplies all the fuel used by the Channelview Facility. Approximately 293 MW of the electric output is resold by RES to RESC, and in turn sold to Equistar for use at the Equistar Plant and at other Equistar facilities in Texas. In addition, Equistar purchases steam from Channelview for use at the Equistar Plant.

16.    Construction of the Channelview Facility was financed by a $475 million credit agreement (the "Secured Credit Facility"). Following repayment of a $92 million bridge loan in November 2002, the Secured Credit Facility consists of (i) $369 million in term loans with scheduled maturities from 2002 to 2024, and (ii) a $14 million revolving credit facility that matured on August 20, 2007.[8] The Secured Credit Facility is secured by substantially all of the assets of Channelview, as well as pledges of the partnership interests in Channelview owned by the Partners. As of the Petition Date, approximately $341.4 million was outstanding under the Secured Credit Facility.

17.    Additionally, based on the Debtors' books and records and on the proofs of claims filed in these chapter 11 cases to date, the Debtors estimate unsecured claims against their estates total approximately $20,000,000.

## RELIEF REQUESTED

18.    By and through this Motion, the Debtors seek approval of the Bid Protections required by the Asset Purchase Agreement. Pursuant to the Asset Purchase Agreement, should the Court determine that an auction of the Acquired Assets is appropriate, the Sellers are required to seek entry of an order approving the Bid Protections within forty-eight

---

[8] The revolving credit facility actually matured on August 15, 2007, however, the credit instrument provides a three business day grace period prior to the occurrence of an Event of Default (as defined in the Secured Credit Facility)

(48) hours of such determination. See Asset Purchase Agreement at § 8.1(d). While the Debtors believe that an auction is unnecessary, it is crucial that the Bid Protections be in place in the event that the Court determines that an auction should occur to protect the Buyer from undue risk and prevent unnecessary, costly delays, as well as to enable the Sellers to perform their obligations under the Asset Purchase Agreement.

19.     The negotiated purchase price (the "Purchase Price") for the assets to be sold to the Buyer is $468,000,000. Pursuant to the Bid Procedures set forth in Schedule 8.1(d) of the Asset Purchase Agreement, in the event that the Acquired Assets are sold to another entity after an auction of the Acquired Assets, the Buyer is entitled to a break-up fee of $15,000,000 (the "Break-Up Fee"), payable on closing of an Alternative Transaction.[9] The Break-Up Fee constitutes approximately 3% of the Purchase Price.

20.     The Bid Protections also provide that the Buyer shall be entitled to reimbursement of out-of-pocket expenses up to an aggregate of $2,000,000 ("Expense Reimbursement"), payable upon the closing of an Alternative Transaction.

21.     In the event an auction is held, an initial topping bid (the "Topping Bid") at the auction must be no less than $5,000,000 higher than an amount equal to the Base Purchase Price plus the Break-Up Fee and Expense Reimbursement.

22.     The Break-Up Fee and Expense Reimbursement will be paid in cash as an administrative expense under section 503(b) of the Bankruptcy Code. Following the closing on

---

[9] As set forth in Schedule 8.1(d), the term "Alternative Transaction" means: "(1) any direct or indirect sale or disposition of all or substantially all of the Acquired Assets (except as expressly permitted under the Agreement) or the capital stock or other equity interests of either Seller, or (ii) any merger, consolidation, business combination, recapitalization, reorganization or other extraordinary business transaction involving or otherwise relating directly or indirectly to either Seller.

any Alternative Transaction, Sellers will promptly pay the Break-Up Fee and Expense Reimbursement to the Buyer.

## BASES FOR RELIEF REQUESTED

23.    Bidding incentives, such as the Break-Up Fee and Expense Reimbursement, encourage a potential purchaser to invest the requisite time, money and effort to negotiate with a debtor and perform the necessary due diligence attendant to the acquisition of a debtor's assets, despite the inherent risks and uncertainties of the chapter 11 process. "Agreements to provide breakup fees or reimbursement of fees and expenses are meant to compensate the potential acquirer who serves as a catalyst or 'stalking horse' which attracts more favorable offers." In re S.N.A. Nut Co., 186 B.R. 98, 101 (Bankr. N.D. Ill. 1995); see also In re 995 Fifth Ave. Assoc. L.P., 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1992) (bidding incentives may "be legitimately necessary to convince a white knight to enter the bidding by providing some form of compensation for the risks it is undertaking") (citation omitted).

24.    A proposed bidding incentive, such as the Break-Up Fee and Expense Reimbursement, should be approved when it is in the best interests of the estate. S.N.A. Nut Co., 186 B.R. at 104; see also In re America West Airlines, Inc., 166 B.R. 908 (Bankr. D. Ariz. 1994); In re Hupp Indus., Inc., 140 B.R. 191 (Bankr. N.D. Ohio 1992). Typically, this requires that the bidding incentive provide some benefit to the debtor's estate. Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.), 181 F.3d 527, 533 (3d Cir. 1999) (holding even though bidding incentives are measured against a business judgment standard in non-bankruptcy transactions the administrative expense provisions of Bankruptcy Code Section 503(b) govern in the bankruptcy context).

25.     Here, the Break-Up Fee constitutes approximately 3% of the gross cash purchase price offered by Buyer for the Acquired Assets and will only be paid if these assets are sold to a higher bidder – i.e., upon closing of an Alternative Transaction – meaning that the Debtors, following an auction process, would have to determine that such other bid is higher and better than Buyer's offer for the assets, including factoring into the competing bid the cost of the Break-Up Fee and Expense Reimbursement. If this occurs, the Debtors will effectively net at least the amount offered by Buyer, as payment of the Break-Up Fee and Expense Reimbursement will come exclusively from any Topping Bid and will not reduce the amount paid to the estates, and consequently the estates will have benefited from the floor set by Buyer's initial bid.

26.     "The usual rule is that if break-up fees encourage bidding, they are enforceable; if they stifle bidding, they are not enforceable." In re Integrated Res., Inc., 147 B.R. 650, 660 (S.D.N.Y. 1992). The Bid Protections were required by the Buyer as a condition to it agreeing to the Asset Purchase Agreement. The Debtors believe that an auction is not necessary, but in the event the Court requires one, the Debtors believe that the Bid Protections will not stifle bidding. Indeed, the Debtors believe that in the event of an auction, the Break-Up Fee will encourage bidding by serving "any of three possible useful functions: (1) to attract or retain a potentially successful bid; (2) to establish a bid standard or minimum for other bidders to follow; or (3) to attract additional bidders." Id. at 662. In other words, if the assets are sold to a competing bidder, it will – in all likelihood – be because of Buyer's crucial role as an initial bidder.

27.     In addition, "[a] break-up fee should constitute a fair and reasonable percentage of the proposed purchase price, and should be reasonably related to the risk, effort,

and expenses of the prospective purchaser. When reasonable in relation to the bidder's efforts and to the magnitude of the transaction, break-up fees are generally permissible." Id. As noted above, the Break-Up Fee of approximately 3% of the purchase price is within the range of fees typically paid in other significant sales transactions that have been consummated in a bankruptcy setting. See, e.g., In re Maxide Acquisition, Inc., Case No. 05-10429 (MFW) (Bankr. D. Del. Mar. 15, 2005) (approving break-up fee of 3.0%, or $2.25 million in connection with a $75 million sale); In re Enron Corp., Case No. 01-16034 (Bankr. S.D.N.Y. July 10, 2003)(approving break-up fee of 6.15%, or $8 million in connection with $130 million sale); In re Am. Classic Voyages Co., Case No. 01-10954 (EIK)(Bankr. D. Del. Mar. 20, 2002 (approving break-up fee of 6.67%, or $250,000 in connection with $3.75 million sale); In re Ameriserve Food Distrib., Inc., Case No. 00-00358 (PJW)(Bankr. D. Del. June 15, 2000)(approving break-up fee of 3.6% of $4 million in connection with $110 million sale); In re Medlab, Inc., Case No. 97-1893 (PJW) (Bankr. D. Del. April 28, 1998)(approving $250,000 break-up fee provision which was approximately 3.12% of transaction value); In re Montgomery Ward Holding Corp., Case No. 97-1409 (PJW) (Bankr. D. Del., June 15, 1998) (court approved break-up fee of 2.75%, or $3,000,000 in connection with $110,000,000 sale of real estate); Consumer News & Business Channel P'ship v. Fin. News Network, Inc. (In re Fin. News Network Inc.), 980 F.2d 165, 167 (2d Cir. 1992) (noting that the transaction at issue provided for a $8.2 million break-up fee on a $149.3 million transaction); Integrated Resources, 147 B.R. at 662 (approving a $7.5 million break-up fee on a $565 million transaction).

28.    For these reasons, and given the benefits provided by the Asset Purchase Agreement, the Debtors urge the Court to approve the Break-Up Fee and the Expense Reimbursement and the Bid Protections set forth on Exhibit A hereto.

29.    The Debtors file this Motion pursuant to Local Rule 6004-1(c)(i).   In accordance with Local Rule 6004-1, the Debtors highlight the following provisions:

i.    **No-Shop or No-Solicitation Provisions.**  The Bid Protections do not contain any no-shop or no-solicitation provisions.

ii.    **Break-Up Fees, Expense Reimbursement and Topping Fee (Schedule 8.1(d) to the Asset Purchase Agreement).**  The Bid Protections provide for a Break-Up Fee of $15,000,000, which represents approximately 3% of the anticipated Purchase Price of $468,000,000.  The Bid Protections also provide for payment of an Expense Reimbursement for out-of-pocket expenses of up to $2,000,000 in the aggregate.  The Break-Up Fee and Expense Reimbursement are payable upon closing of an Alternative Transaction, as defined in the Bid Protections.  Pursuant to the Bid Protections, any Topping Bid must be no less than $5,000,000 higher than an amount equal to the Base Purchase Price plus the Break-Up Fee and Expense Reimbursement.

iii.    The Asset Purchase Agreement will remain open as a backup bid if Sellers enter into an agreement for an Alternative Transaction until the earlier of the Termination Date and the closing of the Alternative Transaction, and to the extent that Buyer has provided a deposit, such deposit shall accrue interest until the Alternative Transaction is terminated or the deposit is returned to Buyer.

iv.    All bids will remain open until the closing.

v.    The winning bidder of any auction, to the extent ordered, must provide a deposit equal to or greater than Buyer's deposit.

vi.    All bids must be accompanied by evidence of committed financing or other ability to perform.

vii.    All bids must be accompanied by a contract in execution form and a copy marked against the Asset Purchase Agreement.

## NOTICE

30.    No trustee or examiner has been appointed in these chapter 11 cases. Notice of this Motion has been provided to: (1) the Office of the United States Trustee for the District of Delaware; (2) counsel for the Official Committee of Unsecured Creditors; (3) counsel to the administrative agent for the Debtors' pre-petition lenders; (4) counsel to the Buyer; (5)

counsel to Reliant Energy; (6) counsel to Equistar; (7) all potentially interested purchasers contacted by the Debtors or HLHZ regarding the sale of the Debtors' assets; and (8) all parties requesting notice in these cases pursuant to Bankruptcy Rule 2002. In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is required.

## NO PRIOR REQUEST

31.    No previous motion for the relief sought herein has been made to this or any other Court.

WHEREFORE, the Debtors respectfully request that the Court grant the relief requested herein and such other and further relief as the Court may deem proper.

Dated: March 7, 2008
       Wilmington, Delaware

Respectfully submitted,

Mark D. Collins (No. 2981)
Paul N. Heath (No. 3704)
Marcos A. Ramos (No. 4450)
Jason M. Madron (No. 4431)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701

*Attorneys for Debtors and Debtors-in-Possession*

# EXHIBIT A

Schedule 8.1(d)

Bid Protections

1. Break fee payable on closing of Alternative Transaction[2]: $15,000,000.

2. Reimbursement of out of pocket expenses on closing of Alternative Transaction, up to an aggregate of $2,000,000.

3. Topping bid: The initial topping bid must be no less than $5,000,000 higher than an amount equal to the Base Purchase Price plus (i) the $15,000,000 break fee, and (ii) the amount of out of pocket expenses to be reimbursed to Buyer in connection with Item 2 above.

4. Sellers will use commercially reasonable efforts to file a motion for the Bidding Procedures Order within 48 hours of the Bankruptcy Court ordering the auction.

5. Sellers will require that as a condition of any Alternative Transaction that such transaction close within 45 days of the date of signing of a definitive Alternative Transaction agreement.

6. Sellers will request that the auction be held within 10 days of the entry of the Bidding Procedures Order.

7. This Agreement remains open as a backup bid if Sellers enter into an agreement for an Alternative Transaction until the earlier of the Termination Date and the closing of the Alternative Transaction, and to the extent that Buyer has provided a deposit, such deposit shall accrue interest until the Alternative Transaction is terminated or the deposit is returned to Buyer.

8. All bids remain open until the closing.

9. The winning bidder must provide a deposit equal to or greater than stalking horse deposit.

10. All bids must be accompanied by evidence of committed financing or other ability to perform.

11. All bids must be accompanied by a contract in execution form and a copy marked against this Agreement.

---

[2] For the purpose of this Schedule 8.1(d), "Alternative Transaction" shall mean: (i) any direct or indirect sale or disposition of all or substantially all of the Acquired Assets (except as expressly permitted under the Agreement) or the capital stock or other equity interests of either Seller, or (ii) any merger, consolidation, business combination, recapitalization, reorganization or other extraordinary business transaction involving or otherwise relating directly or indirectly to either Seller

# **EXHIBIT B**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| In re: | Chapter 11 |
|---|---|
| RELIANT ENERGY CHANNELVIEW LP, *et al.*,[1] | Case No. 07-11160 (MFW) |
| | Jointly Administered |
| Debtors. | **Re: Docket No. ____** |

## <u>ORDER APPROVING DEBTORS' PROPOSED BID PROTECTIONS</u>

This matter coming before the Court on the motion (the "<u>Motion</u>") of the above-captioned debtors and debtors-in-possession (collectively, the "<u>Debtors</u>") for entry of an order approving certain bid protections in connection with the proposed transfer and sale of substantially all of the assets of certain Debtors to Kelson pursuant to the terms and conditions of that certain asset purchase agreement, dated February 25, 2008 (the "<u>Asset Purchase Agreement</u>"). The Court has reviewed the Motion and finds that (a) the Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, (b) this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), (c) notice of this Motion having been provided to, <u>inter alia</u>, the Office of the United States Trustee for the District of Delaware; counsel for the Official Committee of Unsecured Creditors; counsel to the administrative agent for the Debtors' pre-petition lenders; counsel to the Buyer; counsel to Reliant Energy; counsel to Equistar; and all potentially interested purchasers contacted by the Debtors or HLHZ regarding the sale of the Debtors' assets; and all parties requesting notice in these cases pursuant to Bankruptcy Rule 2002; and (d) capitalized terms not otherwise defined herein have the meaning given to them in the Motion; and the Court having determined that the

legal and factual bases set forth in the Motion establish just cause for the relief granted herein, and it appearing that the relief requested is in the best interests of the Debtors' estates and creditors, and other parties in interest;

### IT IS HEREBY ORDERED THAT:

1.    The Motion is GRANTED.

2.    The Bid Protections set forth in Schedule 8.1(d) to the Asset Purchase Agreement, attached hereto as _Exhibit A_, which contain, _inter alia_, provisions concerning the Break-Up Fee and Expense Reimbursement, are hereby approved.

3.    Subject to the provisions of paragraph 5 below, the Debtors are authorized to pay the Buyer a break-up fee in the amount of $15,000,000 (the "Break Up Fee") upon closing of an Alternative Transaction.

4.    Subject to the provisions of paragraph 5 below, the Debtors are authorized to reimburse the Buyer for reasonable, documented out of pocket expenses not to exceed $2,000,000 (the "Expense Reimbursement") upon closing of an Alternative Transaction.

5.    Once due, and until paid, the Break-Up Fee and the Expense Reimbursement shall be allowed as an administrative claim pursuant to section 503(b)(1)(A) of the Bankruptcy Code.

6.    This Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation of this Order.

Dated: March ___ , 2008
    Wilmington, Delaware
                                        _____
                                        THE HONORABLE MARY F. WALRATH
                                        CHIEF UNITED STATES BANKRUPTCY JUDGE

---

[1] The Debtors are Reliant Energy Channelview LP, Reliant Energy Channelview (Texas) LLC ("General Partner"), Reliant Energy Channelview (Delaware) LLC ("Limited Partner, and together with the General Partner, the "Partners"), and Reliant Energy Services Channelview LLC.

**EXHIBIT A**

Schedule 8.1(d)

<u>Bid Protections</u>

1. Break fee payable on closing of Alternative Transaction[2]: $15,000,000.

2. Reimbursement of out of pocket expenses on closing of Alternative Transaction, up to an aggregate of $2,000,000.

3. Topping bid: The initial topping bid must be no less than $5,000,000 higher than an amount equal to the Base Purchase Price plus (i) the $15,000,000 break fee, and (ii) the amount of out of pocket expenses to be reimbursed to Buyer in connection with Item 2 above.

4. Sellers will use commercially reasonable efforts to file a motion for the Bidding Procedures Order within 48 hours of the Bankruptcy Court ordering the auction.

5. Sellers will require that as a condition of any Alternative Transaction that such transaction close within 45 days of the date of signing of a definitive Alternative Transaction agreement.

6. Sellers will request that the auction be held within 10 days of the entry of the Bidding Procedures Order.

7. This Agreement remains open as a backup bid if Sellers enter into an agreement for an Alternative Transaction until the earlier of the Termination Date and the closing of the Alternative Transaction, and to the extent that Buyer has provided a deposit, such deposit shall accrue interest until the Alternative Transaction is terminated or the deposit is returned to Buyer.

8. All bids remain open until the closing.

9. The winning bidder must provide a deposit equal to or greater than stalking horse deposit.

10. All bids must be accompanied by evidence of committed financing or other ability to perform.

11. All bids must be accompanied by a contract in execution form and a copy marked against this Agreement.

---

[2] For the purpose of this Schedule 8.1(d), "Alternative Transaction" shall mean: (i) any direct or indirect sale or disposition of all or substantially all of the Acquired Assets (except as expressly permitted under the Agreement) or the capital stock or other equity interests of either Seller, or (ii) any merger, consolidation, business combination, recapitalization, reorganization or other extraordinary business transaction involving or otherwise relating directly or indirectly to either Seller

**EXHIBIT C**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | . | Case No.  07-11160 (MFW) |
| | . | |
| RELIANT ENERGY CHANNELVIEW, | . | 824 N. Market Street |
| L.P., et al., | . | Sixth Floor |
| | . | Wilmington DE  19801 |
| Debtors. | . | |
| | . | |
| | . | March 18, 2008 |
| . . . . . . . . . . . . . . . | . | 10:30 p.m. |

TRANSCRIPT OF HEARING
BEFORE THE HONORABLE MARY F. WALRATH
UNITED STATES BANKRUPTCY JUDGE


APPEARANCES:

| | |
|---|---|
| For the Debtor: | Richards, Layton & Finger, P.A.<br>By:  MARK D. COLLINS, ESQ.<br>    ROBERT J. STEARN, JR., ESQ.<br>One Rodney Square<br>Wilmington, DE  19801 |
| For the Creditors Committee: | Pepper Hamilton LLP<br>By:  DAVID B. STRATTON, ESQ.<br>1313 Market Street, Suite 5100<br>Wilmington, DE  19899 |
| For Alvarez & Marsal<br>Securities, LLC: | JAMES D. DECKEN<br>3399 Peachtree Road, NE<br>Atlanta, GA  30326 |
| For Bank of New York,<br>Agent: | Fried Frank Harris Shriver &<br>Jacobson<br>By:  BRIAN D. PFEIFFER, ESQ.<br>One New York Plaza<br>New York, NY  10004 |
| | Pachulski, Stang, Ziehl, Young,<br>Jones & Weintraub, P.C.<br>By:  RACHEL WERKHEISER, ESQ.<br>919 North Market Street, 16th<br>Floor<br>P.O. Box 8705<br>Wilmington, DE  19899-8705 |

For Equistar Chemicals, LP:        Blank Rome LLP
                                   By:  BONNIE GLANTZ FATELL, ESQ.
                                   1201 Market Street, Suite 800
                                   Wilmington, DE  19801


For Fortistar LLC:                 Morris, Nichols, Arsht &
                                   Tunnell
                                   By:  DEREK ABBOTT, ESQ.
                                   1201 N. Market Street
                                   P. O. Box 1347
                                   Wilmington, DE  19899-1347


For Kelson Energy VI, LLC:         Bifferato Gentilotti LLC
                                   By:  GARVAN MCDANIEL, ESQ.
                                   800 N. King Street
                                   Plaza Level
                                   Wilmington, DE   19801

                                   Bingham McCutchen LLC
                                   By:  JONATHAN B. ALTER, ESQ.
                                   One State Street
                                   Hartford, CT  06103


For Reliant Energy, Inc.:          Stroock & Stroock & Lavan, LLP
                                   By:  LAWRENCE HANDELSMAN, ESQ.
                                   180 Maiden Lane
                                   New York, NY  10038-4982


For Reliant Energy Power/          Morris, Nichols, Arsht &
Reliant Energy:                    Tunnell
                                   By:  THOMAS BRIGGS, ESQ.
                                   1201 N. Market Street
                                   P. O. Box 1347
                                   Wilmington, DE  19899-1347


For Siemens Power                  Morris James LLP
Generation, Inc.:                  By:  THOMAS M. HORAN, ESQ.
                                   500 Delaware Avenue, Suite 1500
                                   PO Box 2306
                                   Wilmington, DE  19899-2306

                                   McGuireWoods LLP
                                   By:  DOUGLAS M. FOLEY, ESQ.
                                        AARON MCCULLOUGH, ESQ.
                                   World Trade Center
                                   101 West Main Street, Suite 9000
                                   Norfolk, VA  23510

```
For United States Trustee:    Office of the United States
                              Trustee
                              By:  MARK KENNEY, ESQ.
                              844 King Street, Room 2207
                              Wilmington, DE  19899




Audio Operator:  Nicole Schaefer
```

Proceeding recorded by electronic sound recording, transcript
produced by transcription service

_____

**DIANA DOMAN TRANSCRIBING**
**10 Foster Avenue**
**Gibbsboro, NJ  08026**
**Email:  dianadoman@comcast.net**
**Office:  (856) 435-7172   Fax:  (856) 435-7124**

4

INDEX

| WITNESSES | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| For the Debtors | | | | |
| William H. Hardie, III | 11 | 25 | | |
| Andrew Johannesen | 28 | | | |

| EXHIBITS | | Ident. | Evid. |
|---|---|---|---|
| D-1  Hardie summary biography | | 13 | |

| STATEMENT | |
|---|---|
| Mr. Collins | 5 |
| Mr. Alter | 48 |
| Ms. Fatell | 49 |

| ARGUMENTS | |
|---|---|
| Mr. Collins | 6, 34, 43 |
| Mr. Abbott | 35, 42 |
| Mr. Handelsman | 37 |
| Mr. Stratton | 39, 44 |
| Mr. Pfeiffer | 41 |

| DECISION | |
|---|---|
| The Court | 46 |

Collins - Statement                                    5

1          THE COURT:  Good morning.

2          MR. COLLINS:  Good morning, Your Honor.  For the

3    record, Mark Collins of Richards, Layton & Finger on behalf of

4    the debtors.  Your Honor, turning to today's agenda, I would

5    note for the record that agenda items one, two and three have

6    been continued to the next omnibus hearing date in these cases.

7    Agenda items four, five and six have been approved by Your

8    Honor pursuant to certifications of no objection submitted by

9    debtor's counsel.  And then that leads us to agenda item number

10   seven, which is the debtor's motion seeking to establish cure

11   amounts for various executory contracts and unexpired leases

12   that are to be assumed and assigned in connection with the sale

13   of the business which will be heard by the Court on April 9th.

14        Your Honor, we did receive three informal responses, which

15   all have been resolved by consent.  They were submitted to us

16   by GE, Betz, B-E-T-Z, Industrial Ground and Universal Building

17   Services.  I think we had all of them listed at a zero cure

18   amount.  They came back and did establish certain invoices that

19   were outstanding.  A few thousands of dollars is not

20   significant so we've agreed to include them with that now

21   agreed upon amount in a revised order.

22        We also agreed with both Equistar and Siemens that we

23   would continue the hearing with respect to them to the April 9th

24   hearing.

25        I also understand, Your Honor, that the client, the

Collins - Argument                                          6

1   debtors have been in contact with the one contract party who

2   has a number of individual contracts, maybe a handful or so.

3   And they have also reached agreement to the identity of the

4   accounts and the cure amount.  And what we would like to do,

5   Your Honor, is to add them to the cure list by consent of the

6   parties, and then submit that revised form of order under

7   certification of no objection if that is acceptable to Your

8   Honor.

9               THE COURT:  That is fine.

10              MR. COLLINS:  Thank you, Your Honor.  Unless Your

11  Honor has any questions, that will be the presentation on that

12  motion.

13              THE COURT:  All right.  I'll look for the

14  certification of counsel.

15              MR. COLLINS:  Thank you, Your Honor.  Now that then

16  turns us to agenda item number eight, and that is our motion to

17  establish certain bid protections for Kelson Energy.

18        Your Honor, as noted in the motion, after almost a year of

19  searching and negotiating for potential purchasers of the

20  debtors' assets, the debtors were able to locate and reach a

21  definitive sale agreement with Kelson Energy for the purpose of

22  the debtors' power facility.  The purchase price under the, in

23  the asset purchase agreement is $468,000,000.  It is not

24  subject to any due diligence requirements or any financing

25  contingencies.  It is the debtor's belief that this amount,

1    this purchase price amount will fully pay the outstanding debt

2    to our secured lenders, which is approximately $340,000,000,

3    and all third-party unsecured claims which we estimate to be

4    approximately $20,000,000.

5        When we first entered into the agreement with Kelson, the

6    debtors were of the view that we need not go through another

7    formal auction process, given the duration of this chapter 11

8    case and the fact that the debtors have had the luxury of time

9    to complete a thorough sale process.  Obviously, many other

10   chapter 11 cases come in looking for a very expedited sale

11   process.  And it's almost mandatory and expected I think by the

12   Court that you then go through that additional process of a

13   formal auction just to ensure for the Court's confidence and

14   the confidence of all parties that the debtors are obtaining

15   the highest and best value.

16       We thought it not necessary given how long this case has

17   been in chapter 11, but nevertheless, we did receive a motion

18   from Equistar to continue the hearing from what was originally

19   set for today to April 9th, so that has pushed out this sale

20   process, you know, somewhat.  And we also received a request by

21   the creditors committee to establish a bid deadline and then a

22   holding date for an auction should, in fact, we receive a

23   qualifying bid.

24       And the debtors, and I believe Kelson are agreeable to

25   that.  And if I could hand up a form of order to Your Honor,

Collins - Argument                                  8

1    that would reflect the changes that we have made, both at the

2    request of the secured lenders with respect to insuring that

3    the payment of any break-up fee or expense reimbursement to

4    Kelson would only be made after the lenders were paid in full.

5    And that also incorporates the creditors committee's comments

6    regarding the date for a bid deadline and an auction date.

7              THE COURT:  Okay.

8              MR. COLLINS:  May I approach, Your Honor?

9              THE COURT:  You may.

10             MR. COLLINS:  So turning, Your Honor, to paragraph

11   six, that was the paragraph that was negotiated with the

12   secured lenders which makes clear really two things.  One is

13   that the break-up fee is not payable should there be a

14   foreclosure or other type of credit bid by the lenders without

15   any type of additional consideration.  And it also makes clear

16   I believe that the payment to Kelson is only made after their

17   claims were satisfied.

18        And I believe that resolves the informal concerns raised

19   by the secured creditors.

20             THE COURT:  I understand.  Okay.

21             MR. COLLINS:  Thank you, Your Honor.  Then paragraphs

22   seven and eight provide the details for the submission of bids.

23   I would note for the record, and this was something that

24   Kelson's counsel wanted me to put on the record, if you look in

25   paragraph seven, we note that a bid must be accompanied by, and

Collins - Argument                                                    9

1      this is under sub A, evidence of such competing bidder's

2      financial wherewithal.  And what we mean by that, Your Honor,

3      is obviously the wherewithal to consummate the transaction and

4      not be subject to outstanding financing contingencies.  So that

5      would be expected as part of any bid that would be submitted by

6      that bid deadline.

7           Your Honor, when -- and we can get into this a little bit

8      in testimony and argument if there is any with respect to these

9      dates -- what we would propose, Your Honor, is that April 3 be

10     set as the bid deadline, 5:00 Eastern time on April 3rd.  And

11     then we would have if -- auction -- if any qualifying bids are

12     received, an auction would be held at Richards, Layton & Finger

13     on April 7th, starting at 10 a.m.

14          And I think with those changes, we have the consent of the

15     creditors committee and the lenders to the entry of this order.

16               THE COURT:  All right.

17               MR. COLLINS:  Your Honor, just turning to the bid

18     protections themselves, we are seeking a break-up fee of

19     approximately three percent, equal to $15,000,000 payable only

20     upon a closing of an alternative transaction, reimbursement of

21     reasonable and documented expenses up to $2,000,000, a

22     requirement that any topping bid must be $5,000,000 more than

23     Kelson's bid, plus the break-up fee in the expense

24     reimbursement amount.  As a condition of any alternative

25     transaction, such transaction must close within 45 days from

Collins - Argument                              10

1    the date of signing a definitive agreement.  And the
2    alternative transaction bidder must provide a deposit equal to
3    or greater than the deposit placed by Kelson which is
4    $40,000,000.

5        Your Honor, I note that we did receive one objection to
6    this motion.  That was from Fortistar.  We do have issues with
7    standing of Fortistar to be here and object to the bid
8    protections we are seeking to grant to Kelson.  We'll deal with
9    that I guess when Fortistar seeks to be heard.  But what I
10   thought we would do, Your Honor, is have testimony of two
11   witnesses on behalf of the debtors.  First, William Hardie of
12   Houlihan Lokey Howard & Zukin, who will testify about the
13   factual aspects of the sale process as well as provide expert
14   testimony on what we believe are the reasonableness of the bid
15   protections that we are seeking approval of today.

16       We would then also have Andrew Johannensen, an officer of
17   the debtors, testify as to the good faith and arms length
18   nature of the negotiations between the debtors' estates and
19   Kelson with respect to these bid protections.

20            THE COURT:  All right.  Do you want to proceed?
21            MR. COLLINS:  Yes, Your Honor.  I'd like to call Mr.
22   Hardie to the stand.
23            THE COURT:  Okay.  Please remain standing, sir.  You
24   can be sworn.
25            WILLIAM HARDIE, DEBTORS' WITNESS, SWORN

Hardie - Direct                                              11

1          THE CLERK:  Would you state your name for the record

2    and would you spell it?

3          MR. HARDIE:  It's William H. Hardie, H-A-R-D-I-E, the

4    III.

5                          DIRECT EXAMINATION

6    BY MR. COLLINS:

7    Q     Good morning, Mr. Hardie.

8    A     Good morning.

9    Q     By whom are you employed?

10   A     Houlihan Lokey Howard & Zukin.

11   Q     What types of services does Houlihan Lokey provide?

12   A     As it relates to today's hearing, we are or I am

13   principally engaged in the financial restructuring group.  I'm

14   a managing director in the firm's New York office, and I also

15   run the firm's energy and utility practice group.  In addition

16   to those services, we provide traditional investment banking

17   services in non-bankruptcy settings, fairness opinions,

18   solvency opinions, things of that nature.

19   Q     Ands how long have you been employed with Houlihan Lokey?

20   A     Since December of 1999.

21   Q     And by whom is Houlihan Lokey employed by in these cases?

22   A     Reliant Energy, the debtors' parent company.

23   Q     And why was the -- why is it that the parent entity hired

24   Houlihan Lokey rather than the debtors entities?

25   A     We were engaged I believe in April of 2007 to assist

1    Reliant in evaluating what the alternatives it had with respect

2    to this particular project and commenced a sale process for the

3    project in May I believe of last year of '07, and were hopeful

4    at that time of concluding a sale of the project without the

5    necessity of having the project file bankruptcy, and so it

6    wasn't contemplated at the time we were engaged that there in

7    fact would be a bankruptcy.

8    Q    And during that pre-petition time period, was it

9    considered somewhat likely that it would be a stock transaction

10   rather than a potential asset sale?

11   A    It was, yes.

12   Q    Okay.  And did that focus change once it was clear that

13   the debtor entities need to file chapter 11?

14   A    After the debtors filed chapter 11, it was our advice to

15   the company that we look to conclude the transaction as an

16   asset sale so as to provide potential purchasers with the

17   benefit of a 363 sale order, which is something that, you know,

18   in our experience is beneficial to selling assets in bankruptcy

19   and consequently, the decision was made to convert this sale,

20   the form of the sale to an asset sale.

21   Q    And have you been involved in the sale process since its

22   inception back in the early part of last year?

23   A    I have, yes.

24   Q    Okay.  And you are leading the engagement for Houlihan

25   Lokey, is that correct?

Hardie - Direct                                        13

1   A    Yes, I am.

2   Q    Can you briefly describe for the Court your educational

3   background?

4   A    I have a degree in economics from the University of

5   Alabama and a law degree from Vanderbilt University.

6   Q    And can you briefly describe your work history prior to

7   joining Houlihan Lokey?

8   A    I practiced law for roughly nine years at a combination of

9   Winthrop Stinson in New York and Jones Walker in New Orleans,

10  and then went to work for a subsidiary of Marvel Entertainment

11  Group by the name of Fleer Skybox, and then subsequently joined

12  Houlihan Lokey.

13  Q    Okay.  Thank you.  Now, have you been retained as an

14  investment banker for other troubled companies in the past?

15  A    Roughly 30, 35 engagements in the period that I've been

16  with Houlihan Lokey, yes.

17        MR. COLLINS:  Your Honor, we have marked, pre-marked

18  as Debtors' Exhibit 1 some additional information regarding Mr.

19  Hardie's case history, if I could present that to the Court?

20        THE COURT:  You may.  Thank you.

21  BY MR. COLLINS:

22  Q    Mr. Hardie, can you identify the document that I've placed

23  in front of you?

24  A    This is a summary biography that I put together in

25  connection with prior expert testimony on behalf of other

1    clients.

2    Q    And turning to page two of this document, does it identify

3    energy-related entities you've worked on behalf of?

4    A    Yes, it does.  Our firm has been very fortunate over the

5    last four or five years as a lot of the merchant energy

6    industry has gone through restructurings to be successful in

7    being involved with a number of those restructurings.  And as

8    the head of that group, I've been involved with all of them.

9    Q    Okay.  And can you describe some of the services you have

10   provided on behalf of these entities?

11   A    Depending upon the circumstances, you know, they would

12   either involve a restructuring of the debt involved with a

13   particular project, the sale of the project, refinancing of the

14   project depending upon the circumstances.  In, you know,

15   obviously the circumstances of a particular restructuring

16   dictate what the potential outcomes would be.

17   Q    Okay.  I note on page two that Enron Corporation is listed

18   as well as Calpine.

19   A    That's right.  In each of those situations, we were

20   representing creditors.  In the case of Enron, we were active

21   in monitoring and participating in the sale process of, you

22   know, literally billions of dollars of various kinds of energy

23   assets from power plants, wind farms, regulated pipelines, you

24   know, power barges in South and Central America.  It's fairly

25   well documented that that was a fairly large hodge-podge of

Hardie - Direct                                          15

1   energy related assets.

2       In Calpine, I led the engagement on behalf of the second

3   lien creditors there.  And again, we supervised the sale of

4   probably a dozen merchant energy projects in various stages of

5   development and operation as that company looked to prune its

6   portfolio of assets as part of its emergence from bankruptcy.

7       In addition, you'll see on here National Energy and Gas

8   Transmission which was a subsidiary of PacGas, Pacific Gas and

9   Electric.  There, we, on behalf of the secured creditors,

10  essentially supervised the liquidation of that business, the

11  sale of all of its merchant as well as contracted power plants

12  over roughly a two-year bankruptcy process.  Other names on the

13  page under the energy section, you know, involved the sale or

14  restructuring of merchant energy assets.

15  Q    Okay.  And what do you mean by merchant energy assets?

16  A    Essentially, power plants whose energy is largely

17  uncontracted, so that they would sell into the merchant market

18  on a daily basis.

19  Q    And is Reliant Energy Channelview a merchant energy

20  provider?

21  A    It's partially merchant in that certain quantities of its

22  energy are committed to Equistar along with its steam, and

23  certain quantities of its energy are available for sale into

24  the merchant market.

25  Q    And how many, just really very quickly, in that middle

Hardie - Direct                                    16

1    column of energy related restructuring experiences, how many of

2    those entities are merchant energy providers?

3    A    Certain of the assets at Allegheny Energy were merchant.

4    A&P Funding involved three merchant projects.  As I mentioned,

5    Calpine had, the bulk of its assets were merchant.  Enron had

6    probably a half a dozen or so merchant projects.  Klamath Falls

7    is a cogen facility up in Oregon that had a certain amount of

8    its power that was available for merchant sale.  Mayflower

9    Energy was a merchant project.  Mirant America, certain of its

10   assets were merchant; others were contracted.  NEGT, as I

11   mentioned, had roughly half its portfolio was contracted, and

12   the other half was merchant.  Southaven, which is a power

13   project in Mississippi, is a merchant project as well.  Those

14   would be the ones.

15   Q    And again, you were involved in each of those

16   representations by Houlihan Lokey?

17   A    As I said, I've led the engagement for each of these

18   projects.

19   Q    Okay.  Thank you.  Now, have you ever been qualified as an

20   expert by a Bankruptcy Court or other Court?

21   A    I have.  As is reflected at the bottom of page two, in the

22   Entergy New Orleans case, I was qualified as an expert.  I was

23   qualified to provide expert valuation testimony there, as well

24   as testimony with respect to the restructuring of that

25   particular utility.  Frontier Vision, which was a subsidiary of

1    Adelphia, provided expert valuation testimony.  Grove Worldwide

2    which was a crane case in Pennsylvania, provided expert

3    valuation testimony, as well as testimony on DIP financing.

4    Holt Group, testimony there on I believe it was DIP financing.

5    Mirant America's, provided expert, provided an expert report.

6    Was actually never required to testify in Court, although did

7    testify in deposition on various valuation issues associated

8    with those assets.  NEGT, provided expert testimony on energy

9    restructurings generally.  There was no valuation fight there.

10   And then the last two cases, the Nelson Pharmaceuticals (sic)

11   and Trump, those were contested valuations where I provided

12   testimony.

13   Q    Okay.  And when did you first begin representing entities

14   in the energy sector?

15   A    In connection with Enron, which was I guess December of

16   '01 they filed I believe.

17   Q    Thank you.  Now, turning to this case, were you personally

18   involved in the sale process that led to the negotiation and

19   ultimate execution of the asset purchase agreement with Kelson?

20   A    Intimately involved.

21   Q    And can you provide the Court with an overview of the

22   process that you led as well as with the business people at the

23   debtor entities?

24   A    Sure.  As I indicated, starting really in late spring of

25   last year, we created marketing materials in the form of a

1    teaser memorandum which we sent out to roughly 120 people that

2    we believed to be the most relevant potential purchasers of

3    this particular asset based on prior asset sale processes in

4    which they had participated and portfolios which they owned and

5    investments that they had, that they had made.  In response to

6    that, we received requests for a relatively detailed

7    confidential information memorandum from 45ish folks, and we

8    provided information memorandums to that group of roughly 45

9    people.  In response to a request for preliminary non-binding

10   bids, I believe we got, I want to say about a dozen preliminary

11   proposals.  Those parties were then provided with access to a

12   relatively detailed electronic data room for the purpose of

13   doing diligence.

14   Q    And can you provide the Court with the time period in

15   which you received those initial dozen bids or so?

16   A    It would have been I believe in the June-July time frame

17   of last year.

18   Q    Okay.

19   A    I apologize.  It's been a while.

20   Q    Uh-huh.

21   A    We've been working on this one for a while.  We provided

22   site visits to I believe half dozen of the people that we put

23   through the second stage of the process, and ultimately

24   received different -- we received four mark-ups to what was

25   then a stock purchase agreement for the sale of the asset from

1    the various parties who we had put through the second stage of

2    the process.  The balance of the parties I think dropped out

3    essentially after the second round of diligence.  And then

4    spent really from, you know, call it, well, right after the

5    debtor filed until we signed the contract with Kelson, spent a

6    tremendous amount of time trying to reach agreement with a

7    couple of the parties, particularly Kelson and Fortistar.

8    Q    Now, turning back to last fall and winter, did Fortistar

9    emerge as one of the leading potential purchaser of the

10   debtors' assets?

11   A    They provided a very attractive proposal to the debtors

12   and we worked literally hundreds of man hours between ourselves

13   and counsel for the company in trying to reach agreement with

14   them over the terms of the sale of the assets to them.

15   Ultimately, were never able to pin down mutually acceptable

16   terms with them, nor get comfortable with the existence of

17   their financing.  As is, you know, fairly well documented,

18   there has been a fair amount of dislocation in the capital

19   markets, both in the summer of 2007 which certainly didn't help

20   our sale process, and then again currently, and as a result,

21   we, in fact, relatively recently, I believe it was in February,

22   Fortistar came to us and indicated that they had essentially

23   lost their partners for their financing.  And it was on the

24   basis of that, as well as our inability to ever reach a deal

25   with them on the final terms and conditions that we advised the

1    client that the best course of action would be to sign up with

2    Kelson.

3    Q    And do you believe the debtors did everything possible to

4    facilitate a definitive and agreed-upon asset purchase

5    agreement with Fortistar?

6    A    Absolutely.  I mean, we spent countless hours in

7    conference rooms in New York trying to bang out a deal with

8    them.  You know, as I said, in the -- earlier, I mean,

9    literally hundreds of man hours trying to reach an agreement

10   with them.

11   Q    And at this same time, really, I guess at the end of '07

12   and early '08, did the debtors starting receiving encouragement

13   or maybe even a stronger word, like a request by the secured

14   creditors and the creditors committee to turn their time and

15   attention to other potential bidders?

16   A    We had been keeping both secured creditors as well as

17   the -- sorry, let me rephrase it.  We had been keeping the

18   advisors to the secured creditors and the unsecured creditors

19   committee informed at various points in time during the sale

20   process as to how we were doing in terms of the number of

21   people we were talking to, where we were in the various stages

22   of negotiation and diligence with each of them, so as to make

23   sure that they understood where we were.  At a particular point

24   during the winter, we ultimately disclosed to both of those

25   groups who the finalists were in terms of their identity and

1    the prices at which we were having negotiations with them.  And

2    as it became clear to us, I think it also became clear to them

3    that the likelihood of reaching a definitive agreement with

4    Fortistar on terms that we considered acceptable was difficult,

5    if not questionable.  And then ultimately, when we got

6    uncomfortable with the financing that was lost by Fortistar, it

7    was both creditor bodies' strong suggestion that we essentially

8    sign up with Kelson and put an end to the process, before we

9    ran the risk of losing Kelson.

10   Q    And what was attractive about Kelson as a potential

11   purchaser of these assets?

12   A    Several things.  One, they were very quickly able to

13   negotiate what I consider to be a fairly market deal with us

14   over the terms and conditions of the sale.  They are very

15   active buyers of merchant energy assets currently.  We've been

16   involved in other transactions where they are either one of or

17   the successful purchaser, and so we were able to reach a

18   commercial deal with them in terms of the terms and conditions.

19   They offered a price that we considered to be well within the

20   range of fair value for the assets, and a price that would in

21   fact pay out all of the creditors here in full.  And they don't

22   require any outside financing.  Their equity sponsor if you

23   will, their owner, The Harbinger, has more than sufficient

24   capital to pay the full purchase price here without the

25   necessity of any financing.  And as part of negotiating the

1    transaction here, in addition to the $40,000,000 deposit we

2    were successful in negotiating from them, we got the guarantee

3    from their parent, Harbinger, to the obligations of Kelson as

4    purchaser.

5    Q    Now, was it the debtors' intention to hold a formal Court-

6    supervised auction process following the execution of the asset

7    purchase agreement with Kelson?

8    A    No.  As you indicated to the Court previously, it was

9    certainly my hope, and I think Reliant's hope that we would be

10   successful in convincing the Court that on the basis of all the

11   effort that went forward in getting Kelson signed up that there

12   was no necessity for a further auction.  You know, this project

13   has been shopped as hard as I've ever seen a power plant

14   shopped over the span of almost a year now.

15   Q    And is it that reason why the asset purchase agreement

16   requires the debtors to seek approval of the bid protection

17   following a Court ordering of an auction process?

18   A    That's right.  I mean, everybody was cognizant of the fact

19   that a potential outcome of a hearing on the contract was that

20   the Court would order an auction.  And so we essentially pre-

21   negotiated, if you will, the terms of the bid procedures and

22   the bid protections in the event that we were unsuccessful in

23   convincing the Court that an auction was not necessary given

24   the pre-bankruptcy and post-bankruptcy marketing of the asset.

25   Q    And you're aware that the creditors committee has

1    requested that the Court establish a bid deadline and an
2    auction date to be held in case we do receive qualifying bids?
3    A    Yes, I am.
4    Q    Now, can you briefly describe what the sale protections
5    are being requested for approval today?
6    A    There's a break-up fee of I believe $15,000,000.  There is
7    an expense reimbursement of up to $2,000,000.  And then there
8    is a minimum initial overbid of $5,000,000.
9    Q    And are those, the break-up fee and the expense
10   reimbursement only payable upon consummation of an alternative
11   transaction?
12   A    That's my understanding, yes.
13   Q    In your opinion, are these sale protections reasonable and
14   customary for a transaction of this size?
15   A    I believe they are.  I mean, as I indicated earlier, I
16   mean, we've -- I've personally been involved in the sale in
17   bankruptcy of probably, you know, 30, 35 power projects over
18   the last couple of years through Calpine and Mirant and NEGT
19   and Enron, and they are, you know, depending upon the size of
20   the transaction and how much effort went into the marketing of
21   the asset in advance of seeking the bid protections, I think
22   they are consistent with what my experience would be in that
23   context.
24   Q    And were you involved in the negotiations that led to the
25   bid protections that are currently before the Court?

1    A     Yeah, I was directly involved with those, the negotiation

2    of that, yes.

3    Q     And do you believe those negotiations were held in good

4    faith and at arms length?

5    A     It was certainly my attempt to minimize to the greatest

6    extent possible the bid protections and, you know, through the

7    back and forth with the folks at Kelson, we arm wrestled it out

8    to the point where it is as it is provided in the contract

9    today.

10   Q     Now, do you recall whether or not Fortistar in any of its

11   earlier offers also required the granting of bid protections

12   should the Court require that an auction process be held?

13   A     In fact, it was specifically requested by Fortistar on the

14   advice of their bankruptcy counsel that it was their view,

15   their counsel's view that the likelihood of being able to

16   successfully convince the Court that no bankruptcy auction was

17   necessary was relatively low, and that it was their view that

18   we should pre-negotiate that in the event that the Court were

19   to order an auction.

20   Q     Now, what benefit does the Kelson offer provide to the

21   debtors' estates?

22   A     Well, obviously, it sets a floor price and floor terms and

23   conditions for the sale of the assets, you know, at a price

24   that would see that all the creditors here are paid in full and

25   that there's money for the equity.

1    Q    In your opinion, would Kelson have entered into the asset

2    purchase agreement without being afforded the sale protections

3    that are set forth in Schedule 8.1.B of the APA?

4    A    Absolutely not.

5    Q    And has Kelson put down a good faith deposit?

6    A    They have - $40,000,000.

7    Q    Okay.  Thank you.

8              MR. COLLINS:  Your Honor, I have no further

9    questions.

10              THE COURT:  Thank you.  Any cross?

11              MR. ABBOTT:  Your Honor, I have a little bit, if I

12    may.

13              THE COURT:  You may.

14              MR. ABBOTT:  For the record, Derek Abbott of Morris

15    Nichols, here for Fortistar.

16                          CROSS-EXAMINATION

17    BY MR. ABBOTT:

18    Q    Good morning, Mr. Hardie.  How are you?

19    A    Good morning.

20    Q    Just to follow up a couple of the points to which you

21    testified, is it your understanding that the debtor is now

22    going to run an auction process to solicit competing bids to

23    the Kelson bid?

24    A    It's my understanding that the creditors committee has

25    asked that we afford interested parties a period of time, I

Hardie - Cross                                              26

1   believe until April 3rd to submit bids to compete with Kelson,

2   and that in the event that any qualifying bids are received,

3   that we would then conduct an auction down here in Wilmington

4   on the 7th in Mr. Collins' office.

5   Q    And do you understand the debtors, in providing for that

6   auction process, to be seeking to maximize the value for these

7   assets in any sale or other transaction?

8   A    It's been our goal throughout the sale process to get the

9   highest and best price for these assets so as to ensure that

10  the creditors are paid in full, yes.

11  Q    And you'll continue to do that throughout this auction

12  process, won't you?

13  A    Absolutely.

14  Q    Okay.  Was Fortistar -- I think you've testified to this,

15  but just to make it perfectly clear, was Fortistar involved in

16  discussions and negotiations with the company prior to the

17  company's execution of the Kelson APA?

18  A    Absolutely.  We were negotiating with Fortistar, you know,

19  up until I believe mid-February, at which point they came to us

20  and said, look, we've lost our financing partners here and we

21  need to go find other ones.  And it was my advice to the client

22  that given the fairly tumultuous circumstances that exist in

23  the capital markets at this point that we sign up Kelson before

24  they figured out that they were the only buyer with money here.

25  Q    Do you expect to try to encourage Fortistar to continue

1  their interest in these assets and perhaps bid at the auction?

2  A    Absolutely.  And as you know, I was providing them with

3  diligence information this morning.

4  Q    Now, you testified that you're, I think, intimately

5  involved in the negotiations with Kelson.  And you further

6  testified that they would not have had entered into this

7  agreement without the debtors having an obligation to seek bid

8  protections, correct?

9  A    That's right.

10 Q    All right.  Do you have an understanding as you sit there

11 today, and I'm not asking for your legal opinion, whether they

12 have the ability to walk away from this contract if the Court

13 doesn't grant those bid protections here this morning?

14 A    I -- that would be a legal conclusion which I would just

15 as soon not speculate on.

16 Q    Yeah.  I'm not asking for a legal conclusion.

17 A    Uh-huh.

18 Q    I just want your business understanding as the principal

19 negotiator I think you testified to in this deal about whether

20 they have an out if they don't get these bid protections.

21 A    My business understanding is that our obligation is to

22 request that the Court approve the bid protections.  It's been

23 my experience that that is the typical way these things are

24 negotiated is no one can force the Court to order anything, and

25 that you're obligated to request it and advocate it, which I

Hardie - Cross/Johannesen - Direct                    28

1    believe we should, and that hopefully, the Court will award it.

2    Q    Right, but do you have a view about what happens if the

3    Court doesn't?

4    A    I don't believe they have an out, no.

5              MR. ABBOTT:   No further questions, Your Honor.

6              THE COURT:   Anybody else?   All right, thank you.   You

7    may step down.

8              THE WITNESS:   Thank you, Your Honor.

9              MR. COLLINS:   Your Honor, the second witness we'd

10   like to call is Andrew Johannesen, an officer with the debtor

11   entities.

12             THE COURT:   Okay.

13             ANDREW JOHANNESEN, DEBTORS' WITNESS, SWORN

14             THE CLERK:   Please be seated.   State your name for

15   the record and spell it.

16             THE WITNESS:   Andrew Johannesen.   J-O-H-A-N-N-E-S-E-

17   N.

18                           DIRECT EXAMINATION

19   BY MR. COLLINS:

20   Q    Mr. Johannesen, by whom are you employed?

21   A    I am vice president and treasurer at Reliant Energy and

22   several of its subsidiaries, including Reliant Energy

23   Channelview Texas, the general partner of Reliant Energy

24   Channelview, L.P.

25   Q    And is that one of the debtors in these chapter 11 cases?

1   A    Yes, it is.

2   Q    And what are your duties and responsibilities on behalf of

3   the debtor entities?

4   A    They include oversight of the financing, of the project

5   financings of the debtor companies, and more recently have

6   included oversight of the restructuring, bankruptcy and sales

7   processes.

8   Q    And have you been involved, personally been involved in

9   the debtors' efforts to market and sell their assets?

10  A    I have.

11  Q    And in what capacity did you participate in the sale

12  process?

13  A    I've had oversight of the sales process and have been the

14  primary contact and interface with Houlihan as well as the

15  other advisors and attorneys who are working on the

16  transaction.

17  Q    In your opinion, has it been a fairly exhaustive sale

18  process?

19  A    Yes, it has.  I worked on a number of sales processes, and

20  this has been I think as exhaustive as any in terms of the

21  breadth with which we reached out or through our advisors

22  reached out to potential parties, spoke with parties, conducted

23  diligence, and negotiated with multiple parties.

24  Q    Now, on a daily or a weekly basis, can you tell the Court

25  how involved you were in the sale process?

Johannesen - Direct                                                    30

1   A    Yeah, we had -- over the course of the, several months,
2   really frequent, often times multiple times a day if not
3   multiple times, at least multiple times a week with all the
4   respective advisers and attorneys involved in the deal.
5   Q    So you have personally spent quite a bit of time on the
6   last year on this sale process?
7   A    Yes, I have.
8   Q    Now, are you familiar with Fortistar?
9   A    I am.
10  Q    And when did you first become introduced to Fortistar?
11  A    Through the Channelview divestiture efforts.
12  Q    And in your opinion, were they one of the leading
13  potential purchasers for these assets?
14  A    They were.  There were a handful of companies that were
15  attractive buyer candidates after the process we had gone
16  through.  And they were one of those companies.
17  Q    And as the business person most intimately involved in the
18  sale process on behalf of the debtors, do you believe that the
19  debtors did everything possible to facilitate and document a
20  definitive agreement with Fortistar?
21  A    I do.  We were responsive to numerous diligence requests
22  to I believe multiple site visits.  We traveled to New York
23  City on multiple occasions for face to face negotiating
24  sessions.  Again, in the context of other transactions, we were
25  as active as we've ever been in terms of doing what we could to

1    further a transaction.

2    Q    And do you recall roughly the time period in which the

3    debtors turned their attention to Kelson and to start

4    negotiating a definitive asset purchase agreement with Kelson?

5    A    They'd been involved in the process all along, but late in

6    '07, our focus was primarily to Fortistar and in very early

7    '08, we really began to reengage, you know, with Kelson.  And I

8    would say by late, mid to late January were actively engaged in

9    having frequent conversations with Kelson.

10   Q    And how would you describe the pace of the negotiations

11   with Kelson?

12   A    I would describe them as reasonably rapid and quick.

13   Again, as these type of transactions go, we engaged with them

14   on a very serious basis in mid to late January and in

15   approximately a month's time had come to an agreement and

16   executed a contract.  So they were very, both sides were very

17   engaged and moved at a very reasonable pace.

18   Q    And does the Kelson asset purchase agreement have either a

19   financing contingency or a due diligence contingency at this

20   point?

21   A    It has neither.

22   Q    And do you recall what the purchase price is?

23   A    $468,000,000.

24   Q    And do you believe that purchase price will be sufficient

25   to satisfy the secured lenders in full as well as third party

Johannesen - Direct                                     32

1    unsecured claims?

2    A    Yes, I do.

3    Q    Now, were you involved in the negotiations of the bid

4    protections that are contained in the asset purchase agreement?

5    A    Yes, I was.

6    Q    And do you believe those negotiations were had in good

7    faith and at arms length?

8    A    They were.

9    Q    And do you believe that the granting of bid protections to

10   Kelson will in fact benefit the debtors' estates?

11   A    I do.  Kelson is provided a contract that's, it's been

12   executed; they've been provided a floor price that has been

13   testified previously will satisfy the creditors in full.  So I

14   do think that there's significant benefits here.

15   Q    And will the debtors continue to have interest in

16   potential competing bidders who would be willing to provide the

17   same terms and conditions of a sale like Kelson has before but

18   in greater amounts?

19   A    Yes, absolutely.  And we'll do everything we can to help

20   folks complete additional diligence or provide whatever

21   information they need to make that assessment.

22   Q    And is that type of work happening as we speak?

23   A    Yes, it is.  We're engaged with various parties and are in

24   the process of facilitating those discussions, providing

25   additional information and so forth.

Johannesen - Direct                                          33

1    Q    And was it your understanding that the secured creditors

2    were anxious to see the debtors execute a sale transaction?

3    A    It was my understanding, yes.  Previous testimony spoke to

4    some of that.  We had understood through our attorneys that the

5    cash collateral order extension that went through mid-March

6    would be the last that the lenders would grant on a consensual

7    basis, and understood that they're preparing to contest any

8    subsequent requests.  We'd actually received notices of

9    deposition in anticipation of that hearing.

10   Q    And would that have been a costly and time-consuming

11   process?

12   A    It would have, yes.

13   Q    Thank you.

14            MR. COLLINS:  I have no further questions, Your

15   Honor.

16            THE COURT:  Thank you.  Anybody wish to cross-examine

17   the witness?

18            UNIDENTIFIED ATTORNEY:  No, Your Honor.

19            MR. STRATTON:  Your Honor, David Stratton for the

20   Official Committee of Unsecured Creditors.  We don't have any

21   questions for the witness.  We just reserve our rights with

22   respect to the testimony concerning the sale price and the

23   payment of all third-party claims.  I don't think we need to

24   get into that today.  Thank you.

25            THE COURT:  All right.  Thank you.  You may step

1    down.   I'll hear argument then, unless any other party has any

2    witnesses?  All right.  I'll hear argument.

3            MR. COLLINS:  Your Honor, very briefly, I think the

4    testimony's uncontested that this was a very exhaustive sale

5    process run over the past 10 months or so.  Literally hundreds

6    of potential purchasers were contacted.  Many conducted

7    negotiations -- many conducted on-site visits, and the debtors

8    worked throughout the fall and winter to document an asset

9    transaction that would pay all of our creditors in full which

10   was the goal when we first filed this case back in August of

11   last year.

12       We did believe in the value of this enterprise and were

13   very pleased that notwithstanding the length of time that it

14   has taken to be here today, that we do in fact have a

15   transaction that has limited, if any, contingencies in it with

16   respect to financing or due diligence and the ability to close.

17       Obviously, the granting of the DIP protections will ensure

18   that Kelson remains bound by the terms of the asset purchase

19   agreement.  It does set a floor by which all future bidders

20   must now compete against, and it may provide incentive for

21   other bidders to meet the deadlines that are now being

22   requested of the Court so that the process does not continue to

23   drag out for weeks or months in the future.

24       We've already seen Fortistar reemerge; we're happy to see

25   that.  But by having deadlines and dates and a sale hearing

Collins - Argument/Abbott - Argument                    35

1    date put in place, we think that will only further incentivize

2    parties to either appear and bid or decide that they are unable

3    to do so.

4        Obviously, the return of $468,000,000 to the debtors'

5    estates is significant.  We'll pay our secured lenders in full

6    plus interest at the default rate plus early termination fees

7    and the like and also pay our unsecured creditors in full.

8        So Your Honor, we think it's, the debtors have done what

9    they needed to do in order to find a purchaser who is able to

10   consummate a transaction and that the bid protections being

11   requested today are fair and reasonable as testified by Mr.

12   Hardie.

13            THE COURT:  Okay.

14            MR. ABBOTT:  Thank you, Your Honor.  Derek Abbott

15   again for Fortistar.  Your Honor, I think both the testimony

16   and Mr. Collins' argument explains exactly why the bid

17   protections are unnecessary.  There's been a lengthy process.

18   There are active bidders; there are interested bidders

19   including my client who's receiving diligence information even

20   this morning.

21       Your Honor, Mr. Collins suggested that approving the bid

22   protections ensures that Kelson will remain bound but, Your

23   Honor, I think you heard Mr. Hardie testify that he doesn't

24   think they have a out if the Court doesn't grant this expense

25   reimbursement and break it free of the bid protection package.

Abbott - Argument                                                    36

1    Mr. Collins did not argue that they can terminate.  It says he

2    thinks that it shows they remain bound.  But Your Honor, as we

3    read the contract, they remain bound regardless of whether this

4    Court enters these bid protections.

5        Your Honor, Mr. Collins also talked about deadlines and

6    process and timing, and it's clear that Fortistar's been

7    involved in this for quite some time.  We're comfortable with

8    the deadlines that the debtors have proposed, but Your Honor,

9    those deadlines and whatever incentive that may provide

10   Fortistar to get a bid in -- not that they need that particular

11   incentive, but to the extent it does, Your Honor, it's

12   completely divorced from the bid protections.  And the bid

13   protections don't serve any role there.  It's this auction

14   process that the debtors have agreed to now and the time line

15   that Mr. Collins referred to that do that.  I don't think Your

16   Honor, under the circumstances, given that Fortistar was

17   involved pre-petition as the uncontroverted testimony shows,

18   and their willingness to bid, that the debtors can meet the

19   O'Brien standards and the Court can award this break-up fee in

20   these circumstances.

21       Your Honor, I don't really have much further to add.

22   Obviously, we're interested; we're here.  We hope to be

23   involved in this process, but we don't think that the bid

24   protections will do anything for the estate that's not already

25   there.  The asset purchase agreement's been signed.  There's an

Handelsman - Argument                                    37

1    auction process in cue, and we think that will help the estate,

2    but simply the payment of this additional money to Kelson

3    doesn't do that, Your Honor.  And we don't think as a result,

4    it should be approved.

5              THE COURT:  Thank you.  Yes?

6              MR. HANDELSMAN:  Good morning, Your Honor.  Lawrence

7    Handelsman, Stroock and Stroock and Lavan.  I'm counsel to

8    Reliant Energy, the parent company.  Just a few points, and

9    maybe it's to state the obvious, but I think it needs to be

10   stated.  No party in interest has objected to these bid

11   protections.  The only objector is Fortistar who in other

12   contexts I might call a disappointed bidder, but they're not

13   because they haven't bid yet.  They're someone who as the

14   testimony indicates we spent a lot of time, hundreds of man

15   hours as Mr. Hardie testified trying to get to a contract and

16   couldn't wholly aside from their financing abilities.  Now they

17   say they'd like to bid again, and we welcome that.

18       But this, the Kelson contract as people have also

19   testified pays all creditors.  The only economic parties in

20   interest here with respect to the residual amount are my

21   client, Reliant, and Equistar.  And those issues are for

22   another day, April 9th, I guess.  But neither of those parties

23   have objected here.  This is not the kind of case we talk and

24   we reflexively think about the impact on the estate and the

25   O'Brien case and is it necessary to bring in other bidders.

Handelsman - Argument                                              38

1          The estate is really protected here by the Kelson

2     contract.  The parties in interest who will get the benefit of

3     a higher bid if one exists are Reliant and possibly Equistar.

4     And as I said, I think from the Court's perspective, it is very

5     telling that neither the secured lenders nor the committee has

6     objected to these bid procedures.  We have in response to the

7     committee's request, you know, are in the process of soliciting

8     additional bids.  We hope we get them on the time frame that we

9     have.  And for those reasons, I would urge you to approve this

10    bid protection since it is, this is not a case -- this would --

11    denial of the -- put it another way -- the only party

12    disadvantaged by the bid protection in this courtroom today is

13    Fortistar.  And what, all they're trying to do is save

14    $15,000,000 or whatever the amount is that they'd have to

15    overbid.  And that's laudable from their perspective, but this

16    estate really should get the benefit of the bid protections to

17    make sure that this process goes forward, that Kelson is there,

18    that the floor and incentive that it provides remains in place.

19    And as I said, I don't think the traditional thinking when the

20    purchase price and any effect of the amount of the bid

21    protections has on a, on the bankruptcy estate is really

22    germane here given the specific facts of this case.

23          THE COURT:  Well, except that are the bid protections

24    really necessary to keep Kelson here?

25          MR. HANDELSMAN:  Well, Your Honor, there are -- I

Handelsman - Argument/Stratton - Argument                    39

1    believe that the statements about the asset purchase agreement

2    are correct, that our obligation was in the event of an auction

3    to seek, use our commercially reasonable efforts to seek bid

4    protections.  On the other hand, there arise during the course

5    of closing a deal like this many unforeseen possibilities that

6    could given Kelson the ability to walk away that we can't even

7    fathom at the moment, and if they, if they're looking for an

8    exit, most people can find one.  And we want to make sure that

9    they're not looking for an exit and if somebody else comes in

10   and bids more, as I've said, that's for our benefit, not -- it

11   will have no effect on the secured lenders or on the

12   committee's constituents, and we shouldn't deal with that.

13   This really should be looked at almost as a -- and I don't want

14   to overstate this -- as a non-bankruptcy sale where these bid

15   protections are really between the ultimate economic party in

16   interest and the buyer.

17            THE COURT:  Thank you.

18            MR. STRATTON:  Good morning, Your Honor.  David

19   Stratton, Pepper Hamilton for the Official Committee of

20   Unsecured Creditors.

21        Let me start out where Mr. Handelsman ended because I

22   think he makes a very good point.  Outside of a bankruptcy sale

23   where the proceeds of a sale are fought over if you will by

24   unsecured and secured creditors, they break up the bid

25   protection package where there's going to be further shopping

1   of an offer, at least based on my experience, is pretty much

2   the norm.  And so I think we are more in that universe than we

3   are in the O'Brien Energy universe where it's strictly what's

4   going to be left for the estate.  At least that's our hope.

5        The object now is to maximize value, so I think -- and

6   fortunately the debtors agree with that -- and so I think we

7   need an auction process.  The schedule they proposed is

8   aggressive, but it will give Fortistar an opportunity to make a

9   bid or not, and we'll see if they're going to get off the fence

10  and get a financing partner lined up and get in the game or

11  not, and then we'll have an auction if they do or if others

12  make bids as well.

13       The break-up fee provisions, the bid protection provisions

14  we think are reasonable.  They're within the standards

15  established informally by this Court with respect to the

16  percentages of the purchase price, and we believe they should

17  be approved.

18       The one provision that's not in the order and I don't

19  think it needs to be added because I'm sure we can get an

20  agreement on the record is that, and I think I speak for the

21  secured lender as well as the committee and the secured lender

22  would expect that, to be advised of the terms of any competing

23  bids and the debtors' analysis of whether or not any of those

24  bids are qualified bids prior to the decision of whether or not

25  to be an auction.

Pfeiffer - Argument                                          41

1        With that understanding, Your Honor, we would support the

2    relief requested today.

3              THE COURT:  Thank you.

4              MR. HANDELSMAN:  May I respond briefly, Your Honor?

5    Unless there's another supporter who's going to stand up.

6              THE COURT:  I'll hear from the lenders.

7              MR. PFEIFFER:  Good morning, Your Honor.  Brian

8    Pfeiffer from Fried Frank Harris Shriver & Jacobson on behalf

9    of the Bank of New York as administrative agent for the

10   lenders.

11       Your Honor, with the changes to the order regarding the

12   break-up fee and expense reimbursement, the administrative

13   agent has no objections to the bid procedures in large measure

14   because they don't, they will not or should not affect the

15   ultimate recoveries of the secured lenders.

16       But with respect to the prospect of an auction, while the

17   agent is, the agent does not have an objection to the schedule

18   that's been put forth by the debtors which is to have a, you

19   know, have a bid deadline that's a few weeks out and then an

20   auction immediately thereafter, the agent would have an

21   objection to any kind of auction process which pushed out the

22   dates and pushed out the prospect of the sale hearing because

23   you know, as Mr. Hardie noted, the lenders and the agent have

24   ben particularly frustrated with this process.  They believe

25   it's gone on way too long, especially in these markets I think.

Pfeiffer - Argument/Abbott - Argument                    42

1    You know, the risk of loss here is being borne by the lenders,

2    and while it's great that Reliant may want to chase some

3    additional equity returns, it's of critical import to all the

4    creditors here that they get the deal done.

5         So again, while the agent is fine with the schedule as

6    proposed, any schedule that was to really push out the sale

7    hearing date would be problematic from the agent's standpoint.

8    Thank you, Your Honor.

9              THE COURT:  Thank you.

10             MR. ABBOTT:  Thank you, Your Honor.  Derek Abbott

11   again, just very briefly.  Your Honor, Mr. Handelsman is

12   correct.  Fortistar's principal motivation is to lower the

13   hurdles to its initial bid.  There's no question about that.

14   That's how business works.

15        The flip side of that, Your Honor, is that to the extent

16   that we do overbid, whatever amount remains in the absence of

17   these bid protections would go to the estate, and Mr.

18   Handelsman's clients and the other stakeholders in the case.

19        Second, Mr. Handelsman talked about sort of getting away

20   from the traditional thinking.  I don't call it traditional

21   thinking; I call it the law.  Mr. Stratton said well, we're

22   really outside the bankruptcy sale norm, but I, last I checked,

23   we're in a Bankruptcy Court talking about a sale.  So I don't

24   think the Court can simply say well, this isn't the

25   circumstance where the Third Circuit law ought to apply.  I

Abbott - Argument/Collins - Argument                    43

1    think the Court's got an obligation to uphold <u>O'Brien</u>.  I don't

2    think they've met the standard, and can't.  And I would ask the

3    Court certainly to approve the auction process which is what we

4    wanted, but not to approve the bid protections because I don't

5    see any value to the estate here.  No one has stood up here and

6    said that Kelson can walk if they're not approved, and that's

7    my request of the Court.  Thanks.  Thank you, Your Honor.

8            MR. COLLINS:  Very briefly, Your Honor.  First we had

9    the testimony of Mr. Johannesen where he confirmed that it was

10   the debtor's business judgment that the bid protections be

11   granted and be approved here today.  We also had the testimony

12   of both Mr. Hardie and Mr. Johannesen that the inclusion of the

13   bid protections in the asset purchase agreement were incredibly

14   important to Kelson, and in fact they stated, or Mr. Hardie

15   stated that he did not believe that they would have entered

16   into the asset purchase agreement without the inclusion of

17   those bid protections.

18       I would also note, Your Honor, that both 8.1(d) of the

19   Asset Purchase Agreement which is the requirement of the

20   debtors to file a motion seeking approval of the bid

21   protections, along with Schedule 8.1(d) was an overall

22   agreement between the debtors and Kelson over how you would

23   structure bid protections, when they would arise and what would

24   happen if Your Honor decided that we need to have an auction

25   process.

Collins - Argument/Stratton - Argument                    44

1     It is good for the debtors' estates that we were able to

2     negotiate an asset purchase agreement where Kelson cannot

3     simply walk away from the transaction if Your Honor does not

4     approve the bid protections.  That's what debtors should try to

5     negotiate, and it should not then be utilized by competing

6     bidders to say see, gotcha, Your Honor, don't deny it because

7     they can't walk.  That was a favorable provision from the

8     debtors' perspective.  The debtors do have an obligation to

9     seek approval of these bid procedures.  These bid procedures

10    have been testified -- they're customary and reasonable.  So

11    there is no justification for not approving them other than to

12    say the gotcha argument.

13         And again, that was the back and forth of the negotiations

14    between Kelson and the debtors over the terms of the bid

15    protections and how they would be sought.

16              THE COURT:  Ready?  Want to chime in?

17              MR. STRATTON:  I do -- I would, Your Honor.  I don't

18    usually want to do this back and forth and back and forth, but

19    I want to come back to something that Mr. Collins mentioned I

20    think at the outset of his argument, and that is what, if any,

21    standing Fortistar has.

22         Every party in this case with some skin in the game as

23    they say, with an economic interest in the outcome of the sale

24    of this hearing of the bid and auction process supports the

25    granting of some bid protection -- nobody seems to want to

Stratton - Argument                                    45

1    quibble about the amounts -- to Kelson.  And the reason for

2    that is I think borne out of the language in the asset purchase

3    agreement and our concern as Mr. Handelsman identified it that

4    if Kelson is uncomfortable and thinks all of the efforts it put

5    in over the last several months could go down the drain, no

6    agreement perhaps could be tightly enough written to keep them

7    from walking.  And then, and then we would really have a mess

8    on our hands.

9        Fortistar sits in the back of the courtroom having failed

10   once to secure a binding offer for this company.  It doesn't

11   say it has the ability to bid today, but yet it wants to be

12   able to bid for as little as possible if and when the auction

13   process starts.  In theory, as little as whatever the bidding

14   permits would be, let's say $100,000.  I don't think we're here

15   to quibble about a hundred grand, and with numbers being

16   floated around of $468,000,000, and oh by the way, the

17   $100,000,000 differential between the secured debt and the

18   purchase price, and whether that is real is money out of my

19   client's pockets, my constituent's pockets.

20       So let's go back to my point.  The only party with, that

21   doesn't have an economic stake in the outcome of this hearing

22   doesn't want Your Honor to approve the bid protections.

23   Everybody else is on board.  We think it's completely

24   reasonable under the circumstance, and all it will do is force

25   Fortistar to pay, to bid a little more the first time out.  And

The Court - Decision                                          46

1    that, frankly, is a good thing for everybody else in this

2    courtroom.

3              THE COURT:  Well, I see it a little differently from

4    most of the parties.  First, let me address the standing issue.

5    While generally Courts have held that disappointed bidders do

6    not have standing, Fortistar is not in that situation.  They --

7    we haven't had an auction.  While there was a sale process and

8    they were afforded the opportunity to make a bid, the sale

9    process is not over and they still have the opportunity to make

10   a bid.

11       Ultimately, the Court's interest is to assure that bid

12   procedures are approved that are designed to enhance or

13   maximize the assets of the estate and to protect the interests

14   of all parties in that process, and that includes prospective

15   bidders.  Ultimately, it's for the benefit of the estate which

16   is the Court's primary concern, but I cannot conclude that a

17   prospective bidder does not have standing to be heard on the

18   bid procedures themselves.  So I do consider Fortistar to have

19   that standing.

20       I will authorize an auction.  I think the standard of

21   determining what those terms are though is not to approve

22   anything that is standard.  I have to consider whether the

23   specific terms that the parties are proposing are designed to

24   enhance or chill bidding.  The Third Circuit has made it even I

25   think more specific whether in fact this specific term will

1    benefit the estate.  It's hard generally to consider how bid

2    protections or break-up fees protect the estate.  I've heard

3    the arguments and have approved them in the case where the

4    Court, the parties have convinced me that it is the only way to

5    get other bidders, any bidder to the table.  But I'm not

6    convinced in this case that that is the case.  There are other

7    bidders, at least one other bidder.  And I have in the past

8    denied break-up fees in circumstances where another party has

9    appeared and expressed an intention to bid at the auction.

10       I am prepared, however, to approve the expense

11   reimbursement sought because I think that is a legitimate

12   expense of the estate, that it has provided a benefit to the

13   estate by assisting in the preparation of an asset purchase

14   agreement against which others will be required to bid.

15       So I will approve the expense reimbursement authorized.  I

16   will not approve any break-up fee.  And I will approve the time

17   frames suggested by the debtor.

18              MR. COLLINS:  Your Honor, there was also a

19   requirement of an overbid of $5,000,000?

20              THE COURT:  Well, interesting -- $5,000,000 over the

21   17,000,000 I think --

22              MR. COLLINS:  That's correct, Judge.

23              THE COURT:  -- was the suggestion.

24              MR. COLLINS:  Yes.

25              THE COURT:  I would make the initial overbid

1    $5,000,000, which is inclusive of the, what, $2,000,000

2    expense?  So the initial overbid should be 5,000,000.

3                MR. COLLINS:  Okay.  Thank you, Your Honor.  We will

4    modify the form of order, along with including the dates for

5    the bid deadline and the potential auction, and then submit

6    that to Your Honor.

7                THE COURT:  All right.

8                MR. COLLINS:  And Your Honor, I will confirm on the

9    record that we would be prepared to share any competing bids

10   that we may receive with the secured lenders and the creditors

11   committee.

12               THE COURT:  All right.

13               MR. ALTER:  Your Honor, Jonathan Alter on behalf of

14   the prospective bidder -- prospective purchaser, Kelson.  I did

15   want to make one point for the record.  We were quiet in the

16   context of the argument, and I thought rightfully so; it was

17   the burden of the debtors to pursue the motion.  I do not want

18   my silence to connotate any kind of acquiescence to any legal

19   position that were espoused by counsel with respect to whether

20   we have an out, whether we don't have an out and what rights we

21   have under the contract.  And we respectfully reserve all those

22   rights.

23               THE COURT:  I understand.

24               MR. ALTER:  Thank you, Judge.

25               THE COURT:  All right.  I'll look for a form of

1    order.

2                    MR. COLLINS:  Thank you, Your Honor.

3                    THE COURT:  Anything else today?

4                    MR. COLLINS:  Yes, Your Honor.  We do have some

5    additional matters.

6                    THE COURT:  Near and dear to your heart?

7                    MR. COLLINS:  Yes, that's one of them, Your Honor.  I

8    think, Your Honor, I believe and I don't have the agenda in

9    front of me that Your Honor requested a status conference

10   regarding the lawsuit that was commenced by Equistar in Texas

11   that was then removed to Delaware.

12                   THE COURT:  Yeah.  What --

13                   MR. COLLINS:  My understanding is and I can have the

14   other --

15                   THE COURT:  What are we going to do with that?

16                   MR. COLLINS:  I believe, Your Honor, that is simply

17   going to sit for the time being, but I'll let Ms. Fatell

18   address Your Honor.

19                   MS. FATELL:  Good morning, Your Honor.  Bonnie Fatell

20   on behalf of Equistar.  That action was commenced in Texas

21   when, as we heard from Mr. Hardie, it was anticipated that

22   there may be a sale process by the parent company.  At this

23   point, since the process is going forward in this Court, we'd

24   like to just put it on the back burner and let it sit until we

25   see how this process play out.

Colloquy                                              50

1          THE COURT:  All right.

2          MS. FATELL:  Thank you.

3          THE COURT:  Good suggestion.

4          MR. COLLINS:  Your Honor, that then brings us to the

5    first interim fee applications for the time period August 20,

6    2007 through November 30, 2007.

7          THE COURT:  All right.

8                         (Pause)

9          MR. COLLINS:  We have two applications before the

10   Court.  The first is of my firm, Richards Layton & Finger, as

11   well as Alvarez and Marsal Securities.  I believe they're the

12   financial advisors to the creditors committee.

13         THE COURT:  Okay.  I have no -- only minor comments,

14   but I will approve them on an interim basis as filed.

15         MR. COLLINS:  Thank you, Your Honor.  May I present a

16   form of --

17         THE COURT:  Proposed form of order?  Yes.

18         MR. COLLINS:  Yes.

19         THE COURT:  Thank you.

20         MR. COLLINS:  Your Honor, the last item on the agenda

21   is the debtors' expedited motion for an extension of the use of

22   cash collateral.  First of all, thank you, Your Honor, for

23   allowing it to be heard today.

24         THE COURT:  Uh-huh.

25         MR. COLLINS:  I do believe it's on consent with the

1    secured lenders that we utilize cash collateral on a consensual

2    basis for an additional month's period while we proceed with

3    the sale process.  The terms of the funding are the same, and

4    there is a budget that has been attached that reflects the

5    future obligations, estimated obligations of the debtors'

6    estates.

7                THE COURT:  Anybody wish to be heard on that?

8                MR. PFEIFFER:  Your Honor, Brian Pfeiffer from Fried

9    Frank for Bank of New York.  Your Honor, in light of the fact

10   that the proposed sale transaction is expected to satisfy all

11   of the debtors' obligations to the pre-petition lenders, the

12   administrative agent does not object to the extension of the

13   debtors' cash collateral use as a bridge to the sale hearing.

14       As I mentioned previously, however, the administrative

15   agent does have significant concerns that particularly in light

16   of the current market conditions, that absent the Kelson

17   transaction, the case could become a melt-down in which perhaps

18   the claims of the lenders may be materially impaired.

19       So given the litigation surrounding the sale hearing

20   that's on for April 9th, the lenders would like to respectfully

21   reserve the right to reexamine their position in term -- vis-a-

22   vis adequate protection at that time.

23                THE COURT:  All right.

24                MR. PFEIFFER:  Thank you, Your Honor.

25                MR. COLLINS:  One moment, Your Honor?  Your Honor,

1    may I present a form of order?

2              THE COURT:  You may.

3                        (Pause)

4              THE COURT:  All right.  I'll enter that order by

5    consent.

6              MR. COLLINS:  Thank you, Your Honor.  That's all we

7    have.

8              THE COURT:  All right, we'll stand adjourned.

9              MR. COLLINS:  Thank you.

10             THE COURT:  Thank you.

11                        * * * * *

12                  C E R T I F I C A T I O N

13

14        I, Mary Anne Kowalczyk, court approved transcriber,

15   certify that the foregoing is a correct transcript from the

16   official electronic sound recording of the proceedings in the

17   above-entitled matter.

18

19   _____          March 24, 2008

20   DIANA DOMAN TRANSCRIBING

21   (856) 435-7124

22

23

24

25

**EXHIBIT D**

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| RELIANT ENERGY CHANNELVIEW LP, *et al.*,[1] | Case No. 07-11160 (MFW) |
| | Jointly Administered |
| Debtors. | **Re: Docket No. 277** |

### ORDER APPROVING DEBTORS' PROPOSED BID PROTECTIONS

This matter coming before the Court on the motion (the "Motion") of the above-captioned debtors and debtors-in-possession (collectively, the "Debtors") for entry of an order approving certain bid protections in connection with the proposed transfer and sale of substantially all of the assets of certain Debtors to Kelson pursuant to the terms and conditions of that certain asset purchase agreement, dated February 25, 2008 (the "Asset Purchase Agreement"). The Court has reviewed the Motion and finds that (a) the Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, (b) this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), (c) notice of this Motion having been provided to, inter alia, the Office of the United States Trustee for the District of Delaware; counsel for the Official Committee of Unsecured Creditors; counsel to the administrative agent for the Debtors' pre-petition lenders (the " Pre-Petition Lenders"); counsel to the Buyer; counsel to Reliant Energy; counsel to Equistar; and all potentially interested purchasers contacted by the Debtors or HLHZ regarding the sale of the Debtors' assets; and all parties requesting notice in these cases pursuant to Bankruptcy Rule 2002; (d) any objections to the Motion have been withdrawn, resolved, or overruled; and (e) capitalized terms not otherwise defined herein have the meaning given to them

in the Motion; and the Court having determined that the legal and factual bases set forth in the

Motion establish just cause for the relief granted herein, and it appearing that the relief requested

is in the best interests of the Debtors' estates and creditors, and other parties in interest;

## IT IS HEREBY ORDERED THAT:

1.      The Motion is GRANTED, as set forth herein.

2.      The Bid Protections set forth in Schedule 8.1(d) to the Asset Purchase

Agreement, ~as modified and~ attached hereto as <u>Exhibit A</u>, which contain, <u>inter</u> <u>alia</u>, provisions concerning the

~~Break-Up Fee and~~ Expense Reimbursement, are hereby approved.

~~3.      Subject to the provisions of paragraph 6 below, the Debtors are authorized~~

~~to pay the Buyer a break-up fee in the amount of $15,000,000 (the "Break-Up Fee") upon closing~~

~~of an Alternative Transaction~~.

4.      Subject to the provisions of paragraph 6 below, the Debtors are authorized

to reimburse the Buyer for reasonable, documented out of pocket expenses not to exceed

$2,000,000 (the "<u>Expense Reimbursement</u>") upon closing of an Alternative Transaction.

5.      Once due, and until paid, the ~~Break-Up Fee and the~~ Expense

Reimbursement shall be allowed as an administrative claim pursuant to section 503(b)(1)(A) of

the Bankruptcy Code.

6.      Notwithstanding anything to the contrary in the Motion, the Asset

Purchase Agreement or the Sale Motion, for purposes of determining whether the ~~Break-Up Fee~~

~~and/or~~ Expense Reimbursement are required to be paid under the terms of this Order, an

Alternative Transaction shall not include any conveyance or transfer of Acquired Assets to the

---

[1] The Debtors are Reliant Energy Channelview LP, Reliant Energy Channelview (Texas) LLC ("<u>General</u> <u>Partner</u>"), Reliant Energy Channelview (Delaware) LLC ("<u>Limited Partner</u>, and together with the General Partner, the "<u>Partners</u>"), and Reliant Energy Services Channelview LLC.

Pre-Petition Lenders in full or partial satisfaction of the outstanding obligations under the Secured Credit Facility, including, without limitation, by way of foreclosure, distribution under a chapter 11 plan, or credit bid under section 363(k) of the Bankruptcy Code; provided that it is understood and agreed that an Alternative Transaction shall include the sale of the Acquired Assets to the Pre-Petition Lenders for consideration consisting of a credit bid and additional consideration that is a Topping Bid. In addition, the ~~Break-Up Fee and~~ Expense Reimbursement shall not become payable until after all allowed secured claims of the Pre-Petition Lenders are satisfied in full.

7.    To the extent that any competing bids are made in connection with the Sale of the Acquired Assets, such bids must be submitted on or before _5_ : _00_ _p_.m. (Eastern Time) on April _3_, 2008 (the "<u>Bid Deadline</u>"), and must be in an amount ~~sufficient to cover~~ *equal to the Base Purchase Price* ~~fully the Bid Protections afforded to Kelson (inclusive of the Break-Up Fee and Expense Reimbursement)~~, plus $5 million, and must also be accompanied by (a) evidence of such competing bidder's financial wherewithal; (b) a marked copy of the Asset Purchase Agreement of Kelson reflecting all changes made; (c) a clean, executed copy of the Asset Purchase Agreement; and (d) a good faith deposit in the amount of $40 million (collectively, a "<u>Qualifying Bid</u>").

8.    To the extent that any Qualifying Bids are received by the Bid Deadline, an auction of the Acquired Assets will be held at 10:00 a.m. (Eastern Time) on April _7_, 2008 at the offices of Richards, Layton & Finger, P.A., One Rodney Square, 920 North King Street, Wilmington, Delaware 19801.

9.   This Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation of this Order.

Dated: March 18 , 2008
       Wilmington, Delaware

THE HONORABLE MARY F. WALRATH
CHIEF UNITED STATES BANKRUPTCY JUDGE

# **EXHIBIT A**

Schedule 8.1(d)

Bid Protections

1. ~~Break fee payable on closing of Alternative Transaction[2]; $15,000,000.~~

2. Reimbursement of out of pocket expenses on closing of Alternative Transaction, up to an aggregate of $2,000,000.

3. Topping bid: The initial topping bid must be no less than $5,000,000 higher than an amount equal to the Base Purchase Price~~, plus (i) the $15,000,000 break fee, and (ii) the amount of out of pocket expenses to be reimbursed to Buyer in connection with Item 2 above~~.

4. Sellers will use commercially reasonable efforts to file a motion for the Bidding Procedures Order within 48 hours of the Bankruptcy Court ordering the auction.

5. Sellers will require that as a condition of any Alternative Transaction that such transaction close within 45 days of the date of signing of a definitive Alternative Transaction agreement.

6. Sellers will request that the auction be held within 10 days of the entry of the Bidding Procedures Order.

7. This Agreement remains open as a backup bid if Sellers enter into an agreement for an Alternative Transaction until the earlier of the Termination Date and the closing of the Alternative Transaction, and to the extent that Buyer has provided a deposit, such deposit shall accrue interest until the Alternative Transaction is terminated or the deposit is returned to Buyer.

8. All bids remain open until the closing.

9. The winning bidder must provide a deposit equal to or greater than stalking horse deposit.

10. All bids must be accompanied by evidence of committed financing or other ability to perform.

11. All bids must be accompanied by a contract in execution form and a copy marked against this Agreement.

---

[2] For the purpose of this Schedule 8.1(d), "Alternative Transaction" shall mean: (i) any direct or indirect sale or disposition of all or substantially all of the Acquired Assets (except as expressly permitted under the Agreement) or the capital stock or other equity interests of either Seller, or (ii) any merger, consolidation, business combination, recapitalization, reorganization or other extraordinary business transaction involving or otherwise relating directly or indirectly to either Seller

**EXHIBIT E**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE


IN RE:                      .     Case No.  07-11160(MFW)
                            .     Jointly Administered
                            .
RELIANT ENERGY CHANNEL      .
CHANNEL VIEW LP, et al., .        824 Market Street
                            .     Wilmington, Delaware  19801
            Debtors.  .
                            .     April 9, 2008
. . . . . . . . . . . . ..        9:31 a.m.


TRANSCRIPT OF HEARING
BEFORE HONORABLE MARY F. WALRATH, CHIEF JUDGE
UNITED STATES BANKRUPTCY COURT

APPEARANCES:

For the Debtors:        Richards, Layton & Finger, P.A.
                        By:  MARK COLLINS, ESQ.
                             ROBERT STEARN, ESQ.
                             PAUL HEATH, ESQ.
                             MARCUS RAMOS, ESQ.
                        One Rodney Square
                        P.O. Box 551
                        Wilmington, DE  19801


For Siemens:            Morris James LLP
                        By:  THOMAS M. HORAN, ESQ.
                        500 Delaware Ave., Suite 1500
                        Wilmington, DE  19801


Audio Operator:         Brandon McCarthy


Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

_____

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@optonline.net**

**(609) 586-2311  Fax No.  (609) 587-3599**

2

APPEARANCES (CONT'D):

For Siemens:                    McGuire Woods
                                By:  DOUGLAS M. FOLEY, ESQ.
                                     AARON McCOLLOUGH, ESQ.
                                World Trade Center
                                101 West Main Street, Suite 9000
                                Norfolk, VA  23510-1655

For the Committee:              Pepper Hamilton LLP
                                By:  EVELYN J. MELTZER, ESQ.
                                     DAVID B. STRATTON, ESQ.
                                Hercules Plaza
                                1313 Market Street, Suite 5100
                                Wilmington, DE  19899

For the Secured Lenders:        Pachulski Stang Ziehl Young Jones
                                  & Weintraub LLP
                                By:  LAURA DAVIS JONES, ESQ.
                                919 Market Street, 17th Floor
                                Wilmington, DE  19899

For the Secured Lenders:        Fried, Frank, Harris, Shriver &
                                  Jacobson LLP
                                By:  BRIAN PFEIFFER, ESQ.
                                One New York Plaza
                                New York, NY  10004

For the Debtors:                Stroock & Stroock & Lavan LLP
                                By:  LAWRENCE M. HANDELSMAN, ESQ.
                                     CURTIS C. MECHLING, ESQ.
                                One Maiden Lane
                                New York, NY  10038

For CV Acquisition:             Morris, Nichols, Arsht & Tunnell
                                By:  ROBERT J. DEHNEY, ESQ.
                                     CURTIS MILLER, ESQ.
                                Chase Manhattan Centre
                                1201 North Market Street
                                Wilmington, DE  19899

For Equistar Chemical:          Blank Rome, LLP
                                By:  BONNIE FATELL, ESQ.
                                     STEVEN CAPONI, ESQ.
                                Chase Manhattan Centre
                                1201 Market Street, Suite 800
                                Wilmington, DE  19801

3

APPEARANCES (CONT'D):

For Equistar Chemical:          Shannon Martin Finkelstein &
                                   Alvarado, P.C.
                                By:  MARK S. FINKELSTEIN, ESQ.
                                2400 Two Houston Center
                                919 Fannin Street
                                Houston, TX

For Kelson:                     Bifferato Gentillotti
                                By:  GARVAN F. McDANIEL, ESQ.
                                800 N. King Street, Plaza Level
                                Wilmington, DE  19899

For Kelson:                     Bingham McCutchen LLP
                                By:  JONATHAN B. ALTER, ESQ.
                                One State Street
                                Hartford, CT  06103

For Kelson:                     Kasowitz, Benson, Torres &
                                 Friedman LLP
                                By:  ANDREW K. GLENN, ESQ.
                                1633 Broadway
                                New York, NY  10019

For TIAA:                       Debevoise & Plimpton
                                By:  TIMOTHY HOWARD, ESQ.
                                   MY CHI TO, ESQ.
                                919 Third Avenue
                                New York, NY  10022
                                (Telephonic Appearance)

4

**I N D E X**

|                                                      | **PAGE** |
|------------------------------------------------------|------|
| **WITNESSES FOR THE DEBTORS**                        |      |
| WILLIAM HARDIE, III                                  |      |
|     Cross Examination by Mr. Glenn | 28   |
|     Redirect Examination by Mr. Collins | 32 |
|     Recross Examination by Mr. Glenn | 34 |
|                                                      |      |
| LAWRENCE TEEL                                         |      |
|     Direct Examination by Mr. Stearn | 56 |
|                                                      |      |
| CARLA TIBBITTS                                        |      |
|     Direct Examination by Mr. Stearn | 96 |
|                                                      |      |
| ANDREW JOHANNESEN                                     |      |
|     Direct Examination by Mr. Ramos | 130 |
|     Cross Examination by Mr. Finkelstein | 135 |
|     Redirect Examination by Mr. Ramos | 167 |
|     Recross Examination by Mr. Finkelstein | 170 |
|                                                      |      |
| WILLIAM HARDIE, III                                  |      |
|     Direct Examination by Mr. Mechling | 173 |
|     Cross Examination by Mr. Caponi | 176 |
|     Redirect Examination by Mr. Mechling | 192 |
|     Recross Examination by Mr. Caponi | 192 |
|     Further Redirect Examination by Mr. Mechling | 196 |
|                                                      |      |
| **WITNESSES FOR EQUISTAR**                           |      |
| CARLA TIBBITTS                                        |      |
|     Direct Examination by Mr. Finkelstein | 197 |
|     Cross Examination by Mr. Stearn | 215 |
|     Redirect Examination by Mr. Finkelstein | 224 |
|                                                      |      |
| LAWRENCE TEEL                                         |      |
|     Direct Examination by Mr. Finkelstein | 224 |
|     Cross Examination by Mr. Stearn | 235 |

| **EXHIBITS** |                                        | **ID.** | **EVD.** |
|--------------|----------------------------------------|---------|----------|
| Ex. 1        | Bidding Procedures Order               | 28      | 34       |
| D-1          | Copy of Original Letter of Credit      |         | 41       |
| D-2          | Black Line of Asset Purchase Agreement |         | 41       |
| D-1A         | Original Request for Proposal          | 59      |          |
| D-2A         | 12/18/98 Reliant Energy Partnering proposal | 59 |          |
| D-1 - D-17   | Document                               |         | 129      |
| Johannesen-22 | Document                              | 160     |          |
| Johannesen-23 | Document                              | 165     |          |

**J&J COURT TRANSCRIBERS, INC.**

5

1          THE CLERK:  All rise.

2                    (Pause)

3          THE CLERK:  Please be seated.

4          THE COURT:  Good morning.

5          MR. COLLINS:  Good morning, Your Honor.  For the

6   record, Mark Collins of Richard, Layton & Finger, on behalf of

7   the debtors.  Your Honor, we obviously have a number of matters

8   on the agenda.  What I thought we should do is turn to Agenda

9   Item Number 3 on the agenda.  That is our sale motion.  Agenda

10  Items 1 and 2 will likely be subsumed within 3 --

11         THE COURT:  Yes.

12         MR. COLLINS:  -- if Number 3 is approved.  And again,

13  if Agenda Item Number 3 is approved we will likely withdraw

14  Agenda Items 1 and 2.  Your Honor, what I thought made sense is

15  to bifurcate today's hearing in some regards, the first to deal

16  with the Section 363 issues up front, including adequate

17  assurance of future performance, which I think we have

18  resolution of those issues by the objecting parties, and then

19  turn to the balance of Equistar's objections.

20         Your Honor, some background.  Pursuant to Your

21  Honor's prior order, you set the bid deadline for competing

22  bids of April 3, 2008.  To be a qualifying bid pursuant to the

23  Court's order, a bidder needed to provide a mark up of the

24  Asset Purchase Agreement, a clean copy of the APA, $5 million

25  more in consideration above the Kelson offer of $468 million,

**J&J COURT TRANSCRIBERS, INC.**

1    and a good faith deposit of $40 million.

2         We did receive a bid from GIM Channelview

3    Cogeneration LLC in the amount of $473 million.  That bid was

4    received by the bid deadline.  It included a marked and

5    executed copies of the APA, evidence of funding, and a specimen

6    letter of credit in the amount of $40 million with Wilmington

7    Trust Company as the beneficiary.  We reviewed that agreement

8    on April 4th, the debtors did, along with their advisors, and

9    submitted a number of issues and questions of this mark up for

10   the GIM bid to GIM's counsel, and as a result we held off

11   declaring that bid to be a qualifying bid under Your Honor's

12   order.

13        The following day, which is now Saturday, April 5th,

14   we held a multi-hour call with the professionals for GIM and

15   the debtor's counsel to go over these issues and concerns.

16   Sunday evening, I guess that is now April 6th, we received

17   responses from GIM's counsel to a number of the debtor's

18   questions regarding the new bid.  They also, at that time,

19   informed the debtors that they were willing to increase their

20   bid to $480 million, thereby going up an additional $7 million

21   from their original topping bid of $473 million.  The auction

22   was scheduled to commence the following day, April 7th, at ten

23   a.m.  Following discussions among the parties, the debtors

24   determined to delay the commencement of that auction, the

25   formal portion of the auction, so that the debtors, the

7

1 committee, and other parties could continue to have private

2 sale discussions with the two bidders, including encouraging

3 them to increase their bid and/or to modify certain terms and

4 conditions of the proposed Asset Purchase Agreement to make it

5 more beneficial to the debtors' estates.

6        Ultimately, we informed Kelson in the afternoon of

7 Monday, April 7th, that it made sense for them to depart for

8 the day, given the on-going discussions the debtors were having

9 with GIM regarding their bid, and that we would notify them

10 later that day, or first thing in the morning of the following

11 day, the status of GIM's bid, including whether or not it was a

12 qualifying bid, and if so, when an auction would be held.  I

13 would note, Your Honor, that later that day we did receive a

14 letter from counsel to Kelson that they believed that Your

15 Honor's decision not to grant them a break up fee caused the

16 debtors to fail to fulfill a condition precedent in their Asset

17 Purchase Agreement, and as a result were not bound to go

18 forward under the terms of their APA unless they were obviously

19 selected as the successful bidder.

20        Also on Monday, as part of this on-going dialogue

21 with GIM, we obtained evidence of the submission of the

22 executed letter of credit to Wilmington Trust the prior

23 Thursday.  As I noted at the outset, what we received on

24 Thursday as part of the bid package was a specimen letter of

25 credit, which means it was simply a form letter of credit and

8

1  not signed, so we had questions as to where is the original

2  letter of credit?  Is it a binding letter of credit, and the

3  like, to ensure that, in fact, a deposit had been made in

4  accordance with Your Honor's order.

5          We did obtain evidence, again, that it was submitted

6  to Wilmington Trust Company as escrow agent by the bid deadline

7  the prior Thursday, so that resolved one of our concerns.  We

8  also had some concerns regarding the terms of the letter of

9  credit itself in that Wilmington Trust Company was identified

10 as the beneficiary of the letter of credit, maybe a

11 technicality, but we would rather have had the letter of credit

12 in the name of the sellers rather than in the name of the

13 escrow agent.  In order to remedy that, it was -- GIM did not

14 have the time to go get another letter of credit issued that

15 same day, so what they did was they wired cash, a cash deposit

16 of $40 million on Monday to Wilmington Trust Company as escrow

17 agent.  So that, again, resolved one of our concerns.

18         Following hours of conversations and discussions that

19 went almost to midnight if not later on Monday, we did resolve

20 -- the debtors' professionals did resolve all material issues

21 and questions with respect to GIM's bid, and they also agreed,

22 during these discussions, to increase their initial bid to $500

23 million.  So, at that point we were now $32 million above the

24 initial bid submitted by Kelson.  The morning of April 8th we

25 in fact received executed documents of this revised bid,

**J&J COURT TRANSCRIBERS, INC.**

9

1  binding executed documents of all of the relevant purchase

2  agreement documents.  We then informed Kelson and all of the

3  other relevant parties in this case of the terms of GIM's

4  revised bid.  We distributed black lines of the revised asset

5  purchase agreement and the other operative documents, and we

6  scheduled an auction for one p.m. at Richards, Layton & Finger.

7  We did notify Kelson the day before that if we had an auction

8  on Tuesday they could participate by phone so that travel would

9  not be an inconvenience.

10          So, at the commencement of the auction yesterday at

11 one o'clock, the debtors had before it two binding bids, Kelson

12 a stalking horse bid of $468 million.  Obviously all of the

13 parties were in possession of the terms and conditions of that

14 offer.  We also have now the GIM Channelview Cogeneration bid

15 of $500 million.  And again, the parties were in possession of

16 the cumulative black line reflecting all of the material

17 changes to the Kelson contract, and therefore the terms and

18 conditions of that sale.

19          The debtors determined at the outset of the auction

20 that given the bid of GIM, the fact that the forms and purchase

21 agreements were substantially similar to that of Kelson, and

22 the fact that it provided cash consideration of $32 million

23 more than the Kelson bid, the debtors declared at the outset of

24 the auction that that bid of GIM was the current highest and/or

25 best bid submitted for the debtors' assets.  The debtors then

1    asked Kelson representatives if they were willing to increase

2    their stalking horse bid.  They declined to increase their bid

3    but did make statements on the record of the possible breaches

4    by the debtors of their failure to obtain approval of a break

5    up fee.  I stated on the record that we believed, and we put

6    that on the record at the prior hearing that our obligation was

7    to use reasonable efforts to obtain approval of that break up

8    fee, and that we did not believe that Kelson was able to walk

9    away from their obligations under the APA.

10           Again, Kelson decided not to bid at that auction.  As

11   a result the debtors declared at the conclusion of the auction

12   that the GIM bid was the highest and best bid submitted,

13   subject, obviously, to Court approval.

14           Following the auction we did send out a notice of

15   successful bidder to the relevant parties, and I believe this

16   morning we have on file now all of the relevant APA documents,

17   and we also have in the courtroom black lines of all of the

18   relevant documents.  I would note for the Court that the black

19   line of the APA, the changes are not significant, and that it

20   will not take much time to go through those modifications.

21           As a result of all of that, Your Honor, we are here

22   today seeking approval of the GIM purchase agreement with a

23   purchase price of $500 million.  We did receive two primary

24   objections to the motion.  The first was by Siemens Power

25   Generation.  They raise two primary issues.  The first was

**J&J COURT TRANSCRIBERS, INC.**

1  adequate assurance of future performance of the buyer, and a

2  second is the cure amount.  And I'm pleased to report that we

3  resolved both of those objections.  We understand that Siemens

4  has been in contact with GIM and has become comfortable with

5  their adequate assurance of future performance, and will not be

6  pressing that objection today.  We have also reached agreement

7  on their cure amount.  We have included proposed language in

8  the sale order itself that specifies the amount of the cure and

9  how one would true it up between now and closing.

10       The other objection was that of Equistar Chemical.

11  They raised, obviously, a number of arguments, but the one

12  regarding adequate assurance of future performance of a buyer

13  has been resolved, and I understand Equistar is not pressing

14  that portion of their objection today.  Obviously the balance

15  of their objections remain outstanding, and as I stated at the

16  outset we think that that portion of the hearing should go

17  forward after the 363 portion is first considered by Your

18  Honor, not to make a ruling, but simply to have that part of

19  the record established.

20       With that, Your Honor, what I thought would make

21  sense is to have proffers, or direct testimony if the parties

22  would desire, of Mr. Johannesen, which is a business person

23  with the debtors, and then also with Mr. William Hardie of

24  Houlihan Lokey to verify much of what I have said, along with

25  providing Your Honor the relevant findings under Section 363.

12

1  I believe that Mr. Dehney, who represents GIM, would then

2  thereafter provide a proffer for the record with respect to

3  adequate assurance of future performance of the buyer so that

4  Your Honor can make an independent finding on that.  And then,

5  again, we would turn to the balance of Equistar objections.

6  But before turning over to Mr. Heath for presentation of the

7  proffers or direct testimony we'd, I guess, like to hear that I

8  have accurately summarized the status of the objections.

9          THE COURT:  Is that correct?

10          MR. COLLINS:  And, Your Honor, the counsel did confer

11 prior to the hearing.  The proffers that will be going forward

12 really go to the 363 elements, so Equistar would not be cross

13 examining on that -- those aspects.  Then we would have our

14 case-in-chief come back on the Equistar --

15          THE COURT:  Issues.

16          MR. COLLINS:  -- legal issues, and they would then

17 cross examine as they deemed necessary.

18          THE COURT:  All right.  And that is agreed?

19          UNIDENTIFIED ATTORNEY:  Yes, Your Honor.

20          THE COURT:  Does any other party object to proceeding

21 with the 363 issues by proffer.

22          MR. GLENN:  I proffer none.

23          THE COURT:  No objection to that?  All right.  Then

24 let me hear if any other party wishes to be heard on the

25 objection issues.

13

1          MR. McDANIEL:  Good morning, Your Honor.  Garvan
2  McDaniel, Bifferato Gentillotti.  With me this morning, Your
3  Honor, is Andrew Glenn of Kasowitz Benson.  He is admitted in
4  good standing in the State of New York.  We will file his
5  formal pro hac papers this afternoon, and he's appearing for
6  Kelson Energy, Your Honor.

7          THE COURT:  All right.  I'll hear him.

8          MR. GLENN:  Thank you, Your Honor.  Very briefly, as
9  Mr. Collins indicated, it is Kelson and Harbinger's position
10  that there was no qualified bid submitted by the bid deadline
11  in Your Honor's order.  Your Honor's order does not include
12  language that we typically see in other orders indicating that
13  the debtors have discretion or the ability to move those
14  deadlines, so it's my client's position that there shouldn't
15  have been an auction.  We were originally told that there was
16  never going to be an auction, and since the deadline wasn't met
17  it's our position that our bid should have been the winning
18  bidder.  So, I can present that after the proffer, or as Your
19  Honor would otherwise --

20          THE COURT:  All right.  Let's hear that after the 363
21  proffer, then.

22          MS. FATELL:  Good morning, Your Honor.  Bonnie Fatell
23  from Blank Rome.  With me is Steve Caponi from my office as
24  well, and Mark Finkelstein, who is representing Equistar, and
25  we have filed papers pro hac as well, and Mr. Finkelstein would

**J&J COURT TRANSCRIBERS, INC.**

14

1  like to address the Court.

2          THE COURT:  All right.

3          MR. FINKELSTEIN:  Good morning, Your Honor.  Mark

4  Finkelstein from the Houston law firm of Shannon, Martin,

5  Finkelstein & Alvarado.  We're simply here to hear the proffers

6  on the adequate assurance and make sure that they do cover the

7  grounds that we need them to.  Obviously I think you know

8  Equistar has some vital interests to be preserved here.  We

9  have done what we could in the limited amount of time available

10 to complete the due diligence with respect to the purchaser,

11 economic viability and the ability to operate the facility.

12 There still seemed to be some lit bits unknown, but provided

13 that, you know, over the transition period we see that they're

14 capable of operating and providing financial assurance I don't

15 think we're going to have an objection to proceeding with the

16 sale on 363 grounds.

17         THE COURT:  All right.  Thank you.

18         MR. FINKELSTEIN:  Thank you, Your Honor.

19         MR. HORAN:  Good morning, Your Honor.  Tom Horan of

20 Morris, James for Siemens Power Generation.  With me this

21 morning, Your Honor, is Douglas Foley of McGuire Woods, also

22 counsel to Siemens.  Your Honor has admitted Mr. Foley to

23 practice pro hac vice, and he will address the Court.

24         THE COURT:  All right.  Thank you.

25         MR. HORAN:  Thank you.

15

1          MR. FOLEY:  Good morning, Your Honor.  Doug Foley

2 with McGuire Woods on behalf of Siemens Power Generation.  Mr.

3 Collins did accurately represent that our objection to adequate

4 assurance has been resolved based upon the proffers that we're

5 about to hear.  Your Honor, just to make the Court clear of

6 what the issue is with us is we have a parental guarantee in

7 place with Reliant's parent corporation guaranteeing the

8 obligations under the long term maintenance agreement that

9 Siemens has with respect to the plan.

10         We have been in discussions with both Kelson and

11 obviously GIM over the past week or so, not knowing, obviously,

12 which entity was going to be the purchaser until yesterday.  My

13 client has been talking with Mr. Dehney's client, and my

14 understanding is they've reached a satisfactory agreement with

15 respect to providing essentially a letter of credit equal to

16 the amount of the parental guarantee in order to essentially

17 replace that obligation.  So, based upon that, Your Honor, we

18 don't have any objection to the adequate assurance of future

19 performance going forward.  With respect to the cure

20 obligation, Your Honor, we have been working with Mr. Heath.

21 We understand that the order that will be submitted will

22 specify the cure amount for Siemens as $5,750,243.84, and that

23 amount will continue to accrue interest until paid at closing

24 pursuant to the terms of the contract, as well as any other

25 additional amounts that come due in the ordinary course of

**J&J COURT TRANSCRIBERS, INC.**

1  business between approval of the sale and closing of the sale.

2         THE COURT:  Give me that number again?

3         MR. FOLEY:  $5,750,243.84.

4         THE COURT:  Thank you.

5         MR. FOLEY:  Thank you, Your Honor.

6         MR. HEATH:  Good morning, Your Honor.  Paul Heath of

7  Richards, Layton & Finger on behalf of the debtors.  Your

8  Honor, I assume that all parties in the courtroom are agreeable

9  to proceeding by proffer, Your Honor.  I think that we have the

10 consent of Equistar, and the committee, the lenders, and also,

11 I believe, Kelson.

12         THE COURT:  I think nobody has objected to that.  You

13 may proceed.

14         MR. HEATH:  Your Honor, with that I'd first like to

15 offer the proffer of Andrew Johannesen, Your Honor, and I'll

16 apologize in advance for I'm sure what is my very boring voice,

17 so -- I'll do my best to make it exciting.

18         Your Honor, if called to testify, Andrew Johannesen

19 would testify as follows.  He would testify that he is the vice

20 president and treasurer of Reliant Energy Channelview Texas LLC

21 and Reliant Energy Channelview Delaware LLC respectively, the

22 general partner and limited partner of Reliant Energy

23 Channelview LP, and he is the vice president and treasurer of

24 Reliant Energy Services Channelview LLC.  He would testify that

25 he has been involved in the power generation industry for nine

1  years in various capacities.  He would further testify that he

2  holds an M.B.A. from the University of Chicago Graduate School

3  of Business with concentrations in analytic finance and

4  business economics, and a B.A. from Haverford College with a

5  major in economics.  He has served as vice president and

6  treasurer of the general and limited partner and Reliant Energy

7  Services Channelview since March 2007.

8       He would testify that the debtors commenced these

9  cases in August 2007 for the purpose of maximizing returns for

10 all stakeholders, including the lenders, unsecured creditors,

11 and equity holders through a going concern sale of the debtors'

12 assets.  He would testify that in April 2007 the debtors

13 commenced a process to sell the business.  Houlihan Lokey was

14 retained by the debtors' parent, Reliant Energy, in April 2007,

15 to assist with the sale process.  He would further testify that

16 he is the company officer charged with directing and overseeing

17 the sale process.  In connection with this assignment he is

18 responsible for interfacing with the professionals from

19 Houlihan, overseeing due diligence materials and access,

20 reviewing and evaluating asset purchase agreements and all

21 other sale-related documents.

22       He would further testify that a robust sale process

23 has been proceeding under his direction since April 2007.  In

24 early May 2007 the debtors began contacting potentially

25 interested purchasers regarding the sale, including financial

1  and strategic buyers.  In total, over 115 potentially

2  interested purchasers were sent teasers and confidentiality

3  agreements.  Approximately 38 parties executed confidentiality

4  agreements.  He would further testify that the debtors set up a

5  virtual data room for interested purchasers to conduct due

6  diligence.  He would testify that he supervised and oversaw the

7  establishment and maintenance of the data room.  The data room

8  went on line in May 2007.  Approximately 24 parties have

9  visited the data room to conduct due diligence.  He would

10  testify that prior to the petition date the debtors received 11

11  first round bids, and that the debtors, after review and

12  consideration of the bids, invited a majority of such bidders

13  to the second round of bidding.

14         He would further testify that second round bids were

15  due in early August and that several parties submitted further

16  bids along with marked copies of the asset purchase agreement.

17         He would further testify that after the filing of the

18  bankruptcy cases the debtors continued discussions with bidders

19  for several months.  Specifically, the debtor spent several

20  weeks exploring and negotiating a potential transaction with

21  Fortistar.  The debtors attempted to finalize an asset purchase

22  agreement with Fortistar but certain factors, including

23  difficulties in the credit market, prevented the debtors and

24  Fortistar from finalizing an agreement.

25         Finally, in February 2008 the debtors entered into an

**J&J COURT TRANSCRIBERS, INC.**

19

1    asset purchase agreement with Kelson Energy IV LLC.  The asset

2    purchase agreement with Kelson provided, among other things,

3    for the sale of substantially all of the debtors' assets for a

4    purchase price of $468 million.  He would further testify that

5    pursuant to this Court's bidding procedures order dated March

6    18th, 2008, qualifying bids were due by April 3rd, 2008.  The

7    qualifying bid was received on or before the bid deadline of

8    April 3rd, 2008, then an auction was to be scheduled for April

9    7th, 2008.

10          He would further testify that Global Infrastructure

11   and Management LLC and Fortistar, hereafter Fortistar,

12   submitted a bid on April 3rd, 2008.  The Fortistar bid package

13   contained a clean and black line of the asset purchase

14   agreement, evidence of financial wherewithal, and a specimen

15   letter of credit and draft escrow agreement.  He would further

16   testify that the debtors informed Fortistar that they were

17   reserving decision on whether Fortistar was a qualified bidder

18   because the debtors were attempting to clarify certain issues

19   regarding the bid.  He would further testify that discussions

20   with Fortistar continued throughout the weekend prior to the

21   auction, and that the debtors continued to communicate with

22   Fortistar during that time.

23          He would testify that the debtors represent -- he

24   would testify that the debtors' representatives of Fortistar,

25   Kelson, and the committee convened at the offices of Richards,

**J&J COURT TRANSCRIBERS, INC.**

1    Layton & Finger on the morning of April 7th, 2008, the date

2    scheduled for the auction.  He would further testify that the

3    auction did not commence on April 7th, 2008.  The debtors did,

4    however, continue their discussions with Fortistar regarding

5    their bid.  He would further testify that discussions with

6    Fortistar and the debtors continued into the afternoon on April

7    7th, 2008.

8            At some point during the afternoon hours of April

9    7th, 2008, the debtors informed representatives of Kelson that

10   an auction was not likely to take place that day, and that to

11   the extent that one did, the debtors would contact Kelson.  At

12   that time, Kelson's representatives departed.  The debtors then

13   informed Fortistar that they were not qualifying the Fortistar

14   bid at that time because of the open issues with respect to the

15   asset purchase agreement.  The debtors did indicate that they

16   would remain available throughout the day to continue

17   discussions with Fortistar regarding the open issues.

18   Representatives from Fortistar and the debtors continued their

19   discussions throughout the evening of April 7th, 2008.  By

20   April 8th, 2008 the open issues were resolved to the

21   satisfaction of the debtors and Fortistar submitted an amended

22   asset purchase agreement.  The amended asset purchase agreement

23   addressed the debtors' remaining concerns and increased the

24   purchase price to $500 million.

25           He would further testify that the debtors provided

**J&J COURT TRANSCRIBERS, INC.**

1   notice to all interested parties that an auction would commence

2   at one p.m. on April 8th, 2008.  At the auction the debtors

3   announced Fortistar as the highest and best bid.  He would

4   further testify that he understands that GIM Channelview

5   Cogeneration LLC is a limited liability company duly formed an

6   existing under the laws of the State of Delaware.  GIM is a

7   wholly-owned direct subsidiary of Global Infrastructure

8   Management LLC.

9        He understands that Global Infrastructure and

10  Fortistar together form the bid group for GIM.  Global

11  Infrastructure Partners A, LP, an affiliate of Global

12  Infrastructure, has committed funding for the purchase price.

13  He understands that Global Infrastructure is a $5.5 billion

14  private equity fund co-founded by G.E. Infrastructure and

15  Credit Suisse that invests in infrastructure assets.

16       He understands that Fortistar is an independent power

17  generation company owning and managing over 57 projects in

18  North America and totaling over 650 megawatts of generation

19  capacity.  He understands that Fortistar manages all of its

20  cogeneration projects.  He would further testify that sound

21  business reasons exist for the proposed transaction.  The

22  debtors, with the assistance of their professionals and

23  advisors, have marketed the assets for nearly a full year.

24  Prior to the petition date the debtors were unable to satisfy

25  their debt obligations from proceeds recognized from the

1  operation of the business.  Prior to the petition date the

2  debtors considered their strategic options regarding the

3  business.  The debtors ultimately determined that a sale of

4  substantially all their assets presented the best opportunity

5  to meet their objective of satisfying the claims of all

6  creditors in full.  He would further testify that in the

7  debtors' business judgment the Fortistar bid is the highest and

8  best offer received by the debtors and that the Fortistar

9  transaction is likely to close.

10      Additionally, he would testify that the consideration

11  received under the Fortistar asset purchase agreement is fair

12  and reasonable and will generate sufficient proceeds to pay all

13  claims in full and provide a substantial return to the debtors'

14  stakeholders.

15      Additionally, the proposed sale will allow the

16  business to continue as a going concern and will result in the

17  assumption and assignment of nearly all of the debtors'

18  executory contracts and unexpired leases.  He would further

19  testify that the proposed transaction is the product of good

20  faith, arm's length negotiations between Fortistar and the

21  debtors.  Fortistar is not an insider of the debtors, and

22  Fortistar and the debtors do not share any common officers or

23  directors.  And that would conclude the proffer of Mr.

24  Johannesen.

25      THE COURT:  Does anybody wish to cross examine at

**J&J COURT TRANSCRIBERS, INC.**

23

1  this time?

2          MR. GLENN:  Your Honor, on behalf of Kelson, I would

3  suggest, if Your Honor would indulge me, to hear the next

4  proffer so I can determine who best to cross examine, and then

5  --

6          THE COURT:  All right.  You may reserve, then.

7          MR. FINKELSTEIN:  I would like the same treatment,

8  Your Honor.  Mark Finkelstein --

9          THE COURT:  Of course.

10          MR. HEATH:  Your Honor, next the debtors would like

11  to offer the proffer of William H. Hardie, III regarding the

12  sale process, Your Honor.  If called to testify, Mr. Hardie

13  would testify as follows.  William Hardie is the managing

14  director of the restructuring group and the co-head of the

15  North American Energy Group at Houlihan Lokey Howard and Zukin.

16          Mr. Hardie joined Houlihan in the year 2000 and has

17  advised numerous clients through the restructuring process,

18  including Allegheny Energy Supply, Mayflower Energy, and Enron

19  Corp.  Mr. Hardie has extensive experience in energy related

20  cases, such as Energy New Orleans, National Energy and Gas

21  Transmission, and Calpine Corp.  Prior to joining Houlihan, Mr.

22  Hardie held the positions of executive vice president and

23  general counsel at Marvel Enterprises, as well as at Fleer/

24  Skybox International.  Before that, Mr. Hardie was an associate

25  at Jones Walker and Winthrop, Stimson, Putnam & Roberts, where

24

1  he practiced -- where his practice was focused on transactional

2  law, mergers and acquisitions and financings.  Mr. Hardie

3  graduated from the University of Alabama with a degree in

4  economics.  Mr. Hardie also earned a law degree from Vanderbilt

5  University.

6        He would testify that in April 20007 Houlihan Lokey

7  was retained by the debtors' parent, Reliant Energy, to assist

8  with the sale of the debtors' assets.  He would further testify

9  that he is the Houlihan representative primarily responsible

10 for overseeing the sale process.  In connection with this

11 assignment he is responsible for interfacing with potential

12 purchasers, assisting with due diligence issues, reviewing and

13 evaluating asset purchase agreements, and all other sale

14 related documents.  He would further testify that a robust sale

15 process has been proceeding since April 2007.  In early May

16 2007 Houlihan began contacting potentially interested

17 purchasers regarding the sale, including financial and

18 strategic buyers.  In total, over 115 potentially interested

19 purchasers were sent teasers and confidentiality agreements.

20 Approximately 38 parties executed confidentiality agreements.

21 He would further testify that the debtor set up a virtual data

22 room for interested purchasers to conduct due diligence.  The

23 data room went online in May 2007.  Approximately 24 parties

24 have visited the data room to conduct the due diligence.  He

25 would testify that in June and July of 2007 the debtors

**J&J COURT TRANSCRIBERS, INC.**

1  received 11 first round bids, and that the debtors, after

2  review and consideration of the bids, invited a majority of

3  such bidders to the second round of bidding.  He would further

4  testify that second round bids were due in early August, and

5  that several parties submitted further bids, along with marked

6  copies of asset purchase agreements.  He would further testify

7  that after the filing of the bankruptcy cases the debtors

8  continued discussions with bidders for several months.  In

9  particular, the debtor spent several months working with

10 Fortistar to finalize an asset purchase agreement.  He would

11 testify that problems in the credit market made it difficult to

12 finalize the asset purchase agreement.

13      In January of 2008, the debtors turned their

14 attention to Kelson.  The negotiations with Kelson progressed

15 fairly quickly, and in February 2008 the debtors signed an

16 asset purchase agreement with Kelson.  The asset purchase

17 agreement with Kelson provided, among other things, for the

18 sale of substantially all of the debtors' assets for a purchase

19 price of $468 million.  He would further testify that Global

20 Infrastructure Management LLC and Fortistar, hereafter

21 Fortistar, submitted a bid on April 3rd, 2008.  The Fortistar

22 bid package contained a clean and black line of the asset

23 purchase agreement, evidence of financial wherewithal, and a

24 specimen letter of credit and draft escrow agreement.  He would

25 further testify that he remained familiar with Fortistar given

**J&J COURT TRANSCRIBERS, INC.**

1 the substantial negotiations between the parties during the

2 bankruptcy cases, and that he reviewed information regarding

3 Fortistar's equity backer, and spoke to representatives from

4 Fortistar's banker as part of this due diligence regarding

5 Fortistar's financial wherewithal to consummate the proposed

6 transaction.  He would further testify that after reviewing

7 Fortistar's financial information he believes that Fortistar

8 has the financial wherewithal to consummate the transaction and

9 close the sale under the asset purchase agreement.

10         He would further testify that he believes that the

11 Fortistar bid is the highest and best bid for the debtors'

12 assets.  He would testify that the negotiations with Fortistar

13 were arm's length and conducted in good faith.

14         He would further testify that given the substantial

15 time and effort devoted to the sale process and the extensive

16 marketing of the debtors' assets that additional marketing of

17 the assets is unlikely to yield a higher purchase price.  And

18 that would conclude the proffer of Mr. Hardie.

19         THE COURT:  All right.  Does Kelson wish to --

20         MR. GLENN:  I will call Mr. Hardie to the stand,

21 please.

22         THE COURT:  All right.  If Mr. Hardie will take the

23 stand?

24                   (Pause)

25         THE COURT:  You should remain standing so you can be

**J&J COURT TRANSCRIBERS, INC.**

27

1  sworn, Mr. Hardie.

2          THE CLERK:  Raise your right hand, place your left

3  hand on the Bible.  State your full name, spelling your last

4  name for the Court.

5          MR. HARDIE:  William H. Hardie, H-a-r-d-i-e.

6           WILLIAM H. HARDIE, DEBTORS' WITNESS, SWORN

7          MR. COLLINS:  Your Honor, first I want to raise a

8  standing objection with respect to Kelson Energy.  They are at

9  best a disgruntled bidder in this process.  I think the law is

10 clear that disgruntled bidders do not have standing to come in

11 and challenge a sale of this nature.  And I wanted to put that

12 right before the Court at the outset so we don't spend a lot of

13 time on this if Your Honor agrees with the debtors' position

14 that Kelson should not be heard at this hearing.

15         THE COURT:  Well, as I did at the bid procedures, I

16 will allow them to be head on the issue of the fairness of the

17 process.

18         MR. GLENN:  Thank you.

19         THE COURT:  All right.  And just for the record, you

20 can confirm, Mr. Hardie, that the proffer of your direct

21 testimony is what you would have testified to had you been

22 called on direct?

23         THE WITNESS:  That is correct, Your Honor.

24         THE COURT:  All right.  You may cross.

25         MR. GLENN:  Thank you.  Your Honor, I'd like to mark

**J&J COURT TRANSCRIBERS, INC.**

Hardie - Cross/Glenn                                    28

1  as Exhibit 1 the bidding procedures order.  May I approach?

2              THE COURT:  Yes.

3              THE WITNESS:   Thank you.

4              THE COURT:  Do you have a copy for me?

5              MR. GLENN:  I do.

6              THE COURT:  Thank you.

7                        CROSS EXAMINATION

8  BY MR. GLENN:

9  Q    Mr. Hardie, do you recognize Exhibit 1, sir?

10 A    I do.  Yes.  It's the Court's bid procedures order that we

11 conducted the auction pursuant to.

12 Q    Okay.  I'd like to turn your attention, please, to the

13 paragraphs marked seven and eight for a moment.

14 A    I have them.

15 Q    Paragraphs 7 and 8 set forth the requirements for a

16 qualifying bid.  Do you see that?

17 A    Yes, I do.

18 Q    Okay.  And one of the requirements is set forth in

19 Paragraph 7D, which is a good faith deposit in the amount of

20 $40 million, correct?

21 A    That's correct.

22 Q    Am I correct that the Fortistar entities did not submit a

23 cash deposit until Monday of this week?

24 A    Cash deposit?

25 Q    Yes.

                    **J&J COURT TRANSCRIBERS, INC.**

Hardie - Cross/Glenn                    29

1  A    That's correct.

2  Q    Okay.  And the only thing that had been received by the

3  bid -- well, let me back up.  The bid deadline here is April

4  3rd of 2008 at five p.m., correct?

5  A    That's correct.

6  Q    As of that time am I correct that the only thing the

7  debtors had received was a blank form of letter of credit?

8  A    I wouldn't describe it as a blank form.  As was indicated

9  in my proffer, we received a specimen of the letter of credit

10 that had been provided to Wilmington Trust, the escrow agent.

11 As I'm sure counsel is aware, letters of credit are live

12 instruments, and as a consequence banks are loathe to hand out

13 more than one of them because they can all be used to be drawn,

14 and so, in order to ensure the security of the letter of credit

15 process, they sent us essentially the form of it and confirmed

16 that the original had been provided to Wilmington Trust.

17 Q    The Harbinger/Kelson bid, there was a cash deposit

18 provided, correct?

19 A    That's correct.

20 Q    Of $40 million, right?

21 A    That's correct.

22 Q    And the debtors still have that cash today, correct?

23 A    I believe it's being held by Wilmington Trust pursuant to

24 escrow arrangements.

25 Q    Okay.  And I didn't hear in your proffer, correct me if

**J&J COURT TRANSCRIBERS, INC.**

Hardie - Cross/Glenn                                    30

1  I'm wrong, that the debtors concluded that the Fortistar bid

2  was a qualifying bid on or before April 3rd, 2008, at five

3  p.m.?

4  A    I'm sorry.  Would you repeat the question?

5  Q    I must have missed this in your proffer.  Correct me if

6  I'm wrong.  Did you testify in your proffer that the debtors

7  actually concluded that the Fortistar bid was a qualifying bid

8  submitted on or before the April 3rd, 2008 deadline?

9  A    We ultimately concluded late Monday night, the 7th, that

10 after spending a considerable amount of time resolving open

11 issues with respect to the contract that was provided by the

12 Fortistar parties, and after having received the cash deposit

13 until the issues with respect to the letter of credit could be

14 worked out, that the Fortistar parties' bid was a qualifying

15 bid.

16 Q    Okay.  So, it wasn't until after you got the cash that you

17 qualified it as a bid?

18 A    Well, it was a combination of resolving the contract

19 issues that were reflected in the Fortistar bid, as well as

20 receipt of the cash, because as I indicated in the proffer, or

21 was stated by Mr. Collins during his opening remarks, it was

22 our preference to have the letter of credit issued in favor of

23 the debtors as opposed to Wilmington Trust as escrow agent, and

24 there were complications on Monday, the 7th, in getting a

25 replacement letter of credit.

**J&J COURT TRANSCRIBERS, INC.**

1  Q    Did the debtors demand that Fortistar provide an actual

2  cash deposit before it would qualify the bid?

3  A    We informed the Fortistar parties during the course of the

4  discussions on Monday that we would prefer a $40 million cash

5  deposit until such time as the letter of credit issues could be

6  resolved in terms of who the beneficiary was, etcetera, and the

7  escrow arrangements with respect to that letter of credit could

8  be resolved, you know, either -- you know, under the

9  appropriate circumstances either is acceptable as far as the

10 debtor is concerned.

11 Q    And one last line of questioning.  Isn't it the case, sir,

12 that you demanded that as a condition of the Fortistar bid

13 moving forward that Fortistar effectively match the

14 Kelson/Harbinger APA, asset purchase agreement?

15 A    Well, it's always been our position that were comfortable

16 with the terms of the APA that the Kelson/Harbinger Group

17 signed, and it was our goal to get a contract as good or better

18 as that contract, and as is reflected in the final version of

19 that contract that was ultimately accepted at the auction.  You

20 know, it's got a higher price of $500 million, and it's, in my

21 view, on terms that are at least as comparable to the

22 Kelson/Harbinger contract.

23 Q    And that contract, the final version of the contract,

24 resulted after a demand by the debtors to match the Kelson form

25 of APA, correct?

Hardie - Redirect/Collins                              32

1  A    Well, as I think I testified, I mean, there was a series

2  of negotiations that really lasted all day Monday, starting at,

3  you know, eight o'clock in the morning and ending around

4  midnight that resulted in the contract being in a form that we

5  considered to be acceptable.

6  Q    Am I correct that under either bid, the Kelson bid or the

7  Fortistar bid, all unsecured creditors are projected to be paid

8  in full?

9  A    That's correct.

10  Q    Thank you.  Nothing further.

11           THE COURT:  Any other cross of Mr. Hardie?  Any

12  redirect?

13           MR. COLLINS:  Yes, Your Honor.

14                    REDIRECT EXAMINATION

15  BY MR. COLLINS:

16  Q    Mr. Hardie, if you could turn to Paragraph 7 of the bid

17  procedures order that Mr. Glenn handed to you?

18  A    I have it.

19  Q    And turn to Paragraph 7D.  Could you just read 7D into the

20  record?

21  A    A good faith deposit in the amount of 40 million.

22  Q    Does it say -- in your opinion does that require a cash

23  deposit?

24  A    No.

25  Q    And is it, in your experience as an investment banker, is

**J&J COURT TRANSCRIBERS, INC.**

Hardie - Redirect/Collins                          33

1  it fairly routine for proposed purchasers to utilize a letter

2  of credit as the instrument for a good faith deposit?

3  A     Absolutely.

4  Q     Okay.  With respect to Paragraph 7B, can you read that

5  into the record, please?

6  A     A marked copy of the asset purchase agreement of Kelson

7  reflecting all changes made.

8  Q     And in your opinion was that to allow parties to make

9  changes as they desired to the form of the Kelson agreement?

10  A     Yes, that's correct.

11  Q     And does anything in Paragraph 7 require that the asset

12  purchase agreement submitted must be identical in all terms and

13  conditions as the Kelson agreement?

14  A     No.

15  Q     Okay.  And you noted in your testimony that the debtors

16  took their time to review and analyze the GIM agreement before

17  declaring it to be a qualifying bidder.  Why is it that the

18  debtors are not simply qualified at five o'clock on Thursday,

19  April 3?

20  A     There were a number of provisions included in the

21  submitted contract that we consider to be problematic in terms

22  of issues surrounding certainty of clothes, the length of time

23  that the offer -- that the contract was to remain open, and

24  consequently as was indicated both in your opening remarks and

25  my proffer, you know, spent the time during the day on Monday

**J&J COURT TRANSCRIBERS, INC.**

Hardie - Recross/Glenn                                    34

1  to essentially eliminate those issues from the contract that we

2  were prepared to accept and use as a competing bid for the

3  auction with Kelson.

4  Q    Okay.

5        MR. COLLINS:  I have no further questions, Your

6  Honor.

7        THE COURT:  Any recross?

8        MR. GLENN:  One housekeeping matter first, Your

9  Honor.  I move for the admission of Exhibit 1 into Evidence.

10        UNIDENTIFIED ATTORNEY:  No objection.

11        THE COURT:  It is admitted.

12                    RECROSS EXAMINATION

13  BY MR. GLENN:

14  Q    Sir, you can't deposit a letter of credit, can you?

15  A    The way letters of credit work, as I believe I testified

16  earlier, is they are essentially live instruments, allowing the

17  person who possesses them to make a draw on the institution

18  issuing them, and in the context of the concept of a deposit,

19  it would be effectively providing the beneficiary with the

20  original of the letter of credit, which is what happened here.

21  Wilmington, as escrow agent, was provided with a copy, or --

22  sorry, provided with an original of the letter of credit issued

23  by Citibank.

24  Q    And when did that occur?

25  A    Monday.  Sorry -- Thursday.

**J&J COURT TRANSCRIBERS, INC.**

1  Q     Thursday at what time?

2  A     Before five o'clock.

3  Q     Thank you.  Nothing further.

4           THE COURT:  All right.  Thank you.  You may step

5  down.

6           THE WITNESS:  Thank you.

7           MR. COLLINS:  Your Honor, the debtors do not have any

8  additional witnesses with respect to this aspect, 363 portion

9  of the hearing.  I believe that Mr. Dehney is, however,

10 prepared to put on a proffer with respect to his client's

11 adequate assurance of future performance.

12           THE COURT:  All right.

13           MR. MILLER:  I'm not Mr. Dehney.  Curtis Miller from

14 Morris, Nichols, Arsht & Tunnell on behalf of the purchase, GIM

15 Channelview Cogeneration LLC.  I first wanted to just make a

16 remark that GIM Channelview Cogeneration LLC, and I'll just

17 refer to them as GIM CV from here on out --

18           THE COURT:  Thanks.

19           MR. MILLER:  -- is pleased to be here as the winner

20 at the auction, Your Honor.  With regards to the proffer, GIM

21 Co. Channelview -- CV, LLC would put on the direct examination

22 testimony of Mr. Jonathan Bramm (phonetic).  If he were called

23 to testify, Your Honor, he would testify that he has received a

24 bachelor's in economics from Columbia College, that he is a

25 partner of Global Infrastructure Management LLC, and I'll just

**J&J COURT TRANSCRIBERS, INC.**

36

1  refer to them as GIM from here on out.  And GIM is the manager

2  of Global Infrastructure Partners A, LP.  And I'll just refer

3  them as GIP-A, Your Honor, and its affiliated funds.  GIP-A is

4  the 100 percent equity owner of GIM Channelview Cogeneration

5  LLC and GIM CV. was the winner at the auction for the purchase

6  of substantially all of the debtors' assets.

7         Mr. Bramm would testify, if called, that he has

8  worked for GIM since December of 2006, and that prior to

9  working at GIM he worked at Credit Suisse and its predecessor

10 companies from May of 1992 until he co-founded GIM.  While at

11 Credit Suisse he held a variety of senior management positions,

12 including co-head of the Global Industrial and Services Group,

13 Chief Operating Officer of the Global Investment Banking

14 Department, Senior Banker in the C.S. Global Energy Group.

15        At GIM, Mr. Bramm would testify that he is one of the

16 founding partners, as I've already said, and essentially that

17 he and the other members of the investment committee of GIM

18 manage the business of GIM.  GIM manages, in turn, GIP-A and

19 its affiliated funds, Your Honor.

20        Mr. Bramm would also testify that GIM manages GIP and

21 its affiliated funds, and that these funds were co-sponsored by

22 General Electric Corporation and Credit Suisse, and have $5.5

23 billion in commitments from its limited partner investors.  Mr.

24 Bramm would testify that of this $5.5 billion in commitments

25 approximately 1.2 billion has been committed to other

37

1   investments, leaving approximately $4.3 billion in uncommitted

2   funds.

3        GIM focuses its commitments in three sectors, in

4   energy, transportation, and water/waste, and these investments

5   are managed by, among others, the partners of GIM, who combined

6   have over 200 years of relevant industry experience.  If called

7   to testify, Mr. Bramm would state that GIM CV is a special

8   purpose entity formed by GIM for the acquisition of the

9   debtors' assets, and that GIM CV is a wholly-owned subsidiary

10  of GIP-A.  With respect to the capitalization of GIM CV Mr.

11  Bramm would testify that GIP-A and its affiliated funds will

12  capitalize GIM CV with sufficient equity to purchase all of the

13  debtors' assets.  This capitalization will not be market

14  dependent and will be guaranteed by GIP-A.

15       Additionally, Fortistar LLC has the option to

16  purchase up to ten percent of the equity in GIM CV.  GIP-A and

17  its affiliated funds will also provide working capital

18  sufficient to conduct operations.

19       If called to testify, Mr. Bramm would also state that

20  he is not aware of any officers, directors of the debtors, or

21  Reliant Energy Services that are employed at GIM or GIM CV.  He

22  would also testify that GIM did not engage in any collusion

23  with respect to the bidding for or the sale of the debtors'

24  assets.

25       If called to testify, Mr. Bramm would also state that

**J&J COURT TRANSCRIBERS, INC.**

1   he would characterize the negotiations with the debtors over

2   the asset purchase agreement to be extensive, with significant

3   discussions and back and forth on the terms of the asset

4   purchase agreement.  He would also testify that in his opinion

5   these negotiations were conducted at arm's length.  With

6   respect to the energy manager for GIM CV, Mr. Bramm would state

7   that GIM and GIM CV has selected Shell Energy North America as

8   the energy manager, and that GIM is presently negotiating a

9   definitive agreement with Shell.

10          Mr. Bramm would testify that he selected -- that GIM

11  and GIM CV selected Shell because it is one of the industry

12  leaders in energy management, that Shell has approximately

13  5,000 megawatts of power generation, sells more than 200

14  million megawatt hours of power annually, and has the fifth

15  highest volume of power sales in North America.  Additionally,

16  they are the second highest -- they have the second highest gas

17  sales in North America, and have also provided gas to Equistar.

18          Additionally, Mr. Bramm would testify that they

19  selected Shell because it has significant experience in energy

20  supply management, making it a good choice to be an energy

21  manager for this project.

22          With respect to an operations and maintenance

23  provider, Mr. Bramm would testify that GIM and GIM CV selected

24  the Wood Group.  GIM is also presently negotiating a definitive

25  agreement with the Wood Group.  With respect to the reasons why

**J&J COURT TRANSCRIBERS, INC.**

39

1  they selected the Wood Group, Mr. Bramm would testify that the

2  Wood Group is a leading O&M provider for power generating

3  facilities, and that the Wood Group presently provides O&M

4  Services to 32 generating facilities, has 22 long-term

5  maintenance contracts consisting of more than 11,500 megawatts

6  of power generation.  Mr. Bramm would also testify that the

7  Wood Group is also an experienced power generation operator,

8  having provided power generation services for more than 20

9  years.  Additionally, Mr. Bramm would testify that they checked

10  the Wood Group's references with GE and that they were

11  satisfied with the Wood Group's experience.

12         With respect to the role that Fortistar LLC will play

13  in GIM CV, Mr. Bramm would testify that Fortistar, which has 20

14  years experience in owning and operating cogeneration power

15  plants, will also provide management services and assist GIM CV

16  in supervising the activities of the Wood Group and Shell.

17         Mr. Bramm would also testify that GE Corporation --

18  that GIM and its affiliates have access to the operational

19  expertise of General Electric Corporation, who have an

20  approximate ten percent economic interest in the GIP funds.

21  And that would conclude his testimony, Your Honor.

22         THE COURT:  Thank you.  Does anybody wish to cross

23  examine that witness?  Mr. Brown?  All right.  I'll accept the

24  proffer, then.

25         MR. MILLER:  Thank you, Your Honor.

**J&J COURT TRANSCRIBERS, INC.**

40

1          MR. COLLINS:  Your Honor, before we close the record

2 with respect to this portion of the hearing, I would like to --

3 I probably should have done this earlier, but I want to make

4 sure it gets into the record.  First I would like to put into

5 the record a black line of all of the changes made from the

6 Kelson original asset purchase agreement to that which was

7 submitted by GIM.  I would also like to put in the record, and

8 I have copies here, a copy of the letter of credit, the

9 executed letter of credit that was, in fact, delivered, as Mr.

10 Hardie testified, to Wilmington Trust on Thursday, April 3.

11 May I approach, Your Honor?

12          THE COURT:  You may.  How are they marked?

13          MR. COLLINS:  They'll be marked Debtors' Exhibits 1

14 and 2, Your Honor.

15          THE COURT:  All right.  Any objection to those

16 exhibits?  They will be --

17          MR. GLENN:  One moment?

18          THE COURT:  Okay.

19                    (Pause)

20          MR. COLLINS:  May I approach, Your Honor?

21          THE COURT:  You may.  Thank you.

22          MR. GLENN:  Your Honor, I object.  There's no

23 foundation for this document.  It has not been --

24          THE COURT:  Please approach the microphone, or you

25 won't be part of the --

**J&J COURT TRANSCRIBERS, INC.**

41

1          MR. GLENN:  I'm sorry.  This document has not been

2    authenticated, there's no foundation for it, and it's hearsay.

3    So, on that basis I would object.

4          THE COURT:  And that is the specimen letter of

5    credit?

6          MR. GLENN:  Yes.

7          THE COURT:  Okay.

8                         (Pause)

9          MR. DEHNEY:  Good morning, Your Honor.  Robert Dehney

10   from Morris, Nichols, Arsht & Tunnell.  Your Honor, I have the

11   one that's not marked specimen.  Mr. Bramm is here, and if

12   called to testify he would state for Your Honor he authorized

13   the issuance of this letter of credit by Citibank and this is

14   what was transmitted to Wilmington Trust.  This is the same

15   thing you have, but with that specimen written on it.

16         THE COURT:  Okay.  Do you want to show that to

17   Kelson's counsel and see if they can agree that the specimen

18   copy is a true copy?

19                        (Pause)

20         UNIDENTIFIED ATTORNEY:  No objection.

21         THE COURT:  All right.  Then I'll admit Debtor's 1 as

22   a copy of the original.  And there's no objection to Debtor's

23   2.  That's admitted, as well.

24         MR. COLLINS:  Yes.  Thank you, Your Honor.  Your

25   Honor, before moving to the second part of the hearing we

**J&J COURT TRANSCRIBERS, INC.**

42

1  thought it might make sense to take a five or ten minute break

2  so people can reassemble a little bit around the tables?

3          THE COURT:  All right.  Are we going to have argument

4  on the first part, or are we going to go to the Equistar?

5          MR. COLLINS:  Your Honor, maybe we should reserve

6  argument until the end.  I don't believe there's really --

7          THE COURT:  Okay.

8          MR. COLLINS:  -- much to say with respect to the

9  first portion, so --

10          THE COURT:  All right.

11          MR. COLLINS:  -- we can save it for the end.

12          THE COURT:  I think GIM has an issue.

13          MR. DEHNEY:  One minute, Your Honor?

14                       (Pause)

15          MR. COLLINS:  Your Honor, Mr. Dehney, and I can't

16  disagree with him, I guess, if I was in his shoes, I think he

17  would like to have Your Honor's findings, if Your Honor deems

18  them to be appropriate, that GIM is, in fact, the winning

19  bidder for purposes of the auction, that the bid submitted is

20  the highest and best bid, and that the debtors have established

21  the necessary requirements under Section 363 for approval of

22  the transaction, provided that the balance of the issues with

23  Equistar are ultimately resolved in the debtors' favor.

24          THE COURT:  All right.  Well then, let me hear

25  argument, then, on that point.

**J&J COURT TRANSCRIBERS, INC.**

43

1          MR. COLLINS:  On the 363 issues, Your Honor?

2          THE COURT:  Yes.

3          MR. COLLINS:  Your Honor, as the testimony is clear,

4   and I think unrebutted, the debtors engaged in a substantial

5   and lengthy sale process.  The debtors contacted over 100

6   bidders over a ten-month time period, ultimately engaged in

7   discussions with two primary bidders, the first being Fortistar

8   during the summer, and fall, and even in the winter of last

9   year.  We then turned our attention to Kelson and were able to

10  obtain an executed agreement that provided substantial value to

11  the debtors' estates, such value that would pay all creditors

12  in full.  We then proceeded to seek approval of that agreement,

13  Your Honor, and engaged in an auction process, as was requested

14  by the creditors' committee, and then ultimately approved by

15  Your Honor.

16          The auction process itself, I think, it is clear and

17  unrebutted that it was a fair process.  The debtors did, in

18  fact, receive a bid by GIM by the bid deadline.  It contained

19  required documents and evidence of financial wherewithal as

20  required by the DIP procedures order, Paragraph 7.  And the

21  debtors took their time in a deliberative and appropriate

22  manner, Your Honor, to understand the transaction from cover to

23  cover.  This is a complicated transaction.  It is of

24  significant value.  I think it was appropriate for the debtors

25  to exercise their business judgment to have a number of

**J&J COURT TRANSCRIBERS, INC.**

44

1  conversations with GIM to fully understand that offer,

2  understand the financial wherewithal, and, Your Honor, to do

3  what we could to ensure that the debtors' estates obtained the

4  highest and best value possible for these assets.  And, in

5  fact, during that time period from the submission of the bid to

6  the ultimate commencement of the auction, the formal portion of

7  the auction on Tuesday, April 8th, the debtors, in fact,

8  increased that purchase price by almost $32 million.  I would

9  note that, Your Honor, we did keep all parties involved in this

10  process throughout the weekend.  Numerous conversations and

11  communications happened with Equistar and with the creditors'

12  committee, so they were fully involved in this sale process, as

13  well.

14        Ultimately, Your Honor, the auction itself took

15  place, we were on the record.  All parties were in attendance,

16  including Kelson.  They declined to bid, Your Honor.  And I

17  understand they have a litigation position they're announcing

18  today with their argument that it may not have been a

19  qualifying bid, or they may have some ability to walk away from

20  their back up bid.  Your Honor, those issues are really for

21  another day as to whether or not Kelson can argue that the

22  debtor somehow violated that asset purchase agreement and as a

23  result are entitled to their deposit back.

24        The sole issue before Your Honor today is whether or

25  not this offer is fair and reasonable, whether or not the

**J&J COURT TRANSCRIBERS, INC.**

45

1  negotiations were held at arm's length, whether there was fair

2  and appropriate notice of this hearing, and whether this entity

3  has shown adequate assurance of future performance under the

4  Section 365 standards.  Given the testimony of GIM's

5  representative, Mr. Johannesen and Mr. Hardie, we think the

6  record is unrebutted that the debtors have satisfied each and

7  every one of those requirements under Section 363.

8          THE COURT:  So, you are not asking me to decide the

9  issue as to whether Kelson is a qualified back up bidder and

10 obligated to proceed if GIM does not?

11         MR. COLLINS:  That is not before the Court today,

12 Your Honor.  We -- I will announce the debtors' position.  We

13 do think they are bound by the terms of that agreement.  We do

14 believe we're entitled to maintain their deposit.  If Kelson

15 disagrees with that, then they can bring the appropriate motion

16 or adversary proceeding before Your Honor for resolution.

17         THE COURT:  Thank you.  Well -- everybody in support

18 of the -- should go first.

19         MR. FINKELSTEIN:  Well, I guess what I want to say is

20 I'm not sure this is the procedurally proper place at which to

21 mention this, but to the extent that there's an assumption of

22 contracts associated with the sale that excludes an integrated

23 agreement, there may be adequate assurance issues with respect

24 to that aspect of it, so I simply want to reserve our rights

25 before the sale order is entered.  But as far as whether the

46

1   process was fair so far as it goes with the bidding having been

2   conducted in an aboveboard manner, we don't have an issue with

3   that, Your Honor.

4           THE COURT:  All right.

5           MR. STRATTON:  Good morning, Your Honor.  David

6   Stratton, Pepper Hamilton, for the official committee of

7   unsecured creditors.  Your Honor, I think, framed the issue

8   pretty well when you said that the disgruntled bidder had

9   standing to be head with respect to the issue of the fairness

10  of the process, and I think that's exactly the standard.  It's

11  not whether the precise legal requirements of an order were

12  followed to the T, but whether Kelson somehow or another was

13  treated unfairly.  We participated in the auction process.  We

14  observed what was happening.  The debtor did what debtors do

15  time and time and time again, going back to the very beginning

16  of my career -- they develop one of the competing bids so that

17  it was the best offer.  It provides $32 million to this estate.

18  Kelson's real complaint isn't that it was treated unfairly.

19  It's not saying some aspect of our bid was undervalued.  They

20  held an auction and we didn't know when or where it was going

21  to be.  What they're really complaining about is that they were

22  outbid.  That happens all the time.  It's not the basis to

23  disqualify the highest and best offer, which we have here in

24  the GIM bid.  We'd ask that Your Honor overrule that objection.

25          THE COURT:  Thank you.

                    **J&J COURT TRANSCRIBERS, INC.**

47

1          MR. GLENN:  Andrew Glenn on behalf of Kelson.  Your

2     Honor, I recognize that the testimony I elicited, and perhaps

3     my appearance today is a little unusual.  But this is plainly

4     an unusual case.  And I think the most important fact that Your

5     Honor should bear in mind, as you hear me out, is what Mr.

6     Hardie testified about the two bids.  Mr. Stratton's clients

7     are agnostic to the two bids.  There's no doubt -- and it's a

8     happy day for this Court -- both bids provide all creditors to

9     be paid in full.  There's no testimony to the contrary about

10    that.

11          So, the debtor here is -- is owned by Reliant Energy,

12    a large company, one shareholder, one ultimate shareholder.  If

13    this proceeding were a few blocks down the street in Delaware

14    Chancery Court, we wouldn't be here today.  We wouldn't be here

15    today because we wouldn't have gone through this process

16    because the equity holder has the discretion, in its business

17    judgment, to sell its stock and its assets for a price where

18    only it has a dog in the hunt.

19          So, just to back up a little bit, when the bidding

20    procedures were signed by the Court, they included a break up

21    fee.  Your Honor struck that break up fee from the bidding

22    protections.  As I sit here today, my clients have been used in

23    this process for one purpose.  They've set a floor of value

24    that will pay Mr. Stratton's clients off, will benefit Reliant

25    Energy, and now Reliant Energy gets the benefit because this

48

1    case is a couple blocks away from the Delaware Chancery Court.

2    So, we have a very simple position.  These auction procedures

3    were set up and agreed to by the equity holder, and Harbinger,

4    and Kelson.  It was a fair process to Reliant.  There's no

5    doubt about that.  Reliant stood up before the Court, supported

6    our break up fee, and Your Honor did not include that.

7          So, we look at this two ways.  Either we should get

8    that break up fee because Reliant agreed to it, or the

9    technical rules of Your Honor's bidding procedures order should

10   be followed to the T, because Reliant allowed them to be used

11   flexibly so we could profit from that.  And I think that's

12   inequitable, and I think it's inappropriate.  The testimony is

13   absolutely clear that Fortistar did not submit a cash deposit

14   until Monday of this week.  Monday.  There's no doubt that that

15   was after the bid deadline.  They submitted a specimen by the

16   bid deadline, but I don't think a letter of credit qualifies as

17   a deposit --

18         THE COURT:  Well, why do you think the letter of

19   credit is not a deposit?

20         MR. GLENN:  Because it's a letter of credit.  It's

21   not a deposit.  A deposit is, you know, depositing money in a

22   bank, and that's not what they did.  That's not what we did.

23   That's a defined term in the letter of credit, to give the

24   company a deposit in the Kelson APA, and we gave them the

25   money.  So, I'm not going to belabor the record with the

**J&J COURT TRANSCRIBERS, INC.**

49

1  technicalities of Mr. Hardie's testimony.  We made a cash

2  deposit.  They were ultimately required to make a cash deposit,

3  and that didn't occur until Monday of this week.  So, for that

4  reason, under Your Honor's bidding procedures order, an auction

5  should not have been held, and our bid should have been

6  accepted.  Thank you.

7            THE COURT:  Thank you.

8            MR. HANDELSMAN:  Excuse me, Your Honor.

9                         (Pause)

10           THE COURT:  Yes?

11           MR. HANDELSMAN:  Yes.  Your Honor, Lawrence

12  Handelsman, Stroock & Stroock & Lavan, counsel for Reliant

13  Energy.  I'll have to disagree with Mr. Glenn, respectfully, on

14  a couple of -- really the essential argument he makes.  It does

15  matter what Court we're in.  We're not two blocks away.  It

16  matters for a couple of reasons.  One, that, of course, was the

17  very argument that swayed you a couple -- two, three weeks ago,

18  in terms of the bidding procedures, and the break up fee, which

19  we did support, and which the debtor supported, and the

20  argument was made that, well, we're in Bankruptcy Court.  We

21  have to maximize the amount available for the estate.  And it

22  is not sufficient just to say that Mr. Stratton's clients and

23  the banks, who are not his clients, are going to be paid in

24  full.  The rest of today will be devoted to whether not

25  Equistar has an interest, how much of that interest it has, and

50

1 we won't get into that.  But clearly they believe, and to some

2 extent they share -- they believe that they share in the amount

3 available, and $32 million is -- and of the $32 million they

4 are a party in interest in this case.  This is about the -- the

5 rest of today will be about the cash flow participation

6 agreement, so it is not just Reliant, a shareholder, could sign

7 a contract without it being subject to higher and better bids

8 if we were two blocks away --

9         THE COURT:  Um-hmm.

10         MR. HANDELSMAN:  -- because we're not.  Secondly, we

11 disagree completely that the requirements of the bid procedures

12 were not followed.  Yes, there are meetings, as Mr. Stratton

13 says, and, in fact, that goes back before he started

14 practicing.

15                      (Laughter)

16         MR. STRATTON:  (Indiscernible) old, Larry.

17         MR. HANDELSMAN:  Well, you are, but -- but even under

18 the Bankruptcy Act, people got into a room and tried to bid up

19 the bidders.  But that's not the real issue.  The issue is the

20 deposit.  We disagree with Mr. Glenn that a deposit means you

21 walk into a bank with cash.  Mr. Hardie testified, and it was

22 unrebutted, that as the investment banker in charge of the

23 process, of the sale process, a letter of credit, the one that

24 was proffered, is drawable, you know, without any pre-

25 conditions.  A letter of credit was just as good as cash, from

51

1    that perspective.   The technical problem was one of time.   They

2    made it payable to the escrow agent rather than to the debtor.

3    They immediately agreed to make it payable to the debtor, but

4    time, over the weekend, didn't permit that, and so they

5    deposited cash as a stop gap.   We believe that the essence of

6    the requirement that a deposit be made to protect the estate in

7    an amount equal to or greater than the Kelson deposit was fully

8    satisfied in accordance with the terms of the bidding

9    procedures, so there's -- you're not being asked to do anything

10   that wasn't required.   It was a qualifying bid when made in a

11   timely fashion.   It was determined later -- as Mr. Collins

12   said, the debtors took, appropriately, some time to understand

13   it, and to bid it up, frankly, but, nevertheless, was

14   qualifying when made, and we urge you to so find.

15        THE COURT:   Thank you.   Well, let me rule thus.

16   First, let me say that the Bankruptcy Court does have the

17   obligation to protect not only creditors, but shareholders.

18   And this is a happy day that shareholders actually have an

19   interest.   But it's clear that shareholders are parties in

20   interest in bankruptcy cases whose rights are entitled to

21   protection.   Courts have the power to appoint equity

22   committees, shareholders are given distribution to the extent

23   that creditors are paid in full.   It's clear that they are a

24   party in interest in this case, and their rights should be

25   protected.   In looking at the facts as presented, I am

52

1  satisfied that the GIM bid was a qualifying bid.  The

2  requirements of Paragraph 7 were met by the deadline.  A

3  deposit was made.  A marked up asset purchase agreement was

4  submitted.  It did not require, as I read Paragraph 7, that the

5  debtor determine that the bid was qualified by that time, but

6  only that the bid be submitted by that time, and that makes

7  sense because bidders should not be at the whim of a debtor

8  determining whether their bid is qualified or not by a set

9  deadline.  So, the bidder did, in fact, comply with the

10 requirements.

11        In reading the original asset purchase agreement, it

12 does not state that the deposit must be in cash.  Although

13 that's been modified for purposes of this, I find that in

14 accordance with the original asset purchase agreement the

15 deposit of an LC does qualify as a good faith deposit.  The

16 fact that in negotiations with the debtor after the deadline

17 the terms of the asset purchase agreement in this respect were

18 changed does not change the fact that as of April 3rd the bid

19 was a qualified bid, and therefore the parties were permitted

20 to proceed on that basis.

21        In considering the continuance of the auction, I

22 don't really hear an argument that that was prejudicial, or not

23 permitted under the terms of the order, and even had that

24 argument been made I find that due notice was given to Kelson

25 of the continued auction, and Kelson was given the opportunity

**J&J COURT TRANSCRIBERS, INC.**

53

1 to appear and be heard at the auction when it was convened, so

2 I will conclude that the bid was an appropriate bid, and I hear

3 no objection that it was not the highest and best bid at the

4 auction.  I'll reserve on any other issue until after I hear

5 the remainder.

6         Let's take a break.  I'll hear my 10:30.  I think

7 that will be a short hearing, and it will give the parties a

8 chance to determine how they want to proceed with the rest of

9 the hearing.

10         UNIDENTIFIED ATTORNEY:  Thank you, Your Honor.

11         THE COURT:  We'll stand in recess.

12                    (Recess)

13         THE CLERK:  All rise.

14                     (Pause)

15         THE CLERK:  Be seated.

16         MR. STEARN:  Good morning, Your Honor.  May it please

17 the Court, Bob Stearn from Richards, Layton & Finger on behalf

18 of the debtors, and it's my responsibility to present the

19 second half of our sale motion today, the part dealing with

20 Equistar.  I think Ms. Fatell wants to address the Court.

21         THE COURT:  Okay.

22         MS. FATELL:  Good morning, Your Honor.  I think we

23 have a slight dispute as to who was putting on their case

24 first, and so I wanted to bring that before the Court.  The

25 debtor has presented their case-in-chief on the sale.  They've

**J&J COURT TRANSCRIBERS, INC.**

54

1  put on evidence as to the adequate assurance, the sale

2  procedures, etcetera.  Equistar has filed an objection to the

3  sale.  In fact, the debtors filed a response to that objection.

4  So, we believe that it should be our case to go forward and

5  present our objection and let the debtors respond.

6          MR. STEARN:  Your Honor, I was told that by my

7  friends during the break.  I was a bit surprised by what I see

8  as simply an unusual procedure.  Our sale motion not only

9  addressed the typical 363 issues, but it laid out all of the

10 issues with respect to the CFPA.  We were the ones who

11 identified the issues.  We filed our motion with respect to how

12 that CFPA should be treated.  We set forth very clearly in our

13 original motion that there were really four issues.  The CFPA

14 is in effect an equity participation right, it's a contract for

15 the payment of money --

16         THE COURT:  I know the issues.

17         MR. STEARN:  Okay.  Well, we set those issues forth

18 and then they objected on the grounds of those issues, and then

19 we replied.  And we intend to put on our evidence now as to why

20 we believe it's an equity participation right, why we believe

21 it's a contract for the payment of money, why it's not

22 otherwise objected to --

23         THE COURT:  All right.  Don't repeat the arguments.

24         MR. STEARN:  Sorry.

25         THE COURT:  I know what they are.

                    **J&J COURT TRANSCRIBERS, INC.**

55

1          MR. STEARN:  And then they can respond to them.

2          THE COURT:  All right.  I'm going to let the debtor

3    go first.  Let's see.

4          MS. FATELL:  I'm sorry.  One question, Your Honor.

5    Are we going to have brief opening statements?

6          THE COURT:  I would prefer not.  I've read all the

7    papers, so I think I know what the issues are, and -- hopefully

8    we can have closing argument.

9          MR. STEARN:  There will be a little, I think, Your

10   Honor.  Your Honor, as I've discussed with my friends, it's my

11   -- well, it's our intention, just so you know, to call four

12   witnesses in our case-in-chief.  Your Honor, we'll keep the

13   testimony as brief as we can.

14         THE COURT:  Okay.

15         MR. STEARN:  But the first two witnesses that we

16   intend to call in our case-in-chief are two employees from

17   Equistar --

18         THE COURT:  Well, you don't have to tell me --

19         MR. STEARN:  Okay.

20         THE COURT:  -- anything since I'm not having

21   openings.

22         MR. STEARN:  Okay.  I was just trying to give you an

23   idea where we were going.  So --

24         THE COURT:  Four witnesses?

25         MR. STEARN:  Right.  So, the first witness that I'd

**J&J COURT TRANSCRIBERS, INC.**

Teel - Direct/Stearn                                56

1  like to call is Mr. Teel as an adverse witness.

2          THE COURT:  All right.  You can take the witness

3  stand and remain standing so you can be sworn.

4          THE CLERK:  Raise your right hand, state your full

5  name, spelling your last name for the Court.

6          MR. TEEL:  Lawrence Teel.

7          THE CLERK:  Spell your last name, please?

8          MR. TEEL:  T-e-e-l.

9          LAWRENCE TEEL, DEBTORS' WITNESS, SWORN

10          THE COURT:  All right.

11                     DIRECT EXAMINATION

12  BY MR. STEARN:

13  Q    Good morning, Mr. Teel, welcome back to Delaware.

14  A    Good morning, Mr. Stearn.  How are you?

15  Q    I'm fine.  Thank you.

16          MR. STEARN:  Your Honor, I think I should start out

17  by passing out a few binders that I intend to use.  If I may

18  approach?

19          THE COURT:  You may.  I don't have one here?

20          MR. STEARN:  (Indiscernible).

21          THE COURT:  Okay.

22          MR. STEARN:  Your Honor, as you're probably aware,

23  the case has moved forward sort of rapidly.  We have some

24  confidentiality issues.  I'm going to be sensitive to that as I

25  use these documents, and when we go to make essentially this

**J&J COURT TRANSCRIBERS, INC.**

Teel - Direct/Stearn                    57

1 binder a part of the public record we'll essentially submit one

2 in redacted form, but I'm not going to cover, in the existing

3 documents here, any of the things that are, in fact,

4 confidential.

5          THE COURT:  Okay.

6          MR. STEARN:  Thank you, Your Honor.

7          THE COURT:  I'm sure counsel will object if you are.

8          MR. STEARN:  I think that's right.

9 Q    Good morning again, Mr. Teel.

10 A    Good morning.

11 Q    Sir, I'd like to chat with you first about your original

12 responsibilities for the project that ultimately became the

13 Channelview Cogeneration facility.  From 1998 until 2000 or

14 2001 you were the Director of Materials Management for

15 Lyondell, is that right?

16 A    Yes.

17 Q    And that was essentially purchasing, right?

18 A    Yes.

19 Q    You had responsibility for purchasing, among other things,

20 electricity?

21 A    That's correct.

22 Q    And in your capacity as a Director of Materials Management

23 you had responsibility for the project that ultimately became

24 the Channelview Cogeneration facility, right?

25 A    Yes.

**J&J COURT TRANSCRIBERS, INC.**

Teel - Direct/Stearn                              58

1  Q    You were project director for the Channelview Cogeneration

2  facility, weren't you?

3  A    Yes.

4  Q    And in your capacity as project director, and I'll list a

5  few things, see if we can speed it up, you oversaw the

6  initiation of the project, the process to develop requests for

7  proposal, the bid strategy, the bid negotiations, the selection

8  of a provider, obtaining necessary internal approvals for the

9  project, and negotiation of the final documents, right?

10 A    Yes.

11 Q    Now, you haven't had any responsibilities, however, for

12 the Channelview Cogeneration facility since about 2000 or 2001,

13 is that right?

14 A    That's correct.

15 Q    And with the exception of preparing for your deposition,

16 the last time you looked at the project agreements was probably

17 2000 or 2001, right?

18 A    That's correct.

19 Q    Sir, I'd like to walk you through a few documents.  They

20 going to be familiar to you.  We talked about them just last

21 week.

22 A    Okay.

23 Q    Sir, if you would open up the binder that I've placed

24 before you.  It's a series of debtors' hearing exhibits.

25 A    Okay.

**J&J COURT TRANSCRIBERS, INC.**

Teel - Direct/Stearn                                    59

1  Q    I'm going to have to orally renumber a few of them since

2  we've already taken up one and two, and I had one and two in

3  here.  But for the record, in my binder I'll make Debtors' 1

4  and Debtors' 2 Debtors' 1A and Debtors' 2A.  Let's turn to the

5  first document in your book if we could, sir.  It's behind

6  Exhibit 1.  And you'll see it's got the sticker on it, Debtors'

7  -- well, Debtors' 1, but it's Debtors' 1 A.

8  A    Okay.

9  Q    And, sir, this is Equistar's original request for

10 proposals for the cogeneration facilities, right?

11 A    Yes, I believe it is.

12 Q    And you reviewed a draft of this -- I'll call it an RFP,

13 and provided comments on that draft, right?

14 A    Yes.

15 Q    And you approved the sending of this RFP, right?

16 A    Yes.

17 Q    Now, if we could just focus on a few of the lines in the

18 RFP, I'd like to look at the second paragraph, it's the one

19 that starts, "Equistar currently consumes."

20 A    Okay.

21 Q    Do you see that?

22 A    Yes.

23 Q    In the second line it says, "We are interested in reducing

24 our costs."  Do you see that?

25 A    Yes.

**J&J COURT TRANSCRIBERS, INC.**

1  Q    That line says, "We are interested in reducing our costs

2  for steam and electricity through projects using cogeneration

3  technology."  That was one of the key issues for -- excuse me

4  -- that was one of the key reasons for issuing the RFP, right?

5  A    Yes, it was.

6  Q    And the Channelview Cogeneration facility has, in fact,

7  allowed Equistar to do that, to reduce its costs for steam and

8  electricity, right?

9  A    Yes.

10 Q    Let's look at the last sentence of Debtors' 1A if we

11 could.  It says, "Value added services are of interest where a

12 partner could contribute to our goal of reducing energy

13 consumption at Equistar's facilities and optimizing its use."

14 Now, you didn't object to the use of the word partner in your

15 request for proposal, did you?

16 A    We used the word partner here in a commercial sense, just

17 like we would with our suppliers, with our customers.  Clearly

18 the word implies, you know, some kind of give and take, some

19 kind of working together over a period of time to, you know,

20 provide a -- and find a mutual benefit to whatever project we

21 pulled together.  So, I absolutely did not object to the word

22 partner.

23 Q    So, let's go back to my original question.  You didn't

24 object to the use of the word partner in the last sentence on

25 the first page of Debtors' Exhibit 1, did you?

**J&J COURT TRANSCRIBERS, INC.**

Teel - Direct/Stearn                                    61

1  A    I did not because it was used in a commercial sense.

2  Q    And you didn't hear anyone else object to the use of the

3  word partner anywhere in the RFP, did you?

4  A    I believe they viewed the word to be used in that sense.

5  Yes.

6  Q    It would be helpful, sir, if you could answer my question.

7  Did you hear anybody else object to the use of the word partner

8  in the request for proposal?

9  A    I did not hear anyone object to it in the sense that it

10 was used.

11 Q    Sir, let's look, if we could -- if you would turn to --

12 and I'm going to -- remember the Bates labels at the bottom

13 right hand corner of the page?  It's easier to use those to

14 flip pages.  I'm going to turn to Page 4754, which is the third

15 page in the document.  And we're going to walk through a couple

16 of lines on this page.

17 A    All right.

18 Q    In what is essentially the fourth paragraph it says, "We

19 offer."  Do you see that?

20 A    Yes.

21 Q    "We offer a prospective partner significant opportunity to

22 create value through the use of Equistar's large thermal demand

23 in several locations, land infrastructure, fuel availability,

24 and geographic diversity."  Once again, no objection to the use

25 of the word partner in that sentence on your behalf, right?

**J&J COURT TRANSCRIBERS, INC.**

Teel - Direct/Stearn                      62

1  A    Again, it was used in a commercial sense, and I absolutely

2  didn't object to it.

3  Q    Nor did anybody else, right?

4  A    Nor did anyone else.

5  Q    Now, let's look at the next paragraph that says value to

6  Equistar.

7  A    Okay.

8  Q    Let's just read part of that to move along.  The fourth

9  line down says, "Our partner."

10  A    Okay.

11       MR. STEARN:  Excuse me one second, Your Honor.  I

12  have a drier mouth than I anticipated.

13                      (Pause)

14  Q    Oh, I did want to ask you, sir, one other question about

15  Paragraph 4.  That essentially sets forth what Equistar's

16  potential contribution was going to be to the project, doesn't

17  it, thermal demand, land, infrastructure, fuel availability,

18  geographic diversity, right?

19  A    Those were some of the things that we were offering at the

20  time of the proposal.

21  Q    Okay.  So, let's go back to the fifth paragraph.  It says

22  our partner would have the benefit of excess electricity sales

23  and the land Equistar would provide in return for providing the

24  steam and electricity to Equistar at production cost, which is

25  fuel plus operating and maintenance expense.  So, essentially,

Teel - Direct/Stearn                                          63

1  in exchange for construction of the Channelview facility the

2  bidder would get to use Equistar's land and would be able to

3  sell excess electricity, and Equistar would get steam and

4  electricity at production cost, right?  I mean, that's what

5  that says?

6  A    That's what that says, but that's not the way the

7  agreements ended up.

8  Q    Well, and once again, no objection to the use of the word

9  partner in that paragraph, right?

10 A    I mean, again, we didn't change our use of the word

11 partner from paragraph to paragraph, so --

12 Q    Well --

13 A    -- it was always used in a commercial sense.

14 Q    Well, let's see how many more times it was used.  The

15 seventh paragraph on shared risk and shared reward.  As a

16 producer of ethylene and propylene, Equistar is familiar with

17 the boom and bust nature of commodity markets.  We might have

18 interest in structuring a venture so that both partners share

19 in the risks and rewards associated with the sale of

20 electricity.  Now, the reference to both partners, that's

21 Equistar and the bidder, right?

22 A    Yes.  Probably -- yes.

23 Q    Now, the sentence says you might have interest there.

24 Shared risk and shared reward was not actually, at least in the

25 initial proposal, required by Equistar in proposals for the

**J&J COURT TRANSCRIBERS, INC.**

noneTeel - Direct/Stearn                    64

1 Channelview Cogeneration facility, was it?

2 A    None of these things were required.  We were seeking the

3 benefit of a provider's thinking as to what best way we could

4 work with them to arrange a facility.  So, for instance, there

5 would be give and take in regard to the price of steam and the

6 price of power to finance the facility.  So, when we referred

7 to partner, that's really how we were going to be working with

8 the provider to make sure that we were flexible on the prices

9 of these commodities to get the project financed.

10 Q    Well --

11 A    Equistar ultimately provided the majority of the

12 commitment in regard to financing through fixed payments.

13 Q    I appreciate that, but it's going to go a lot quicker if

14 you just answer my questions.  But let me ask another one.  The

15 shared risk/shared reward concept, that's the only paragraph on

16 Page 4754 of Debtors' 1A that uses the words might have

17 interest, isn't it?

18 A    I haven't looked through the whole thing, so if you say

19 so.

20 Q    Let's take a look at the last paragraph.  It says, "We

21 understand that because this process is capital intensive that

22 a long term partnership will likely be desirable."  Do you see

23 that?

24 A    Yes.

25 Q    And once again you didn't object to this slightly

1  different phrase, long term partnership, in the RFP, did you?

2  A    What that refers to is long term contracts for steam and

3  power to finance the facility, and that we would work together

4  with Reliant to get that done.  So, again, no, I didn't object

5  in that regard.

6  Q    Let's turn to Teel Exhibit 2 -- I'm sorry.  It was Teel 2

7  in your deposition.  It's also Debtors' Exhibit 2A in the

8  binder in front of you.  On its face it's a December 18, 1998

9  Reliant Energy Partnering proposal, and my question to you,

10 sir, is this Houston Industries' response to Equistar's RFP?

11 A    Yes.  It appears to be.

12 Q    And Houston Industries became Reliant, right?

13 A    Yes, they did.

14 Q    And in or about December of 1998 you reviewed Houston

15 Industries' response to Equistar's RFP, right?

16 A    Yes, I did.

17 Q    Okay.  Let's take a look at some of the information in

18 that response. If you would turn to the Bates page 965?

19 A    Okay.

20 Q    And I'll read a little bit of the first paragraph.  It

21 talks about value to Equistar, H-I-W-E-G proposal.  That, once

22 again, was Houston Industries, or Reliant, right?

23 A    Yes.  Houston Industries Wholesale Electric Group I think

24 is what it stands for.

25 Q    And that paragraph says, "Equistar invests no capital

Teel - Direct/Stearn                                    66

1  since HIWEG will fund the entire cogeneration and service

2  projects.  Equistar receives power at a discount of

3  approximately 30 percent to current price and 21 percent

4  discount to forecast market price, or approximately 105 million

5  of estimated savings over 20 years.  Equistar receives reliable

6  steam supply at the cost of fuel used to generate the steam,

7  thereby avoiding equipment investment (capital O&M

8  depreciation)."  Equistar has, in fact, been receiving power at

9  a discount, right?

10 A     Well, it depends on what you mean by discount.  We -- I

11 don't know what the current price/power relationship is, but

12 certainly we got a more favorable price than we were currently

13 paying.  But it was high enough to finance the project.  Again,

14 you have to remember that this was give and take between the

15 lenders and the host, which was Equistar, as well as this

16 service provider, which was Reliant.

17 Q     Have you been receiving power at a discount to the market

18 price?

19 A     I don't know.

20 Q     Has Equistar been receiving steam at the cost of fuel used

21 to generate the steam?

22 A     At -- I believe that's correct.  I believe it's -- the

23 situation is -- it's very close to the price that we could

24 generate steam for, but it's the cost at which the project

25 generates steam, yes.

**J&J COURT TRANSCRIBERS, INC.**

Teel - Direct/Stearn                    67

1  Q    Well, if you're actually able to generate steam at -- you

2  pay less for the generation of steam at the project than you

3  were paying on your own before the project, right?

4  A    Yes.

5  Q    And you were generating your own steam before the project,

6  right?

7  A    Yes, we were.

8  Q    And discounted power and steam were important benefits to

9  Equistar, right?

10  A    Yes, they were.

11  Q    Okay.  Let's take a look at the second point on Page 965

12  of Debtors' 2A.  It says, "Goal, collect up front value, HIWEG

13  proposal 20 million up front to Equistar attributable to

14  cogeneration."  And, in fact, Reliant provided Equistar with 20

15  million in advance cash flows, right?

16  A    Reliant did.

17  Q    And you considered $20 million in advance cash flows to be

18  an important benefit to Equistar, right?

19  A    Right.  It was an important benefit, and if you -- you

20  know, referring to the previous proposal, I mean, it -- there

21  was not -- I mean, it says Equistar invests no capital, that's

22  not correct either --

23  Q    Well, I haven't asked you that question, sir, but I

24  appreciate --

25  A    I know, but it relates to the advanced cash flow piece.  I

**J&J COURT TRANSCRIBERS, INC.**

Teel - Direct/Stearn                                    68

1   mean, you're talking about the commitment up front.  The

2   commitment up front wasn't negative.  I mean, that's what's

3   important to understand.  We did invest over $50 million in

4   this project, and yes, we did get 20 million from Reliant.

5   Q    And that $50 million was to build essentially -- I'll say

6   the word pipes, because I don't know the right word, but to

7   carry the steam to the facility, right?

8   A    Yes, it was.  And the interconnects associated with it,

9   which I think you referred to as expensive plumbing, but -- it

10  is expensive plumbing.

11  Q    Sir, the third paragraph on Page 965, shared risk/shared

12  reward.  "Goals, share risk and reward of electricity sales.

13  HIWEG proposal -- HIWEG and Equistar will share the proceeds of

14  the projects ultimately equally."  Do you see that?

15  A    Yes.

16  Q    And that's the concept that ultimately became embodied in

17  the cash flow participation agreement, or the CFPA, right?

18  A    The concept behind the CFPA was to make sure that we

19  fairly shared the benefit of this project appropriately between

20  the two parties that were committing to the project.  The steam

21  and the power prices had to be sufficiently high to justify and

22  get the financing secured.  The CFPA then helped cover the

23  additional benefit from the project and split it fairly between

24  the two parties.  We could not have lowered steam price, or

25  lowered power price further to enable us to fairly break up

Teel - Direct/Stearn                                69

1  that benefit.  You know, as a result, a CFPA was constructed to

2  do that.

3  Q    So, the answer to my question is the concept in this

4  paragraph on shared risk and reward was ultimately embodied in

5  the CFPA, right?

6  A    I don't know about shared risk and reward.  I would

7  definitely say shared benefit.

8  Q    Okay.  Let's take a look at Page 974 if we could.  And

9  let's talk about the shared benefits, so to speak.

10  A    I'm sorry?

11  Q    974.  I'm still using the Bates numbers.  And for the

12  record, I'm still in Debtors' 2A.

13  A    Okay.

14  Q    The last bullet point on the bottom on revenue sharing?

15  A    Yes.

16  Q    The very last sentence, which starts in the second to last

17  line says the sharing payment to Equistar was considered a

18  royalty payment in order to receive a tax deduction for the

19  project, right?

20  A    Yes, it says that.

21  Q    And you certainly agree that obtaining a tax deduction is

22  one of the reasons that the sharing payment to Equistar was

23  structured as a royalty payment, right?

24  A    No, I can't tell you the reason that they structured it

25  that way.  That you'd have to ask Reliant why they structured

**J&J COURT TRANSCRIBERS, INC.**

Teel - Direct/Stearn                                    70

1   it that way.  This was their proposal.

2            MR. STEARN:  Can I have his deposition, please?

3            UNIDENTIFIED ATTORNEY:  I gave them to you.

4            MR. STEARN:  I'm sorry, Your Honor.  Just a little

5   logistical snafu.

6                         (Pause)

7            MR. FINKELSTEIN:  Your Honor, may I confer with

8   counsel for just a second?

9            THE COURT:  Yes, you may.

10                        (Pause)

11           MR. STEARN:  Your Honor, may I approach?

12           THE COURT:  You may.

13  Q    Sir, I was once again talking to you about whether or not

14  the concept of shared risk/shared reward was ultimately

15  embodied in the CFPA.  And then I asked you about the royalty

16  payment issue and whether obtaining a tax deduction is one of

17  the reasons that the sharing payment to Equistar was structured

18  as a royalty payment.  And you may recall we talked about that

19  for a bit in your deposition.  And I'd like to take you to Page

20  115 of your deposition if you would.

21  A    Okay.

22  Q    And I asked you, on Page 115, Line 2, "Do you recall

23  discussing that particular concept with anyone at either

24  Equistar or Reliant, that the sharing payment to Equistar was

25  considered a royalty payment in order to receive a tax

**J&J COURT TRANSCRIBERS, INC.**

Teel - Direct/Stearn                                          71

1  deduction for the project?"  You said, and this is just last

2  Thursday, right?  "We probably asked some clarification

3  questions to make sure we understand what they were talking

4  about, but, you know, I don't necessarily remember that

5  concept.  I think, you know, there was this whole talk about

6  are we going to have equity in this project or not, and it was,

7  in fact, their stance that we weren't going to have equity in

8  this project, and I think that's one of the reasons that they

9  structured it this way, and I think that they got the benefit

10 of that through this tax deduction."  That was your testimony

11 just last week, right?

12 A    Yes, it was.

13 Q    Okay.  Now, Equistar wasn't opposed to having equity in a

14 Channelview Cogeneration project?  That's just the way the deal

15 ended up getting structured, right?

16 A    That's correct.

17 Q    You weren't really focused on how the payment was

18 characterized?  You were more focused on the value to be

19 delivered, right?

20 A    It depends on what you mean.

21        MR. FINKELSTEIN:  Objection to the form of the

22 question.

23        THE COURT:  Overruled.  You can answer.

24 A    I'm sorry.  I didn't understand the question.

25 Q    Let me try it again, and maybe I'm speaking too quickly.

**J&J COURT TRANSCRIBERS, INC.**

Teel - Direct/Stearn                                72

1  And if there's some part of it, you know, we'll work through

2  it.  You weren't really focused on how the payment was

3  characterized.  You were more focused on the value to be

4  delivered to Equistar, correct?

5  A    We were focused on the value -- the overall project value,

6  and how it was split I think was important because there had to

7  be so much fixed commitment to the lenders.  Again, you know, I

8  think I've prefaced all my comments with, I think, but yes, we

9  were -- we wanted to make sure that we -- that we received

10 adequate value -- adequate benefit from the project, and how we

11 got that benefit, but we were satisfied that it would come

12 through this royalty payment.  And I guess that's what you're

13 asking.

14 Q    So, you weren't really focused on how the payment was

15 characterized?  You were more focused on the value to be

16 delivered to Equistar, right?

17 A    I think that's correct.  Yes.

18 Q    Now, let's flip ahead, if we could, to the third document

19 in your binder.

20            THE COURT:  Does somebody have a Blackberry on the --

21 thank you.  Go ahead.  Where are we?

22            MR. STEARN:  I'm sorry, Your Honor.  It's Debtors' 3.

23            THE WITNESS:  Are we on Exhibit 3?

24            THE COURT:  Yes.

25            THE WITNESS:  (Indiscernible)?

**J&J COURT TRANSCRIBERS, INC.**

Teel - Direct/Stearn                                73

1        MR. STEARN:  Yes, sir.  You can put that aside,

2   unless you make me take it out again.

3        THE WITNESS:  I used the word I think.

4   Q    Sir, let's just focus for a moment, if we could, on

5   Debtors' Exhibit 3 that's, once again, behind Exhibit 3 in your

6   binder.  Now, you'll see it's, once again, an energy partnering

7   proposal.  It's dated December 14, 1998.  This appears, on its

8   face, to be a Powerpoint presentation of the information we

9   just looked at.  You've seen this document before, right?

10  A    Yes.

11  Q    And let's turn to Page 946 of this document.  It's about

12  the fourth page in, and just for the benefit of the record it's

13  Debtors' Exhibit 3.  And I'd like to focus on the first -- call

14  it a bullet point, call it a diamond point at the top of that

15  page, by the way, there's a reference to LCC.  That's Lyondell

16  Chemical Corporation, right?

17  A    Yes, it was.

18  Q    And that was Equistar's parent?

19  A    Yes.

20  Q    Okay.  And it says, in the first bullet point, under value

21  overview on Page 946 of Debtors' Exhibit 3, the following:

22  "Effectively, LCC becomes 50 percent partner in $440 million

23  project with no capital investment.  LCC receives a percentage

24  of after tax profits in accordance with a formula which allows

25  H.I. or reliant to recover its equity return, then increasing

**J&J COURT TRANSCRIBERS, INC.**

Teel - Direct/Stearn                                    74

1  LCC's share to 50 percent."  Do you see that?

2  A    Yes.

3  Q    Now, you don't recall anyone at Equistar or Reliant

4  voicing an objection to the characterization of -- I'm sorry.

5  You don't recall anyone at Equistar or Lyondell voicing an

6  objection to the characterization of Equistar's or Lyondell's

7  effectively becoming a 50 percent partner in the Channelview

8  Cogeneration project, do you?

9  A    Again, it depends on what you mean.  I mean, yes, they did

10 object -- Reliant did specifically object to us becoming a

11 legal partner as you have characterized it, as a commercial

12 partner, as a participant, no, that was the concept that we

13 were trying to share the benefit of this project.

14 Q    Let me see if I can focus you on my question, sir.  Would

15 you turn to Page 123 of your deposition?

16                          (Pause)

17 Q    Tell me when you have it, please?

18 A    Okay.

19 Q    And in Line 3 I asked the following question:  "Do you

20 recall at any presentation, and in particular, anyone from

21 Equistar or perhaps Lyondell voicing an objection to the

22 characterization of Equistar or Lyondell effectively becoming a

23 50 percent partner in the Channelview Cogeneration project?"

24 And your answer was, "No, I don't."  Right?

25 A    Again, yes, but it depends on how you're using the word

**J&J COURT TRANSCRIBERS, INC.**

Teel - Direct/Stearn                                    75

1  partner.  We can talk about this.

2  Q    Well, it didn't say you would be a partner.  It said you

3  would effectively become a partner.  Correct?  Effectively a 50

4  percent partner?  That's what the document said, right, Mr.

5  Teel?

6  A    Yes.  That's what the document says.

7  Q    Let's just turn pages if we can, in your binder.  I'm now

8  on Debtors' Exhibit 4.  Debtors' Exhibit 4 on its face, just

9  for the record, starts out with an agenda dated February 12th,

10  1999, and its attachment is a power team review dated February

11  4, 1999.  Now, this document that we've identified as Debtors'

12  4, Mr. Teel, you've seen this document before, right?

13  A    Yes.

14  Q    And Meyer Day (phonetic) was your attorneys for the

15  Channelview Cogeneration project, right?

16  A    Yes.

17  Q    And if we look at the second page, the power team, there

18  was an Equistar power team that was involved in the analysis of

19  the proposals received by Equistar, right?

20  A    That's correct.

21  Q    And if we turn to Page 879 of Debtors' Exhibit 4, this is

22  essentially an overview of the economics of the proposals

23  received by Equistar at that time, correct?

24  A    Yes.

25  Q    Okay.  Now, if we looked in the left hand column, again,

**J&J COURT TRANSCRIBERS, INC.**

Teel - Direct/Stearn                                    76

1  Houston Industries ultimately became Reliant, right?

2  A    Yes.

3  Q    And if we start in the Houston Industries -- well, we

4  start with Houston Industries, read across the row, and we get

5  about five or six cells over, and we see profit share, right?

6  A    Yes.

7  Q    And it says, ten percent at start, increasing to 50

8  percent after 18 percent return reached.  That was ultimately

9  embodied in the cash flow participation agreement, right?

10 A    Yes.

11 Q    Now let's turn to Page 880 if we could?  It's simply the

12 next page.  Page 880 of Debtors' Exhibit 4 reflects a more

13 detailed comparison of the components of value and the total

14 value of the project to Equistar with each of the key bidders,

15 right?

16 A    Yes.

17 Q    And on the left hand side H.I. is just -- this is the

18 abbreviation for Houston Industries, right, or Reliant?

19 A    Um-hmm.

20 Q    I'm sorry.  Did you say yes?

21 A    Yes.

22 Q    Thank you.

23 A    Yes, I said yes.

24 Q    Thank you.  And the upside base and downside cases

25 essentially reflect different energy market projections, right?

**J&J COURT TRANSCRIBERS, INC.**

Teel - Direct/Stearn                                77

1  A    Yes.

2  Q    And if you read across the page once again, you know,

3  looking at the columns, you're going to see a column for upside

4  equity participation, right?  Do you see that?  It's most of

5  the way to the right?

6  A    I see that.

7  Q    And upside equity participation is at sort of the very top

8  of this spreadsheet, and then there's kind of subcategories

9  below it, right?

10 A    Yes.

11 Q    And this subcategory on -- I mean, this reflects the value

12 of the sharing of the cash flow generated by the Channelview

13 Cogeneration project, right?

14 A    That's what that column shows based on the way the

15 proposal was presented to us.

16 Q    Right.  And now, the --

17 A    But again, you know, you keep breaking these things up

18 into three separate pieces.  They really weren't three separate

19 pieces.  It was you had to have the steam and power high enough

20 to finance the project, and it was their concept to build this

21 very large plant and for us to accept this very high steam

22 demand, and the way to be compensated for that was to, you

23 know, participate in this profit sharing, or this royalty

24 payment, or this cash flow participation agreement.  And so, I

25 mean --

**J&J COURT TRANSCRIBERS, INC.**

Teel - Direct/Stearn                                    78

1  Q    I --

2  A    -- there wasn't -- you can see the concept here.  These

3  were just ways to split up the benefit of this project, not

4  necessarily each one of these things in passing.

5  Q    I appreciate that, sir, but I'm just breaking up the

6  document, and my question is the way you folks broke up the

7  document back in 1999.  So, let me ask you another question.

8  Under profit sharing in the -- essentially reading across it in

9  the Reliant row, that is, at least, a present value calculation

10 of the anticipated future royalty payments, right?

11 A    That's correct.

12 Q    Okay.  Which comes under the heading of upside equity

13 participation, right?

14 A    Yes, it does.

15 Q    Let's turn to the next document in your binder if we

16 could.  This is Debtors' Exhibit 5.  Now, you recognize this

17 document as well, right?

18 A    Yes.

19 Q    Debtors' Exhibit 5, on its face, is an e-mail on which you

20 were C.C.'d, and then it has a term sheet attached to it.

21 Let's -- well, let me take a step back.  I should just ask you,

22 instead of me testifying, you're C.C.'d on this e-mail, and you

23 received it, right?

24 A    Yes, I did.

25 Q    Now, the attachment to the e-mail that's part of Debtors'

**J&J COURT TRANSCRIBERS, INC.**

 1  5 is the proposed term sheet prepared by Equistar for the

 2  Channelview Cogeneration facility, right?

 3  A    Yes.

 4  Q    And the cover page of Debtors' Exhibit 5 is an e-mail from

 5  Mr. Litzenburg (phonetic) forwarding the term sheet to Reliant,

 6  right?

 7  A    Yes.

 8  Q    And Mr. Litzenburg was a member of your Channelview

 9  Cogeneration project team, and he reported directly to you,

10  right?

11  A    Yes.

12  Q    So, let's start out chatting about the e-mail if we could?

13  A    Okay.

14  Q    Just for the record, this is Page -- Bates page 1052 of

15  Debtors' 5.  The first paragraph says, "Attached is a listing

16  of Equistar's understanding of terms based on your proposal of

17  December 18, 1998, and associated information and discussions."

18  Now, you would not have sent Reliant this term sheet on March

19  2, 1999 if that contained terms that you found to be

20  unacceptable, would you?

21  A    We sent them this document, number one, to make sure that

22  we understood the offer that they had proposed to us.  I don't

23  believe we would have sent them terms that we would not have

24  found acceptable.

25  Q    So, let me just make sure the record is clear.  You would

**J&J COURT TRANSCRIBERS, INC.**

1  not have sent Reliant this term sheet, Debtors' Exhibit 5, if

2  it contained terms that you found to be unacceptable, correct?

3  A    I think that's correct.  Right.  But again, we were trying

4  to make sure that we understood their proposal, and as you

5  might guess, they marked this up considerably when they

6  received it and reviewed it.

7  Q    And then the second paragraph of the e-mail that we were

8  just reviewing, once again, Debtors' 5 on the first page, Mr.

9  Litzenburg says, "I look forward to entering this next phase

10  and the opportunity to enter into a long-term partnership with

11  Reliant Energy."  Do you see that?

12  A    Yes.

13  Q    And you didn't take Mr. Litzenburg aside after he sent

14  this e-mail and said don't use the phrase long term partnership

15  when describing the relationship with Reliant, did you?

16  A    Again, because we used it in this commercial sense that we

17  had talked about in the past.

18  Q    Well, let --

19  A    He's not an attorney, so he had no idea what the

20  implications of the word partnership were.

21  Q    Well, let's take a look at your term sheet so we can

22  understand precisely what Equistar's understanding of

23  partnership was.

24  A    Okay.

25  Q    In preparing this term sheet Equistar had the assistance

**J&J COURT TRANSCRIBERS, INC.**

1  of its outside counsel, Meyer Dey, right?

2  A    Meyer Dey reviewed this, yes.

3  Q    And they provided comments on it, right?

4  A    Yes.

5  Q    Okay.  Well, let's turn to Page 1055 if we could?  And for

6  the record, again, this is Page 1055 of Debtors' Exhibit 5.

7  The first bullet point says in your term sheet, "Reliant and

8  Equistar will form an entity to own the project and ask as the

9  vehicle for profit sharing."  Now, you didn't object to that

10 description of Reliant and Equistar owning the project, did

11 you?

12 A    We did not object to that.  No.

13 Q    And at the time Equistar sent the March 2, 1999 term sheet

14 to Reliant, you understood that the Channelview project would

15 be jointly owned by Reliant and Equistar, didn't you?

16 A    It was certainly a possibility, yes.

17 Q    That was your understanding based on your own term sheet,

18 right?

19 A    That's what we had presented to them.  That's what we

20 thought that their proposal was.

21 Q    Although their proposal expressly referred to a royalty

22 payment, right?

23 A    Well, yeah.  And I can't necessarily reconcile those two

24 things because there was quite a bit of conversation that

25 happened in between, but clearly we got to that proposal of

Teel - Direct/Stearn                                    82

1 royalty payment to this proposal here that we interpreted as

2 equity.  And then when we got their response back, they very

3 clearly said you're not going to have equity.  We don't want

4 you to have equity.  So --

5 Q    Well, you'll get a chance to --

6 A    -- we definitely did misunderstand -- I'm just -- you

7 asked the question, and I just want to make sure you understand

8 where we were in the process, and make sure that you realize

9 that there's a tremendous -- this is a very large project,

10 there's a tremendous amount of moving parts.  You have two big

11 teams working on this.  And so, there were some items in these

12 documents that changed hands as we went back and forth.

13 Q    Let's go to the third bullet point on Page 1055 of

14 Debtors' Exhibit 5 if we could.  It says, "Customary

15 restrictions on transfers of interest and right of first

16 refusal, except that Equistar will have the ability to transfer

17 a portion of its equity to a mutually agreeable party."  Do you

18 see that?

19 A    Yes.

20 Q    And you did not object to the description of Equistar's

21 ownership interest as equity, did you?

22 A    Not at that time, no.

23 Q    Because at the time that Equistar sent this March 2, 1999

24 term sheet to Reliant you understood that Equistar would own

25 equity in the Channelview project, didn't you?

**J&J COURT TRANSCRIBERS, INC.**

Teel - Direct/Stearn                               83

1  A    Again, it was a possibility.  Right.

2  Q    Okay.

3  A    I don't think we got everything on this term sheet, Bob,

4  but --

5  Q    Can you turn to Debtors' Exhibit 15, please?

6  A    Okay.

7  Q    Debtors' Exhibit 15 is the preliminary objection that was

8  filed on, I believe, it's about March 31, 2008, by Equistar.

9  I'm just going to ask you a question or two about that.  Let's

10 turn to Page 6 if we could, sir.  This is Equistar's

11 description of some of the negotiation process with respect to

12 the Cogen facility.  I want to ask you about the last sentence

13 of Paragraph 13.

14 A    Okay.

15 Q    It says, "Equistar accepted the modified structure as

16 Equistar had no interest in owning a power plant or marketing

17 and selling excess electricity."  Well, the statement that

18 Equistar had no interest in owning a power plant, that's not

19 accurate, is it?

20 A    Again, at that time, it's -- I guess it's not entirely

21 accurate.  We had some interest.  It was acceptable to us.

22 Q    Well -- and you didn't object to Equistar owning equity,

23 did you?

24 A    Not at the time.

25 Q    Okay.  Let's just pick up chronologically in your binder

**J&J COURT TRANSCRIBERS, INC.**

1  if we could with Debtors' Exhibit 7.  Debtors' Exhibit 7, for

2  the record, is a March 11, 1999 e-mail to Mike Joyce of Reliant

3  from Bob Abbott of Equistar.  Now, Mr. Abbott was the

4  engineering project manager at Equistar, right?

5  A    Yes, he was.

6  Q    He was a member of the Equistar power team, right?

7  A    Yes, he was.

8  Q    And if we look at the second paragraph of the e-mail,

9  which is the first page of Debtors' 7, Mr. Abbott says to Mr.

10 Joyce of Reliant Energy, "As we reviewed at the onset of the

11 meeting yesterday, our objection -- excuse me -- our objective

12 was to, quote, share with potential partner the proposed

13 cogeneration site and technical information to aid in

14 development of a path forward."  Do you see that?

15 A    Yes.

16 Q    And you never told Mr. Abbott, gee, don't refer to the

17 relationship with Reliant as a partnership, did you?

18 A    I probably didn't see this particular item before it went

19 out, but I would not have objected.  He was -- Mr. Abbott is a

20 project manager and an engineer, and was in charge of the

21 expensive plumbing, and he clearly was trying to make sure that

22 he was using that word in a commercial sense to make sure the

23 two parties, you know, worked together to complete the project.

24 Q    Okay.  Let's go back to the preliminary objection, which,

25 again, is Debtors' 15, near the back of your binder, sir.

Teel - Direct/Stearn                                    85

1  A    Okay.

2  Q    Go back to that same page where we were just a few moments

3  ago, Page 6.

4  A    Okay.

5  Q    I want to talk to you about the MOU.  You know what the

6  MOU is, right, the memorandum of understanding that was reached

7  between Equistar and Reliant?

8  A    Yes.

9  Q    There's a discussion in Paragraph 14 about the MOU.  It

10 says at the end of March 1999 the parties reached agreement on

11 and executed a detailed memorandum of understanding.  Just to

12 move things along, this paragraph describes several agreements,

13 including a development agreement, steam supply agreement,

14 energy supply agreement, water services agreement, site lease,

15 and cash flow participation agreement.  You participated in the

16 negotiation of the MOU, right?

17 A    Yes.

18 Q    And, in fact, you had oversight responsibility at Equistar

19 for negotiating the terms of the MOU, right?

20 A    Yes.

21 Q    And you had to sign off on the terms before Equistar

22 actually signed the MOU, right?

23 A    Yes.

24 Q    Let's look at the MOU if we could, which is Debtors'

25 Exhibit 8.  Do you recognize Debtors' Exhibit 8, you know,

**J&J COURT TRANSCRIBERS, INC.**

1 excluding the cover sheet --

2 A    Yes.

3 Q    -- as the MOU?

4 A    Yes.

5 Q    Would you turn, please, sir, to Page -- again, I'll use

6 the Bates numbers, 1097?  And I want to focus on the first

7 sentence of Paragraph 14, near the bottom of the page.  This

8 says, "The parties agree that only the provisions of Paragraph

9 1 and Paragraphs 5 to 14 of this MOU are intended to be binding

10 and enforceable against the parties."  Well, let me --

11 essentially that means that Paragraphs 2, 3, and 4 were subject

12 to further negotiation, right?

13 A    Yes.  I think that's what that means.

14 Q    And if we go to Paragraph 2, which is on Page 5 of

15 Debtors' 8, or I should refer to the Bates number of 1091,

16 Paragraph 2 dealt with the formation of the project entity,

17 right?

18 A    That's what it says.

19 Q    And then Paragraph 3, subject to further negotiation,

20 dealt with the project agreements, right?

21 A    Which one?  Pardon me?

22 Q    I'm sorry.  I was moving ahead.  It's easier for me to do

23 so since I yellow highlighted my binder.

24 A    Yes.

25 Q    I'm on Page 1092, Paragraph Number 3.  And I was simply

**J&J COURT TRANSCRIBERS, INC.**

Teel - Direct/Stearn                                           87

1  saying Paragraph Number 3 deals with the project agreements

2  which would be subject to further negotiation.  Right?

3  A    Yes.

4  Q    Okay.  And you're generally familiar -- I should take a

5  step back.  I know it's been some time since you've dealt with

6  this.  You're generally familiar with the project agreements,

7  right?

8  A    I'm generally familiar with them.

9  Q    And you would agree that it's actually not necessary to

10 refer to the MOU in order to understand or interpret the

11 project agreements because you believe the project agreements

12 stand on their own, right?

13 A    I'm not the one to, you know, make a judgment of that at

14 this point.

15 Q    Really?

16 A    Yeah.  Generally I would say, again, that probably makes

17 sense, but I'm not a lawyer.

18 Q    Some days I wish I wasn't, either.

19                      (Laughter)

20 Q    Sir, let's go back to the core -- excuse me -- the

21 preliminary objection if we could.  It's Debtors' 15.  You'll

22 be happy to know I'm running out of pages.

23 A    There's a lot here.  We're back to 15, please?

24 Q    We are, sir.  Let's look at Page 8, Paragraph 18.

25 A    Okay.

**J&J COURT TRANSCRIBERS, INC.**

Teel - Direct/Stearn                    88

1  Q    I want to read the first two sentences, just for purposes

2  of the record.  "Equistar was a party to only nine of the

3  project agreements."  Then there was a definition as the

4  Equistar agreements.  "Five of the Equistar agreements (the

5  development agreements, site lease, steam supply agreement,

6  water services agreement, and cash flow participation agreement

7  are, 'core' project agreements then defined as the core project

8  agreements that were first negotiated in connection with the

9  MOU)."  Now, sir, back in the late 1990's and early 2000's,

10  when you had responsibility for the Channelview Cogeneration

11  project, you didn't hear the term core project agreements, did

12  you?

13  A    No.

14  Q    And you've never used the term core project agreements,

15  have you?

16  A    I have not used that term.

17  Q    And now, your counsel defined core project agreements as

18  including five agreements, and let's just chat about those.

19  And you'll see, essentially on Pages 9 through about 11, are

20  these agreements listed.  But we don't need to use the document

21  for the questions I'm going to ask you.  One of these

22  supposedly core project agreements is the development

23  agreement.  Now, you don't think the development agreement is

24  ambiguous, do you?

25  A    I think -- I think we're going to go through this one by

**J&J COURT TRANSCRIBERS, INC.**

Teel - Direct/Stearn                                89

1  one, and I'm supposed to say yes --

2         MR. FINKELSTEIN:  Objection to the form of the

3  question, Your Honor.

4         THE COURT:  And what's your objection?

5         MR. FINKELSTEIN:  This is -- this is for the -- the

6  provenance of the Court.

7         THE COURT:  I'll overrule.  I'll allow him to answer

8  if he can.

9         MR. STEARN:  Thank you, Your Honor.

10 Q    Sir, you don't think there's anything ambiguous in the

11 development agreement, do you?

12 A    I don't think these agreements were structured to be one

13 by one.  Again, like I told you before, I think this was done,

14 to some extent --

15        MR. STEARN:  Your Honor, I would move to strike at

16 this point.  I really want an answer to my question.

17        THE COURT:  No.  He can answer.  He's answering.

18 A    Yeah.  These weren't meant to be, you know, specific

19 agreements that were meant to be, you know, stuck in serial

20 order.  They were all agreements that were supposed to, and I

21 think what the term core agreements were they encompassed

22 trying to describe and fairly split the benefit of the project.

23 Do I think that these agreements in total are unambiguous --

24 are -- pardon me, are -- I'm not sure what you used -- I don't

25 believe they're ambiguous, you know, we paid attorneys quite a

**J&J COURT TRANSCRIBERS, INC.**

Teel - Direct/Stearn                                          90

1  bit of money to make the agreements as clear as possible.  I

2  hope they achieved their end.  So --

3  Q    So, let me -- now that you've got that out, let me just

4  ask you my questions, which are, you don't believe there's

5  anything ambiguous in the development agreement, do you?

6  A    Again, we paid attorneys a lot of money.  I hope not.

7  Q    Okay.  Let me make this real simple.  Can you go to Page

8  210 of your deposition, please?

9  A    I think I know what it's going to say.

10  Q    I think I do, too.

11                        (Laughter)

12  Q    Line 21, I asked you the following question.  "Do you

13  believe that there's anything that's ambiguous in the

14  development agreement?"  The answer at the top of Page 211, "I

15  don't believe there's anything ambiguous."  That was your

16  answer last Thursday, right?

17  A    Again, I don't believe so, because, you know, we paid

18  those attorneys a lot of money to make those agreements clear.

19  Q    Do you believe there's anything ambiguous in the site

20  lease?

21  A    I hope that they were as effective on the site lease.

22  Yes.

23  Q    Okay.  So, you believe -- you don't believe there's

24  anything ambiguous in the site lease, right?

25  A    Again, not to my knowledge.

**J&J COURT TRANSCRIBERS, INC.**

Teel - Direct/Stearn                                        91

1  Q    Okay.  Do you believe there's anything ambiguous in the

2  steam supply agreement?

3  A    I don't believe so.

4  Q    Do you believe there's anything ambiguous in the water

5  services agreement?

6  A    I don't believe there is.

7  Q    You don't -- and you also don't believe there's anything

8  ambiguous in the CFPA, correct?

9  A    I don't believe so.

10 Q    In other words, we're agreeing?  You're not aware of

11 anything ambiguous in the CFPA, right?

12 A    I think I'm aware we're agreeing, yes.

13 Q    I just wanted to make sure the record was aware.  Well,

14 let's talk about the CFPA.

15         MR. STEARN:  Your Honor, can I have just one second

16 to confer with opposing counsel?

17         THE COURT:  You may.

18                    (Pause)

19         MR. STEARN:  The CFPA may be one of the documents

20 where I have to deal with confidentiality later, when we, I

21 guess, submit this for the public record.

22         THE COURT:  Okay.  But your questions won't implicate

23 it?

24         MR. STEARN:  That's correct.  But I know Mr.

25 Finkelstein will throw something at me if they do.

**J&J COURT TRANSCRIBERS, INC.**

Teel - Direct/Stearn                                      92

1  Q    Sir, you're generally familiar with the CFPA, right?

2  A    That's correct.

3  Q    And sitting here, you have no understanding as to whether

4  the CFPA is an executory contract, right?

5  A    I'm not an attorney.

6  Q    Can you answer my question?  You have no understanding of

7  whether the CFPA is an executory contract, correct?

8  A    I have no understanding of what the word executory means

9  in that manner, no.

10 Q    Well, let's look at just a little bit of the CFPA if we

11 can?  Let's go to Section 6.14, which is on Page 17 of Debtors'

12 Exhibit 13.

13 A    I'm sorry.  Page 14?

14 Q    I'm sorry.  It's Page 17, but it's 6.14 is the section.

15 A    Okay.

16 Q    This deals with certain breaches and remedies, and I

17 really just want to use it to ask you a broader question, which

18 is, sir, you're not aware of any provision of the CFPA which,

19 if breached, would result in a cross default, or a cross breach

20 under some other project agreement, are you?

21 A    It's been a long time since I've looked at these

22 agreements.  I'm not aware of that.

23 Q    Okay.  Let's see if we can just help refresh your

24 recollection just a bit.  Can you turn to Debtors' Exhibit 9,

25 sir?

**J&J COURT TRANSCRIBERS, INC.**

Teel - Direct                                          93

1   A     Okay.

2   Q     Now, just -- again, for the recording, Debtors' Exhibit 9

3   on its face is an October 18, 1999 memo to, among others, you

4   from Ms. Powers. And you've seen this document before, right?

5   A     Yes, I'm sure I read it, yes.

6   Q     And, Mr. Powers was outside counsel for Reliant in

7   connection with the transaction that ultimately became the

8   Channelview Cogeneration facility, right?

9   A     Yes, he was.

10  Q     And you see on the cover page, if we just look at the

11  initial text, that this memo sets forth certain issues raised

12  by the banks and their counsel?

13  A     Yes.

14  Q     And, if you would turn to Page 726, I'm once again using

15  the Bates numbers, sir, because the document isn't quite that

16  long.

17  A     Okay.

18          THE COURT:  What page again?

19          MR. STEARN:  I'm sorry, Your Honor, it's Bates 726,

20  which is actually Page 9 of debtors 9.

21          THE COURT:  Thank you.

22  Q     At the bottom of Page 726 you'll see there's a reference

23  to the cash flow participation agreement for the project,

24  right?

25  A     Yes.

**J&J COURT TRANSCRIBERS, INC.**

Teel - Direct                                94

1  Q    And, then there's some information beneath that and you

2  have to flip the page to get to the rest of it.

3  A    Okay.

4  Q    And, you'll see Item D, breach of agreement, comments, a

5  breach of this agreement should not create an event of default

6  under any other project agreement.  Solution agreed, clarify if

7  necessary in the consent.  And do you recall, sir, that

8  ultimately a breach of the CFPA would not result in a breach of

9  any of the other project agreements?

10 A    Bob, I honestly don't recall.

11 Q    This doesn't help refresh your recollection?

12 A    Well, I mean I agree that we talked about that, the

13 attorneys handled it, I'm not sure I remember that detail.

14 Q    Just a few more questions, sir.  I'd like to go back to

15 the preliminary objection, which is Debtors 15.  And, I'd like

16 to ask you to flip closer to the back of the document, Page 22,

17 paragraph 44.  I'm just going to read part of the paragraph so

18 we know what I'm focusing on.  It says "Further, the core

19 project agreements clearly are operationally interdependent.

20 For example, the existence of the steam agreement is dependent

21 on the service agreement because the water source to produce

22 the steam is provided by Equistar under the service agreement.

23 Similarly, the CFPA and the promised royalty payments are

24 entirely dependent on the parties continued performance on the

25 site lease steam agreement and the services agreement."  You

**J&J COURT TRANSCRIBERS, INC.**

Teel - Direct                              95

1  see that, right?

2  A    Yes.

3  Q    Sir, if the CFPA didn't exist, the Channelview

4  Cogeneration facility could be operated, right?

5  A    I think you -- you know, you could get the opinion of an

6  operations person, the answer to that question I'm sure would

7  be without that agreement you could operate that site.

8  Q    And, if the CFPA didn't exist, the Channelview

9  Cogeneration facility could produce steam, right?

10  A    It could.

11  Q    And, the Channelview Cogeneration facility could produce

12  electricity without the CFPA, right?

13  A    It could.

14        MR. STEARN:  Mr. Teel, thanks for your time, I have

15  no further questions.  Thank you, Your Honor.

16        THE COURT:  Do you wish to direct at this time or

17  cross?

18        MR. FINKELSTEIN:  We'll call him later if we may,

19  Your Honor.

20        THE COURT:  All right.  Thank you, Mr. Teel, you may

21  step down.

22        THE WITNESS:  Okay, thanks.

23        THE COURT:  You can leave the exhibits up there.

24        THE WITNESS:  Okay.

25        THE COURT:  Thank you.

                    **J&J COURT TRANSCRIBERS, INC.**

                              Tibbitts - Direct                    96

1          MR. STEARN:  Just for planning purposes, what time
2    does Your Honor care to break for lunch?

3          THE COURT:  Well, how long will your next witness be?

4          MR. STEARN:  About the same length of time as this
5    witness, maybe just a hair shorter.

6          THE COURT:  All right, let's try to do that, go to
7    one, I have a two o'clock hearing list, but it should be short,
8    so if we break between one and one-thirty, then you can come
9    back at 2:30, I guess.  Okay.

10         MR. STEARN:  Your Honor, for our second witness the
11   debtors call, once again as an adverse witness, Carla Tibbitts
12   of Equistar.

13         COURT ATTENDANT:  Raise your right hand, state your
14   full name and spell your last name for the Court.

15         THE WITNESS:  Carla Marie Tibbitts, T-i double b, i-
16   double t-s.

17               CARLA TIBBITTS, DEBTORS WITNESS, SWORN:

18                         DIRECT EXAMINATION

19   BY MR. STEARN:

20   Q    Good afternoon, Ms. Tibbitts.

21   A    I think -- oh, it is afternoon.  Good afternoon, Mr.
22   Stearn.

23   Q    Sorry, I tend to be a little long winded.  Got us into the
24   afternoon.  Ma'am, I want to start chatting a little about
25   history with respect to the Channelview Cogeneration project.

                        **J&J COURT TRANSCRIBERS, INC.**

Tibbitts - Direct                                    97

1  You had no involvement, whatsoever, in the process of

2  requesting proposals for the Channelview Cogeneration facility,

3  or in reviewing those proposals, right?

4  A    No, I did not.

5  Q    And, you had no involvement in negotiating the agreements

6  for the Channelview Cogeneration facility, right?

7  A    No, I did not.

8  Q    You do, however, have some current responsibilities for

9  that project, right?

10  A    Yes, I do.

11  Q    And in approximately June of 2006 you became director of

12  U.S. Utilities and Industrial Gases, is that right?

13  A    Yes, I did.

14  Q    And, just for purposes of chronology, by June 2006, the

15  steam outage litigation had already occurred -- excuse me, the

16  steam outage had already occurred, right?

17  A    The steam outage occurred in March of 2006.

18  Q    And, ultimately there was litigation over that and

19  Equistar sued Reliant, right?

20  A    Yes, that's correct.

21  Q    And, as director of U.S. Utilities and Industrial Gases,

22  you're employed by Equistar's parent corporation, Reliant,

23  right?

24  A    Lyondell.

25  Q    Lyondell, sorry.  I didn't get much sleep last night.  And

**J&J COURT TRANSCRIBERS, INC.**

Tibbitts - Direct                                    98

1  as director of U.S. Utilities and Industrial Gases, you're

2  responsible for the group that bought all of the utilities,

3  including steam and electricity for the U.S. sites, right?

4  A    (Inaudible).

5  Q    I know your responsibilities have changed, I'll come to

6  that in a minute.

7  A    Okay.  I just wanted to make sure I answer the question

8  correctly.  Yes, that is m responsibility.

9  Q    And, more recently you became vice president of Utilities

10 and Gases, right?

11 A    Yes, I did.

12 Q    And, you had similar responsibilities but now a more

13 global scope.

14 A    Correct.

15 Q    And you remain employed Lyondell.

16 A    Yes, I do.

17 Q    And in your capacity, first as director and later as vice

18 president of Utilities and Gases, that's when you took on

19 responsibility for the Channelview Cogeneration project, right?

20 A    That's correct.

21 Q    And, that's because the Channelview Cogeneration facility

22 supplies steam for the Equistar -- I'm not sure I'll pronounce

23 this right Olefins plant, and electricity to multiple Equistar

24 plants, right?

25 A    That's correct.   As well as some of the services we

**J&J COURT TRANSCRIBERS, INC.**

Tibbitts - Direct                                                              99

1  provide to the plant.

2  Q    I'm going to chat with you about some documents.  Can you

3  turn to the exhibit binder that's hopefully in front of you.

4  A    The one that says debtors hearing exhibits?

5  Q    That would be the one.

6  A    Okay.

7  Q    I want to start out chatting with you about Equistar's

8  preliminary objection, which is Debtors Exhibit 15.

9  A    Okay.

10 Q    And you recognize this document as Equistar's preliminary

11 objection, which was filed on or about March 31, about a week

12 ago, right?

13 A    Yes.

14 Q    Would you turn to Page 14, please?  I want to talk to you

15 about paragraph 25.  It says, and once again for the record,

16 we're on Debtors Exhibit 15, paragraph 25 of the preliminary

17 objection.  "Equistar also expected to be kept apprized of the

18 sale process, instead, Equistar effectively was shut out of the

19 process, both pre and post petition and was not even provided

20 with the most basic information such as the identity of the

21 perspective purchasers and the timing and structure of

22 contemplated transactions until such information was public."

23       Ma'am, do you believe that Equistar was effectively

24 shutout of the process?

25 A    Yes, I do.

Tibbitts - Direct                           100

1  Q    Okay.  Well, let's see what the record tells us.  There
2  was a meeting between Reliant and Equistar at Reliant's offices
3  on November 20 of 2006, right?
4  A    Yes, that's correct.
5  Q    And at that meeting you learned that Reliant was
6  considering selling either its equity in or its assets of the
7  Channelview Cogeneration facility, right?
8  A    I was made aware that Reliant wanted to do something with
9  the plant and that selling may have been one of the options
10 that they looked at.
11 Q    And, at that point, the Reliant folks asked for Equistar's
12 permission to share the project agreements as part of the sale
13 process, right?
14 A    Yes, they did.
15 Q    And Reliant told you that absent a sale, the project might
16 be thrown into bankruptcy because the revolver was coming due
17 soon and the project was running out of cash, right?
18 A    And, they weren't willing to put any more equity in, yes.
19 Q    And, there was no requirement for them to put any more
20 equity in, was there?
21 A    No, there was not.
22 Q    And, at the November 2006 meeting, Equistar did not give
23 Reliant permission to provide the project agreements for
24 purposes of facilitating a sale, did it?
25 A    At the meeting we said we would consider their request.

**J&J COURT TRANSCRIBERS, INC.**

Tibbitts - Direct                                                        101

1  Q    So, you didn't give permission at that time, right?

2  A    No.

3  Q    Okay.  Now, let's just kind of move ahead through 2007,

4  you continued to have discussions with Reliant concerning the

5  Channelview Cogeneration facility during 2007, right?

6  A    Yes, we did.

7  Q    And, you were -- you were essentially the point person for

8  Equistar in those discussions, right?

9  A    Yes, I was.

10 Q    And, in May 2007, you asked Mr. Johannesen of Reliant for

11 a copy of the CIM, or the confidential information memorandum,

12 that was going to be provided to potential bidders for the

13 Channelview facility, right?

14 A    Yes, I did.

15 Q    And, he gave it to you, right?

16 A    Yes, I received a copy after that.

17 Q    And, if we -- well, you received a copy immediately,

18 right, upon request?

19 A    Shortly after that.

20 Q    All right.  And if you turn to Debtors Exhibit 11 -- do

21 you have it?

22 A    Yes, I do, I'm sorry.

23 Q    There we have Mr. Johannesen's letter to you of May 18,

24 2007, along with the confidential information memorandum,

25 right?

**J&J COURT TRANSCRIBERS, INC.**

Tibbitts - Direct                                102

1   A    Yes.

2   Q    Okay.  And this, by the way, Your Honor, is one of the

3   documents that I'm going to need to redact.

4        THE COURT:  Okay.

5   Q    And at this point in time, which is May 2007, Equistar

6   still had not given its permission for the confidential project

7   agreements to be disclosed, right?

8   A    That's correct.

9   Q    And, you understood in May of 2007 that Reliant was trying

10  to consummate the sale of the Channelview facility by August

11  2007, right?

12  A    Yes, we did.

13  Q    And, you knew during May 2007 that any buyer of the

14  Channelview facility would want to see the project agreements

15  before it closed the sale, right?

16  A    I thought it was likely, yes.

17  Q    Now, let's move onto June.  You attended another meeting

18  with Reliant on or about June 20th, 2007, right?

19  A    Yes, I did.

20  Q    And, you knew that Reliant still wanted permission to

21  disclose the project agreements in the sales process, right?

22  A    Yes.

23  Q    And you told Reliant that the steam litigation needed to

24  be resolved, didn't you?

25  A    We told Reliant that we had a very important issue with

**J&J COURT TRANSCRIBERS, INC.**

Tibbitts - Direct                                    103

1  them and we felt that that issue needed to be addressed.

2  Q    Well, you told them that the steam litigation needed to be

3  settled, right?

4  A    Told them that the issue needed to be addressed, yes.

5  Q    Did you tell Reliant in June, 2007 that the steam

6  litigation needed to be settled?

7         MR. FINKELSTEIN:  Objection, asked and answered.

8         THE COURT:  Sustained.

9  Q    Okay.  Let's do it this way.  Would you go, ma'am, please

10 to -- oh, I need another deposition.  May I approach, Your

11 Honor?

12        THE COURT:  You may.

13 Q    Would you turn to Page 170 of your deposition, ma'am?

14 A    Okay, which page are you looking at?

15 Q    I'm sorry, what you've got to look at, these are lawyers

16 ways of saving trees, and there are essentially four pages on

17 each single page and what I'd like you to look at is -- it's

18 Page 44, in terms of the bottom left hand corner.  And then

19 you'll see up at the top left there's a Page 170, do you see

20 that?

21 A    Yes, I do.

22 Q    Okay.  Just so that we can get the context, I want to read

23 some of the questions leading up to where I'm going.  I'm going

24 to start with line six, "Does that sound like a meeting that

25 you attended on or about June 20, 2007?"  "Yes."

**J&J COURT TRANSCRIBERS, INC.**

Tibbitts - Direct                                        104

1  A    Wait a minute.  I'm not in the same place you are.

2  Q    Can I approach the witness, Your Honor, just to show her

3  where --

4         THE COURT:  Page 170, I'm not there, either.  I don't

5  see that.

6  Q    I'm not sure why this isn't working.  If you look in the

7  bottom left hand corner, it should say Page 44.  Does it say

8  that?

9  A    It says in the bottom right hand corner.

10 Q    Okay.  I may just have a different printout.  Bottom right

11 hand corner, but they if you look up on the top, you should see

12 Page 170, do you see that?

13 A    I see that, but line six is not what you were reading on

14 my copy.

15 Q    Okay.  Well, let me just find --

16         UNIDENTIFIED MALE SPEAKER:  It may be the case that

17 the court reporter provided it subsequently.

18                           (Pause)

19         MR. STEARN:  I'm sorry, Your Honor, for some reason

20 the version that I got from the court reporter is not -- I may

21 have used the version that he sent originally and not

22 subsequently, so if I could just take a few minutes and figure

23 that out, rather than make the witness stand there.

24         THE COURT:  Do you want to take a short five minute

25 break?

**J&J COURT TRANSCRIBERS, INC.**

Tibbitts - Direct                                    105

1          MR. STEARN:  If you don't mind, because I think once

2  I figure out what the delta is between my pages and the court

3  reporter's final, I'll be there.

4          THE COURT:  All right, let's take a break.

5          MR. STEARN:  Thank you.

6              (Short break in proceedings)

7          COURT CLERK:  All rise.  You may be seated.

8          MR. STEARN:  Thanks for that short break, Your Honor.

9  I've realized that there's about a four page difference between

10 what I was working with and what the final was, so I apologize

11 for that.

12         THE COURT:  All right.

13 Q    Ma'am, thanks for coming back.

14 A    Sure.

15 Q    We were talking about, just to put us back in perspective,

16 whether or not you told Reliant at the June 20 meeting that the

17 steam litigation needed to be settled and I want to take a look

18 at some of your deposition testimony on this point.  Would you

19 turn, please, to Page 174.

20 A    I'm there.

21 Q    Starting with line seven.

22      "Q    Does that sound like a meeting that you attended on

23 or about June 20, 2007?

24      "A    Yes.

25      "Q    What do you recall of that meeting?

                    **J&J COURT TRANSCRIBERS, INC.**

Tibbitts - Direct                    106

1       "A    In that meeting we did discuss the project agreements

2  and giving permission for them to be disclosed and we discussed

3  the issues around the steam litigation.

4       "Q    I suppose the Reliant folks once again asked for

5  permission to disclose the confidential project agreements to

6  the bidders.  Mr. Finkelstein objected.  I asked, If you could

7  answer my question.

8       "A    I don't recall specifically if they asked, but it was

9  certainly a topic.

10      "Q    You knew they wanted permission.

11      "A    Yes.

12      "Q    What was said about the steam litigation?

13      "A    That it needed to be settled, and also that we

14 thought it was in Reliant's best interest to settle it to

15 clarify the sale process.

16      "Q    Who said the steam litigation needed to be settled?

17      "A    Equistar did.  I don't remember specifically who was

18 speaking at the time."

19      That was your testimony just a week ago today, right?

20 A    Yes, it was.

21 Q    And, let's talk a little bit more about the settlement

22 agreement in the steam litigation.  I happen to have that as

23 Debtors Exhibit 12 in your binder.

24 A    Okay.  And you recognize this document, Debtors Exhibit 12

25 as the settlement agreement concerning the steam litigation,

**J&J COURT TRANSCRIBERS, INC.**

Tibbitts - Direct                                    107

1    right?

2    A    Yes, I do.

3    Q    And, let's just look at a couple of its provisions.    If

4    you turn to the second page, ma'am, of Debtors Exhibit 12,

5    there's an item two on payment.

6    A    Yes.

7    Q    It says, "Reliant Channelview will pay or cause to be paid

8    to Equistar the sum of $10 million.    Payment will be made

9    within three business days after and conditional on, Reliant's

10   receipt of the proceeds from the Channelview sale.    So, you

11   understood that the settlement agreement provides for a payment

12   of $10 million to Equistar, contingent on the sale of the

13   facility, right?

14   A    Yes.

15   Q    And, let's read on the next page over, which is Page 3 of

16   Debtors 12, under paragraph 4a, it says cooperation and sale

17   process?

18   A    Yes.

19   Q    I'll just read a part of that since it's kind of a long

20   paragraph.    It says:    "Effective upon the execution of this

21   settlement agreement by the parties, Equistar agrees to

22   reasonably cooperate in good faith in Reliant's sale process

23   for Reliant Channelview on reasonable notice as follows.    One,

24   Equistar hereby consents to the disclosure to bidders in

25   Reliant's sale process of the agreements, which is defined at

**J&J COURT TRANSCRIBERS, INC.**

Tibbitts - Direct                                      108

1  the end to be the project agreements, related to the

2  performance of the agreements -- excuse me, and information

3  related to the performance of the agreements which may also be

4  deemed confidential, notwithstanding any restrictions on

5  confidentiality contained in such agreements."

6      Now, it's true, is it not, that Equistar was not prepared

7  to permit the project agreements to be disclosed absent

8  settlement of the steam litigation?

9  A    The confidentiality of the project agreements was very

10 important to us, as was resolving issues around the steam

11 litigation, as was the boiler feed water pump that's referenced

12 here.

13 Q    So, let me go to Page 181 of your deposition, if I could,

14 please.

15 A    I'm there.

16 Q    And on Page 2, I asked you the following question:

17     "Q   Well, was Equistar prepared to permit the project

18 agreements to be disclosed absent the settlement of the steam

19 litigation?"  And you said "Probably not."  That was your

20 testimony just a week ago, right?

21 A    Yes, it is.

22 Q    Now, ma'am, as a result of your conversations with Mr.

23 Johannesen during 2007, by July 2007, it was clear to you that

24 the Channelview facility was being marketed without the CFPA,

25 right?

**J&J COURT TRANSCRIBERS, INC.**

Tibbitts - Direct                    109

1  A    It was clear that it was marked without the CFPA, yes, in
2  the offering.
3  Q    Well, it was clear to you that the sale would exclude the
4  CFPA, right?
5  A    It was clear to me it was being marketed without the CFPA.
6  We were told that they really didn't know what structure of the
7  sale would be.  So, it was not clear to me how this would be
8  effected in the end because certainly we told them that we
9  disagreed with it, not going with the CFPA.
10 Q    Can we turn to Page 223 of your deposition, please.  I'd
11 like to focus on line 19 if I could.  We were talking a little
12 bit about the sale during your deposition and I said,
13      "Q    Well, you weren't surprised by the fact that the sale
14 was excluding the CFPA, were you?
15      "A    No.  I wasn't surprised by it.  But --
16 And, then I said:
17      "Q    I mean you knew back --
18 and then you said:
19      "A    It was extremely clear.
20      "Q    You knew back in July of 2007 the sale was being
21 conducted without the CFPA, right?
22      "A    That's what I was told."
23 A    Yes, but I have one comment to make, actually, this is a
24 mark I made on the copy I got of my deposition.
25 Q    Okay.  Just so you know I haven't seen that.

**J&J COURT TRANSCRIBERS, INC.**

Tibbitts - Direct                                          110

1  A    Well, I just got to mark it.  It was extremely clear, I

2  don't believe was the end of my sentence.

3  Q    I'm sorry?

4  A    When I said it was extremely clear, I don't think that was

5  a complete sentence.  I believe I was interrupted.

6  Q    Now, Mr. Johannesen told you in July that bidders could

7  not provide with CFPA bids because bidders could not get

8  financing with CFPA in place, right?

9  A    I'm sorry, could you repeat that?

10 Q    I'll try.  Mr. Johannesen told you that bidders could not

11 provide with CFPA bids because bidders could not get financing

12 wit the CFPA in place, right?

13 A    That's what I was told when we had asked for bids to be

14 done on both bases.

15 Q    And, in July, 2007, Mr. Johannesen also made a proposal to

16 buy Equistar out of the CFPA, right?

17 A    Yes, he did.

18 Q    And, Mr. Johannesen also told you that absent an agreement

19 to monetize the CFPA, the sales process would not be able to

20 move forward, the project would go into default on August 15

21 and the project would then file bankruptcy to avoid the lenders

22 foreclosing, right?

23 A    That was an awfully long question, can we do that again?

24 Q    I can try.  Mr. Johannesen told you that absent agreement

25 to monetize the CFPA, the sales process would not be able to

**J&J COURT TRANSCRIBERS, INC.**

                              Tibbitts - Direct                    111

1   move forward, the project would go into default on August 15

2   and the project would then file bankruptcy to avoid the lenders

3   foreclosing, right?

4   A    I'm not sure I recall at all being put in that way, but

5   those points were probably brought up.  I'm not sure that it

6   was -- if we don't monetize the CFPA, then the project will go

7   into bankruptcy.  If that was the case, I'm not sure I would

8   have believed that.

9   Q    Just to tie this down, can you go to Page 197 of your

10  deposition, please.  And on line 17 I asked you the following

11  question.

12       "Q   Do you recall Mr. Johannesen telling you on or about

13  July 25, 2007 that if we don't have an agreement to monetize

14  the CFPA, the sales process would not be able to move forward,

15  the project would go into default on August 15 and the project

16  would then file bankruptcy to avoid the lenders foreclosing?

17  And you told me at the top of the next page:

18       "A   I believe we did have a conversation around that, at

19  that point."  Right?

20  A    Yes, we had a conversation around those issues.

21  Q    And, in response, you told Mr. Johannesen what your

22  valuation was of the CFPA, didn't you?

23  A    I don't recall if it was exactly at that point, but yes.

24  Q    Sometime around that point, didn't you?

25  A    Yes.

                         **J&J COURT TRANSCRIBERS, INC.**

Tibbitts - Direct                                    112

1  Q    Okay.  And it was a pretty big number, wasn't it?

2  A    Yes.  It was very valuable.

3  Q    Okay.  That's an issue for another day.  Now, you also

4  told Mr. Johannesen during July 2007 -- I'm sorry.  You were

5  also told by Mr. Johannesen during July 2007 that bidding was

6  in the second round, contracts had been shared with bidders,

7  these are the project agreements, and seven bidders were

8  engaged in the process, right?

9  A    Yes.  I don't recall specifically the seven bidders, but

10 --

11 Q    We can -- probably don't need to fence about that.  You

12 knew there was some number of bidders in the process, right?

13 A    Yes.

14 Q    Let's move onto September.  You spoke to Mr. Johannesen,

15 again, about the sales process during September, right?

16 A    I'm sure I did.

17 Q    And, Mr. Johannesen told you the process was continuing,

18 that it was robust with several parties going through the

19 process?

20        MR. CAPONI:  Excuse me, Your Honor, I have an

21 objection in that Mr. Johannesen hasn't testified and the

22 question is were you aware is one thing, but to constantly say

23 Mr. Johannesen told you is hearsay.  He's not here --

24        MR. STEARN:  I'm just asking her if she was told

25 that.

**J&J COURT TRANSCRIBERS, INC.**

Tibbitts - Direct                                113

1        THE COURT:  Overruled, she can answer that question.

2  Q    I'm sorry, I got lost.  Mr. Johannesen told you that the

3  process was continuing and that it was robust with several

4  parties going through that process, right?

5  A    Yes, I recall being told it was a robust process several

6  times.

7  Q    And you were told that they don't have breakthrough

8  information yet and they don't know where it's going to end up,

9  right?

10 A    Yes.

11 Q    Now, let's move onto October.  You attended a meeting with

12 Reliant in October of 2007, where you were informed of a

13 preliminary bid range, right?

14 A    Yes.

15 Q    And, do you remember what the range was?

16 A    Yes.  It --

17 Q    Go ahead.

18 A    It was $460 to $600 million.

19 Q    And you were told that issues included price terms and

20 timing and that major players were at the low end of the range,

21 right?

22 A    I don't recall being told that the major players were at

23 the low end of the range.

24 Q    Okay.  I might be able to help refresh your recollection.

25 Can you to go --

**J&J COURT TRANSCRIBERS, INC.**

Tibbitts - Direct                              114

1  A    I believe you would.

2  Q    Can you go to Debtors Exhibit 16.

3  A    Yes.

4  Q    Now that -- You don't have to comment on the first page,

5  but the substance of Debtors Exhibit 16 are your handwritten

6  notes that relate to, among other things, conversations that

7  you've had with Mr. Johannesen about the Channelview facility,

8  right?

9  A    That's correct.

10  Q    And, I didn't have these notes at your deposition, did I?

11  A    No, you didn't.

12  Q    You may recall we had a little stink about that, right?

13  A    Yes.

14  Q    Let's take a look at one of the pages of your notes, which

15  is EQU-2626.

16  A    Okay.

17  Q    It says, and I'm about two thirds of the way down, maybe

18  you can just read these for us, rather than have me read them.

19  It looks like, I don't know if that's a four or if it's just

20  and bidding, can you read that?

21  A    Yes.  Four bidders in active dialogue, in Energy Space, no

22  lenders.  Mix of financial and mid-size strategic.  Would hire

23  third party operator and energy manager.  Range of bids, 450

24  million to 600 million (apples to apples), no CFPA.  Structure

25  still open.

**J&J COURT TRANSCRIBERS, INC.**

Tibbitts - Direct                    115

1  Q    So, let's actually pause there before we get to the next

2  page, which is what I want to talk to you about.  You were told

3  that the bid range, in October of 2007 was without the CFPA,

4  right?

5  A    Yes.

6  Q    And, if you turn to the very next page, maybe you can just

7  read the first couple of lines for me?  This is Page 2627 of

8  Debtors Exhibit 16.

9  A    Exchange contract drafts.  Issues, price, terms, timing

10 including certainty of close.

11 Q    And what's the next line say?

12 A    Major players at low end of range.

13 Q    So you knew that in October of 2007, right?

14 A    Yes, I believe these are my notes.

15         MR. FINKELSTEIN:  Object to the form of the question.

16         MR. STEARN:  I'm sorry, can I just have the answer.

17         THE COURT:  Excuse me?

18         MR. FRENCHMAN:  Object to the form of the question.

19         THE COURT:  Overruled.

20 Q    You knew that in October 2007?

21 A    Yes.

22 Q    You were also told in October of 2007 that the structure

23 of the sale was still open, right

24 A    Yes, we were.

25 Q    Now, let's move onto December of 2007, you spoke to Mr.

**J&J COURT TRANSCRIBERS, INC.**

Tibbitts - Direct                                116

1  Johannesen again in December, right?

2  A    I'm sure I did, yes.

3  Q    And you were told that the process was marching along and

4  Reliant was in advanced discussions with the lead bidder?

5  A    Yes.

6  Q    And you were told that it was looking like an asset sale,

7  right?

8  A    Yes, although I was also told there was nothing formal at

9  that point.

10 Q    And, you asked, when will you let us know who the bidder

11 is and Mr. Johannesen said when we have something signed up,

12 right?

13 A    Yes.

14 Q    And, in fact, Mr. Johannesen called and left you a voice

15 mail right after they signed the Kelson APA, right?

16 A    Yes, at ten o'clock Sunday evening.

17 Q    Sometimes things get signed late.  But you already knew by

18 late January or early February that the lead bidders were

19 Fortistar and Kelson, right?

20 A    I'm not sure I knew that at that point.

21 Q    Well, let's take a look at the very last exhibit in your

22 binder.  Unfortunately, I didn't get a chance to ask you about

23 this one in your deposition, because I didn't get it until this

24 weekend.  But Debtors Exhibit 17 is an e-=mail to you, on or

25 about February 1, 2008, is it not?

**J&J COURT TRANSCRIBERS, INC.**

Tibbitts - Direct                    117

1  A    Yes, it is.

2  Q    And, it says, and it appears to attach some kind of a -- I

3  don't think it's a press release, but it's some sort of public

4  statement, from January 23, 2008 and it says, Fortistar and

5  partner, Australian Infrastructure Partner, all capital, are

6  among a handful of contenders left in the race to acquire

7  Reliant Energy's Channelview Cogeneration facility.  Also in

8  the running is Kelson Holdings.  So, you knew almost a month

9  before you learned of the APA with Kelson, that the folks in

10 the running were Kelson and Fortistar, right?

11 A    Yes.  I guess it must have been February 1st.  I didn't

12 know the date.

13 Q    Let's go back to the preliminary objection, if we could,

14 which is Debtors Exhibit 15.  I'd like to go to Page 14,

15 paragraph 24 and read the first sentence.  Equistar expected --

16 are you with me?

17 A    Yes, I am.

18 Q    Equistar expected through discussions and the settlement

19 negotiations and in accordance with the settlement agreement,

20 that the sale of the cogen facility would leave undisturbed

21 Equistar's rights under the project agreements, including its

22 rights under the CFPA.  But you knew that in January that the

23 sale would be without the CFPA, right?  Or excuse me, not in

24 January in July, 2007, the sale would be without the CFPA,

25 right?

**J&J COURT TRANSCRIBERS, INC.**

Tibbitts - Direct                    118

1    A    We knew it was being marketed with the CFPA.

2    Q    Well, and you knew that bidders had asked to bid without

3    the CFPA and you were asked -- I'm sorry, let me take a step

4    back.  Mr. Johannesen specifically told you in July that the

5    bidders were being asked to bid without the CFPA in place and

6    with monetizing it, right?

7    A    Yes, I knew that was the way that Reliant was conducting

8    the sale process.

9    Q    So, it really wasn't a surprise to you, was it ma'am, that

10   when you found out about the asset purchase agreement that the

11   bidder wasn't taking the CFPA?

12   A    No.

13   Q    Let's chat a bit about the CFPA and the core project

14   agreements.  Let's go back to the preliminary objection if we

15   could, which is Exhibit 15.  And if you could turn to Page 8.

16   And, you probably heard me discuss this with Mr. Teel a bit.

17   Paragraph 18 on Page 8 says, Equistar was a party to only nine

18   of the project agreements, the Equistar agreements.  Five of

19   the Equistar agreements, development agreements, site lease,

20   steam supply agreement, water services agreement and cash flow

21   participation agreement, are core project agreements which is

22   then defined as core project agreements, that were first

23   negotiated in connection with the MOU.

24        Now, prior to this dispute, ma'am, you never heard the

25   term core project agreements used to describe a subset of the

**J&J COURT TRANSCRIBERS, INC.**

Tibbitts - Direct                                          119

1  project agreements, did you?

2  A    No, it was not a term we used.

3  Q    In fact, core project agreements is a term Equistar came

4  up with to use in these court proceedings, right?

5  A    It was a term to describe these agreements, yes.

6  Q    In this court proceeding, right?

7  A    Yes.

8  Q    And by the way, any testimony, ma'am, that you would

9  provide about the supposedly integrated nature of the core

10 project agreements would be based solely on your reading the

11 documents, right?

12 A    It would be based on my reading of the document and the

13 way we have conducted business during the time I've had

14 responsibility for it.

15 Q    You essentially learned about these documents by reading

16 them, right?

17 A    Yes.

18 Q    And, one of the core project agreements, as defined, is

19 the development agreement, right?

20 A    Yes, it is.

21 Q    And, you know that expired six years ago, right?

22 A    Yes.

23 Q    Let's go to Page 22 of the preliminary objection.  I'm in

24 paragraph 44 and I'm going to read the rest of it, and I read

25 sort of the first had of it to Mr. Teel, I'm going to read the

**J&J COURT TRANSCRIBERS, INC.**

Tibbitts - Direct                                120

1   rest of it to you.  The fourth line up from the bottom, in the

2   absence of any one of these core project agreements, neither

3   Equistar nor Channelview could operate its respective facility

4   and Channelview obviously would receive little or no cash flow

5   but for the multimillion dollar payments it receives each month

6   from Equistar for steam and electricity.  That's not really

7   right, is it?

8   A    (Inaudible).

9   Q    Is that sentence accurate?

10  A    I'm not sure what you're asking me.

11  Q    Well, Channelview also markets electricity in the merchant

12  market, right?

13  A    Yes, the cogen plant, yes.

14  Q    And, in fact, it markets more electricity in the merchant

15  market than it sells to Equistar, right?

16  A    It has passed the merchant more, yes.

17  Q    Let's just chat a bit more about the CFPA.  Since the

18  debtors filed bankruptcy in August 2007, I think it's fair to

19  say, is it not, that Reliant and Equistar have continued to

20  have at least occasional discussions regarding the buyout of

21  the CFPA?

22  A    Yes.

23  Q    And, the parties have been unable to reach agreement on

24  the amount that Equistar would accept in exchange for

25  terminating the CFPA, right?

Tibbitts - Direct                          121

1  A    That's correct.

2  Q    And, if the parties had been able to reach agreement on

3  the amount of money that Equistar would accept in exchange for

4  terminating the CFPA, we wouldn't be here fighting about

5  whether the Channelview assets could be sold without the CFPA,

6  would we?

7              MR. FINKELSTEIN:  Objection, calls for speculation.

8              THE COURT:  Sustained.

9              MR. STEARN:  Your Honor, can I impeach the witness

10 with her deposition testimony on that point?

11             THE COURT:  Yes.

12 Q    Let me ask it this way.  You told me in your deposition

13 did you not, ma'am, that if the parties had been able to reach

14 agreement on the amount of money Equistar would accept in

15 exchange for terminating the CFPA, we wouldn't be fighting

16 about whether Channelview assets can be sold without the CFPA.

17             MR. FINKELSTEIN:  Objection, Your Honor.  I'd

18 appreciate counsel directing me to where he sees this

19 testimony.

20             THE COURT:  Sustained, sustained.

21             MR. STEARN:  So, I should direct him to where I see

22 it, Your Honor?

23             THE COURT:  Yes.

24 Q    Well, as you know, I have a little problem with pages but

25 -- let's go to Page 199 of the deposition, and I'll read the

**J&J COURT TRANSCRIBERS, INC.**

Tibbitts - Direct                                    122

1  question and answer and you tell me if that's what you said.

2           THE COURT:  Give me the page number again.

3           MR. STEARN:  I'm sorry, Your Honor, it's Page 199.

4           THE COURT:  Thank you.

5  Q    Line 19,

6      "Q   Is it also fair to say that if the parties are able

7  to reach agreement on the amount of money that Equistar would

8  accept in exchange for terminating the CFPA, that we won't be

9  fighting on April 9 about whether the Channelview assets can be

10 sold without the CFPA?"

11          MR. FINKELSTEIN:  Objection, Your Honor.  As I did

12 during the deposition, I object to the form of the question.

13 It calls for speculation.

14          MR. STEARN:  Well, actually, he said when is the

15 agreement going to reached is my point, and I said, can you

16 answer and Ms. Tibbitts testified:  "If the agreement is

17 reached, we won't be fighting about the CFPA, right.  In other

18 words if we agree on the amount of money before April 9 that

19 Equistar would accept in exchange for --

20          MR. FINKELSTEIN:  Move to strike, Your Honor.

21          THE COURT:  Sustained.

22          MR. STEARN:  I'm sorry, Your Honor.  I thought it

23 supported our point that this is all about money, but I'll come

24 to that in the argument.

25          THE COURT:  You can make your argument.  This

**J&J COURT TRANSCRIBERS, INC.**

Tibbitts - Direct                    123

1  objection is sustained.

2  Q    Let's go to the CFPA, ma'am, if we could.  It's Tibbitts

3  -- I'm sorry, it's Debtors 13.  Tell me when you have it, if

4  you would.

5  A    I'm there.

6  Q    You're generally familiar with the CFPA, right?

7  A    Yes, I am.

8  Q    You became familiar with it by reviewing it, right?

9  A    Yes, I did.

10 Q    And, you first read the CFPA probably in about 2006?

11 A    Yes.

12 Q    Could you turn to Section 2.1 of the CFPA, please.  It's

13 the page numbered 2.

14 A    Yes.

15 Q    This is the section on project cash flow.  Your

16 understanding is, this section generally provides a priority of

17 payments and distributions, including for royalty payments to

18 Equistar, right?

19 A    This goes through the manner of calculation to get to the

20 royalty payments.

21 Q    Right.  I don't think we're disagreeing, it says to make

22 the following payments and distributions in the following prior

23 art, right?

24 A    Right.

25 Q    Okay.  Now, the Channelview Cogeneration facility has been

Tibbitts - Direct                    124

1  in operation about six years, right?

2  A    That's correct.

3  Q    And, to date, Equistar has not received any money under

4  Section 2.1, right?

5  A    No, we haven't.

6  Q    And, let's look at Section 3.1 which is on Page 3.

7  Section 3.1 of the CFPA deals with essentially the mechanics

8  for payment of the royalty payment to Equistar, right?

9  A    Yes, it does.

10 Q    And, if there were a royalty payment to Equistar, such

11 payment would be wired directly to Equistar, right?

12 A    Yes, it would.

13 Q    And, you may recall, we talked about this last week, but

14 you would agree that under the CFPA, the amount of the royalty

15 payment to Equistar can't be reduced if Equistar owes money

16 under one of the other project agreements, right?

17 A    I don't believe that's the case, no.

18 Q    In other words we're in agreement.

19 A    I agree with you.

20 Q    Okay, thank you.  And, since we're consenting, let's turn

21 to the consent section, which is 4.2 on Page 5.  This Section

22 4.2, which is several pages long, essentially describes certain

23 consent rights Equistar has, right?

24 A    Yes, that's correct.

25 Q    And, to your knowledge, Equistar has never been asked to

Tibbitts - Direct                                        125

1  provide its consent under Section 4.2, right?

2  A     That will have been there.

3  Q     And by the way, if we turn to Page 7, towards the top,

4  under the CFPA, if Reliant makes a written request for

5  Equistar's consent, and Equistar does nothing, after ten days,

6  Equistar's consent is deemed given, right?

7  A     That's correct.

8  Q     And, let's look at one last section of the CFPA, it might

9  be two.  If we could, I'd like you to go to Section 5.2.

10 Section 5.2 is on Page 11 of the CFPA, which is Debtors Exhibit

11 13.  It's short enough that I can read it, it's entitled

12 Termination of Financing Agreement, the parties hereby covenant

13 and agree that after the termination of the financing

14 agreements, they shall mutually agree as to new reasonable

15 provisions regarding the definition of project cash flow

16 (including allowances for reasonable reserves) and the periodic

17 calculation and payment of the royalty payments.  You're

18 familiar with Section 5.2, right?

19 A     Yes, I am.

20 Q     Okay.  Now, if the existing financing is terminated, the

21 parties need to agree to new provisions regarding the

22 definition of project cash flow and periodic calculation and

23 payment of royalty payments because the royalty payment is

24 dependent on the debt, right?

25        MR. FINKELSTEIN: Object to the form of the question,

**J&J COURT TRANSCRIBERS, INC.**

Tibbitts - Direct                                126

1  Your Honor.  The document speaks for itself.

2          MR. STEARN:  Well, you may hear that one a lot later,

3  but we --

4          THE COURT:  Overruled.

5  Q    Do you want me to read it again?

6  A    Yes, read it again.

7  Q    I'll try.  As you can tell, I'm getting a little dry

8  mouthed.  Under Section 5.2, if the existing financing is

9  terminated, the parties need to agree on new provision

10 regarding the definition of project cash flow and periodic

11 calculation and payment of royalty payments, because the

12 royalty payment is dependent on the debt, right?

13         MR. FINKELSTEIN:  Objection to the form of the

14 question.  The use of the term need characterizes the agreement

15 in a manner that's inconsistent with the document.

16         MR. STEARN:  I --

17         THE COURT:  Overruled.   You can answer the question.

18         THE WITNESS:  The royalty payments, the calculation

19 fo the royalty payments is dependent on the debt service.  So,

20 it would --

21         MR. STEARN:  Okay, good enough.

22         THE WITNESS:  -- would need to be revised if the debt

23 service changed.

24 Q    Okay.  Let's get past that one.  Well, you would need to

25 know what the new financing arrangements were in order to

**J&J COURT TRANSCRIBERS, INC.**

Tibbitts - Direct                                127

1   determine the royalty payments, right?  A simpler way of asking

2   it?

3               MR. FINKELSTEIN:  Objection.  Calls for speculation.

4               THE COURT:  Sustained.

5   Q    Section 5.2 of the CFPA doesn't tell you what to do if the

6   parties can't agree, does it?

7   A    No, it does not.

8   Q    One more section of the CFPA, I promise.  And that is

9   Section 6.14, that's on Page 17, ma'am.

10  A    I'm there.

11  Q    This is the section that deals generally with breaches and

12  remedies and you may remember we talked about this a bit last

13  week.  Ma'am, you're not aware of any provision of the CFPA

14  which, if breached, would result in a cross default or a cross

15  breach under some other project agreement, are you?

16  A    No, I'm not.

17  Q    And, you're not aware of any other project agreement

18  which, if breached, would result in a cross default under the

19  CFPA, are you?

20  A    Not in a cross default.

21  Q    Or it may be a term I'm making up, or a cross breach?

22  A    Not in a breach.

23              MR. STEARN:  Ma'am, I have no further questions.

24  Thanks for your time.

25              THE COURT:  Do you want to save this witness for your

**J&J COURT TRANSCRIBERS, INC.**

128

1  case as well?

2          MR. FINKELSTEIN:  Yes, Your Honor.

3          THE COURT:  All right.  Thank you, you may step down.

4  All right, let's take a break and come back at 2:30.  How long

5  does the debtor think they're going to be?

6          MR. STEARN:  We have two more witnesses who are going

7  to be, I think, substantially shorter than I was, is that

8  right, so I would assume not much longer.  And then our friends

9  can put on their case.

10         THE COURT:  How many witnesses do you have?

11         MR. FINKELSTEIN:  We have two witnesses, Your Honor.

12         THE COURT:  All right.  I hope we finish today.

13         MR. FINKELSTEIN:  We'll make every effort.

14         MR. STEARN:  We hope so, too.

15         THE COURT:  All right.  We'll stand adjourned until

16  2:30.

17         MR. STEARN:  Thank you, Your Honor.

18                    (Luncheon recess)

19         COURT CLERK:  All rise.  You may be seated.

20         THE COURT:  You may proceed.

21         MR. STEARN:  Good afternoon, Your Honor.  For the

22  record, Bob Stearn from Richards, Layton & Finger on behalf of

23  the debtors.

24         The last thing I wanted to do, Your Honor, before I

25  turned over the podium to one of my colleagues is move into the

**J&J COURT TRANSCRIBERS, INC.**

129

record the debtors exhibits, which are Debtors 1 through 17

which are in the binder.  Now, when I say move into the record

it's with the caveat that Mr. Finkelstein and I still need to

sit down and figure out what's going to be redacted for

purposes of the public record but I saw no reason to hold off

on essentially moving the binder into evidence.

THE COURT:  Any objection to the documents?

MR. FINKELSTEIN:  I don't have an objection to them

being admitted in unredacted form, but I will talk with him

about any redactions he feels necessary.  I didn't anticipate

that, but I'd like the exhibits in evidence and, if necessary,

to protect confidentiality.  I think we can work that out.

THE COURT:  All right.  You can do it by sealing

them, if you'd like, rather than redacting them, if the

relevant provision is necessary for my consideration.

MR. STEARN:  We'll work it out.

THE COURT:  Okay.

MR. FINKELSTEIN:  I'd e agreeable to either method,

as long as you have access to the documents that you need.

THE COURT:  All right, thank you.

MR. STEARN:  Thank you, Your Honor.

THE COURT:  They'll be admitted then.

MR. STEARN:  At this point I'm going to turn the

podium over to my colleague Marcos Ramos who is going to put

Mr. Johannesen on the stand.

**J&J COURT TRANSCRIBERS, INC.**

Johannesen - Direct                        130

1          THE COURT:  All right.

2          MR. STEARN:  Thank you, Your Honor.

3          MR. RAMOS:  Good afternoon, Your Honor, Marcos Ramos,

4    Richards, Layton & Finger on behalf of the debtors.  And the

5    debtors would call Mr. Johannesen to the stand.

6          COURT ATTENDANT:  State your full name, spelling your

7    last name.

8          MR. JOHANNESEN:  Andrew Johannesen,

9    J-o-h-a-n-n-e-s-e-n.

10         ANDREW JOHANNESEN, DEBTORS WITNESS, SWORN:

11                   DIRECT EXAMINATION

12   BY MR. RAMOS:

13   Q    Good afternoon, Mr. Johannesen.

14   A    Good afternoon.

15   Q    I would like to follow up a bit of your testimony that was

16   given earlier today regarding the debtors sale efforts, but

17   paying particular attention to discussions with Equistar

18   regarding those sale efforts.  Did the debtors inform Equistar

19   of their intention to conduct a sale related to the Channelview

20   project?

21   A    Yes, we did.  We first broached that subject in November

22   of 2006 and had a series of conversations on that matter

23   through 2007.

24   Q    And were you a part of the initial discussion that you

25   referenced that occurred in 2006?

**J&J COURT TRANSCRIBERS, INC.**

Johannesen - Direct                    131

1  A    Yes, I was.

2  Q    And, would you be able to just generally describe the

3  subject matters of the discussion that occurred in that

4  November 2006 meeting?

5  A    In that meeting we discussed, met with Equistar and

6  discussed the status of the project, that we were concerned

7  about the project's ability to meet a revolver of maturity that

8  was scheduled for August of 2007 and we explained to them that

9  we thought the best course forward for the project was a sale

10 to another buyer and we requested their consent to waive the

11 collateral provisions, that we could show the project

12 agreements to potential purchasers.

13 Q    And, just to try to speed things along, you were in the

14 court earlier today during Ms. Tibbitts' testimony, is that

15 correct?

16 A    That is correct.

17 Q    Would it be fair to say that you had several discussions

18 after that initial November 2006 meeting with Equistar

19 regarding the sale process?

20 A    Yes.  We had a number of conversations as the process

21 moved forward.

22 Q    And, can you generally just describe for the record the

23 nature -- the subject matters that you were discussing with

24 Equistar during these conversations in 2007, regarding the sale

25 process?

**J&J COURT TRANSCRIBERS, INC.**

Johannesen - Direct                           132

1  A     Sure.  A couple different topics were covered in those

2  meetings.  One was the general status of the process, where we

3  were in the initial phase, bring in information memorandum,

4  sending that out, getting initial bids, going to the next

5  round, so on and so forth.

6        Also, initially, there was a good time, a good amount of

7  the focus was on the confidentiality issue that you heard about

8  this morning and our desire to get a waiver on the

9  confidentiality so that we could show the project agreements to

10 potential purchasers.  And, then once we agreed to the

11 litigation settlement and put that matter behind us, we

12 continued to have conversations with them.  Obviously that

13 matter was no longer pertinent and we began conversations more

14 around the CFPA, then again just general status updates.

15 Q     Okay.  You were just talking about the issue of consents

16 and just for the purposes of the record, would you just be able

17 to address a little bit more why you were seeking Equistar's

18 consent for the disclosure of the subject contracts.

19 A     Sure.  The contracts, there were numerous contracts that

20 relate to this project, as I think everyone is well aware.

21 They have rather significant economic implications for the

22 project.  Any one who would have an interest in the project and

23 potentially acquiring the project would want to understand in

24 detail the implications of those contracts.

25 Q     And, do you recall when Equistar provided its consent?

**J&J COURT TRANSCRIBERS, INC.**

Johannesen - Direct                    133

1  A    I believe it was early July of 2007.

2  Q    And in the time frame of the debtors sale process, do you

3  recall -- well, let me ask you, do you recall when the debtors

4  first solicited bids from interested bidders?

5  A    Well, we began the process in the April May time frame and

6  had indicative bids, I believe, in June.

7  Q    And, do you recall --

8  A    So, July would have been after the first round of bids,

9  but before we had gotten the second round of bids.

10  Q    And, do you recall whether Equistar provided its consent

11  before or after those initial first round bids were received?

12  A    It was after the initial round.

13  Q    So, when the interested bidders were first submitting

14  bids, they had not been provided with specific terms of the

15  Equistar related agreements?

16  A    That is correct.

17  Q    And you also mentioned that you had discussions during

18  2007 with Equistar regarding the CFPA, is that correct?

19  A    Yes.

20  Q    Can you just generally describe the nature of the subject

21  matters discussed with Equistar regarding the CFPA?

22  A    Yes.  We initially were looking at a sale of the

23  partnership interests, this is before we had filed bankruptcy,

24  we were hoping to avoid bankruptcy process, and recognized that

25  as part of that it would facilitate the process to monetize the

**J&J COURT TRANSCRIBERS, INC.**

Johannesen - Direct                                134

1  CFPA, so we initiated conversations with them on that.  I

2  believe in June we first -- we began having discussions on that

3  and those have continued periodically since then.

4  Q    And, in terms of the sale process, did Equistar ever ask

5  whether bidders would be given the opportunity to bid on a sale

6  which included the CFPA?

7  A    They did.

8  Q    And, can you describe your discussions with Equistar

9  regarding that issue?

10 A    Yes.  We expressed some of our concerns about that, that

11 bidders were going to have concerns about their ability to

12 finance the project, subject to the CFPA.  They subsequently

13 asked us to go ahead and ask for that.  So, we asked Houlihan,

14 who was interface, direct interface with the bidders, to ask

15 for their input in terms of their appetite for bidding on the

16 project, with the CFPA remaining in place and received the

17 feedback that there generally was not interest in that.

18 Q    And, did you inform Equistar regarding those responses in

19 terms of interest, potential bidders on the project?

20 A    Yes.  After we received the feedback, after I received the

21 feedback from Houlihan, I passed that along to Equistar.

22 Q    And, did any potentially interested bidder every ask for

23 the opportunity to participate or bid on the debtors sale with

24 the CFPA included?

25 A    Not that I'm aware of.

**J&J COURT TRANSCRIBERS, INC.**

Johannesen - Direct                    135

1  Q    And did the debtors ever reach a business judgment

2  regarding its ability to accomplish a sale transaction which

3  included the CFPA?

4  A    Yes.  Based on the input we received from the bidders, we

5  concluded that in our business judgment we wouldn't be able to

6  successfully sell or divest the assets with the CFPA remaining

7  in place.

8  Q    And, with regard to that judgment did the debtors proceed

9  in terms of the sale process on the basis of that judgment?

10 A    Yes.  Yes, we did.

11        MR. RAMOS:  May I have one moment, Your Honor?  I

12 pass the witness, Your Honor.

13        THE COURT:  Okay.  Cross examine.

14        MR. RAMOS:  Thank you, Mr. Johannesen.

15              CROSS EXAMINATION

16 BY MR. FINKELSTEIN:

17 Q    Good afternoon, Mr. Johannesen, my name is Mark

18 Finkelstein, I represent Equistar Chemicals LP in these

19 proceedings.

20 A    Good afternoon.

21 Q    Thank you.  The project that we're here talking about,

22 owned by Channelview -- Reliant Energy Channelview LP was

23 originally financed with the case flow participation agreement

24 intact, isn't that the case?

25 A    I'm not sure of the exact sequence in all the events, that

**J&J COURT TRANSCRIBERS, INC.**

Johannesen - Cross                    136

1  was before my involvement, but I assume that those agreements

2  would have been in place at the time of the financing.

3  Q    And, in fact, you've seen the project agreements and,

4  therefore, you know, the date of the project agreements that

5  were executed predated the funding of the $475 million loan

6  that was made to Reliant Energy Channelview LP in connection

7  with the project financing of this project?

8  A    I don't remember the exact date the initial funding was

9  made, but as I said, it seems reasonable that those documents

10 would be in place before the financing was executed.

11 Q    And, you have no contrary information as you sit here

12 today as to whether or not the documents between Reliant Energy

13 Channelview LP and my client, Equistar, were executed, in fact,

14 before the financing was funded?

15 A    I have no reason to believe otherwise.

16 Q    And, you have no reason to think that the cash flow

17 participation agreement was not part of those initial

18 agreements that were executed in connection with the project

19 that we're here talking about today?

20 A    My understanding is, it was executed at virtually the same

21 time as the other agreements, yes.

22 Q    Mr. Johannesen, are you the officer at Reliant Energy

23 Inc., the ultimate parent company, principally responsible for

24 the sale process?

25 A    Yes.

**J&J COURT TRANSCRIBERS, INC.**

Johannesen - Cross                        137

1 Q    Okay.  And you, in fact, hired the Houlihan, Lokey, Howard

2 and Zukin investment banking firm, to facilitate the process,

3 to handle the process of the sale?

4 A    We hired them to help us explore strategic alternatives --

5 Q    Including --

6 A    -- of which

7 Q    Sorry, sir.

8 A    Included in the sale.

9 Q    You also hired them to explore strategic alternatives such

10 as refinancing of the outstanding indebtedness owed to the

11 lender group.

12 A    Yes.  That was one of the strategic alternatives that was

13 considered.

14 Q    Was there ever any discussion between you and Equistar

15 with regard to the prospect that the project was going to be

16 surrendered to the lender group in light of the fact that this

17 was not a strategic investment for Reliant Energy, Inc., and

18 that it desired to walk away from the project?

19 A    We had, as part of the November 2006 conversation we had

20 with then, we had with Equistar when we discussed our interest

21 in selling, we explained that the alternative would potentially

22 be turning it over to the lenders.

23 Q    And, did you, in fact, negotiate with the lenders for

24 terms under which the project would be surrendered to the

25 lenders?

**J&J COURT TRANSCRIBERS, INC.**

Johannesen - Cross                    138

1  A    We did have some conversations, we proposed a term sheet

2  to them.  That transaction never moved forward.

3  Q    Okay.  Now, let me talk for a moment about the cash flow

4  participation agreement.  The CFPA addresses whether Equistar

5  owns a royalty payment not an equity interest, does it not?

6  A    It refers to a royalty payment which has some -- certainly

7  has a number of equity like features to it.

8  Q    The royalty payment, as stated in the cash flow

9  participation agreement is tied into the investment return of

10 the partners as defined within the cash flow participation

11 agreement, namely, the Reliant entities that are partners in

12 the Reliant Energy Channelview LP partnership?

13 A    Well, the CFPA relates to both the partners and Equistar.

14 Q    Yes, but the royalty payments are going to be determined

15 in terms of percentage payable to Equistar, based upon the

16 after tax internal right of return earned by the partners of

17 the Channelview partnership which does not include Equistar.

18 A    That is my understanding.

19 Q    The CFPA also states that it is not intended to create a

20 partnership between Equistar and Channelview, under Section

21 4.3(c), correct?

22 A    I believe there's some language in there.  The exact -- I

23 wasn't around and involved in the formation of this document,

24 so I'm not sure what the original genesis was for those.

25 Q    And let me correct myself, it's actually Section 4.3(e),

**J&J COURT TRANSCRIBERS, INC.**

Johannesen - Cross                    139

1  I'm just having vision problems lately.  You're familiar with

2  the provision in the agreement that disclaims a partnership

3  between Reliant Energy Channelview LP and my client, Equistar.

4         MR. RAMOS:  Objection, Your Honor.  Calls for a legal

5  conclusion.

6         THE COURT:  Well, the document speaks for itself.

7  So, I'll sustain.

8  Q    Mr. Johannesen, did you read the debtors sale motion

9  before it was filed with this court?

10 A    Yes, I did.

11 Q    Is it fair to say that one of the debtors initial argument

12 is that Equistar's ownership interest is properly characterized

13 as an equity interest under the CFPA?

14 A    I would describe it as equity like, yes.

15 Q    Okay  So, it's not really straight equity, in your view,

16 it's equity like in your view?

17 A    I think it's a matter of semantics.  It certainly has the

18 characteristics of equity.

19 Q    Is it fair to say that the debtors sale motion argues that

20 even though the form of the parties agreement shows that

21 Equistar was to have no partnership with Reliant Channelview,

22 the argument is being made by reference to evidence outside of

23 the project agreements, that purportedly will show that an

24 equity interest was intended.

25         MR. RAMOS:  Objection, Your Honor, the document

**J&J COURT TRANSCRIBERS, INC.**

Johannesen - Cross                          140

1  speaks for itself.

2          THE COURT:  Well, overruled, I will allow him to

3  present questions regarding what your motion said.

4          MR. RAMOS:  It is compound, Your Honor, as well.

5          THE COURT:  All right.  Can you break it up?

6          MR. FINKELSTEIN:  Yes, Your Honor.

7  Q    The sale motion argues that even though the form of the

8  parties documents shows that Equistar was to have no

9  partnership with Reliant Energy Channelview, LP, isn't the

10 argument being made that by reference to evidence outside of

11 the project agreement, debtors will purportedly show that an

12 equity interest was intended?

13         MR. RAMOS:  Apologies, Your Honor, could counsel

14 direct to the specific location he's reading from, in the

15 motion?

16                         (Pause)

17 Q    Let me direct you to paragraph 60 of the sale motion.  Do

18 you have a copy of that handy?

19 A    It's quite possible.  Is there a binder you can refer me

20 to?

21         MR. FINKELSTEIN:  What I'll do, since it's a pleading

22 filed in the case, what I'd like to do is simply share with you

23 a copy of it.  I don't see any need to introduce the document

24 into evidence.  I'll provide you with a copy of paragraph 60

25 with the sale motion.

**J&J COURT TRANSCRIBERS, INC.**

Johannesen - Cross                          141

1          THE COURT:  Okay.

2  Q    You have paragraph 60 in front of you, Mr. Johannesen?

3  A    I do.

4  Q    Okay.  Do you see where it says that the court can readily

5  conclude that Equistar does not have any direct interest in

6  Channelview's assets?

7  A    Yes, general idea here, the whole page is paragraph 60?

8  Q    Yes, sir.  On the fourth line, as an equity like

9  instrument, the court readily can conclude that Equistar does

10 not have any direct interest in Channelview's assets.  You see

11 that?

12 A    Yes.

13 Q    And you see the next statement, the assets of a

14 corporation belong to the corporation and not to its

15 shareholders?

16 A    Yes.

17 Q    And you see the next sentence that says, indeed, this

18 basic principle of corporate law is mirrored in relevant state

19 specific limited partnership statutes.

20 A    I see that.

21 Q    And, you see the next sentence that says, a partner has no

22 interest in specific limited partnership property.

23 A    Yes.

24 Q    You don't read that to be an implication that Equistar is

25 a partner in the partnership?

**J&J COURT TRANSCRIBERS, INC.**

Johannesen - Cross                                142

1          MR. RAMOS:  Objection, Your Honor.  Counsel is

2   referring the witness to legal authority cited in the debtors

3   brief.  There's no foundation established for the nature of

4   counsel's question.  And the document speaks for itself.

5          THE COURT:  Sustained.

6   Q    Mr. Johannesen, did you have occasion to read the sale

7   motion before it was filed with the court?

8   A    I did.

9   Q    Do you subscribe to the notion that the characterization

10  of Equistar's interests under the cash flow participation

11  agreement is a partnership interest?

12         MR. RAMOS:  Objection, Your Honor.  Again, I believe

13  he's calling for a legal conclusion.

14         THE COURT:  Well, overruled.  Is that the position of

15  the debtor.

16         MR. RAMOS:  Okay.

17         THE WITNESS:  That economically it's effectively a

18  partnership, yes.

19  Q    Okay.  Is the partnership one in which Equistar is a

20  partner in Reliant Energy Channelview LP, in your view?

21  A    Economically it has partnership like interests.

22  Q    Okay.  So, you're saying that my client Equistar

23  Chemicals, LP, is a partners in Reliant Energy Channelview LP,

24  the debtor in this case?

25         MR. RAMOS:  Objection, asked and answered, Your

**J&J COURT TRANSCRIBERS, INC.**

Johannesen - Cross                       143

1  Honor.

2            THE COURT:  Overruled.

3            THE WITNESS:  It has -- there's partnership like

4  elements.  I don't think it is in other senses -- the formal

5  partners of the LP are Reliant Energy Channelview, Texas and

6  Reliant Energy Channelview, Delaware.   If that's what your

7  question is, those are the legal partners in the partnership.

8  Q    Well, my question is, who are the legal partners in the

9  partnership, 100 percent of the partnership interests are owned

10 by the entities that you just referenced, correct?

11 A    Yes.

12 Q    Okay.  You don't have any personal knowledge of any

13 evidence that an equity interest was intended by either Reliant

14 Energy Channelview, LP or its parent company, or by Equistar

15 Chemicals LP?

16 A    I have no evidence regarding what was the initial

17 intention or genesis of these agreements, other than what I've

18 heard here and read in the different motions.  From reading the

19 agreement, I can draw some conclusions that it certainly has a

20 lot of those type of characteristics as I've said, but I wasn't

21 involved in 1999.

22 Q    And, you can't tell what the intent of the parties was

23 prior to entry into the agreement because you weren't involved

24 in the negotiation process.

25 A    I was not involved, but as I said, there's certainly

**J&J COURT TRANSCRIBERS, INC.**

Johannesen - Cross                    144

1 characteristics in these agreements that have equity like or

2 partnership like elements to them.

3 Q    Has Reliant Energy Channelview LP, the debtor in this

4 bankruptcy case, conducted its relationship with Equistar

5 Chemicals, my client, as if Equistar is a partner with Reliant

6 Energy Channelview LP?

7 A    We've had -- there is certainly an element of partnership.

8 We've had a lot of conversations with them, we've tried to keep

9 them apprized of the process.  We worked with them on different

10 issues.

11 Q    Are you using the term partnership, sir, in the technical

12 legal sense or are you using it in the commercial sense of two

13 parties trying to work together to accomplish an objective?

14 A    I'm not an attorney so I'm not opining on any kind of

15 consequences of a legal definition.

16 Q    Are you under the impression that Reliant Energy

17 Channelview LP, owes fiduciary duties to my client, Equistar?

18        MR. RAMOS:  Objection, Your Honor, calls for a legal

19 conclusion and, frankly, the relevance is just not

20 demonstrated.

21        THE COURT:  Well, please speak into the microphone

22 because you're objection is not being picked up.

23        MR. RAMOS:  I'm terribly sorry, Your Honor.

24 Objection, it calls for a legal conclusion and, frankly, on the

25 basis of relevance as well.

**J&J COURT TRANSCRIBERS, INC.**

Johannesen - Cross                    145

1         THE COURT:  Well, I'm not sure it's irrelevant but it

2    does call for a legal conclusion.  Sustained.

3         MR. FINKELSTEIN:  And I'm asking for his business

4    understanding in the way the parties have conducted their

5    affairs as to whether he has treated my client as a legal

6    partner with fiduciary duties --

7         THE COURT:  Ask that question, ask it.

8         MR. FINKELSTEIN:  Okay.  Yes, Your Honor.

9    Q    Mr. Johannesen, has Reliant Energy Channelview LP treated

10   by client as if it is a partner owed fiduciary duties

11   throughout the relationship between the parties, to the extent

12   you have personal knowledge?

13   A    Based on my personal knowledge and business understanding,

14   I think a fiduciary duty is an obligation to maximize value for

15   all, and interests of all stakeholders.  To the extent that

16   Equistar is an off-taker of the Channelview Cogeneration plant,

17   I believe that we've operated in the way which is consistent

18   with  maximizing value to them, whether it's attempting to

19   operate the plant effectively and reliably, whether it's

20   honoring our contractual commitments in delivering power and

21   steam, and so forth, and the terms agreed, whether it's

22   maximizing the proceeds of a sale, to maximize the value of all

23   stakeholders, I felt that we've acted in a manner consistent

24   with that.

25   Q    Have you considered that Reliant Energy Channelview LP

**J&J COURT TRANSCRIBERS, INC.**

Johannesen - Cross                    146

1  owes a duty of loyalty to Equistar greater than the duty that

2  the entity owes to itself?

3          MR. RAMOS:  Your Honor, again, calls for a legal

4  conclusion.

5          THE COURT:  Sustained.

6  Q    Do yo consider Equistar's interest to be paramount as

7  between the two parties, such that Reliant Energy Channelview,

8  LP has to look out for the interests of Equistar, ahead of the

9  interests of the debtor entity?

10         MR. RAMOS:  Your Honor, again, it's the same line of

11 questioning that's being pursued.

12         THE COURT:  No, overruled.

13         MR. RAMOS:  Thank you.

14         THE COURT:  I'll allow that.

15         THE WITNESS:  I believe that the project has

16 obligations to all of its stakeholders.  All of its contract

17 parties, its lenders.  It has obligations and duties to protect

18 and preserve to the extent it can maximize the value of all

19 those interests.

20 Q    Okay.  Mr. Johannesen, I'm not asking my questions very

21 well.  I'm asking for you to prioritize the duties that are

22 owed by the debtor entity.  Does it have duties owed to my

23 client, Equistar that are paramount or come ahead of the duties

24 that the entity owes to itself?

25 A    I've never --

**J&J COURT TRANSCRIBERS, INC.**

Johannesen - Cross                    147

1        MR. RAMOS:  Excuse me, Your Honor, objection.  That

2   calls for a legal conclusion.

3        THE COURT:  Overruled.

4        THE WITNESS:  I've never thought of it in those

5   terms.  If I found myself in a situation where I felt that

6   there is a conflict between those interests, I would speak to

7   an attorney and get advice on that. But we've -- as I said,

8   we've managed the project in a way that attempts to maximize

9   the value and interests of all stakeholders.

10  Q    Let's talk about the lenders to the project for a moment.

11  Does Reliant Energy Channelview LP, the debtor partnership,

12  view itself as having a duty to the lenders that is paramount

13  over the duty that Reliant Energy Channelview LP owes to

14  itself?

15        MR. RAMOS:  Objection, Your Honor, on the grounds of

16  relevancy.

17        THE COURT:  Sustained.

18  Q    You have business interests that need to be fulfilled with

19  regard to the lenders in connection with the operation of this

20  project.  Do you consider the relationship between Reliant

21  Energy Channelview LP and the lenders to be a partnership?

22        MR. RAMOS:  Objection, Your Honor.

23        THE COURT:  Overruled.

24        MR. RAMOS:  Thank you.

25        THE WITNESS:  No, I view it to be a lending

**J&J COURT TRANSCRIBERS, INC.**

Johannesen - Cross                    148

1  arrangement.  We've borrowed money from them and as a result of

2  that, we've entered into certain obligations back to them.

3  Q    Okay.  May I approach, Your Honor?

4         THE COURT:  You may.

5  Q    Mr. Johannesen, I've handed you what has been previously

6  marked as Johannesen 19, a document I questioned you about at

7  your deposition.  Are you able to identify that document, sir?

8  A    Based on the face of it, it is a 2004 U.S. Return of

9  Partnership Income.

10 Q    And, is any of the content of the U.S. Return of

11 Partnership Income reflective of how the partners in the

12 partnership are, for Internal Revenue Service purposes?

13 A    I'm not a tax person, I haven't -- other than you're

14 presenting this to me in my deposition, have not seen this

15 document before.  I'm not sure how these forms are prepared.

16 Q    Is this a 1065 U.S. Return of Partnership Income for 2004

17 for Reliant Energy Channelview LP, one of the debtors in this

18 case?

19        MR. RAMOS:  Your Honor, lack of foundation and he's

20 already testified about his knowledge of this document.

21        THE COURT:  Sustained.  Lay a foundation as to his

22 knowledge.

23 Q    Mr. Johannesen, is the partnership required to file

24 partnership returns on Internal Revenue Service from 1065?

25 A    I understand the partnership has some tax obligations.  I

**J&J COURT TRANSCRIBERS, INC.**

Johannesen - Cross                              149

1  don't know what those are, or what forms need to be required to

2  exercise those obligations.

3  Q    Do you not know, sir -- strike that.  Mr. Johannesen, you

4  are a certified public accountant, are you not?

5  A    I am.

6  Q    And you're the vice president and treasurer of this

7  entity, are you not?

8  A    I am.

9  Q    Okay.  Do you not know whether or not this partnership is

10 required to file an income tax return utilizing Form 1065?

11 A    I'm sure that an income tax form needs to be filed.  I can

12 assume based on what you've shown me that 1065 is one of them,

13 but I have no personal knowledge of what IRS tax forms would

14 need to be filed.  Tax is no -- our tax department does not

15 report to me.  I have no direct involvement with that.

16 Q    Do you have any reason to disbelieve that this is the U.S.

17 partnership income tax return for that entity, for 2004?

18 A    I do not.

19 Q    Do you recognize the signature on the first page of the

20 document?

21 A    I do not.

22 Q    Could I get -- please turn your attention to Bates

23 numbered Page 9219.

24 A    I have it.

25 Q    Okay.  Do you see a signature on that page, sir?

**J&J COURT TRANSCRIBERS, INC.**

Johannesen - Cross                    150

1  A    I do.

2  Q    And who is the signatory on that page?

3  A    That would be Michelle Watkins.

4  Q    Do you know Ms. Watkins?

5  A    I know who she is.

6  Q    Okay.  Do you know who she works for?

7  A    Well, she no longer works for Reliant.

8  Q    So, she previously worked for Reliant?

9  A    That's correct.

10 Q    And was one of her duties preparing income tax returns on

11 behalf of the partnership, or requests for extension of time to

12 file income tax returns on behalf of the partnership?

13 A    As she didn't report to me I have, frankly, no idea what

14 her specific responsibilities are.  The fact that she has

15 signed this, it would appear to suggest she has at least some

16 involvement in the preparation of these returns.

17        MR. FINKELSTEIN:  At this time, Your Honor, I offer

18 Johannesen Exhibit 19.

19        THE COURT:  Well, let's wait until after cross, or

20 redirect, I guess.

21        MR. FINKELSTEIN:  Yes, Your Honor.

22 Q    Mr. Johannesen, is there any indication in this document

23 that my client Equistar Chemicals LP is a partnership in the

24 debtor partnership?  Is a partner in the debtor partnership?

25 A    I'm not familiar with this document.  I can page through

J&J COURT TRANSCRIBERS, INC.

Johannesen - Cross                    151

1  it and look and see if I see their name, if that's what you're

2  asking me to do.

3  Q    I would like you to do that, sir.

4         MR. RAMOS:  Your Honor, the document does speak for

5  itself.  If all counsel is asking him to do is see if the word

6  Equistar is identified in the document, it does speak for

7  itself.

8         THE COURT:  Well, do you have an objection to the

9  admission of this exhibit?

10        MR. RAMOS:  Your Honor, this is a document that has

11 been labeled as confidential.  And I'd like to reserve the

12 right to consider that issue at this time.

13        THE COURT:  Well, then let's let him leaf through it,

14 see if he sees Equistar in there.

15                    (Pause)

16        THE WITNESS:  Based on my glance I do not see it.

17 Q    Mr. Johannesen, let me direct your attention to the Bates

18 numbered Page 9220.

19 A    I have it.

20 Q    Do you see the title of that document?

21 A    Schedule K-1, Form 1065.

22 Q    And who does that Schedule K-1 relate to?

23 A    It relates to the Reliant Energy Channelview LP

24 partnership.

25 Q    And under part H of that form, who does it indicate is the

**J&J COURT TRANSCRIBERS, INC.**

Johannesen - Cross                                152

1  partner?

2  A    Reliant Energy Channelview, Texas, LLC.

3  Q    That's the debtor entity that you referred to earlier,

4  that owns a 1 percent general partnership interest --

5  A    The general partner, yes.

6  Q    Yes, the general partner.  Please continue turning through

7  the pages until you get to Page 9222.

8  A    I'm there.

9  Q    All right, sir.  And what do you see there?

10  A    I assume you're referring to what partnership is named?

11  Q    Yes.  What partnership is named and what partner is named?

12  A    The partnership is Reliant Energy Channelview LP, in box

13  B.  In box H the partner is Reliant Energy Channelview

14  Delaware, LLC.

15  Q    May I approach the witness, Your Honor.

16        THE COURT:  You may.

17  Q    Mr. Johannesen, I've now handed you what's been previously

18  marked as Johannesen Exhibit 20.  Can you please tell me for

19  the record what this document purports to be?

20  A    Form 1065, U.S. Return of Partnership Income for 2005.

21  Q    And, for what entity?

22  A    Reliant Energy Channelview LP.

23  Q    Does this document also reflect the signature of Michelle

24  Watkins?

25  A    Is there a Bates number?  I flipped through and didn't see

**J&J COURT TRANSCRIBERS, INC.**

Johannesen - Cross                    153

1  it.

2  Q    I'm overlooking it myself, Mr. Johannesen, let me see if

3  I can find it for us.  I think that what happened here is, she

4  didn't file for an extension so her signature is not included.

5  I would like to next direct your attention to Bates numbered

6  Page 4036.

7  A    I have it.

8  Q    You see that that is a Form K-1 for 2005 for Reliant

9  Energy Channelview LP?

10  A    Yes.

11  Q    And you see in box H it refers to Reliant Energy

12  Channelview Delaware, LLC, as a 99 percent limited partner?

13  A    Yes.  Based on Section L and H, that appears to be

14  correct.

15  Q    And then turning back to Page 4038.

16  A    I'm there.

17  Q    Do you see another K-1 for that year?

18  A    I do.

19  Q    For the debtor partnership?

20  A    Yes.

21  Q    Listing Reliant Energy Channelview Texas, LLC as the 1

22  percent general partner?

23  A    Again, based on boxes H and L, yes.

24  Q    Okay.  May I approach, Your Honor?

25        THE COURT:  You may.

**J&J COURT TRANSCRIBERS, INC.**

Johannesen - Cross                    154

1  Q    Mr. Johannesen, I've handed you what's been marked as

2  Johannesen 21 to your deposition.  Can you please identify that

3  document for the record?

4  A    The 2006 Form 1065, U.S. Return of Partnership Income for

5  Reliant Energy Channelview LP.

6  Q    Do you see a K-1 within that document, sir?

7  A    Is there a Bates number?

8  Q    I'll get there as quickly as I can.  I'm sorry, sir.

9  A    Okay, it's 8583.

10 Q    Thank you.  Do you see a K-1 there, sir?

11 A    I do.

12 Q    And that's for the debtor partnership?

13 A    Yes.

14 Q    And, what does it indicate with regard to the ownership

15 interest for Reliant Energy Channelview Texas, LLC?

16 A    It states Reliant Energy Channelview Texas, LLC is the

17 partner and in Section L refers to 1 percent share of profit,

18 loss and capital.

19 Q    And, it refers to it as the general partner, does it not?

20 A    Yes, in box I.

21 Q    Okay, sir.  And then please turn to Page 8585 of that

22 document.

23 A    Okay.

24 Q    And this document reflects a K-1 for the other partner of

25 the partnership?

**J&J COURT TRANSCRIBERS, INC.**

Johannesen - Cross                    155

1  A    Yes, Reliant Energy Channelview Delaware.

2  Q    And, what does it reflect as its ownership interest in the

3  partnership?

4  A    Box L indicates 99 percent interest in profit, loss and

5  capital.

6  Q    And, is it reflected as a limited partner?

7  A    In box I it is, yes.

8  Q    Do you believe that my client Equistar shares in losses of

9  the Reliant Energy Channelview LP partnership?

10 A    To the extent there are losses of the partnership, they

11 would reduce future income and cash and, therefore, would

12 reduce distributions under the cash flow participation

13 agreement.

14 Q    Okay.  You understand that a partnership is a flow through

15 entity for income tax purposes, do you not?

16 A    Generally, yes.

17 Q    And, the tax attributes earned at a partnership level are

18 not taxed at the partnership level, they're paid out or

19 distributed to the partners of the partnership?

20        MR. RAMOS:  Objection, Your Honor, lack of

21 foundation.

22        THE COURT:  Overruled.

23        THE WITNESS:  Generally, my business understanding is

24 the income reported in this form would be reported by the

25 entities, the partners listed in the Form K-1's.

**J&J COURT TRANSCRIBERS, INC.**

Johannesen - Cross                          156

1  Q    So, in other words, the K-1 tells the partners the

2  distributive share of income or losses?

3  A    For IRS tax purposes, yes.

4  Q    Yes, sir.  And have you ever seen a K-1 relating to my

5  client, Equistar from this partnership?

6  A    I have not seen any K-1's related to this partnership,

7  other than what you've presented to me today.

8  Q    Do you still have the debtors binder of exhibits up there,

9  Mr. Johannesen?

10 A    Is that the skinny one?

11 Q    Yes, I believe it is.  Specifically, what I want to direct

12 your attention to is Debtors Exhibit 13, which is the second

13 amended and restated cash flow participation agreement.

14 A    I have it.

15 Q    Is the royalty payment that is paid to Equistar Chemicals

16 LP based in part upon the partners return on their investment

17 in the Channelview partnership?

18 A    The CFPA contemplates an internal rate of return concept,

19 which one of the inputs into that would be capital investments

20 in the project.

21 Q    Does the CFPA rely in any respect, on the internal rate of

22 return received by Equistar, before determining the royalty

23 payments that are due Equistar under that document?

24 A    It does not appear to, no.

25 Q    It's not any part of the calculation of determining the

**J&J COURT TRANSCRIBERS, INC.**

Johannesen - Cross                                157

1  internal rate of return earned by the partners of the

2  partnership?

3  A    You're referring to capital contributions from Equistar to

4  the project.

5  Q    Yes, sir.

6  A    No.

7  Q    Before this bankruptcy case was filed by these debtors did

8  any of them seek Equistar's consent to the filing of the

9  bankruptcy cases?

10 A    I don't recall requesting a consent -- request discussing

11 it and informing Equistar, keeping them apprized of the process

12 as we proceed towards the filing, but I don't recall a specific

13 consent request.

14 Q    And you didn't obtain Equistar's consent to the filing of

15 the bankruptcy case, to the best of your knowledge?

16 A    To the best of my knowledge, no.

17 Q    And you would be the person in a position to know because

18 you signed the bankruptcy petition that was filed in this case?

19 A    I would most likely know, it's been a few months now, but

20 I would expect to recall that, if I had.

21 Q    I want to ask you for your business understanding, Mr.

22 Johannesen, as to whether or not you consider this cash flow

23 participation agreement to be an ambiguous contract?

24 A    The -- I think the contract speaks for itself and it has a

25 number of terms in it.  I think one could argue that any

**J&J COURT TRANSCRIBERS, INC.**

Johannesen - Cross                            158

1   contract has some elements of ambiguity in it.  Certainly from

2   a legal side.  So --

3   Q    Okay.  Sorry.

4   A    So I'm not sure how to answer.

5   Q    You don't have an opinion one way or the other as a

6   businessperson as to whether this contract is completely

7   unambiguous or potentially ambiguous in certain respects?

8              MR. RAMOS:  Your Honor, asked and answered.

9              THE COURT:  Sustained.

10  Q    Mr. Johannesen, do you have any disagreement with the fact

11  that when the CFPA speaks about Equistar receiving a royalty

12  payment, pursuant to the cash flow participation agreement,

13  that that's exactly what the contract means?

14  A    I apologize, I'm not sure I understand the question.

15  Q    Do you have any reason to believe that when the contract

16  speaks in terms of paying a royalty payment to Equistar, that

17  is not what the parties meant to say?

18  A    Well, I think clearly they meant to have the words,

19  royalty payment in the contract, that's what is there.  What

20  was the intent or the economic significance of that, behind

21  that, I don't know, I wasn't involved in the negotiation of the

22  contract.

23  Q    And, to be clear, you don't really have any personal

24  knowledge about what the parties intent was at the time they

25  entered into this mix of project agreements?

**J&J COURT TRANSCRIBERS, INC.**

Johannesen - Cross                    159

1  A    As I testified to earlier, I don't have any direct

2  knowledge of the intent at the time of entering into the

3  agreement.  Based on the content of the agreement, I can

4  certainly draw conclusions about what the substance was meant

5  to be.

6  Q    As we sit here today, you recognize that the cash flow

7  participation agreement explicitly refers to other project

8  agreements within the four corners of the document?

9        MR. RAMOS:  Your Honor, the document speaks for

10 itself.

11       THE COURT:  Sustained.

12 Q    And, you're aware that the cash flow participation

13 agreement requires that one refer to Schedule X definitions,

14 second amended and restated version, to allow an interpretation

15 of the cash flow participation agreement?

16       MR. RAMOS:  Same objection, Your Honor.

17       THE COURT:  Sustained.

18 Q    When you read the cash flow participation agreement and

19 try to divine it's meaning, you personally referred to Schedule

20 X definitions for purposes of determining the meaning of the

21 cash flow participation agreement, do you not, sir?

22 A    It would depend on what I was specifically looking at it

23 for, but yes, there are occasions where I would refer to those

24 definitions.

25 Q    Mr. Johannesen, you headed up the bid process on behalf of

**J&J COURT TRANSCRIBERS, INC.**

Johannesen - Cross                        160

1  the debtors, correct?

2  A    I oversaw the sales process, yes.

3  Q    Okay.  And you agree that a successful bidder must be a

4  qualified relying assignee as specified within the definitions

5  contained within Schedule X?

6           MR. RAMOS:  Your Honor, calls for a legal conclusion

7  and, frankly, relevance.  I believe there was no objection

8  earlier today in terms of the bid process and who is determined

9  the highest and best.

10          THE COURT:  No argument, sustained.

11 Q    Mr. Johannesen, with your involvement in the sale process,

12 you're aware that certain of the prospective purchasers,

13 certain of the bidders, requested opportunities to have a face

14 to face meeting with Equistar prior to submitting asset

15 purchase agreements?

16 A    I'm aware of at least one bidder who asked for a --

17 requested a conversation.  They didn't specify face to face or

18 not, is my recollection, before executing an asset purchase

19 agreement.

20 Q    May I approach, Your Honor?

21          THE COURT:  You may.  Do we have a number for this?

22 An exhibit number?

23          MR. FINKELSTEIN:  I would like to mark it as the next

24 exhibit in sequence, which would be Johannesen 22.

25          THE COURT:  Okay.

**J&J COURT TRANSCRIBERS, INC.**

Johannesen - Cross                    161

1  Q    Mr. Johannesen, I've just handed you a document that we're

2  marking as Johannesen Exhibit 22.

3  A    I have it.

4  Q    Do you recall receiving a copy of this document,

5  specifically the cover sheet consisting of an e-mail and the

6  attachment consisting of a bid proposal from PSEG Global LLC?

7  A    I may remember it's receipt.  I don't remember the

8  specific contents of it.

9  Q    Does it appear to be a true copy of the document that you

10 remember receiving?

11 A    As far as I can tell, yes.

12 Q    And, it, in fact, bears Bates numbers, Reliant S-Star 851

13 through 853?

14 A    Yes.

15 Q    Okay.  On the second page of that document, sir, the

16 bottom paragraph would you please read the last sentence that

17 appears there?

18 A    Secondly, we believe that a face to face meeting with

19 Equistar Chemicals LP, Equistar, is essential to better

20 understand the planned commercial relationship between Equistar

21 and the facility buyer and to explore the commercial basis for

22 a -- turning to the next page -- discussions, and our getting a

23 clear understanding of the procedures and timing you would

24 propose to utilize to continue the sale process.  We would be

25 prepared to devote the necessary resources to conclude our due

**J&J COURT TRANSCRIBERS, INC.**

Johannesen - Cross                          162

1  diligence, which include reasonable access to the data room

2  facility and (indiscernible) personnel in support of the

3  binding bid.

4  Q    Are you aware of ever arranging a meeting between PSEG

5  Global, LLC and my client Equistar Chemicals LP?

6  A    My recollection, and this is eight months ago now, but my

7  recollection is that this letter did not quantify a specific

8  value level other than they expressed some general interest and

9  that before we would take any action on a letter of this sort,

10 regardless of the nature of the request, we would want to get

11 some indication that the value was at a level that would

12 justify investing further time in the bidder.  My recollection

13 is that PSE&G never came in with a bid at a level that was

14 attractive enough to warrant further action.

15 Q    But you never asked my client, Equistar, to meet with PSEG

16 Global in order to facilitate the obtaining of a dollar amount

17 bid from this company?

18 A    We did not.  And, as a general matter of principle, in

19 divestitures, we're selling assets.  We typically do not

20 facilitate meetings between bidders and other contractual

21 counter parties.

22 Q    You've been aware since at least the time that you met

23 with Equistar in November of 2006, that Equistar considers

24 itself to have some vital interests at stake in the sale

25 process.  You're aware of that, aren't you, sir?

**J&J COURT TRANSCRIBERS, INC.**

Johannesen - Cross                    163

1  A    I'm aware that they have some vital interests in the

2  generation facility.  In terms of interest in the sale process,

3  I guess I'm not quite sure how to answer that or what you're

4  getting to there.

5  Q    Well, you would understand that Equistar would certainly

6  have concern about who might be the successor owner and

7  operator of the Reliant Cogen. facility?

8  A    Yes.

9  Q    And, in fact, Equistar expressed to you concern in

10  November of 2006, that if Reliant Energy Channelview LP as no

11  longer going to be the owner or operator of the facility, that

12  Equistar needed to have the steam outage claim that is

13  sustained in March of 2006, addressed before the disposition of

14  the assets?

15  A    Yes.  They made that quite clear.  In fact, it became

16  evident that they would not waive confidentiality restrictions

17  until a settlement was reached in that litigation settlement.

18  Q    Or until the issue was somehow resolved?

19  A    Until it was resolved through a settlement agreement.

20  Q    And, did Equistar insist that it have its claim paid prior

21  to the disposition of the assets of Channelview?

22  A    That was the initial ask, but through the process of

23  negotiation, it obviously arrived in its final form, where that

24  payment is contingent on a sale.

25  Q    And, as soon as the parties met in early July of 2007, and

**J&J COURT TRANSCRIBERS, INC.**

Johannesen - Cross                    164

1  reached an agreement, Equistar readily consented, pursuant to

2  the settlement agreement, to the placement of the documents in

3  a data room for review by perspective bidders, provided they

4  all sign confidentiality agreements?

5  A    I believe that was directly embodied in the settlement

6  agreement, that waiver.  So, yes.

7  Q    And Equistar also requested as part of that settlement

8  process that Reliant Energy Channelview LP install a third

9  boiler feed water pump in order to try to prevent a recurrence

10 of the steam outage that had been occasioned in March of 2006?

11 A    Yes, part of the settlement agreement was an agreement to

12 install a pump.

13 Q    And the parties are sharing the cost of the installation

14 of that pump as we speak, are they not?

15 A    That is the agreement, yes.

16         MR. FINKELSTEIN:  Excuse me just a moment, Your

17 Honor.  Pass the witness, Your Honor.

18         THE COURT:  Redirect.

19         MR. RAMOS:  One moment, Your Honor.

20         MR. FINKELSTEIN:  May I withdraw that passing of the

21 witness?  I just realized I had a document I forgot to ask him

22 about.

23         THE COURT:  Yes, you may.

24         MR. FINKELSTEIN:  Thank you, Your Honor.

25         THE COURT:  Are we marking this Johannesen 23?

**J&J COURT TRANSCRIBERS, INC.**

Johannesen - Cross                                165

1          MR. FINKELSTEIN:  23, I believe.

2          THE COURT:  All right.

3          MR. RAMOS:  Your Honor, may I object to the use of

4    this document at this time.  Pursuant to agreement of the

5    parties, issues of valuation under the CFPA were left to

6    another day and I believe that this is only for that purpose.

7          MR. FINKELSTEIN:  Actually, the contrary, Judge.  I'm

8    quite willing to redact the first paragraph that appears on the

9    document.

10          THE COURT:  Okay.  Is that then redacting that, any

11   objection to the rest of the document?

12          MR. RAMOS:  Well, why don't I -- I guess I should

13   have waited to hear what counsel is going to ask.

14          THE COURT:  All right.

15          MR. RAMOS:  Apologize, Your Honor.

16          MR. FINKELSTEIN:  And, I should have mentioned that I

17   didn't intend to ask any questions about the first paragraph.

18   Q    Mr. Johannesen, is this a document from your file?

19   A    It appears to be, yes.

20   Q    And, what is?

21   A    It is an e-mail from Noel Tobin to me.

22   Q    Who is Noel Tobin?

23   A    Noel Tobin works for me.

24   Q    And, with respect to the portion of the document beginning

25   with, here's a summary of contract terms --

**J&J COURT TRANSCRIBERS, INC.**

Johannesen - Cross                        166

1  A    Yes.

2  Q    -- could you please read that into the record?

3  A    Here's a summary of contract terms.  One, steam agreement,

4  23 years in COD with three renewal periods of five years and a

5  fourth renewal term that expires in the 40th anniversary of the

6  COD.  Two, ESA.  17 years, renewal by E/S for one period of

7  three years.  Three, site lease.  40 years from COD, renewals

8  coterminous with steam renewals.  Four, services agreement.  23

9  years in COD, renewals conterminous with steam renewals.  Five,

10 CFPA, initial term of 23 years, from COD, renewals coterminous

11 with steam renewals.

12 Q    And he signs off, Thanks, Noel.

13 A    Thanks, Noel.

14 Q    And there's handwritten notation next to item four on that

15 document.

16 A    Yes, next to services agreement, the handwritten note

17 reads, includes water.

18 Q    And, that's your handwriting, sir?

19 A    Yes.

20 Q    The abbreviation COD, does that stand for commencement of

21 delivery?

22 A    I believe so, yes.  It's the time the plant came on line.

23 Q    It started delivering steam and electricity to the

24 Equistar Chemical plant?

25 A    I believe so.

**J&J COURT TRANSCRIBERS, INC.**

Johannesen - Redirect                    167

1  Q    And the term ESA, is that referring to the energy supply

2  agreement?

3  A    Yes.

4  Q    And, the term E/S, is that referring to my client

5  Equistar?

6  A    Yes.

7          MR. FINKELSTEIN:  Pass the witness, Your Honor.

8          THE COURT:  All right.

9                    REDIRECT EXAMINATION

10 BY MR. RAMOS:

11 Q    Mr. Johannesen, let me just ask you to stay on that one

12 document that counsel was just discussing.

13 A    Yes.

14 Q    Do you have it before you?

15 A    I do.

16 Q    The 23 years from COD, that's next to item number one,

17 steam agreement?

18 A    Yes.

19 Q    Do you understand that to refer to the term of that

20 agreement?

21 A    That is my understanding.

22 Q    And, how about for the ESA, what would be the term of that

23 agreement?

24 A    Seventeen years.

25 Q    And how about for the site lease?

**J&J COURT TRANSCRIBERS, INC.**

Johannesen - Redirect                    168

1  A    Forty years.

2  Q    You had -- thank you, you can put that away.  You had some

3  -- counsel had some discussion with you regarding certain tax

4  returns.

5  A    Yes.

6  Q    I just wanted to clarify.  Do you recall that discussion?

7  A    Yes, I do.

8  Q    I just wanted to clarify for the record did you have any

9  involvement in the preparation of these returns?

10 A    I did not.

11 Q    And familiarity with the person whose signature may appear

12 on certain of the tax returns discussed by counsel with you?

13 A    I'm familiar with that one signature on the first return.

14 Q    Were you familiar with the signature or were you just

15 familiar with the person --

16 A    I'm sorry, I stand correct.   I'm familiar with the

17 person.

18 Q    Okay.  And you hadn't reviewed these document -- I believe

19 you testified that these documents were presented to you at

20 your deposition is that correct?

21 A    That's correct.

22 Q    Now, aside from today, and your deposition, have you ever

23 seen these documents before?

24 A    I have not.

25 Q    I just wanted to make sure the record was clear.  Did you

**J&J COURT TRANSCRIBERS, INC.**

Johannesen - Redirect                    169

1  have any involvement in the negotiations back in 1999 that

2  preceded execution of the various agreements at issue?

3  A    I did not.

4  Q    You had some discussion as well -- I'm sorry, counsel

5  discussed with you as well a little bit about the -- some

6  initial discussions with the banks and the possibility of

7  turning over interest to the banks, do you recall that

8  discussion?

9  A    I do.

10 Q    And, just for my own purposes, to make sure I'm clear, at

11 some point the debtors decided not to go forward with that

12 route, correct?

13 A    Yes.

14 Q    And, would it be fair to say that the debtors did not

15 decide to --

16         MR. FINKELSTEIN:  Objection, Your Honor, these are

17 leading questions.

18         THE COURT:  Sustained.

19 Q    In terms of -- do you recall when the debtor -- that

20 decision not to go forward with the turnover to the banks

21 occurred?

22 A    It was, I think, late March, maybe early April of 2007.

23 Q    And, that would have been prior to the sale process that's

24 been discussed in depth today?

25 A    That is correct.

**J&J COURT TRANSCRIBERS, INC.**

Johannesen - Redirect                              170

1  Q    Do you recall the discussions regarding the face to face
2  meeting that counsel was referring to with PG&E?
3  A    Yes.  I think it was PSE&G but yes.
4  Q    Okay.  Now, I just wanted to clarify, with regard to the
5  question of the consent, requesting Equistar's consent for the
6  disclosure of the terms, the specific terms of the particular
7  agreements, when did the debtors first request that?
8  A    For the consent -- that would have been in November of
9  2006.
10  Q    And why did the debtors make that request for consent to
11  disclose those specific terms?
12  A    To facilitate a sales process.
13  Q    And when did the debtors actually receive the consent to
14  disclose those terms?
15  A    In July of 2007.
16       MR. RAMOS:  Thank you, Your Honor, no further
17  questions.
18       MR. FINKELSTEIN:  A little bit of recross, Your
19  Honor.
20       THE COURT:  All right.
21                  RECROSS EXAMINATION
22  BY MR. FINKELSTEIN:
23  Q    Mr. Johannesen, you just testified, I believe, that it was
24  April or May before the debtor and I guess the parent company
25  decided that they would not turn the facility back to the

**J&J COURT TRANSCRIBERS, INC.**

Johannesen - Recross                    171

1  lenders.

2  A    I believe I said March to April, or at least I meant to

3  day that.

4  Q    I'm sorry.  I wasn't catching your testimony.  So, March

5  or April of 2007 is when the debtor made the decision or

6  Reliant Energy Inc., on behalf of the debtor, made a decision

7  not to surrender the project back to the lenders?

8  A    That is correct.

9  Q    Okay.  And, so, the time period was let's say from April

10  through May, possibly June, before you obtained Equistar's

11  consent to the delivery of the confidential project agreements

12  into a data room?

13  A    It was -- we initially asked in November, they had said

14  no.  We went down a path with the lenders that ended, as I

15  said, in March or April and at that point we reinitiated

16  attempts to, or thereabouts, to get waivers from Equistar for

17  the confidentiality that we eventually obtained in July.

18  Q    The debt that's now currently owed with respect to the

19  facility to the lender group who are parties in this bankruptcy

20  case, that's a different lender group than previously, isn't

21  that right?

22         MR. RAMOS:  Your Honor, objection, this is outside

23  the scope of what was examined on cross.

24         THE COURT:  And why is it relevant?

25         MR. FINKELSTEIN:  Because what happened was that the

**J&J COURT TRANSCRIBERS, INC.**

Johannesen - Recross                    172

1  debt was sold at a premium and that changed Reliant's mind with

2  regard to whether or not --

3           THE COURT:  Well, why is that relevant, though?

4           MR. FINKELSTEIN:   Because the blame has been laid at

5  my client's feet for failing to facilitate a sale process from

6  --

7           THE COURT:  You've made your point here, but I don't

8  think a lender identity is relevant at all to that.

9           MR. FINKELSTEIN:  It's really the issue that the debt

10 was sold above par, Your Honor.

11          THE COURT:  I don't thin that's relevant

12          MR. FINKELSTEIN:  Thank you, Your Honor.  No further

13 questions, Your Honor.

14          THE COURT:  All right, thank you, you may step down.

15          THE WITNESS:  Thank you.

16          MR. RAMOS:  Your Honor, at this point the debtors

17 will call their last witness, Mr. Hardie, who will be presented

18 by Curt Mechling of the Stroock firm.

19          THE COURT:  Okay.

20          MR. MECHLING:  Good afternoon, Your Honor, Curt

21 Mechling from Stroock & Stroock & Lavan on behalf of Reliant

22 Energy.  I'd like to recall Mr. Hardie to the stand please.

23          THE COURT:  All right.  You should remain standing so

24 you can be sworn.

25          UNIDENTIFIED MALE SPEAKER:  He's already --

**J&J COURT TRANSCRIBERS, INC.**

Hardie - Direct                                    173

1         THE COURT:  Oh, today?

2         THE WITNESS:  Yes.

3         THE COURT:  Oh, I'm sorry.

4         UNIDENTIFIED MALE SPEAKER:  (Indiscernible).

5         THE COURT:  Yes, and it's even on the same motion,

6  okay.

7         THE WITNESS:  Nice to know I made such an impression,

8  Your Honor.

9         THE COURT:  How did I decide that first issue?  Go

10  ahead.

11                        DIRECT EXAMINATION

12  BY MR. MECHLING:

13  Q    Good afternoon, Mr. Hardie.  And we all have heard your

14  proffer and your confirmation of your proffer of testimony

15  concerning the sale process.  I just want to ask you three or

16  four questions about the place of the CFPA in that process.

17  First, when you first got involved in the sale process with

18  respect to the Channelview facility, did you at that time

19  provide prospective bidders with a copy of the CFPA?

20  A    No.  As has previously been testified, we weren't in a

21  position to disclose any of the Equistar contracts to the

22  bidders as part of the first round process.  And it wasn't

23  until, I think July 12th or so, which is after we had received

24  the first round bids, that we were in a position to release

25  those contracts to the people who were then part of the second

**J&J COURT TRANSCRIBERS, INC.**

Hardie - Direct                                      174

1  round because we had made a cut between the first and second

2  round at that point, to get to a more manageable group.

3  Q    And, what happened at around July of 2007 that permitted

4  you to be able to share the CFPA with your bidders?

5  A    We received Equistar's consent to, subject to

6  confidentiality arrangements, release the documents to the

7  potential --

8  Q    Do you know what the basis of that consent was?

9  A    I'm not sure I follow the question.

10 Q    Well, what -- I'll withdraw that.  And at that time did

11 you share the terms of the cash flow participation agreement

12 with prospective bidders?

13 A    We did, yes.

14 Q    Did you ascertain whether bidders were prepared to make

15 bids on the facility encumbered with the CFPA?

16 A    The process was essentially, we made presentations to all

17 of the second round bidders as to each of the various Equistar

18 contracts, the energy contract, the steam contract, et cetera.

19 And, then as we got closer and closer to the second round bid

20 deadline, we started the process of -- sorry, let me retract a

21 bit in terms of the process.  We made the presentations to the

22 second round bidders of all the Equistar contracts.  We then

23 had a series of diligence calls with them to make sure that

24 they were appropriate interpreting the way the contracts were

25 working from a financial modeling perspective, to make sure

1   that to the extent they had issues or questions about how to

2   model the financial impact of these contracts, that we sorted

3   those out so as to make sure that any second round bids that we

4   did get were as well informed as possible.

5       During the course of those conversations, most -- well,

6   frankly, all of the  bidders indicated that they were concerned

7   about the terms of the CFPA in that there were a number of

8   restrictions on the ability of a new owner to essentially take

9   a free hand, if you will, with respect to the operation of the

10  plant should they be the successful bidder, as well as the fact

11  that the terms of the CFPA essentially provided that a hundred

12  percent of the cash flows from the project aren't available to

13  an owner, they have to share those cash flows through the

14  royalty arrangements that are embedded in the contract, the

15  CFPA, with Equistar.  So, we were essentially selling them less

16  than 100 percent of the cash flows from the project and those

17  cash flows were encumbered, if you will, by a relatively

18  lengthy list of fairly significant restrictions on the new

19  owner's ability to manage the project as they wish.

20  Q    Based on that feedback, did you and the debtors make a

21  decision as to whether to market the facility with the CFPA?

22  A    We spent a great deal of time analyzing whether or not it

23  was possible to solicit bids with and without the CFPA and

24  ultimately concluded based on the reaction that we had gotten

25  from the bidders, that it was unlikely we were going to get

Hardie - Direct                                176

1   bids or bids at values that we thought would be acceptable if

2   we asked people to bid with the CFPA.  And, so, ultimately our

3   second round bid instruction letter indicated that we wanted

4   people to assume that the CFPA was not part of the contracts

5   that they would have to assume.

6   Q    Did you come to a conclusion about whether you could, you

7   and the debtors could maximize value for the estate by

8   marketing the facility encumbered with the CFPA?

9   A    I mean, the indications that we got from the people who

10  were part of the second round, were they either would not bid

11  because of the implications of the CFPA, or if they did bid,

12  that those bids would be, you know, somewhere less than the

13  secured debt claims here and, consequently, it was my opinion,

14  which I advised our clients, that that would not be a value

15  maximizing approach to take here and that the more -- the

16  better approach to take would be to ask the people to bid

17  without the CFPA and work out with Equistar some financial

18  accommodation to get out of the CFPA.

19            MR. MECHLING:  Thank you.  I have nothing further,

20  Your Honor.

21            MR. CAPONI:  Good afternoon, Your Honor, Steve Capone

22  from Blank Rome.

23                      CROSS EXAMINATION

24  BY MR. CAPONI:

25  Q    Good afternoon, Mr. Hardie, we meet again.

                   **J&J COURT TRANSCRIBERS, INC.**

Hardie - Cross                      177

1   A    Good afternoon.

2   Q    I want to go over a couple topics with you and we'll start

3   off with -- Your Honor, this is previously marked Johannesen 8.

4   Mr. Hardie, again, I would assume you're familiar with this

5   document, this is, in fact, the engagement letter for your firm

6   in connection with the sale of the Channelview Cogeneration

7   facility?

8   A    This is the engagement letter that we entered into with

9   Reliant Energy to provide them with the investment banking

10  services reflected, yes.

11  Q    And, this was the retention by Reliant Energy, Inc.,

12  correct?

13  A    That's correct.

14  Q    That's the equity holder not the operating debtor?

15  A    It's the ultimate parent company of the debtor.  I mean

16  there are intermediate subsidiaries between REI and the debtor,

17  yes.

18  Q    All right.  Again, you were retained or still retained,

19  solely by Reliant Energy, Inc., the ultimate equity holder and

20  the debtor.

21  A    That's correct.

22  Q    Your retention was not submitted for approval by the

23  court?

24  A    No, it was not.

25  Q    Okay.  And in conducting the sale process, you're

**J&J COURT TRANSCRIBERS, INC.**

Hardie - Cross                                178

1   ultimately responsible to Reliant Energy, Inc., as the party

2   with whom you're in the engagement agreement with.

3   A    That's correct.

4   Q    And, in fact, you were just questioned by counsel for

5   Reliant Energy, Inc., the equity holder a few minutes ago.

6   A    That's correct.

7   Q    Okay.  If you could take a look at paragraph one in your

8   letter, and we went over this in your deposition, where it

9   outlines the services to be provided and the one service, the

10  description of the service, says you're there to maximize the

11  value of the interest in Channelview project for Reliant

12  Energy, Inc., is that correct?

13  A    That's correct.

14  Q    Again, going back to your deposition, you testified that

15  the way you were going to maximize the value, from the get go,

16  was to sell the asset, being the cogeneration facility.

17  A    I think what I testified in my deposition was that we

18  evaluated the potential for refinancing the project, we

19  certainly explored a sale of the project.  We conducted a

20  discussion or two with the existing lenders about their

21  willingness to accommodate some form of restructuring here.  I

22  mean, it wasn't a foregone conclusion when we were retained

23  that we were going to immediately start a sale process.  You

24  know based on the experience that we have in dealing with

25  merchant energy facilities, over the last several years, you

**J&J COURT TRANSCRIBERS, INC.**

Hardie - Cross                              179

1 know, it didn't take us long to reach that conclusion, but we

2 certainly didn't come to the engagement with a foregone

3 strategy in mind.

4 Q    Do you recall testifying at your deposition that Reliant

5 Energy, Inc., wanted to maximize its value by divesting this

6 asset because it was not a core of the business operations?

7 A    I certainly recall testifying that Reliant Energy, Inc.,

8 had a number of issues with respect to the project that it

9 wanted to address.  One was to maximize value, one was to

10 eliminate the leverage associated with this project off of its

11 balance sheet.  But every step of the way, you know, our advice

12 to them was based on, you know, what was going to be the most

13 value maximizing course of action to take because, frankly, you

14 know, if there's value to be had here, they weren't prepared to

15 throw the baby out with the bath water, to accommodate some

16 other strategy.

17        MR. CAPONE:  Hold on one second, Your Honor, I just

18 have to grab a copy of the transcript.

19 Q    Here's a copy of your deposition.  Can you turn to Page

20 24, at the bottom?  It would be line 24.  Do you have that?

21 A    I have the question, yes.

22 Q    The question I asked you was: "Did Reliant come to you and

23 say we want to get cash out of this deal?  We don't mind

24 refinancing, you've got a blank slate, do what you want?  Did

25 they give you any indication as to what route they preferred to

                              Hardie - Cross                          180

1    see this project go down?"  And your answer was --

2              MR. MECHLING:  Your Honor, I objected to that

3    question.

4              THE COURT:  And what was your objection?

5              MR. MECHLING:  It was to the form and to the compound

6    nature of the question, Your Honor.

7              THE COURT:  Well, I'll allow the answer to be read.

8    Q    Answer, "I think they were generally interested in

9    divesting the project because it's not really core to what

10   Reliant does now based on the deregulation that occurred in the

11   markets a couple of years ago."  Did I accurately read your

12   answer?

13   A    That's an accurate recitation of what is, essentially a

14   page and a quarter of an answer, but yeah, sure, you've

15   summarized the first sentence.

16   Q    I'm sorry, you said I summarized it, did I accurately read

17   what was in the transcript or did I summarize it?

18   A    You accurately summarized the first part of -- the first

19   sentence of a page and a half answer.

20   Q    Okay.  Not to quibble, but did I accurately read the first

21   sentence, or did I accurately summarize the first sentence,

22   because I can read it again if you don't think I've read it

23   accurately.

24   A    I'll assume that you know how to read and that you read it

25   accurately.

                        **J&J COURT TRANSCRIBERS, INC.**

Hardie - Cross/ Caponi                    181

1 Q   Okay.  Thank you.  And, I believe also in your deposition

2 you testified that, and you testified here again today, that a

3 number of bidders were troubled by the Equistar agreements, the

4 various Equistar agreements, and that may have inhibited the

5 value of certain of the bids.

6 A   Well, I believe I testified at my deposition that the

7 energy contract that this project is a party to is deep in the

8 money in favor of Equistar and that you could increase the

9 value of the project if you were able to get out of that

10 contract.  But we did not attempt to do that as part of the

11 sale process.  And then I think as I testified at my deposition

12 and again today there are a series of restrictions on the

13 operations of the project embedded in the CFPA.  I think they

14 number A through L.  That basically gave people a great deal of

15 pauses to whether or not they were willing to put up with those

16 kind of restrictions when they were being asked to write a half

17 a billion dollar check for a power plan.

18 Q   And it's accurate for me to say that your testimony, to

19 summarize it, is a number of bidders expressed to you concern

20 about the Equistar agreements and that had a sort of deflating

21 effect on what you think you otherwise could have sold this

22 cogeneration facility for.

23 A   Well, I certainly know I could have sold it for more than

24 half a billion dollars if I could have eliminated the energy

25 contract, because as I've testified it's deep in the money in

Hardie - Cross/ Caponi                    182

1  Equistar's favor because it's an under market contract.

2  Q    Now, given that fact that in your view you could have sold

3  this asset for significantly more money had the agreements not

4  been in place yet you never approached Equistar to see about

5  renegotiating these contracts on terms that may make the

6  facility more valuable.

7  A    As I testified at my deposition our intention was to sell

8  the project with as many of the Equistar contracts in place as

9  we could for the highest possible value, and it was only the

10 cash flow participation agreement that people basically said we

11 either won't bid or we'll bid a number that's lower than the

12 bank bid.  And so as a consequence we believed that it was

13 value maximizing to move forward with the sale with only the

14 cash flow participation agreement excluded from the contracts

15 that we would ask the bidders to assume.

16 Q    Yet, you never approached Equistar on behalf of Reliant

17 Energy, Inc. or the debtor or any bidders to see if they were

18 interested in renegotiating the terms of those agreements to

19 make the asset more valuable or more marketable.

20         MR. MECHLING:  Your Honor, relevance.

21         THE COURT:  Overruled.

22 A    We did approach Equistar -- I believe I testified in my

23 deposition -- on behalf of one bidder late in the sale process

24 to try and facilitate a conversation with Equistar and that

25 particular bidder.  And ultimately we were never able to put

Hardie - Cross/ Caponi                183

1  the meeting together because the bidder pulled out.

2  Q    Let's take a step back a little bit, take a little bite

3  size.  You were hired to sell this asset -- when the sale was

4  determined it was your job to sell this asset for the maximum

5  value possible.  Correct?

6  A    Yes.

7  Q    And one of the ways you determined you could do that is to

8  agree to be able to get rid of certain Equistar agreements

9  including the cash flow participation agreement because it was

10 hindering bids.  Correct?

11 A    The only agreement that we determined we could not sell

12 the asset at a fair price for was the CFPA.

13 Q    Yet, you knew, being the person in charge of the sale,

14 never approached Equistar and said your agreement is inhibiting

15 the value of this project would you be willing to renegotiate

16 some of the terms or to meet with some of the bidders to

17 discuss the terms to alleviate their concerns?

18 A    Over the CFPA?

19 A    Over the CFPA.

20 A    That's correct.  Although as Mr. Johannesen testified

21 earlier there were a number of discussions between he and

22 representatives of Equistar about how to buy them out of the

23 CFPA.

24 Q    I believe you testified a second ago and again at your

25 deposition that the energy supply agreement was in your opinion

Hardie - Cross/ Caponi                    184

1  the one contract that was depressing the price of this facility

2  more than any other agreement?

3  A    It is deep in the money to Equistar.  Yes.  That's

4  correct.

5  Q    And you considered whether if you -- if the debtor

6  breached that agreement what the economic impact would be on

7  the estate?

8  A    No, we didn't do any analysis as to what the economic

9  impact of that would be because as I testified we concluded

10 that we could sell the project for a fair price leaving the

11 energy contract in place.

12 Q    Turn to Page 36 of your deposition.

13 A    I have it.

14 Q    Okay.  Go to Line 7.

15 "Q    Did you consider what the impact would be on the project

16 if you were able to unencumber it from the power sale contract?

17 "A    No.

18 "Q    If your testimony is that it is the one that is really

19 holding back the value why did you not explore that option?

20 "A    Because it was my advice to the client that whatever value

21 would be created from blowing up the contract would be the

22 measure of damages that Equistar would have from blowing it up

23 so the net to the client you're not getting anything and the

24 client being Reliant Energy, Inc. the equity holder."

25 A    Okay.

Hardie - Cross/ Caponi                    185

1  Q    Is that correct?

2  A    Yeah.   Sure.

3  Q    So you as the person in charge of this sale looked at, can

4  we get rid of this contract, and determine that if you did it,

5  you did get rid of the contract it would negatively impact your

6  client Reliant Energy, Inc.

7  A    As you and I discussed at my deposition this is a solvent

8  debtor.  So creating rejection damage claims doesn't get you

9  anywhere.  You're going to pay them.  So what's the point?

10 Q    But then you did look at the CFPA and conclude that if

11 you, quote, blew up that agreement the damages that would

12 result would not negatively impact Reliant Energy, Inc. to a

13 degree that you would not want to proceed with blowing up that

14 contract.

15 A    I believe what I testified at my deposition, and I

16 certainly testify today is, that we couldn't get people to bid

17 with the CFPA or if they would bid it would be below the bank

18 debt value.  And consequently the sale would not have paid off

19 the creditors in this case.  And consequently we made the

20 decision to sell it without the CFPA and fight with Equistar

21 later about how much money they'd get.

22 Q    Again, that analysis was driven by your conclusion that

23 you could get rid of the CFPA and still protect the interest of

24 your client Reliant Energy, Inc.

25        MR. MECHLING:  Your Honor, I've got to object on

**J&J COURT TRANSCRIBERS, INC.**

Hardie - Cross/ Caponi                186

1   grounds of relevance.  We're not here seeking to reject the

2   CFPA.  It is what it is.

3              THE COURT:  Well, sustained.

4              MR. CAPONI:  Your Honor, if I recall correctly the

5   debtor has sought alternative relief to reject the CFPA.  I

6   mean, it is at issue here.  And how we got through the sale

7   process of this contract being extracted out goes --

8              THE COURT:  I think they're not taking that position.

9              UNIDENTIFIED ATTORNEY:  Yes.  At the risk of speaking

10  for the debtors I don't believe that's the case.

11             MR. CAPONI:  Your Honor, I'll let that one slide to

12  the point.

13  BY MR. CAPONI:

14  Q    Mr. Hardie, at your deposition, am I correct, you

15  testified that at no point during the sale process did you

16  recommend to the debtors or to your client Reliant Energy, Inc.

17  that you put Equistar in a room with potential bidders to try

18  to alleviate the concerns of potential bidders regarding what

19  would be an ongoing relationship following a sale?

20  A    I'm not sure I understand the question.

21  Q    You never suggested that potential bidders meet with my

22  client Equistar throughout the entire bid process in order to

23  address their concerns over the CFPA or any of the other

24  contracts.

25  A    I believe as I testified there was one bidder that we did

Hardie - Cross/ Caponi                    187

1  recommend we try and set up a meeting with Equistar with and we

2  tried and as I previously testified that bidder ultimately

3  concluded that they were no longer interested in pursuing the

4  project and pulled out of the process.

5         MR. CAPONI:  Your Honor, just to clarify, I guess,

6  what I said earlier not that I'm going to harp on it, but the

7  motion from the debtors Paragraph 78.  "Therefore, based on the

8  foregoing even if the CFPA is an executory contract the debtors

9  are entitled to reject the CFPA because the CFPA and other

10 Equistar agreements are severable under Texas law," and it goes

11 on.  But I will pass on that point.

12        THE COURT:  All right.

13        MR. CAPONI:  Just wanted to clarify the record.

14        THE COURT:  All right.  Thank you.

15 BY MR. CAPONI:

16 Q    If I may step back for a second.  Recall my question.  You

17 testified earlier that the bidders were -- the bids were not as

18 high as you would have liked because some of the bidders had

19 concerns about the Equistar contract, specifically the CFPA.

20 Is that correct?

21 A    No.  What I testified was that certain of the bidders

22 indicated they were not going to move forward in the process if

23 they were required to encumber the asset with restrictions

24 embodied in the CFPA.  And certain other of the bidders

25 indicated that they might be willing to move forward, but that

Hardie - Cross/ Caponi                    188

1  they did not anticipate being able to get to values that would

2  be north of the bank debt.

3  Q    Do you recall at your deposition I asked you if you ever

4  recommended that the debtor -- excuse me -- that potential

5  bidders sit down with Equistar in an effort to maximize the

6  bids, and you testified that you did not want to go down that

7  road because you did not want to disrupt the working

8  relationship with Equistar?

9  A    I believe what I testified was that we had -- we were

10 trying to minimize -- and I think the exact words I used was

11 the violence that we did to the contractual relationships with

12 Equistar and it was only the CFPA that we believed was going to

13 prohibit a sale from getting done here and that while the value

14 would be impacted by the energy contract that we could get a

15 deal done at a price that would pay the creditors off in full

16 here.  And ultimately that's what happened.

17                        (Pause)

18 Q    My understanding is the sale process sort of took the bid

19 process at two phases.  You had the first set of bids and you

20 narrowed it down to a set of seven what you deem as qualified

21 bidders that you would invite the bid a second time?

22 A    Well, I wouldn't use the word qualified bids because we've

23 debated that one enough today.  But there was a group of seven

24 bidders that we took into the second round which we believed

25 had, you know, values at that stage of the process that were

**J&J COURT TRANSCRIBERS, INC.**

Hardie - Cross/ Caponi                189

1  attractive and that would have resulted in the payment in full

2  of all of the creditors in this case.  And so it was those

3  bidders that we provided all the Equistar contracts to,

4  provided site visits to facilitate a sense of diligence for and

5  ultimately solicited second round bids from, I believe, in the

6  process between first and second round a couple of those seven

7  may have even dropped out after they had been provided with

8  copies of all of the various Equistar contracts.  But my

9  memory's a little fuzzy at this point because it's been gone on

10 for almost a year now.

11 Q    When you got to the second phase you were down to seven

12 bidders.

13 A    I believe that's correct.  Yeah.

14 Q    And even when you were down to seven bidders you never

15 approached Equistar and said would you please meet with these

16 seven bidders to give them comfort going forward in an effort

17 to try to maximize their bids.

18 A    We did not offer people the opportunity to meet with

19 Equistar.  That's correct.

20 Q    And whoever owns -- am I correct, whoever ends up

21 acquiring this cogeneration facility is going to have

22 extensive, I'll say, daily contact with Equistar as a result of

23 the various contracts back and forth for steam and water and

24 electricity?

25 A    I'm not familiar enough with the frequency of the

1  contacts.  But, yes, there will be a great deal of contact.

2  Q    And did it not occur to you that you may be able to

3  increase the bids if you were able to get the buyers

4  comfortable with who was going to be their, to keep using the

5  word partner, let's say the party with whom they're going to

6  have significant ongoing daily relationships with?

7  A    The buyers were basically bidding on the asset that we

8  have to sell and the contracts that that asset is a party to.

9  And that's what we wanted to find out what the highest and best

10  price was and that's what we ultimately did.

11  Q    I believe earlier, probably was this morning, maybe early

12  afternoon, when Ms. Tibbitts was testifying, I believe you were

13  in the courtroom.

14  A    I was.  Yes.

15  Q    Okay.  Do you recall the testimony Mr. Stearn was

16  questioning her regarding whether or not Equistar was kept

17  apprized of the bidding process and informed as to what was

18  taking place.  Do you recall that exchange?

19  A    I recall the line of questioning.  Yes.

20  Q    Okay.  You were the person primarily responsible for

21  marketing and selling these assets?

22  A    That's correct.

23  Q    And you never contacted Ms. Tibbitts to say can we get

24  together with any of these bidders, try to address your

25  contract concerns, to try to maybe encourage more bidders or

Hardie - Cross/ Caponi                    191

1  higher bids?

2  A    The principal contact between Reliant and Equistar on the

3  Reliant side of the fence was Mr. Johannesen.

4  Q    Did Mr. Johannesen contact to your knowledge Ms. Tibbitts

5  and say we'd like you to come in meet with a number of these

6  bidders.  We have some bidders that are on the fence.  Let's

7  talk about your contract, see if we can maximize the value for

8  everyone?

9  A    He would be the better person to ask that question of.

10 Q    You were in charge of the sale process.  You're getting a

11 commission and I assume payment if the sale goes forward?

12 A    I hope so.

13 Q    All right.  Then I take it you've got a financial

14 interest.  You were keeping, you know, yo were somewhat paying

15 attention to all that's taking place?

16 A    Certainly did.

17 Q    Okay.  And your paying attention did you ever hear anybody

18 talk about phone calls to my client saying get together with

19 the bidders to try to work through some of these issues to make

20 sure we maximize the bids and the value for everyone?

21 A    I was aware of the fact that Mr. Johannesen was having

22 conversations with Ms. Tibbitts, but was not a party to those

23 conversations.

24          MR. CAPONI:  I'm done, Your Honor.

25          THE COURT:  Any redirect?

J&J COURT TRANSCRIBERS, INC.

Hardie - Redirect/Mechling / Recross/Caponi        192

1        MR. MECHLING:  Your Honor, on redirect I have just a

2   couple of questions.

3                    REDIRECT EXAMINATION

4   BY MR. MECHLING:

5   Q    Am I correct that at the end of the process you had two

6   finalist bidders, Kelson and Fortistar?

7   A    That's correct.

8   Q    And when you got to those two finalists was Equistar given

9   an opportunity to speak to those bidders?

10  A    Equistar, a meeting was facilitated between Equistar and

11  each of those bidders.  The Kelson representatives after their

12  contract was signed and then the Fortistar group between when

13  the auction procedures were ordered and the auction itself, so

14  after they had submitted their papers on Thursday of last week

15  there was a meeting on Friday at which the big group was given

16  the opportunity to meet with Equistar.

17  Q    And was that part of the process that's eventuated in the

18  $500 million bid for these assets?

19  A    It is.  Yes.

20        MR. MECHLING:  I have no further questions.

21        MR. CAPONI:  A couple quick questions, Your Honor.

22                    RECROSS EXAMINATION

23  BY MR. CAPONI:

24  Q    Focusing on these last two bidders and the conversations

25  that took place in the last few weeks those conversations took

                    J&J COURT TRANSCRIBERS, INC.

Hardie - Recross/Caponi                    193

1  place in the context of the CFPA absolutely not being part of

2  this sale.  Correct?

3  A    We had been informed by both of those parties that they

4  had no intention of moving forward if the CFPA was part of the

5  process.

6  Q    Mr. Hardie, you sent out a document soliciting bids?

7  A    We sent out a bid instruction letter in the beginning of

8  August as I recall indicating that we wanted people to bid on

9  the project and assumed that they were bound by all of the

10  contracts other than the CFPA.

11  Q    Okay.  So then it's no surprise that the bids you received

12  complied with your request which is give us a bid that excludes

13  the CFPA.

14  A    It's my experience in selling both these kinds of projects

15  as well as other assets in bankruptcies that bidders very often

16  will send you what they intend to send you as opposed to what

17  you ask for.  But in this particular instance I had had direct

18  conversations with the senior representatives of both of these

19  bidders and been told in no uncertain circumstances were they

20  willing to bid if they were required to live up to all of the

21  restrictions that were contained in the CFPA.

22  Q    And it never occurred to you to say how about I put you in

23  the room with Equistar to see if you guys can come to an

24  amicable resolution of this issue to avoid exactly what we're

25  doing here today so that everyone gets the full value of their

Hardie - Recross/Caponi                    194

1  contracts.

2  A    In fact, what I told both of those bidders was we'll take

3  care of the CFPA issue.  You tell me what you're willing to bid

4  on the project assuming the CFPA's our problem, meaning

5  Reliant's problem.

6  Q    And the reason you didn't want to put the bidders in a

7  room with Equistar is because if it resulted in a lower bid

8  price to compensate Equistar for its contract that would be a

9  dollar less going into your client's pocket the Equity Reliant

10 Energy, In.

11 A    I'm not sure I followed the question.  You're going to

12 have to ask me that one again.

13 A    Let's say Kelson come Fortistar the bidder.  If they met

14 with my client and said we'll reduce our bid to 480 million and

15 we'll give you the 20 million to buy you out of the CFPA that

16 would result in potentially $20 million less that could go

17 upstream to your client Equity Reliant Energy, Inc.

18 A    It's impossible for me to speculate as to how those kinds

19 of conversations would go forward.

20 Q    I'm not asking you to speculate about the conversation.

21 I'm asking you to tell me what would happen with the dollars.

22 If a bidder dropped it's bid by $20 million and satisfied my

23 client's concern over the CFPA that would be $20 million less

24 that would be available to go to Equity.

25 A    You're assuming that there's a fixed dollar amount that

Hardie - Recross/Caponi                    195

1  the bidder is willing to pay both for the asset as well as to

2  the elimination of the CFPA.

3  Q    Isn't it safe to say that whatever dollars would go to

4  Equistar to compensate them for the CFPA would be less dollars

5  that would be potentially available to go upstream to Equity?

6  A    I have no idea.

7  Q    That thought never occurred to you or to your client or to

8  the debtors?

9  A    It was our judgment that the best way to sell this asset

10 was to get people to bid on the asset assuming all of the

11 contracts other than the CFPA.

12 Q    Going down that road would put as much money as possible

13 into the pool in front of this court that you could then try to

14 divide up.

15 A    To pay off all those creditors that are sitting at your

16 table.  Yes.  That's correct.

17 Q    And if that pool was reduced because the bidder lowered

18 its bid in order to compensate my client you didn't want a

19 smaller pool.  So that's why you never put the conversations

20 together.

21 A    My goal was to maximize the value of the asset for the

22 benefit of Reliant which means that I have to pay all of those

23 creditors over at that table.  And as I indicated in my prior

24 testimony the indications that I had were that the only price

25 at which people would be willing to bid with the CFPA would not

Hardie - Further Redirect/Mechling                196

1 clear the bank debt which means you have a lot of unhappy

2 unsecured creditors over there.

3          MR. CAPONI:  Thank you.  Thank you, Your Honor.

4          MR. MECHLING:  Your Honor, I just really -- I think

5 one question.  It's a question that counsel didn't ask, but I

6 will.

7                    FURTHER REDIRECT EXAMINATION

8 BY MR. MECHLING:

9 Q    If you had been retained by the debtors as opposed by the

10 debtors' parent would your marketing of this project have

11 differed in any way?

12 A    Absolutely not.

13          MR. MECHLING:  Thank you.

14          THE COURT:  Thank you.  You may step down.

15          MR. MECHLING:  Your Honor, that's our fourth and last

16 witness.  Does Your Honor want to take a five minute break?

17          THE COURT:  Yes.  Let's take a five minute break

18 before we hear from Equistar.

19          MR. MECHLING:  Thank you.

20                         (Break)

21          COURT DEPUTY:  All rise.

22          THE COURT:  You can be seated.

23          MR. MECHLING:  Your Honor, I'm rising solely to yield

24 the podium to my colleague.

25          THE COURT:  All right.  Thank you.

Tibbitts - Direct/Finkelstein                197

1          MR. FINKELSTEIN:  Your Honor, Mark Finkelstein.  Do

2    you have a time estimate of when you'd like to conclude today?

3          THE COURT:  As soon as possible.  I must be out of

4    here no later than 6:15.

5          MR. FINKELSTEIN:  I think we'll make that time table.

6          THE COURT:  Okay.

7          MR. FINKELSTEIN:  At this time, Your Honor, I'd like

8    to call Ms. Carla Tibbitts to the stand.

9          THE COURT:  You're still under oath.

10              CARLA TIBBITTS PREVIOUSLY SWORN

11                   DIRECT EXAMINATION

12   BY MR. FINKELSTEIN:

13   Q    Carla, let's spend a brief amount of time going back over

14   your employment history with Lyondell and its predecessor.

15   A    Okay.

16   Q    Please tell me about your employment history with Lyondell

17   and its predecessor as well as with Equistar.

18   A    Okay.  I received a Bachelor's of Science in Chemical

19   Engineering from Purdue University in 1981.  Actually, a little

20   bit prior to that I worked at what was then the Arco Chemical

21   Channelview Olefins plant during the summer.  And then after I

22   graduated I came back to work there.  That's the plant that is

23   now the Equistar Olefins plant connected to the cogent facility

24   that we're talking about.

25   Q    At Channelview.

Tibbitts - Direct/Finkelstein                    198

1  A    At Channelview.  I started as a process engineer, did that

2  for several years and then moved through a variety of different

3  experiences that I was happy to have in a variety of different

4  areas.  I went to the University of Houston and got an MBA

5  which I received in '86 and I had responsibilities in areas of

6  purchasing and economic analysis and planning, treasury,

7  corporate planning involving merger and acquisition analysis,

8  the business, technical supervision and now in the utilities

9  area.  Probably more of my experience was concentrated in

10  economic analysis, merger and acquisition activities than

11  anything else.

12  Q    Give the Court some idea of the scope of your current

13  responsibilities.

14  A    Okay.  Currently I'm vice president of utilities and

15  gases.  I'm responsible for a group that purchases those items

16  for the entire company.  So that's steam, electricity, natural

17  gas and a variety of industrial gases, hydrogen, syngas,

18  oxygen, nitrogen for the company globally.  It's for

19  LyondellBasell and all of its subsidiaries of which Equistar is

20  one.  And it's about two and a half billion dollars of annual

21  spent.

22  Q    You're responsible for two and half billion dollars of

23  annual expenditures?

24  A    Yes, I am.

25  Q    What number of chemical plants, if you can keep count, are

Tibbitts - Direct/Finkelstein                    199

1  you responsible for?

2  A    Over 40.

3  Q    Characterize for Judge Walrath what the Channelview

4  complex is from Lyondell and Equistar's perspective.

5  A    Okay.  The Channelview complex, the Equistar piece of the

6  Channelview complex is one of the largest olefins plants in the

7  world.  Olefins are basic commodity chemicals that go into a

8  variety of things that eventually end up in plastic milk jugs,

9  packaging, furniture, clothing, cars, all kinds of things we

10 touch everyday.  The plant produces four billion pounds a year

11 of ethylene and a variety of co-products in addition to that.

12 It's about four thousand acres and has about 1800 employees.

13 Q    And what's the approximate value of four billion pounds of

14 ethylene that you produce each year at the Channelview plant?

15 A    In today's market it's over $2 billion.

16 Q    Now, Carla, what's the dependence of the Channelview plant

17 owned by Equistar on the cogeneration facility owned by our

18 debtor here?

19 A    Essentially we've entrusted our utilities to the

20 cogeneration plant.  It provides steam and electricity to our

21 plant which are critical to our operations.  We took out our

22 boilers and are entirely dependent on this facility for our

23 steam.  So we really entrusted our operations to them.

24 Q    And if the cogent facility goes down what happens to the

25 Equistar chemical plant?

J&J COURT TRANSCRIBERS, INC.

Tibbitts - Direct/Finkelstein                    200

1 A    The plant goes down.  We had that incident occur in March

2 of 2006.  There was a cessation of steam flow, the olefins

3 plants came down very suddenly which is not a condition of

4 course we want to occur.  Naturally it resulted in economic

5 impacts, but even more importantly there were significant

6 safety exposures and significant environmental exposures as a

7 result.

8 Q    And how did Reliant address that steam outage with you?

9         MR. STEARN:  Sorry, Your Honor, objection.

10 Relevance.

11        THE COURT:  Sustained.

12 Q    Did you have meetings with Reliant after the occurrence of

13 the steam outage and try to resolve the claim prior to

14 initiating the lawsuit against Reliant Energy Channelview, LP?

15        MR. STEARN:  Same objection.

16        THE COURT:  Well, I'll allow general questions.

17 A    We met with Reliant several times trying to come to a

18 commercial solution around the impacts of that event and these

19 monies due to Equistar because of the cessation of steam

20 causing us to shut down which was provided for in the steam

21 supply agreement.

22 Q    So your business understanding is that the steam supply

23 agreement gives you compensation for steam outages that might

24 occur on account of actions by cogent -- Reliant cogent

25 facility.

Tibbitts - Direct/Finkelstein                    201

1   A    Yes, it does.

2   Q    And what was the approximate amount of the claim for the

3   damages sustained?

4   A    Well, it's over $40 million of damages, and then there is

5   a one-time three day, I believe it is, excused breach that

6   would apply that would subtract about $8 million from that.

7              MR. FINKELSTEIN:  May I approach, Your Honor?

8              THE COURT:  You may.

9              THE WITNESS:  Is there some more water available?

10                         (Pause)

11  BY MR. FINKELSTEIN:

12  Q    Ms. Tibbitts, I've handed you what's been marked as

13  Equistar Exhibit Number 1.  Can you please identify that

14  document for the record?

15  A    Yes.  It says Reliant Energy Channelview, LP contract

16  overview.

17  Q    Have you seen this --

18  A    And it does have Reliant Energy emblem in the corner.

19             MR. STEARN:  Objection.  Foundation.  She said what

20  it says, but she hasn't said she had anything to do with it in

21  terms of identifying it..

22             THE COURT:  Well, let's have him ask a question.

23  Q    I have you seen this document before?

24  A    I have seen it as part of discovery.

25  Q    Let's turn attention to Page 0965.  Bates Number Page

Tibbitts - Direct/Finkelstein                202

1  0965.

2  A    I'm there.

3  Q    Was this document produced to us in discovery by Reliant

4  parties?

5  A    Yes.

6  Q    Can you, by walking through the diagram on that page,

7  explain the contractual relationship between the parties?

8  A    I can make an attempt.  If you look at this diagram you

9  can see that this is a very interrelated complex set of

10 agreements and operations.  As I indicated earlier what we're

11 really looking at is the Reliant cogent providing the utilities

12 that the Channelview olefins plan is very dependent on.  And

13 that's the way that this is set up.  There is a services

14 agreement by which Equistar provides water that goes in to feed

15 the plant at the cogent plant and also we take and do waste

16 water treatment for the cogent plant because it's much more

17 efficient and effective for us to have done that than for them

18 to have built separate facilities.

19     Key components are also of course the steam supply

20 agreement and the energy supply agreement.  The steam supply

21 agreement is the agreement by which the cogent facility

22 provides steam that's critical to Equistar's olefins plant, and

23 of course, we're paying revenues in return for receiving that

24 steam.  The energy supply agreement provides electricity not

25 only to the Equistar olefins plant, but also to several other

Tibbitts - Direct/Finkelstein                    203

1  Equistar facilities in the gulf coast area.  And of course

2  we're paying a significant amount of revenue back to Reliant in

3  return for that electricity.

4      There is also the fuel purchase and sale agreement under

5  which Equistar can provide fuel to the cogent plant.  Sometimes

6  it's more effective when we do that.  And essentially it

7  provides -- we can provide natural gas in up to the amount that

8  would be required to generate the steam that we take.  And then

9  of course another key component we've been discussing a lot

10 today is the cash flow participation agreement which gives

11 Equistar a portion of the cash flows from the operation of the

12 cogent plant as well as several other rights.  I think that's a

13 quick overview.

14 Q    What's Equistar's perspective about the degree to which

15 Reliant has kept Equistar informed about the sale process?

16 A    We don't feel that we've been kept very well informed.

17 We've been kept informed in an extremely high level.

18 Q    What do you mean by that?

19 A    Well, although we've had conversations as the process has

20 progressed the conversations have been very brief and without

21 much detail.  I've typically been told that the process is

22 robust and it's moving along, but I was frequently told we

23 don't know what the structure of the sale is going to be, we're

24 not ready to disclose who is involved in the process.  There

25 was very little detail given at all of precisely what was going

Tibbitts - Direct/Finkelstein                    204

1    on.

2    Q    And have you ever declined to meet with any of the

3    perspective bidders or purchasers that Reliant asked you to

4    meet with?

5    A    Absolutely not.

6    Q    And have you met with them rapidly and readily whenever

7    you've been asked to do so?

8    A    Yes.  We had two meetings recently which required a lot of

9    juggling of schedules and getting people together in order to

10   have them on very short notice including on last Friday.

11   Q    That was two days after your deposition was taken?

12   A    Yes, it was.

13   Q    And where were you the day prior to your deposition being

14   taken?

15   A    I was in San Antonio.

16   Q    And you flew to Wilmington, Delaware to give your

17   deposition.

18   A    Yes, I did, missing a meeting.

19   Q    And then you flew back to Houston in order to attend the

20   meeting with the perspective purchaser.

21   A    Yes, I did.

22   Q    And you assembled a team of people in order to provide

23   information --

24        MR. STEARN:  Objection.  Leading, Your Honor.  I let

25   three or four of them go.

J&J COURT TRANSCRIBERS, INC.

Tibbitts - Direct/Finkelstein                    205

1          THE COURT:  Sustained.

2  Q    With whom did you meet on Friday?

3  A    We met with Fortistar on Friday.

4  Q    And is that the party that's the successful bidder in this

5  bankruptcy case?

6  A    Yes.  And actually I should say we met with Fortistar and

7  Global Infrastructure Partners and Shell Energy and the Wood

8  Group all came together.

9  Q    And how many people from Equistar participated in that

10 meeting?

11 A    It was about seven of us.

12 Q    What kinds of roles or responsibilities do those seven

13 people have?

14 A    I had brought in people from manufacturing, from corporate

15 development, from corporate finance, from legal and then

16 myself.

17 Q    When you bring in people from manufacturing where are they

18 coming from?

19 A    They're coming from -- well, one came from Channelview.

20 One is an office downtown.

21 Q    Okay.  You have a binder of the debtors' exhibits up

22 there.  Could you please turn to Debtors' Exhibit Number 12.

23 A    I'm there.

24 Q    That's previously been identified as the settlement

25 agreement reached between Equistar and the Reliant entities.

Tibbitts - Direct/Finkelstein                206

1  A    Yes.

2  Q    And that relates to the steam outage that occurred in

3  March of 2006.

4  A    As well as some other things.  Yes.

5  Q    Yes.  Tell me the importance of that agreement to

6  Equistar.

7  A    Well, this agreement was very important to us particularly

8  because we wanted to get settlement of the dispute on the steam

9  outage and resolve that.  We also were very interested in

10 having the third boiler feedwater pump installed because we

11 were very concerned about a similar outage occurring again

12 which was a big issue for us.  And then also in this agreement

13 we agreed to cooperate in the sale process and make ourselves

14 available as needed.

15 Q    And did you have anticipation when you entered in this

16 agreement that you would be kept much more informed about the

17 sale process than you ultimately were until February of this

18 year?

19 A    Yes.

20 Q    And do you think that Equistar did everything it committed

21 to do in conformity with the settlement agreement in order to

22 assist or cooperate with the sale process?

23 A    Absolutely.

24 Q    Were you ever asked to do anything that you refused to do

25 to facilitate the sale process?

1  A    No, I wasn't.

2  Q    Do you feel that Reliant, the debtor here, fulfilled its

3  commitments in accordance with this settlement agreement?

4          MR. STEARN:  I'm sorry, Your Honor, objection.  Are

5  we having an argument about whether the settlement agreement's

6  been breached?

7          THE COURT:  Well, I'll sustain it because it calls

8  for a legal conclusion.

9          MR. STEARN:  That's what I meant, Your Honor.

10          THE COURT:  All right.

11  BY MR. FINKELSTEIN:

12  Q    Let me ask you specifically about a provision relating to

13  the effect on the Equistar contracts of the sale process.

14  A    I'm looking for it just to make sure it's in here.  Yes.

15  The agreement called for the sale process to move forward and

16  for Equistar not to be required to renegotiate any of its

17  agreements as a party to that.

18  Q    Please direct the Court to which paragraph you're

19  referring to.

20  A    I was speaking from memory.  Here we go.

21  Q    Is 4A the provision you had in mind?

22                        (Pause)

23  A    There we go.  Okay.  Yes.  It's in 4A three little I.

24  Q    Did you do what you believed you were required to do to

25  conform with the provisions of that agreement?

Tibbitts - Direct/Finkelstein                    208

1  A    Yes, we did.

2  Q    Ms. Tibbitts, turn a few more pages further on in that

3  document and look specifically to Exhibit A to the settlement

4  agreement.

5  A    Yes.

6  Q    Do you see there a listing of some documents that are

7  titled list of project agreements between Equistar and Reliant?

8  A    Yes, I do.

9          THE COURT:  Can you give me that page again?  I'm

10 sorry.

11         MR. FINKELSTEIN:  Yes, Your Honor.  It's right before

12 the final judgment.  I don't see a bates number on it.  And

13 it's Exhibit A right behind --

14         THE COURT:  Okay.  I have it.  Thank you.

15         MR. FINKELSTEIN:  -- right behind the signature page.

16 BY MR. FINKELSTEIN:

17 Q    And included within that list of project agreements is

18 cash flow participation agreement, second amended and restated.

19 Correct?

20 A    Yes.  It's Number 7 on the list.

21 Q    Ms. Tibbitts, by reference of the cash flow participation

22 agreement which I think is also in this exhibit binder --

23 A    Exhibit 13.

24 Q    All right.  Please explain your view as to whether or not

25 a sale of the facility triggers a termination of the cash flow

Tibbitts - Direct/Finkelstein                                209

1  participation agreement.

2              MR. STEARN:  Objection, Your Honor.  That's clearly

3  calling for a legal conclusion and the document will speak for

4  itself on that point.

5              THE COURT:  Sustained.

6  Q    Ms. Tibbitts, have you ever been told by Reliant that they

7  considered the contract to terminate on sale?

8  A    No, I have not.

9  Q    Do you consider this contract to terminate on a sale of

10 the facility?

11             MR. STEARN:  Objection.  Same objection raised

12 before, Your Honor.

13             THE COURT:  Sustained.

14 Q    Do the cash flows that Equistar receives as royalty

15 payments pursuant to this agreement bear a capital internal

16 rate of return relationship to an amount of money invested by

17 Equistar at the outset of the transaction?

18 A    No.  The calculation is based on the internal rate of

19 return of the Reliant partners.

20 Q    And you've looked at the calculation of the cash flows

21 under this document based upon information provided to you by

22 Reliant in the past?

23 A    Yes.

24 Q    What's the methodology that's utilized in determining the

25 royalty payments to which Equistar is entitled?

**J&J COURT TRANSCRIBERS, INC.**

Tibbitts - Direct/Finkelstein                    210

1          MR. STEARN:  Objection, Your Honor, relevance.  We're

2    not here to talk about what the payments are.

3          THE COURT:  Well, sustained.

4    Q    At anytime in the relationship between this debtor and

5    Equistar have you felt that this debtor was treating Equistar

6    as a partner in the legal technical sense?

7          MR. STEARN:  Objection.  Calls for a legal technical

8    conclusion.

9          THE COURT:  Sustained.

10   Q    Would you have expected to be kept apprised of every step

11   of the sale process by somebody who was looking out for your

12   interest ahead of their own if that is in fact what Reliant and

13   her partnership was doing?

14         MR. STEARN:  I'm not even sure where to start the

15   objection.

16         THE COURT:  Sustained.

17   Q    Prior to filing of the sale motion had Reliant ever

18   characterized -- Reliant, this debtor, ever characterized

19   Equistar's interest under the cash flow participation

20   agreement, to your knowledge, as an equity participation

21   interest?

22   A    No, I don't believe so.

23   Q    And you've operated under this agreement since March of --

24   June of 2006?

25   A    I've been responsible for it since then.  Yes.

Tibbitts - Direct/Finkelstein                    211

1  Q    Did Reliant ever request your consent to the sale of the

2  cogent plant without the CFPA?

3  A    No, they did not.

4  Q    Did you let the debtor know your view as to the effect of

5  a sale without the CFPA?

6  A    Yes, we did.

7  Q    And what did you tell them?

8  A    We told them that we disagreed with that, that we thought

9  that was a valid contract that was a part of the mix of

10  integrated agreements around this project, and we basically

11  didn't think they could do that.

12          MR. FINKELSTEIN:  I'm nearly at the end, Your Honor.

13                  (Pause)

14  Q    From your perspective, Ms. Tibbitts, would there be a

15  cogeneration facility at Channelview in the absence of the mix

16  of agreements that were executed with Equistar Chemicals?

17          MR. STEARN:  Objection.  Foundation.  She wasn't

18  there in 1999 and she didn't start working on the project until

19  2006.

20          THE COURT:  Sustained.

21                  (Pause)

22  Q    I want to follow-up on something you said a moment ago

23  about the agreements being considered integrated in your view

24  based upon the parties' performance under those agreements.

25  Tell me about the conduct of the parties under the agreements

**J&J COURT TRANSCRIBERS, INC.**

Tibbitts - Direct/Finkelstein                    212

1    that leads you to the conclusion that they are integrated.

2         MR. STEARN:  Object to the form of the question.

3    Object to the question to the extent it's calling for a legal

4    conclusion.  If she wants to talk about the parties' conduct

5    that's fine.  But she shouldn't be able to draw a legal

6    conclusion regarding integration.

7         MR. FINKELSTEIN:  I'm asking her for the conduct of

8    the party that leads her to conclude that they are integrated.

9         THE COURT:  I'll allow it.

10   A    I mean, as I said this is almost as if we've taken a part

11   of our plant and entrusted it to the Reliant cogent.  So on a

12   day-to-day basis there are communications between the plants on

13   the steam needs, the water needs, the waste water flows and

14   some other things.  For example, even when the outage occurred

15   some of our people went over to see if they could help because

16   the facilities are next to one another.  So there's a lot of

17   day-to-day operational communication as well as, you know, when

18   we handle the revenue flows and the invoices from this, you

19   know, it's handled very much in sync and together and from a

20   business standpoint certainly we talk about all these things as

21   a group.  We have quarterly operations meetings to talk about

22   how things are going and what's going on.  And it's all talked

23   about as an integrated mix.  You really can't separate one

24   thing from the other because they're all critical.

25                        (Pause)

**J&J COURT TRANSCRIBERS, INC.**

Tibbitts - Direct/Finkelstein                    213

1  Q    Couple of additional questions about the claims for cure

2  that Equistar believes it has in this case.  The claim that we

3  talked about earlier under the steam supply agreement, it's

4  your point of view that that's a contract claim that has to be

5  paid in connection with the assumption of this contract?

6  A    Yes.

7  Q    And the site lease provides that Reliant Energy

8  Channelview, LP is --

9         MR. STEARN:  I'm sorry, leading, Your Honor.  If he

10 wants to ask what's in the site lease that's fine.

11        THE COURT:  Sustained.

12 Q    Who has responsibility for paying the property taxes

13 underneath the cogent facility?

14        MR. STEARN:  Objection.  Relevance.

15        THE COURT:  Overruled.

16 A    The cogent plant has the responsibility for the taxes.

17 Q    The debtor in this -- the primary debtor in this

18 bankruptcy case?

19 A    Yes.

20 Q    And do you know whether those taxes have been paid current

21 to date?

22 A    Yes, I do know that.  And they have not.

23 Q    And what's the approximate amount of those taxes,

24 according to your best understanding?

25 A    I believe it's around $5 million.

Tibbitts - Direct/Finkelstein                    214

1  Q   And do you know whether or not that dollar amount is

2  accruing penalties and interest?

3  A   Yes, it is.

4  Q   How do you know that?

5  A   Because I've seen a report to that effect.  I don't recall

6  exactly which report.

7                         (Pause)

8  Q   One more thing might need explaining, Ms. Tibbitts.

9  Equistar actually filed a lawsuit relating to the sale

10 transaction at one point.  It's a lawsuit that was removed to

11 this Court.

12 A   Yes.

13 Q   Can you explain the purpose behind Equistar filing that

14 lawsuit?

15 A   Yes.  We were concerned about the possibility that Reliant

16 was going to sell its interest in the entities as opposed to

17 selling the assets and that that may be a way to take the sale

18 proceeds basically up to the parent level rather than having

19 them go through the project entity and the bankruptcy court.

20 Q   And have you also seen indication of the documents

21 produced by Reliant that one part of their plan was to sell the

22 property of the estate and dismiss the bankruptcy case?

23 A   I don't recall.

24          MR. FINKELSTEIN:  Pass the witness, Your Honor.

25                    CROSS EXAMINATION

J&J COURT TRANSCRIBERS, INC.

Tibbitts - Cross/Stearn                    215

1  BY MR. STEARN:

2  Q    Hello again, Ms. Tibbitts.

3  A    Hello again, Mr. Stearn.

4  Q    I think I have just a handful of questions.  There was

5  some discussion that you had with Mr. Finkelstein about the

6  steam outage litigation and the amount of your claims in the

7  steam outage litigation.  And I think ultimately you gave a

8  number that netted out to something in the three millions.

9  Right?

10  A    Yes.

11  Q    Do you remember what Reliant's position was as to the

12  damages in the litigation?

13  A    Their original position?

14  Q    Yes.

15  A    Their position was that it was, I think, they sent us a

16  check for a little more than a hundred thousand dollars.

17  Q    So their original position, while you said 30 some odd

18  million, they said that the real damages was in the hundred

19  thousands.  Right?

20  A    They said their interpretation of the schedule got them to

21  that point.

22  Q    Okay.  I want to ask you a little bit about this chart

23  that was placed before you by my friend Mr. Finkelstein.  I

24  don't really know what to call it other than Johannesen Exhibit

25  5.

Tibbitts - Cross/Stearn                    216

1      MR. STEARN:  I'll simply note for the record, Your

2  Honor, that it's also been designated by Reliant in production

3  as confidential.  So it's another one that we're going to have

4  to deal with.

5      THE COURT:  Well, isn't it marked Equistar 1?

6      MR. STEARN:  Is it?

7      MR. FINKELSTEIN:  Yes, it is, Your Honor.  I didn't

8  have enough stickers.  You can just mark it as Equistar 1.

9      MR. STEARN:  Sorry, Your Honor.  I didn't get the

10 memo.

11     THE COURT:  All right.

12 BY MR. STEARN:

13 Q    Let's turn to the page you were looking at on Equistar 1

14 which is Rel_estar000965.

15 A    Yes.  I'm there.

16 Q    Now, you see there's a lot of arrows with agreements

17 referenced and a lot of numbers.  Right?

18 A    Yes.

19 Q    I'd like you to perform sort of a mental erasure for me

20 for a second.  I want you to -- you see the line that says 11

21 next to it, cash flow participation agreement?

22 A    Yes, I do.

23 Q    In your mind I want you to erase that line.

24 A    I don't want to erase that line, but if you insist.

25 Q    Well, I'd ask you to humor me, if you wouldn't mind.  If

J&J COURT TRANSCRIBERS, INC.

Tibbitts - Cross/Stearn                                217

1  we erase that Line 11 does the rest of the facility continue to

2  function?

3  A    Well, when you asked does the facility continue to

4  function to me that talks about operating a plant.  And

5  operating a plant versus having all the agreements around the

6  economics of that plant are two different questions.

7  Q    Well, let's approach it this way.  If we erase Line 11

8  power marketing agreement, Number 1, that still could go

9  forward.  Right?

10  A    Yes.

11  Q    Number 2 power purchase and sale agreement, that wouldn't

12  be interfered with by deleting the cash flow participation

13  agreement from this chart.  Right?

14  A    No.

15  Q    Same thing -- actually, why don't I just make it easy.

16  For all the items 1 through 10 would those contracts somehow be

17  interfered with?  Would you be prohibited somehow, either

18  party, from performing under any of the contracts 1 through 10

19  if we erased Number 11 the cash flow participation agreement?

20  A    Well, what you're going to do is you're going to take all

21  the revenues that go back to the project in a number of these

22  other agreements and have them all in the project with no cash

23  flow sharing back to Equistar as well as some of the other

24  provisions of that agreement being eliminated.

25  Q    Well, let's take that in part.  I mean, we know because

**J&J COURT TRANSCRIBERS, INC.**

Tibbitts - Cross/Stearn                    218

1 you and I discussed it this morning that there's never been a

2 penny distributed to Equistar in six years under the cash flow

3 participation agreement.  Right?

4 A    As would be anticipated early in the project life.

5 Q    It's been six years.  Right?

6 A    Yes, it has.

7 Q    And so my question is simply, and I thought it was pretty

8 straightforward, could you operate under the remaining ten

9 agreements without agreement Number 11 the cash flow

10 participation agreement in place?

11 A    You could operate.  It would be different.

12 Q    You just wouldn't see the revenues that are provided for

13 in the cash flow participation agreement potentially at some

14 future date.  Right?

15 A    That's correct.

16 Q    Now, you also said, when we were talking about this

17 document Equistar 1 that the energy supply agreement which is

18 -- that's Number 8.  Right?

19 A    Yes.

20 Q    You said that was a key component.  Right?

21 A    Yes.

22 Q    Let's take a look, if we can, let's go back to your

23 preliminary objection and let's see if I can find your

24 definition of core project agreements.  Would you turn to Page

25 8, Paragraph 18 of the preliminary objection.  If I didn't say

Tibbitts - Cross/Stearn                                           219

1  it, it's debtors' 15.  It's in that one inch binder.

2  A     Okay, I'm sorry, what was the page?

3  Q     I'm sorry.  It's Page 8, Paragraph 18.

4  A     Yes.

5  Q     Paragraph 18 defines Equistar's view of the core project

6  agreements.  Right?

7  A     Yes.

8  Q     And although you've testified that the energy supply

9  agreement is a key component of the relationship the energy

10 supply agreement is not listed in the core project agreements

11 in your preliminary objection.  Is it?

12 A     That's correct.

13 Q     Let's chat for a minute about the --

14 A     Can I finish?

15 Q     I'm sorry.

16        THE COURT:  You can finish your answer.

17 A     The energy supply agreement provides the electricity to

18 all of the plants and the electricity although theoretically

19 provided from this plant can be provided by other means.

20 Q     Well, that electricity comes to Equistar at a below market

21 price.  Right?

22 A     It comes to Equistar at the negotiated heat rate that was

23 done as a long term contract when these contracts were done.

24 Q     Which is currently below market.  Correct?

25 A     It's current blow the spot market heat rate.  Yes.  It

Tibbitts - Cross/Stearn                          220

1   sometimes happens with long term contracts.

2   Q    And it was below market at the beginning of the contract.

3   Right?

4   A    I don't know that.  It was certainly competitively bid.

5   Q    We can talk to Mr. Teel about that I suppose.  You talked

6   a little bit about the sales process.  Did you really expect to

7   be in the same room as Reliant and Houlihan Lokey when it was

8   speaking to bidders?

9   A    Well, there's two pieces of that.  First of all, you've

10  said that we were somehow a partner in this.  And if we were

11  truly an equity partner in this then yes, I'd expect equity

12  partners to be in a room together in a sales process.  Now, I

13  did not expect that because I don't feel we are an equity

14  partner at all.  Certainly have not had a relationship that

15  evidences that.  However, as the process went on having done

16  many merger and acquisition activities I certainly would have

17  expected the bidders to want to talk to their largest and base

18  load customer in the process.  And I was quite surprised we

19  weren't contacted to do that.

20  Q    Well, you said some things early on in your answer about

21  whether we've characterized you as a partner.  We don't need to

22  argue about whether we've called you a partner or whether we've

23  said your interest is equity like.  There was a discussion

24  around the settlement agreement, the steam outage settlement

25  agreement.  And you were asked the question, were you ever

J&J COURT TRANSCRIBERS, INC.

Tibbitts - Cross/Stearn                                    221

1  asked by Reliant to do something that you didn't agree to do?

2  Do you remember that?

3  A    Yes.

4  Q    And you answered no.  Right?

5  A    Yes.

6  Q    Well, we know that's not really true because you were

7  asked multiple times by Reliant for permission to disclose the

8  confidential project agreements, and until you got the $10

9  million in the steam settlement you didn't agree to disclose

10 those agreements.  Right?

11         MR. FINKELSTEIN:  Object to the form of the question,

12 Your Honor.

13         THE COURT:  Sustained.  Overruled.  Go ahead and

14 answer.  You can answer.

15 A    First of all, we still haven't gotten the $10 million in

16 the steam litigation settlement.  That's contingent on a sale

17 as Reliant desired.  And what I was speaking to in response to

18 that question was fulling our obligations under that settlement

19 agreement.  When we agreed to put the documents in the data

20 Roman have waived the confidentiality provisions of the

21 agreement.

22 Q    A couple more questions, if you don't mind.  You were

23 asked whether Reliant ever said to you that the CFPA terminates

24 on a sale.  And you said no.  Do you remember that?

25 A    That's correct.

**J&J COURT TRANSCRIBERS, INC.**

Tibbitts - Cross/Stearn                    222

1  Q    Did Reliant ever say to you that the CFPA doesn't

2  terminate on a sale?

3  A    No.

4  Q    Okay.  You were also asked whether anybody from Reliant

5  has ever characterized the CFPA to you as an equity

6  participation interest.  Right?

7  A    Uh-huh.

8  Q    But we know that you weren't involved between 1999 and

9  2006.  Right?

10 A    That's correct.

11       MR. STEARN:  Just take me a second to read some

12 writing, Your Honor.  It's my own so I have no one to blame but

13 myself.

14                   (Pause)

15 Q    You were asked some questions about -- well, actually, you

16 were asked a fair number of questions about whether folks would

17 talk to you about the CFPA and whether the sale could go

18 forward without the CFPA.  And you recall, I think, giving some

19 testimony that the CFPA was important to you and that's why you

20 didn't want the sale to go forward without the CFPA.  Do you

21 remember that?

22 A    Yes.

23 Q    Okay.  But we know that for the right amount of money that

24 you would have let the sale go forward without the CFPA.

25 Wouldn't you?

Tibbitts - Cross/Stearn                                         223

1  A     Well, virtually any asset a company has for, you know,

2  some amount of money or other considerations they may be

3  willing to trade it off for that consideration.

4  Q     So it's principally about money, isn't it?

5  A     It is somewhat about money.  But there's other provisions

6  in that agreement that I care about as well.

7  Q     Which you were willing to sell for money.  Right?

8  A     I might be.  We indicated we were willing to either, you

9  know, talk about a settlement on that or leave it in place, and

10 talk about a structure that leaves it in place on an ongoing

11 basis.

12 Q     One last question, ma'am.  You were -- you gave some

13 testimony that related to I think it was the claims for cure.

14 Do you recall giving at least a little testimony about taxes

15 and things like that?

16 A     Just a few minutes ago?

17 A     Yeah.

18 A     Yes.

19 Q     I think so.  I think it was a few minutes ago.  Do you

20 know whether the debtors plan to satisfy that in connection

21 with their plan?

22 A     We've been told that they plan to pay those taxes upon a

23 sale.

24 Q     Okay.

25        MR. STEARN:  Nothing further, Your Honor.

Tibbitts - Redirect/Finkelstein / Teel - Direct/Finkelstein 224

1              THE COURT:  Redirect?

2              MR. FINKELSTEIN:  Perhaps a single question.

3                        REDIRECT EXAMINATION

4  BY MR. FINKELSTEIN:

5  Q    Ms. Tibbitts, what's the aggregate amount on an annual

6  basis that Equistar pays to Reliant Energy Channelview, LP for

7  the steam and electricity purchases?

8  A    It's around $250 million.

9              MR. FINKELSTEIN:  Thank you, Ms. Tibbitts.

10             THE WITNESS:  Thank you.

11             MR. STEARN:  No further questions, Your Honor.

12             THE COURT:  All right.  You may step down then.

13 Thank you.

14             THE WITNESS:  Thank you.

15             THE COURT:  Your next witness then.

16             MR. FINKELSTEIN:  Yes, Your Honor.  I would like to

17 call Mr. Skip Teel to the stand.

18             THE COURT:  And you are still under oath.

19             SKIP TEEL, PREVIOUSLY SWORN:

20             MR. FINKELSTEIN:  May I approach, Your Honor?

21             THE COURT:  You may.

22                        DIRECT EXAMINATION

23 BY MR. FINKELSTEIN:

24 Q    Mr. Teel, I've handed you what's been marked as Equistar

25 Exhibit Number 2 in this proceeding.  Please tell me what that

Teel - Direct/Finkelstein                    225

1  is.

2  A     That looks like a presentation by Reliant in regard to

3  their qualifications to be an energy provider.

4  Q     Did you review and consider this document at the time you

5  entered into the project agreements with Reliant Energy

6  Channelview, LP?

7  A     Yes, I believe I did.

8  Q     What was important to you about this document and the

9  characteristics possessed by Reliant?

10         MR. STEARN:  Objection.  Assumes facts.

11  Q     Was there anything --

12         THE COURT:  You may rephrase it.

13  Q     Was there anything about this document that you considered

14  important in terms of the characteristics of Reliant?

15  A     Absolutely.  One of the important pieces of selecting the

16  energy provider was the potential reliability of the steam

17  source and the ability of that provider to provide steam on an

18  uninterrupted basis long term.

19  Q     Why was that important?

20  A     Because the steam demand is an integral part of the

21  operation.  Without the steam plant as Carla explained, the

22  plant can down, create safety issues, creates a business

23  exposure as well as environmental issues.

24  Q     Now, Mr. Teel, let me direct your attention to Page 1584

25  of that document.  It's toward the back.

Teel - Direct/Finkelstein                                226

1  A     Okay.

2  Q     Do you see the chart at the top of the page?

3  A     Yes.

4  Q     What does that represent to you?

5  A     That looks like an outline of the cash flow participation

6  agreement.

7  Q     And the left column, what does that mean to you?

8  A     That would be the cogent plant return to Reliant.

9  Q     And the right column?

10 A     Would be the percentage of pretax cash flow that Equistar

11 would receive.

12 Q     Did the pretax cash flow, a royalty to be received by

13 Equistar constituted an important component of the value of the

14 project from Equistar's perspective?

15 A     Yes.

16 Q     What quantity or percentage of value did it represent to

17 Equistar at the time the project agreements were executed?

18 A     It was at least half of the potential benefit of the

19 project Equistar.

20 Q     Was it -- do you recall when it was anticipated that

21 Equistar would start to receive cash flows or royalty payments

22 under the cash flow participation agreement?  Was it early on

23 in the process?

24 A     It depends on how you characterize that.  It was not

25 immediate, but after a period of time, a number of years.

Teel - Direct/Finkelstein                    227

1  Q    Does it surprise you that Equistar has not to date

2  received any royalty payments under the cash flow participation

3  agreement?

4  A    It disappoints me.  We certainly would have expected the

5  project to have done better.  But I'm not surprised that we

6  didn't receive royalty payments early on.

7  Q    And why are you not surprised?

8  A    Because it takes a while to pay off the project, and to

9  establish a successful working project.

10  Q    What was the relationship of the energy supply and steam

11  supply agreements with regard to the bank financing obtained by

12  the project?

13  A    This is a, you know, very interesting question and

14  probably one that not everyone fully understands at this

15  proceeding.  And that is that without the Lyondell commitment

16  on those projects or on those contracts at that price level

17  there probably would be no project here whatsoever.  The

18  project was quite honestly very large compared to other cogent

19  projects that have been built in the past.  The prospect of

20  deregulation and the steam load made it a situation where

21  Reliant could build this very large facility.  And Lyondell --

22  pardon me -- Equistar was taking quite honestly, you know, a

23  fairly substantial risk in regard to the long term commitment

24  on steam and power, not only financially, but as well as

25  reliability toward the plant site.

Teel - Direct/Finkelstein                    228

1    Lyondell or Equistar did give a number presentations

2  directly to the financial community to get the financing.  One

3  of the other pieces that facilities always want to know is

4  well, will the steam be received so the olefins or the cogent

5  plant can run?  The other benefit of why this facility was

6  located here was that olefins plant is one of the lowest cost

7  olefins plants in the country.  It already was prior to the

8  cogent plant being there.  That gave the lenders the comfort

9  that this plant would run, the olefins plant would run and take

10 the steam and that the cogent debt could get paid.

11 Q    Were the contracts entered into between Equistar and

12 Reliant Energy Channelview, LP and the other entities in the

13 Reliant family heavily negotiated?

14 A    These agreements were very heavily negotiated.

15 Q    Who was your counterpart in the negotiations on the

16 Reliant side?

17 A    My counterpart was Carolyn Marsh.

18                      (Pause)

19         MR. FINKELSTEIN:  May I approach, Your Honor?

20         THE COURT:  You may.

21                      (Pause)

22 BY MR. FINKELSTEIN:

23 Q    Mr. Teel, I've handed you what's been marked as Equistar

24 3.  Please identify that document for the record.

25 A    It looks like a clarification by Reliant in more detail as

Teel - Direct/Finkelstein                              229

1   to how to do the calculation for the cash flow sharing.

2   Q    Did Equistar consider this to be an inducement to enter

3   into the project agreements?

4   A    Yes.

5   Q    And was a chart similar to that reflected on the

6   attachment to the fax cover sheet in fact part of the cash flow

7   participation agreement?

8   A    Ultimately.  Yes.  It became part of the cash flow

9   purchase agreement.

10            MR. FINKELSTEIN:  May I approach, Your Honor?

11            THE COURT:  You may.

12   Q    Mr. Teel, you testified a moment ago that there was an

13   approach by both Houston Industries Reliant and Equistar to

14   lenders in order to facilitate the financing of the project?

15   A    Yes.

16   Q    Does this document which I've handed to you marked as

17   Equistar 4 one of the documents that was used in that process?

18   A    It looks like it.  Yes.  Yes, it was.

19   Q    Would Equistar have preferred to have gotten a lower price

20   for steam and electricity from the cogent facility?

21   A    That would have been the best alternative for Equistar.

22   Yes.

23   Q    Explain your answer, sir.

24   A    Well, Equistar again, is in the business to make

25   chemicals.  We're in the business of producing those chemicals

J&J COURT TRANSCRIBERS, INC.

Teel - Direct/Finkelstein                              230

1  at a lower cost than our competition.  The easiest way to do

2  that for us is to have the lowest price utilities and the

3  lowest cost structure.  That's one of the things in the

4  chemical business, refining business any kind of manufacturing

5  business that you're always constantly searching for.  This was

6  a mix of that and it certainly helped us at the site

7  considerably.  But again, the best outcome would have been to

8  receive the cheapest cost power and steam.  And that would have

9  been effectively a guaranteed return for us.

10 Q    Now, sir, I want to direct your attention to one of the

11 exhibit binders.  It's called a joint exhibit binder and it's

12 JX-39.  I don't know if I can help you find that.  Volume 4

13 which contains JX-39 through JX-46.  Is that up there for you?

14 A    I don't have any idea.  I'm sorry.  You said JX what?

15 Q    39.

16 A    39.

17         MR. FINKELSTEIN:  Your Honor, I don't know if you've

18 been passed a copy of that.  It's Volume 4 of the joint

19 exhibits.

20         THE COURT:  I have it.

21                   (Pause)

22 A    Yes.  JX-39 I have.

23 Q    What is that document, sir?

24 A    It's a consent and assignment agreement.

25 Q    Does it reflect the signature of the parties to the

**J&J COURT TRANSCRIBERS, INC.**

Teel - Direct/Finkelstein                    231

1  project agreements?

2  A    Yes, I believe so.

3  Q    Does it reflect any other signatures?

4  A    None that I can see.  The bank's.  Yes.

5  Q    There's a signature there on behalf of Bank of America NA

6  as agent.

7  A    Yes.

8  Q    What's your understanding of what this agreement

9  accomplished?

10 A    Again, I don't know this agreement in detail, but I

11 believe what this agreement does is if one of the parties fails

12 to perform any of their obligations that I believe the bank can

13 assign one of the other parties to fulfill that obligation.

14            MR. FINKELSTEIN:  May I approach, Your Honor?

15                      (Pause)

16            THE COURT:  Equistar 5.  Yes.

17 Q    Mr. Teel, I've just handed you a document that should be

18 marked, but currently isn't, Equistar 5.

19 A    Okay.

20 Q    Do you recognize that document?

21 A    Yes.  It looks like part of the term sheet markup that was

22 passed back and forth between Equistar and Reliant.

23 Q    When you were answering questions earlier today for Mr.

24 Stearn you were provided with a copy of the predecessor

25 document to this one, were you not?

J&J COURT TRANSCRIBERS, INC.

Teel - Direct/Finkelstein                    232

1  A    Yes, I was.

2  Q    And what does this document represent?

3  A    This looks like Reliant's comments to the term sheet that

4  we had provided them.  Like I pointed out to Mr. Stearn that

5  there was considerable markups on the term sheet.  Again,

6  because it was a complicated deal and we were in the process of

7  trying to make sure we fully understood the expectations of

8  both sides so we provided them a term sheet, they marked it up.

9  That was part of the negotiating process.

10 Q    Let me direct your attention to the third page of this

11 document, sir.

12 A    Okay.

13 Q    And in particular to the 7th bullet point beginning with

14 the words, "Customary restrictions."

15 A    Yes.

16 Q    Could you please read that paragraph into the record.

17 A    It says, "Customary restrictions on transfers of interest

18 and right of first refusal accept that Equistar will have the

19 ability to transfer a portion of it's," -- and then equity is

20 scratched out, and the words, "cash flow participation," are

21 added, "to a mutually agreeable party."  And this is under the

22 heading of profitsharing.

23 Q    Is this markup, according to your understanding, something

24 that was provided by or on behalf of the Reliant party in the

25 transaction?

Teel - Direct/Finkelstein                   233

1  A    Yes.  This is provided by Reliant.

2  Q    Look a little bit further up on that same page with regard

3  to the bullet point here immediately beneath profitsharing.

4  A    Okay.  And the first bullet point under profitsharing?

5  Q    Yes, sir.

6  A    You want me to read that?

7  Q    Yes.

8  A    "Reliant and Equistar will form an entity to own the

9  project and act as the vehicle for profitsharing."  And then in

10 red which is Reliant's comments it said, "Structured as a

11 royalty payment in the proposal.  No change has been

12 discussed."  So they were just reinforcing their belief that

13 this should be structured as a royalty payment and that there

14 was not going to be any kind of entity formed to share profit.

15 Q    And there's actually an exclamation point after that red

16 -- comment in red, is there not?

17 A    They were very firm about us not holding any equity in

18 this project.

19 Q    Who was very firm about that?

20 A    Everyone on the Reliant side from Carolyn Marsh to the

21 Baker & Botts attorneys, to their senior executives.  Well, I

22 guess I only know one actual senior.  That was Mr. Perkins.

23 Q    Based upon testimony that you've heard today would it be

24 your point of view that these Equistar and Reliant documents

25 that constitute the project agreements, and in particular the

Teel - Direct/Finkelstein                          234

1  development agreement, the site fees, the steam supply

2  agreement, the services agreement and last but not least the

3  cash flow participation agreement were an integrated set of

4  documents intended to operate in tandem through the end of the

5  term of the site lease?

6          MR. STEARN:  Objection.  Calls for a legal

7  conclusion.

8          THE COURT:  Sustained.

9  Q   Mr. Teel, given the pricing structures under the steam

10 supply agreement and the energy supply agreement as they were

11 ultimately executed and assuming that those agreements were

12 executed with the financial considerations embodied in them

13 would there have been a transaction to build Reliant cogent --

14 Channelview cogent facility had there not been a cash flow

15 participation agreement?

16         MR. STEARN:  Objection.  Calls for speculation.

17         THE COURT:  Overruled.

18 A   Would there be a project?  I can tell you that Lyondell

19 would not -- Equistar would not have selected Reliant on the

20 basis of its proposals without that cash flow participation

21 agreement.

22         MR. FINKELSTEIN:  Pass the witness, Your Honor.

23         THE COURT:  Okay.

24                      CROSS EXAMINATION

25 BY MR. STEARN:

**J&J COURT TRANSCRIBERS, INC.**

Teel - Cross/Stearn                    235

1  Q    Hello again, Mr. Teel.  I think I have just two questions

2  for you, but I'm known to be bad at math.  So we'll see.  Can

3  you take out Equistar Exhibit 3.  That's the couple of page fax

4  from -- I guess it's from Michael Joyce.

5  A    It says Equistar 3 December 14, 1998?

6  Q    Equistar 3.  I hope I'm following correctly because the

7  one's I'm getting aren't marked and I'm just writing on them.

8  Equistar 3 is not the energy partnering proposal.  It looks

9  like it's a January 26th 1999 fax.  It's just a couple of

10 pages.

11 A    Okay.  Yes.  From Mike Joyce to Skip Teel.

12 Q    Right.  Can you just turn to the second page, please.

13 A    Okay.

14 Q    I think you were asked a question or two about whether you

15 expected to be receiving royalties by this time and I think

16 your response essentially was that you were disappointed

17 although I don't know that you gave a particular year by which

18 you expected to receive royalties.  Based on the second page of

19 Equistar Exhibit 3 does this reflect a royalty payment to

20 Equistar in 2005?

21 A    It appears to be Reliant's projection that we would

22 receive a royalty payment by 2005.  I think they're the ones

23 that put this exhibit together.

24 Q    And you came up with your value that you attributed to the

25 cash flow participation agreement based upon Reliant's

1  projections.  Right?

2  A    We used some of Reliant's projections, some of our

3  projections.  I'm sure the bank used their projections.  And I

4  don't think that we would dispute that we are all hopeful that

5  by 2005, 2006 that we wouldn't be receiving royalty payments.

6  Q    Did even your projections project that you would be

7  receiving royalty payments by 2005, 2006?

8  A    I don't exactly remember, but I wouldn't be surprised if

9  we had some projections where we got cash flow by 2006.

10 Q    And as we know it's now 2008 and there's been no royalty

11 payments under the cash flow participation agreement.  Right?

12 A    That's apparently true.

13 Q    I want to ask you a question or two about Equistar Exhibit

14 4.  That's the December 14, 1998 energy partnering proposal.

15 A    Okay.

16 Q    I, unfortunately after a long day didn't catch quite all

17 of your testimony so I may ask you a little bit.  Did you say

18 that this document Equistar 4 was used with the banks in

19 someway?

20 A    I think it was.  I think this was part of what we

21 presented in discussion with the banks.  Or this could have

22 been --  no, I'm looking at this, that's not true.  This is --

23 it appears to be Houston Industry's proposal to us.

24 Q    So Equistar -- I'm sorry.

25 A    Go ahead.

Teel - Cross/Stearn                    237

1  Q    I was going to ask you so can you say definitively one way

2  or the other for the record whether Equistar 4 the December 14,

3  1998 energy partnering proposal was presented to the banks?

4  A    Yeah.  This was not presented to the banks.  That was my

5  mistake.  That was a different presentation that we made.

6            MR. STEARN:  That's all I have, Your Honor.  Thanks.

7            THE COURT:  Any redirect?

8                       (Pause)

9            MR. FINKELSTEIN:  No, Your Honor.

10           THE COURT:  Thank you.  You may step down.

11           THE WITNESS:  Thanks.

12           THE COURT:  We're done with testimony and exhibits?

13           MR. STEARN:  I think we're done with testimony and

14  with exhibits, Your Honor, and with Your Honor's permission I'm

15  prepared to move to argument.

16           THE COURT:  All right.  Let's do it.

17           MR. FINKELSTEIN:  I would like to offer the exhibits

18  into evidence, Your Honor.

19           THE COURT:  Any objection to their exhibits?

20           MR. STEARN:  No.  Other than the fact that there may

21  be some confidentiality issues we need to work out.

22           THE COURT:  All right.  Then they're admitted subject

23  to that caveat.

24           UNIDENTIFIED ATTORNEY:  Your Honor, It's a timing

25  issue.  I think you wanted to be out by quarter after six?

Teel - Cross/Stearn                          238

1         THE COURT:  Yes.

2         UNIDENTIFIED ATTORNEY:  Should we split the time

3   50/50?  You want some time for questions?

4         THE COURT:  How about ten minutes each?

5         UNIDENTIFIED ATTORNEY:  Ten minutes.  Five, three?

6   All right.  Ten minutes.  Thank you.

7         MR. STEARN:  I was hoping to take up 30 of that, Your

8   Honor.  Your Honor, knows the issues today.  The bottom line

9   issue is can the cash flow participation agreement be used

10  essentially as a, in our view, a veto right on this transaction

11  or can it simply be satisfied from the distributions of the

12  sale proceeds?  That's the process we're proposing.  We think

13  it should ride through.  There's a lot of money here and we can

14  figure out what the appropriate valuation is for the CFPA after

15  the fact.  Nobody's trying to jam them on the CFPA, nobody's

16  trying to take it away from them.  It's just a question of can

17  it be used as essentially a veto right over this transaction?

18        Your Honor, for four reasons we think not.  First of

19  all, because the CFPA is in effect an equity participation

20  right in the debtors' operations.  Second, it's a contract for

21  the payment of money.  Third, it's not executory because there

22  are no remaining material obligations.  The breach of which

23  would excuse the other party's performance.  And finally

24  because it's not integrated.

25        Since I have ten minutes I'll do my best to walk

Teel - Cross/Stearn                          239

1    through these quickly, Your Honor.  Let's talk about our

2    argument that the CFPA is in effect an equity participation

3    right.  There's no real dispute on the legal analysis here,

4    Your Honor.  The cases such as the Third Circuit <u>Submicron</u>

5    opinion made clear that this is a fact intensive analysis, that

6    substance should give way to form, and it tells us to look not

7    just to the language of the contracts, but also to the economic

8    reality and the surrounding circumstances.  And we tried very

9    hard to present that to Your Honor today.

10         What do the contemporaneous facts and circumstances

11   tell us?  Well, in it's original November 1998 request for a

12   proposal which was Debtors' 1 Equistar repeatedly referred to

13   its partner and a long term partnership.  Now, I understand Mr.

14   Teel said this was a commercial relationship, but we also saw

15   that the very first term sheet that they proposed had Equistar

16   owning equity which speaks volumes as to what they're

17   understanding was of the partnership.

18              THE COURT:  Of what they wanted.

19              MR. STEARN:  Pardon me.

20              THE COURT:  Not what they got.

21              MR. STEARN:  I understand.

22              THE COURT:  Okay.

23              MR. STEARN:  But that's where they were.  They were

24   perfectly happy to own equity in the facility.

25              THE COURT:  Okay.

J&J COURT TRANSCRIBERS, INC.

Teel - Cross/Stearn                    240

1          MR. STEARN:  In our view it was for tax reasons that

2    we didn't do it that way.  But then I'll comment a minute to

3    however what the economic rights were and what they really

4    reflect.  I think it's important that in the December 14, 1998

5    presentation, that's Debtors' 3, Reliant expressly stated that

6    Equistar was effectively becoming a partner.  Now, that is

7    although Reliant had stated in its proposal that look, it is a

8    royalty, it's going to be tax deductible, but effectively we

9    view you as becoming a partner.  Equistar's own internal

10   documents characterize the payments to Equistar.  I know it's a

11   long day and we looked at these this morning, but as upside

12   equity participation.

13          All of the background facts and circumstances, Your

14   Honor, and by the way, the document I was just referring to was

15   Debtors' Exhibit 4, all of the background facts and

16   circumstances demonstrate that the parties understood that

17   while they were technically not partners, and we're not arguing

18   that this is a partnership with Equistar and we're not arguing

19   that Equistar is our partner, effectively what happened is they

20   entered into economically a relationship which gave Equistar

21   partner or equity like participation in the debtors'

22   operations, and yet still maintained the beneficial tax

23   treatment at the project level.

24          THE COURT:  So that the debtor got the NOL and no tax

25   benefits went to the other partner.

Teel - Cross/Stearn                    241

1          MR. STEARN:  I think technically although I'm even

2   less versed on tax law than Mr. Johannesen, but I think that

3   the partners in the partnership got the flow through tax

4   benefits.  It's probably the right way to say it.  But -- I

5   hope that's right.  And let's look at the CFPA itself, Your

6   Honor, because we should also look at the terms of the

7   agreement.  That's Debtors' Exhibit 13.  Section 2.1 is the

8   section which describes the payments.  We start out with

9   project cash flow.  And project cash flow is specifically

10  defined in other places, and there's not really time for me to

11  take Your Honor through it.

12          However, what we see is a waterfall that resembles

13  ultimately, I mean, you saw it for instances in the fax we just

14  looked at that came from Ms. Marsh which is identified

15  elsewhere, but what we see is a waterfall that's very much like

16  things you might see in a partnership agreement.  And in fact,

17  if you look to Section 4.2 of the CFPA which is the consent

18  rights -- this is on Page 5, Your Honor -- there's an important

19  point about the consent rights since Equistar's royalty payment

20  is determined by the profitability of the project company's

21  operations.  That really speaks volumes as to what was going on

22  here, Your Honor.

23          As we discuss in Paragraph 53 of our sale motion

24  returns based on profits is the hallmark of an equity interest.

25  And we believe Section 4.2's consent rights also resemble the

Teel - Cross/Stearn                    242

1  kind of consent rights you might see in a limited partnership

2  agreement.  Now, there's no question, Your Honor --

3          THE COURT:  Except that a partnership or equity

4  interest has risks as well as benefits.  And none of the risk

5  of loss, if you will, is born by Equistar.

6          MR. STEARN:  Well, common stock doesn't have risk of

7  loss either other than your --

8          THE COURT:  Sure they do.  You're investment.

9          MR. STEARN:  -- original investment.  Right.

10          THE COURT:  Yes.  But partnership interests clearly

11  have risk of loss.  You have tax losses.  You can view it as a

12  benefit.

13          MR. STEARN:  But I think the way the cases analyze

14  this, Your Honor, is they focus on whether or not the return is

15  based on profits.  I'm not saying --

16          THE COURT:  No, whether there's the assumption of

17  risk as a shareholder.

18          MR. STEARN:  Well, at least the cases we've cited in

19  Paragraph 53 of our sale motion, Your Honor, speak in terms of

20  return based on profits.

21          THE COURT:  Right.

22          MR. STEARN:  And that's our understanding of the case

23  law.  Now, we're not saying it's a partnership agreement, and

24  we're not saying it's a partnership.  There's not all the

25  provisions you would see in here for a partnership agreement,

Teel - Cross/Stearn                                243

1  you know, termination dissolution, things like that.  And we

2  couldn't put all that in there because then the taxing

3  authorities probably would have said this is a partnership

4  agreement and you don't get the deduction.  But on its face the

5  CFPA reflects the fact that although it is technically not a

6  partnership agreement and although Equistar is technically not

7  a partner Equistar's interest in the debtors' assets is partner

8  like or equity like in terms of the return that it receives.

9        And, Your Honor, if it looks like an equity

10 participation right, and it walks like one, and it quacks like

11 one, based upon what's critical here which is a return based on

12 profits it is in effect an equity participation right.  And we

13 respectfully submit that that's how it should be treated here.

14 Appropriate distributions to Equistar after the sale proceeds

15 are set aside.  We may be back in court someday fighting before

16 Your Honor about precisely how those distributions should be

17 made, but that's really an issue for another day.

18        And on these legal issues, Your Honor, and I think I

19 only have about three minutes left you don't really need to go

20 any further to rule on the debtors' favor than the equity

21 participation right, because once --

22        THE COURT:  But if I rule against you on this.

23        MR. STEARN:  Then you've got three other things to

24 swing at.  And I'll have to spend only a moment on each one.

25 Your Honor, the CFPA is a contract for the payment of money.

Teel - Cross/Stearn                          244

1          THE COURT:  Don't you need to deal with the

2    integration first?  Because if it's an integrated contract the

3    fact that this is the provision that deals with some payment

4    doesn't mean you ignore it.

5          MR. STEARN:  Okay.  I'll deal with that one first.

6          THE COURT:  All right.

7          MR. STEARN:  First of all let's take a look at the

8    way the quote, unquote, core project agreements have been

9    cherry picked to make them as much -- to make it look as much

10   as possible like somehow they're integrated.  You've seen these

11   five agreements.  We had a lot of discussion about them.  The

12   term was made up for purposes of the litigation, and that does

13   in fact, Your Honor, in our view, speak volumes as to how

14   they're packaging the agreement such that you will consider

15   them to be integrated.

16         I mean, they don't even put the energy supply

17   agreement in there pursuant to which they purchased energy.

18   And the reason they don't do that is because it -- and even

19   though they need it it's because it harms their integration

20   argument because it's got different parties, different dates

21   things like that.  So what you're seeing is cherry picking

22   amongst these agreements.

23         You've also heard that this CFPA and it's undeniable

24   based on the testimony of all of Equistar's witnesses it's not

25   necessary to run this project.  Now, it may be the case that

**J&J COURT TRANSCRIBERS, INC.**

1  they were all negotiated together.  It may be the case that our

2  friends at Equistar had an expectation of a return based on the

3  CFPA.  But that's not the legal analysis for whether or not

4  agreements are integrated.  And we've laid that legal analysis

5  out in our briefs.  And in the one minute I have left I'll do

6  my best to highlight it, Your Honor.

7         The couple of points I would want to make are first

8  of all, as I just said, the fact that they're negotiated as

9  part of a single transaction is not dispositive for purposes of

10 whether it's an integrated agreement under 365.  Second, in

11 it's brief my friends cite the fact that there are entire

12 agreements clauses in these supposed core project agreements.

13 But these entire agreements clauses don't actually say what is

14 quoted in Equistar's brief.  What they say, and I'll use the

15 CFPA version as an example.

16         THE COURT:  All right.  Which page?

17         MR. STEARN:  I'm sorry.  This is Debtors' 13.

18         THE COURT:  Yes.  I have it.

19         MR. STEARN:  It's Section 6.8 which is Page 17.

20         THE COURT:  Okay.

21         MR. STEARN:  It says, this agreement and the other

22 project agreements contain the complete agreement of the

23 parties hereto with respect to the matters contained herein and

24 therein.  Now, my friends don't cite herein and therein, they

25 just cite one of those.  And this is an important distinction,

Teel - Cross/Stearn                          246

1  Your Honor, because in the case that they rely on in their

2  brief which is the <u>Phillip Services</u>, I think, what that court

3  concluded with respect to integration was because the agreement

4  at issue said all documents at issue are deemed part of this

5  agreement that that was sufficient for integration purposes.

6  But the integration clauses and the cash flow participation

7  agreement and the other quote, unquote, core project agreements

8  don't use such language.  They actually specify that there are

9  different agreements, herein and therein.

10        I'll try to use my last minute, Your Honor, hopefully

11  wisely.  I think we've laid out in our brief the reasons why,

12  for instance, Equistar's not being deprived of consideration

13  here, why the consideration here is apportionable under the

14  CFPA, and frankly the <u>In re Union Financial Services Group</u> case

15  is very helpful on that.  What that case concluded with

16  essential three agreements that the counter party argued were

17  integrated.  One of them was a seller note.  And the seller who

18  of course wasn't going to get paid under the note argued that

19  it was integrated withe APA.  And the court said no, it's not,

20  it's got separate apportionable consideration which is the

21  payment under the note.  That's really analogous to any

22  payments that might be received under the CFPA.

23        THE COURT:  Well, then tell me, please what

24  consideration was given by Equistar for the payments it's to

25  receive under the CFPA?  And where is that stated in the CFPA?

Teel - Cross/Stearn                    247

1          MR. STEARN:  Well, I think the way that the case -- I

2    guess what I'm offering on this case law is, Your Honor, the

3    way the Union Financial Services Group looked at this is

4    clearly there was consideration, you know for the APA.  The

5    consideration for the note was really giving up the assets that

6    were at issue in the APA.  Yet, because these agreements even

7    though they were negotiated at the same time address different

8    elements of consideration.  The consideration being the outflow

9    under the note.  That's analogous to the outflow here under the

10   CFPA.  And that's what that case stands for, Your Honor.  I

11   read it pretty carefully.

12         THE COURT:  Well, tell me again what consideration is

13   in this -- the consideration for the cash flows under the CFPA

14   were what Equistar gave up in the other contracts.  Is that

15   correct?

16         MR. STEARN:  Well, actually what we've seen in some

17   of the documents, and in particular I guess the one document

18   that I would cite to that I thought was pretty helpful on this

19   was the original November 18, 1998 RFP.  It's Debtors' Exhibit

20   1.  And what that document says, and if we could just go to

21   Debtors' Exhibit 1 on Page 4752 and the fifth paragraph.

22   Actually, maybe the fourth paragraph.  I'm sorry.  It's the

23   fourth and the fifth.  We offer a perspective partner

24   significant opportunity to create value through the use of

25   Equistar's large thermal demand in several locations, land,

Teel - Cross/Stearn                          248

1  infrastructure, fuel availability and geographic diversity.

2  Additional explanation of some of the valuation criteria is

3  given below.

4         And that goes on to say in value to Equistar in the

5  fourth line down, and I questioned Mr. Teel about this, "Our

6  partner would have the benefit of excess electricity sales and

7  land Equistar would provide in return for providing the steam

8  and electricity to Equistar at production cost.  Fuel plus

9  operating and maintenance expenses."

10        You've heard that the important things to Equistar

11 her were steam and electricity.  This was the essential quid

12 pro quo, steam and electricity in exchange for, you know,

13 here's our land and you build the facility.

14        THE COURT:  Then what did it give your client in

15 exchange for the agreement to give the cash flow?

16        MR. STEARN:  I'm sorry?.

17        THE COURT:  What did Equistar give in exchange for

18 the agreement to get the cash flow participation?

19        MR. STEARN:  Well, that was part and parcel of -- I

20 mean, look, as we said there's no doubt these agreements were

21 negotiated together.  But under the legal analysis, under the

22 cases as we've read it what you focus on is the outflow under

23 the CFPA and it's a separate apportionable consideration.

24        THE COURT:  Well, don't -- okay.  All right.

25        MR. STEARN:  I think my time's up, Your Honor.

**J&J COURT TRANSCRIBERS, INC.**

Teel - Cross/Stearn                         249

1          THE COURT:  Thank you.

2          MR. STEARN:  Thank you.

3          MR. FINKELSTEIN:  Your Honor, I'm going to start by

4    painting a target on my chest.  Do you have questions for us?

5          THE COURT:  Well, answer my question.  What was the

6    consideration under the CFPA?

7          MR. FINKELSTEIN:  Well, it's not stated within the

8    CFPA.  But the purpose of building this facility was to enable

9    Reliant to have a very large cogeneration facility that would

10   be supported by cash flows paid under the two key agreements,

11   the energy supply agreement and the steam supply agreement

12   which was the revenue source to enable the financing of the

13   project.  And it would put Reliant in a position where it would

14   be able to exploit in a nice way the deregulated energy market

15   to deliver what amounted to electricity needed by multiple

16   plants by Equistar and also sell into the power merchant

17   market.

18          That was what Reliant was looking for, was the

19   opportunity to take advantage of the merchant capacity of this

20   facility where Equistar utilized only 293 megawatts out of the

21   total 830 megawatts.  Equistar's point of view was they wanted

22   valuable low cost steam and electricity for the purpose of

23   being able to be competitive with the other chemical plants

24   with which they compete on a global basis.  And so if they

25   could have gotten lower steam and electricity payments as you

Teel - Cross/Stearn                    250

1    heard Mr. Teel testify Equistar would have been happier with

2    the deal.

3        But because financing would not have been available

4    without the higher cost steam and electricity that Equistar

5    committed to pay for under a long term supply agreements there

6    wouldn't have been financing available.  But the financing was

7    made available by virtue of the long term supply contracts.

8    Where Equistar was taking their risk, and I guess it pays to

9    keep in mind that Equistar was not the power company.

10       Equistar did not have the ability to determine what

11   power prices were going to be going forward whereas Reliant

12   having been in the industry was more capable of projecting cash

13   flows that were anticipated to be received from the

14   deregulation of the energy market and the delivery of merchant

15   power from this very large facility into the market place.

16   Equistar's compensation or the values that Equistar felt it

17   needed, the benefits that Equistar felt it needed were a mix.

18       If the contracts that Equistar was signing up for on

19   a long term basis to pay substantial sums of money to Reliant

20   had been lower priced there wouldn't have been any need for a

21   cash flow participation agreement.  There was also some money

22   paid up-front to help reimburse Equistar for the cost that it

23   incurred in preparing its site, what we call the fence line.

24   The expensive plumbing.  That was prepared by Equistar at a $50

25   million cost for which it got $20 million of reimbursement.

Teel - Cross/Stearn                            251

1           And so there were a mix of considerations flowing

2   between the parties.  The primary consideration sought by

3   Reliant was the opportunity to go into the merchant market and

4   sell power at what they expected would be market prices on a

5   long term basis.  Equistar devoted 25 acres out of its 3900

6   acre complex to the site of the cogent under a 40 year lease

7   for $100 rent payment.  And that's the provision of the site

8   lease.

9           Now, I have to take issue with the way that the

10  debtors present the argument which is the last thing they want

11  to talk about is the first thing that must be talked about and

12  that is integration.  If you've got an integrated set of

13  contracts then you read them all together and you construe them

14  all together.  In contrary to the characterization what we call

15  the five core agreements which certainly was merely for

16  convenience not characterizing them as being somehow -- that

17  was a term of art that the parties used -- but merely for

18  argument sake those core agreements all contain a common entire

19  agreement provision that is distinct for those five agreements

20  from the entire agreement provision and all of the other both

21  project agreements and nonproject agreements.

22          Specifically, project agreement is a term defined in

23  Schedule X that encompasses, depending on how you count it, 13

24  agreements.  And within those 13 agreements there are five that

25  have the precise same entire agreement clause.  It is not a

**J&J COURT TRANSCRIBERS, INC.**

1  provision that says we've had oral discussions, they're all
2  merged with this document, that's the end of the story.  On the
3  contrary, what they say is you read this agreement in tandem
4  with the other project agreements that have the same clause in
5  the entire agreement provision and only the five agreements
6  that we've been discussing here today as the so-called core
7  agreement contain the identical entire agreement clause.  The
8  other agreements, because they may not be as integrated as
9  necessary to the process didn't necessarily have the same terms
10 of duration.  Those don't have that clause.

11          Now, what was the thought process behind that?  I
12 can't tell you.  All I can tell you is I think it's a
13 meaningful distinction between the agreements that we've
14 identified as the development agreement which fulfilled its
15 complete purpose by being fully performed, the site lease which
16 is a 40 year term agreement whereby the cogent facility could
17 occupy the premises owned by Equistar for 100 year lease --
18 $100 rent for 40 year term, the steam supply agreement which
19 had an initial term of 23 years subject to multiple extensions
20 so that it would extend throughout the duration of the site
21 lease, the services agreement which had similar provisions so
22 that it could extend throughout the duration of the site lease,
23 and finally the cash flow participation agreement where if
24 Equistar breached the agreement or if -- and as a consequence
25 of that Reliant converted the entire facility into a merchant

1  facility then the term of the cash flow participation agreement

2  automatically extended for the 40 year term of the site lease.

3        They were integrated and intended to operate in

4  tandem throughout the duration of site lease with the

5  anticipated prospect that they might fulfill their obligations

6  and, for example, Equistar might want to unwind the long term

7  energy supply agreement or in fact Reliant had the ability to

8  terminate the long term energy supply agreement after the end

9  of 17 years by making a $3 million payment.  The parties

10 anticipated these agreements needed to remain in place for long

11 enough to pay the debt service and then they wouldn't be joined

12 at the hip quite as readily or quite as thoroughly with respect

13 to the energy supply agreement.

14       But the steam supply agreement, the site lease, the

15 cash flow participation agreement and the services agreement as

16 well as the fully performed development agreement would all

17 have to be fully performed during the duration of those

18 agreements.  And that's why they have a common entire agreement

19 clause which is distinct from the entire agreement clause in

20 the other documents.

21       So I think it's telling that our debtors at Page 3 of

22 their reply brief always want to talk about integration as the

23 last issue, and I think the Court is well aware that's got to

24 be the first consideration.  If we have integrated nonseverable

25 agreements I don't see how we get to talk about things like an

Teel - Cross/Stearn                                254

1   equity participation interest when in fact the agreement if you

2   consider it to be unambiguous refers to it as a royalty

3   payment, not an equity participation.

4          As you also seem to recognize the payments that are

5   made to Equistar pursuant to the cash flow participation

6   agreement are deductible ordinary expenses to the partnership

7   which is a benefit to the partnership as opposed to returns of

8   capital which is what the distributions are.  And so if you're

9   making a distribution to a partner you don't take a deduction

10  for that.  But if you're paying a royalty payment as indicated

11  in the cash flow participation agreement that's a deductible

12  expense to the partnership and increases those net operating

13  loss carry forward that those partners are so -- that are so

14  dear to those partners.  To even begin to characterize Equistar

15  as a partner when it was Reliant that insisted that Equistar

16  would have no equity in this operation is at best disingenuous,

17  Your Honor.

18          THE COURT:  Any reply?

19          MR. STEARN:  Two quick points, Your Honor, because

20  I'm not sure I'm awake enough to make any more.  I think it's

21  helpful sometimes to once again come back to the documents.

22  The second amended cash flow participation agreement, second

23  amended and restated cash flow participation agreement says in

24  its recitals, and I hope this is at least partially responsive

25  to the question you asked me earlier.

**J&J COURT TRANSCRIBERS, INC.**

Teel - Cross/Stearn                    255

1          THE COURT:  Where are you?

2          MR. STEARN:  In it's recitals which are -- well, I'm

3    in Debtors' 13 and I'm on the page numbered 1 which is about

4    four pages in.

5          THE COURT:  Yes.

6          MR. STEARN:  At the very bottom it says, at the

7    bottom of the first page, "In consideration of the premises and

8    of the mutual covenants and agreements set forth herein the

9    parties intending to be legally bound hereby agree as follows."

10   It doesn't bring in all these other agreements.  It doesn't say

11   in consideration for land or building a building or buying

12   electricity or providing steam.

13         THE COURT:  Well, it does talk about the, you know,

14   business of developing and owning cogeneration and that the

15   project company and Equistar entered into the development

16   agreement to do just that.

17         MR. STEARN:  But it also says, and I'm just reading

18   the words --

19         THE COURT:  I mean, but the recitals are set forth

20   herein.

21         MR. STEARN:  I understand, Your Honor.  And the

22   second point that I wanted to make, and this really goes to

23   both the equity participation right and essentially the cash

24   flow of the cogeneration facility, and in our view also goes to

25   the integrated -- it goes to the point about integration.

Teel - Cross/Stearn                    256

1  Remember, at the end of the day what we're suggesting and

2  whether you consider this an integrated agreement, whether you

3  consider it to be equity like is actually satisfaction of what

4  was given.  In other words, what Equistar got in the CFPA was

5  the right to essentially certain cash flows as calculated.

6  Well those cash flows have now essentially come in.  The CFPA

7  has outlived its purpose and --

8        THE COURT:  Well, where does it say that it'll be

9  cash flow from the sale of the cogeneration facility?

10        MR. STEARN:  I'm not sure that's addressed one way or

11  the other, Your Honor.

12        THE COURT:  Right.

13        MR. STEARN:  But what we're talking about is whether

14  or not the ultimate purpose has been satisfied.  And this is

15  the ultimate cash flows in our view and all we believe we're

16  doing is giving them the benefit of the bargain through

17  appropriate distributions.

18        THE COURT:  Then you would suggest you can give a

19  suit care creditor the benefit of the bargain by paying him

20  whatever is realized from the sale of the collateral as opposed

21  to a --

22        MR. STEARN:  I don't think I need to go there because

23  again, in our view it's an equity like interest and we're

24  giving them their return.

25        THE COURT:  All right.

Teel - Cross/Stearn                    257

1          MR. STEARN:  Anyway, thank you very much, Your Honor.

2          THE COURT:  Thank you.

3          MR. STRATTON:  Your Honor, David Stratton for the

4    creditors' committee.  I'm not going to get into the particular

5    merits of each of the arguments because frankly we don't want

6    to take sides.  What I'm going to ask the Court to do is what I

7    asked the parties to do.  And that is let's get this sale

8    closed.  It's $500 million.  In my view it sort of monetizes

9    the economics -- I think that was Ms. Tibbitts words -- under

10   the cash flow participation agreement.  And then they can fight

11   until the cows come home about who gets what portion of that

12   after the lenders and some of the other expenses come off the

13   top.

14          The risk we take is that we lose the sale and then

15   either we sell it with the cash flow participation agreement

16   and all we do is pay off the senior lender or we don't have a

17   sale at all and then I have no idea what happens next.  I

18   encourage both sides to that that.  We've been unsuccessful so

19   far.  I would urge Your Honor to dictate that resolve.  If

20   there's a dispute you can resolve it.  Nobody's interest --

21   economic interest, and that's what at stake here, the economic

22   interest that Equistar has in that agreement are going to be

23   imperiled one bit.

24          THE COURT:  Well, if it's an integrated contract

25   though I can't change the terms.  You assume all or none.

Teel - Cross/Stearn                    258

1          MR. STRATTON:  I leave to the parties to argue about,

2    Your Honor.  I think that --

3          THE COURT:  I don't think I can dictate it though if

4    I --

5          MR. STRATTON:  I understand.  If you reach that

6    conclusion based on all the facts.  I understand what the case

7    law is.  I'm not sure which way that comes out or whether it's

8    a close enough call that you have no choice there.  But I think

9    the right result, the bankruptcy result, if you will, the

10   predictable bankruptcy court this is the way it should get

11   worked out is -- either that or you should kick them all out of

12   the room and tell them to come back when they have a resolution

13   -- is as I suggested.  Thank you, Your Honor.

14         MR. PFEIFFER:  Good afternoon, Your Honor.  Brian

15   Pfeiffer from Fried, Frank, Harris, Shriver & Jacobson on

16   behalf of the Bank of New York as administrative agent to the

17   lenders.  Your Honor, I'll be brief.  As we noted in our papers

18   the administrative agent similarly does not take a position

19   with respect to the underlying merits of the parties'

20   arguments.  However, the administrative agent does reiterate

21   its position in its papers that any decision with respect to

22   the underlying merits here should not impact the lender's

23   rights under the cash flow participation agreement and  the

24   other project agreements to determine whether or not to assume

25   each agreement after an event of default under the credit

J&J COURT TRANSCRIBERS, INC.

Teel - Cross/Stearn                                    259

1    agreement.

2              In that regard Section 6.2(b) of the cash flow

3    participation agreement states that Equistar  acknowledges that

4    upon an event of default by the project company under the

5    financing agreements which is  defined as the credit agreement

6    the lenders may, but  shall not be obligated to assume or cause

7    a new lessee or purchaser of the project to assume all of the

8    interest, rights and obligations of the project company under

9    this agreement.  And this agreement was relating to the cash

10   flow participation agreement.

11             This same clause is in each of the project documents

12   and there are a number of provisions that govern the  rights

13   between the lenders and Equistar and Reliant.  So I understand

14   that that's not before the Court today.  I just want to make

15   sure that whatever decision is reached should be without

16   prejudice to our rights.  Thank you.

17             THE COURT:  But your right is only to require that

18   they assume and assign all the rights.

19             MR. PFEIFFER:  To assume and assign all the rights.

20   Well --

21             THE COURT:  You can't dictate that some of the rights

22   would be assumed.  This is the --

23             MR. PFEIFFER:  Well, whether or not this is an

24   integrated agreement each individual agreement says that the

25   lenders may, but shall not be obligated to assume.  So even if,

Teel - Cross/Stearn                                    260

1   I think, even if you find that this is all one integrated

2   agreement that was contemplated by the parties and Equistar

3   specifically acknowledged that with respect to the lenders

4   after an event of default on their credit agreement the lender

5   should have the right to essentially cherry pick.  To pick and

6   choose.  This is in a foreclosure type of situation.

7           And again, there are a number of provisions in other

8   agreements such as the consent that will impact upon this.  But

9   our position is that we do have a right to cherry pick in a

10  situation where there's a foreclosure.  And I think that

11  unfortunately to the extent that this sale goes away because,

12  you know, if Equistar is successful and the sale goes away we

13  could very well find ourselves in a position where we're

14  foreclosing on our collateral.  And in that case, what I'm

15  saying is we're reserving the right to argue that.  Under the

16  terms of these agreements we have the right to cherry pick

17  which agreements we want to take and not take notwithstanding

18  that the parties have contemplated this.  And, you know, yes,

19  there's an integration clause, but in two provisions before the

20  integration clause there's a section that says that you can

21  cherry pick.

22          THE COURT:  Do you want me to decide that?

23          MR. PFEIFFER:  No.  I'm looking to reserve our rights

24  on that.  Thank you, Your Honor.

25          MS. FATELL:  Your Honor, if we may have one final

**J&J COURT TRANSCRIBERS, INC.**

Teel - Cross/Stearn                      261

1  closing remark.  Your Honor, it's very telling that the parties

2  are arguing that Equistar should waive its rights.  That

3  there's a sale here and for the good of everybody Equistar

4  notwithstanding that nearly ten years ago it negotiated a

5  bundle of agreements to comprise one project agreement -- one

6  group of project agreements and there were considerations back

7  and forth for that, that today it should waive its rights and

8  walk away and deal with the issue later.

9        Your Honor, we're not the fly in the ointment, we

10  didn't bring this before the Court at this stage.  You heard

11  testimony that Equistar was prepared all along to talk with

12  buyers.  It's hard for us to believe that after going through

13  this whole process and we believe Fortistar has been involved

14  in this process for many, many months, didn't just show up

15  recently and are prepared to pay half a billion dollars that

16  they're going to walk away because the Court ruled as it should

17  that there's a legal contract, Judge, that has to be honored.

18  We believe that there can be a business resolution.

19        Debtors' counsel tried to make that point very

20  strongly with Ms. Tibbitts, and yes, there's always a business

21  resolution.  This is about business.  But that doesn't mean

22  that Equistar should be required to waive its rights and walk

23  away from its contracts.

24        MR. HANDELSMAN:  Your Honor, I know it's getting --

25  Lawrence Handelsman for Reliant Energy, Your Honor.  I only

J&J COURT TRANSCRIBERS, INC.

Teel - Cross/Stearn                                         262

1  want to say one thing because I just don't want it to get lost

2  in the shuffle here especially as we come to the end of a very

3  long day.  We don't believe that Equistar is being asked to

4  waive any rights.  And I'd just like to focus on what the cash

5  flow participation agreement is.  It provides a future stream

6  of income, if you will, royalty payments after all of the

7  project cost, that's -- I don't want to get too involved in the

8  definition.

9       But the project cash flow is essentially all of the

10 project costs including debt service and payments to unsecured

11 creditors.  All of that.  That comes first.  After that's left

12 if the partners take a distribution, a dividend, if you will,

13 then Equistar's entitled to formulaically determine

14 distribution as well.  And it's based upon the internal rate of

15 return that the Reliant partners get on their capital that they

16 contribute.

17      That future cash flow is produced by the assets that

18 we're selling.  We're selling these assets where essentially

19 present valuing the future cash flow that they would produce by

20 producing the energy to be sold over the years and producing,

21 if there is any, and so far there hasn't been, if there is any

22 in fact extra profits to be distributed.  That's been present

23 valued by this sale.  That's in fact what the buyers buy.  And

24 Equistar's entitled to a share of that.  It will get a share of

25 that if we can't arrive at a settlement which would be

**J&J COURT TRANSCRIBERS, INC.**

Teel - Cross/Stearn                    263

1  preferable.

2           So far the parties are in different ball parks.

3  Maybe even different leagues.  But if we can't arrive as a

4  consensual settlement over how much their share is and there's

5  a formula and it -- and I won't bore you with the details, it's

6  not for today -- but if we can't then maybe you have to decide

7  it.  But the point is that they money that's left over after

8  all of the creditors get paid is really a satisfaction of the

9  cash flow participation agreement.  They're not being asked to

10  waive any rights.  In fact, they're getting money that they

11  haven't gotten to date and probably wouldn't ever get.

12           If we don't do this sale the lenders are going to --

13  despite Ms. Fatell's hopes -- this project's in default, the

14  lenders can take it, we'll take it.  They can pick and choose.

15  If they sell it to somebody at a foreclosure the CFPA is gone.

16  And what we're doing here is saying we're selling it, we're

17  paying everybody off, there's a bunch of money left over.

18  Maybe even $100 million left over.  And that $100 million or

19  whatever it is -- turns out to be -- represents the present

20  value of all those future income streams.  And to the extent we

21  get some of it they're entitled to some of it.  And we'll have

22  to figure out how much or you'll have to figure out how much.

23  But they're getting their rights under the CFPA.

24           THE COURT:  Well, let me make my ruling quickly.

25  Okay.  One other party to be heard?

J&J COURT TRANSCRIBERS, INC.

Teel - Cross/Stearn                    264

1          MR. MILLER:  I'm sorry, Your Honor, I think it's

2    going to be two parties.  Again, Your Honor, Curtis Miller from

3    Morris, Nichols, Arsht & Tunnell on behalf of Fortistar and

4    GIMCV.  I just rise briefly to address a comment by Equistar's

5    counsel about what my client would do based on your Court's

6    ruling.  That's just pure speculation and the deal that GIMCV

7    has struck is for the assets without the CFPA.  That's it.

8          THE COURT:  I understand that's true of both debtors.

9    Let me make my ruling.  I think that -- first let me deal with

10   the argument that this is an equity like interest.  I think

11   while it's true if it looks like a duck and quacks like a duck

12   it is a duck, but if it is only half a duck and doesn't have

13   all the duck features it's not a duck.  This did not have all

14   of the attributes of an equity interest.  It did not share in

15   the risk, it did not share in the tax benefits or burdens.  It

16   really was a share in a stream of cash.  And that can be a debt

17   instrument as well as an equity instrument.  A stream of cash

18   does  not in and of itself determine that it's an equity

19   interest.

20          I'm also convinced based on the negotiations of the

21   parties and the proposal and response to the request for

22   proposal that it was the debtor itself that did not want this

23   to be characterized in anyway as an equity participation.  So I

24   think it's easy to conclude that it was no an equity

25   participation.

Teel - Cross/Stearn                    265

1       With respect to the integration issue based on all

2   the evidence I think that the CFPA was integral part of the

3   total project which included the supply agreement, the service

4   agreement, the elect -- excuse me, the electric entity and

5   supply agreement.  The development agreement.  All of these

6   documents were negotiated at the same time.  They were not for

7   separate projects.  They were all part and partial of the same

8   project to build a cogeneration facility, to provide for the

9   sale of the production of that facility to Equistar at set

10  prices.

11       And I accept the testimony that the prices would have

12  been different had there not been a cash flow agreement.  That

13  in fact they wanted different pricing, but in order to allow

14  the deal to go forward and allow financing for the debtor that

15  they agreed to increase the pricing and get what they thought

16  was consideration for this deal in the form of cash flow later.

17       The problem with the suggestion of the committee and

18  the parent that this can just be cashed out and it's just an

19  interest in cash is that that's not the way the bankruptcy code

20  is written.  The bankruptcy code treats executory contracts

21  differently.  You cannot just take the benefits of the contract

22  and pay what you think the value of that contract is.  It would

23  be similar to taking a lease and present valuing the rent due

24  under and paying some cash increment rather than future rents

25  or percentage rent, or any other executory contract where

Teel - Cross/Stearn                                266

1  somebody could present evidence that the present value of the

2  cash that might be realized by this contract can be determined.

3          The code and case law does not allow the Court to do

4  that or the debtor to do that.  You accept the contract as it's

5  written.  All the terms as they're written.  And,

6  unfortunately, because I think it's one integrated contract it

7  is executory.  It's not simply the contract for payment of

8  money.  And I think the debtor cannot sell some of those

9  contracts without all of them.  All right.  That's my decision.

10  I guess I'll leave the parties to determine where to go from

11  there.

12          THE ATTORNEYS:  Thank you, Your Honor.

13          MR. PFIFFER:  Your Honor, can you hold just one

14  second.  We do have one issue we need to address.  Your Honor,

15  if I could just address the Court for one second.  I'll be

16  brief.  The debtors did file a motion to extend their period to

17  assume or reject leases under Section 365(d)(4).  Your Honor,

18  if I understand Your Honor's ruling you've just denied our

19  motion to assume in connection with the sale motion so

20  technically we don't have a motion to assume that's pending.

21  And by operation of the code that lease could be deemed

22  rejected.  Equistar did respond to our 365(d)(4) motion and

23  they did consent to an extension through April 30th.  And I

24  have a form of order which would extend the time to assume or

25  reject through April 30th, 2008.

Teel - Cross/Stearn                           267

1            THE COURT:  All right.  And that's agreed to.

2            MR. FINKELSTEIN:  That is agreed to, Your Honor.

3            MR. PFEIFFER:  If I may approach.

4            THE COURT:  Okay.  You may.  Thank you.

5            MR. STAIB:  I think, Your Honor, -- Jason Staib for

6    Equistar.  Your Honor, we are okay with an extension through

7    April 30th.  I think we need some additional language in the

8    reservation of rights.  I don't know that we need to amend the

9    language.  I'll just make a representation on the record.

10           THE COURT:  Sorry.  I'm going to have to throw myself

11   out of court and turn in my phone.  Yes.

12           MR. STAIB:  In Paragraph 4 after the reference to

13   2008 I would add and with respect to Equistar's pending sale

14   cure, and any other objection.  With that I think we're fine

15   with the order.

16           THE COURT:  To extend the period beyond and what?

17           MR. STAIB:  And with respect to Equistar's pending

18   sale cure, and any other objection.  It's in Paragraph 4, Your

19   Honor, at the end.

20           THE COURT:  Have you hand written that in?

21           MR. STAIB:  I have not.  As long as it's on the

22   record we're fine with that.

23           THE COURT:  Hand write it in and I'll --

24           MR. STAIB:  I interliterate on a black line.

25           THE COURT:  All right.  You can give it to the --

Teel - Cross/Stearn                    268

1  yes.  All right.  We'll stand adjourned then and I'll hear from

2  the parties I assume.

3                          * * * * *

4                  **C E R T I F I C A T I O N**

5          We, ELAINE HOWELL, TAMMY DeRISI and KIMBERLY UPSHUR,

6  court approved transcribers, certify that the foregoing is a

7  correct transcript from the official electronic sound recording

8  of the proceedings in the above-entitled matter, and to the

9  best of our ability.

10

11  /s/ Elaine Howell              DATE:  April 14, 2008
    ELAINE HOWELL

12

13  /s/ Tammy DeRisi
    TAMMY DeRISI

14

15  /s/ Kimberly Upshur
    KIMBERLY UPSHUR
16  J&J COURT TRANSCRIBERS, INC.

17

18

19

20

21

22

23

24

25

**EXHIBIT F**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                          )  Case No. 07-11160(MFW)
                                )  Chapter 11
RELIANT ENERGY                  )
CHANNELVIEW, LP, *et* al.,      )  Courtroom No. 4
                                )  824 Market Street
                Debtors.        )  Wilmington, Delaware 19801
                                )
                                )
                                )  May 14, 2008
                                )  4:02 P.M.


TRANSCRIPT OF HEARING
BEFORE HONORABLE MARY F. WALRATH
UNITED STATES CHIEF BANKRUPTCY JUDGE


APPEARANCES:

For the Debtors:            Richards Layton & Finger, PA
                            By:  PAUL HEATH, ESQ.
                            One Rodney Square, P.O. Box 551
                            Wilmington, Delaware 19899

For Unsecured Creditors'    Pepper Hamilton
Committee:                  By:  DAVID STRATTON, ESQ.
                                 EVELYN J. MELTZER, ESQ.
                            Hercules Plaza, 1313 Market Street
                            Suite 5100, P.O. Box 1709
                            Wilmington, Delaware 19899-1709

ECRO:                       Nickita Barksdale

TRANSCRIPTION SERVICE:      TRANSCRIPTS PLUS
                            435 Riverview Circle
                            New Hope, Pennsylvania 18938
                            Telephone:  215-862-1115
                            Facsimile: 215-862-6639
                            e-mail CourtTranscripts@aol.com


Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

2

```
APPEARANCES:
(Continued)

For CIM CV:              Morris Nichols Arsht & Tunnell, LLP
                         By:  ROBERT J. DEHNEY, ESQ.
                              CURTIS MILLER, ESQ.
                         1201 North Market Street
                         P.O. Box 1347
                         Wilmington, Delaware 19899-1347

For the Bank of          Pachulski Stang Ziehl & Jones
New York:                By:  TIM CAIRNS, ESQ.
                         919 North Market Street, 16th Floor
                         Post Office Box 8705
                         Wilmington, Delaware 19899-8705

                         Fried Frank Harris Shriver
                         By:  BONNIE STEINGART, ESQ.
                              BRIAN PFEIFFER, ESQ.
                         One New York Plaza
                         New York, New York 10004

The U.S. Trustee:        Office of the U.S. Trustee
                         By:  MARK KENNEY, ESQ.
                         844 King Street
                         Wilmington, Delaware 19899

For Equistar Chemicals:  Blank Rome, LLP
                         By:  BONNIE GLANTZ FATELL, ESQ.
                         Chase Manhattan Centre
                         1201 Market Street, Suite 800
                         Wilmington, Delaware 19801

TELEPHONIC APPEARANCE:

LAWRENCE HANDELSMAN, ESQ.

JONATHAN ALTER, ESQ.
```

3

1            MR. HEATH:  Good afternoon, Your Honor.  Paul Heath

2   of Richards Layton and Finger on behalf of the debtors.

3            THE COURT:  Good afternoon.

4            MR. HEATH:  Your Honor, I have good news to report.

5            THE COURT:  The news I got was everybody worked hard.

6            MR. HEATH:  Yes, especially --

7            THE COURT:  And --

8            MR. HEATH:  Especially Judge Shannon.  So --

9            THE COURT:  -- you got it done.

10           MR. HEATH:  Yes.  There is a deal, Your Honor.  I

11  believe that the parties are going to put the basic terms of

12  that deal on the record.

13           THE COURT:  Okay.

14           MR. HEATH:  And then they're going to work, Your

15  Honor, to reduce it to writing, Your Honor, over the next

16  couple of days.

17           So, Your Honor, again, we're happy to report that we

18  have a deal.  There are, at this point, sort of three issues

19  that we need to address with the Court:

20           We have a pending exclusivity motion;

21           And we have a deadline of May 15th for consensual use

22  of cash collateral.  So, it expires tomorrow;

23           And the deadline to assume or reject the site lease

24  also expires tomorrow, May 15th.

25           What we've discussed amongst the parties is is

4

1  continuing the hearing on the motion on exclusivity until

2  sometime -- I think the Tuesday, maybe, after Memorial Day.

3  And then also the parties would agree -- the lenders and

4  Equistar would agree to extend those two deadlines:  The site

5  lease assumption or rejection deadline and the cash collateral

6  -- the consensual use of cash collateral period through that

7  date.

8           That gives the parties time to work on the definitive

9  agreement with respect to the settlement.

10          THE COURT:  Okay.

11          MR. HEATH:  So, that's how we would intend to address

12  those three issues, Your Honor.

13          We'd also like to raise the following with the Court.

14  We believe, Your Honor, at the sale hearing that the Court

15  approved the 363 aspect of the sale.  The remaining issue was

16  the integration of contracts issue under 365, that's now been

17  resolved in connection with the settlement.  Because Your Honor

18  approved the sale under Section 363, and the only open issue

19  has been resolved.  What we'd like to do is at least maintain

20  the possibility that if the parties are able to reach a

21  definitive -- you know, definitive documentation with respect

22  to the settlement within the next two to three to four business

23  days.  We'd like to have the opportunity to submit that

24  settlement agreement and the sale order under certification of

25  counsel so that Your Honor could consider it and hopefully

5

1 approve it, and then we'd put the case in a position for a lot

2 of good things to happen.  We could start to move forward with

3 this sale.

4         We'd still then have that Tuesday after the Memorial

5 Day in case things get extended to be back before Your Honor to

6 address those other open issues.  We think they're all going to

7 be resolved, Your Honor, by virtue of the fact that we've

8 reached a settlement.

9         So, with that, Your Honor, I think either Mr.

10 Handelsman, who I believe is on the phone, or Ms. Fatell, will

11 have the pleasure of letting the Court know the terms of the

12 settlement.

13         MR. HANDELSMAN:  Your Honor, Lawrence Handelsman.

14 Before we do that, I just -- there is also a -- the pending

15 Trustee motion.

16         THE COURT:  Right.

17         MR. HANDELSMAN:  So, that should be, I guess, carried

18 with all of the others --

19         MR. HEATH:  I would be happy to continue that, Your

20 Honor.

21         MR. HANDELSMAN:  -- until we have the definitive

22 documentation.

23         THE COURT:  Well, one wrinkle is that I will be out

24 of the country from the Friday before Memorial Day to the

25 Thursday after Memorial Day.  The 22nd to the 29th.  So, if

6

1  the --

2          MS. FATELL:  That goes to the cash collateral and the

3  time to assume or reject the site lease.

4          THE COURT:  Yes.

5          MS. FATELL:  That's okay.  Your Honor, whatever day

6  after you return I think sounds acceptable to the parties.

7          THE COURT:  All right.  It -- I get in late on

8  Thursday, so let's make it that Friday --

9          MS. FATELL:  Okay.

10          THE COURT:  -- the 30th.

11          MS. FATELL:  Mr. Handelsman, Bonnie Fatell speaking,

12  I was going to read the settlement into the record, if that's

13  okay, and you can correct me if I've missed anything.

14          MR. HANDELSMAN:  Sure.

15          MS. FATELL:  Okay.  Your Honor, Bonnie --

16          MR. HANDELSMAN:  We're cooperating, so I'll let you

17  do it.

18                          (Laughter)

19          MS. FATELL:  Your Honor, Bonnie Fatell on behalf of

20  Equistar Chemicals.

21          We are pleased to report that Your Honor's insistence

22  that we go to mediation was well served and Judge Shannon was

23  really a terrific and very appropriate mediator for this

24  dispute.  I'm not sure it would have been settled absent his

25  participation as the mediator.

1          So, I want to read into the record basically the

2   business terms.  I actually have a draft stipulation already

3   prepared that I haven't yet completed or circulated.  So, I

4   don't think it will take us that long to document this.

5          The settlement assumes that there is this -- that the

6   sale goes through at the purchase price of $500 million.  That

7   after payment of all of the cure claims, including the $10

8   million settlement with Equistar that will be reinstated,

9   priority and tax claims, secured claims, unsecured claims which

10  will include the fuel claim of Reliant which is estimated at

11  approximately $8.6 million, approximately $750,000 thrown in

12  for wind down costs to complete the case, and payment of

13  professionals, which is exclusive of the payment of Reliant's

14  professional, which is Stroock and Hoolihan, we come to a net

15  figure of $52.7 million.  And we assume that there's --

16          THE COURT:  What's the net again?

17          MS. FATELL:  $52.7 million.  And we assume there's

18  $18 million in cash all at closing, which would bring the

19  number available at closing to $70.7 million.

20          Now, I didn't itemize every single item that might

21  come out, those are the general categories.  We have agreed

22  that the financial advisor for the Creditors' Committee will go

23  in and review all of the numbers and verify and confirm the

24  accuracy of the numbers that gets us to that net sale number.

25          We also assume that there's a $40 million escrow.

8

1  And for purposes of the settlement, we've just used that full

2  number as being available.

3           So, with those assumptions, Your Honor, the parties

4  have agreed that the sale proceeds plus the cash will be split

5  80 percent to Equistar and 20 percent to Reliant at closing.

6  And then the escrow will be split 12.5 percent to Equistar and

7  87.5 percent to Reliant, which provides that Equistar would

8  receive $61.6 million and Reliant would receive $49.1 million.

9           Equistar is guaranteed to receive at least $60

10 million.  So, if, for example, the sale proceeds and Equistar's

11 sale of the escrow, the 12 and a half percent, are less than

12 $60 million, then before Reliant receives its share of the

13 escrow, the difference would be made up to Equistar.

14           THE COURT:  Okay.

15           MS. FATELL:  The 80/20 is estimated to produce -- I

16 added in the total -- I added in the --

17           MR. HANDELSMAN:  You added in the escrow --

18           MS. FATELL:  61.6 million to Equistar.  61.6 million

19 to Equistar and 49.1 million to Reliant.

20           THE COURT:  From both of those sources.

21           MS. FATELL:  I'm sorry?

22           THE COURT:  From both of those sources.

23           MS. FATELL:  Correct.  And just so it's perfectly

24 clear, Your Honor, the amount that's to be made up to Equistar

25 to get to the $60 million does not come off the top of the

9

1  escrow proceeds and then it's split.  It first comes out of the

2  five million that would -- well, the 12.5 percent that would go

3  to Equistar.  And then if there's still not enough to get to

4  60, it would come out of Reliant's share.

5          THE COURT:  Okay.

6          MS. FATELL:  Okay?  Let me just see if there's

7  anything else.  I think -- we would expect that the parties

8  will all execute full releases of one another.  The structure,

9  I believe, would contemplate that the cash flow participation

10 agreement is assumed and assigned, but then cashed out based on

11 this scenario.  So, that it would not go with the -- it would

12 not be part of the agreements that are going with the buyer at

13 closing.

14         THE COURT:  Um-hum.

15         MS. FATELL:  Let me just see if there's anything

16 else.  Um -- and we would expect hopefully that the debtors

17 will then promptly prepare and file a liquidating plan and we

18 would get to the end of the rope fairly quickly without too

19 much additional expense.

20         THE COURT:  Okay.

21         MS. FATELL:  Did I leave anything out, Mr.

22 Handelsman?

23         MR. HANDELSMAN:  Uh, no.  I think that is -- it's an

24 accurate reflection.  Obviously I'm sure we'll come up with

25 items when we do definitive documentation and there are some

1    things I have to think about.  But the economic terms were

2    exactly right and I'd just like to express our appreciation for

3    the efforts of everybody, especially Judge Shannon, and I -- I

4    echo everything that Ms. Fatell said about that.

5          In addition, the counsel to the banks, Mr. Pfeiffer

6    and Ms. Steingart, and counsel for the Committee, Mr. Stratton,

7    were also very helpful to getting these parties together and

8    we're all very pleased that we've reached this point and we can

9    move forward promptly.

10          THE COURT:  Okay.

11          MS. FATELL:  We agree with that, Your Honor.  And

12    just so the Court is aware, Judge Shannon did say that to the

13    extent we have any glitches in trying to document this that he

14    would still make himself available if we needed him.

15          THE COURT: Okay.

16          MS. FATELL:  Thank you.

17          THE COURT:  When can I anticipate the settlement

18    agreement?

19          MS. FATELL:  We should be able to send it out

20    probably by tomorrow to Mr. Handelsman and his clients, and

21    then I think we probably need to agree on the terms before

22    circulating it to everyone else.

23          THE COURT:  Okay.  But you anticipate I can get this

24    under certification of counsel certainly by early in the week?

25          MS. FATELL:  Oh, absolutely.

1          THE COURT:  All right.  I leave Thursday, so --

2                        (Laughter)

3          THE COURT:  I know Mr. Dehney is chomping at the bit.

4          MS. FATELL:  You will -- you will have it.  And, Your

5   Honor, just to clarify what we're proposing, the settlement

6   agreement will be settled -- the settlement agreement will be

7   approved.  We have a stipulation for the Court's signature and

8   then the sale order will be entered.

9          THE COURT:  Yes.

10         MS. FATELL:  So, the sale order is conditioned on the

11  settlement agreement being approved.

12         THE COURT:  Yes, understood.  Okay.

13         MR. STRATTON:  Your Honor, David Stratton with Pepper

14  Hamilton for the Unsecured Creditors' Committee.

15         We are very happy that the Reliant and Equistar

16  parties were able to reach an agreement.  We saw that as the --

17  clearly the most logical way to resolve this, and that anything

18  else is far short of that.  So, we're very pleased about that.

19         And we, too, think Judge Shannon did a great job.  He

20  stayed -- I think it was eight o'clock Monday night to the

21  point where everybody was cranky, and continued to work on it

22  yesterday and today.  So, I know that that was a lot of work on

23  his part and you get credit for getting him to enlist and he

24  gets credit for doing the work.

25         One reservation of rights, as I told Judge Shannon

1  during the mediation, and I don't think it's any big surprise,

2  but since equity is going to take a distribution out of this

3  case, it will be our position that unsecured claims will be --

4  should be paid with interest or resolve that as a plan issue.

5  I don't think it's a big dollar amount, but I don't want

6  anybody to forget that as we get overcome with joy that this --

7  what could have been a disaster has been averted.

8          Thank you.

9          MR. DEHNEY:  Your Honor, Robert Dehney on behalf of

10  the purchaser.  We're also very pleased to hear that the

11  parties have been able to figure out how to split the net

12  proceeds of our sale transaction.  I really have a couple

13  things I want to raise:

14          One, they're talking about hypothetical numbers on

15  the distribution.  We're prepared to move forward and close

16  under the purchase agreement.  There's the escrow and the

17  proceeds are what they are.  I understand the numbers that

18  counsel was using was assuming certain things, and I'm not

19  close enough on the numbers and what the escrow is going to

20  look like, but I wanted to make sure we're not changing the

21  purchase agreement.

22          THE COURT:  Understood.

23          MR. DEHNEY:  And second, I know they're talking about

24  sending the order in.  We would like to see what the settlement

25  is because we want to know that we're getting it free and clear

13

1  of this agreement.  So, we would like to see that.

2            And then the third thing, because Your Honor is

3  leaving Thursday, we're happy, if it's done under

4  certification, but I'm going to ask whether parties want a

5  holding date or time next week so we know it's done.  I like

6  having feet to the fire, Your Honor.

7            MS. STEINGART:  Good afternoon, Your Honor.  Bonnie

8  Steingart from Fried Frank on behalf of the lenders.

9            When Rob is chomping at the bit, I don't like to try

10 to get between him and the microphone --

11           THE COURT:  Yes.

12           MS. STEINGART:  -- but we, too, are, as you know,

13 very pleased.  We think it's a great result for all

14 participants.  And very grateful to Judge Shannon for his

15 extraordinary efforts, and also to Reliant and Equistar for

16 their willingness to come to terms.

17           THE COURT:  Thank you.  Well, again, I was told all

18 the parties participated in good faith and made the upmost

19 effort to get this resolved.  So, I'm happy about that.

20           MR. ALTER:  Your Honor, Jonathan Alter on behalf of

21 Kelson Energy.  May I --

22           THE COURT:  Be heard?

23           MR. ALTER:  -- talk to the Court or approach the

24 Court with a reservation of rights, as well, please?

25           THE COURT:  Yes.

1           MR. ALTER:  Thank you, Your Honor.  Your Honor,

2   according to my understanding from the comments that have been

3   made thus far, some form of certification of counsel will be

4   submitted concerning the order relative to the Section 363

5   sale.  And in that regard, certainly based upon the fact that

6   we were an objecting party regarding the sale, we would like

7   the opportunity to review the order, as well, comment thereon,

8   to the extent appropriate, and, of course, reserve all rights

9   relative thereto.

10          THE COURT:  Well, you can certainly look at the form

11  of order, but I think my ruling at sale hearing dealt with your

12  issues.  But you should get a copy of the sale order.

13          MR. HEATH:  We will circulate a copy of the sale

14  order.

15          MR. ALTER:  Thank you, Your Honor.  That's

16  appreciated.

17          MR. HEATH:  Your Honor, that's all we have.  Once

18  again, Your Honor was right.  And for the record, I couldn't

19  have been more wrong predicting the success of the mediation.

20  I am currently considering my only other viable career option,

21  and -- but, Your Honor, the parties are grateful for Your

22  Honor's ruling.  And -- and we are very glad that there's a

23  deal that's been reached.

24          THE COURT:  Well, just so you know, I had to do a

25  trade so I'll be doing a mediation for Judge Shannon and --

1                         (Laughter)

2          THE COURT:  I hope I'm as successful as he was.  All

3  right.  We'll stand adjourned.

4          Thank you again.

5          MULTIPLE SPEAKERS:  Thank you, Your Honor.

6               (Proceedings Adjourn at 4:17 P.M.)

7

8

9               C E R T I F I C A T I O N

10

11         I, Karen Hartmann, certify that the foregoing is a

12  correct transcript to the best of my ability, from the

13  electronic sound recording of the proceedings in the above-

14  entitled matter.

15

16  _/s/_ *Karen Hartmann*_____        Date:  May 21, 2008

17  TRANSCRIPTS PLUS

18

19

20

21

22

23

24

25

**$**
$10- 7:7
$18- 7:18
$40- 7:25
$49.1- 8:8
$500- 7:6
$52.7- 7:15,17
$60- 8:9,12,25
$61.6- 8:8
$70.7- 7:19
$750,000- 7:11
$8.6- 7:11

**/**
/S/- 15:16

**1**
12- 8:11
12.5- 8:6 9:2
15TH- 3:21,24

**2**
20- 8:5
2008- 15:16
21- 15:16
22ND- 5:25
29TH- 5:25

**3**
30TH- 6:10
363- 4:15,18 14:4
365- 4:16

**4**
49.1- 8:19
4:17- 15:6

**6**
60- 9:4
61.6- 8:18

**8**
80- 8:5
80/20- 8:15
87.5- 8:7

**A**
ABILITY- 15:12
ABLE- 4:20 10:19
11:16 12:11
ABOVE- 15:13
ABSENT- 6:24
ACCEPTABLE- 6:6
ACCORDING- 14:2
ACCURACY- 7:24
ACCURATE- 9:24
ADDED- 8:16,17
ADDITION- 10:5
ADDRESS- 3:19
4:11 5:6
ADJOURN- 15:6
ADJOURNED- 15:3
ADVISOR- 7:22
AFTERNOON- 3:1,3

AGREEMENT- 4:9,
24 9:10 10:18
11:6,11,16 12:16,
21 13:1
AGREEMENTS- 9:12
ALTER- 13:20,23
14:1,15
AMONGST- 3:25
AMOUNT- 8:24 12:5
ANTICIPATE-
10:17,23
APPRECIATED-
14:16
APPRECIATION-
10:2
APPROACH- 13:23
APPROPRIATE-
6:23 14:8
APPROVE- 5:1
APPROVED- 4:15,
18 11:7,11
APPROXIMATELY-
7:11
ASPECT- 4:15
ASSIGNED- 9:10
ASSUMED- 9:10
ASSUMPTION- 4:5
ASSUMPTIONS- 8:3
AVAILABLE- 7:19
8:2 10:14
AVERTED- 12:7
AWARE- 10:12

**B**
BACK- 5:5
BANKS- 10:5
BASED- 9:10 14:5
BASIC- 3:11
BIG- 12:1,5
BIT- 11:3 13:9
BONNIE- 6:11,15,
19 13:7
BOTH- 8:20,22
BUSINESS- 4:22
7:2
BUYER- 9:12

**C**
CAREER- 14:20
CARRIED- 5:17
CASE- 5:1,5 7:12
12:3
CASH- 3:22 4:5,6
6:2 7:18 8:4 9:9
CASHED- 9:10
CATEGORIES- 7:21
CERTAIN- 12:18
CERTAINLY- 10:24
14:5,10
CERTIFICATION-
4:24 10:24 13:4
14:3
CERTIFY- 15:11
CHANGING- 12:20
CHEMICALS- 6:20

CIRCULATING-
10:22
CLAIM- 7:10
CLAIMS- 7:7,9
12:3
CLARIFY- 11:5
CLIENTS- 10:20
CLOSE- 12:15,19
CLOSING- 7:18,19
8:5 9:13
COLLATERAL- 3:22
4:5,6 6:2
COME- 7:14,21
8:25 9:4,24 13:16
COMES- 9:1
COMMENT- 14:7
COMMENTS- 14:2
COMMITTEE- 7:22
10:6 11:14
COMPLETE- 7:12
COMPLETED- 7:3
CONCERNING- 14:4
CONDITIONED-
11:10
CONFIRM- 7:23
CONNECTION- 4:17
CONSENSUAL- 3:21
4:6
CONSIDER- 4:25
CONSIDERING-
14:20
CONTEMPLATE- 9:9
CONTINUE- 5:19
CONTINUED- 11:21
CONTINUING- 4:1
CONTRACTS- 4:16
COOPERATING- 6:16
COPY- 14:12,13
COSTS- 7:12
COULDN'T- 14:18
COUNSEL- 4:25
10:5,6,24 12:18
14:3
COUNTRY- 5:24
COUPLE- 3:16
12:12
COURSE- 14:8
COURT'S- 11:7
CRANKY- 11:21
CREDIT- 11:23,24
CREDITORS'- 7:22
11:14
CURE- 7:7
CURRENTLY- 14:20

**D**
DATE- 4:7 13:5
15:16
DAVID- 11:13
DAY- 4:2 5:5,24,
25 6:5
DAYS- 3:16 4:23
DEADLINE- 3:21,
23 4:5
DEADLINES- 4:4

DEFINITIVE- 4:8,
21 5:21 9:25
DEHNEY- 11:3
12:9,23
DIDN'T- 7:20
DIFFERENCE- 8:13
DISASTER- 12:7
DISPUTE- 6:24
DISTRIBUTION-
12:2,15
DOCUMENT- 7:4
10:13
DOCUMENTATION-
4:21 5:22 9:25
DOLLAR- 12:5
DRAFT- 7:2

**E**
EARLY- 10:24
ECHO- 10:4
ECONOMIC- 10:1
EFFORT- 13:19
EFFORTS- 10:3
13:15
EIGHT- 11:20
ELECTRONIC- 15:13
ENERGY- 13:21
ENLIST- 11:23
ENTERED- 11:8
ENTITLED- 15:14
EQUISTAR- 4:4
6:20 7:8 8:5,6,7,
9,13,18,19,24
9:3 11:15 13:15
EQUISTAR'S- 8:10
EQUITY- 12:2
ESCROW- 7:25 8:6,
11,13,17 9:1
12:16,19
ESTIMATED- 7:10
8:15
EVERYBODY- 3:5
10:3 11:21
EVERYONE- 10:22
EVERYTHING- 10:4
EXAMPLE- 8:10
EXCLUSIVE- 7:13
EXCLUSIVITY-
3:20 4:1
EXECUTE- 9:8
EXPECT- 9:7,16
EXPENSE- 9:19
EXPIRES- 3:22,24
EXPRESS- 10:2
EXTENDED- 5:5
EXTENT- 10:13
14:8
EXTRAORDINARY-
13:15

**F**
FAIRLY- 9:18
FAITH- 13:18
FAR- 11:18 14:3
FATELL- 5:10 6:2,

11:4,10
FEET- 13:6
FIGURE- 7:15
12:11
FILE- 9:17
FINANCIAL- 7:22
FINGER- 3:2
FIRE- 13:6
FIRST- 9:1
FIVE- 9:2
FLOW- 9:9
FOLLOWING- 4:13
FOREGOING- 15:11
FORGET- 12:6
FORM- 14:3,10
FORWARD- 5:2
10:9 12:15
FOUR- 4:22
FRANK- 13:8
FREE- 12:25
FRIDAY- 5:24 6:8
FRIED- 13:8
FUEL- 7:10
FULL- 8:1 9:8

**G**
GENERAL- 7:21
GETS- 7:24 11:24
GIVES- 4:8
GLAD- 14:22
GLITCHES- 10:13
GO- 6:22 7:22
9:2,11
GOING- 3:11,14
5:6 6:12 9:12
12:2,19 13:4
GOOD- 3:1,3,4
5:2 13:7,18
GOT- 3:5,9
GRATEFUL- 13:14
14:21
GUARANTEED- 8:9
GUESS- 5:17

**H**
HALF- 8:11
HAMILTON- 11:14
HANDELSMAN- 5:10,
13,17,21 6:11,14,
16 8:17 9:22,23
10:20
HAPPY- 3:17 5:19
11:15 13:3,19
HARD- 3:5
HARTMANN- 15:11,
16
HAVEN'T- 7:3
HEAR- 12:10
HEARD- 13:22
HEARING- 4:1,14
14:11
HEATH- 3:1,4,6,8,
10,14 4:11 5:19
14:13,17
HELPFUL- 10:7

HOPE- 15:2
HOPEFULLY- 4:25 9:16
HYPOTHETICAL- 12:14

**I**

INSISTENCE- 6:21
INTEGRATION- 4:16
INTEND- 4:11
INTEREST- 12:4
ISSUE- 4:15,16, 18 12:4
ISSUES- 3:18 4:12 5:6 14:12
ITEM- 7:20
ITEMIZE- 7:20
ITEMS- 9:25

**J**

JOB- 11:19
JONATHAN- 13:20
JOY- 12:6
JUDGE- 3:8 6:22 10:3,12 11:19,25 13:14 14:25

**K**

KAREN- 15:11,16
KELSON- 13:21

**L**

LATE- 6:7
LAUGHTER- 6:18 11:2 15:1
LAWRENCE- 5:13
LAYTON- 3:2
LEASE- 3:23 4:5 6:3
LEAVE- 9:21 11:1
LEAVING- 13:3
LENDERS- 4:3 13:8
LET'S- 6:8
LETTING- 5:11
LIQUIDATING- 9:17
LOGICAL- 11:17
LONG- 7:4
LOOK- 12:20 14:10
LOT- 5:1 11:22

**M**

MAINTAIN- 4:19
MAKE- 6:8 10:14 12:20
MEDIATION- 6:22 12:1 14:19,25
MEDIATOR- 6:23,25
MEMORIAL- 4:2 5:4,24,25
MICROPHONE- 13:10
MILLION- 7:6,8, 11,15,17,18,19, 25 8:8,10,12,18, 19,25 9:2
MISSED- 6:13

12:15
MUCH- 9:19
MULTIPLE- 15:5

**N**

NEEDED- 10:14
NET- 7:14,16,24 12:11
NEWS- 3:4,5
NIGHT- 11:20
NUMBERS- 7:23,24 12:14,17,19

**O**

OBJECTING- 14:6
ONE- 5:23 9:8 11:25 12:14
OPEN- 4:18 5:6
OPTION- 14:20
ORDER- 4:24 11:8, 10 12:24 14:4,7, 11,12,14
OVERCOME- 12:6

**P**

PAID- 12:4
PARTICIPANTS- 13:14
PARTICIPATED- 13:18
PARTICIPATION- 6:25 9:9
PARTIES- 3:11,25 4:3,8,20 6:6 8:3 9:7 10:7 11:16 12:11 13:4,18 14:21
PARTY- 14:6
PAUL- 3:1
PAYMENT- 7:7,12, 13
PENDING- 3:20 5:14
PEPPER- 11:13
PERCENT- 8:5,6,7, 11 9:2
PERFECTLY- 8:23
PERIOD- 4:6
PFEIFFER- 10:5
PHONE- 5:10
PLAN- 9:17 12:4
PLEASED- 6:21 10:8 11:18 12:10 13:13
PLEASURE- 5:11
PM- 15:6
POSITION- 5:1 12:3
POSSIBILITY- 4:20
PREDICTING- 14:19
PREPARE- 9:17
PREPARED- 7:3 12:15
PRICE- 7:6
PRIORITY- 7:9

PRODUCE- 8:15
PROFESSIONAL- 7:14
PROFESSIONALS- 7:13
PROMPTLY- 9:17 10:9
PROPOSING- 11:5
PROVIDES- 8:7
PURCHASE- 7:6 12:16,21
PURCHASER- 12:10

**Q**

QUICKLY- 9:18

**R**

RAISE- 4:13 12:13
REACH- 4:20 11:16
REACHED- 5:8 10:8 14:23
RECEIVE- 8:8,9
RECEIVES- 8:12
RECORDING- 15:13
REDUCE- 3:15
REFLECTION- 9:24
REINSTATED- 7:8
REJECT- 3:23 6:3
REJECTION- 4:5
RELATIVE- 14:4,9
RELEASES- 9:8
RELIANT- 7:10 8:5,7,8,12,19 11:15 13:15
RELIANT'S- 7:13 9:4
REMAINING- 4:15
REPORT- 3:4,17 6:21
RESERVATION- 11:25 13:24
RESERVE- 14:8
RESOLVE- 11:17 12:4
RESOLVED- 4:17, 19 5:7 13:19
RESPECT- 4:9,21
RESULT- 13:13
RETURN- 6:6
RICHARDS- 3:2
RIGHTS- 11:25 13:24 14:8
ROB- 13:9
ROBERT- 12:9
ROPE- 9:18
RULING- 14:11,22

**S**

SALE- 4:14,15,18, 24 5:3 7:6,24 8:4,10,11 11:8, 10 12:12 14:5,6, 11,12,13
SAW- 11:16
SCENARIO- 9:11

SENDING- 12:24
SERVED- 6:22
SETTLED- 6:24 11:6
SETTLEMENT- 4:9, 17,22,24 5:8,12 6:12 7:5,8 8:1 10:17 11:5,6,11 12:24
SHANNON- 3:8 6:22 10:3,12 11:19,25 13:14 14:25
SHARE- 8:12 9:4
SIGNATURE- 11:7
SINGLE- 7:20
SITE- 3:23 4:4 6:3
SOUND- 15:13
SOUNDS- 6:6
SOURCES- 8:20,22
SPEAKERS- 15:5
SPLIT- 8:4,6 9:1 12:11
STAND- 15:3
START- 5:2
STAYED- 11:20
STEINGART- 10:6 13:7,8,12
STIPULATION- 7:2 11:7
STRATTON- 10:6 11:13
STROOCK- 7:14
STRUCTURE- 9:8
SUBMITTED- 14:4
SUCCESS- 14:19
SUCCESSFUL- 15:2
SURPRISE- 12:1

**T**

TAX- 7:9
TERMS- 3:11 5:11 7:2 10:1,21 13:16
TERRIFIC- 6:23
THEREON- 14:7
THERETO- 14:9
THEY'RE- 3:14 5:6 12:14,23
THIRD- 13:2
THREE- 3:18 4:12, 22
THROWN- 7:11
THURSDAY- 5:25 6:8 11:1 13:3
THUS- 14:3
TIME- 4:8 6:3 13:5
TODAY- 11:22
TOMORROW- 3:22, 24 10:20
TOP- 8:25
TOTAL- 8:16
TRADE- 14:25
TRANSACTION-

TRUSTEE- 5:15
TUESDAY- 4:2 5:4
TWO- 4:4,22

**U**

UMHUM- 9:14
UNDERSTOOD- 11:12 12:22
UNSECURED- 7:9 11:14 12:3
UPMOST- 13:18
USED- 8:1
USING- 12:18

**V**

VERIFY- 7:23
VIABLE- 14:20
VIRTUE- 5:7

**W**

WE'D- 4:13,19,23 5:1,4
WEEK- 10:24 13:5
WHAT'S- 7:16
WILLINGNESS- 13:16
WIND- 7:12
WORK- 3:14 4:8 11:21,22,24
WORKED- 3:5
WRINKLE- 5:23
WRITING- 3:15

**EXHIBIT G**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | ) | |
| | ) | **Chapter 11** |
| **RELIANT ENERGY** | ) | |
| **CHANNELVIEW LP**, *et al.*, | ) | **Case No. 07-11160 (MFW)** |
| | ) | |
| Debtors. | ) | **(Jointly Administered)** |
| | ) | |
| | ) | Re: Docket No. 251 |
| | ) | |

## ORDER AUTHORIZING (I) THE SALE OR TRANSFER OF CERTAIN ASSETS OF RELIANT ENERGY CHANNELVIEW LP AND RELIANT ENERGY SERVICES CHANNELVIEW LLC FREE AND CLEAR OF LIENS, CLAIMS AND ENCUMBRANCES AND OTHER INTERESTS, (II) THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES IN CONNECTION THEREWITH, (III) ASSUMPTION OF CERTAIN LIABILITIES, AND (IV) GRANTING RELATED RELIEF

Upon consideration of the motion dated February 26, 2008 (the **"Sale Motion"**) of Reliant Energy Channelview LP, a Delaware limited partnership (**"Channelview LP"**) and Reliant Energy Services Channelview LLC, a Delaware limited liability company (**"RESC"** and collectively with Channelview LP, the **"Sellers"**), as debtors and debtors-in-possession,[1] pursuant to sections 105(a), 363 and 365 of Title 11 of the United States Code (the **"Bankruptcy Code"**), and Rules 2002, 6004, 6006, 9007 and 9014 of the Federal Rules of Bankruptcy Procedure (the **"Bankruptcy Rules"**):    (A) approving the terms and conditions of, and authorizing the Sellers to consummate the transactions contemplated by, the asset purchase agreement dated as of April 3, 2008, among Sellers and GIM Channelview Cogeneration, LLC, a Delaware limited liability company (the **"Buyer"**), substantially in the form attached hereto as Exhibit A (the **"Asset Purchase Agreement"**); (B) authorizing (i) the sale or transfer (the

---

[1]    The debtors and debtors-in-possession in the above-captioned chapter 11 cases are (i) Channelview LP, (ii) RESC, (iii) Reliant Energy Channelview (Texas) LLC, a Delaware limited liability company and (iv) Reliant Energy Channelview (Delaware) LLC, a Delaware limited liability company (collectively, the **"Debtors"**).

"Sale") of certain assets of the Sellers, as set forth in the Asset Purchase Agreement, free and clear of all liens, claims, encumbrances, interests, debts, mortgages, security interests, pledges, charges, demands, options, rights of first refusal, restrictions, or adverse claims of any kind or nature whatsoever (collectively, "**Liens**") and liabilities of any Person, other than any Permitted Exceptions and Assumed Liabilities under the Asset Purchase Agreement, (ii) the assumption by the Sellers and assignment to the Buyer of certain executory contracts and unexpired leases of the Sellers (the "**Assigned Contracts**"),[2] and (iii) the assumption of certain liabilities as specifically identified and described in the Asset Purchase Agreement (the "**Assumed Liabilities**"); and (C) granting certain related relief; and the Court having heard statements of counsel and the evidence presented in support of the relief requested in the Sale Motion and at a hearing before the Court on April 9, 2008 (the "**Sale Hearing**"); and the Court having considered the (a) Preliminary Objections of Equistar Chemicals, LP (the "**Equistar Objection**") to Debtors' Motion for an Order Authorizing (i) the Sale or Transfer of Certain Assets of the Debtors Free and Clear of Liens, Claims and Encumbrances, (ii) the Assumption and Assignment of Certain Executory Contracts and (iii) Granting Related Relief (Docket No. 349), (b) the Objection of Siemens Power Generation to the Debtors' Sale Motion (Docket No. 258), (c) the Preliminary Response of the Official Committee of Unsecured Creditors to the Debtors' Motion, Inter Alia, to Sell Assets and Assume and Assign Executory Contracts (Docket No. 277), (d) the Debtors' Reply in Further Support of the Debtors' Sale Motion and Motion to Establish Cure (Docket No. 362) and (e) the Response of the Administrative Agent to the Secured Lenders to the Debtors' Sale Motion (Docket No. 363); and following mediation to resolve the Equistar Objection in light of the Court's ruling on April 9, 2008 wherein the Court

---

[2] The Assigned Contracts consist of the (i) Real Estate Leases, (ii) Supplier Contracts, (iii) Entitled Real Property constituting Contracts, and (iv) Other Contracts.

2

held that the Second Amended and Restated Cash Flow Participation Agreement[3], dated December 15, 1999, between Equistar and Channelview LP (**"CFPA"**) was integrated with certain other Project Agreements identified on Exhibit A to the Equistar Objection and the Project Agreements could not be assumed and assigned without the CFPA, and the Debtors, Equistar, Reliant Energy Power Generation Inc., Reliant Energy Services, Inc. and Reliant Energy Inc. entered into a Stipulation Regarding the Sale Motion (the **"Stipulation"**); and all of Equistar's objections to the Sale Motion having been resolved pursuant to the terms of the Stipulation; and all other objections to the Sale Motion having been overruled, resolved or withdrawn; and the Court having jurisdiction over this matter; and it further appearing that the legal and factual bases set forth in the Sale Motion and at the Sale Hearing establish just cause for the relief granted herein; and after due deliberation thereon,

IT IS HEREBY FOUND AND DETERMINED THAT:[4]

### Jurisdiction, Final Order and Statutory Predicates

A.      This Court has jurisdiction to hear and determine the Sale Motion pursuant to 28 U.S.C. §§ 157(b)(1) and 1334(a).   This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (N) and (O).   Venue is proper in this District and in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

B.      This Order constitutes a final and appealable order within the meaning of 28 U.S.C. § 158(a).   Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), and to any extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure,

---

[3]   Certain terms not otherwise defined herein are defined in the Sale Motion, the Asset Purchase Agreement, the Stipulation or the Equistar Objection.

[4]   The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Fed. R. Bankr. P. 7052, made applicable to this proceeding pursuant to Fed. R. Bankr. P. 9014. Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when appropriate. See Fed. R. Bankr. P. 7052.

as made applicable by Bankruptcy Rule 7054, the Court expressly finds there is no just reason to stay the implementation of this Order, and expressly directs that this Order shall be immediately effective.

C.      The statutory predicates for the relief requested in the Sale Motion are sections 105, 363(b), (f), and (m), and 365 of the Bankruptcy Code and Bankruptcy Rules 2002(a)(2), 6004, 6006, 9006(c), 9007 and 9014.

### Notice of Sale and Cure Amounts

D.      Actual written notice of the Sale Hearing and the Sale Motion, and a reasonable opportunity to object or be heard with respect to the Sale Motion and the relief requested therein has been afforded to all interested persons and entities, including, but not limited to: (i) the United States Trustee for the District of Delaware; (ii) counsel to the Official Committee of Unsecured Creditors; (iii) counsel to the administrative agent and collateral agent for the Debtors' prepetition and postpetition secured lenders; (iv) the Securities and Exchange Commission; (v) all taxing authorities having jurisdiction over any of the Acquired Assets, including, without limitation, the Internal Revenue Service; (vi) all parties that have requested notice pursuant to Bankruptcy Rule 2002; (vii) the Buyer and its respective counsel; (viii) all persons or entities known or reasonably believed by the Debtors to have asserted a Lien in any of the Acquired Assets; (ix) all non-Debtor parties to the Assigned Contracts; (x) the Attorneys General in the States where the Acquired Assets are located; (xi) the United States Environmental Protection Agency; (xii) all parties contacted by the Debtors or Houlihan, Lokey, Howard & Zukin regarding the sale of the Debtors' assets; (xiii) counsel to Equistar; and (xiv) counsel for Reliant Energy, Inc., Reliant Energy Power Generation, Inc. and Reliant Energy Services, Inc.

4

E.      The Sellers published notice of the Sale and the time and place of the Sale Hearing in the Houston Chronicle on March 4, 2008.

F.      The Debtors have served notice of the cure amounts (the **"Cure Notice"**) upon each non-debtor counter-party to an Assigned Contract that the Sellers seek to assume and assign to the Buyer on the Closing Date. The service of such Cure Notice was good, sufficient and appropriate under the circumstances and no further notice need be given in respect of establishing a cure amount for the respective Assigned Contract. Non-debtor counter-parties to the Assigned Contracts have had an opportunity to object to the assumption and assignment of the Assigned Contracts and to the cure amounts set forth in the Cure Notice.

G.      As evidenced by the affidavits of service previously filed with this Court, proper, timely, adequate and sufficient notice of the Sale Motion and the Sale Hearing has been provided in accordance with sections 102(1), 363 and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006 and 9014. The Debtors also have complied with all obligations to provide notice of the Sale Motion and the Sale Hearing as required by the Bankruptcy Code or by an order of the Court. The foregoing described notice was good, sufficient and appropriate under the circumstances, and no other or further notice of the Sale Motion, the Sale Hearing, the Sale or the assumption and assignment of the Assigned Contracts is required.

## Good Faith Buyer

H.      The Buyer is not an "insider" of any of the Debtors, as that term is defined in section 101(31) of the Bankruptcy Code.

I.      Buyer is purchasing the Acquired Assets in good faith and is a good faith buyer within the meaning of section 363(m) of the Bankruptcy Code, and is therefore entitled to the protection of that provision, and otherwise has proceeded in good faith in all respects in

5

RLFI-3270975-13

connection with this proceeding in that: (a) the Sellers and their advisors diligently and in good faith analyzed all other available options in connection with the disposition of the Acquired Assets; (b) a reasonable opportunity has been given to any interested party to make a higher and better offer for the Acquired Assets; (c) all payments to be made by the Buyer and other agreements or arrangements entered into by the Buyer in connection with the Sale have been disclosed; (d) Buyer has not violated section 363(n) of the Bankruptcy Code by any action or inaction; (e) no common identity of directors or controlling stockholders exists between the Buyer and any of the Debtors; and (f) the negotiation and execution of the Asset Purchase Agreement and any other agreements or instruments related thereto was without collusion, at arm's-length and in good faith.

J.      It is not a principal purpose of any Person entering into the Asset Purchase Agreement or any transactions contemplated by the Asset Purchase Agreement to evade liability to which such Person would be subject under Subtitle D of Title IV of ERISA.

<h3 style="text-align:center">Highest and Best Offer</h3>

K.      The Sellers and their advisors determined that the terms and conditions set forth in the Asset Purchase Agreement, and the sale and transfer to Buyer of the Acquired Assets pursuant thereto, represent a fair and reasonable purchase price and constitute the highest or otherwise best value obtainable for the Acquired Assets. At the conclusion of the marketing of the Acquired Assets and an auction conducted in connection therewith, the Sellers selected Buyer as the prevailing buyer, subject to the terms and conditions of the bid Buyer proffered.

L.      The Acquired Assets have been the subject of a full and robust marketing and sale and auction process conducted prior to entry into the Asset Purchase Agreement, and the Debtors' determination that the Asset Purchase Agreement constitutes the highest and best offer

6

for the Acquired Assets constitutes a valid and sound exercise of the Debtors' business judgment. No other person or entity or group of entities has offered to purchase the Acquired Assets for greater economic value to the Debtors' estates than the Buyer, and the terms set forth in the Asset Purchase Agreement are fair and reasonable and constitute the highest and best offer for the Acquired Assets, and will provide a greater recovery for the Debtors' estates than would be provided by any other available alternative. The purchase price under the Asset Purchase Agreement is sufficient to satisfy in full all claims against the Debtors' estates, and no other or further sale process or auction is required.

M.      Approval of the Sale Motion and the Asset Purchase Agreement and the consummation of the transactions contemplated thereby is in the best interests of the Debtors, their creditors, their estates and other parties in interest.

N.      The Debtors have demonstrated compelling circumstances and a good, sufficient and sound business purpose and justification for the Sale prior to, and outside of, a plan of reorganization.

### Validity of Transfer

O.      The Sellers have full corporate power and authority to execute and deliver the Asset Purchase Agreement and all other documents contemplated thereby, and no further consents or approvals are required for the Sellers to consummate the transactions contemplated by the Asset Purchase Agreement, except as otherwise set forth in the Asset Purchase Agreement.

P.      The transfer of each of the Acquired Assets to the Buyer will be as of the Closing Date a legal, valid and effective transfer of such assets, and vests or will vest the Buyer with all right, title and interest of the Sellers and their estates in and to the Acquired Assets free and clear

of all Liens accruing, arising or relating to any time prior to the Closing Date, except as agreed under the Asset Purchase Agreement.

## Section 363(f) Is Satisfied

Q.    The Sellers may sell the Acquired Assets free and clear of all Liens against the Debtors, their estates or any of the Acquired Assets (except for any Permitted Exceptions and Assumed Liabilities under the Asset Purchase Agreement), including but not limited to (i) Liens for property taxes in respect of the Acquired Assets for the period through the Closing Date (whether or not assessed) and (ii) any Liens, claims or interests of Equistar under the CFPA, because, in each case, one or more of the standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code has or have been satisfied. Those holders of Liens against the Debtors, their estates or any of the Acquired Assets who did not object, or who withdrew their objections, to the Sale or the Sale Motion are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code. Those holders of such Liens who did object fall within one or more of the other subsections of section 363(f) and are adequately protected by having their Liens, if any, in each instance against the Debtors, their estates, or any of the Acquired Assets, attach to the cash proceeds of the Sale ultimately attributable to the Acquired Assets in which such creditor alleges an interest, in the same order of priority, with the same validity, force and effect that such creditors had prior to the Sale, subject to any claims and defenses the Debtors and their estates may possess with respect thereto.

## No Successor

R.    Neither the Buyer nor its affiliates, successors or assigns, as a result of any action taken in connection with the purchase of the Acquired Assets: (a) are a successor to any of the

8

Debtors; (b) have, de facto or otherwise, merged with or into any of the Debtors; or (c) are a continuation or substantial continuation of any of the Debtors or any enterprise of the Debtors.

### The Stipulation By and Between Debtors, Equistar, Reliant Energy Power Generation, Inc., Reliant Energy Services, Inc. and Reliant Energy, Inc.

S.       Representatives for the Debtors, Equistar, Reliant Energy Power Generation, Inc. and Reliant Energy Inc. participated in mediation and such parties, together with Reliant Energy Services, Inc., entered into and filed with the Court the Stipulation setting forth in full the terms of the agreements reached in the mediation.  The Stipulation has been entered into in good faith by the parties thereto and reviewed by counsel for the Committee, the Lenders, and the Buyer.  The Court finds that the Stipulation resolves the Equistar Objection and having been reviewed by all the necessary parties in interest, no further notice is required.  The Stipulation avoids prolonged and costly litigation, disruption to the sale process and is in the best interests of the Debtors and their estates, creditors and other parties in interest, and represents the reasonable exercise of sound and prudent business judgment by the Debtors.  Court approval of the Stipulation is necessary to enable the sale to the Buyer to proceed to closing free of any rights, claims, interests or obligations related to the CFPA as to the Buyer.

### Assumption and Assignment of the Assigned Contracts

T.       The assumption and assignment of the Assigned Contracts pursuant to the terms of this Order is integral to the Asset Purchase Agreement and is in the best interest of the Debtors and their estates, creditors and other parties in interest, and represents the reasonable exercise of sound and prudent business judgment by the Debtors.

U.       Except as set forth herein, the respective amounts set forth in (i) Exhibit A annexed to this Court's Order Establishing Cure Amounts, dated March 28, 2008 (Docket No.

9

337), if any, together with applicable interest, and (ii) the Steam Supply Settlement Agreement are the sole amounts necessary under sections 365(b)(1)(A) and (B) and 365(f)(2)(A) of the Bankruptcy Code to cure all defaults and pay all actual pecuniary losses under the Assigned Contracts (the **"Cure Amounts"**).

V.    The Sellers have: (i) cured and/or provided adequate assurance of cure of any default existing prior to the Closing Date under any of the Assigned Contracts, within the meaning of section 365(b)(1)(A) of the Bankruptcy Code; and (ii) provided compensation or adequate assurance of compensation to any party for actual pecuniary loss to such party resulting from a default prior to the Closing Date under any of the Assigned Contracts, within the meaning of section 365(b)(1)(B) of the Bankruptcy Code. The Buyer has provided adequate assurance of its future performance under the Assigned Contracts within the meaning of sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code.

## Compelling Circumstances for an Immediate Sale

W.    To maximize the value of the Acquired Assets and preserve the viability of the business to which the Acquired Assets relate, it is essential that the Sale of the Assets occur within the time constraints set forth in the Asset Purchase Agreement.

NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:

1.    The relief requested in the Sale Motion is GRANTED and APPROVED, and the Sale contemplated thereby is approved as set forth in this Order.

2.    All objections to the Sale Motion or the relief requested therein that have not been withdrawn, waived or settled as announced to the Court at the Sale Hearing or by stipulation filed with the Court, and all reservations of rights included therein, are hereby overruled on the

merits with prejudice or the interests of such objections have been otherwise satisfied or adequately provided for.

## Approval of the Stipulation

3.      The Stipulation including Schedule "A" and the form of Mutual Release are hereby approved, and the Debtors are authorized and directed to comply with the terms of the Stipulation. Upon entry of this Order, the Stipulation shall be binding on all the parties thereto in accordance with its terms.[5]  A copy of the Stipulation is attached hereto as Exhibit B.

## Approval of the Asset Purchase Agreement

4.      The Asset Purchase Agreement and all other ancillary documents, and all of the terms and conditions thereof, are hereby authorized and approved.  No other or further consents or approvals of this Court are required for the Debtors to consummate or effectuate the Asset Purchase Agreement or the Sale.

5.      Pursuant to section 363(b) of the Bankruptcy Code, the Sellers are authorized and empowered to take any and all actions necessary or appropriate to:  (i) consummate the Sale of each of the Acquired Assets to the Buyer pursuant to and in accordance with the terms and conditions of the Asset Purchase Agreement; (ii) close the Sale as contemplated in the Asset Purchase Agreement and this Order; and (iii) execute and deliver, perform under, consummate, implement and close fully the Asset Purchase Agreement, together with all additional instruments and documents that may be reasonably necessary or desirable by Buyer or Sellers to implement the Asset Purchase Agreement and the Sale, including any other ancillary documents, or as may be reasonably necessary or appropriate to the performance of the obligations as contemplated by the Asset Purchase Agreement and such other ancillary documents.

---

[5]     To the extent there are any conflicts between the Stipulation and the terms of this Order, this Order shall govern.

RLF1-3270975-13

6. The terms and provisions of this Order shall be binding in all respects upon the Buyer and the Debtors, their estates and any trustees thereof, and all creditors and shareholders of the Debtors, all interested parties and their respective successors and assigns, including, but not limited to, any creditor asserting a Lien in the Acquired Assets.

**Sale and Transfer of Acquired Assets**

7. Pursuant to sections 105(a), 363 and 365 of the Bankruptcy Code, the Sellers are authorized to transfer the Acquired Assets on the Closing Date. Such Acquired Assets shall be transferred to the Buyer upon and as of the Closing Date and such transfer shall constitute a legal, valid, binding and effective transfer of such Acquired Assets and, upon Buyer's payment of the amounts due at Closing in accordance with the Asset Purchase Agreement, shall fully and irrevocably vest Buyer with all right, title and interest of the Sellers and their estates in the Acquired Assets free and clear of all Liens, including but not limited to: (i) Liens for property taxes (including, but not limited to, ad valorem taxes) in respect of the Acquired Assets for the period through the Closing Date (whether or not assessed) and (ii) any Liens, claims or interests of Equistar under the CFPA with all such Liens to attach to the net proceeds of the Sale with the same validity, priority, force and effect that they now have as against such Acquired Assets, subject to any claims and defenses the Sellers and their estates may possess with respect thereto.

8. Except as expressly permitted or otherwise specifically provided by the Asset Purchase Agreement or this Order, all persons and entities (including governmental, taxing and regulatory authorities) holding Liens or other interests in the Acquired Assets (other than Permitted Exceptions and the Assumed Liabilities) arising under or out of, in connection with, or in any way relating to the Debtors, the Acquired Assets, the operation of the Debtors' businesses prior to the Closing Date or the transfer of the Acquired Assets to the Buyer, hereby are forever

12

RLF1-3270975-13

barred, estopped and permanently enjoined from asserting against the Buyer or its successors or

assigns, their property or the Acquired Assets, such persons' or entities' Liens or other interests

in and to the Acquired Assets. On the Closing Date, subject to the provisions of this Order, each

creditor is authorized and directed as may be reasonably requested by Buyer or Sellers to execute

such documents and take all other actions as may be necessary to release Liens (except Permitted

Exceptions) on the Acquired Assets, if any, as provided for herein, as such Liens may have been

recorded or may otherwise exist.

9.      Except as expressly provided in the Asset Purchase Agreement, Buyer is not

acquiring or assuming any of Sellers' or any other Person's liabilities, debts or obligations.

10.     All persons and entities are hereby forever prohibited and enjoined from taking

any action that would interfere with the ability of the Sellers to sell and transfer the Acquired

Assets to the Buyer in accordance with the terms of the Asset Purchase Agreement and this

Order.

11.     All persons and entities that are in possession of some or all of the Acquired

Assets on the Closing Date are directed to surrender possession of such Acquired Assets to the

Buyer or its assignee at the Closing in accordance with the Asset Purchase Agreement.

12.     A certified copy of this Order may be filed with the appropriate clerk and/or

recorded with the recorder to act to cancel the Liens and other encumbrances of record with

respect to the Acquired Assets except the Permitted Exceptions.

13.     If any person or entity which has filed statements or other documents or

agreements evidencing Liens on, or interests in, the Acquired Assets shall not have delivered to

the Debtors prior to the Closing, in proper form for filing and executed by the appropriate

parties, termination statements, instruments of satisfaction, releases of liens and easements, and

13

any other documents necessary for the purpose of documenting the release of all Liens which the person or entity has or may assert with respect to the Acquired Assets, the Debtors are hereby authorized and directed, and the Buyer is hereby authorized, to execute and file such statements, instruments, releases and other documents on behalf of such person or entity with respect to the Acquired Assets.

14.    Except as provided in the Asset Purchase Agreement, the consummation of the Asset Purchase Agreement shall not subject the Buyer to any claims, liabilities, debts or obligations whatsoever with respect to the operation of the business by the Debtors through the Closing Date, including, without limitation, by reason of any theory of successor or transferee liability or pursuant to, among other things and without limitation, claims, liabilities, debts or obligations arising from (i) any employment or labor agreements, consulting agreements, severance arrangements, change in control agreements or other similar agreements to which the Debtors are or were a party, (ii) any pension, welfare, compensation or other employee benefit plans, agreements, practices, and programs, including without limitation, any pension plan of the Debtors, (iii) the cessation of the Debtors' operations, dismissal of employees, or termination of employment or labor agreements or pension, welfare, compensation or other employee benefit plans, agreements, practices and programs and any obligations with respect thereto that arise from the Employee Retirement Income Security Act of 1974, the Fair Labor Standard Act, Title VII of the Civil Rights Act of 1964, the Age Discrimination and Employment Act of 1967, the Federal Rehabilitation Act of 1973, the National Labor Relations Act, the Consolidated Omnibus Budget Reconciliation Act of 1985 or the Worker Adjustment and Retraining Notification Act, (iv) workmen's compensation, occupational disease or unemployment or temporary disability insurance claims, (v) any bulk sales or similar law, (vi) any liabilities, debts, or obligations of or

14

required to be paid by the Debtors for any taxes of any kind for any period, (vii) any claims, liabilities, debts or obligations of the Debtors for taxes arising from the sale of the Assigned Contracts, (viii) any litigation of or against the Debtors and (ix) any other claims, debts, obligations or liabilities, whether pursuant to any state or any federal laws or otherwise. For the avoidance of doubt, the claims, debts, obligations and liabilities set forth in this paragraph are Liens for all purposes herein and the Acquired Assets shall be sold free and clear of all such Liens.

15.    This Order is and shall be binding upon and govern the acts of all persons and entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any lease; and each of the foregoing persons and entities is hereby directed to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the transactions contemplated by the Asset Purchase Agreement.

## Assigned Contracts

16.    Upon the Closing of the Sale, the Sellers are authorized and directed to assume and assign each of the Assigned Contracts to the Buyer free and clear of all Liens. The payment of the applicable Cure Amounts (if any) shall: (i) effect a cure of all defaults existing thereunder as of the Closing Date; (ii) compensate for any actual pecuniary loss to such non-Debtor party resulting from such default; and (iii) together with the assumption of the Assigned Contracts by

15

the Buyer, constitute adequate assurance of future performance thereof. The Buyer shall then have assumed the Assigned Contracts and, pursuant to section 365(f) of the Bankruptcy Code, the assignment by the Sellers of such Assigned Contracts shall not be a default thereunder. After the Closing Date, neither the Sellers nor the Buyer shall have any liabilities or obligations to the non-Debtor parties to the Assigned Contracts other than the Buyer's obligations under the Assigned Contracts that are required to be performed on or after the Closing Date.

17.    Any provisions in any Assigned Contract that prohibit or condition the assignment of such Assigned Contract or allow the party to such Assigned Contract to terminate, recapture, impose any penalty, condition on renewal or extension or modify any term or condition upon the assignment of such Assigned Agreement, constitute unenforceable anti-assignment provisions under the Bankruptcy Code that are of no force and effect in connection with the assignment of the Assigned Contracts to the Buyer. Further, the termination of the CFPA, in accordance with the terms of the Stipulation, shall not constitute or trigger a default under any of the Project Agreements (as defined in the Stipulation). All other requirements and conditions under sections 363 and 365 of the Bankruptcy Code for the assumption by the Sellers and assignment to the Buyer of the Assigned Contracts have been satisfied. Upon the Closing, in accordance with sections 363 and 365 of the Bankruptcy Code, the Buyer shall be fully and irrevocably vested with all rights, title and interest of the Sellers and their estates under the applicable Assigned Contracts.

18.    The Assigned Contracts shall, as of the Closing Date, be valid and binding on the Buyer and the other non-debtor counter-parties thereto, and in full force and effect and enforceable in accordance with their respective terms. Following such assignment, the Sellers

16

shall be relieved, pursuant to section 365(k) of the Bankruptcy Code, from any further liability under the Assigned Contracts that arise after the Closing Date.

19.    Upon Closing, Buyer shall be obligated to perform its obligations pursuant to Section 7.17 of the Asset Purchase Agreement in accordance with the terms thereof.  In the event the final judgment attached as Exhibit B to the Settlement Agreement is entered:  (a) such final judgment shall be applicable to the Steam Agreement in accordance with its terms; and (b) the Project Company (as defined in the Steam Agreement) and its assignees shall be deemed to have invoked their right under Section 3.6(b) thereof to a one-time excused breach of three days duration during the initial term of such agreement.

20.    The RES Assignment and Assumption Agreement, attached hereto as Exhibit C, is hereby approved.

21.    The Buyer has provided adequate assurance of its future performance under the relevant Assigned Contracts within the meaning of sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code.

22.    There shall be no rent accelerations, assignment fees, increases (including advertising rates) or any other fees charged to Buyer or the Debtors as a result of the assumption and assignment of the Assigned Contracts.

23.    Pursuant to sections 105(a), 363 and 365 of the Bankruptcy Code, all parties to the Assigned Contracts are forever barred and enjoined from raising or asserting against Buyer any assignment fee, default, breach or claim or pecuniary loss, or condition to assignment, arising under or related to the Assigned Contracts existing as of the Closing Date or arising by reason of the Closing, regardless of whether such assignment fee, default, breach or claim or

17

pecuniary loss, or condition to assignment is matured or unmatured, fixed or contingent, or liquidated or unliquidated.

24.     Notwithstanding anything to the contrary herein, (i) the cure amount due to Equistar under the Second Amended and Restated Steam Supply Agreement (**"Steam Supply Agreement"**), to be paid by the Sellers and for which Buyer shall have no liability, shall be the amount set forth in the Steam Supply Settlement Agreement, specifically the sum of $10 million, provided however that notwithstanding anything in a confirmed plan of reorganization or liquidation no interest shall be paid on account of this cure payment, and (ii) following the assignment of the Assigned Contracts with Equistar to the Buyer, the terms and conditions of such   Assigned Contracts with Equistar, including but not limited to any conditions to assignment contained therein, shall remain in effect in accordance with their terms.

## Other Provisions

25.     Notwithstanding anything to the contrary herein, nothing in this Order shall relieve the Sellers from any obligation or liability to Siemens Power Generation, Inc. (**"Siemens"**) arising or incurred prior to the Closing Date pursuant to any Assigned Contracts by and between the Sellers and Siemens (the **"Siemens Contracts"**), including, without limitation, interest as set forth in the Siemens Contracts. Any such additional obligation or liability of the Sellers to Siemens under the Siemens Contracts, whether or not due under the terms of such Siemens Contracts, shall be either: (i) added to Siemens' Cure Amount and cured pursuant to 11 U.S.C. § 365(b)(1) prior to assumption and assignment of the Siemens Contracts, or (ii) paid by Sellers to Siemens in the ordinary course of business as an administrative expense prior to assumption and assignment of the Siemens Contracts. To the extent the Sellers and Siemens cannot agree on such additional amounts to be cured or paid pursuant to this paragraph, either

RLF1-3270975-13

party may submit the dispute for resolution by this Court on an expedited basis. In addition, notwithstanding anything to the contrary herein or in the Asset Purchase Agreement, the Sellers and the Buyer expressly acknowledge that title to all Program Parts, Generator Program Parts, and Miscellaneous Hardware (as those terms are defined in the Siemens Contracts) and any other equipment and materials being provided under the Siemens Contracts shall convey as provided in the Siemens Contracts. Subject to the terms and conditions of this paragraph, the Cure Amount applicable to the Siemens Contracts is $5,793,038.19 as of May 19, 2008.

26. Effective upon the Closing Date, all persons and entities are forever prohibited and enjoined from commencing or continuing in any manner any action or other proceeding, whether in law or equity, in any judicial, administrative, arbitral or other proceeding against the Buyer, its successors and assigns, or the Acquired Assets, with respect to any (a) Lien (other than a Permitted Exception) arising under, out of, in connection with or in any way relating to the Debtors, the Buyer, the Acquired Assets, or the operation of the Acquired Assets prior to the Closing of the Sale, or (b) successor liability, including, without limitation, the following actions: (i) commencing or continuing in any manner any action or other proceeding against the Buyer, its successors and assigns, assets or properties; (ii) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order against the Buyer, its successors and assigns, assets or properties; (iii) creating, perfecting or enforcing any Lien or other encumbrance against the Buyer, its successors and assigns, assets or properties; (iv) asserting any setoff, right of subrogation or recoupment of any kind against any obligation due the Buyer or its successors and assigns; (v) commencing or continuing any action, in any manner or place, that does not comply or is inconsistent with the provisions of this Order or other orders of the Court, or the agreements or actions contemplated or taken in respect thereof; or (vi) revoking,

19

terminating or failing or refusing to issue or renew any license, permit or authorization to operate any of the Acquired Assets or conduct any of the businesses operated with the Acquired Assets.

27.    Except as otherwise expressly provided for in this Order or the Asset Purchase Agreement, the Buyer shall not have any liability or other obligation of or to the Debtors arising under or related to the Acquired Assets. Without limiting the generality of the foregoing, and except as otherwise specifically provided herein or in the Asset Purchase Agreement, the Buyer shall not be liable for any claims against the Debtors or any of their respective predecessors or affiliates, and the Buyer shall have no successor or vicarious liabilities of any kind or character, including, but not limited to, any theory of antitrust, environmental, successor or transferee liability, labor law, de facto merger or substantial continuity, whether known or unknown as of the Closing Date, now existing or hereafter arising, whether fixed or contingent, matured or unmatured, or liquidated or unliquidated with respect to the Debtors or any obligations of the Debtors arising prior to the Closing Date, including, but not limited to, liabilities on account of any taxes arising, accruing or payable under, out of, in connection with, or in any way relating to the operation of the Acquired Assets prior to the Closing.

28.    The transactions contemplated by the Asset Purchase Agreement are undertaken by the Buyer without collusion and in good faith, as that term is defined in section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale shall not affect the validity of the Sale (including the assumption and assignment of the Assigned Contracts), unless such authorization and such Sale are duly stayed pending such appeal. The Buyer is a good faith buyer within the meaning of section 363(m) of the Bankruptcy Code and, as such, is entitled to the full protections of section 363(m) of the Bankruptcy Code.

20

29.    The consideration provided by the Buyer for the Acquired Assets purchased by the Buyer pursuant to the Asset Purchase Agreement shall be deemed to constitute reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession, or the District of Columbia.  The sale of the Acquired Assets to Buyer pursuant to the Asset Purchase Agreement and this Order is free from any fraudulent intent, purpose or desire on the part of the Buyer or the Debtors to escape liability for any obligations of the Debtors.

30.    Pursuant to Bankruptcy Rules 7062, 9014, 6004(h) and 6006(d), this Order shall be effective immediately upon entry and the Sellers and Buyer are authorized to close the Sale immediately upon entry of this Order.

31.    The Debtors are directed to pay, at or prior to Closing, the undisputed portion of all valid real property and ad valorem tax claims asserted against the Debtors and due as of Closing that have given rise to Liens with respect to the Acquired Assets. The Sellers shall make provision at Closing for the payment of all taxes and other obligations related to the Debtors' operation of business through the Closing Date.

32.    Nothing in this Order or the Asset Purchase Agreement approves or provides for the transfer to Buyer of any avoidance claims (whether under chapter 5 of the Bankruptcy Code or otherwise) of the Debtors' estates.

33.    No bulk sales law or any similar law of any state or other jurisdiction applies in any way to the Sale.

34.    There are no brokers involved in consummating the Sale and no brokers' commissions are due.

21

35.     The failure specifically to include any particular provision of the Asset Purchase Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Asset Purchase Agreement be authorized and approved in its entirety.

36.     The Asset Purchase Agreement and any related agreements, documents or other instruments may be modified, amended or supplemented by the parties thereto in writing and in accordance with the terms thereof, without further order of the Court, provided that any such modification, amendment or supplement does not have a material adverse effect on the Debtors' estates. Notice of any such modifications, amendments or supplements shall be provided to counsel for the Administrative Agent, counsel to the Committee, counsel for Equistar and counsel for Reliant Energy, Inc.

37.     In accordance with paragraph 38 below, at the Closing, Buyer shall pay the amount due under the Asset Purchase Agreement in accordance with joint written instructions signed by the Debtors, Equistar and Reliant Energy Inc. and delivered to counsel for (i) Buyer, (ii) the Committee, and (iii) the Administrative Agent for the Pre-Petition Lenders (a) no later than three (3) business days prior to the Closing Date and (b) with respect to the Make Whole Amount (as defined in the Credit Agreement) payable at Closing to the Tranche B-1 Lender as defined in the Credit Agreement, no later than one (1) business day prior to the Closing Date. To the extent no such joint written instructions are delivered by such dates, Buyer will pay the amount due at Closing under the Asset Purchase Agreement to the Debtors.

38.     Subject to the Lenders' delivery of lien terminations and releases with respect to the Acquired Assets and the funding of each of the (i) Cure Cost Reserve Amount (as defined in the Asset Purchase Agreement), and (ii) the Indemnity Escrow Account, the Debtors are

22

authorized and directed to pay from the proceeds of the Sale: (a) all amounts then outstanding under that certain Credit Agreement, dated December 15, 1999 (as amended, modified or supplemented and in effect from time to time, the **"Credit Agreement"**) to the Lenders under the Credit Agreement including, without limitation, the Fee (as defined in that certain Order, dated January 11, 2008, with respect to the Debtors use of cash collateral), which shall be paid to each of the Lenders on a pro rata basis after reservation of proceeds sufficient to satisfy all third-party unsecured claims, and then (b) the funding of the Reserve (as defined in the Stipulation) and (c) all other amounts payable at Closing under the Stipulation.

39.    All amounts payable under the Indemnity Escrow Account may be made without further order of this Court.

40.    Notwithstanding anything to the contrary contained herein or in the Stipulation, upon the Buyer's payment of the amounts due at Closing in accordance with the Asset Purchase Agreement, the Buyer shall not be responsible for any rights, claims, obligations or interests arising from or related to the CFPA or the Stipulation.

41.    Upon the Closing of the Sale, any and all claims or liens asserted against the Debtors' estates, or that could be asserted against the Debtors' estates, pursuant to the Credit Agreement will attach only to the proceeds of the Sale, and any other amounts payable to the Debtors under the Asset Purchase Agreement, in the same amount and to the same extent, validity and priority as presently exists with respect to the Acquired Assets. Upon entry of this Order, the security interest granted in the proceeds of the Sale hereby shall be properly perfected without the need for further filings or further documentation.

42.    Upon the date the obligations pursuant to the Credit Agreement are paid in full in cash pursuant to the terms of this Order, the Debtors shall execute for the benefit of (i) the

23

Lenders party to the Credit Agreement, (ii) The Bank of New York as successor Administrative Agent and Collateral Agent under the Credit Agreement, and (iii) Teachers Insurance and Annuity Association of America as Institutional Agent under the Credit Agreement, and their respective trustees, agents, executors, sureties, insurers, attorneys, advisors, officers, directors, representatives, predecessors, affiliates, delegates, successors and/or assigns, a general release of any and all claims and causes of action that could have been asserted or raised under or in connection with the Credit Agreement.

43.     The Asset Purchase Agreement and the transactions and instruments contemplated thereby shall be specifically enforceable against and binding upon, and not subject to rejection or avoidance by, each Seller or any trustee of a Seller and its applicable estate.

44.     Notwithstanding anything to the contrary herein, the Debtors shall not file, nor seek to confirm, any plan of reorganization or liquidation in these cases that impairs Buyer's rights and remedies under the Asset Purchase Agreement, or take any other action that is inconsistent with the Asset Purchase Agreement.

45.     The Court shall retain jurisdiction to, among other things, interpret, implement, and enforce the terms and provisions of this Order, the Stipulation and the Asset Purchase Agreement, all amendments thereto and any waivers and consents thereunder and each of the agreements executed in connection therewith to which the Sellers are a party or which has been assigned by the Sellers to the Buyer, and to adjudicate, if necessary, any and all disputes concerning or relating in any way to the Sale.

46.     All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

24

47.    To the extent that this Order is inconsistent with any prior order or pleading with respect to the Sale Motion in this chapter 11 case, the terms of this Order shall govern. The provisions of this Order are non-severable and mutually dependent.

Dated: June 9, 2008
Wilmington, Delaware

UNITED STATES BANKRUPTCY JUDGE

# **Exhibit A to the Order**

EXECUTION COPY

ASSET PURCHASE AGREEMENT

By and Among

RELIANT ENERGY CHANNELVIEW LP

And

RELIANT ENERGY SERVICES CHANNELVIEW LLC

AS SELLERS

And

GIM CHANNELVIEW COGENERATION, LLC

AS BUYER

Dated as of April 3, 2008

# TABLE OF CONTENTS

Page

ARTICLE 1   DEFINITIONS AND CONSTRUCTION ...................................................1
   1.1   Definitions.........................................................................................1
   1.2   Construction.....................................................................................13

ARTICLE 2   14

PURCHASE AND SALE OF THE ACQUIRED ASSETS ...........................................14
   2.1   Transfer of Acquired Assets ..........................................................14
   2.2   Excluded Assets...............................................................................15
   2.3   Assumption of Liabilities................................................................17
   2.4   Excluded Liabilities .........................................................................18
   2.5   Non-Assignment of Assigned Contracts.........................................18

ARTICLE 3   CONSIDERATION ..........................................................................20
   3.1   Purchase Price..................................................................................20
   3.2   Deposit .............................................................................................20
   3.3   Post-Closing Adjustment. ................................................................20
   3.4   Allocation of Purchase Price ...........................................................21
   3.5   Equistar Payment ............................................................................21

ARTICLE 4   CLOSING AND DELIVERIES ..........................................................22
   4.1   Closing..............................................................................................22
   4.2   Closing Deliveries by Sellers to Buyer............................................22
   4.3   Closing Deliveries by Buyer ...........................................................23
   4.4   RES Fuel Purchase Transactions ....................................................24

ARTICLE 5   REPRESENTATIONS AND WARRANTIES REGARDING THE
            ACQUIRED ASSETS ......................................................................24
   5.1   Organization and Qualification; Authority .....................................24
   5.2   No Conflicts; Consents and Approvals ...........................................25
   5.3   Subsidiaries......................................................................................25
   5.4   Financial Statements .......................................................................25
   5.5   Absence of Undisclosed Liabilities; Certain Developments ...........26
   5.6   Litigation..........................................................................................26
   5.7   Compliance with Laws ....................................................................26
   5.8   Permits .............................................................................................26
   5.9   Contracts. .........................................................................................27
   5.10  Taxes ................................................................................................28
   5.11  Employee Benefit Plans; ERISA. ...................................................29
   5.12  Labor and Employment....................................................................30
   5.13  Environmental Matters....................................................................31
   5.14  Intellectual Property.........................................................................32
   5.15  Real Estate .......................................................................................32

| 5.16 | Insurance | 32 |
|------|-----------|----|
| 5.17 | Federal Regulation | 32 |
| 5.18 | Brokers | 32 |
| 5.19 | Conduct of Business and Operations | 32 |
| 5.20 | Sufficiency of Assets | 32 |

**ARTICLE 6   REPRESENTATIONS AND WARRANTIES OF BUYER ... 33**

| 6.1 | Organization and Qualification | 33 |
| 6.2 | Authority | 33 |
| 6.3 | No Conflicts; Consents and Approvals | 33 |
| 6.4 | Legal Proceedings | 34 |
| 6.5 | Compliance with Laws and Orders | 34 |
| 6.6 | Brokers | 34 |
| 6.7 | Financial Resources | 34 |
| 6.8 | No Knowledge of a Sellers' Breach | 34 |
| 6.9 | Opportunity for Independent Investigation | 34 |

**ARTICLE 7   COVENANTS ... 34**

| 7.1 | Access. | 34 |
| 7.2 | Conduct of Business Pending the Closing. | 36 |
| 7.3 | Use of Certain Names | 38 |
| 7.4 | Support Obligations. | 38 |
| 7.5 | Termination of Certain Services, Contracts | 39 |
| 7.6 | Insurance | 39 |
| 7.7 | Tax Matters. | 40 |
| 7.8 | Confidentiality. | 41 |
| 7.9 | Employee and Benefit Matters | 42 |
| 7.10 | Public Announcements | 45 |
| 7.11 | Expenses and Fees | 46 |
| 7.12 | Regulatory and Other Approvals | 46 |
| 7.13 | Further Assurances | 47 |
| 7.14 | Schedule Update | 47 |
| 7.15 | PUCT Matters | 48 |
| 7.16 | Equistar Consents | 48 |
| 7.17 | Boiler Feedwater Pump | 48 |
| 7.18 | Fulfillment of Conditions | 48 |
| 7.19 | Cure of Defaults | 48 |
| 7.20 | 2007 Financial Statements | 49 |

**ARTICLE 8   BANKRUPTCY PROCEDURES ... 49**

| 8.1 | Bankruptcy Actions. | 49 |

**ARTICLE 9   CONDITIONS TO THE CLOSING ... 50**

| 9.1 | Conditions to the Obligations of Each Party | 50 |
| 9.2 | Conditions to the Obligations of Buyer | 51 |
| 9.3 | Conditions to the Obligations of Sellers | 51 |

ii

ARTICLE 10  TERMINATION ....................................................................................52

    10.1   Termination ..................................................................................52
    10.2   Effect of Termination ...................................................................53
    10.3   Termination Fees. .........................................................................53

ARTICLE 11  INDEMNIFICATION ...........................................................................54

    11.1   Survival .......................................................................................54
    11.2   Indemnification. ...........................................................................54
    11.3   Waiver of Other Representations. ................................................56
    11.4   Waiver of Remedies; Certain Limitations ..................................58
    11.5   Procedures for Indemnification ...................................................59
    11.6   Manner of Payment .....................................................................60

ARTICLE 12  MISCELLANEOUS ..............................................................................60

    12.1   Notices ........................................................................................60
    12.2   Headings .....................................................................................61
    12.3   Assignment .................................................................................61
    12.4   Governing Law ...........................................................................62
    12.5   Jurisdiction .................................................................................62
    12.6   Counterparts ................................................................................62
    12.7   Amendments; Extensions ............................................................62
    12.8   Entire Agreement ........................................................................62
    12.9   Severability ................................................................................63
    12.10  Joint and Several ........................................................................63

## EXHIBITS

| | |
|---|---|
| Exhibit A | Form of Bill of Sale |
| Exhibit B | Form of Assignment and Assumption Agreement (Contracts) |
| Exhibit C | Form of Assignment and Assumption Agreement (Lease) |
| Exhibit D | Form of RES Assignment and Assumption Agreement |
| Exhibit E | Form of Sale Order |
| Exhibit F | Interim Period Capital Expenditures |
| Exhibit G-1 | Administrative Services Transition Services Agreement |
| Exhibit G-2 | Fuel and Power Transition Services Agreement |
| Exhibit H | Form of Escrow Agreement |

## DISCLOSURE SCHEDULES

| | |
|---|---|
| Schedule 1.1(x) | Knowledge of Sellers |
| Schedule 1.1(y) | Knowledge of Buyer |
| Schedule 1.1(z) | Buyer's Energy Manager |
| Schedule 2.1(a) | Real Estate Leases |
| Schedule 2.1(b) | Entitled Real Property |
| Schedule 2.1(c) | Equipment |
| Schedule 2.1(d) | Supplier Contracts |
| Schedule 2.1(e) | Other Contracts |
| Schedule 2.1(f) | Inventory |
| Schedule 2.1(g) | Intellectual Property |
| Schedule 2.1(h) | Permits |
| Schedule 2.1(i) | Business Records |
| Schedule 2.2(m) | Reliant Marks |
| Schedule 2.2(p) | Excluded Assets |
| Schedule 2.4 | Excluded Liabilities |
| Schedule 4.2(i) | RES Agreements |
| Schedule 5.2(b) | Company Consents |
| Schedule 5.2(c) | Sellers' Governmental Approvals |
| Schedule 5.4 | Financial Statements |
| Schedule 5.5 | Undisclosed Liabilities |
| Schedule 5.6 | Litigation |
| Schedule 5.7 | Compliance with Laws |
| Schedule 5.8(i) | Permits |
| Schedule 5.8(ii) | Permits in Violation |
| Schedule 5.9(a) | Contracts |
| Schedule 5.9(d) | Excluded Contracts |
| Schedule 5.10 | Taxes |
| Schedule 5.11(a) | Seller Affiliate Plans |
| Schedule 5.11(c) | Favorable Determination Letters |
| Schedule 5.12(f) | Seller Affiliate Plan Increases or Acceleration |
| Schedule 5.13 | Environmental Matters |
| Schedule 5.14 | Intellectual Property |
| Schedule 5.15 | Real Estate |

iv

Schedule 6.3(c)        Buyer's Governmental Approvals
Schedule 7.2          Conduct of Business Pending the Closing
Schedule 7.4(a)        Support Obligations
Schedule 7.9(b)        Non-Collective Bargaining Contract Employees
Schedule 8.1(b)        Publications
Schedule 9.1(c)        Certain Consents

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this *"Agreement"*), dated as of April 3, 2008 (the *"Execution Date"*), is made by and between Reliant Energy Channelview LP, a Delaware limited partnership (*"Channelview LP"*) and Reliant Energy Services Channelview LLC, a Delaware limited liability company (*"RESC"* and together with Channelview LP, the *"Sellers"*) and GIM Channelview Cogeneration, LLC, a Delaware limited liability company (the *"Buyer"*).

## RECITALS

WHEREAS, Channelview LP owns the Channelview Facility and certain other Acquired Assets;

WHEREAS, on August 20, 2007, Channelview LP filed a voluntary petition for relief under the Bankruptcy Code in the Bankruptcy Court;

WHEREAS, RESC owns certain Acquired Assets;

WHEREAS, on August 20, 2007, RESC filed a voluntary petition for relief under the Bankruptcy Code in the Bankruptcy Court;

WHEREAS, on the terms and subject to the conditions set forth in this Agreement, Buyer desires to purchase from Sellers, and Sellers desire to sell to Buyer, the Acquired Assets, in a sale authorized by the Bankruptcy Court pursuant to, *inter alia*, sections 105, 363, and 365 of the Bankruptcy Code;

WHEREAS, Buyer also desires to assume, and Sellers desire to assign and transfer to Buyer, the Assumed Liabilities.

NOW, THEREFORE, in consideration of the foregoing and their respective representations, warranties, covenants and undertakings herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Sellers and Buyer hereby agree as follows:

## ARTICLE 1

## DEFINITIONS AND CONSTRUCTION

1.1    <u>Definitions</u>.  As used in this Agreement, the following terms shall have the following meanings:

*"2007 Financial Statements"* has the meaning set forth in <u>Section 7.20</u>.

*"Accounts Payable"* has the meaning set forth in <u>Section 2.4</u>.

*"Accounts Receivable"* has the meaning set forth in <u>Section 2.2(c)</u>.

*"Acquired Assets"* has the meaning set forth in <u>Section 2.1</u>.

"*Administrative Services Transition Services Agreement*" (means that certain Transition Services Agreement, to be dated as of the Closing Date, by and among Operator and Buyer, in substantially the form of Exhibit G-1 hereto.

"*Adverse Ruling*" means relief granted by the Bankruptcy Court to a third party that the Buyer in good faith believes, based on the advice of counsel, would adversely impact the relief provided in the Sale Order under Section 363(m) of the Bankruptcy Code.

"*Affiliate*" means any Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, the Person specified; provided, that neither General Electric Company nor Credit Suisse Group, or any of their respective wholly- or partially-owned direct or indirect subsidiaries, shall be deemed to be "Affiliates" of Buyer for any purpose of this Agreement. For purposes of this definition, control of a Person means the power, direct or indirect, to direct or cause the direction of the management and policies of such Person whether through ownership of voting securities or ownership interests, by contract or otherwise, and specifically with respect to a corporation, partnership, trust or limited liability company, shall include direct or indirect ownership of more than 50% of the voting securities in such corporation or of the voting interest in a partnership or limited liability company or of the beneficial interest in a trust.

"*Agreement*" has the meaning set forth in the Recitals to this Agreement.

"*Assigned Contracts*" has the meaning set forth in Section 2.1(e).

"*Assumed Liabilities*" has the meaning set forth in Section 2.3.

"*Assumption Agreements*" has the meaning set forth in Section 4.2(b).

"*Bankruptcy Code*" means Title 11 of the United States Code.

"*Bankruptcy Court*" means the United States Bankruptcy Court for the District of Delaware or such other court having jurisdiction over the Chapter 11 Cases originally administered in the United States Bankruptcy Court of the District of Delaware.

"*Base Purchase Price*" has the meaning set forth in Section 3.1(a).

"*Benefit Plan*" means: (a) each "employee benefit plan," as such term is defined in Section 3(3) of ERISA, (b) each plan or program that would be an employee benefit plan if it were subject to ERISA, such as foreign plans and plans for directors, (c) each stock bonus, stock ownership, stock option, stock purchase, restricted stock, stock appreciation rights, phantom stock, or other equity plan (whether qualified or nonqualified), (d) each bonus, deferred compensation or incentive compensation plan, and (e) any other material employee benefit plan, program, contract, commitment, policy, agreement or arrangement of any kind (including, any employment, consulting, retention, disability, accident, savings and thrift, unemployment compensation, post-retirement, fringe benefits, cafeteria plans, change in control or severance plan, policy, arrangement or agreement providing compensation or benefits to any employee (whether active or on leave of absence) and/or former employee of the Operator, Sellers, their Affiliates or any Commonly Controlled Entity); provided, that such term shall not include (1)

2

routine employment policies and procedures, including wage, vacation, holiday, and sick or other leave policies, (2) workers compensation insurance, and (3) directors and officers liability insurance.

"*Business*" means the business of generating and selling steam, electric power, capacity and ancillary services from the Channelview Facility, as managed by Channelview LP, or its Affiliates, on the date hereof; or, as applicable, RESC's business of purchasing power from third-parties and selling power to Equistar pursuant to the Energy Supply Agreement, and any business activities of Channelview LP or RESC incidental to the foregoing.

"*Business Day*" means a day other than Saturday, Sunday or any day on which banks located in the State of New York and the State of Texas are authorized or obligated to close.

"*Business Records*" means all books, files and records (whether in paper or electronic format) to the extent they apply to the Acquired Assets or the Business, including customer lists, historical customer files, reports, plans, data, accounting and tax records, test results, product specifications, drawings, diagrams, training manuals, procedures manuals, logs, engineering data, safety and environmental reports and documents, maintenance schedules, operating and production records, inventory records, business plans, and marketing and all other studies, documents and records but excluding any Retained Books and Records.

"*Buyer*" has the meaning set forth in the Recitals to this Agreement.

"*Buyer Governmental Approvals*" has the meaning set forth in Section 6.3(c).

"*Buyer Indemnified Group*" means Buyer and Buyer's Affiliates and their respective officers, directors, managers, members, employees and agents.

"*Buyer Savings Plan*" has the meaning set forth in Section 7.9(g).

"*Capital Expenditures*" means expenditures for capital additions to, or replacements of, property, plant and equipment included in the Channelview Facility and other expenditures for repairs on property, plant and equipment included in the Channelview Facility that would be capitalized by Sellers in accordance with their normal capitalization policies, which are in accordance with GAAP.

"*Change of Law*" means the adoption, implementation, promulgation, repeal, modification or reinterpretation of any Law of or by any Governmental Authority which occurs subsequent to the Execution Date.

"*Channelview Facility*" means the 830 MW combined cycle, cogeneration facility located in Channelview, Texas, and facilities and equipment owned or leased by Channelview LP in connection with the Business.

"*Channelview Facility Employees*" has the meaning set forth in Section 5.12(a).

"*Channelview LP*" has the meaning set forth in the Recitals to this Agreement.

3

"*Channelview September 30 Balance Sheet*" has the meaning set forth in <u>Section 5.5</u>.

"*Chapter 11 Cases*" means collectively, the cases commenced under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court by Channelview LP and RESC, and which are jointly administered under case no. 07-11160 (MFW).

"*Charter Documents*" means, with respect to any Person, the articles of incorporation or organization and by-laws, the limited partnership agreement, the partnership agreement or the limited liability company agreement, and/or such other organizational documents of such Person, including those that are required to be registered or kept in the place of incorporation, organization or formation of such Person and which establish the legal personality of such Person.

"*Claims*" has the meaning set forth in <u>Section 2.2(j)</u>.

"*Closing*" has the meaning set forth in <u>Section 4.1</u>.

"*Closing Date*" has the meaning set forth in <u>Section 4.1</u>.

"*Code*" means the Internal Revenue Code of 1986, as amended.

"*Collective Bargaining Contract*" means that certain Agreement, effective as of January 1, 2004, between Reliant Energy Corporate Services, LLC, as successor by merger to Reliant Energy Power Operations I, Inc., and the International Brotherhood of Electrical Workers Local Union No. 66 Houston, Texas.

"*Commonly Controlled Entity*" means any trade or business, whether or not incorporated, that, together with either Seller, would be a "single employer" within the meaning of Section 4001(b) of ERISA.

"*Company Consents*" has the meaning set forth in <u>Section 5.2(b)</u>.

"*Confidentiality Agreement*" has the meaning set forth in <u>Section 7.8(a)</u>.

"*Consent*" means any consent, approval, authorization, qualification, waiver or notification of a Governmental Authority or other Person.

"*Continuing Employee*" means each individual who accepts an offer of employment from Buyer or its designee as provided in <u>Section 7.9(b)</u>, reports to work with Buyer or its designee, and is hired by Buyer or its designee.

"*Contract*" means any written contract, agreement, instrument, bond, commitment, lease, license, evidence of indebtedness, mortgage, indenture, purchase order, binding bid, letter of credit, security agreement or other written legally binding arrangement.

"*Credit Agreement*" means that certain Credit Agreement, dated as of December 15, 1999, as amended, among Channelview LP, the Lenders parties thereto, The Bank of New York,

as successor Administrative Agent and Collateral Agent, and Teachers Insurance and Annuity Association of America, as Institutional Agent.

"*Credit Rating*" means, with respect to any Person, each rating given by Standard & Poor's or Moody's, as applicable, to such Person's long-term, unsecured, unsubordinated debt obligations not supported by third party credit enhancement.

"*Cure Cost Reserve Amount*" has the meaning set forth in Section 7.19.

"*Cure Costs*" means all (i) cure costs required to be paid and all defaults required to be cured as a condition to assumption and assignment of the Assigned Contracts pursuant to Section 365 of the Bankruptcy Code and (ii) all contingent, unliquidated or unmatured liabilities under such Assigned Contracts or under any subcontracts related thereto (whether or not such subcontracts are Assigned Contracts) arising prior to the Closing Date.

"*Deposit*" has the meaning set forth in Section 3.2.

"*Disclosure Schedules*" has the meaning set forth in Section 2.1(a).

"*Emission Allowances*" means authorizations to emit specified units of substances, whether those authorizations are described as allowances, offsets, credits or by another term, from the Channelview Facility that are allocated to the Channelview Facility and owned by Channelview LP as of the time of Closing or to which the Channelview Facility becomes entitled to after Closing, which units are established by any Governmental Authority with jurisdiction over the Channelview Facility.

"*Energy Manager*" means (i) any one of the entities set forth on Schedule 1.1(z) or (ii) another energy manager, which may be an Affiliate of Buyer, reasonably satisfactory to Sellers or RES as applicable, or (iii) another energy manager selected by Buyer, provided that such alternate energy manager has and maintains an investment grade rating with Standard & Poor's and Moody's.

"*Energy Supply Agreement*" means that certain Second Amended and Restated Energy Supply Agreement, dated as of December 15, 1999, by and between Equistar and RESC.

"*Entitled Real Property*" has the meaning set forth in Section 7.19.

"*Environmental Law*" means any federal, state, or local law, statute, ordinance, rule, regulation, code, directive, judicial or administrative order, judgment, decree, injunction, or requirement of any Governmental Authority, relating to (a) pollution or the protection, preservation or restoration of the environment (including air, water vapor, surface water, groundwater, surface land, subsurface land and natural resources), as the same may be amended or adopted as of the Closing Date or any date prior to the Closing Date, (b) Releases or threatened Releases (including, without limitation, Releases into the ambient air, surface water, groundwater, land, surface and subsurface strata) or otherwise relating to Hazardous Substances; or (c) the use, storage, recycling, treatment, generation, transportation, processing, handling, labeling, testing, discharge, control, cleanup, production, or disposal of Hazardous Substances.

"*Equipment*" has the meaning set forth in <u>Section 2.1(c)</u>.

"*Equistar*" means Equistar Chemicals LP, a Delaware limited partnership.

"*ERCOT*" means the Electric Reliability Counsel of Texas.

"*ERISA*" means the Employee Retirement Income Security Act of 1974, as amended.

"**Escrow Agent**" means Wilmington Trust Company the escrow agent under the Escrow Agreement.

"*Escrow Agreement*" means the escrow agreement by and between Sellers, Buyer and the Escrow Agent, in substantially the form of <u>Exhibit H</u>.

"*Estimated Purchase Price*" has the meaning set forth in <u>Section 4.3(a)</u>.

"*Excluded Assets*" has the meaning set forth in <u>Section 2.2</u>.

"*Excluded Liabilities*" has the meaning set forth in <u>Section 2.4</u>.

"*Execution Date*" has the meaning set forth in the Recitals to this Agreement.

"*FERC*" means the Federal Energy Regulatory Commission.

"*Final Purchase Price*" has the meaning set forth in <u>Section 3.3(c)</u>.

"*Fuel and Power Transition Services Agreement*" means that certain Transition Services Agreement, to be dated as of the Closing Date, by and among RES and Buyer, in substantially the form of <u>Exhibit G-2</u> hereto.

"*Fuel Purchase and Sale Agreement*" means that certain Fuel Purchase and Sale Agreement, dated as of December 15, 1999, by and among RES, Channelview LP and Equistar.

"*Fuel Supply Agreement*" has the meaning set forth in <u>Section 2.5</u>.

"*FutureCare Program*" has the meaning set forth in <u>Section 7.9(b)</u>.

"*GAAP*" means generally accepted accounting principles in the United States of America.

"*Generator Operator*" has the meaning set forth in <u>Section 5.7</u>.

"*Governmental Authority*" means (i) any federal, state, local, or foreign government, (ii) any court, tribunal, arbitrator, authority, agency, administrative body, taxing authority, commission, official or other instrumentality of the United States or any state, county, city, municipality, local authority or other political subdivision or similar governing entity, and (iii) any governmental, quasi-governmental or non-governmental body administering, regulating or having general oversight over gas, electricity, power or other markets, including ERCOT, the Texas Regional Entity and NERC.

*"Hazardous Substance"* means any chemical, material or substance in any form, whether solid, liquid, gaseous, semisolid, or any combination thereof, whether waste material, raw material, chemical, finished product, byproduct, or any other material or article, listed, defined, designated, regulated or classified as a pollutant, contaminant, hazardous substance, toxic substance, hazardous waste, solid waste, or special waste, or that is otherwise listed or regulated, or as to which liability could be imposed under any Environmental Law; including without limitation, petroleum products, and toxic mold.

*"HSR Act"* means the Hart-Scott-Rodino Antitrust Improvements Act of 1976.

*"Indemnified Party"* has the meaning set forth in Section 11.5.

*"Indemnifying Party"* has the meaning set forth in Section 11.5.

*"Indemnity Security"* has the meaning set forth in Section 11.2(c).

*"Intellectual Property"* means any and all (a) patents and patent applications, (b) marks (including trademarks, service marks, certification marks, collective marks, registered or unregistered), trade names, designs, expressions and works of authorship, logos, slogans, trade dress and applications for registration of the foregoing, (c) copyrights, mask works and applications for registration of the foregoing, and (d) trade secrets and confidential information, including confidential know-how and any other similar property, whether or not embodied in tangible form (including but not limited to technical drawings and specifications, shop drawings, manuals, forms, working notes and memos, technical and laboratory data, notebooks, samples, engineering prototypes and computer software.

*"Interest Rate"* means the prime per annum rate of interest as published by *The Wall Street Journal.*

*"Interim Period"* means the period of time from the Execution Date until the earlier of the Closing Date or termination of this Agreement.

*"Inventory"* has the meaning set forth in Section 2.1(f).

*"Investment Grade"* means an entity having long term, unsecured, unsubordinated debt not supported by third party credit enhancement that is rated "BBB-" or higher by Standard & Poor's and "Baa3" or higher by Moody's and that in either case is not on negative credit watch.

*"IRS"* means the U.S. Internal Revenue Service.

*"Knowledge"* means, in the case of Sellers, the actual knowledge (as opposed to any constructive or imputed knowledge) of the individuals listed on Schedule 1.1(x), and in the case of Buyer, the actual knowledge (as opposed to any constructive or imputed knowledge) of the individuals listed on Schedule 1.1(y), in each case without inquiry.

*"Laws"* means all laws, codes, statutes, rules, regulations, ordinances, orders and other legally-binding pronouncements having the effect of law of any Governmental Authority.

*"Leased Real Property"* has the meaning set forth in <u>Section 2.1(a)</u>.

*"Lenders"* means the lenders party to the Credit Agreement.

*"Lien"* means any mortgage, pledge, hypothecation, assessment, levy, imposition, charge, claim, assignment, security interest, easement, deed, restriction, transfer restriction, lien or other similar restriction or encumbrance of any kind.

*"Losses"* means any and all judgments, losses, liabilities, amounts paid in settlement, damages, fines, penalties, supplemental environmental project costs, deficiencies, losses and expenses (including interest, court costs, reasonable fees of attorneys, accountants and other experts and other reasonable expenses of litigation, settlement, judgment or other proceedings or of any claim, default or assessment).

*"LTMA Adjustment"* shall mean any adjustment to the purchase price for prorated availability bonuses or credits made in accordance with Item 6 on <u>Schedule 2.4</u>.

*"LTMA Support Obligations"* shall mean any Support Obligations arising under that certain Guaranty Agreement, dated as of September 30, 2002, by and between Reliant Energy Power Generation, Inc. and Siemens Power Generation, Inc,

*"Material Adverse Effect"* means any change, event or effect that is materially adverse to the Acquired Assets, taken as a whole, in each case, except for any such change, event or effect resulting from or arising out of (a) changes in economic conditions generally or in the industry in which the Channelview Facility operates, (b) changes in international, national, regional, state or local wholesale or retail markets for electric power or fuel or related products, including those due to actions by competitors (excluding any such change to the extent it only or disproportionately affects the Acquired Assets relative to other combined-cycle cogeneration facilities in ERCOT), (c) changes in general regulatory or political conditions, including any acts of war or terrorist activities, (d) changes in national, regional, state or local electric transmission or distribution systems, (e) strikes, work stoppages or other labor disturbances, (f) increases in costs of commodities or supplies, including fuel, (g) effects of weather or meteorological events, (h) any Change of Laws, (i) any actions to be taken pursuant to or in accordance with this Agreement, (j) any changes, events, or effects to which Sellers have cured prior to or as of Closing, and (k) the Chapter 11 Cases.

*"Material Contracts"* has the meaning set forth in <u>Section 5.9</u>.

*"Moody's"* means Moody's Investors Services, Inc., and its successors.

*"Multiemployer Plan"* has the meaning set forth in ERISA § 3(37).

*"NERC"* means North American Electric Reliability Corporation.

*"Operator"* means Reliant Energy Corporate Services, LLC, a Delaware limited liability company.

*"Other Contracts"* has the meant set forth in <u>Section 2.1(e)</u>.

8

*"Parties"* means each of Buyer and Sellers.

*"Permits"* means all licenses, permits, authorizations, approvals, registrations, variances, exemptions, concessions, franchises and similar consents granted or issued by any Governmental Authority.

*"Permitted Exceptions"* means (i) all Liens and any defects, exceptions, restrictions, easements, rights of way and encumbrances (x) disclosed in the title commitment referenced in Schedule 5.15, (y) which are shown on that certain TSPS Category 5 Survey made by Carter Burgess, dated September 26, 2002, or (z) which a search of the public records would reveal; (ii) statutory liens for Taxes, assessments or other governmental charges not yet due and payable; (iii) mechanics', carriers', workers', repairers' and similar Liens arising or incurred in the ordinary course of business that are not yet delinquent or, if delinquent, that are being contested in good faith; (iv) zoning, entitlement and other land use and environmental regulations by any Governmental Authority; (v) such other Liens, imperfections in title and easements, restrictions and encumbrances which do not materially detract from the value of, or materially interfere with the present use of, the Channelview Facility in the aggregate; (vi) Liens arising under fuel procurement arrangements; (vii) any encumbrances or liens arising under the Credit Agreement in favor of the Lenders which will be satisfied by Sellers as of, and released upon, Closing; (viii) liens for pre-petition ad valorem Taxes which will be satisfied by Sellers upon Closing; and (ix) any rights of Equistar to purchase the partnership interests of Channelview LP, pursuant to the Second Amended and Restated Agreement Steam Supply Agreement, dated as of December 15, 1999, between Channelview LP and Equistar.

*"Person"* means any natural person, corporation, general partnership, limited partnership, limited liability company, proprietorship, other business organization, trust, union, association, entity or Governmental Authority.

*"Pre-Closing Portion"* has the meaning set forth in <u>Section 7.7(b)</u>.

*"Prudent Industry Practice"* means those practices, methods, equipment, specifications and standards of safety and performance as the same may change from time to time, as are commonly used in the North American electric utility industry by independent operators of electric generation stations of a type and size similar to those constituting the Channelview Facility during a particular time period as good, safe and prudent engineering practices in connection with the operation, maintenance, repair and use of gas turbines, electrical generators and other equipment and facilities with commensurate standards of safety, performance, dependability, efficiency and economy, and consistent with applicable Laws and Regulations. Prudent Industry Practices are not intended to be limited to the optimum practice or method to the exclusion of others, but rather to be a spectrum of possible but reasonable practices and methods generally accepted in the North American electric utility industry during the relevant time period in light of the circumstances.

*"PUCT"* means the Public Utility Commission of Texas.

*"Pump Payments"* has the meaning set forth in <u>Section 7.17</u>.

*"Purchase Price Allocation"* has the meaning set forth in <u>Section 3.4</u>.

*"QF"* has the meaning set forth in <u>Section 5.17</u>.

*"QSE"* means a qualified scheduling entity qualified by ERCOT in accordance with ERCOT Protocol Section 16, Registration and Qualification of Market Participants, to submit Balanced Schedules and Ancillary Services bids and settle payments with ERCOT.

*"Real Estate Leases"* has the meaning set forth in <u>Section 2.1(a)</u>.

*"Real Property"* has the meaning set forth in <u>Section 2.1(b)</u>.

*"Related Person"* means, with respect to any Person, all past, present and future directors, officers, members, managers, stockholders, employees, controlling persons, agents, professionals, attorneys, accountants, investment bankers, Affiliates or representatives of any such Person.

*"Release"* means any release, spill, leak, discharge, abandonment, disposal, pumping, pouring, emitting, emptying, injecting, leaching, dumping, depositing, dispersing, allowing to escape or migrate into or through the environment (including ambient air, surface water, ground water, land surface and subsurface strata or within any building, structure, facility or fixture) of any Hazardous Substance, including the abandonment or discarding of Hazardous Substances in barrels, drums, or other containers.

*"Reliant Energy"* has the meaning set forth in <u>Section 2.2(d)</u>.

*"Reliant Marks"* has the meaning set forth in <u>Section 2.2(m)</u>.

*"Representatives"* means officers, directors, employees, counsel, accountants, financial advisers or consultants of either Sellers or Buyer, as applicable.

*"RES"* means Reliant Energy Services, Inc.

*"RES Agreements"* has the meaning set forth in <u>Section 4.2(i)</u>.

*"RES Assignment and Assumption Agreement"* has the meaning set forth in <u>Section 4.2(i)</u>.

*"RES Fuel Purchase Transactions"* shall mean those fuel purchase transactions listed on Schedule 2 of the Fuel and Power Transition Services Agreement or entered into after the date hereof in accordance with such Schedule 2.

*"RES"* has the meaning set forth in the Recitals to this Agreement.

*"Retained Books and Records"* means: (i) all corporate seals, minute books, charter documents, corporate stock record books, original tax and financial records and such other files, books and records to the extent that any of the foregoing relates primarily to any of the Excluded Assets or Excluded Liabilities or the organization, existence, capitalization or debt financing of a Seller or of any Affiliate of a Seller; (ii) all books, files and records that would otherwise constitute a Business Record but for the fact that disclosure of books, files or records could (v)

disclose information related to a Seller or any of its Affiliates concerning public utility regulatory matters, including matters before ERCOT, the FERC, or other similar bodies, (w) violate any legal constraints or obligations regarding the confidentiality thereof, provided that such Seller shall use its commercially reasonable efforts to obtain a waiver of any such confidentiality restrictions in order to permit such disclosure, (x) waive any attorney client, work product or like privilege, (y) disclose information about such Seller or any of its Affiliates that is unrelated to the Channelview Facility or the Business or (z) disclose information about such Seller or any of its Affiliates pertaining to energy or project evaluation, energy or natural gas price curves or projections or other economic predictive models; or (iii) all books and records prepared in connection with or relating in any way to the transactions contemplated by this Agreement, including bids received from other parties and analyses relating in any way to the Acquired Assets or the Assumed Liabilities.

"*Rule*" or "*Rules*" means the Federal Rules of Bankruptcy Procedure.

"*Sale Order*" means an order: (i) (x) in substantially the form of Exhibit E hereto, or (y) in such other form which is in form and substance reasonably acceptable to Sellers and Buyer approving this Agreement and all of the terms and conditions hereof, and approving and authorizing Sellers to consummate the transactions contemplated hereby. Without limiting the generality of the foregoing, such order shall find and provide, among other things, that (a) other than Permitted Exceptions, the Acquired Assets sold to Buyer pursuant to this Agreement shall be transferred to Buyer free and clear of all Liens and liabilities of any Person, such Liens and liabilities to attach to the Purchase Price, (b) Buyer has acted in good faith within the meaning of Section 363(m) of the Bankruptcy Code, and, as such, is entitled to the protections afforded thereby, (c) this Agreement was negotiated, proposed and entered into by the parties without collusion, in good faith and from arm's length bargaining positions, (d) Buyer is not acquiring or assuming any of Sellers' or any other Person's liabilities except as expressly provided in this Agreement, (e) all Assigned Contracts shall be assumed by Sellers and assigned to Buyer pursuant to Section 365 of the Bankruptcy Code, (f) the Bankruptcy Court shall retain jurisdiction to resolve any controversy or claim arising out of or relating to this Agreement, or the breach hereof as provided in <u>Section 8.1</u> hereof during the pendency of the Chapter 11 Cases, (g) this Agreement and the transactions and instruments contemplated hereby shall be specifically enforceable against and binding upon, and not subject to rejection or avoidance by, each Seller or any trustee of a Seller and its applicable estate, (h) is it not a principal purpose of any Person entering into this Agreement or any transactions contemplated by this Agreement to evade liability to which such Person would be subject under Subtitle D of Title IV of ERISA, and (i) the provisions thereof are non-severable and mutually dependent; and (ii) that does not require the assignment and assumption of the Cash Flow Participation Agreement, dated as of December 15, 1999, by and between Channelview LP and Equistar.

"*Schedule Update*" has the meaning set forth in <u>Section 7.14</u>.

"*Seller Affiliate Plan*" means each Benefit Plan that is sponsored, administered, maintained or contributed to as of the date of this Agreement by any Affiliate of either Seller and which Benefit Plan provides benefits with respect to employees of the Operator who are employed at the Channelview Facility.

11

*"Seller Affiliate Savings Plans"* means the Reliant Energy, Inc. Savings Plan and the Reliant Energy, Inc. Union Savings Plan.

*"Seller Indemnified Group"* means each Seller and such Seller's Affiliates and their respective officers, directors, employees and agents.

*"Sellers"* has the meaning set forth in the Recitals to this Agreement.

*"Sellers' Governmental Approvals"* has the meaning set forth in Section 5.2(c).

*"Sellers' Post-Closing Estimate"* has the meaning set forth in Section 3.3(a).

*"Settlement Agreement"* means that certain Settlement Agreement, dated as of July 10th, 2007, by and between Channelview LP, RESC, and Equistar.

*"Severance Plan"* means the Reliant Energy, Inc. 2003 Involuntary Severance Benefits Plan for Employees With Annual Base Pay Less Than $150,000 As Amended and Restated Effective June 1, 2004.

*"Standard & Poor's"* means Standard & Poor's Ratings Group (a division of McGraw Hill, Inc.), and its successors.

*"Straddle Period"* has the meaning set forth in Section 7.7(b).

*"Supplier Contracts"* has the meaning set forth in Section 2.1(d).

*"Support Obligations"* has the meaning set forth in Section 7.4(a).

*"Tax"* or *"Taxes"* means any federal, state, local, or foreign income, profits, franchise, withholding, ad valorem, personal property (tangible and intangible), employment, payroll, sales and use, social security (or similar), disability, occupation, real property, severance, excise, gross receipts, utility, severance, license, transfer, stamp, premium, windfall profits, environmental (including taxes under Code § 59A), customs duties, capital stock unemployment, registration, utility, production, value added, alternative or add-on minimum, estimated, and other taxes imposed by a Taxing Authority of any kind whatsoever whether computed on a separate or consolidated, unitary or combined basis or in any other manner, including any interest, penalty or addition thereto, whether disputed or not.

*"Tax Proceeding"* has the meaning set forth in Section 7.7(e).

*"Tax Returns"* means any and all returns, reports, statements, information returns or other similar filings filed or required to be filed with respect to any Taxes, including any supporting information, schedules, attachments or amendments thereof.

*"Taxing Authority"* means, with respect to any Tax, the Governmental Authority or political subdivision thereof that administers such Tax, and the agency (if any) charged with the collection of such Tax for such entity or subdivision.

*"Termination Date"* has the meaning set forth in <u>Section 10.1</u>.

*"Texas Regional Entity"* means the Texas Regional Entity, a Division of ERCOT.

*"Third-Party Claim"* has the meaning set forth in <u>Section 11.5</u>.

*"Transfer Taxes"* means all transfer, Real Property transfer, goods and services, value added, recordation, documentary, stamp, duty, excise and conveyance Taxes and other similar Taxes, duties, fees or charges, as levied by any Taxing Authority in connection with the transactions contemplated by this Agreement, provided, however, that for the avoidance of doubt, the term Transfer Taxes shall not include any income Taxes based on or measured by net income, including the Texas franchise or margins tax.

*"Transition Services Agreements"* means the Administrative Services Transition Services Agreement and the Fuel and Power Transition Services Agreement.

*"Union"* has the meaning set forth in <u>Section 7.9(c)</u>.

*"WARN Act"* means the Worker Adjustment and Retraining Notification Act of 1988, as amended and any similar foreign, state or local law, regulation or ordinance.

*"Welfare Benefits"* has the meaning set forth in <u>Section 7.9(h)</u>.

1.2    <u>Construction</u>.

(a)    All Article, Section, Subsection, Schedule and Exhibit references used in this Agreement are to Articles, Sections, Subsections, Schedules and Exhibits to this Agreement unless otherwise specified. The Exhibits and Schedules attached to this Agreement constitute a part of this Agreement and are incorporated herein for all purposes.

(b)    If a term is defined as one part of speech (such as a noun), it shall have a corresponding meaning when used as another part of speech (such as a verb). Unless the context of this Agreement clearly requires otherwise, words importing the masculine gender shall include the feminine and neutral genders and vice versa. The words "includes" or "including" shall mean "includes without limitation" or "including without limitation," the words "hereof," "hereby," "herein," "hereunder" and similar terms in this Agreement shall refer to this Agreement as a whole and not any particular Section or Article in which such words appear and any reference to a Law shall include any amendment thereof or any successor thereto and any rules and regulations promulgated thereunder. Currency amounts referenced herein are in U.S. Dollars.

(c)    Time is of the essence in this Agreement. Whenever this Agreement refers to a number of days, such number shall refer to calendar days unless Business Days are specified. Whenever any action must be taken hereunder on or by a day that is not a Business Day, then such action may be validly taken on or by the next day that is a Business Day.

(d)    Sellers may, at their option, include in the Schedules items that are not material, and any such inclusion, or any references to dollar amounts, shall not be deemed to be

an acknowledgment or representation that such items are material or would be reasonably expected to cause a Material Adverse Effect, to establish any standard of materiality or to define further the meaning of such terms for purposes of this Agreement. Information disclosed in each Schedule of the Sellers' Disclosure Schedules shall be deemed to be disclosed in each other Schedule therein, if it is disclosed in such a way as to make reasonably apparent its relevance or applicability to another Section of this Agreement or any other Schedule (or subparts thereof) in order to avoid a misrepresentation hereunder.

(e)    Each Party acknowledges that it and its attorneys have been given an equal opportunity to negotiate the terms and conditions of this Agreement and that any rule of construction to the effect that ambiguities are to be resolved against the drafting Party or any similar rule operating against the drafter of an agreement shall not be applicable to the construction or interpretation of this Agreement.

## ARTICLE 2

## PURCHASE AND SALE OF THE ACQUIRED ASSETS

2.1    <u>Transfer of Acquired Assets.</u>  At the Closing, and upon the terms and conditions herein set forth, each Seller (as applicable) shall sell to Buyer (or Buyer's designee, in the case of the Energy Supply Agreement), and Buyer (or Buyer's designee, in the case of the Energy Supply Agreement) shall acquire from Sellers, all of each Seller's right, title and interest in, to and under the Acquired Assets free and clear of Liens, claims and other interests (except for Permitted Exceptions) pursuant to sections 105, 363 and 365 of the Bankruptcy Code. *"Acquired Assets"* shall mean all of each Seller's right, title and interest in, to and under all property (tangible or intangible), rights, goodwill, claims and assets to the extent relating to or used in or held for use in connection with the Business (except for the Excluded Assets) as the same exist on the Closing Date including:

(a)    subject to the receipt of any necessary consents or approvals, all of Sellers' rights under the leases of real property (the *"Real Estate Leases"*), listed on <u>Schedule 2.1(a)</u> of the disclosure schedules accompanying this Agreement (the *"Disclosure Schedules"*) and the real property leased by Channelview LP pursuant to the Real Estate Leases, together with any improvements and fixtures owned by Channelview LP erected on the real property subject to the Real Estate Leases (the *"Leased Real Property"*);

(b)    subject to the receipt of any necessary consents or approvals, all of Sellers' rights under the easements, rights of way, real property licenses, and other real property entitlements used in the Business or listed on <u>Schedule 2.1(b)</u> (the *"Entitled Real Property"* and, together with the Leased Real Property, the *"Real Property"*);

(c)    all of (i) Sellers' owned and leased equipment, spare parts, machinery, furniture, materials, supplies, fixtures, and other personal property used in the Business, and in connection with Channelview LP, located on the Real Property or listed on <u>Schedule 2.1(c)</u> (the *"Equipment"*); and (ii) any rights of Sellers to the warranties and licenses received from third parties with respect to the Equipment;

(d)     subject to the receipt of any necessary consents or approvals, all of Sellers' rights under outstanding purchase orders or other similar Contracts used exclusively in the Business entered into by Channelview LP with any supplier that are listed on Schedule 2.1(d) of the Disclosure Schedules ("*Supplier Contracts*");

(e)     subject to the receipt of any necessary consents or approvals, all of Sellers' rights under the Contracts that are listed on Schedule 2.1(e) of the Disclosure Schedules (the "*Other Contracts*" and, together with the Real Estate Leases, the Entitled Real Property constituting Contracts, and the Supplier Contracts, the "*Assigned Contracts*");

(f)     all (i) inventories of fuel, chemicals and gas wherever located (including in transit to the Channelview Facility) and owned by Channelview LP on the Closing Date, or listed on Schedule 2.1(f) (the "*Inventory*"), and (ii) any rights of Channelview LP to the warranties received from third parties with respect to such Inventory;

(g)     any Intellectual Property, including any computer software or systems (i) located at the Real Property, the offices of RESC or listed on Schedule 2.1 (g) and (ii) owned exclusively by either Seller and licenses held exclusively by either Seller, to the extent transferable, in each case that pertain solely to the Business;

(h)     to the extent transferable under applicable Law, all rights of either Seller under the Permits relating exclusively to the Business including those listed on Schedule 2.1(h);

(i)     copies of all Business Records (including those listed on Schedule 2.1(i) to the extent they apply to the Acquired Assets) and the right to receive mail and other communications addressed to the Sellers that pertain to the Channelview Facility or the Business;

(j)     all accounts, rights or allowances involving Emissions Allowances, and all rights to any future Emission Allowances, if any, that will be granted or allocated with respect to the Channelview Facility (other than those Emission Allowances expended in the ordinary course of operation of the Channelview Facility prior to the Closing);

(k)     subject to Section 2.2(o), all claims, causes of action, choses in action, rights of set-off of any kind, rights of recovery, whether known or unknown, in favor of any of the Sellers, and pertaining to, arising out of or relating to, the Acquired Assets or offsetting any Assumed Liabilities, but excluding any of the same relating to any Affiliate of the Sellers, or relating to any matter covered by the Settlement Agreement; and

(l)     all of Channelview LP's right, title and interest in the Channelview Facility.

2.2     Excluded Assets.  Notwithstanding anything to the contrary in this Agreement, the Acquired Assets do not include the following (collectively, the "*Excluded Assets*"):

(a)     any right, title or interest of any Person other than a Seller in any property or asset;

15

(b)    all of Sellers' cash and cash equivalents, marketable securities, prepaid expenses, advance payments, surety accounts, deposits and other similar prepaid items (including for the purchase of natural gas), checks in transit and undeposited checks to the extent attributable to the period prior to the Closing Date;

(c)    all of Sellers' accounts and notes receivable to the extent attributable to the period prior to 11:59 pm on the day prior to the Closing Date (the *"Accounts Receivable"*);

(d)    other than assets, property, and other rights specifically identified in any Schedule referenced in <u>Section 2.1</u> above, any assets, property and other rights held or owned by Reliant Energy, Inc. (*"Reliant Energy"*) or its Affiliates to the extent not used in the operation of the Business;

(e)    financial information or financial statements and proprietary manuals (except rights to use manuals specific to and necessary for the operation of the Business) prepared by or used by either Seller or their Affiliates to the extent not relating exclusively to the Business;

(f)    all of Sellers' rights under Contracts that are not Assigned Contracts;

(g)    all rights to Claims, refunds or adjustments with respect to Excluded Assets, relating to any proceeding before any Governmental Authority relating to the period prior to the Closing, and all rights to insurance proceeds or other insurance recoveries: (i) that are reimbursement for, either Seller's or such Seller's Affiliate's expenditures made prior to the Closing Date for which insurance proceeds are available or due to a Seller or such Affiliates or (ii) to the extent relating to Excluded Assets or Excluded Liabilities;

(h)    any asset of a Seller that would constitute an Acquired Asset (if owned by such Seller on the Closing Date) that is conveyed or otherwise disposed of during the period from the date hereof until the Closing Date either: (i) in the ordinary course of business of the Sellers, (ii) at the direction of the Bankruptcy Court or (iii) as otherwise permitted by the terms of this Agreement;

(i)    all losses, loss carry forwards and rights to receive refunds, credits and loss carry forwards with respect to any and all Taxes of Sellers incurred or accrued on or prior to the Closing Date, including interest receivable with respect thereto;

(j)    any and all rights, demands, claims, credits, allowances, rebates, causes of action, known or unknown, pending or threatened (including all causes of action arising under sections 510, 544 through 551 and 553 of the Bankruptcy Code or under similar state Laws, including fraudulent conveyance claims, and all other causes of action of a trustee and debtor-in-possession under the Bankruptcy Code) or rights of set-off (collectively, *"Claims"*), of a Seller or any Affiliate of a Seller: (i) in respect of the Excluded Assets or the Excluded Liabilities, or (ii) arising out of or relating in any way to the Chapter 11 Cases or any of the transactions contemplated thereby or entered into as a consequence thereof; including any claims (as defined in Section 101(5) of the Bankruptcy Code) filed, scheduled or otherwise arising in the Chapter 11 Cases;

16

(k)    all shares of capital stock or other equity interests of either Seller and all Affiliates of Sellers;

(l)    all rights of either Seller arising under this Agreement and under any other agreement between either Seller and Buyer entered into in connection with this Agreement;

(m)    all rights to or goodwill represented by or pertaining to all names, marks, trade names, trademarks and service marks incorporating the name Reliant Energy or any other name set forth on Schedule 2.2(m) (the *"Reliant Marks"*) and any brand names or derivatives thereof no matter how used, whether as a corporate name, domain name or otherwise and including the corporate design logo associated with any Reliant Mark or variant of any Reliant Mark;

(n)    all Retained Books and Records; provided, however, that Seller will grant Buyer reasonable access to all such Retained Books and Records under clause (i) of the definition thereof, but excluding Retained Books and Records which fall under clauses (ii) or (iii) of such definition, necessary to operate the Channelview Facility in the ordinary course and consistent with past practices, and subject to execution of a customary confidentiality undertaking;

(o)    all rights and Claims of a Seller against any Affiliate of such Seller relating to the Assigned Contracts that arose prior to the Closing Date; and

(p)    any assets set forth on Schedule 2.2(p) of the Disclosure Schedules.

2.3    Assumption of Liabilities.   At the Closing, Buyer shall assume, and Buyer shall thereafter pay, perform and discharge when due, the following liabilities and obligations (collectively, the *"Assumed Liabilities"*):

(a)    all liabilities and obligations of Sellers under the Assigned Contracts, other than Excluded Liabilities;

(b)    all liabilities and obligations of Sellers under the Permits;

(c)    to the extent provided in Section 7.7(a), Transfer Taxes;

(d)    all liabilities and obligations of Sellers, any of their Affiliates or any of their respective Related Persons arising under or relating to any environmental matter (including any liability or obligation arising under any Environmental Law) relating to the Acquired Assets;

(e)    any liability for any Taxes attributable to the Acquired Assets to the extent arising or accruing (on a pro rata daily basis in the case of Taxes other than income Taxes) with respect to a period (or any portion thereof) beginning, or events occurring, after the Closing Date; and

(f)    all other liabilities and obligations relating to or arising from the operation of the Business or the ownership of the Acquired Assets (other than the Excluded Liabilities), but for purposes of clarity, excluding liabilities or obligations under the Credit Agreement, and any

17

other Contract (written or oral) which is not an Assigned Contract, including those obligations of Sellers associated with that certain Channel Area Industrial District Agreement between Lyondell Petrochemical Company and the City of Houston, dated as of June 17, 1997.

Notwithstanding the foregoing, Assumed Liabilities does not include any liabilities or obligations for which Buyer is entitled to indemnity pursuant to this Agreement.

2.4    **Excluded Liabilities.**  Buyer is assuming only the Assumed Liabilities, and all liabilities of Sellers not expressly assumed by Buyer pursuant to Section 2.3, whether or not incurred or accrued, whether asserted before, on or after the Closing Date, shall be assumed or retained, as the case may be, by Sellers, who shall be responsible for paying, performing and discharging such liabilities and Buyer shall not have any responsibility for such liabilities (such liabilities are hereinafter referred to as the *"Excluded Liabilities"*), including: (i) all Cure Costs; (ii) all liabilities and obligations with respect to accounts payable accrued under Assigned Contracts as of 11:59 pm on the day prior to the Closing Date (the *"Accounts Payable"*); (iii) liabilities to the extent arising in connection with Excluded Assets; (iv) any liability for any Taxes attributable to the Acquired Assets to the extent arising or accruing (on a pro rata daily basis in the case of Taxes other than income Taxes) with respect to a period (or any portion thereof) ending on or before the Closing Date, and any other liability for any Taxes attributable to Sellers (except such Taxes described in Section 2.3(e)); (v) liabilities with respect to Benefit Plans (including Seller Affiliate Plans); (vi) all liabilities and obligations of Sellers or any Affiliate thereof representing indebtedness for money borrowed (or any refinancing thereof); (vii) liabilities with respect to loans made by and, other than with respect to transactions under the Transition Services Agreements, accounts payable arising from transactions with Affiliates; (viii) any liability of any of the Sellers for (a) transaction fees and expenses and fees and expenses payable to lenders, brokers, financial advisors, legal counsel, accountants and other professionals, and (b) except as provided otherwise in Section 7.7(a), Transfer Taxes; (ix) those listed on Schedule 2.4 of the Disclosure Schedules; (x) all liabilities arising out of any exchange act or securities liability; (xi) all costs and expenses associated with the Chapter 11 Cases; (xii) all liability for any claims discharged pursuant to the Chapter 11 Cases or for claims against either of the Sellers which are filed after the bar date or disallowed by the Bankruptcy Court; (xiii) all liability for any rejection damages claim filed in the Chapter 11 Cases; and (xiv) all interests and liabilities that have not been otherwise assumed pursuant to this Agreement, to the extent that applicable law permits this sale under Section 363 of the Bankruptcy Code to be free and clear of such interests and liabilities.

2.5    **Non-Assignment of Assigned Contracts.**  Anything contained herein to the contrary notwithstanding, (i) this Agreement shall not constitute an agreement to assign any Assigned Contracts if, after giving effect to the provisions of Sections 363 and 365 of the Bankruptcy Code, an attempted assignment thereof, without obtaining a Consent, would constitute a breach thereof or in any way negatively affect the rights of Sellers or Buyer, as the assignee of such Assigned Contracts and (ii) unless Sellers have otherwise violated the provisions of this Section 2.5, no breach of this Agreement or failure of a closing condition shall have occurred by virtue of such nonassignment.  Sellers shall use commercially reasonable efforts to obtain the consent of the counterparties to each Assigned Contract, to the extent that after giving effect to the provisions of Sections 363 and 365 of the Bankruptcy Code, such Consent is required; provided, that nothing in this Section 2.5 shall (x) require Sellers to make

18

any significant expenditure or incur any significant obligation on its own or on Buyer's behalf or (y) prohibit Sellers from ceasing operations or winding up its affairs following the Closing. Any assignment to Buyer of any Assigned Contracts that shall, after giving effect to the provisions of Sections 363 and 365 of the Bankruptcy Code, require the Consent of any third party for such assignment as aforesaid shall be made subject to such Consent being obtained. Without limiting the foregoing, the Parties agree that, if any required consent to the assignment or release of RES' obligations under the Fuel Purchase and Sale Agreement is not timely obtained prior to the Closing Date or the date of termination of Gas Services under the Fuel and Power Transition Services agreement, as applicable, Buyer and Buyer's Energy Manager will enter into an agreement (the *"Fuel Supply Agreement"*) in form and substance reasonably acceptable to the Parties, in relation to the Fuel Purchase and Sale Agreement, pursuant to which (i) RES shall consult with Buyer (or Buyer's Energy Manager) with respect to transactions occurring under the Fuel Purchase and Sale Agreement and keep Buyer and Buyer's Energy Manager advised of all transactions thereunder, and not take any material discretionary action thereunder without Buyer or Buyer's Energy Manager's consent, not to be unreasonably withheld; (ii) RES shall not modify, amend or terminate the Fuel Purchase and Sale Agreement without Buyer's consent, which consent shall not be unreasonably withheld or delayed; (iii) RES shall continue to perform and act such that the gas sold to RES under such agreement shall be resold to the Buyer through the Buyer's Energy Manager; (iv) RES shall agree that Buyer's Energy Manager may be replaced from time to time in Buyer's sole discretion with a new Energy Manager, and (v) RES shall use commercially reasonable efforts to obtain the execution and delivery by Equistar of the RES Assignment and Assumption Agreement. The Parties agree further that if RES continues to be directly obligated to purchase gas from Equistar under the Fuel Purchase and Sale Agreement after the Closing Date or the date of termination of Gas Services under the Fuel and Power Transition Services Agreement, as applicable, Buyer's Energy Manager shall, pursuant to the Fuel Supply Agreement, accept and purchase from RES all such gas accepted and purchased by RES from Equistar. The price for such gas shall be equal to the price paid for such gas by RES, and the terms and conditions of Buyer's Energy Manager's purchase of such gas shall be substantially identical to the terms and conditions on which RES purchased such gas from Equistar, and, in turn, such gas shall be resold to the Buyer on such terms and conditions. The Fuel Supply Agreement shall require RES to indemnify, defend and hold Buyer (and Buyer's Energy Manager) harmless from and against any and all claims, losses, damages, liabilities, suits, payments, costs and expenses, including reasonable attorneys' fees and costs of investigation arising out of (i) the performance or breach of the Fuel Purchase and Sale Agreement by RES except to the extent that a liability arises out of the breach by Buyer or Buyer's Energy Manager of the Fuel Supply Agreement, and (ii) any breach or alleged breach of the Fuel Purchase and Sale Agreement as a result of the Fuel Supply Agreement (except to the extent that a liability arises out of the breach by Buyer or Buyer's Energy Manager of the Fuel Supply Agreement). Buyer shall indemnify defend and hold RES harmless from and against any and all claims, losses, damages, liabilities, suits, payments, costs and expenses, including attorneys' fees and costs of investigation arising out of Buyer's (or Buyer's Energy Manager's) breach of the Fuel Supply Agreement. Notwithstanding anything in this Section 2.5 to the contrary in using commercially reasonable efforts to obtain any consent described above, RES shall not be obligated to commence litigation or expend any sums of money to obtain such consent.

# ARTICLE 3

## CONSIDERATION

3.1    Purchase Price.    The purchase price to be paid by Buyer to Sellers for the Acquired Assets is equal to:

(a)    Five Hundred Million Dollars ($500,000,000) (the *"Base Purchase Price"*), plus

(b)    the amount of Capital Expenditures paid by the Sellers for work done during the period beginning on February 25, 2008 and ending on the Closing Date, subject to and in accordance with the budget for which is provided on Exhibit F hereto, plus or minus (as applicable)

(c)    the amount of the LTMA Adjustment calculated in accordance with Item 6 on Schedule 2.4.

3.2    Deposit.    Buyer has deposited with the Escrow Agent cash in the amount of Forty Million Dollars ($40,000,000).  Buyer shall have the option to substitute for such cash deposit a letter of credit in the amount of Forty Million Five Hundred Fifty Thousand Dollars ($40,550,000) in a form reasonably acceptable to Sellers, naming the Sellers as beneficiary (and held by Sellers with draws being deposited with the Escrow Agent) (such cash deposit or letter of credit, the *"Deposit"*).  The Deposit shall be held and disbursed pursuant to the terms of the Escrow Agreement and this Agreement.  The Parties shall use commercially reasonable efforts to cause the execution and delivery of the Escrow Agreement as soon as possible after the date hereof.

3.3    Post-Closing Adjustment.

(a)    As soon as practicable after the Closing, but no later than 90 days after the Closing Date, Sellers shall determine the actual adjustment to the Base Purchase Price pursuant to Section 3.1 as of the Closing Date.  Sellers and Buyer shall cooperate and provide each other access to their respective books and records and those of Channelview LP as are reasonably requested in connection with the matters addressed in this Section 3.3.  Sellers shall provide Buyer with written notice of such determinations within such 90 days, along with reasonable supporting information (the *"Sellers' Post-Closing Estimate"*).

(b)    If Buyer objects to any determinations set forth in Sellers' Post-Closing Estimate, then it shall provide Sellers written notice thereof within 20 Business Days after receiving Sellers' Post-Closing Estimate.  Such notice shall specify in reasonable detail Buyer's objections to specific determinations, along with reasonable supporting documentation.  Any objections not so specified shall be deemed waived, and Sellers' determinations to which specific objections were not so made shall prevail.  If the Parties are unable to agree on the disputed amounts as of the Closing Date within 120 days after the Closing Date or such longer time as may be agreed by the Parties, the Parties shall refer such dispute to an internationally recognized accounting firm that is not the principal accounting firm of Buyer or either Seller, mutually acceptable to Buyer and Sellers, which firm shall make a final and binding determination as to

all such matters in dispute (and only such matters) on a timely basis (and such accounting firm shall be instructed to make such determination within 45 days of such engagement or as soon thereafter as reasonably practicable) and promptly shall notify the Parties in writing of its resolution. Such firm shall not have the power to modify or amend any term or provision of this Agreement. The fees and disbursements of the accounting firm shall be allocated between Buyer and Sellers in inverse proportion as they shall prevail on the amounts of such disputed items so submitted (as finally determined by such accounting firm).

(c)    If the Base Purchase Price adjusted using such actual values (as agreed or determined by the above-referenced accounting firm) (the *"Final Purchase Price"*) is greater than the Estimated Purchase Price, then Buyer shall pay Sellers within 10 Business Days after such actual values are agreed or determined, by wire transfer of immediately available funds, the difference between the Final Purchase Price and the Estimated Purchase Price plus interest thereon at the Interest Rate from the Closing Date through and including the date of such payment. If the Final Purchase Price is less than the Estimated Purchase Price, then Sellers shall pay Buyer within 10 Business Days after such actual values are agreed or determined, by wire transfer of immediately available funds, the difference between the Estimated Purchase Price and the Final Purchase Price plus interest thereon at the Interest Rate from the Closing Date through and including the date of such payment. In each case, the recipient Party shall designate the account to which such payment is to be made at least two Business Days prior to the date such payment is due.

3.4    Allocation of Purchase Price. Within thirty (30) days after the determination of the Final Purchase Price, Sellers and Buyer shall agree upon an allocation of the purchase price (as determined in accordance with US federal income tax principles) among the Acquired Assets in accordance with Section 1060 of the Code and the Treasury Regulations promulgated thereunder (the *"Purchase Price Allocation"*); provided that the purchase price shall not be increased by or otherwise reflect the obligations under any of the Assigned Contracts. Buyer and Sellers shall work in good faith to resolve any disagreements regarding the Purchase Price Allocation. If the Parties fail to agree within such 30-day period upon Purchase Price Allocation, such dispute shall be resolved by an independent accounting firm mutually acceptable to Buyer and Sellers, and the decision of such independent accounting firm shall be final and binding on the Parties. Sellers together shall bear and pay one-half of such fees and other costs charged by such accounting firm and Buyer shall bear and pay one-half of such fees and other costs. Sellers and Buyer shall each prepare and timely file IRS Form 8594 "Asset Acquisition Statement Under Section 1060" and any other similar statements or forms as are prescribed under federal, state, local or foreign Tax Law (including any exhibits thereto) to report the Purchase Price Allocation. The Parties agree that they shall not, and shall not permit their Affiliates to take a position on any Tax Return or for any Tax purpose that is inconsistent with the Purchase Price Allocation unless otherwise required by applicable laws; provided, however, that neither Sellers nor Buyer shall be obligated to litigate any challenge to the Purchase Price Allocation by any Governmental Authority. The Parties agree to provide, and shall cause their Affiliates to provide, each other promptly with any information required to complete such Tax forms or statements as are required under applicable law to report the Purchase Price Allocation.

3.5    Equistar Payment. In accordance with the Settlement Agreement and provided the Settlement Agreement is then still in effect, Channelview LP agrees to apply $10,000,000 of

its portion of the Purchase Price payable at Closing either to (in Channelview LP's discretion): (i) Equistar pursuant to paragraphs 2 and 6 of the Settlement Agreement, or (ii) into the escrow account contemplated by paragraph 6 of the Settlement Agreement.

## ARTICLE 4

## CLOSING AND DELIVERIES

4.1    Closing.  Subject to satisfaction or waiver of the conditions to the Closing set forth herein, unless the Parties mutually agree otherwise in writing, the closing of the transactions contemplated by this Agreement (the *"Closing"*) shall take place at the offices of Reliant Energy, Inc., 1000 Main Street, 21st Floor, Houston, Texas 77002 at 10:00 A.M. local time, on the second Business Day after the conditions to the Closing set forth in ARTICLE 9 (other than actions to be taken or items to be delivered at the Closing) have been satisfied or waived by the applicable Party or Parties or such other date and at such other time and place as may be mutually agreed to in writing (the *"Closing Date"*); provided, that notwithstanding any provision herein to the contrary, the Closing Date shall not occur prior to the later of (a) thirty (30) days following the date of entry of the Sale Order and (b) forty (40) days following the Execution Date.  All actions listed in Section 4.2 and Section 4.3 that occur on the Closing Date shall be deemed to occur simultaneously at the Closing.

4.2    Closing Deliveries by Sellers to Buyer.  At the Closing, the appropriate Seller shall deliver, or shall cause to be delivered, as applicable, to Buyer the following:

(a)    subject to the receipt of the applicable Company Consents and Sellers' Governmental Approvals, a bill of sale with respect to the Acquired Assets, duly executed by the appropriate Seller and substantially in the form of Exhibit A hereto;

(b)    subject to the receipt of the applicable Company Consents and Sellers' Governmental Approvals, one or more assignment and assumption agreements (the *"Assumption Agreements"*), in the form attached as Exhibit B hereto, duly executed by the appropriate Seller or Related Person with respect to the Assigned Contracts and Assumed Liabilities;

(c)    subject to the receipt of the applicable Company Consents and Sellers' Governmental Approvals, assignments of the Real Estate Leases and all Entitled Real Property interests held by Channelview LP, in the form attached as Exhibit C hereto, including, without limitation, all such interests set forth on Schedules 2.1(a) and 2.1(b), each duly executed by Channelview LP and in recordable form;

(d)    the Business Records (either at Closing or as soon as practicable thereafter);

(e)    (i) an executed copy of the Administrative Services Transition Services Agreement (to the extent Buyer notifies Sellers at least ten (10) days prior to the Closing Date that it intends to enter into the Administrative Services Transition Services Agreement), and (ii) subject to Section 4.4, an executed copy of the Fuel and Power Transition Services Agreement.

22

(f)    a duly executed affidavit of non-foreign status that complies with Section 1445 of the Code;

(g)    duly executed certificates referenced in <u>Section 9.2(c)</u>;

(h)    a copy of the Sale Order that has been entered on the docket by the clerk of the Bankruptcy Court;

(i)    unless Buyer has elected Gas Services under the Fuel and Power Transition Services Agreement (which services would include the sale of gas purchased by RES under the Fuel Purchase and Sale Agreement), either (i) an assignment and assumption agreement executed by RES (the *"RES Assignment and Assumption Agreement"*), in substantially the form attached as <u>Exhibit D</u> hereto, assigning to Buyer's designee the agreements which RES is a party as set forth in <u>Schedule 4.2(i)</u> hereto (the *"RES Agreements"*), or (ii) if required by <u>Section 2.5</u>, the Fuel Supply Agreement executed by RES; if Buyer has elected such Gas Services, then Sellers shall deliver the RES Assignment and Assumption Agreement or the Fuel Supply Agreement, as applicable, at the time such Gas Services terminate; and

(j)    a joint direction letter executed by Sellers instructing the Escrow Agent to (i) transfer $40,000,000 of the funds held in the Deposit Escrow Account (as defined in the Escrow Agreement) into the Indemnity Escrow Account (as defined in the Escrow Agreement) and (ii) to transfer all interest earned in the Deposit Escrow Account as directed by Sellers.

4.3    <u>Closing Deliveries by Buyer</u>.    At the Closing, Buyer shall deliver to Sellers the following:

(a)    a wire transfer of immediately available funds (to such accounts as Sellers shall have notified Buyer of at least two Business Days prior to the Closing Date) in an amount equal to the Base Purchase Price, reduced by the amount of the Deposit together with any interest earned thereon, as adjusted pursuant to <u>Sections 3.1(b)</u> and <u>3.1(c)</u>, as estimated in good faith by Sellers (the *"Estimated Purchase Price"*). Sellers shall deliver the Estimated Purchase Price in writing to Buyer at least two Business Days prior to the Closing Date and shall attach to the calculation of the Estimated Purchase Price a schedule showing the estimated adjustments to the Base Purchase Price pursuant to <u>Sections 3.1(b)</u> and <u>3.1(c)</u>;

(b)    an executed counterpart to the Assumption Agreements relating to the Assigned Contracts and Assumed Liabilities;

(c)    (i) an executed copy of the Administrative Services Transition Services Agreement (to the extent Buyer notifies Sellers at least ten (10) days prior to the Closing Date that it intends to enter into the Administrative Services Transition Services Agreement), and (ii) subject to <u>Section 4.4</u>, an executed copy of the Fuel and Power Transition Services Agreement;

(d)    Except to the extent that Buyer has delivered a letter of credit or guarantee pursuant to <u>Section 7.4(b)(iv)</u>, a release of the LTMA Support Obligations (other than with respect to amounts owing prior to Closing) and unless Buyer has elected Gas Services under the Fuel and Power Transition Services Agreement either (i) RES Assignment and Assumption

Agreement executed by Buyer in substantially the form attached as Exhibit D hereto, assigning to Buyer's designee the RES Agreements, or (ii) if required by Section 2.5, the Fuel Supply Agreement executed by Buyer and Buyer's Energy Manager; if Buyer has elected such Gas Services, then Buyer shall deliver the RES Assignment and Assumption Agreement or the Fuel Supply Agreement, as applicable, at the time such Gas Services terminate;

(e)    a joint direction letter executed by Buyer instructing the Escrow Agent to (i) transfer $40,000,000 of the funds held in the Deposit Escrow Account into the Indemnity Escrow Account and (ii) to transfer all interest earned in the Deposit Escrow Account as directed by Sellers; and

(f)    a duly executed certificate as described in Section 9.3(c).

4.4    RES Fuel Purchase Transactions.  If Buyer does not intend to utilize RES' services under the Fuel and Power Transition Services Agreement, the Parties shall nonetheless enter into the Fuel and Power Transition Services Agreement with respect to the sale to Buyer of the fuel purchased by RES under the RES Fuel Purchase Transactions from and after the Closing Date in accordance with the terms and conditions of the Fuel and Power Transition Services Agreement (including without limitation under ARTICLE 6 thereto concerning the supplying of credit support) but without payment of the monthly fee set forth in Section 2.1 of the Fuel and Power Transition Services Agreement.  The Parties agree that no fees will be paid to Sellers except to the extent required under and pursuant to the terms of the Transition Services Agreements.  Notwithstanding the foregoing, if as of Closing or at anytime thereafter, the Parties are able to cause one or more of the RES Fuel Purchase Transactions to be novated directly to Buyer's Energy Manager, then such transactions shall be excluded from the Fuel and Power Transition Services Agreement.  Each of the Parties shall use commercially reasonable efforts to cause such novations to occur.  Each such novation shall include the acknowledgment of the counterparty under such RES Fuel Purchase Transaction that it will look solely to RES for the payments of amounts arising or accruing under such RES Fuel Purchase Transaction prior to the effective time of such novation.

## ARTICLE 5

## REPRESENTATIONS AND WARRANTIES
## REGARDING THE ACQUIRED ASSETS

Each Seller hereby represents and warrants to Buyer, for itself, and with respect to the Acquired Assets owned by such Seller that:

5.1    Organization and Qualification; Authority.  Each Seller is duly formed and existing under the laws of the State of Delaware.  Each Seller has the requisite power and authority to enter into this Agreement, to perform its obligations hereunder and to consummate the transactions contemplated hereby and to own, lease and operate its assets and properties and to carry on its business as it is now being conducted or as contemplated herein and in accordance with Sections 363, 1107 and 1108 of the Bankruptcy Code.  Each Seller is qualified to transact business and, where applicable, is in good standing in each jurisdiction in which the nature of the business conducted by it makes such qualification necessary, except in the jurisdictions where

24

the failure to be so qualified or licensed would not, in the aggregate, be reasonably expected to have a Material Adverse Effect on such Seller's ability to perform its obligations hereunder. The execution and delivery by Sellers of this Agreement and the performance by each Seller of its respective obligations hereunder have been duly and validly authorized by all necessary limited partnership or limited liability company (as applicable) action on behalf of such Seller. This Agreement has been duly and validly executed and delivered by each Seller and constitutes the legal, valid and binding obligation of such Seller enforceable against such Seller in accordance with its terms except as the same may be limited by bankruptcy, insolvency, reorganization, arrangement, moratorium or other similar Laws relating to or affecting the rights of creditors generally or by general equitable principles.

5.2    No Conflicts; Consents and Approvals. The execution and delivery by each Seller of this Agreement and each of the documents contemplated hereby does not, and the performance by such Seller of its obligations under this Agreement and each of the documents contemplated hereby and the consummation of the transactions contemplated hereby and thereby will not:

(a)    conflict with or result in a violation or breach of any of the terms, conditions or provisions of the Charter Documents of such Seller;

(b)    assuming the consents set forth on Schedule 5.2(b) (the *"Company Consents"*) have been obtained, require the consent of, notice to or approval of any Person under any Material Contract which is an Assigned Contract, be in violation of or result in a default (or give rise to any notice requirement or right of termination, cancellation or acceleration) under any Material Contract that is an Assigned Contracts except for any such violations or defaults (or rights of termination, cancellation or acceleration), as would not reasonably be expected to, individually or in the aggregate, result in a Material Adverse Effect;

(c)    assuming all required filings, approvals, consents, authorizations and notices set forth on Schedule 5.2(c) (collectively, the *"Sellers' Governmental Approvals"*) including the Sale Order have been made, obtained or given, (i) conflict with or result in a violation or breach of any term or provision of any Law or writ, judgment, order or decree applicable to Sellers or (ii) require the consent of notice to or approval of any Governmental Authority under any applicable Law, except in each case such conflicts, violations or breaches, or the failure to obtain such consents or approvals, which would not reasonably be expected to, individually or in the aggregate, have a Material Adverse Effect; and

(d)    result in the imposition or creation of a Lien upon or with respect to the Acquired Assets.

5.3    Subsidiaries. Sellers have no subsidiaries and do not own equity interests in any Person.

5.4    Financial Statements. Attached as Schedule 5.4 are copies of (i) the audited financial statements of Channelview LP for the years ended December 31, 2005 and December 31, 2006; and (ii) the unaudited balance sheet and statements of income and cash flow of Channelview LP as of and for the quarter ended September 30, 2007. The December 31, 2006

financial statements fairly present, in all material respects and in accordance with GAAP, the financial position and the results of operations, as the case may be, of Channelview LP as of the dates and for the periods indicated, except in the case of the interim financial statement for footnote disclosure and year-end audit adjustments.

5.5     Absence of Undisclosed Liabilities; Certain Developments. Except as recorded in the September 30, 2007 Balance Sheet included in Schedule 5.4 (the "*Channelview September 30 Balance Sheet*") or the notes thereto or as disclosed on Schedule 5.5, and except such liabilities that do not and would not reasonably be expected to, individually or in the aggregate, have a Material Adverse Effect, to their Knowledge, neither Seller has aggregate liabilities that would be required to be recorded in a balance sheet prepared in accordance with GAAP, excluding (i) liabilities under Material Contracts, (ii) liabilities under this Agreement, (iii) liabilities incurred in the ordinary course of business since September 30, 2007, (iv) liabilities that will be repaid or extinguished on or prior to the Closing, or not assumed by Buyer pursuant to the terms hereof, (v) liabilities incurred after the date of this Agreement, in accordance with ARTICLE 8, and (vi) to the extent not otherwise included in (i) - (iii) and (v) above, administrative expenses in the Chapter 11 Cases.

5.6     Litigation. Except as disclosed on Schedule 5.6, there is no litigation pending, or, to either Seller's Knowledge, threatened in writing against such Seller before any Governmental Authority or any arbitrator, except for litigation that would not reasonably be expected to, individually or in the aggregate, have a Material Adverse Effect Except as disclosed on Schedule 5.6, neither Seller is subject to any judgment, writ, decree, injunction, rule or order of any Governmental Authority (whether preliminary or final) that prohibits the consummation of the transactions contemplated by this Agreement or otherwise detracts from the value of, or interferes with the present use of, the Acquired Assets, other than, in each case, those that would not reasonably be expected to, individually or in the aggregate, have a Material Adverse Effect.

5.7     Compliance with Laws. Except as disclosed on Schedule 5.7, neither Seller nor Reliant Energy Power Supply LLC, as registered with NERC and the Texas Regional Entity, as Generator Operator of the Channelview Facility (in such capacity the "*Generator Operator*"), is in violation of or has been given written notice of any current violation of any Law, except violations that would not reasonably be expected to, individually or in the aggregate, have a Material Adverse Effect. Except as disclosed on Schedule 5.7, with respect to the Channelview Facility, to Sellers' Knowledge, no investigation, audit or review relating to Sellers, the Channelview Facility, the Generator Operator or any of the other Acquired Assets by any Governmental Authority is pending or threatened, other than, in each case, those that would not reasonably be expected to, individually or in the aggregate, have a Material Adverse Effect. For the avoidance of doubt, the representation above, insofar as it relates to the Generator Operator, is only made with respect to any Law applicable to it in its capacity as Generator Operator.

5.8     Permits.     Each material Permit used with respect to the operation of the Channelview Facility and the conduct of the Business is set forth on Schedule 5.8(i). Except as disclosed on Schedule 5.8(ii), neither Seller is in violation of the terms of any Permit used to conduct their respective businesses as currently conducted, except for violations which would not reasonably be expected to, individually or in the aggregate, have a Material Adverse Effect.

To Sellers' Knowledge, such Permits are in full force and effect, except as would not reasonably be expected to have a Material Adverse Effect.

5.9    Contracts.

(a)    Excluding Assigned Contracts, any Benefit Plans and any Contracts with respect to which Buyer will not be bound or have any liability after the Closing, Schedule 5.9(a) sets forth a list as of the date of this Agreement of the following Contracts to which either Seller is bound (collectively, the *"Material Contracts"*):

(i)    Contracts for the future purchase, exchange or sale of electric power, steam or ancillary services or fuel;

(ii)    Contracts for the future transmission of electric power or fuel or for the storage of fuel;

(iii)    interconnection Contracts;

(iv)    other than Contracts of the nature addressed by Section 5.9(a)(i)-5.9(a)(ii), Contracts that grant a right or option to purchase any asset of Sellers, other than in each case, Contracts entered into in the ordinary course of business consistent with past practices relating to assets with a value of less than $500,000 individually or $2,000,000 in the aggregate;

(v)    other than Contracts of the nature addressed by Section 5.9(a)(i)-5.9(a)(ii), Contracts for the future provision of goods or services requiring payments in excess of $500,000 for each individual Contract, excluding any such Contracts that are terminable by Sellers without penalty on not more than 30 days' notice;

(vi)    Contracts under which such Seller has created, incurred, assumed or guaranteed any outstanding indebtedness for borrowed money or any capitalized lease obligation, or under which such Seller has imposed a security interest on any of its assets, tangible or intangible, which security interest secures outstanding indebtedness;

(vii)    letters of credit or outstanding agreements of guaranty, surety or indemnification, direct or indirect, by Channelview LP, or by a Seller or any Affiliate of a Seller for the benefit of Channelview LP;

(viii)    Contracts with Reliant Energy or any Affiliate of Reliant Energy relating to the future provision of goods or services;

(ix)    Contracts under which Channelview LP has advanced or loaned money outside of the ordinary course of business;

(x)    employment, consulting or separation Contracts and any Contract that will result in the payment of any severance, termination, "golden parachute," or similar payments to any present or former personnel following termination of employment or otherwise as a result of the consummation of the transactions

contemplated by this Agreement and each of the agreements executed in connection therewith;

> (xi)    any collective bargaining agreement;

> (xii)    outstanding futures, swap, collar, put, call, floor, cap, option or other Contracts that are intended to benefit from or reduce or eliminate the risk of fluctuations in the price of commodities, including electric power, fuel or securities;

> (xiii)    Contracts that purport to limit either Sellers' freedom to compete in any line of business or in any geographic area;

> (xiv)    partnership, joint venture or limited liability company agreements; and

> (xv)    leases for real property.

(b)    Sellers have provided Buyer with, or access to, true and complete copies of all Material Contracts.

(c)    Other than as affected by the Chapter 11 Cases or as would not have a Material Adverse Effect, each Material Contract constitutes the legal, valid and binding obligation of the applicable Seller and, to such Seller's Knowledge, of the other Person party thereto, enforceable against such Seller and, to such Seller's Knowledge, such other Person party thereto in accordance with its terms, except as the same may be limited by Laws relating to or affecting the rights of creditors generally, or by general equitable principles.

(d)    Except as a result of the filing of the Chapter 11 Cases or as set forth on Schedule 5.9(d) hereto, neither Seller is, and to Sellers' Knowledge, no counterparty is, in default in the performance or observance of any term or provision of, and no event has occurred which, with lapse of time or action by a third party, would result in such a default under any Assigned Contracts to which either Seller is a party other than as would not reasonably be expected to, individually or in the aggregate, have a Material Adverse Effect.

5.10    Taxes.  Except as set forth on Schedule 5.10:

(a)    Each Seller has duly filed with the appropriate Taxing Authorities all Tax Returns required to be filed by it, and such Tax Returns are true, correct, and complete in all material respects.

(b)    Each Seller has duly paid in full any and all Taxes owed by it (whether or not shown or required to be shown on any Tax Return, except in each case where the failure to file such Tax Returns or pay such Tax would not reasonably be expected to, in the aggregate, have a Material Adverse Effect).

(c)    There are no liens for Taxes upon any Acquired Asset, except for liens for Taxes not yet due.

(d)     As of the date hereof, to Sellers' Knowledge, there are no pending or threatened in writing, Tax audits, examinations, actions, suits, claims, investigations or proceedings with respect to the ownership of the Acquired Assets and no outstanding written deficiencies or assessments for any amount of Tax have been assessed by any Taxing Authority with respect to Taxes relating to the ownership of the Acquired Assets that have been received by Sellers.

(e)     There are no outstanding agreements extending or waiving the statutory period of limitations applicable to any claim for, or the period for the collection or assessment or reassessment of, Taxes due from either Seller for any taxable period and no request for any such waiver or extension is currently pending.

(f)     Neither Seller is a party to or bound by any agreement relating to the sharing or allocation of Taxes, Tax benefits or credits, any Tax indemnity agreement, or any other similar arrangement.

(g)     Neither Seller is a party to any agreement, Contract, arrangement or plan that (i) has resulted or could result, separately or in the aggregate, in the payment of any "excess parachute payment" within the meaning of Section 280G of the Code (or any similar provision of state, local or foreign Law) or any amount that would not be fully deductible as a result of Section 162(m) of the Code (or any similar provision of state, local or foreign Law), or (ii) could provide for the deferral of compensation subject to Section 409A of the Code (or any similar provision of state, local or foreign Law).

(h)     Neither Seller currently is the beneficiary of any extension of time within which to pay any Tax or to file any Tax Return.

(i)     Neither Seller is required to include any item of income in, or exclude any item of deduction or loss from, taxable income for any taxable period or portion thereof beginning on or after the Closing Date as a result of (A) a change in method of accounting for a taxable period beginning on or before the Closing Date, (B) any "closing agreement" described in Section 7121 of the Code (or any similar provision of state, local or foreign Law) executed on or before the Closing Date, (C) any installment sale or open transaction disposition made on or before the Closing Date, or (D) any prepaid amount received on or before the Closing Date.

(j)     All Taxes required to be withheld or collected by Sellers have been duly withheld and collected and have been properly paid or deposited as required by applicable Laws.

(k)     RESC, at all times since its formation, has been classified and treated for federal income tax purposes as a disregarded entity, and not as a corporation.

(l)     Channelview LP, at all times since its formation, has been classified and treated for federal income tax purposes as a partnership, and not as a corporation.

5.11    Employee Benefit Plans; ERISA.

(a)     Schedule 5.11(a) sets forth a true, correct and complete list, as of the Execution Date, of all Seller Affiliate Plans. No Continuing Employee is entitled to, or may

become eligible to receive, any benefit from a Benefit Plan other than a Seller Affiliate Plan. On or before the Execution Date, Sellers have made available to Buyer copies (including amendments) of (i) each of the Seller Affiliate Plans, including any plan documents, trust agreements, annuity contracts, insurance contracts or other funding documents related to a Seller Affiliate Plan, (ii) the latest determination letter obtained from the IRS with respect to any Seller Affiliate Plan intended to be qualified or exempt under Section 401 or 501 of the Code, and (iii) census data for the Channelview Facility Employees for each Seller Affiliate Plan.

(b)     None of Sellers, Sellers' Affiliates, or any Commonly Controlled Entity contribute to, have an obligation to contribute to, or have ever contributed to, or ever had an obligation to contribute to, any multiemployer plan (within the meaning of Section 3(37) of ERISA).

(c)     All Seller Affiliate Plans and related trust agreements are and have been maintained in compliance both as to form and operation with all Laws, including the Code and ERISA, except to the extent that any such non-compliance would not reasonably be expected to have a Material Adverse Effect.   Except as set forth in Schedule 5.11(c), a favorable determination letter as to qualification under Section 401 of the Code has been issued with respect to any Seller Affiliate Plan intended to be qualified under Section 401 of the Code, and the related trust has been determined to be exempt from taxation under Section 501 of the Code. The Sellers and their Affiliates know of no events or circumstances that have occurred that would adversely affect the qualified status of any such plans or trusts.

(d)     Other than as provided under the Collective Bargaining Contract, no individual listed on Schedule 7.9(b) has ever received employer-subsidized health care or any other non-pension benefits with respect to employment at the Channelview Facility for more than 31 days after his or her employment is terminated (other than as required by part 6 of subtitle B of title I of ERISA) and has never been promised such employer-subsidized post-termination benefits with respect to employment at the Channelview Facility.

5.12    Labor and Employment.

(a)     With respect to each individual employed by Operator who performs services for the Channelview Facility (the *"Channelview Facility Employees"*), except for the Collective Bargaining Contract, Operator is not a party to, nor is bound by, the terms of any collective bargaining agreement or any other Contract with any labor union or representative of employees. To Sellers' Knowledge, there are no union organization campaigns or attempts to organize or establish any employee association underway or threatened involving employees of either Seller.

(b)     Channelview LP is in compliance with all laws, rules and regulations relating to labor relations and employment with respect to the Continuing Employees, except to the extent that any such non-compliance would not reasonably be expected to, individually or in the aggregate, have a Material Adverse Effect.

(c)     To Sellers' Knowledge no Channelview Facility Employees are in violation of any term or provision of any employment contract, confidentiality or other

proprietary information disclosure agreement or other contract relating to the right of any such Person to be employed or engaged by a Seller which would reasonably be expected to have a Material Adverse Effect.

      (d)    To Sellers' Knowledge, none of Operator's employment policies or practices applicable to the Channelview Facility Employees are currently being audited or investigated by any Governmental Authority which would reasonably be expected to have a Material Adverse Effect. To Sellers' Knowledge there are no current, nor have there been since four (4) years prior to the Closing Date, any, charges, claims, or demands filed with any Governmental Authority from any current or former Channelview Facility Employees regarding their employment or former employment at the Channelview Facility which would reasonably be expected to have a Material Adverse Effect including claims or charges of employment discrimination, sexual harassment or unfair labor practices.

      (e)    With respect to the Channelview Facility Employees, Operator has complied with all applicable Laws respecting employment and employment practices, terms and conditions of employment, wages and hours and other Laws, regulations and requirements related to employment, except to the extent that any such non-compliance would not reasonably be expected to have a Material Adverse Effect.

      (f)    Except as set forth on Schedule 5.12(f), neither the execution and delivery of this Agreement or the documents contemplated hereby by the Sellers, the performance by the Sellers of their obligations hereunder and thereunder, nor the consummation of the transactions contemplated hereby and thereby will (i) materially increase or enhance any benefits payable to a Continuing Employee under any Seller Affiliate Plan, or (ii) materially accelerate the time of payment or vesting, or increase the amount, of any compensation due to any Continuing Employee under a Seller Affiliate Plan.

    5.13    Environmental Matters. Except for such matters as disclosed on Schedule 5.13 or for such matters that would not reasonably be expected to, individually or in the aggregate, have a Material Adverse Effect:

      (a)    With respect to the Acquired Assets, Sellers are in compliance with all applicable Environmental Laws;

      (b)    All Permits required under Environmental Laws for conducting the operations of the Channelview Facility, as such facility is currently being operated, have been obtained or applied for and, to the extent obtained, are currently in full force and effect;

      (c)    Neither Channelview LP nor any of its Affiliates, with respect to the Channelview Facility, have received any written notice of a pending Claim from any Governmental Authority or other Person alleging that it or the Channelview Facility is in violation of, or has liability under, any applicable Environmental Law;

      (d)    To Channelview LP's Knowledge, there has been no disposal or Release by Sellers or their Affiliates at, on, under or from the Channelview Facility, except in compliance with Environmental Laws; and

(e)    Neither Channelview LP nor any of its Affiliates have received any written notice from any Governmental Authority or other Person alleging that Channelview LP or the Channelview Facility have liability under applicable Environmental Laws with respect to the disposal or transportation, or the arrangement for disposal or transportation of Hazardous Substances from the Channelview Facility by Channelview LP or any of its Affiliates at or to any off-site location.

Notwithstanding any other provision of this Agreement to the contrary, this Section 5.13 contains the sole and exclusive representations and warranties of Sellers on environmental matters with respect to Sellers and the Acquired Assets.

5.14    Intellectual Property.    Except as set forth on Schedule 5.14, or as would not reasonably be expected to have a Material Adverse Effect, (a) each Seller owns or has the right to use all Intellectual Property used in the operations of its respective business as currently conducted; (b) to the Knowledge of Sellers, no Person has or is infringing or misappropriating any Intellectual Property of Channelview LP that is exclusively used in the operation of the Channelview Facility; and (c) to the Knowledge of Sellers, no Person has or is infringing or misappropriating any Intellectual Property of RESC that is used exclusively in the running of RESC's Business.    Except for such violations which would not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect, neither the Sellers nor the Channelview Facility have infringed or misappropriated, and the operation of the Channelview Facility does not infringe or misappropriate any valid rights of third parties with respect to Intellectual Property.

5.15    Real Estate.    Channelview LP has delivered or otherwise made available to Buyer true, correct and complete copies of the surveys, title reports and the ground lease set forth on Schedule 5.15.    Channelview LP does not own any real property or interest in real property other than pursuant to the Real Estate Leases or with respect to the Entitled Real Property.

5.16    Insurance.    The Channelview Facility and Sellers are covered by valid policies of insurance as part of Reliant Energy's corporate insurance program.    Such insurance coverage shall not survive the Closing.

5.17    Federal Regulation.    As of the Closing Date, the Channelview Facility meets the requirements for a "Qualifying Cogeneration Facility" as defined in Section 3(18)(B) of the Federal Power Act, as amended, and the rules and regulations thereunder and the Public Utility Regulatory Policies Act of 1978, as amended (a "QF").

5.18    Brokers.    Neither Seller has any liability or obligation to pay fees or commissions to any broker, finder or agent with respect to the transactions contemplated by this Agreement.

5.19    Conduct of Business and Operations.    To Channelview LP's Knowledge, since December 31, 2006, Channelview LP has operated and maintained the Channelview Facility in accordance with Prudent Industry Practice, except as would not, in the aggregate, reasonably be expected to have a Material Adverse Effect.

5.20    Sufficiency of Assets.    Except for the Excluded Assets and assets consumed in the ordinary course of business, the Acquired Assets include all of the assets (whether tangible or

intangible) used by the Channelview Facility to conduct the business of the Channelview Facility as conducted as of each of the date hereof except as would not reasonably be expected to have a Material Adverse Effect. Except as would not reasonably be expected to have a Material Adverse Effect, the Sellers have good title to, or valid license or right to use, free and clear of all Liens (other than Liens that will be discharged prior to Closing or pursuant to the Chapter 11 Cases, or Permitted Exceptions), all of the tangible personal property described in the preceding sentence.

## ARTICLE 6

## REPRESENTATIONS AND WARRANTIES OF BUYER

In order to induce Sellers to enter into this Agreement and consummate the transactions contemplated hereby, Buyer hereby represents and warrants to Sellers that:

6.1     <u>Organization and Qualification.</u>  Buyer is a limited liability company duly formed and existing under the Laws of the State of Delaware. Buyer is qualified to transact business and, where applicable, is in good standing in each jurisdiction where the nature of the business conducted by it makes such qualification necessary, except in those jurisdictions where the failure to be so qualified or licensed would not, in the aggregate, be reasonably expected to result in a material adverse effect on Buyer's ability to perform its obligations hereunder.

6.2     <u>Authority.</u>  Buyer has all requisite limited liability company power and authority to enter into this Agreement, to perform its obligations hereunder and to consummate the transactions contemplated hereby. The execution and delivery by Buyer of this Agreement and the performance by Buyer of its obligations hereunder have been duly and validly authorized by all necessary limited liability company action on behalf of Buyer. This Agreement has been duly and validly executed and delivered by Buyer and constitutes the legal, valid and binding obligation of Buyer enforceable against Buyer in accordance with its terms except as the same may be limited by bankruptcy, insolvency, reorganization, arrangement, moratorium or other similar Laws relating to or affecting the rights of creditors generally or by general equitable principles.

6.3     <u>No Conflicts; Consents and Approvals.</u>  The execution and delivery by Buyer of this Agreement and each of the documents contemplated hereby do not, and the performance by Buyer of its obligations hereunder and under each of the documents contemplated hereby and the consummation of the transactions contemplated hereby and thereby will not:

(a)     conflict with or result in a violation or breach of any of the terms, conditions or provisions of its Charter Documents;

(b)     be in violation of or result in a default (or give rise to any right of termination, cancellation or acceleration) under any material Contract to which Buyer is a party or by which any of its assets may be bound except for any such violations or defaults (or rights of termination, cancellation or acceleration) which would not, in the aggregate, be reasonably expected to result in a material adverse effect on Buyer's ability to perform its obligations hereunder; or

(c)     assuming all required filings, approvals, consents, authorizations and notices set forth in Schedule 6.3(c) (collectively, the *"Buyer Governmental Approvals"*) have been made, obtained or given, (i) conflict with or result in a violation or breach of any term or provision of any Law or writ, judgment, order or decree applicable to Buyer or any of its assets or (ii) require the consent or approval of any Governmental Authority under any applicable Law, except in each case such conflicts, violations or breaches, or the failure to obtain such consents or approvals, which would not reasonably be expected to result in a material adverse effect on Buyer's ability to perform its obligations hereunder.

6.4     Legal Proceedings.  Buyer has not been served with written notice of any Claim, and to Buyer's Knowledge, none is threatened against Buyer which seeks a writ, judgment, order or decree restraining, enjoining or otherwise prohibiting or making illegal any of the transactions contemplated by this Agreement.

6.5     Compliance with Laws and Orders.  Buyer is not in violation of or has been given written notice of any current violation of any Law applicable to Buyer or its assets the effect of which, in the aggregate, would reasonably be expected to result in a material adverse effect on Buyer's ability to perform its obligations hereunder.

6.6     Brokers.  Buyer does not have any liability or obligation to pay fees or commissions to any broker, finder or agent with respect to the transactions contemplated by this Agreement for which Sellers or any of their Affiliates could become liable or obligated.

6.7     Financial Resources.  Buyer at Closing will have sufficient funds to satisfy its obligations required to be performed at Closing.

6.8     No Knowledge of a Sellers' Breach.  Buyer has no Knowledge of any breach by either Seller of any representation or warranty made hereunder which breach would reasonably be expected to result in a Material Adverse Effect, of which the Buyer has not advised Sellers.

6.9     Opportunity for Independent Investigation.  Prior to its execution of this Agreement, Buyer has conducted to its satisfaction an independent investigation and verification of the current condition and affairs of the Sellers and the Channelview Facility without reliance on Sellers or any of their Affiliates; provided that such independent investigation and verification shall not affect the express representations, warranties, covenants or other obligations of Sellers contained in this Agreement Buyer has had reasonable and sufficient access to documents, other information and materials as it considers appropriate to make its evaluations.

## ARTICLE 7

## COVENANTS

The Parties hereby, as applicable, covenant and agree as follows:

7.1     Access.

(a)     During the Interim Period, to the extent within their reasonable control in light of the commencement of the Chapter 11 Cases, each Seller (as applicable) will provide, and

will cause its Affiliates to provide, Buyer and its Representatives with reasonable access during normal business hours to the Channelview Facility, and the officers and management employees of Sellers and their Affiliates who are responsible for the Channelview Facility in such a manner so as not to unreasonably interfere with the business or operations of Sellers or their Affiliates; provided, that each Seller shall have the right to (i) have a Representative present for any communication with employees or officers of such Seller or its Affiliates, and (ii) impose reasonable restrictions and requirements for safety or operational purposes; provided further, that the right of access granted hereunder shall not include physical testing or sampling. Notwithstanding the foregoing, neither Seller shall be required to provide any information or allow any inspection which (i) such Seller reasonably believe contravenes applicable Law, (ii) constitutes or allows access to information protected by attorney/client privilege, or (iii) such Seller or its Affiliates is required to keep confidential or prevent access to by reason of any Contract with third parties; provided, however, that Sellers shall advise Buyer of the existence of such Contracts at Closing. Following the Closing, Sellers shall be entitled to retain copies of all books and records relating to the ownership and/or operation of their respective businesses (as applicable) and at Buyer's request after the Closing, to the extent such books and records have not been disposed of, Sellers shall at Buyer's sole cost and expense, provide Buyer with a copy of any such books and records.

(b)    Buyer agrees to indemnify, defend and hold harmless Sellers, their Affiliates and their Representatives from and against any and all Losses incurred by Sellers, their Affiliates, their Representatives or any other Person arising out of the access rights under this Section 7.1, including any Claims by any of Buyer's Representatives for any injuries or Losses while present at the Channelview Facility, **EVEN IN INSTANCES OF THE NEGLIGENCE OF SELLERS, THEIR AFFILIATES OR THEIR REPRESENTATIVES, BUT NOT TO THE EXTENT CAUSED BY THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF SELLERS, THEIR AFFILIATES OR THEIR REPRESENTATIVES.**

(c)    Each Party agrees that, for a period of three years following the Closing Date, it will use its commercially reasonable efforts to cooperate with and make available to the other Party and its Representatives for reviewing and making copies or taking extracts, upon reasonable notice and during normal business hours, books and records and information of or relating to the Acquired Assets which are necessary or useful in connection with any investigation, dispute or proceeding or audit by a Governmental Authority, or any claim by or against a third party involving the Acquired Assets (other than in connection with disputes between the Parties); provided that no such Party shall be required to make available any information, books or records, the disclosure of which would cause a waiver of any applicable privilege or breach of an obligation of confidentiality to a third- party and either party may make access to such information, books and records conditioned upon execution and delivery of a confidentiality agreement reasonably satisfactory to the party requesting disclosure. Further, after the Closing, Buyer shall grant to Sellers or their Representatives the access and right to make copies or take extracts described in the preceding sentence for such other purpose as may be reasonably requested by either Seller. The Party requesting any such books and records, information or cooperation shall bear all of the out-of-pocket costs and expenses of the other Party reasonably incurred in connection therewith (including out-of-pocket expenses to third parties incurred by any Party).

35

7.2     Conduct of Business Pending the Closing.

(a)     Except as otherwise contemplated by this Agreement or set forth in Schedule 7.2, during the Interim Period, Sellers will, to the extent within their reasonable control in light of the commencement of the Chapter 11 Cases:

(i)     use their commercially reasonable efforts to operate and maintain the Channelview Facility and the Business in the ordinary course of business consistent with past practices and in accordance with Prudent Industry Practice;

(ii)     use their commercially reasonable efforts to (A) preserve its present business operations, organization (including management) and goodwill with respect to the Channelview Facility and (B) preserve its present relationship with Persons having business dealings with respect to the Channelview Facility;

(iii)     provide to Buyer copies of invoices paid or to be paid during or attributable to the Interim Period; and

(iv)     provide to Buyer copies of the monthly operations reports delivered to Lenders.

(b)     Except as otherwise contemplated by this Agreement, as set forth in Schedule 7.2, as required by any Material Contract or material Permit of either Seller, or as consented to by Buyer, which consent shall not be unreasonably withheld, conditioned or delayed (except in respect of clause (iii) below, for which Buyer's consent shall be given or withheld in its sole discretion), during the Interim Period, each Seller (as applicable) will, to the extent within its reasonable control (and as applicable in light of the Chapter 11 Cases) with respect to the Business, the Channelview Facility or the other Acquired Assets, not:

(i)     other than any Permitted Exceptions, permit or allow any Lien securing indebtedness for borrowed money against any of the Acquired Assets;

(ii)     except in the ordinary course of business consistent with past practice, terminate, amend or renegotiate in any material respect or grant a waiver of any material term of, or give any material consent with respect to, any Material Contract which is an Assigned Contract or Permit, or enter into a Contract after the Execution Date that would be a Material Contract if entered into prior to the Execution Date (other than Contracts that will be fully performed prior to Closing or renewals of Contracts in place on the Execution Date);

(iii)     other than accounts payable incurred in the ordinary course of business consistent with past practices or otherwise incurred pursuant to the Material Contracts (or Contracts entered into in accordance with clause (ii) above, after the Execution Date that would be Material Contracts if entered into prior to the Execution Date), incur, create, assume or otherwise become liable for indebtedness for borrowed money or issue any debt securities or assume or guarantee the obligations of any other Person unless in any such case paid in full and discharged at or before the Closing;

36

(iv)    fail to maintain their limited partnership or limited liability company existence or merge or consolidate with any other Person or acquire all or substantially all of the assets of any other Person;

(v)    issue or sell any membership interests, partnership interests or securities or rights convertible into membership interests, partnership interests or securities;

(vi)    liquidate, dissolve, recapitalize, reorganize or otherwise wind up its business or operations if any such action would impact the transactions contemplated hereby;

(vii)    except in the ordinary course of business, sell, assign, license, transfer, convey, lease or otherwise dispose of any assets with a value in excess of $500,000;

(viii)    make or change any material election with respect to Taxes;

(ix)    make any material change in its accounting principles, methods or policies, except as otherwise required by GAAP or applicable Law;

(x)    make any loans or purchase any securities of any Person, except for short-term investments or cash equivalents made in the ordinary course of business consistent with past practices;

(xi)    cancel, terminate or allow any material property or liability insurance policy to lapse;

(xii)    cancel any debts, discount any receivables or waive any claims in excess of $500,000;

(xiii)    amend or modify its Charter Documents if such amendment or modification would affect such Seller's ability to perform its respective obligations hereunder or under the documents contemplated hereby; or

(xiv)    agree or commit to do any of the foregoing.

Notwithstanding the foregoing, each Seller may take commercially reasonable actions in accordance with Prudent Industry Practice with respect to emergency situations and to comply with applicable Law so long as such Seller shall, and with respect to Channelview LP, to the extent within its reasonable control in light of the commencement of the Chapter 11 Cases, promptly (but no later than two (2) Business Days after the taking of any such action) inform Buyer of such actions.

For purposes of clarification, it is understood and agreed that Capital Expenditures made by Sellers for the items and in the amounts set forth in the budget attached hereto as Exhibit F shall be deemed to have been commercially reasonable and

made by Sellers to operate and maintain the Channelview Facility and the Business in the ordinary course of business.

7.3    Use of Certain Names.  Within 30 days following the Closing, Buyer shall cease using the Reliant Marks, including eliminating the Reliant Marks from all Acquired Assets and disposing of any unused stationery and literature including the Reliant Marks and thereafter, Buyer shall not, and shall cause the Channelview Facility not to, use the Reliant Marks or any logos, trade names, patents or other Intellectual Property rights belonging to Sellers or any of their Affiliates, or which Sellers or any of their Affiliates have the right to use, and Buyer acknowledges that it, its Affiliates and the Channelview Facility have no rights whatsoever to use such Intellectual Property.  Sellers hereby agree not to object to Buyer's use of any Reliant Marks in connection with the operation of the Channelview Facility during the aforementioned thirty (30) day period.

Without limiting the foregoing, within 30 days after the Closing Date, Buyer shall provide evidence to Sellers, in a format that is reasonably acceptable to Sellers, that Buyer has provided notice to all applicable Governmental Authorities and all counterparties to the Assigned Contracts regarding the sale of the Acquired Assets to Buyer and the new addresses for notice purposes.

7.4    Support Obligations.

(a)    (i) Prior to the Closing, Buyer shall use commercially reasonable efforts to effect the full and unconditional release, effective as of the Closing, of Sellers and their Affiliates from the LTMA Support Obligations and (ii) following the Closing, Buyer shall use commercially reasonable efforts to effect the full and unconditional release, effective as of the date contemplated in paragraph 2 of Schedule 7.4(a), of Sellers and their Affiliates from their obligations to post collateral under the RES Fuel Purchase Transactions (collectively, the *"Support Obligations"*), in each case, including by offering within a reasonable time in advance of such release replacement bonds, guaranties, letters of credit, cash collateral and/or escrow arrangements, as needed, to effect the replacement of such Support Obligations, in accordance with the applicable requirements of such Support Obligations.  Sellers shall reasonably cooperate with Buyer in such effort.

(b)    If Buyer is not successful, following the use of commercially reasonable efforts, in obtaining the full and unconditional release of Sellers and their Affiliates from the LTMA Support Obligations as of Closing, then Sellers shall have the right to waive the condition to Closing set forth in Section 9.3(a) (provided that such condition shall be deemed satisfied in respect of Buyer's obligation under clause (a)(i) above to the extent that Buyer delivers to Sellers at the Closing either the letter of credit or guaranty contemplated in Section 7.4(b)(iv) below); and

(i)    from and after the Closing, Buyer shall continue to use commercially reasonable efforts to obtain promptly the full and unconditional release of Sellers and their Affiliates from the LTMA Support Obligations;

(ii)    Buyer shall indemnify Sellers (as applicable) and their Affiliates for any liabilities, losses, costs or expenses incurred by Sellers or their Affiliates in connection with the LTMA Support Obligations arising or accruing after the Closing (excluding any such liabilities, losses, costs or expenses resulting from any breach of the LTMA Support Obligations) by Sellers and their Affiliates;

(iii)    Buyer shall not, shall cause its Affiliates not to, effect any amendments or modifications or any other changes to the contracts or obligations to which any of the LTMA Support Obligations relate, or to otherwise take any action that in either case would reasonably be expected to increase, extend or accelerate the liability of either Seller or their Affiliates under the LTMA Support Obligations, without such Seller's prior written consent; and

(iv)    Buyer shall deliver to Sellers at the Closing and maintain at all times thereafter until the full and unconditional release of the LTMA Support Obligations in accordance with this Section 7.4, at Sellers' election, either (A) an irrevocable, standby letter of credit in the amount of the maximum amount of exposure under the LTMA Support Obligations, in form and substance and from an issuing bank reasonably satisfactory to Sellers or (B) a guaranty of the Buyer's obligations hereunder with respect to the LTMA Support Obligations from a Person with a Credit Rating of Investment Grade, which guarantee shall be in form and substance reasonably satisfactory to Sellers.

7.5    Termination of Certain Services, Contracts.  Except as otherwise provided in the Transition Services Agreements and for purposes of clarity, Buyer shall be responsible for providing all administrative, operating and energy management services, including tax, legal, insurance, financial reporting, operations and maintenance services, technical support and banking services for the Acquired Assets from and after the Closing, and any and all arrangements under which such services are provided by Reliant Energy or an Affiliate shall not be assigned to Buyer and/or shall be terminated, as applicable, including serving as a QSE or a "Retail Electric Provider" with respect to the Channelview Facility.

7.6    Insurance.  Sellers shall be solely responsible for providing insurance to the Channelview Facility and the Business for periods prior to the Closing.  Buyer shall be solely responsible for providing insurance to the Channelview Facility and the Business for all periods after the Closing.  Buyer acknowledges that no insurance coverage or policy maintained for the Channelview Facility or the Business will extend beyond the Closing for the benefit of Buyer. Buyer shall provide evidence of such independent coverage to Sellers as of Closing. Notwithstanding any provision hereof to the contrary, if, before the Closing, all or any material portion of the Acquired Assets is (a) condemned or taken by eminent domain or is the subject of a pending or threatened condemnation or taking which has not been consummated, or (b) materially damaged or destroyed by fire or other casualty, Sellers shall notify Buyer promptly in writing of such fact, and (i) in the case of condemnation or taking, Sellers shall assign or pay, as the case may be, any proceeds thereof to Buyer at the Closing and (ii) in the case of a fire or other casualty, Sellers shall either restore such Acquired Asset to substantially the same condition as before such casualty or assign the insurance proceeds therefrom to Buyer at Closing. In the event of clause (i) or (ii) above, and to the extent Sellers receive any proceeds thereof after

Closing, Sellers shall distribute those proceeds to Buyer immediately upon receipt except to the extent paid or payable by Sellers in the repair or restoration of such casualty.

7.7    Tax Matters.

(a)    Transfer Taxes.    Notwithstanding anything in this Agreement to the contrary, all Transfer Taxes shall be paid one-half by Buyer and one-half by Sellers. Buyer shall file all Tax Returns required to be filed to report Transfer Taxes.

(b)    Responsibility for Pre-Closing Taxes.    Sellers shall be responsible for all Taxes relating to the Acquired Assets with respect to any period (or portion thereof) ending on or before the Closing Date. Sellers shall pay, and shall indemnify Buyer, for any such Taxes. For this purpose, in the case of any taxable period that includes (but does not end on) the Closing Date (a *"Straddle Period"*), Taxes (including any applicable withholding obligations) other than income or franchise Taxes will be allocated between the portion of the Straddle Period ending on the Closing Date (*"Pre-Closing Portion"*) and the portion of the Straddle Period beginning on the day after the Closing Date. The amount of such Taxes allocable to the Pre-Closing Portion will be determined on the basis of a deemed closing of the books of Sellers as of the close of business on the Closing Date; provided, that in the case of ad valorem Taxes and any other Tax that is a fixed amount for the entire taxable period, the amount of each such Tax allocable to the Pre-Closing Portion will be equal to the product of each such Tax multiplied by a fraction, the numerator of which is the number of days in the Straddle Period from the commencement of such period through and including the Closing Date, and the denominator of which is the number of days in the entire Straddle Period. The amount of Taxes (other than income or franchise Taxes) for a Straddle Period not allocable to the Pre-Closing Portion shall be allocable to the portion of the Straddle Period beginning the day after the Closing Date.

(c)    Income and Franchise Taxes.    Notwithstanding anything in this Agreement to the contrary, each Seller shall be responsible for reporting for any income or franchise Taxes for which it may be liable. Without limiting the foregoing, Sellers shall be responsible for reporting and paying the Texas franchise Tax and any associated penalties and interest with respect to the total revenues of Sellers attributable to the Business through and including the Closing Date, Buyer shall be responsible for reporting and paying the Texas franchise Tax with respect to the total revenues of the Acquired Assets after the Closing Date.

(d)    Texas Temporary Credits.    Buyer (i) acknowledges and agrees that a purchaser of the Acquired Assets will not be entitled to any Channelview Texas temporary credits; and (ii) agrees that the Sellers shall have no obligation to the Buyer from and after the Closing, with respect thereto.

(e)    Cooperation.    Buyer and Sellers shall cooperate fully as and to the extent reasonably requested by either Party, in connection with the filing of Tax Returns relating to the Acquired Assets and any audit, litigation or other proceeding (each a *"Tax Proceeding"*) with respect to such Tax Returns. Such cooperation shall include, the retention and (upon request and until the expiration of the applicable statute of limitations,) the provision of records and information relating solely to the Acquired Assets which are reasonably relevant to any such Tax Return or Tax Proceeding and making employees available on a mutually convenient basis to

provide additional information and explanation of any material provided hereunder. Promptly following receipt of any notice of a Tax Proceeding relating to the Acquired Assets with respect to a taxable period (or portion thereof) ending on or before the Closing Date, the appropriate Seller or Buyer, as the case may be, shall inform the other Party of such Tax Proceeding. The Buyer and Sellers further agree, upon reasonable request, to use their commercially reasonable efforts to obtain any certificate or other document from any Taxing Authority or any other Person, or make any election, as may be necessary to mitigate, reduce, or eliminate any Tax that could be imposed (including, but not limited to, with respect to the transactions contemplated hereby). To the extent that Sellers are in receipt of any Tax assessment notice issued by a Governmental Authority with respect to the Acquired Assets, Sellers agree to provide Buyer copies of such Tax assessment notice and at Buyer's request and direction, Sellers hereby agree to timely appeal any such Tax assessment and to continue to prosecute such appeal, in good faith, until the Closing, provided, however, that to the extent that such claim adversely affects the value of the Acquired Assets, Buyer's ownership and operations thereof or result in any liability to Buyer, Sellers agree not to settle any claims with respect to such appeal without the prior written consent of Buyer, not to be unreasonably withheld, conditioned or delayed.

(f)    Notice. If prior to Closing, Sellers receive notice that the property tax appraised and/or tax rate applicable to the Acquired Assets (or any portion thereof) are or may be increased or otherwise modified in a manner that could be adverse to Buyer or the Acquired Assets or any portion thereof, then Sellers shall (i) promptly so advise Buyer and provide Buyer with all notices and documents relating thereto, (ii) meet with Buyer and its representatives to discuss potential responses to any such increase or modification and otherwise cooperate with Buyer in developing a response with respect thereto and (iii) promptly and in good faith take such actions as Buyer may from time to time reasonably request to challenge any such increase or modification, including timely filing applicable notices of protest to any such increases or modification.

7.8    Confidentiality.

(a)    All nonpublic information provided to, or obtained by, Buyer or its Representatives in connection with the transactions contemplated hereby shall be "Evaluation Material" for purposes of the letter dated May 15, 2007 between Channelview LP and Fortistar LLC (the *"Confidentiality Agreement"*), the terms of which shall continue in force until the Closing; provided, that Buyer may disclose such information as may be necessary in connection with seeking Buyer Governmental Approvals.

(b)    Notwithstanding anything to the contrary set forth herein or in any other agreement to which the Parties hereto are parties or by which they are bound, the obligations of confidentiality contained herein and therein, as they relate to the Acquired Assets, shall not apply to the U.S. federal tax structure or U.S. federal tax treatment of the Acquired Assets and the Parties hereto (and any employee, Representative, or any party hereto) may disclose to any and all persons, without limitation of any kind, the U.S. federal tax structure and U.S. federal tax treatment of the Acquired Assets. The preceding sentence is intended to cause the Acquired Assets not to be treated as having been offered under conditions of confidentiality for purposes of Section 1.6011-4(b)(3) (or any successor provision) of the Treasury Regulations promulgated under Section 6011 of the Internal Revenue Code of 1986, as amended, and shall be construed in

41

a manner consistent with such purpose. In addition, each Party hereto acknowledges that it has no proprietary or exclusive rights to the tax structure of the Acquired Assets or any tax matter or tax idea related to the Acquired Assets.

      7.9    <u>Employee and Benefit Matters</u>.

          (a)    On or before the Closing, Channelview LP shall take, or shall cause to be taken, all actions necessary to cause the Continuing Employees to cease to accrue any additional benefits on or after the Closing Date under all Seller Affiliate Plans (except as set forth in the Transition Services Agreement to the extent applicable). Prior to the Closing Date, Sellers shall provide Buyer or its designee with census information for the Continuing Employees and all Seller Affiliate Plan documents as necessary for Buyer to construct and implement the benefit plans required by this <u>Section 7.9</u>.

          (b)    Within 30 days after the Execution Date, but effective as of the Closing Date, Buyer or its designee shall offer employment (which shall be contingent on the occurrence of the Closing to each individual who is (i) eligible for employment under applicable law, (ii) actively at work on the Closing Date, and (iii) listed as "actively at work" on <u>Schedule 7.9(b)</u>). Sellers shall not, and shall cause their affiliates to not, discourage such employees from accepting, or otherwise interfere with, the offers made by Buyer or its designee, although such employees may, on their own initiative, post for and be considered for open position with Sellers' Affiliates. For purposes of this <u>Section 7.9</u>, an employee is not "actively at work" if the employee applied for long-term disability benefits or is receiving long-term disability benefits under any long-term disability plan or program established or maintained by Sellers, Sellers' Affiliates or any Commonly Controlled Entity as of the Closing Date. All employees described in the preceding sentence shall be listed as "not actively at work" on <u>Schedule 7.9(b)</u>. The list of employees identified as "not actively at work" on <u>Schedule 7.9(b)</u> shall be updated as of the Closing Date. Each offer of employment shall be consistent with the provisions of this <u>Section 7.9</u> and shall remain open for a period of at least 10 days. For a period of at least one year beginning on the Closing Date and subject to the Collective Bargaining Contract (for covered Continuing Employees) and the remaining paragraphs of this <u>Section 7.9</u> and such individual's continued employment with Buyer or its designee, Buyer or its designee shall cause each such Continuing Employee to be provided with compensation (including annual incentive compensation) on a substantially equivalent basis to the compensation provided to such employee by the Operator immediately prior to the Closing and benefits (including severance benefits and worker's compensation benefits) on a basis substantially similar in the aggregate to those provided to such employee by the Operator immediately prior to the Closing (but excluding participation in a defined benefit plan, any right to employer contributions to a defined contribution plan, participation in an employee stock purchase plan, and participation in any stock-based compensation program, in each case, to the extent not offered to other similarly situated employees of Buyer or its designee). Notwithstanding the foregoing sentence, Buyer shall not be required to provide post-retirement medical benefits to any Continuing Employee except for (i) amounts required to be contributed on an annual basis under the Collective Bargaining Contract to accounts of eligible Continuing Employees established by Buyer or its designee to replicate amounts referred to as "Basic Credits", "Additional Credits" and "Interest" under the Reliant Energy FutureCare program as of the date hereof (*"FutureCare Program"*), (ii) providing access to accounts under the FutureCare Program for eligible Continuing

Employees as required under the Collective Bargaining Contract, and (iii) as required under part 6 of subtitle B of title I of ERISA. After Closing, subject to the Collective Bargaining Contract (for covered Continuing Employees), the employment policies and practices of Buyer or its designee shall apply to the Continuing Employees. Individuals listed on Schedule 7.9(b) who are not actively at work on the Closing Date will not become employees of Buyer or its designee until such time as they are medically certified to return to work, provided such release is within 6 months of the Closing Date. Offers of employment by Buyer or its designee to these employees will be made consistent with the conditions outlined in this Section 7.9.

(c)    Buyer acknowledges and agrees that (i) certain employees employed at the Channelview Facility are represented by the International Brotherhood of Electrical Workers and its Local Union No. 66 (the *"Union"*) pursuant to the terms of the Collective Bargaining Contract, (ii) Buyer, or its designee, as applicable, will continue to recognize the Union as the exclusive bargaining representative of the employees whose employment is covered by the Collective Bargaining Contract, (iii) the Collective Bargaining Contract will continue to be effective until it expires by its own terms or is renegotiated, and (iv) Buyer or its designee will assume and be bound by the terms, conditions and provisions of the Collective Bargaining Contract. Buyer further acknowledges that, subject to the terms of the Collective Bargaining Contract and applicable Law, Buyer or its designee shall offer employment (which shall be contingent on the occurrence of the Closing) to the employees covered by the Collective Bargaining Contract. The employment policies and practices of Buyer or its designee shall apply to the Continuing Employees covered by the Collective Bargaining Contract to the extent consistent with the Collective Bargaining Contract. Nothing herein is intended to restrict or prohibit the ability of Buyer or its designee to negotiate modifications of the Collective Bargaining Contract with the Union.

(d)    Buyer shall cause the employee benefit plans and programs maintained after the Closing by Buyer or its designee to recognize each Continuing Employee's years of service and level of seniority prior to the Closing Date with the Operator (including service and seniority with any other employer that was previously recognized by the Operator) for purposes of terms of employment and eligibility, vesting and benefit determination (but not for benefit accrual under any defined benefit plan) under such plans and programs. Buyer shall cause each group health plan or program sponsored by Buyer or its designee in which a Continuing Employee may be eligible to participate on or after the Closing Date to waive any preexisting condition exclusion with respect to participation and coverage requirements applicable to such Continuing Employee, to the extent that a Continuing Employee provides Buyer with a certificate of creditable coverage (as defined in Section 701(c)(1) of ERISA) reflecting prior coverage sufficient to eliminate any such provision that would otherwise be applicable .

(e)    To the extent consistent with the Collective Bargaining Contract, as applicable, Buyer shall cause, or as applicable shall cause its designee to cause, each Continuing Employee and his or her eligible dependents (including all such Continuing Employee's dependents covered immediately prior to the Closing Date by a Seller Affiliate Plan that is a group health plan) to be offered coverage under a group health plan maintained by Buyer or its designee that (i) provides medical and dental benefits to the Continuing Employee and such eligible dependents effective immediately upon the Closing Date and (ii) credits such Continuing Employee, for the year during which such coverage under such group health plan begins, with

43

any deductibles and co-payments already incurred during such year under a Seller Affiliate Plan that is a group health plan.

(f)     Buyer expressly agrees that it assumes all obligations to provide any required notice under the WARN Act, or other applicable Laws, and to pay all severance payments, damages for wrongful dismissal and related costs, with respect to the termination of any Continuing Employee that occurs on or after the Closing Date. Sellers, as applicable, shall remain liable for any such liabilities that may arise as a result of any action taken by Seller with respect to any employee of the Operator employed at the Channelview Facility who is not a Continuing Employee.

(g)     Sellers (as applicable) shall cause each Continuing Employee to be permitted to elect on the Closing Date (or as soon thereafter as reasonably practicable) a direct rollover of his/her account balance under a Seller Affiliate Savings Plan to a defined contribution plan designated by Buyer (the *"Buyer Savings Plan"*), and Sellers shall cause the applicable Seller Affiliate Savings Plan to deliver to the Buyer Savings Plan as soon as reasonably practicable after such date the promissory notes and other loan documentation, if any, of each Continuing Employee who has elected such a direct rollover in accordance with the procedures as determined by Sellers and Buyer. Buyer and Sellers shall cooperate and take such actions, if any, as are necessary to permit the continuation of loan repayments by Continuing Employees to the Seller Affiliate Savings Plans by payroll deductions during the 90-day period beginning on the Closing Date; provided, however, that if a Continuing Employee makes a direct rollover election as described in this Section (g) within such 90-day period, then the applicable Seller Affiliate Savings Plan shall continue to accept loan repayments from such Continuing Employee by payroll deduction until the date of such direct rollover. Buyer shall cause the Buyer Savings Plan to accept the direct rollover of electing Continuing Employees' benefits in cash and, if applicable, promissory notes that are not accelerated from the Seller Affiliate Savings Plans. Sellers represent, warrant and agree with respect to the Seller Affiliate Savings Plans, and Buyer represents warrants and agrees with respect to the Buyer Savings Plan, that, as of each date of a rollover described in this Section (g), such plan (i) is intended to satisfy the requirements of Sections 401(a), (k), and (m) of the Code and (ii) will have received, or a pending application will have been timely filed for, a favorable determination letter from the IRS regarding such qualified status and covering amendments required to have been adopted prior to the expiration of the applicable remedial amendment period. Except as required by Law or as required by the Collective Bargaining Contract, Buyer or its designee shall not be required to provide any particular benefit under the Buyer Savings Plan.

(h)     Claims of Continuing Employees and their eligible beneficiaries and dependents for medical, dental, prescription drug, life insurance, and/or other welfare benefits (*"Welfare Benefits"*) (other than long-term disability benefits) that are incurred before the Closing Date shall be the sole responsibility of the Seller Affiliate Plans. Claims of Continuing Employees and their eligible beneficiaries and dependents for Welfare Benefits (other than long-term disability benefits) that are incurred on or after the Closing Date shall be the sole responsibility of Buyer or its designee. Claims for workers compensation and unemployment compensation arising prior to Closing shall be the sole responsibility of Sellers and their Affiliates. For purposes of the preceding provisions of this paragraph, a medical/dental claim shall be considered incurred on the date when the medical/dental services are rendered or

medical/dental supplies are provided, and not when the condition arose or when the course of treatment began. Claims for long-term disability benefits that are made under a Seller Affiliate Plan prior to the Closing Date, or that relate to any condition of a Continuing Employee existing as of the Closing Date as a result of which such Continuing Employee is not actively at work on the Closing Date, shall be the sole responsibility of the Seller Affiliate Plan. Except as provided in the preceding sentence, claims of Continuing Employees and their eligible beneficiaries and dependents for long-term disability benefits that are incurred from and after the Closing Date shall be the sole responsibility of Buyer or its designee. For purposes of the preceding provisions of this paragraph, claims for long-term disability benefits based on an injury or illness occurring prior to the Closing Date will be deemed to have been incurred prior to the Closing Date. In the case of any claim for benefits other than a medical/dental claim or a long-term disability claim, a claim will be deemed to have been incurred upon the occurrence of the event giving rise to such claim.

(i)     Except to the extent required by applicable Law, Sellers shall not pay Continuing Employees their accrued and unused vacation, and Buyer or its designee, as applicable, shall provide, without duplication of benefits, all such Continuing Employees with vacation time rather than cash in lieu of vacation time for all unused vacation accrued through the Closing Date.

(j)     If, within the one-year period beginning on the Closing Date, (i) a Continuing Employee voluntarily terminates his or her employment with Buyer or its designee within 30 days after the date upon which he or she is notified that the principal place of his or her employment is changing to a location that is 25 miles or more from the location of such employee's principal place of employment immediately prior to the Closing Date, or (ii) the employment of a Continuing Employee is terminated by Buyer or its designee for a reason other than cause (as that term is defined in the Severance Plan as of the Closing Date, but based on the terms of the plan as in effect on the Execution Date), then, in any such case, Buyer or its designee, as applicable, shall provide such Continuing Employee with severance benefits at least equal to the severance benefits which such Continuing Employee would have received under the Severance Plan had the employment of such Continuing Employee been terminated under circumstances entitling him or her to benefits under such plan. Such severance benefits shall be determined based on the terms of the Severance Plan in effect on the Execution Date, but Buyer or its designee shall take into account such Continuing Employee's aggregate service with Buyer or its designee and his or her pre-Closing Date service recognized pursuant to Section 7.9(d). Notwithstanding the foregoing, the provisions of this Section 7.9(k) shall not apply to any Continuing Employee who is covered by the Collective Bargaining Contract.

(k)     No assets or liabilities of any Seller Affiliate Plan shall be transferred to, or assumed by, Buyer or its designee.

7.10    Public Announcements. Sellers and Buyer will consult with each other before issuing, and provide each other a reasonable opportunity to review and make reasonable comment upon, any press release or making any public statement with respect to this Agreement and the transactions contemplated hereby and, except as may be required by applicable Law or any listing agreement with the NYSE, will not issue any such press release or make any such public statement prior to such consultation; provided, that each of the Parties may issue a press

release or make any public statement in response to specific questions by the press, analysts, investors or those attending industry conferences or financial analyst conference calls; provided further, that (i) each Party may make disclosures to Persons bound by a confidentiality obligation to the disclosing Party that covers such disclosed information, and (ii) Buyer may make disclosures to any of its direct and indirect equity owners subject to compliance with the Confidentiality Agreement.

7.11    Expenses and Fees. Except as expressly provided otherwise herein, all costs and expenses incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the Party incurring such expenses.

7.12    Regulatory and Other Approvals. During the Interim Period:

(a)    The Parties will, in order to consummate the transactions contemplated hereby, (i) take all commercially reasonable steps necessary, and proceed diligently and in good faith and use all commercially reasonable efforts, as promptly as practicable, to obtain or make, as applicable, all necessary or appropriate waivers, consents, approvals and authorizations of, filings with and notices to all third parties and Governmental Authorities required in order to consummate the transactions contemplated by this Agreement and (ii) provide such other information and communications to such Governmental Authorities or other Persons as such Governmental Authorities or other Persons may reasonably request in connection therewith.

(b)    The Parties will provide prompt notification to each other when any such waiver, consent, approval, authorization, filing or notice referred to in Section 7.13 is obtained, taken, made, given or denied, as applicable, and will advise each other of any material communications with any Governmental Authority or other Person regarding any of the transactions contemplated by this Agreement.

(c)    In furtherance of the foregoing covenants:

(i)    Each Party shall prepare, as soon as is practical following the execution of this Agreement, all necessary filings in connection with the transactions contemplated by this Agreement that may be required by FERC, the PUCT or other Governmental Authority or under the HSR Act or any other federal, state or local Laws. Each Party shall submit such filings as soon as practicable, but (A) in no event later than ten (10) Business Days after the execution hereof for filings with the FERC, and (B) in no event more than five (5) Business Days after the Bankruptcy Court enters the Sale Order for filings under the HSR Act. The Parties shall request expedited treatment of any such filings, shall promptly furnish each other with copies of any notices, correspondence or other written communication from the relevant Governmental Authority, shall promptly make any appropriate or necessary subsequent or supplemental filings and shall cooperate in the preparation of such filings as is reasonably necessary and appropriate (provided that HSR Act filings and attachments need not be exchanged or preapproved by the other party and provided that any exchange of information between Sellers and Buyer in connection with any filings shall be done in a manner that complies with applicable antitrust laws). Buyer and Sellers shall each pay 50% of the filing fees in connection with submissions by the Parties pursuant to the HSR Act. Except as

described in the immediately preceding sentence, each Party shall bear its own costs incurred in connection with the filing.

(ii)     The Parties shall not, and shall cause their respective Affiliates not to, take any action that could reasonably be expected to adversely affect the approval of any Governmental Authority of any of the aforementioned filings. Without limiting the foregoing, Buyer agrees that except as may be agreed in writing by Sellers or as may be expressly permitted pursuant to this Agreement, it shall not, and shall not permit any of its subsidiaries or Affiliates to, acquire, develop or construct any electric generation or transmission facility, enter into any Contract with respect to any electric generation or transmission facility, or otherwise obtain control over any electric generation or transmission facility, located within the State of Texas or the control areas operated by ERCOT or take any action with any Governmental Authority relating to the foregoing, or agree, in writing or otherwise, to do any of the foregoing, in each case which could reasonably be expected to materially delay the consummation of the transactions contemplated hereby or result in the failure to satisfy any condition to consummation of the transactions contemplated hereby.

(iii)     Buyer shall cooperate in good faith with the Governmental Authorities and undertake promptly any and all action required to complete lawfully the transactions contemplated by this Agreement, including proffering and consenting to a governmental order providing for the sale or other disposition, or the holding separate, of particular Acquired Assets or of any other assets or lines of business of Buyer or its Affiliates in order to remedy any competition concerns that any Governmental Authority may have. The entry by any Governmental Authority in any legal proceeding of a governmental order permitting the consummation of the transactions contemplated hereby but requiring any of the assets or lines of business of Buyer or its Affiliates to be held separate or sold or disposed of thereafter (including the Acquired Assets) shall not be deemed a failure to satisfy any condition to Closing.

(d)     Each Party agrees that after the Closing Date, it will cooperate in good faith with the other Parties to complete in a timely manner all post-closing filings and notices required by FERC or any other Governmental Authorities.

7.13     Further Assurances. Subject to the terms and conditions of this Agreement, at any time or from time to time after the Closing, at any Party's request and without further consideration, the other Party shall execute and deliver to such Party such other instruments of sale, transfer, conveyance, assignment and confirmation, provide such materials and information and take such other actions and execute and deliver such other documents as such Party may reasonably request in order to consummate the transactions contemplated by this Agreement.

7.14     Schedule Update. From time to time, but no less than 15 days prior to the Closing Date, either Seller may, at its option, deliver updates to the Disclosure Schedules (each a *"Schedule Update"*) that are necessary to complete or correct any information in such Schedules or in any representation or warranty of such Seller; provided, that, except as expressly set forth in the following sentence, no such Schedule Update will be deemed to amend or supplement the Disclosure Schedules or to prevent or cure any misrepresentation or breach of any representation,

warranty or covenant herein; and further provided, however, that no Schedule Update shall be permitted with respect to <u>Schedule 1.1(x)</u>, <u>Schedules 2.1(a)</u>, <u>(b)</u>, <u>(c)</u>, <u>(e)</u>, <u>(g)</u>, and <u>(h)</u>, <u>Schedule 2.2(p)</u>, <u>Schedule 2.4</u>, <u>Schedule 7.2</u> and <u>Schedule 7.4(a)</u>. If Buyer has the right to terminate the Agreement pursuant to <u>Section 10.1(c)</u> as a result of such Schedule Update and does not exercise such right by the tenth day after delivery of the Schedule Update then such Schedule Update shall be deemed to have amended the appropriate Schedule or Schedules as of the date of this Agreement, to have qualified the representations and warranties contained in <u>ARTICLE 5</u> as of the date of this Agreement and to have cured any misrepresentation or breach of warranty that otherwise might have existed hereunder by reason of the existence of such matter.

7.15    <u>PUCT Matters</u>. Buyer understands and acknowledges that RESC is certificated by the PUCT to provide retail electric service to Channelview LP and Equistar under Certificate No. 10044. Buyer acknowledges and accepts the obligation to take all steps required prior to Closing to engage each of a "Retail Electric Provider" and a QSE to act on Buyer's behalf with regard to sales of electricity at retail.

7.16    <u>Equistar Consents</u>. Buyer will act in good faith and cooperate with Sellers in obtaining any and all consents of Equistar required for the transaction contemplated by this Agreement.

7.17    <u>Boiler Feedwater Pump</u>. Provided such installation is not completed prior to Closing, and pursuant to paragraph 4.B of the Settlement Agreement (as in effect on the date hereof), Buyer agrees to complete the installation of the Pump (as defined in the Settlement Agreement) in accordance with the terms and conditions of the Settlement Agreement. Sellers shall pay to Buyer amounts incurred by Buyer, to the extent such amounts are reimbursable by Equistar, and at the time such amounts would otherwise be due from Equistar in accordance with Section 4.B of the Settlement Agreement, for its share of the work performed after the Closing Date in connection with the installation of the Pump as required by the Settlement Agreement, subject to receipt by Sellers of an appropriate invoice and supporting documentation (the *"Pump Payments"*).

7.18    <u>Fulfillment of Conditions</u>. Subject to the terms and conditions herein, each of the Parties hereto shall use its commercially reasonable efforts to consummate and make effective, as soon as reasonably practicable, the transactions contemplated hereby, including the satisfaction of all conditions thereto set forth herein, to the extent it can reasonably do so.

7.19    <u>Cure of Defaults</u>. At or prior to Closing, each Seller shall (i) cure any and all defaults under the Assigned Contracts required to be cured under the Bankruptcy Code in order to assign such Contract to Buyer pursuant to Section 365 thereof, and (ii) pay all Cure Costs that are required to be paid as a condition to the assumption and assignment of such Assigned Contracts under Section 365 of the Bankruptcy Code. At Closing, Sellers shall establish a reserve of cash in a bank account (the *"Cure Cost Reserve Amount"*) in an amount sufficient to satisfy any disputed Cure Costs and any Cure Costs not settled or paid (whether or not then due and payable) prior to Closing. After Closing, Sellers shall promptly resolve, settle and/or pay from the Cure Cost Reserve Amount all remaining Cure Costs.

7.20   2007 Financial Statements.   It is understood and agreed between Buyer and Sellers that if the audit of the financial statements of Channelview LP for the period ended December 31, 2007 (the *"2007 Financial Statements"*) is completed on or prior to Closing, a true, correct and complete copy of the audited 2007 Financial Statements shall be promptly provided to Buyer.   If the audit of the 2007 Financial Statements is not completed prior to Closing (i.e., the auditors have not completed their review and approval thereof), Sellers shall provide at Closing (and, to the extent necessary, at any time thereafter that further information is reasonably requested by Buyer, provided that such information has to such date been retained by Sellers or their Affiliates) to Buyer the current form of the 2007 Financial Statements that are under review by the auditors, contact information for such auditors, all correspondence to and from such auditors relating to the 2007 Financial Statements which does not contain confidential information about the Sellers' Affiliates, and any other relevant documentation and/or materials in Sellers' possession or control that is reasonably requested by Buyer in order for the auditors to complete the audit of the 2007 Financial Statements.   Buyer, acknowledges that Sellers' auditors are under no obligation to, and may opt not to, complete an audit of the 2007 Financial Statements.

## ARTICLE 8

## BANKRUPTCY PROCEDURES

8.1   Bankruptcy Actions.

(a)   The approval of this Agreement by the Bankruptcy Court is required for the Agreement to be binding and enforceable against the Sellers.

(b)   Each Seller shall promptly provide Buyer with drafts of all documents, motions, orders, filings or pleadings, that such Seller proposes to file with the Bankruptcy Court that relate to (i) this Agreement or the transactions contemplated hereunder; (ii) entry of the Sale Order; or (iii) the Buyer, and will provide Buyer with a reasonable opportunity to review such documents in advance of their service and filing.   Each Seller shall consult and cooperate with Buyer, and consider in good faith the views of Buyer with respect to all such filings.   Buyer covenants and agrees that it shall cooperate with Channelview LP in connection with furnishing information or documents to Channelview LP to satisfy the requirements of adequate assurance of future performance under Section 365(f)(2)(B) of the Bankruptcy Code.

(c)   Seller shall promptly make any filings, take all actions, and use all reasonable efforts to obtain any and all other approvals and orders of the Bankruptcy Court necessary or appropriate for consummation of the transactions contemplated hereby, subject to Seller's obligations to comply with any order of the Bankruptcy Court and other applicable Laws.   Buyer will, if requested by Sellers, reasonably cooperate with the Sellers with respect to the Chapter 11 Cases in order to consummate the transactions contemplated hereunder, and will not take any action opposing or attempting to delay or hinder the transactions contemplated hereby in the Chapter 11 Cases

(d)   As inducement for and in consideration of the Purchase Price, Sellers hereby agree to the following bid protections and procedures in respect of the auction relating to

49

the sale of the Acquired Assets to be held by Sellers on or about April 7' 2008 in accordance with the Order Approving Debtors' Proposed Bid Protections dated March 18, 2008 (the "Auction"):

> (i)    Any qualifying overbid of the Purchase Price shall equal $505,000,000 in cash in immediately available funds (the "Initial Overbid");

> (ii)    Upon receipt of an Initial Overbid, each successive bid thereafter shall be in increments of no less than $1,000,000, and shall not accept any bid that is not in compliance therewith;

> (iii)    To the extent that there is no Initial Overbid, Sellers agree to accept the terms and conditions of this Agreement and deem Buyer to be the "winning bidder" for purposes of the Auction; and

> (iv)    To the extent that Sellers, acting in accordance with the terms of this Section, select a Person other than Buyer as the "winning bidder" for purposes of the Auction (an :"Alternate Buyer"), Sellers shall reimburse Buyer for its out of pocket expenses relating to its due diligence and the negotiation of this Asset Purchase Agreement and related documents upon closing of the purchase and sale of the Acquired Assets with the Alternate Bidder, up to an aggregate amount of $2,000,000.

## ARTICLE 9

## CONDITIONS TO THE CLOSING

9.1    Conditions to the Obligations of Each Party.  The obligations of the Parties to proceed with the Closing are subject to the satisfaction on or prior to the Closing Date of all of the following conditions, any one or more of which may be waived in writing (other than the condition contained in Section 9.1(d), the satisfaction of which cannot be waived), in whole or in part, as to a Party by such Party:

> (a)    no judgment, injunction, order or decree of a court or other Governmental Authority of competent jurisdiction or other condition arising under Law shall be in effect which has the effect of making the transactions contemplated by this Agreement illegal or otherwise restraining or prohibiting the consummation of the transactions contemplated by this Agreement (each Party agreeing to use its commercially reasonable efforts, including appeals to higher courts, to have any judgment, injunction, order or decree lifted);

> (b)    (i) any waiting period applicable to consummation of the transactions contemplated by this Agreement under the HSR Act shall have expired or been terminated, and (ii) all Sellers' Governmental Approvals designated with an asterisk on Schedule 5.2(c) and Buyer's Governmental Approvals designated with an asterisk on Schedule 6.3(c) shall have been filed, made or obtained, as the case may be;

> (c)    Subject to Section 2.5, the consents, waivers and approvals listed on Schedule 9.1(c) shall have been obtained (with no conditions that would reasonably be expected to materially and adversely impact the rights and obligations under the applicable Assigned

Contract for which such consent, waiver or approval is provided) either from the applicable third party or through entry of the Sale Order; and

(d)    the Bankruptcy Court shall have entered the Sale Order, and the Sale Order shall not have been stayed, and no Adverse Ruling shall be in effect.

9.2    Conditions to the Obligations of Buyer. The obligation of Buyer to proceed with the Closing is subject to the satisfaction on or prior to the Closing Date of the following further conditions, any one or more of which may be waived, in whole or in part, by Buyer:

(a)    Sellers shall have performed their obligations hereunder required to be performed by such Seller at or prior to the Closing Date, unless the failure to perform would not reasonably be expected to have a Material Adverse Effect (except for Channelview LP's obligations contained in Section 3.5, which, assuming the Settlement Agreement is then still in effect, shall have been performed in full through an application of a portion of the payment of the Purchase Price in accordance with Section 3.5);

(b)    the representations and warranties of each Seller contained in this Agreement (without regard to "materiality", "material adverse effect", Material Adverse Effect or similar qualifiers) shall be true and correct as of the Closing Date (except to the extent such representations and warranties expressly relate to an earlier date, in which case as of such earlier date), except for failures to be true and correct that would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect;

(c)    Buyer shall have received certificates signed on behalf of each Seller by an executive officer of each Seller indicating that the conditions provided in Section 9.2(a) and Section 9.2(b) have been satisfied;

(d)    Sellers shall have complied with their obligations under Section 7.19 in all material respects;

(e)    Sellers shall have delivered each of the items required by Section 4.2;

(f)    Buyer shall have received a letter from URS consenting to Buyer's reliance on the Phase I Environmental Site Assessment, dated as of November 2007, as updated December 20, 2007, in form and substance reasonably acceptable to Buyer; and

(g)    since the Execution Date, no Material Adverse Effect shall have occurred and be continuing.

9.3    Conditions to the Obligations of Sellers. The obligation of Sellers to proceed with the Closing is subject to the satisfaction on or prior to the Closing Date of the following further conditions, any one or more of which may be waived, in whole or in part, by Sellers:

(a)    Buyer shall have performed in all material respects all of its obligations hereunder required to be performed by it at or prior to the Closing Date;

(b)    the representations and warranties of Buyer contained in this Agreement (without regard to "materiality", "material adverse effect", or similar qualifiers) shall be true and correct as of the Closing Date (except to the extent such representations and warranties expressly relate to an earlier date, in which case as of such earlier date), except for failures to be true and correct that would not reasonably be expected, individually or in the aggregate, to have a material adverse effect on Buyer's ability to perform its obligations hereunder;

(c)    Sellers shall have received a certificate signed on behalf of Buyer by an executive officer of Buyer indicating that the conditions provided in Section 9.3(a) and 9.3(b) have been satisfied;

(d)    Except to the extent that Buyer has delivered a letter of credit or guarantee pursuant to Section 7.4(b)(iv), Sellers shall have received the complete and unconditional release of Sellers and their Affiliates from the LTMA Support Obligations (other than with respect to amounts owing prior to Closing); and unless Buyer has elected Gas Services under the Fuel and Power Transition Services Agreement, either (i) the full execution of the RES Assignment and Assumption Agreement, or (ii) or if required by Section 2.5, the Fuel Supply Agreement shall have been executed by Buyer and Buyer's Energy Manager; and

(e)    Buyer shall have delivered each of the items required by Section 4.3.

## ARTICLE 10

## TERMINATION

10.1    Termination.  This Agreement may be terminated and the consummation of the transactions contemplated hereby may be abandoned at any time prior to the Closing only under one of the following circumstances:

(a)    by mutual written consent of Sellers and Buyer;

(b)    by either Sellers or Buyer:

(i)    if the Closing has not occurred on or before August 25, 2008 (such date, the *"Termination Date"*) provided, that the right to terminate this Agreement pursuant to this Section 10.1(b)(i) shall not be available to any Party whose breach of any provision of this Agreement has been the cause of, or resulted in, the failure of the Closing to occur by the Termination Date; or

(ii)    if any court of competent jurisdiction in the United States or other United States Governmental Authority shall have issued a final order, decree or ruling or taken any other final action restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated by this Agreement and such order, decree, ruling or other action is or shall have become final and nonappealable;

(c)    by Buyer, if there has been a material breach by either Seller of any representation, warranty, covenant or agreement contained in this Agreement which individually or in the aggregate (x) would result in a failure of a closing condition set forth in Section 9.2(a)-

9.2(e) (which is not waived) and (y) cannot be cured prior to the Termination Date; provided that Buyer is not then in breach in any material respect of any representation, warranty, covenant or agreement contained herein;

(d)    by either Seller, (i) if Buyer has not made the Deposit on the date required to be made pursuant to Section 3.2, or (ii) if there has been a material breach by Buyer of any representation, warranty, covenant or agreement contained in this Agreement which (x) would result in a failure of a closing condition set forth in Section 9.3(a) - 9.3(e) (which is not waived) and (y) cannot be cured prior to the Termination Date; provided that Sellers are not then in breach in any material respect of any representation, warranty, covenant or agreement contained herein; and

(e)    by either Seller, if the Closing has not occurred within 45 days following the entry of the Sale Order; provided that Sellers are not then in breach in any material respect of any representation, warranty, covenant or agreement contained herein.

The Party desiring to terminate this Agreement pursuant to Section 10.1 (other than pursuant to Section 10.1(a)) shall give notice of such termination to the other Party.

10.2    Effect of Termination.    In the event of termination of this Agreement by either Sellers or Buyer prior to the Closing pursuant to the provisions of Section 10.1, this Agreement shall forthwith become void, and there shall be no liability or further obligation on the part of Buyer or Sellers or their respective officers or directors (except pursuant to Section 7.1(b), Section 7.8, Section 7.11, Section 10.2, Section 10.3, ARTICLE 11, Section 12.4 and Section 12.5, all of which shall survive the termination); provided, that nothing in this Section 10.2 shall relieve any Party from liability for any willful breach of this Agreement by such Party prior to termination of this Agreement. Notwithstanding any provision to the contrary herein, in the event of a termination pursuant to the provisions of Section 10.1(a), 10.1(b), 10.1(c) or 10.1(e), the Deposit shall be released and delivered to Buyer immediately upon such termination.

10.3    Termination Fees.

(a)    If this Agreement is terminated pursuant to Section 10.1(d), then in lieu of all other claims and remedies that might otherwise be available with respect thereto, including elsewhere hereunder and notwithstanding any other provision of this Agreement, Buyer shall pay immediately to Sellers as liquidated damages in connection with such termination, an amount in immediately available funds equal $40,000,000, and Sellers shall have the right immediately to draw on the Deposit to satisfy such payment obligation of Buyer.

(b)    The provision for payment of liquidated damages in this Section 10.3 has been included because, in the event of a termination of this Agreement pursuant to Section 10.1(d), the actual damages to be incurred by Sellers can reasonably be expected to approximate the amount of liquidated damages called for herein and because the actual amount of such damages would be difficult if not impossible to measure accurately.

(c)    If this Agreement is terminated pursuant to Section 10.1(c), Sellers shall pay (and shall be jointly and severally responsible for the payment thereof) to Buyer all of

Buyer's reasonable third-party costs and expenses (including reasonable attorneys' and accountants' fees and related expenses) incurred by Buyer in connection with the transactions contemplated by this Agreement, including: (i) Buyer's due diligence review with respect to the Acquired Assets (including costs and expenses for third party consultants and related reports); (ii) the negotiation of this Agreement, the exhibits attached hereto and the documents to be executed pursuant hereto; and (iii) analysis of securities, Tax and other transaction related issues. Provided, however, that in the event this Agreement is terminated pursuant to Section 10.1(c), Sellers shall only be responsible for Buyer's third-party expenses to the extent such expenses do not exceed $2,000,000; provided further that in the event this Agreement is terminated pursuant to Section 10.1(c) as a result of a willful breach of this Agreement by Sellers, Sellers shall pay immediately to Buyer as liquidated damages in connection with such termination, $15,000,000 in immediately available funds. Any obligation of Sellers to pay damages hereunder shall be an administrative expense under Section 507(a)(1) of the Bankruptcy Code and shall be payable as specified herein and not be subject to any defense, counterclaim, offset, recoupment or reduction of any kind whatsoever.

## ARTICLE 11

## INDEMNIFICATION

11.1    Survival.    All representations, warranties, covenants and agreements contained herein, and the right to commence any Claim with respect thereto, shall terminate upon the Closing Date, except that (a) the representations and warranties of Sellers and Buyer contained herein shall survive until the first anniversary of the Closing Date, (b) the representations and warranties contained in Section 5.10 shall survive until thirty (30) days after the expiration of the applicable statute of limitations, and (c) the covenants and agreements of the Parties contained herein that by their terms are to be performed after the Closing Date, shall survive and continue in effect in accordance with their terms; *provided*, that in the event written notice of any Claim for indemnification under Section 11.2(a)(i), Section 11.2(a)(ii), Section 11.2(d)(i) or Section 11.2(d)(ii) shall have been given in accordance herewith within the applicable survival period setting forth such Claim in reasonable detail (including a reasonable specification of the legal and factual basis for such Claim and the Loss incurred), the representations, warranties, covenants and agreements that are the subject of such indemnification Claim shall survive with respect to that Claim until such time as the Claim is fully and finally resolved.

11.2    Indemnification.

(a)    Subject to the provisions of this ARTICLE 11, from and after the Closing, Sellers shall jointly and severally indemnify, defend and hold the Buyer Indemnified Group harmless from and against any and all Losses, whether arising out of the contract, tort, strict liability, other Law or otherwise, actually incurred by any of them to the extent arising out of or resulting from:

(i)    any breach as of the Closing Date of a representation or warranty made by either Seller herein (including the related Schedules) or under the officer's certificate delivered pursuant to Section 9.2(c) ;

(ii)    any breach of any covenant or agreement of either Seller herein;

(iii)    the Excluded Liabilities; and

(iv)    any failure of Sellers to make the Pump Payments to Buyer in accordance with Section 7.17.

(b)    Notwithstanding anything to the contrary in this Agreement, Sellers shall not be liable for any Losses with respect to the matters set forth in Section 11.2(a) unless (x) a Claim is timely asserted during the survival period specified in Section 11.1, (y) the Loss with respect to the particular act, circumstance, development, event, fact, occurrence or omission exceeds $500,000 (aggregating all Losses arising from substantially identical facts) and (z) the aggregate of all Losses under Section 11.1 exceeds, on a cumulative basis, 2% of the Final Purchase Price and then only to the extent of such excess.  Notwithstanding anything to the contrary in this Agreement, the aggregate liability of Sellers to the Buyer Indemnified Group arising under or related to the matters set forth in this Agreement, whether based in contract, tort, strict liability, other Law or otherwise, shall not exceed 15% of the Final Purchase Price, provided that the foregoing limitations shall not apply to the Excluded Liabilities and the Pump Payments.

(c)    In connection with Sellers' obligations under this Section 11.2, upon Closing, pursuant to Sections 4.2(j) and 4.3(e), Forty Million Dollars ($40,000,000) will be transferred into the Indemnity Escrow Account (the *"Indemnity Security"*) to be held and disbursed pursuant to the terms of the Escrow Agreement and this Agreement; provided, however, the Sellers may at any time and in their sole discretion, withdraw the Indemnity Security so long as Reliant Energy simultaneously provides Buyer with a guaranty of all of Sellers' obligations under this Section 11.2, in form and substance reasonably satisfactory to Buyer, such guaranty to terminate one (1) year from the Closing Date.  It is further agreed that at any time, beginning one (1) year from the Closing Date, if Sellers have not replaced the Indemnity Security with a guaranty of Reliant Energy, Sellers may withdraw the entire amount of the Indemnity Security and any accrued interest without providing any replacement security, provided, however, if a claim has been made on the Indemnity Security, the amount remaining in the Indemnity Escrow Account may not be less than the amount of such claim (if the amount of such claim is indeterminate, the amount remaining in the Indemnity Escrow Account shall be the highest reasonable estimate for such claim in the reasonable judgment of Buyer),

(d)    Subject to the provisions of this ARTICLE 11, from and after the Closing, Buyer hereby agrees to indemnify, defend and hold the Seller Indemnified Group harmless from and against any and all Losses, whether arising out of contract, tort, strict liability, other Law or otherwise, actually incurred by any of them to the extent arising out of or resulting from:

(i)    any breach as of the Closing Date of a representation or warranty made by Buyer herein or under the officer's certificate delivered pursuant to Section 9.3(c);

(ii)    any breach of any covenant or agreement of Buyer herein; and

(iii)    the Assumed Liabilities.

(e)    THE PARTIES INTEND AND AGREE THAT THE INDEMNITY OBLIGATIONS SET FORTH IN THIS SECTION 11.2 ARE INTENDED TO AND SHALL EXTEND TO AND COVER ANY AND ALL LOSSES RESULTING FROM OR CAUSED IN WHOLE OR IN PART BY ANY ACTIVE, PASSIVE, AFFIRMATIVE, SOLE, CONCURRENT OR OTHER NEGLIGENCE, STRICT LIABILITY OR OTHER FAULT OF, REGARDLESS OF WHETHER SUCH LOSSES RESULT FROM OR ARE CAUSED IN WHOLE OR IN PART BY ANY ALLEGED OR ACTUAL NEGLIGENCE OR OTHER FAULT OF, (I) ANY OF THE BUYER INDEMNIFIED PARTIES WITH RESPECT TO SECTION 11.2(a), AND (II) ANY OF THE SELLER INDEMNIFIED PARTIES WITH RESPECT TO SECTION 11.2(d); and shall be the sole and exclusive remedy of the parties hereunder from and after the Closing.

(f)    Notwithstanding anything to the contrary contained in this Agreement, for purposes of determining whether there has been a breach and the amount of any Losses that are the subject matter of a claim for indemnification hereunder, each representation and warranty in this Agreement and each certificate or document delivered pursuant to this Agreement shall be read without regard and without giving effect to the term(s) "material" or "Material Adverse Effect", or any derivation thereof, in each instance where the effect of such term(s) would be to make such representation and warranty less restrictive (as if such standard or qualification were deleted from such representation and warranty).

(g)    The indemnification obligations set forth in this Section 11.2(a) are made notwithstanding any investigation by or on behalf of Buyer or the result of any investigation and notwithstanding the participation of Buyer in the Closing.

11.3    Waiver of Other Representations.

(a)    NOTWITHSTANDING ANYTHING IN THIS AGREEMENT TO THE CONTRARY, IT IS THE EXPLICIT INTENT OF EACH PARTY HERETO, AND THE PARTIES HEREBY AGREE, THAT NONE OF SELLERS OR ANY OF THEIR AFFILIATES OR REPRESENTATIVES HAS MADE OR IS MAKING ANY REPRESENTATION OR WARRANTY WHATSOEVER, EXPRESS OR IMPLIED, WRITTEN OR ORAL, INCLUDING ANY IMPLIED REPRESENTATION OR WARRANTY AS TO THE CONDITION, MERCHANTABILITY, USAGE, SUITABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE WITH RESPECT TO THE ACQUIRED ASSETS, OR ANY PART THEREOF, EXCEPT THOSE EXPRESS REPRESENTATIONS AND WARRANTIES CONTAINED IN ARTICLE 5. NOTWITHSTANDING ANYTHING IN THIS AGREEMENT TO THE CONTRARY, IT IS THE EXPLICIT INTENT OF EACH PARTY HERETO, AND THE PARTIES HEREBY AGREE, THAT NEITHER BUYER NOR ITS AFFILIATES OR REPRESENTATIVES HAS MADE OR IS MAKING ANY REPRESENTATION OR WARRANTY WHATSOEVER, EXPRESS OR IMPLIED, WRITTEN OR ORAL, INCLUDING ANY IMPLIED REPRESENTATION OR WARRANTY, EXCEPT THOSE EXPRESS REPRESENTATIONS AND WARRANTIES CONTAINED IN ARTICLE 6. IN PARTICULAR, AND WITHOUT IN ANY WAY LIMITING THE FOREGOING, (I) NEITHER SELLER MAKES ANY REPRESENTATION OR WARRANTY REGARDING ANY ENVIRONMENTAL MATTERS EXCEPT AS EXPRESSLY SET FORTH IN SECTION 5.13, (II) NEITHER SELLER MAKES ANY REPRESENTATION OR WARRANTY TO

BUYER WITH RESPECT TO ANY FINANCIAL PROJECTIONS OR FORECASTS RELATING TO THE ACQUIRED ASSETS, AND (III) NEITHER SELLER MAKES ANY REPRESENTATION OR WARRANTY TO BUYER WITH RESPECT TO INFORMATION PROVIDED TO BUYER IN RESPONSE TO QUESTIONS PRESENTED BY BUYER OR OTHER INFORMATION PROVIDED TO BUYER RELATING TO THE ACQUIRED ASSETS; PROVIDED, THAT THIS SENTENCE SHALL NOT LIMIT THE EXPRESS REPRESENTATIONS AND WARRANTIES CONTAINED IN ARTICLE 5.

(b)    EXCEPT FOR THOSE EXPRESS REPRESENTATIONS AND WARRANTIES CONTAINED IN ARTICLE 5, THE ACQUIRED ASSETS ARE BEING TRANSFERRED "AS IS, WHERE IS, WITH ALL FAULTS," AND SELLERS EXPRESSLY DISCLAIM ANY REPRESENTATIONS OR WARRANTIES OF ANY KIND OR NATURE, EXPRESS OR IMPLIED, AS TO THE CONDITION, VALUE OR QUALITY OF THE ACQUIRED ASSETS OR THE PROSPECTS (FINANCIAL OR OTHERWISE), RISKS AND OTHER INCIDENTS OF THE ACQUIRED ASSETS.

(c)    BUYER ACKNOWLEDGES THAT IT HAS INVESTIGATED TO ITS SATISFACTION, THE CONDITION AND SUITABILITY OF ALL ASPECTS OF THE ACQUIRED ASSETS AND ALL MATTERS AFFECTING THE VALUE OR DESIRABILITY OF THE ACQUIRED ASSETS, INCLUDING, BUT NOT LIMITED TO, THE OPERATIONAL ASPECTS OF THE CHANNELVIEW FACILITY, POTENTIAL ENVIRONMENTAL HAZARDS ARISING FROM THE PRESENCE ON OR ABOUT THE PROPERTY OF HAZARDOUS SUBSTANCES, INCLUDING ASBESTOS, FORMALDEHYDE, RADON GAS, LEAD-BASED PAINT, OTHER LEAD CONTAMINATION, FUEL OR CHEMICAL STORAGE TANKS, CAVERNS, PIPELINES, ELECTROMAGNETIC FIELDS, PHOSPHO-GYPSUM OR POLYCHLORINATED BIPHENYLS; PROVIDED, HOWEVER, THAT SELLERS ACKNOWLEDGE THAT BUYER WAS NOT PERMITTED TO PERFORM ANY ENVIRONMENTAL TESTING OF ANY KIND. EXCEPT AS EXPRESSLY PROVIDED HEREIN, NEITHER THE SELLERS, NOR THEIR AFFILIATES OR REPRESENTATIVES MAKES OR HAS MADE ANY REPRESENTATIONS OR WARRANTIES OF ANY KIND, EXPRESS OR IMPLIED, WRITTEN OR ORAL, AS TO THE PHYSICAL CONDITION OF THE ACQUIRED ASSETS, THE USES OF THE ACQUIRED ASSETS OR ANY LIMITATIONS THEREON, THE INCOME TO BE DERIVED THEREFROM, THE COSTS OF OPERATION, COMPLIANCE WITH LAW, AND/OR ANY REQUIREMENTS FOR ALTERATIONS OR IMPROVEMENTS TO COMPLY WITH LAW, INCLUDING ANY REPRESENTATIONS OR WARRANTIES PERTAINING TO ZONING, ENVIRONMENTAL OR OTHER LAW; THE UTILITIES, PIPELINES OR OTHER PHYSICAL EQUIPMENT AND FIXTURES ON THE REAL PROPERTY COMPRISING OR ASSOCIATED WITH THE ACQUIRED ASSETS OR ANY OTHER ASPECT OF THE ECONOMIC OPERATIONS ON SUCH REAL PROPERTY; THE CONDITIONS OF THE SOILS, WATER OR GROUNDWATER OF, OR IN THE VICINITY OF, SUCH REAL PROPERTY; THE PRESENCE OR ABSENCE OF ELECTROMAGNETIC FIELDS, TOXIC MATERIALS OR HAZARDOUS SUBSTANCES ON OR UNDER SUCH REAL PROPERTY OR IN THE VICINITY OF SUCH REAL PROPERTY; OR ANY OTHER MATTER BEARING ON THE USE, VALUE OR CONDITION OF THE ACQUIRED ASSETS.

11.4    <u>Waiver of Remedies; Certain Limitations.</u>    Notwithstanding anything in this Agreement to the contrary:

(a)    the Parties hereby agree that no Party shall have any liability, and no Party shall make any Claim, for any Loss or other matter, under, relating to or arising out of this Agreement or any other document, agreement, certificate or other matter delivered pursuant hereto, whether arising out of contract, tort, strict liability, other Law or otherwise, except as expressly set forth in <u>Section 3.3</u>, <u>Section 7.1(b)</u>, <u>Section 7.7(b)</u>, <u>ARTICLE 10</u> and this <u>ARTICLE 11</u>.

(b)    NO PARTY SHALL BE LIABLE FOR SPECIAL, PUNITIVE, EXEMPLARY, INCIDENTAL, CONSEQUENTIAL OR INDIRECT DAMAGES OR LOST PROFITS, WHETHER BASED ON CONTRACT, TORT, STRICT LIABILITY, OTHER LAW OR OTHERWISE AND WHETHER OR NOT ARISING FROM THE OTHER PARTY'S SOLE, JOINT OR CONCURRENT NEGLIGENCE, STRICT LIABILITY OR OTHER FAULT, EXCEPT SUCH DAMAGES THAT ARE PAYABLE TO A THIRD PARTY WITH RESPECT TO A THIRD PARTY CLAIM FOR WHICH ANY PERSON IS SEEKING INDEMNIFICATION HEREUNDER;

(c)    in calculating any amount of Losses recoverable pursuant to <u>Section 11.2(a)</u> or <u>Section 11.2(d)</u>, the amount of such Losses shall appropriately take into account Tax consequences and be reduced by (i) any insurance proceeds actually received relating to such Loss, net of any related deductible and any expenses to obtain such proceeds, and (ii) any recoveries from third parties pursuant to indemnification (or otherwise) with respect thereto, net of any expenses incurred by the Indemnified Party in obtaining such third party payment. The Parties agree to treat any indemnification payment pursuant to this ARTICLE 11 as an adjustment to the Purchase Price for all Tax purposes unless otherwise required by applicable Law. The Indemnified Party shall use its commercially reasonable efforts to seek insurance recoveries in respect of Losses to be indemnified hereunder. In the event any insurance proceeds or other recoveries from third parties (described in clause (ii) of this <u>Section 11.4(c)</u>) are actually realized (in each case net of expenses of such recoveries) by an Indemnified Party subsequent to the receipt by such Indemnified Party of an indemnification payment hereunder in respect of the claims to which such insurance proceedings or third party recoveries described in clause (ii) of this <u>Section 11.4(c)</u> relate, appropriate refunds shall be made promptly to the Indemnifying Party regarding the amount of such indemnification payment (net of reasonable attorney's fees and other expenses incurred in connection with such recoveries);

(d)    no Representative or Affiliate of either Seller shall have any personal liability to Buyer or any other Person as a result of the breach of any representation, warranty, covenant, agreement or obligation of such Seller in this Agreement and no Representative or Affiliate of Buyer shall have any personal liability to Sellers or any other Person as a result of the breach of any representation, warranty, covenant, agreement or obligation of Buyer in this Agreement;

(e)    no member of the Buyer indemnified Group shall be entitled to indemnification under this <u>ARTICLE 11</u> if the facts and circumstances giving rise to such claim for indemnification would result in a breach of <u>Section 6.8</u> hereof;

58

(f)    each Party shall have a duty to use commercially reasonable efforts to mitigate any Loss suffered by such Party in connection with this Agreement;

(g)    No Seller shall have any liability for any Losses that represent the cost of repairs, replacements or improvements which enhance the value of the repaired, replaced or improved asset above its value on the Closing Date or which represent the cost of repair or replacement exceeding the reasonable cost of repair or replacement;

(h)    Buyer, on behalf of itself and its Affiliates, hereby releases, waives and discharges forever each Seller and its Affiliates from all present and future Claims and from all Losses, present and future, that are or may be attributable to the matters described in <u>Section 11.3</u>;

(i)    From and after Closing, Buyer, on behalf of itself and its Affiliates, agrees to release and indemnify and hold harmless Sellers, their Affiliates and the managers, officers, directors and employees of Channelview LP and RESC (acting in their capacity as such) from and against any Losses for controlling member liability or breach of fiduciary duty or other duty relating to any pre-Closing actions or failures to act (including negligence or gross negligence) in connection with the Business prior to the Closing; provided that nothing in this <u>Section 11.4(h)</u> shall effect Sellers' obligations under <u>Section 11.2(a)-11.2(c)</u>. **THE PARTIES INTEND AND AGREE THAT THE INDEMNITY OBLIGATIONS SET FORTH IN THIS <u>SECTION 11.4(i)</u> ARE INTENDED TO AND SHALL EXTEND TO AND COVER ANY AND ALL LOSSES RESULTING FROM OR CAUSED IN WHOLE OR IN PART BY ANY ACTIVE, PASSIVE, AFFIRMATIVE, SOLE, CONCURRENT OR OTHER NEGLIGENCE, STRICT LIABILITY OR OTHER FAULT OF, REGARDLESS OF WHETHER SUCH LOSSES RESULT FROM OR ARE CAUSED IN WHOLE OR IN PART BY ANY ALLEGED OR ACTUAL NEGLIGENCE OR OTHER FAULT OF ANY OF THE PERSONS TO BE INDEMNIFIED PURSUANT TO THIS <u>SECTION 11.4(i)</u>;**

(j)    THE REMEDIES FOR ENVIRONMENTAL CLAIMS SET FORTH IN THIS AGREEMENT SHALL BE THE BUYER'S SOLE AND EXCLUSIVE REMEDIES AND BUYER EXPRESSLY WAIVES ALL OTHER RIGHTS OF RECOVERY AGAINST SELLERS UNDER ANY ENVIRONMENTAL LAW INCLUDING, BUT NOT LIMITED TO, THE COMPREHENSIVE ENVIRONMENTAL RESPONSE, COMPENSATION, AND LIABILITY ACT (CERCLA) AND THE RESOURCE CONSERVATION AND RECOVERY ACT (RCRA).

11.5    <u>Procedures for Indemnification</u>.    Whenever a Claim shall arise for indemnification resulting from or in connection with a Claim by a third party (a "Third-Party Claim"), the Person entitled to indemnification (the *"Indemnified Party"*) shall promptly notify the Party from which indemnification is sought (the *"Indemnifying Party"*) of such Claim and, when known, the facts constituting the basis of such Claim, *provided*, that failure to notify the Indemnifying Party shall not relieve the Indemnifying Party of any liability it may have to the Indemnified Party, except to the extent that the Indemnifying Party has been prejudiced by such failure.  Following receipt of notice of any such Third-Party Claim, and unless the assumption of such defense by the Indemnifying Party would be inappropriate due to a conflict of interest, the Indemnifying Party shall have the option, at its cost and expense, to assume the defense of such

Third-Party Claim and to retain counsel (not reasonably objected to by the Indemnified Party) to defend any such claim or legal proceeding, and the Indemnifying Party shall not be liable to the Indemnified Party for any fees of other counsel or any other expenses (except as expressly provided to the contrary herein) with respect to the defense of such Claim, other than reasonable fees and expenses of counsel employed by the Indemnified Party for any period during which the Indemnifying Party has not assumed the defense thereof. In the defense of such Claim, the Indemnifying Party shall act in good faith and conduct the defense actively and diligently, and in the event the Indemnifying Party is not complying with the foregoing, the Indemnified Party shall have the right to assume the defense of such Claim. The Indemnified Party shall have the option of joining the defense of such Claim (which shall be at the sole cost and expense of the Indemnified Party) with counsel not reasonably objected to by the Indemnifying Party and counsel for each party shall, to the extent consistent with such counsel's professional responsibilities, cooperate with the other party and any counsel designated by that party. In effecting the settlement or compromise of, or consenting to the entry of any judgment with respect to, any such Third-Party Claim with respect to which the Indemnifying Party has assumed the defense in accordance with this Section 11.5, the Indemnifying Party, or the Indemnified Party, as the case may be, shall act in good faith, shall consult with the other party and shall enter into only such settlement or compromise or consent to the entry of any judgment as the other party shall consent, such consent not to be unreasonably withheld, conditioned or delayed; provided that no such consent shall be required if (a) there is a full release of the Indemnified Party and (b) the sole relief provided is monetary damages that are paid in full by the Indemnifying Party. An Indemnifying Party shall not be liable for any settlement, compromise or judgment entered into by the Indemnified Party not made in accordance with the preceding sentence. Notwithstanding the rights of Sellers under this Section 11.5 with respect to the defense of claims, the Buyer shall control any environmental remediation performed at the Channelview Facility, and shall have the right to take any action required, in Buyer's reasonable judgment, by prudent environmental management and plant operation. Notwithstanding anything to the contrary in this Section 11.5, the Parties shall jointly control any Tax Proceeding involving Taxes attributable to a Straddle Period.

11.6   Manner of Payment.   Except as otherwise provided herein, any payment with respect to an indemnification obligation owing hereunder shall be made by wire transfer of immediately available funds to an account designated by such indemnified party, within ten (10) days after determination thereof.

## ARTICLE 12

## MISCELLANEOUS

12.1   Notices.   All notices and other communications hereunder shall be in writing and shall be deemed given if delivered personally to, or mailed by registered or certified mail (return receipt requested) if and when received by, or sent via facsimile if and when received by, the Parties at the following addresses (or at such other address for a Party as shall be specified by like notice):

If to Sellers, to:

Reliant Energy Channelview LP
Reliant Energy Services, Inc.
1000 Main Street, 12th Floor
Houston, Texas 77002
Attention:    General Counsel
Facsimile:    (713) 537-7465

With a copy to:

Stroock & Stroock & Lavan LLP
180 Maiden Lane
New York, NY 10038
Attention:    Michael S. Shenberg
Facsimile:    (212) 806-6006

If to Buyer, to:

GIM Channelview Cogeneration, LLC
c/o Global Infrastructure Partners - A, L.P.
315 Park Avenue South, 8th Floor
New York, NY 10010
Attention:    Salim G. Samaha
Facsimile:    (212) 448-3526

Fortistar LLC
One North Lexington Avenue
White Plains, NY 10601
Attention:    Mark Comora
Facsimile:    (914) 421-0052

With a copy to:

Hunton & Williams LLP
1900 K Street, NW
Washington, D.C. 20006
Attention:    Jeremy R. Schwer
Facsimile:    (202) 778-2201

     12.2    Headings.  The headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

     12.3    Assignment.  This Agreement (including the documents and instruments referred to herein) shall not be assigned by operation of Law or otherwise by any Party hereto without the prior written consent of the other Parties hereto, which consent shall not be unreasonably withheld or delayed; provided that Buyer may assign its rights and interests hereunder (but not any of its obligations) to (i) any Affiliate, or (ii) any persons providing financing to Buyer in connection with the transactions contemplated hereby.  This Agreement shall be binding upon

and inure to the benefit of the Parties hereto and their respective successors and permitted assigns.

12.4    Governing Law.    THIS AGREEMENT SHALL BE GOVERNED IN ALL RESPECTS, INCLUDING VALIDITY, INTERPRETATION AND EFFECT, BY THE LAWS OF THE STATE OF NEW YORK (WITHOUT GIVING EFFECT TO ANY CONFLICT OF LAWS PRINCIPLES OTHER THAN SECTION 5-1401 OF THE GENERAL OBLIGATIONS LAW OF THE STATE OF NEW YORK).

12.5    Jurisdiction.    For so long as Sellers are subject to the jurisdiction of the Bankruptcy Court, the parties hereto irrevocably elect as the sole judicial forum for the adjudication of any matters arising under or in connection with the Agreement, and consent to the exclusive jurisdiction of, the Bankruptcy Court. After Sellers are no longer subject to the jurisdiction of the Bankruptcy Court, any legal action or proceeding with respect to this Agreement or the transactions contemplated hereby shall be brought exclusively in the courts of the State of New York sitting in New York County or of the United States for the Southern District of New York, and by execution and delivery of this Agreement, each of the Parties consents to the jurisdiction of those courts. Each of the Parties irrevocably waives any objection, including any objection to the laying of venue or based on the grounds of *forum non conveniens*, which it may now or hereafter have to the bringing of any action or proceeding in such jurisdiction in respect of this Agreement or the transactions contemplated hereby.

12.6    Counterparts.    This Agreement may be executed in two or more counterparts, and by facsimile and/or electronic transmission, each of which shall be deemed to be an original, but all of which shall constitute one and the same agreement.

12.7    Amendments; Extensions.

(a)    This Agreement may not be amended except by an instrument in writing signed on behalf of each of the Parties.

(b)    At any time a Party may (i) extend the time for the performance of any of the obligations or other acts of the other Party, (ii) waive any inaccuracies in the representations and warranties of the other Party contained herein or in any document delivered pursuant hereto and (iii) waive compliance with any of the covenants or agreements of the other Party contained herein. Any agreement on the part of a Party to any such extension or waiver shall be valid only if set forth in a written instrument signed on behalf of such Party. The failure or delay of any Party to assert any of its rights under this Agreement or otherwise shall not constitute a waiver of those rights.

12.8    Entire Agreement.    This Agreement, the Confidentiality Agreement and the other agreements contemplated hereby constitute the entire agreement between the Parties with respect to the subject matter hereof and supersede all prior agreements, understandings and negotiations, both written and oral, between the Parties with respect to the subject matter of this Agreement. No representation, inducement, promise, understanding, condition or warranty not set forth herein has been made or relied upon by any Party. Neither this Agreement nor any provision hereof is intended to confer upon any Person other than the Parties hereto any rights or remedies

hereunder except as expressly provided otherwise in <u>Section 7.1(b)</u>, <u>Section 7.5</u>, <u>Section 7.10</u>, <u>Section 7.14</u> and ARTICLE 11.

12.9    <u>Severability</u>.  If any term or other provision of this Agreement is invalid, illegal, or incapable of being enforced by any rule of applicable Law, or public policy (including any term or provision of <u>Section 12.5</u>), then such term or provision shall be severed from the remaining terms and provisions of this Agreement (including the remaining terms and provisions of <u>Section 12.5</u>), and such remaining terms and provisions shall nevertheless remain in full force and effect.

12.10  <u>Joint and Several</u>.   Each Seller shall be jointly and severally liable for the payment and performance of all "Seller" obligations and liabilities hereunder.

[Remainder of Page Intentionally Left Blank]

IN WITNESS WHEREOF, the Parties have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

**RELIANT ENERGY CHANNELVIEW LP**

By:  Reliant Energy Channelview (Texas) LLC,
*General Partner of Reliant Energy*
*Channelview LP*

By: _____
Name: _____
Title: _____

**RELIANT ENERGY SERVICES**
**CHANNELVIEW LLC**

By:  Reliant Energy Services, Inc.,
*Manager of Reliant Energy Services*
*Channelview LLC*

By: _____
Name: _____
Title: _____

**GIM CHANNELVIEW COGENERATION,**
**LLC**

By:  Global Infrastructure Partners - A, L.P.
*Member of GIM Channelview Cogeneration, LLC*

By: Global Infrastructure GP, L.P., its general
partner

By: Global Infrastructure Investors, Limited, its
general partner

By: _____
Name: _Jonathan Bram_____
Title: _Partner_____

[Signature page to Asset Purchase Agreement]

# <u>Exhibit B to the Order</u>

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| RELIANT ENERGY | : | Case No. 07-11160 (MFW) |
| CHANNELVIEW LP, *et al.*, | : | |
| | : | Jointly Administered |
| Debtors. | : | **Re: Dkt. No. 251** |
| | : | |
| | : | |

-------------------------------------------------------

**STIPULATION REGARDING MOTION OF THE DEBTORS AND
DEBTORS-IN-POSSESSION PURSUANT TO SECTIONS 105(A), 363
AND 365 OF THE BANKRUPTCY CODE AND BANKRUPTCY
RULES 2002, 6004, 6006, 9007 AND 9014 FOR AN ORDER AUTHORIZING
(I) THE SALE OR TRANSFER OF CERTAIN ASSETS OF THE DEBTORS
FREE AND CLEAR OF LIENS, CLAIMS AND ENCUMBRANCES, AND OTHER
INTERESTS, (II) THE ASSUMPTION AND ASSIGNMENT OF CERTAIN
EXECUTORY CONTRACTS, (III) AND GRANTING RELATED RELIEF [D.I. 251]**

The undersigned parties (the "Stipulating Parties") have considered the motion dated

February 26, 2008 (the "Sale Motion") of Reliant Energy Channelview LP, a Delaware limited

partnership ("Channelview LP") and Reliant Energy Services Channelview LLC, a Delaware

limited liability company ("RESC" and collectively with Channelview LP, the "Sellers"), as

debtors and debtors-in-possession,[1] pursuant to sections 105(a), 363, and 365 of Title 11 of the

United States Code (the "Bankruptcy Code"), and Rules 2002, 6004, 6006, 9007 and 9014 of the

Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") (D.I. 251), the Preliminary

Objections of Equistar Chemicals, LP ("Equistar") to Debtors' Motion for an Order Authorizing

(i) the Sale or Transfer of Certain Assets of the Debtors Free and Clear of Liens, Claims and

---

[1] The debtors and debtors-in-possession in the above-captioned chapter 11 cases are (i) Channelview LP, (ii) RESC,
(iii) Reliant Energy Channelview (Texas) LLC, a Delaware limited liability company and (iv) Reliant Energy
Channelview (Delaware) LLC, a Delaware limited liability company (collectively, the "Debtors").

Encumbrances, (ii) the Assumption and Assignment of Certain Executory Contracts and (iii) Granting Related Relief (D.I. 251), the Preliminary Response of the Official Committee of Unsecured Creditors to the Debtors' Motion, inter alia, to Sell Assets and Assume and Assign Executory Contracts (D.I. 343), the Debtors' Reply in Support of the Debtors' Sale Motion and Motion to Establish Cure Amounts (D.I. 362), and the Response of the Administrative Agent to the Secured Lenders to the Debtors' Motion Pursuant to Sections 105(a), 363 and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006, 9007 and 9014 for an Order Authorizing (I) the Sale or Transfer of Certain Assets of the Debtors Free and Clear of Liens, Claims and Encumbrances, (II) the Assumption and Assignment of Certain Executory Contracts, (III) and Granting Certain Relief (D.I. 363); and the statements and rulings of the Court (the "Court" or the "Bankruptcy Court") in response to the evidence presented at the hearing on April 9, 2008 (the "Sale Hearing");

In connection with the above, the Stipulating Parties hereby agree and stipulate as follows:

1.    The Stipulating Parties will jointly submit to the Court under Certification of Counsel this Stipulation and an Sale Order approving this Stipulation and the Sale Motion (the "Sale Order"). This Stipulation is to be attached to the Sale Order.

2.    The Sale Order shall approve the sale of the assets that are the subject of the Sale Motion (the "Acquired Assets") in accordance with the terms of the Asset Purchase Agreement dated as of April 3, 2008 (the "APA") to GIM Channelview Cogeneration, LLC ("GIM") as the successful bidder

2

(the "GIM Transaction.")  Nothing in this Stipulation shall be deemed to amend, alter, or otherwise modify the APA or the Sale Order.  To the extent there are any conflicts between this Stipulation and the Sale Order, the Sale Order shall control.

3.      Notwithstanding anything in this Stipulation to the contrary, the Stipulation and all agreements contained herein are conditioned upon the closing of the GIM Transaction (the "Closing") and the payments due at Closing to Equistar and Reliant Energy, Inc. ("REI") or its designees being paid at Closing in accordance with the terms of this Stipulation.

4.      The Sale Motion, as originally filed, excluded the Second Amended and Restated Cash Flow Participation Agreement[2] ("CFPA") from those agreements with Equistar that were to be assumed by the Debtors and then assigned to the successful bidder ("the Project Agreements"); however, the Stipulating Parties agree that the CFPA shall be treated in accordance with the terms set forth further in this Stipulation.

5.      Effective upon the Closing, the CFPA shall be deemed assumed by Channelview LP but not assigned to GIM, directly or indirectly.  The Acquired Assets shall be conveyed to GIM free and clear of any liens, claims, obligations or interests under or related to the CFPA.  The Project Agreements, excluding the CFPA, including, without limitation, the Steam Supply Agreement, Site Lease, Energy Supply Agreement, and Services

---

[2] Capitalized terms used but not defined herein shall have the meanings set forth in the Sale Motion.

3

Agreement, and the specified Letter Agreements, as identified in the schedules to the APA, shall be assumed and assigned under the Sale Order as part of the GIM Transaction. For the avoidance of doubt, in no event shall Equistar have any liens, claims, rights or other interests in the Acquired Assets or against GIM arising from or related to the CFPA and GIM shall have no duties or obligations to Equistar under the CFPA and shall not be deemed to have assumed the CFPA or any duties or obligations under or related to the CFPA.

6.   At Closing, and provided Equistar is paid at Closing those payments due at Closing in accordance with the terms of this Stipulation, Equistar shall be deemed to have terminated its interests under and waived all rights in or related to the CFPA upon the terms set forth further in this Stipulation. There shall be no cure payment obligation arising from the Debtors' assumption of the CFPA.

7.   In return for Equistar's termination of its rights under the CFPA, Equistar and REI or such affiliates of REI as it designates prior to Closing shall receive the following. All funds that become available for distribution in accordance with subparagraphs 7a, 7b and 7c below, after the payment of or reserve for all Required Obligations (as defined below) of the Debtors ("Available Cash") will be paid to Equistar and REI in the following ratios: Available Cash up to and including $71.7 million shall be paid 80% to Equistar and 20% to REI or its designees, and Available Cash in excess of $71.7 million shall be paid 60% to Equistar and 40% to REI or

4

its designees.  In accordance with subparagraphs 7d and 7e below, and except as otherwise provided therein, additional funds (from the Escrow and funds from sources other than from Net Sales Proceeds, Cash on Hand at Closing, and Amounts Received from Operations, as such terms are defined below) will be paid 12.5% to Equistar and 87.5% to REI.  To effectuate the agreed payments of Available Cash to them, Equistar and REI shall share in Net Sales Proceeds, Cash on Hand, Amounts Received from Operations and in addition, shall share funds disbursed from the Escrow, as follows:

a.      At Closing, Net Sale Proceeds (up to $71.7 million) shall be paid 80.0% to Equistar and 20.0% to REI. "Net Sale Proceeds" are defined as the funds available at the Closing after payments required under the APA and the Sale Order to the Lenders, taxes due, payments of cure amounts and the establishment and funding of the Escrow and the Reserve (defined in subparagraph 7c below), as illustrated in Schedule A attached hereto.

b.      At Closing, the operating cash on hand (net of any amounts required for the Reserve) ("Cash on Hand"), (when combined with Net Sale Proceeds) up to $71.7 million shall be paid 80.0% to Equistar and 20.0% to REI.

c.      At Closing, in addition to $40 million deposited into escrow in accordance with the APA (the "Escrow"), there shall be a reserve (the "Reserve") created for amounts payable upon confirmation of a plan of liquidation (the "Confirmed Plan"), including, without limitation, administrative

5

expenses, priority claims, secured claims, unsecured claims, any amount for administrative claims or expenses arising and/or incurred between the entry date of the Sale Order and the Closing and post-confirmation wind down expenses, including, without limitation, amounts described in paragraphs 8, 9, 10, 11 and 12 below ("Required Obligations"). At Closing, in order to determine the amount to be deposited into the Reserve, all Required Obligations and accounts receivable arising from the operation of the Debtors' business prior to the Closing Date ("Accounts Receivable") shall be netted against one another as of the Closing Date, and adjusted, as necessary, for any timing differences of anticipated cash receipts versus anticipated cash disbursements, and the Reserve shall be funded at Closing with the net amount reasonably needed (including a reasonable allowance for unexpected variations in amounts and timing) in order to pay the Required Obligations to the extent they are in excess of the Accounts Receivable. Any funds not required to be deposited into the Reserve shall be considered Cash on Hand, and distributed in accordance with subparagraph 7b. In addition, all funds received after the Closing from Debtors' operations, including all amounts received in the ordinary course of business from deliveries of goods or services occurring prior to the Closing, and any underpayments or overpayments, whenever received, whether before or after the effective date of the Confirmed Plan but excluding any amounts pursuant to subparagraph 7d and 7e ("Amounts Received from Operations"), shall be deposited solely into the Reserve, to

6

be disbursed in accordance with the next succeeding sentence. Amounts in the Reserve, including all Amounts Received from Operations, shall be disbursed to pay, without limitation, administrative expenses, priority claims, unsecured claims, and administrative claims or expenses of operations arising and/or incurred between the entry date of the Sale Order and the Closing, and post-confirmation wind down expenses. On the effective date under the Confirmed Plan, all Available Cash shall then be disbursed from the Reserve, to be paid (i) 80% to Equistar and 20% to REI or its designees until the aggregate paid to Equistar in accordance with subparagraphs 7a, 7b and 7c equals 80% of $71.7 million and the aggregate paid to REI equals 20% of $71.7 million, and (ii) amounts of Available Cash in excess of the aggregate amount of $71.7 million shall be paid 60% to Equistar and 40% to REI or its designees. After the Closing no less often than on a monthly basis, Debtors shall report to Equistar and REI, and shall pay to Equistar and REI, in the appropriate sharing ratios, all Available Cash. Interest earned on funds in the Reserve shall be paid pro rata to Equistar and REI in accordance with their sharing ratios. By way of example, if Equistar receives $50 million from the Net Sales Proceeds and Cash on Hand at Closing, then Equistar shall continue to receive 80% of Available Cash until it has received $57.36 million (80% of $71.7 million), and then it shall receive 60% of Available Cash, without limitation on the amounts to which it is entitled under subparagraphs 7d and 7e. In the event the Reserve is insufficient to pay in

7

full the Required Obligations, Equistar and REI shall disgorge such amounts as are necessary to fund the insufficiency, if any, provided such disgorgement shall be solely from funds actually disbursed to them at Closing under subparagraphs 7a and 7b, and in the same ratio as funds were actually disbursed to them; and provided further, that—except for amounts payable for goods and services provided prior to the Closing, including the recovery of any overpayments or underpayments, but then only with respect to amounts invoiced or paid after the date that is nine (9) months prior to Closing—(i) no claim of Equistar or Equistar's affiliates or professionals, (ii) no claim of Debtors, (iii) no claim of REI or REI's professionals, and (iv) no claim of REI's non-Debtor affiliates (other than the RES Claim, as allowed herein) or REI's non-Debtor affiliates' professionals, shall be included within the amounts giving rise to the disgorgement required by this subparagraph 7c. To the extent Equistar or REI is required to disgorge any amounts under this subparagraph, it shall be entitled to be reimbursed such amounts from any amounts thereafter distributed from the Reserve, and in the same ratio as disgorgement.

d.    From the amounts thereafter released from the Escrow in accordance with Article 11 of the APA, 12.5% shall be paid to Equistar and 87.5% shall be paid to REI, subject to the following: Equistar shall receive in the aggregate from the payments in subparagraphs 7a, 7b, 7c and 7d the sum of at least $60 million, and to the extent such payments to Equistar are less than $60 million, before any payments to REI from the Escrow, Equistar

8

shall receive payments from REI's 87.5% share of the Escrow until Equistar has received the total of $60 million. By way of example, if Equistar receives $50 million pursuant to subparagraphs 7a, 7b and 7c, then after payment to Equistar from the Escrow (at 12.5%, assume $5 million), Equistar shall receive an additional $5 million from Reliant's share of the Escrow before any distributions to REI.

e.   Other than Net Sales Proceeds, Cash on Hand, Amounts Received from Operations, or Available Cash in the Reserve, if there are amounts recovered by the bankruptcy estates (for example, without limitation, insurance recoveries, tax refunds or avoided transfers) that are available after payments to all unsecured creditors under the Confirmed Plan, 12.5% shall be paid to Equistar and 87.5% shall be paid to REI, with payment to be made within ten (10) business days of the later of the effective date of the Confirmed Plan or receipt of such funds.

f.   To the extent REI and Equistar cannot agree on amounts to be paid pursuant to this paragraph 7, either party may submit the dispute for resolution by this Court on an expedited basis.

8.   All Obligations under the Secured Credit Facility, as defined in the Sale Motion, that are due at Closing shall be paid in full at Closing. Obligations, if any, under the Secured Credit Facility arising after Closing shall be paid in full pursuant to the Confirmed Plan.

9

9.     All cure payments (including those cure amounts that are to be paid from the sale proceeds, namely: (i) Equistar's damages under the Steam Supply Settlement Agreement as defined below in the amount of $10 million, provided, however, notwithstanding anything in the Confirmed Plan, no interest shall be paid on account of the payment under the Steam Supply Settlement Agreement; and (ii) the amounts due Siemens, plus applicable interest under Siemen's contract) shall be paid at Closing.

10.    To the extent not paid at Closing, all priority property taxes (including those priority tax claims that are identified on Schedule A) shall be paid in full in accordance with the APA and the Confirmed Plan.

11.    All allowed, non-insider administrative expense claims will be paid in full pursuant to the Confirmed Plan. These amounts are exclusive of any payments asserted by the professionals employed by REI in connection with these cases. Such professionals shall not be paid from the Debtors' estates.

12.    The net claim of Reliant Energy Services, Inc. ("RES") for fuel supplied to the Debtors pre-petition (the "RES Claim") shall be and hereby is allowed as an unsecured claim in the amount of $7,569,392. All allowed unsecured creditor claims including the RES Claim will be paid upon confirmation pursuant to the Confirmed Plan; provided, however, notwithstanding anything in the Confirmed Plan, no interest shall be paid on the RES Claim. The claims asserted by REI or its subsidiaries for an

10

unpaid development fee of approximately $4.3 million under a certain Development Agreement and an incentive fee of approximately $3.6 million under a certain Power Marketing Agreement are disallowed and shall not be paid from the Debtors' estates.

13.    Upon the Closing and the payments due at Closing being made at Closing to Equistar and REI or its designees in accordance with the terms of this Stipulation, all issues concerning the characterization of Equistar's interest as equity, or as an "equity-like" interest, the severability of the CFPA from the other Project Agreements, and all other legal issues presented at the Sale Hearing, shall be deemed to have been determined finally by the Court, and the Debtors and related Stipulating Parties shall waive all challenges to and rights to appeal those issues.

14.    Upon entry of the Sale Order, the Settlement Agreement between Equistar and the Debtors relating to the Steam Supply Agreement (the "Steam Supply Settlement Agreement") shall be deemed reinstated and its term shall be extended automatically, without the need for the parties to sign further amendments extending its term, through and including the Termination Date as that term is defined in the APA.  If the Closing does not occur by the Termination Date, then the Steam Supply Settlement Agreement shall terminate.

15.    The Debtors shall conduct their business in the ordinary course until the Closing and, except in the case of emergencies, no extraordinary payments

11

shall be made absent an order of the Court. For the avoidance of doubt, nothing in this paragraph is intended to modify, alter, or amend section 7.2 of the APA.

16. a. All figures used in the waterfall as the basis for Schedule A herein (with the exception of the RES Claim which has been verified by Alvarez & Marsal) shall be reviewed and verified by Alvarez & Marsal, the financial advisers for the Official Committee of Unsecured Creditors, and the Debtors shall provide all reasonable and necessary access and assistance to Alvarez & Marsal to enable them to do so and report their findings to the Stipulating Parties. Notwithstanding anything to the contrary, it is understood and agreed that the Administrative Agent and the Lenders and GIM have not agreed to the figures set forth on Schedule A and reserve all rights with respect to the same.

b. Debtors shall prepare and not less than five (5) business days prior to the Closing, shall deliver at the same time to counsel for REI, Equistar, the Administrative Agent for the Pre-Petition Lenders, and the Committee, a complete closing statement indicating all funds available or anticipated to be available at Closing, and all disbursements or anticipated disbursements to be made at Closing, including, without limitation, all amounts to be funded into the Escrow and the Reserve, and all amounts to be disbursed at Closing to the Administrative Agent for the Pre-Petition Lenders (except as provided in clause (c) below), taxing authorities, Siemens, REI and Equistar. Not less than four (4) business days prior to the Closing,

12

REI, Equistar, Debtors, the Administrative Agent for the Pre-Petition Lenders and the Committee shall meet and confer (including by e-mail and telephone) and shall use good faith efforts to prepare and reach agreement upon a single joint written instruction specifying the amounts and payees to be paid by GIM at Closing in accordance with the Asset Purchase Agreement, and, if agreement is reached, the joint written instruction shall then be signed by the Debtors, Equistar and REI, and delivered to counsel for (i) GIM, (ii) the Committee, and (iii) the Administrative Agent for the Pre-Petition Lenders no later than three (3) business days prior to the Closing Date.

c.   With respect to the Make Whole Amount (as defined in the Credit Agreement (as defined in the Sale Order)) payable at Closing to the Tranche B-1 Lender as defined in the Credit Agreement, pursuant to the Credit Agreement, the Tranche B-1 Lender shall give notice two (2) business days prior to the Closing of the Make Whole Amount (including the details of such computation) at the same time to counsel for the Debtors, REI, Equistar, the Administrative Agent for the Pre-Petition Lenders and the Committee, and, if the Debtors agree with the terms of such notice, a joint written instruction with respect to the payment of the Make Whole Amount to the Tranche B-1 Lender shall be signed by the Debtors, Equistar and REI and delivered to counsel for (i) GIM, (ii) the Committee, and (iii) the Administrative Agent for the Pre-Petition Lenders no later than one (1) business day prior to the Closing Date.

13

    d. The parties shall consult with Alvarez & Marsal, as necessary to accomplish the foregoing. If agreement is not reached on the joint written instructions referred to in clauses (b) or (c) above, GIM will pay the respective amount due at Closing under the APA to the Debtors.

17.     Equistar, the Debtors, and the other Stipulating Parties agree to execute and deliver at Closing the Mutual Release in the form annexed hereto as Exhibit B.

18.     The Debtors' motion for the appointment of a trustee (the "Trustee Motion") shall be continued until the entry of the Sale Order whereupon the Trustee Motion shall be deemed withdrawn.

19.     The Debtors shall promptly prepare and file a plan of liquidation and disclosure statement, consistent with the terms of this Stipulation.

20.     Equistar (a) hereby approves the assumption and assignment of all its contracts contemplated by the APA and hereby consents to all such assignments required by the APA and (b) shall provide any other consents necessary to effectuate the GIM Transaction, including, without limitation, executing together with RES and GIM, the RES Assignment and Assumption Agreement with respect to the Fuel Purchase and Sale Agreement annexed to the Sale Order as Exhibit C.

14

21.     This Stipulation represents the entire agreement and understanding of the

Stipulating Parties and, upon entry of the Sale Order, shall be binding on

the Stipulating Parties, their successors and assigns.

15

22.    The Bankruptcy Court shall retain exclusive jurisdiction to resolve any disputes under this Stipulation.

Date: _____ June 6 _____, 2008

Reliant Energy Channelview LP

By: Reliant Energy Channelview (Texas) LLC, general partner

By: _____    DFS
Its: _____
      Andrew Johannesen
      Vice President and Treasurer

Reliant Energy Channelview (Texas) LLC

By: _____    DFS
Its: _____
      Andrew Johannesen
      Vice President and Treasurer

Reliant Energy Channelview (Delaware) LLC

By: _____    DFS
Its: _____
      Andrew Johannesen
      Vice President and Treasurer

Reliant Energy Services Channelview LLC

By: _____    DFS
Its: _____
      Andrew Johannesen
      Vice President and Treasurer

Reliant Energy Power Generation Inc.

By: _____    DFS
Its: _____
      Andrew Johannesen
      Vice President and Treasurer

Reliant Energy Services, Inc.
By: _____    DFS
Its: _____
      Andrew Johannesen
      Vice President and Treasurer

Reliant Energy, Inc.
By: _____    DFS
Its: _____
      Andrew Johannesen
      Vice President and Treasurer

Equistar Chemicals, LP

By: _____
Its: _____

15

22.    The Bankruptcy Court shall retain exclusive jurisdiction to resolve any

disputes under this Stipulation.

Date: _____, 2008

Reliant Energy Channelview LP

By: Reliant Energy Channelview (Texas) LLC,
     general partner

By: _____
Its: _____

Reliant Energy Channelview (Texas) LLC

By: _____
Its: _____

Reliant Energy Channelview (Delaware) LLC

By: _____
Its: _____

Reliant Energy Services Channelview LLC

By: _____
Its: _____

Reliant Energy Power Generation Inc.

By: _____
Its: _____

Reliant Energy Services, Inc.
By: _____
Its: _____

Reliant Energy, Inc.
By: _____
Its: _____

Equistar Chemicals, LP

By: _Carla M. Tibbitts_____  <SS
Its: _VP, Utilities & Gases_____

15

# Exhibit A to the Stipulation

## Schedule A
**All amounts are estimates and subject to change**

| | |
|---|---|
| 12.5% | Escrow % to Equistar |
| 80.0% | Base % to Equistar (on up to $71.7 million) |
| 60.0% | % to Equistar on amounts over $71.7 million |

| | |
|---|---|
| $500,000,000.00 | Gross Sale Proceeds from GIM Sale |
| $4,000,000.00 | Estimated Purchase Price Adjustments # |
| $504,000,000.00 | Gross Proceeds from GIM Sale after Adjustments |
| | |
| -$374,508,261.00 | Total Lenders' Claim (includes estimated make whole and accrued interest) |
| -$438,384.00 | Contingent payment to Lenders (unless paid from cash flow) |
| | |
| $129,053,355.00 | Net Proceeds from GIM Sale after payment(s) to Lenders |
| | |
| -$1,500,000.00 | Professional Fees (not including insiders' professionals) |
| -$2,000,000.00 | Kelson |
| -$6,338,586.00 | 2007 Property Taxes (past due including 13% penalty) |
| -$1,150,000.00 | 2007 Property Taxes (due June 2008) |
| -$5,793,038.19 | Siemens |
| -$7,569,392.00 | REI Gas Claim* |
| -$243,032.00 | Other Unsecured Claims* |
| -$750,000.00 | Post-Closing Wind Down |
| -$10,000,000.00 | Equistar Settlement |
| Unknown | Reserve for Administrative expenses or claims arising after the Sale Order** # |
| -$40,000,000.00 | Escrow |
| $53,709,306.81 | Net Sales Proceeds after Escrow and Reserve (as defined in para 7a of the Stipulation) |
| $18,000,000.00 | Cash on Hand at close (Illustrative) |
| $71,709,306.81 | Total Cash at close |

| | | |
|---|---|---|
| -$57,360,000.00 | 80% Proceeds to Equistar | 80.0% |
| -$14,340,000.00 | 20% Proceeds to Reliant | 20.0% |
| -$5,584.09 | 60% Proceeds to Equistar | 60.0% |
| -$3,722.72 | 40% Proceeds to Reliant | 40.0% |
| | | |
| **-$57,365,584.09** | **Payment to Equistar at closing** | |
| **-$14,343,722.72** | **Payment to Reliant at closing** | |
| | | |
| $10,000,000.00 | Post-closing funds available for distribution from Reserve (illustrative) | |
| $0.00 | 80% Proceeds to Equistar | 80.0% |
| $0.00 | 20% Proceeds to Reliant | 20.0% |
| -$6,000,000.00 | 60% Proceeds to Equistar | 60.0% |
| -$4,000,000.00 | 40% Proceeds to Reliant | 40.0% |
| | | |
| $40,000,000.00 | Return of Escrow (assumed) | |
| -$5,000,000.00 | Escrow to Equistar | 12.5% |
| -$35,000,000.00 | Escrow to Reliant (subject to adjustment per para. 7d of the Stipulation) | 87.5% |
| | | |
| **-$68,365,584.09** | **Total to Equistar***** | |
| **-$53,343,722.72** | **Total To Reliant***** | |

## Schedule A

* The numbers marked with an asterisk are general unsecured, non-priority claims.

** This line is a place-keeper to reserve for other administrative expenses or claims arising between the date of the Sale Order and the Confirmed Plan that might not be covered by anticipated cash flow.

*** The numbers set forth above are not an admission and are subject to revision, but material changes are not expected and all amounts remain subject to verification.

# An allowance for pre-closing 2008 property taxes will be made at close.

# **Exhibit B to the Stipulation**

# MUTUAL RELEASE

This Mutual Release ("Release") is made and entered into as of _____, 2008 by and between Reliant Energy Channelview LP, Reliant Energy Services Channelview LLC, Reliant Energy Channelview (Texas) LLC and Reliant Channelview (Delaware) LLC, debtors and debtors in possession under the United States Bankruptcy Code (collectively, the "Debtors") in cases pending in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), Case No. 07-11160 (MFW), jointly administered, (the "Bankruptcy Case"), Reliant Energy Power Generation Inc., Reliant Energy Services, Inc., and Reliant Energy, Inc. (collectively, together with the Debtors, the "Debtor and Reliant Entities"), on the one hand, and Equistar Chemicals, LP ("Equistar"), on the other hand, (the Debtor and Reliant Entities and Equistar shall be collectively referred to as the "Parties").

## R E C I T A L S

Certain disputes and controversies exist between the Parties in the Bankruptcy Case.

The Parties have agreed to settle and resolve all issues in dispute pursuant to a Stipulation Regarding Motion of the Debtors and Debtors-In-Possession Pursuant to Sections 105(a), 363 and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006, 9007 and 9014 for an Order Authorizing (i) the Sale or Transfer of Certain Assets of the Debtors Free and Clear of Liens, Claims and Encumbrances, (ii) the Assumption and Assignment of Certain Executory Contracts, (iii) and Granting Related Relief which has been approved by the Bankruptcy Court (the "Stipulation"). Terms not otherwise defined herein shall have the meaning set forth in the Stipulation.

In consideration of the premises and the mutual covenants contained in this Release and the Stipulation, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1. **Releases.**

    A.    Release by the Debtor and Reliant Entities. In consideration of the promises herein, the execution of this Release and in further consideration of the Stipulation, each of the Debtor and Reliant Entities, for itself, its successors, assigns, and any party claiming by, through, or under them, do hereby release, acquit, and forever discharge Equistar, and all of its past or present officers, directors, shareholders, employees, agents, partners, insurers, attorneys, divisions, affiliated, parent or subsidiary companies, assigns, or successors in interest (collectively, the "Equistar Released Parties"), from any and all claims, demands, actions, causes of action, liabilities, obligations, or judgments arising out of any personal, property or financial injuries to, or damages incurred by, the Debtor and Reliant Entities, together with anyone acting by, through, or under the Debtor and Reliant Entities caused by any act, omission, or fault, or any alleged act, omission, or fault of any one or more of the Equistar Released Parties in connection with any of the matters brought, or that might have been brought, whether or not asserted, in connection with the Channelview Project and the contracts related thereto (collectively, the "Claims"). This Release includes, but is not limited to, Claims asserted or capable of assertion by the Debtor and Reliant Entities under statutory law, common law, strict products liability, negligence, contract, warranty,

consumer relations law, intentional or other tort law, or any other law, statute, regulation, or theory of law or equity that permits or allegedly permits recovery of any form of monetary or other damages or relief of whatsoever nature, whether in contract or in tort, whether contingent or absolute, which the Debtor and Reliant Entities ever had, may now have, or may ever claim to have against the Equistar Released Parties. The release extinguishes Claims for actual damages, economic or pecuniary losses, mental anguish damages, expenses, and/or attorneys' fees, which the Debtor and Reliant Entities may now have, might ever have had in the past, or might ever have in the future, based in whole or in part upon or arising out of any fact, transaction, or occurrence that was alleged or that could have been alleged in connection with the Channelview Project and the contracts related thereto, at any time, from the beginning of time, through and including the Closing, as defined in the Stipulation, other than (i) those for breach of this Release, the Stipulation or the Steam Supply Settlement Agreement, (ii) amounts payable for goods and services provided prior to the Closing, including the recovery of any overpayments or underpayments, but only with respect to amounts invoiced or paid after the date that is nine (9) months prior to Closing, or (iii) any claims exclusively arising out of events occurring after the execution of the Stipulation and asserted in writing prior to the Closing, which are hereby expressly reserved and not released. Claims, if any, asserted under (iii) are listed on Exhibit "A" attached hereto, which each of the Parties shall initial at Closing.

B.    Release by Equistar. In consideration of the promises herein, the execution of this Release, and in further consideration of the Stipulation, Equistar, for itself, its successors, assigns, and any party claiming by, through, or under them, does hereby release, acquit, and forever discharge the Debtor and Reliant Entities, and all of their past or present officers, directors, shareholders, employees, agents, partners, insurers, attorneys, divisions, affiliated, parent or subsidiary companies, assigns or successors in interest, (collectively, the "Debtor and Reliant Entities' Released Parties"), from any and all claims, demands, actions, causes of action, liabilities, obligations, or judgments arising out of any personal, property or financial injuries to, or damages incurred by, Equistar, or anyone acting by, through, or under Equistar, whether caused by any act, omission, or fault, or any alleged act, omission, or fault of the Debtor and Reliant Entities' Released Parties in connection with any of the matters brought, or that might have been brought, whether or not asserted, in connection with the Channelview Project and the contracts related thereto (collectively, the "Claims"). This Release includes, but is not limited to, Claims asserted or capable of assertion under statutory law, common law, negligence, contract, warranty, consumer relations law, intentional or other tort law, or any other law, statute, regulation, or theory of law or equity that permits or allegedly permits recovery of any form of monetary or other damages or relief of whatsoever nature, whether in contract or in tort, whether contingent or absolute, which Equistar ever had, may now have, or may ever claim to have against the Debtor and Reliant Entities' Released Parties. The release extinguishes Claims for actual damages, economic or pecuniary losses, mental anguish damages, expenses, and/or attorneys' fees, which Equistar may now have, might ever have had in the past, or might ever have in the future, based in whole or in part upon or arising out of any fact, transaction, or occurrence that was alleged or that could have been alleged in connection with the Channelview Project and the contracts related thereto, at any time, from the beginning of time, through and including the Closing, other than (i) those for breach of this Release, the Stipulation or the Steam Supply Settlement Agreement, (ii) amounts payable for goods and services provided prior to the Closing, including the recovery of any overpayments or underpayments, but only with respect to amounts invoiced or paid after the date that is nine (9) months prior to Closing, or (iii) any claims

arising out of events occurring after the execution of the Stipulation and asserted in writing prior to the Closing, which are hereby expressly reserved and not released. Claims, if any, asserted under (iii) are listed on Exhibit "A" attached hereto, which each of the Parties shall initial at Closing.

2. **Releases Unconditional.** THE RELEASES IN PARAGRAPH 1 ABOVE ARE SPECIFICALLY INTENDED TO OPERATE AND BE APPLICABLE EVEN IF IT IS ALLEGED, CHARGED, OR PROVED THAT SOME OR ALL OF THE CLAIMS OR DAMAGES RELEASED ARE SOLELY AND COMPLETELY OR PARTIALLY CAUSED BY THE NEGLIGENCE, NEGLIGENCE PER SE, GROSS NEGLIGENCE, BREACH OF WARRANTY, VIOLATION OF STATUTE OR COMMON LAW, OR OTHER ACTIONABLE CONDUCT OF ANY OF THE RELEASED PARTIES AND/OR CLAIMANTS AND/OR ANY THIRD PARTY.

3. **Advice of Counsel.** Each Party acknowledges to each other-Party that they have executed this Release acting upon its independent judgment or upon the advice of his legal counsel, without representation, expressed or implied, of any kind or nature from any party except as specifically set forth herein. Each of the Parties acknowledge that it has read this Release, that it has reviewed all terms and conditions herein, that it understands the meaning and effect thereof, and, after discussing this Release with its legal counsel, it has willingly entered into and executed this Release for the above-stated consideration.

4. **Joint Preparation.** It is agreed that this Release has been jointly prepared and, therefore, the authorship hereof shall not affect the construction hereof.

5. **Modification/Amendment.** This Release cannot be modified, changed, or terminated orally. Any modification, change or termination of this Release must be in writing and signed by authorized representatives of all parties.

6. **Parties.** Each of the Parties agree that this Release shall inure to the benefit of, and be binding upon, each of the Parties and their respective affiliates, officers, directors, shareholders, partners (general and limited), agents, heirs, legal representatives, executors, administrators, successors and assigns, and any who might attempt to claim by, through or under them.

7. **Applicable Law, Jurisdiction and Venue.** This Release shall be governed by, construed and enforced in accordance with, and subject to, the laws of the State of Texas except to the extent that federal statutory or common law may pre-empt or overrule such laws. Any claim arising out of a breach of this Release shall be brought in the Bankruptcy Court or, in the event the Bankruptcy Court does not have or declines to exercise jurisdiction, in the District Court of Harris County, Texas, without limiting any party's right of removal to Federal District Court.

8. **Counterparts.** This Release may be executed in a number of identical counterparts, each of which shall be deemed an original for all purposes.

9. **Authorization.** Each of the Parties warrant and represent to each other that they have the full lawful right, power and authority, without joinder of any other party, to execute this Release through the persons whose signatures are subscribed below, and to consummate the undertakings specified in this Release.

NY 71498851v2

10.    **Waiver.**  Any failure by the parties to exercise any rights under this Release shall not be construed as a waiver of its right to exercise the same or any other right at any time or from time to time.  No waiver of any of the terms of this Release shall be valid unless in writing and signed by the parties.

EXECUTED by duly authorized signatories of the parties as of the date hereof.

Reliant Energy Channelview LP

By: Reliant Energy Channelview (Texas) LLC,
       general partner

By:_____
Its: _____

Reliant Energy Channelview (Texas) LLC

By:_____
Its: _____

Reliant Energy Channelview (Delaware) LLC

By:_____
Its: _____

Reliant Energy Services Channelview LLC

By:_____
Its: _____

Reliant Energy Power Generation Inc.

By:_____
Its: _____


Reliant Energy Services, Inc.
By:_____
Its: _____

Reliant Energy, Inc.
By:_____
Its: _____

NY 71498851v2

Equistar Chemicals, LP

By:_____

Its:_____

NY 714988S1v2

EXHIBIT A to Mutual Release

The claims listed below are excepted from this Release.

     OR

There are no claims excepted from this Release.

Initialed on behalf of each of the Parties:

REC          REC (TX)     REC (DE)     RESC     REPG     RES     REI

EQUI

# **Exhibit C to the Order**

## RES ASSIGNMENT AND ASSUMPTION AGREEMENT

This ASSIGNMENT AND ASSUMPTION AGREEMENT (this "*Agreement*"), dated as of _____, 2008, is made by and between Reliant Energy Services, Inc., a Delaware corporation (the "*Assignor*") and GIM Channelview Cogeneration, LLC, a Delaware limited liability company (the "*Assignee*"). Unless otherwise defined herein, capitalized terms have the meanings ascribed to them in the Purchase Agreement defined below.

## RECITALS:

WHEREAS, Reliant Energy Channelview LP, Reliant Energy Services Channelview LLC and GIM Channelview Cogeneration, LLC have entered into that certain Asset Purchase Agreement, dated as of April 3, 2008 (the "*Purchase Agreement*");

WHEREAS, pursuant to the Purchase Agreement, that certain Fuel Purchase and Sale Agreement, dated as of December 15, 1999, by and among Assignor, Reliant Energy Channelview LP and Equistar Chemicals, LP (the "*Fuel Purchase and Sale Agreement*") is required to be assigned to and assumed by Buyer's designee.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and pursuant to the terms and conditions of the Purchase Agreement, the parties hereto hereby agree as follows:

1.  Assignment of Fuel Purchase and Sale Agreement. Subject to the terms and conditions hereof, Assignor does hereby sell, convey, transfer, assign, set over and deliver to Assignee all of Assignor's rights, title and interest in and to and obligations under, the Fuel Purchase and Sale Agreement, free and clear of all Liens, Claims and other interests (except Permitted Exceptions).

2.  Assumption. Assignee hereby assumes and agrees to perform all of Assignor's obligations and liabilities arising out of the Fuel Purchase and Sale Agreement.

3.  Subject to Purchase Agreement. Nothing contained herein shall itself change, amend, extend or alter (nor shall it be deemed or construed as changing, amending, extending or altering) the terms or conditions of the Purchase Agreement in any manner whatsoever. In the event of any conflict or other difference between the Purchase Agreement and this Agreement, the provisions of the Purchase Agreement shall control.

4.  Binding Effect; Third Party Beneficiaries. This Agreement shall be binding upon the parties hereto and their respective successors and permitted assigns and shall inure to the benefit of, and be enforceable by, the parties hereto and their respective successors and permitted assigns. This Agreement is not intended, and shall not be construed, to give any Person other than the parties signatory hereto and their respective successors and permitted assigns any interest or rights (including third party beneficiary rights) with

respect to or in connection with any agreement or provision herein or any matter contemplated hereby.

5.    Headings.  The headings contained in this Agreement are included for purposes of convenience only and shall not affect the meaning or interpretation of this Agreement.

6.    Governing Law.  THIS AGREEMENT SHALL BE GOVERNED IN ALL RESPECTS, INCLUDING VALIDITY, INTERPRETATION AND EFFECT, BY THE LAWS OF THE STATE OF NEW YORK (WITHOUT GIVING EFFECT TO ANY CONFLICT OF LAWS PRINCIPLES OTHER THAN SECTION 5-1401 OF THE GENERAL OBLIGATIONS LAW OF THE STATE OF NEW YORK).

7.    Further Assurances.  At any time or from time to time after the date hereof, each party hereto shall execute, acknowledge and deliver any further agreements, instruments or documents and take all such further action as the other party may reasonably request in order to evidence the assignment by Assignor to Assignee of the Fuel Purchase and Sale Agreement in accordance with the terms hereof.

8.    Notices.  All notices and other communications hereunder shall be in writing and shall be deemed given if delivered personally to, or mailed by registered or certified mail (return receipt requested) if and when received by, or sent via facsimile if and when received by, the parties at the following addresses (or at such other address for a party as shall be specified by like notice):

        If to Assignor, to:

        Reliant Energy Services, Inc.
        1000 Main Street, 12th Floor
        Houston, Texas 77002

        Attention:      General Counsel
        Facsimile:      713-537-7465

        With a copy to:

        Stroock & Stroock & Lavan LLP
        180 Maiden Lane
        New York, NY 10038

        Attention:      Michael S. Shenberg
        Facsimile:      212-806-6006


        If to Assignee, to:

        If to Buyer, to:

NY 71502871v3

GIM Channelview Cogeneration, LLC
c/o Global Infrastructure Partners - A, L.P.
315 Park Avenue South, 8th Floor
New York, NY 10010
Attention:      Salim G. Samaha
Facsimile:      (212) 448-3526

Fortistar LLC
One North Lexington Avenue
White Plains, NY 10601
Attention:      Mark Comora
Facsimile:      (914) 421-0052

With a copy to:

Vinson & Elkins LLP
The Willard Office Building
1455 Pennsylvania Avenue NW
Suite 600
Washington, D.C. 20004-1008
Attention:      Mark S. Laufman
Facsimile:      (202) 879-8869

9.      <u>Interpretation</u>.  Capitalized terms used but not defined herein shall have the meaning set forth in the Purchase Agreement.

10.     <u>Counterparts</u>.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

**[Signature page follows this page.]**

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

ASSIGNOR:

RELIANT ENERGY SERVICES, INC.

By: _____
Name:
Title:

ASSIGNEE:

**GIM CHANNELVIEW COGENERATION, LLC**

By:  Global Infrastructure Partners - A, L.P.
*Member of GIM Channelview Cogeneration, LLC*

By: Global Infrastructure GP, L.P., its general partner

By: Global Infrastructure Investors, Limited, its general partner

By   : _____
Name: _____
Title: _____

-4-

Equistar Chemicals, LP ("Equistar") hereby (i) consents to the assignment of the Fuel Purchase and Sale Agreement from Reliant Energy Services, Inc., Assignor ("Assignor") to GIM Channelview Cogeneration LLC, Assignee, or its designee ("Assignee"), (ii) acknowledges that to its knowledge, Assignor is not in default in keeping, observing or performing any term, covenant, agreement, provision, condition or limitation set forth in the Fuel Purchase and Sale Agreement, (iii) releases Assignor from all of the duties, covenants, provisions, conditions and obligations of the Assignor in the Fuel Purchase and Sale Agreement, excluding, however, from such release the payment of amounts arising or accruing for deliveries occurring prior to the date hereof, as provided in the Mutual Release to be executed by Equistar, Assignor, and others at the Closing ("Pre-Closing Amounts"), and (iv) from and after the date hereof, agrees to look solely to Assignee for payment under and performance of the Fuel Purchase and Sale Agreement arising or accruing on or after the date hereof (excluding Pre-Closing Amounts, for which Equistar agrees to look solely to Assignor for such payment and performance).

EQUISTAR CHEMICALS, LP


By:      _____
Name:
Title:


Reliant Energy Services, Inc., Assignor ("Assignor"), desiring to make an assignment of its rights and obligations under the Fuel Purchase and Sale Agreement from Assignor to GIM Channelview Cogeneration LLC, Assignee or its designee ("Assignee"), (i) acknowledges that to its knowledge, Equistar Chemicals, LP ("Equistar") is not in default in keeping, observing or performing any term, covenant, agreement, provision, condition or limitation set forth in the Fuel Purchase and Sale Agreement, (ii) releases Equistar from all of the duties, covenants, provisions, conditions and obligations of Equistar in the Fuel Purchase and Sale Agreement, excluding, however, from such release the payment of amounts arising or accruing for deliveries occurring prior to the date hereof, as provided in the Mutual Release to be executed by Equistar, Assignor, and others at the Closing ("Pre-Closing Amounts"), and (iii) from and after the date hereof, Assignor relinquishes all rights and interests in the Fuel Purchase and Sale Agreement and agrees that it has no right to payment or performance under the Fuel Purchase and Sale Agreement as a third party beneficiary or otherwise (excluding Pre-Closing Amounts, for which Assignor agrees to look solely to Equistar for such payment and performance).

RELIANT ENERGY SERVICES, INC.


By:      _____
Name:
Title:

NY 71502871v3

**EXHIBIT H**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | **Chapter 11** |
| | ) | |
| **RELIANT ENERGY CHANNELVIEW,** | ) | **Case No. 07-11160 (MFW)** |
| **LP, et al.,** | ) | |
| | ) | |
| Debtors. | ) | **Jointly Administered** |
| | ) | **Re: Docket No. 319, 479 & 486** |

STATEMENT OF ISSUE AND DESIGNATION OF RECORD ON APPEAL OF
KELSON CHANNELVIEW LLC (F/K/A KELSON ENERGY IV LLC) FROM ORDER
APPROVING DEBTORS' PROPOSED BID PROTECTIONS (Dk. No. 319), AND
ORDER AUTHORIZING (I) THE SALE OR TRANSFER OF CERTAIN ASSETS OF
RELIANT ENERGY CHANNELVIEW LP AND RELIANT ENERGY SERVICES
CHANNELVIEW LLC FREE AND CLEAR OF LIENS, CLAIMS AND
ENCUMBRANCES AND OTHER INTERESTS, (II) THE ASSUMPTION AND
ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED
LEASES IN CONNECTION THEREWITH, (III) ASSUMPTION OF CERTAIN
LIABILITIES, AND (IV) GRANTING RELATED RELIEF (Dk. No. 479)

Pursuant to Federal Rule of Bankruptcy 8006, Kelson Channelview LLC (f/k/a Kelson

Energy IV LLC) (the "Appellant"), hereby submits its statement of the issues to be presented and

designates the record on appeal to the United States District Court for the District of Delaware

with respect to the *Order Approving Debtors' Proposed Bid Protections* [Docket No. 319] (the

"Bid Order") and the *Order Authorizing (I) the Sale or Transfer of Certain Assets of Reliant*

*Energy Channelview LP and Reliant Energy Services Channelview LLC Free and Clear of Liens,*

*Claims and Encumbrances and Other Interests, (II) the Assumption and Assignment of Certain*

*Executory Contracts and Unexpired Leases in Connection Therewith, (III) Assumption of*

*Certain Liabilities, and (IV) Granting Related Relief* [Docket No. 479] (the "Sale Order").

**Issue to be Presented on Appeal**

1.      Whether the United States Bankruptcy Court for the District of Delaware

incorrectly denied the award of a break-up fee in the amount of $15,000,000 to Appellant upon

the closing of an Alternative Transaction.[1]

## Designation of Items to be Included in Record on Appeal[2]

### Bid Order Documents

| DATE | DOCKET NUMBER | DOCUMENT |
|---|---|---|
| 08/31/2007 | 69 | Transcript of First Day Motions Before Honorable Mary F. Walrath, Chief Judge |
| 03/07/2008 | 277 | Motion of the Debtors and Debtors-in-Possession to Approve Certain Bid Protections in Connection with the Debtors' Proposed Sale of Substantially All of Their Assets to Kelson Energy IV LLC |
| 03/07/2008 | 278 | Affidavit of Service of Rebecca V. Speaker re: Order (MODIFIED) (A) Granting Expedited Motion of Equistar Chemicals, LP to Continue Hearing on and Objection Deadline for Debtors' Sale Motion (B) Continuing Certain Hearing Dates and Objection Deadlines |
| 03/07/2008 | 280 | Supplemental Affidavit of Service of Rebecca V. Speaker re: Motion of Debtors' and Debtors in Possession to Approving Certain Bid Protection in Connection with the Debtors' Proposed Sale of Substantially all of their Assets to Kelson Energy IV LLC |
| 03/14/2008 | 295 | Objection of Fortistar LLC to Motion of the Debtors and Debtors-In-Possession to Approve Certain Bid Protections in Connection with the Debtors' Proposed Sale of Substantially All of Their Assets to Kelson Energy IV LLC |
| 03/14/2008 | 300 | Response of Official Committee of Unsecured Creditors to Debtors' Motion to Approve Certain Bid Procedures in Connection with the Debtors' Proposed Sale of Substantially All of Their Assets to Kelson Energy IV LLC |
| 03/18/2008 | 319 | Order Approving Debtors' Proposed Bid Protections |
| 03/26/2008 | 335 | Transcript of the Hearing held on March 18, 2008 before the Honorable Mary F. Walrath. |

---

[1]       Capitalized terms not parenthetically defined herein shall have the meaning ascribed to them in the *Motion of the Debtors and Debtors-In-Possession to Approve Certain Bid Protections in Connection with the Debtors' Proposed Sale of Substantially All of their Assets to Kelson Energy IV LLC* [Docket No. 277].

[2]       All items designated herein include all exhibits, attachments or other papers included within each docket entry for such item.

| DATE | DOCKET NUMBER | DOCUMENT |
|------|---------------|----------|
| 03/31/08 | 343 | Preliminary Response of the Official Committee of Unsecured Creditors to the Debtors' Motion, Inter Alia, to Sell Assets and Assume and Assign Executory Contracts |
| 06/13/2008 | 486 | Notice of Appeal from Order Approving Debtor's Proposed Bid Protections (Dk. No. 319), and Order Authorizing (I) The Sale or Transfer of Certain Assets of Reliant Energy Channelview LP and Reliant Energy Services Channelview LLC Free and Clear of Liens, Claims and Encumbrances and Other Interests, (II) The Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection Therewith, (III) Assumption of Certain Liabilities, and (IV) Granting Related Relief (Dk. No. 479) |

## Sale Order Documents

| DATE | DOCKET NUMBER | DOCUMENT |
|------|---------------|----------|
| 02/26/2008 | 251 | Motion of the Debtors and Debtors-in-Possession Pursuant to Sections 105(a), 363 and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006, 9007 and 9014 for an Order Authorizing (I) the Sale or Transfer of Certain Assets of the Debtors Free and Clear of Liens, Claims and Encumbrances, (II) the Assumption and Assignment of Certain Executory Contracts, (III) and Granting Related Relief |
| 03/04/2008 | 263 | Emergency Motion of Equistar Chemicals, LP to Continue Hearing On and Objection Deadline for Debtors' Motion for an Order Authorizing (I) the Sale or Transfer of Certain Assets of the Debtors Free and Clear of Liens, Claims and Encumbrances, (II) the Assumption and Assignment of Certain Executory Contracts and (III) Granting Related Relief |
| 03/04/2008 | 264 | Motion for Expedited Consideration of Equistar Chemicals, LP's Emergency Motion to Continue Hearing On and Objection Deadline for Debtors' Motion for an Order Authorizing (I) the Sale or Transfer of Certain Assets of the Debtors Free and Clear of Liens, Claims and Encumbrances, (II) the Assumption and Assignment of Certain Executory Contracts and (III) Granting Related Relief |

| Date | Docket Number | Document |
|---|---|---|
| 03/04/2008 | 266 | Order Shortening Notice Period and Response Deadline for, and Scheduling Expedited Hearing on, Equistar Chemicals, LP's Emergency Motion to Continue Hearing on and Objection Deadline for Debtors' Sale Motion |
| 03/05/2008 | 268 | Response of the Debtors and Debtors-in-Possession to the Emergency Motion of Equistar Chemicals, LP to Continue Hearing on and Objection Deadline for Debtors' Motion for an Order Authorizing (I) The Sale or Transfer of Certain Assets of the Debtors Free and Clear of Liens, Claims and Encumbrances, (II) The Assumption and Assignment of Certain Executory Contracts and (III) Granting Related Relief |
| 03/07/2008 | 273 | Certification of Counsel Filed by Equistar Chemicals, LP. |
| 03/07/2008 | 275 | Order (Modified) (A) Granting Expedited Motion of Equistar Chemicals, LP to Continue Hearing on and Objection Deadline for Debtors' Sale Motion and (B) Continuing Certain Hearing Dates and Objection Deadlines |
| 03/11/2008 | 284 | Certificate of Publication of Vicki Eubanks of Notice of Hearing in Connection with the Sale of Assets of Certain Debtors in The Houston Chronicle |
| 03/11/2008 | 285 | Preliminary Objection of Fortistar LLC to Motion of the Debtors and Debtors-In-Possession Pursuant to Sections 105(a), 363 and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006, 9007 and 9014 for an Order Authorizing (I) the Sale or Transfer of Certain Assets of the Debtors Free and Clear of Liens, Claims and Encumbrances (II) the Assumption and Assignment of Certain Executory Contracts, (III) and Granting Related Relief |
| 03/14/2008 | 302 | Objection of Siemens Power Generation, Inc. to (A) Debtors' Motion Pursuant to Sections 105(a), 363 and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006, 9007, and 9014 for an Order Authorizing (I) the Sale or Transfer of Certain Assets of the Debtors Free and Clear of Liens, Claims and Encumbrances, (II) the Assumption and Assignment of Certain Executory Contracts, (III) and Granting Related Relief [Docket No. 251]; and (B) Debtors' Motion for Entry of an Order Establishing Cure Amounts With Respect to Executory Contracts and Unexpired Leases That are to be Assumed and Assigned in Connection With the Sale of the Debtors' Business [Docket No. 258] |

| DATE | DOCKET NUMBER | DOCUMENT |
|---|---|---|
| 03/19/2008 | 325 | Transcript of Hearing held on March 5, 2008 before the Honorable Mary F. Walrath |
| 03/24/2008 | 332 | Certification of Counsel Regarding Stipulated Confidentiality Agreement and Protective Order |
| 03/28/2008 | 340 | Notice of Filing of Revised Schedule 2.1(e) to Asset Purchase Agreement |
| 03/31/2008 | 349 | Preliminary Objections of Equistar Chemicals, LP to Debtors' Motion for an Order Authorizing (I) the Sale or Transfer of Certain Assets of the Debtors Free and Clear of Liens, Claims and Encumbrances, (II) the Assumption and Assignment of Certain Executory Contracts and (III) Granting Related Relief |
| 04/07/2008 | 363 | Response of the Administrative Agent to the Secured Lenders to the Debtors' Motion Pursuant to Sections 105(a), 363 and 365 Of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006, 9007 and 9014 for an Order Authorizing (I) the Sale or Transfer of Certain Assets of the Debtors Free and Clear of Liens, Claims and Encumbrances, (II) the Assumption and Assignment of Certain Executory Contracts, (III) and Granting Related Relief |
| 04/07/2008 | 362 | Reply in Further Support of the Debtors' Sale Motion and Motion to Establish Cure Amounts |
| 04/08/2008 | 365 | Notice of Auction Result and Hearing |
| 04/09/2008 | 366 | Notice of Filing of Asset Purchase Agreement |
| 04/16/2008 | 381 | Transcript of Hearing held April 9, 2008 before the Honorable Mary F. Walrath |
| 04/28/2008 | 402 | Certification of Counsel Regarding Proposed Order Denying Motion of the Debtors and Debtors-in-Possession Pursuant to Sections 105(a), 363 and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006, 9007 and 9014 for an Order Authorizing (I) the Sale or Transfer of Certain Assets of the Debtors Free and Clear of Liens, Claims and Encumbrances, (II) the Assumption and Assignment of Certain Executory Contracts, (III) and Granting Related Relief |

| DATE | DOCKET NUMBER | DOCUMENT |
|---|---|---|
| 04/28/2008 | 404 | Response of Official Committee of Unsecured Creditors to the Certification of Counsel Regarding Proposed Order Denying Motion of the Debtors and Debtors-In-Possession Pursuant to Sections 105(A), 363 and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006, 9007 and 9014 for an Order Authorizing (I) the Sale or Transfer of Certain Assets of the Debtors Free and Clear of Liens, Claims and Encumbrances, (II) the Assumption and Assignment of Certain Executory Contracts, (III) and Granting Related Relief |
| 06/06/2008 | 473 | Certification of Counsel Concerning Motion of the Debtors and Debtors-in-Possession Pursuant to Sections 105(a), 363 and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006, 9007 and 9014 for an Order Authorizing (I) the Sale or Transfer of Certain Assets of the Debtors Free and Clear of Liens, Claims and Encumbrances, (II) the Assumption and Assignment of Certain Executory Contracts, (III) and Granting Related Relief |
| 06/09/2008 | 474 | Certification of Counsel Concerning Motion of the Debtors and Debtors-in-Possession Pursuant to Sections 105(a), 363 and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006, 9007 and 9014 for an Order Authorizing (I) the Sale or Transfer of Certain Assets of the Debtors Free and Clear of Liens, Claims and Encumbrances, (II) the Assumption and Assignment of Certain Executory Contracts, (III) and Granting Related Relief |
| 06/09/2008 | 479 | Order Authorizing (I) the Sale or Transfer of Certain Assets of Reliant Energy Channelview LP and Reliant Energy Services Channelview LLC Free and Clear of Liens, Claims and Encumbrances and Other Interests, (II) the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection Therewith, (III) Assumption of Certain Liabilities, and (IV) Granting Related Relief |

| DATE | DOCKET NUMBER | DOCUMENT |
|---|---|---|
| 06/13/2008 | 486 | Notice of Appeal from Order Approving Debtor's Proposed Bid Protections (Dk. No. 319), and Order Authorizing (I) The Sale or Transfer of Certain Assets of Reliant Energy Channelview LP and Reliant Energy Services Channelview LLC Free and Clear of Liens, Claims and Encumbrances and Other Interests, (II) The Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection Therewith, (III) Assumption of Certain Liabilities, and (IV) Granting Related Relief (Dk. No. 479) |

## Cash Collateral Documents

| DATE | DOCKET NUMBER | DOCUMENT |
|---|---|---|
| 08/20/2007 | 10 | Emergency Motion of the Debtors for Entry of (I) Interim Order (A) Authorizing Use of Cash Collateral and Granting Adequate Protection, (B) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001, and (C) Granting Related Relief, and (II) a Final Order in Respect Thereof |
| 08/21/2007 | 24 | Objection to Debtors' Motion for Entry of an Interim Order Authorizing Use of Cash Collateral and Cross Motion for Order Conditioning the Debtors' Continued Use of the Lenders' Collateral Upon Adequate Protection of the Lenders or, in the Alternative, Granting Relief from the Automatic Stay |
| 08/22/2007 | 28 | Certification of Counsel re: Emergency Motion of the Debtors for Entry of (I) Interim Order (A) Authorizing Use of Cash Collateral and Granting Adequate Protection, (B) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001, and (C) Granting Related Relief, and (II) a Final Order in Respect Thereof |
| 08/23/2007 | 48 | Interim Order (I) Authorizing Use of Cash Collateral and Granting Adequate Protection, (II) Scheduling a Final Hearing, and (III) Granting Related Relief |
| 08/23/2007 | 49 | Notice of (A) Entry of Interim Order Pursuant to Sections 361, 362 and 363 of the Bankruptcy Code (I)Authorizing the Use of Cash Collateral and Granting Adequate Protection, (II) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001, and (III) Granting Related Relief and (B) Scheduling of a Final Hearing Thereon |

7

| DATE | DOCKET NUMBER | DOCUMENT |
|---|---|---|
| 09/7/2007 | 82 | Statement of Equistar Chemicals, LP in Response to (I) Debtors' Motion for Final Order Authorizing Use of Cash Collateral and Granting Adequate Protection and (II) Pre-Petition Lenders' Objection and Cross-Motion |
| 09/17/2007 | 100 | Minute Entry re: Final Cash Collateral |
| 09/17/2007 | 101 | Order (Final) (I) Authorizing Use of Cash Collateral and Granting Adequate Protection and (II) Granting Related Relief |
| 09/24/2007 | 105 | Transcript of Hearing held on September 17, 2007 before the Honorable Mary F. Walrath |
| 01/02/2008 | 195 | Motion of the Debtors for Entry of an Order (A) Extending "Final Order Pursuant to Sections 105, 361, 362 and 363 of the Bankruptcy Code (I) Authorizing the Use of Cash Collateral and Granting Adequate Protection and (II) Granting Related Relief" [Docket No. 101], Entered September 17, 2007, (B) Authorizing Continued Use of Cash Collateral and Granting Adequate Protection, and (C) Granting Related Relief |
| 01/02/2008 | 196 | Debtors' Motion for an Order (A) Shortening Notice with Respect to Motion of the Debtors for Entry of an Order (a) Extending "Final Order Pursuant to Sections 105, 361, 362 and 363 of the Bankruptcy Code (I) Authorizing the Use of Cash Collateral and Granting Adequate Protection and (II) Granting Related Relief" [Docket No. 101], Entered September 17, 2007, (b) Authorizing Continued Use of Cash Collateral and Granting Adequate Protection, and (c) Granting Related Relief; and (B) Setting Expedited Hearing Date in Connection Therewith |
| 01/04/2008 | 198 | Order (A) Shortening Notice with Respect to Motion of the Debtors for Entry of an Order (a) Extending "Final Order Pursuant to Sections 105, 361, 362 and 363 of the Bankruptcy Code (I) Authorizing the Use of Cash Collateral and Granting Adequate Protection and (II) Granting Related Relief" [Docket No. 101], Entered September 17, 2007, (b) Authorizing Continued Use of Cash Collateral and Granting Adequate Protection, and (c) Granting Related Relief; and (B) Setting Expedited Hearing Date in Connection Therewith |

| DATE | DOCKET NUMBER | DOCUMENT |
|------|---------------|----------|
| 01/04/2008 | 199 | Notice of "Motion of the Debtors for Entry of an Order (A) Extending "Final Order Pursuant to Sections 105, 361, 362 and 363 of the Bankruptcy Code (I) Authorizing the Use of Cash Collateral and Granting Adequate Protection and (II) Granting Related Relief" [Docket No. 101], Entered September 17, 2007, (B) Authorizing Continued Use of Cash Collateral and Granting Adequate Protection, and (C) Granting Related Relief" [Docket No. 195] and Expedited Hearing Thereon |
| 01/10/2008 | 202 | The Official Committee of Unsecured Creditors' Response to Motion of the Debtors for Entry of an Order (A) Extending "Final Order Pursuant to Sections 105, 361, 362 and 363 of the Bankruptcy Code (I) Authorizing the Use of Cash Collateral and Granting Adequate Protection and (II) Granting Related Relief" [Docket No. 101], Entered September 17, 2007, (B) Authorizing Continued Use of Cash Collateral and Granting Adequate Protection, and (C) Granting Related Relief |
| 01/15/2008 | 212 | Order Granting Motion of the Debtors for Entry of an Order (A) Extending "Final Order (I) Authorizing the Use of Cash Collateral and Granting Adequate Protection and (II) Granting Related Relief", Entered September 17, 2007, (B) Authorizing Continued Use of Cash Collateral and Granting Adequate Protection, and (C) Granting Related Relief |
| 03/14/2008 | 304 | Motion of the Debtors for Entry of an Order Further Extending "Final Order Pursuant to Sections 105, 361, 362 and 363 of the Bankruptcy Code (I) Authorizing the Use of Cash Collateral and Granting Adequate Protection and (II) Granting Related Relief" [Docket No. 101], Entered September 17, 2007 |
| 03/14/2008 | 306 | Debtors' Motion for an Order Shortening Notice with Respect to Motion of the Debtors for Entry of an Order Further Extending "Final Order Pursuant to Sections 105, 361, 362 and 363 of the Bankruptcy Code (I) Authorizing the Use of Cash Collateral and Granting Adequate Protection and (II) Granting Related Relief" [Docket No. 101] Entered September 17, 2007 |

| DATE | DOCKET NUMBER | DOCUMENT |
|---|---|---|
| 03/17/2008 | 309 | Order Shortening Notice with Respect to Motion of the Debtors for Entry of an Order Further Extending "Final Order Pursuant to Sections 105, 361, 362 and 363 of the Bankruptcy Code (I) Authorizing the Use of Cash Collateral and Granting Adequate Protection and (II) Granting Related Relief" [Docket No. 101] Entered September 17, 2007 |
| 03/18/2008 | 318 | Order (Second) Further Extending "Final Order (I) Authorizing the Use of Cash Collateral and Granting Adequate Protection and (II) Granting Related Relief" |
| 04/18/2008 | 383 | Certification of Counsel Concerning Agreed Order Further Extending "Final Order Pursuant to Sections 105, 361, 362 and 363 of the Bankruptcy Code (I) Authorizing the Use of Cash Collateral and Granting Adequate Protection and (II) Granting Related Relief" [Docket No. 101] |
| 04/21/2008 | 384 | Order (Agreed) Further Extending "Final Order (I) Authorizing the Use of Cash Collateral and Granting Adequate Protection and (II) Granting Related Relief" |
| 04/21/2008 | 385 | Motion of the Debtors for Entry of an Order Further Extending "Final Order Pursuant to Sections 105, 361, 362 and 363 of the Bankruptcy Code (I) Authorizing the Use of Cash Collateral and Granting Adequate Protection and (II) Granting Related Relief" [Docket No. 101] Entered September 17, 2007 |
| 04/21/2008 | 386 | Motion of the Debtors for Entry of an Order Further Extending "Final Order Pursuant to Sections 105, 361, 362 and 363 of the Bankruptcy Code (I) Authorizing the Use of Cash Collateral and Granting Adequate Protection and (II) Granting Related Relief" [Docket No. 101], Entered September 17, 2007 |
| 04/21/2008 | 387 | Debtors Motion for an Order Shortening Notice with Respect to Motion of the Debtors for Entry of an Order Further Extending "Final Order Pursuant to Sections 105, 361, 362 and 363 of the Bankruptcy Code (I) Authorizing the Use of Cash Collateral and Granting Adequate Protection and (II) Granting Related Relief" [Docket No. 101] Entered September 17, 2007 |
| 04/22/2008 | 391 | Order Shortening Notice with Respect to Motion of the Debtors for Entry of an Order Further Extending "Final Order Pursuant to Sections 105, 361, 362 and 363 of the Bankruptcy Code (I) Authorizing the Use of Cash Collateral and Granting Adequate Protection and (II) Granting Related Relief" [Docket No. 101] Entered September 17, 2007 |

| DATE | DOCKET NUMBER | DOCUMENT |
|---|---|---|
| 4/30/2008 | 407 | The Official Committee of Unsecured Creditors' Response to Motion of the Debtors for Entry of an Order Further Extending "Final Order Pursuant to Sections 105, 361, 362 and 363 of the Bankruptcy Code (I) Authorizing the Use of Cash Collateral and Granting Adequate Protection and (II) Granting Related Relief" [Docket No. 101] Entered September 17, 2007 |
| 05/02/2008 | 422 | Minute Entry re: Cash Collateral and Motion to Appoint a Chapter 11 Trustee and Certification of Counseling re: Sale |
| 05/02/2008 | 423 | Order (Second Agreed) Further Extending Final Order (I) Authorizing The Use Of Cash Collateral And Granting Adequate Protection And (II) Granting Related Relief |
| 05/12/2008 | 433 | Transcript of the Hearing held on May 2, 2008 before the Honorable Mary F. Walrath |
| 05/13/2008 | 437 | Objection of the Administrative Agent to the Prepetition Lenders to Debtors' Motion Seeking the Use of Lenders' Cash Collateral and to the Debtors' Continued Use of Lenders' Collateral Absent Appropriate Adequate Protection |
| 05/19/2008 | 441 | Certification of Counsel Concerning Agreed Order Further Extending "Final Order Pursuant to Sections 105, 361, 362 and 363 of the Bankruptcy Code (I) Authorizing the Use of Cash Collateral and Granting Adequate Protection and (II) Granting Related Relief" [Docket No. 101] |
| 05/20/2008 | 445 | Order (Third Agreed) Further Extending "Final Order (I) Authorizing the Use of Cash Collateral and Granting Adequate Protection and (II) Granting Related Relief" |
| 05/30/2008 | 456 | Certification of Counsel Concerning Agreed Order Further Extending "Final Order Pursuant to Sections 105, 361, 362 and 363 of the Bankruptcy Code (I) Authorizing the Use of Cash Collateral and Granting Adequate Protection and (II) Granting Related Relief" [Docket No. 101] |
| 06/03/2008 | 462 | Order (Fourth Agreed) Further Extending "Final Order (I) Authorizing the Use of Cash Collateral and Granting Adequate Protection and (II) Granting Related Relief" |
| 06/09/2008 | 478 | Order (Fifth Agreed) Further Extending "Final Order (I) Authorizing the Use of Cash Collateral and Granting Adequate Protection and (II) Granting Related Relief" |
| 06/18/2008 | 489 | Transcript of Hearing held on June 9, 2008 before the Honorable Mary F. Walrath |

Dated: June 23, 2008

Respectfully submitted,

BIFFERATO GENTILOTTI LLC

By: _____
Garvan F. McDaniel, Esq. (#4167)
800 North King Street
Wilmington, DE 19801
Telephone:    (302) 429-1900

-and-

KASOWITZ, BENSON, TORRES
  & FRIEDMAN LLP

Andrew K. Glenn, Esq.
1633 Broadway
New York, New York 10019
Telephone:    (212) 506-1700
Facsimile:    (212) 506-1800

## EXHIBIT I

Westlaw.

98 Fed.Appx. 93
98 Fed.Appx. 93, 2004 WL 843283 (C.A.3 (Del.))
(Not Selected for publication in the Federal Reporter)
98 Fed.Appx. 93, (C.A.3 (Del.))2004 WL 843283

Page 1

**H**
In re Vencor Inc.
C.A.3 (Del.),2004
This case was not selected for publication in the
Federal Reporter NOT PRECEDENTIAL Please
use FIND to look at the applicable circuit court rule
before citing this opinion. Third Circuit Local Ap-
pellate Rule 28.3(a) and Internal Operating Proced-
ure 5.3. (FIND CTA3 Rule 28.0 and CTA3 IOP
APP 1 5.3.)

United States Court of Appeals,Third Circuit.
In re: VENCOR INC., et al., Debtor
Charles L. Abrahams; Eli-Anne Phillips-Minks,
Appellants,
v.
Kindred Healthcare Inc. f/k/a Vencor Inc. David
Buckbiner, Trustee
No. 03-2670.

Submitted Under Third Circuit LAR 34.1(a) April
12, 2004
Decided April 21, 2004

**Background:** Following confirmation of their reor-
ganization plan and determination that government
had authority to settle prepetition qui tam action
against debtors, debtors moved to disallow proofs
of claim filed by relator from qui tam action and re-
lator's attorney. The Bankruptcy Court granted mo-
tion. Relator and attorney appealed, and debtors
moved, inter alia, to dismiss appeal. The United
States District Court for the District of Delaware,
Gregory M. Sleet, J., 2003 WL 2004385, granted
motion. Relator and attorney appealed.

**Holdings:** The Court of Appeals, Rendell, Circuit
Judge, held that:
(1) Court of Appeals lacked jurisdiction to consider
either merits of order addressing government's set-
tlement authority or district court's jurisdiction to
issue such order;
(2) Court of Appeals lacked jurisdiction to consider
issues related to prior order confirming debtors'
proposed plan of organization; and

(3) bankruptcy rules did not allow relator and attor-
ney to file corrected designation of the record on
appeal and clarification of issues on appeal.

Affirmed.

West Headnotes

**[1] Bankruptcy 51 ☜2060.1**

51 Bankruptcy
    51II In General
        51II(C) Jurisdiction
            51k2060 Exclusive, Conflicting, or Con-
current Jurisdiction
                51k2060.1 k. In General. Most Cited
Cases
On subsequent appeal from Delaware bankruptcy
court's disallowance of proofs of claim that were
filed by relator and relator's attorney in connection
with qui tam action brought against debtors in Cali-
fornia federal district court, Court of Appeals
lacked jurisdiction to consider either merits of Cali-
fornia court's order indicating that government had
authority to settle relator's qui tam action or that
court's jurisdiction to issue such order; Court of
Appeals for circuit embracing California court's
district was proper court with which to lodge appeal
in qui tam action. 28 U.S.C.A. § 1294.

**[2] Bankruptcy 51 ☜3773**

51 Bankruptcy
    51XIX Review
        51XIX(B) Review of Bankruptcy Court
            51k3773 k. Taking and Perfecting Appeal;
Time; Bond. Most Cited Cases

**Bankruptcy 51 ☜3779**

51 Bankruptcy
    51XIX Review
        51XIX(B) Review of Bankruptcy Court
            51k3779 k. Scope of Review in General.
Most Cited Cases

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works

98 Fed Appx 93                                                    Page 2
98 Fed Appx 93, 2004 WL 843283 (C A 3 (Del ))
**(Not Selected for publication in the Federal Reporter)**
**98 Fed.Appx. 93, (C.A.3 (Del.))2004 WL 843283**

On subsequent appeal from bankruptcy court's dis-
allowance of proofs of claim arising out of relator's
qui tam action against debtors, Court of Appeals
lacked jurisdiction to consider issues related to pri-
or order confirming debtors' proposed plan of or-
ganization, given failure of relator and his attorney
in qui tam action to seek to revoke or appeal order
of confirmation before deadline Bankr Code, 11
U S C A § 1144; 28 U S C A § 157(d); 31
U S C A § 3730(c)(3); Fed Rules Bankr Proc Rule
8002, 11 U S C A

**[3] Bankruptcy 51 ☜══3777**

51 Bankruptcy
   51XIX Review
      51XIX(B) Review of Bankruptcy Court
         51k3777 k Record; Assignments of Error;
Briefs Most Cited Cases
Bankruptcy rules did not allow claimants to file
corrected designation of the record on appeal and
clarification of issues on appeal when debtors, as
appellees, did not file cross-appeal Fed Rules
Bankr Proc Rule 8006, 11 U S C A

**[4] Bankruptcy 51 ☜══3777**

51 Bankruptcy
   51XIX Review
      51XIX(B) Review of Bankruptcy Court
         51k3777 k Record; Assignments of Error;
Briefs Most Cited Cases
Claimants' corrected designation of the record on
appeal and clarification of issues on appeal, which
was filed 20 days after debtors filed counter-
designation, was untimely under rule, which
provided for 10-day filing period, and untimeliness
was not excused by counsel's explanation that he
was out of the country and his temporary secretary
failed to follow office procedure Fed Rules
Bankr Proc Rule 8006, 11 U S C A

***94** Appeal from the United States District Court
for the District of Delaware (D C Civil No
03-cv-00004) District Judge: Honorable Gregory
M Sleet

Charles L Abrahams, San Diego, CA, for Appel-
lants
William H Sudell, Jr, Morris, Nichols, Arsht &
Tunnell, Wilmington, DE, Thomas J Moloney,
Lindsee P Granfield, New York, NY, for Appellee

Before RENDELL, COWEN and LAY,[FN*] Circuit
Judges

        FN* Honorable Donald P Lay, Senior Cir-
        cuit Judge for the Eighth Circuit, sitting by
        designation

***95** OPINION OF THE COURT

RENDELL, Circuit Judge
****1** Appellants Charles L Abrahams and Eli-Ane
Phillips-Minks challenge an order of the District
Court granting Appellee Debtors' motion to dismiss
an appeal of an order of the Bankruptcy Court dis-
allowing proof of claims filed by the Appellants in
a bankruptcy action We will affirm

Appellant Phillips-Minks filed a *qui tam* action
against the Debtors in the District Court for the
Southern District of California ("the California
court") Subsequently, Debtors filed bankruptcy pe-
titions in the Bankruptcy Court for the District of
Delaware Appellants then filed proofs of claim
based upon the allegations of the Phillips-Minks *qui
tam* action and fees incurred by Abrahams during
his representation of Phillips-Minks As part of the
Debtors' proposed Plan of Reorganization, the
Debtors and the government settled a number of *qui
tam* actions, including the one filed by Appellants
Appellants objected to the proposed Plan of Reor-
ganization On March 19, 2001, the Bankruptcy
Court issued an order confirming the Plan, with the
settlement of the Appellant's *qui tam* action effect-
ive to the extent that the government had authority
to settle the *qui tam* action, noting that the Califor-
nia court could determine whether the government
had the authority to settle the *qui tam* action Ap-
pellants did not appeal this order

© 2008 Thomson Reuters/West No Claim to Orig U S Govt Works

98 Fed.Appx. 93
98 Fed.Appx. 93, 2004 WL 843283 (C.A.3 (Del.))
**(Not Selected for publication in the Federal Reporter)**
98 Fed.Appx. 93, (C.A.3 (Del.))2004 WL 843283

Page 3

The government moved to intervene in the *qui tam* action in the California court. The court allowed the government to intervene and, subsequently, found that the government had the authority to settle the action. Appellants did not appeal this order.

Debtors then filed a request with the Bankruptcy Court to disallow Appellants' proofs of claim. The Bankruptcy Court issued an order disallowing the proofs of claim, based on that court's order confirming the Plan and the California court's order confirming the government's authority to settle the *qui tam* action. Appellants did appeal this order, and filed a Designation of the Contents for Inclusion in the Record, pursuant to Rule 8006 of the Federal Rules of Bankruptcy Procedure. This Designation listed seven issues for appeal. Also pursuant to Rule 8006, the Appellees filed a Counter Designation in response to the Appellants' Designation, but did not file a cross appeal. Despite this, however, the Appellants filed a Corrected Designation of Record and Clarification of Issues on Appeal, which listed a total of 67 issues for appeal, seven of which had been included in the first Designation. Debtors subsequently filed a motion with the District Court to dismiss the appeal and/or strike the Corrected Designation. The Court granted the motion. Appellants now appeal from the District Court's order granting Debtors' motion to dismiss the appeal.

The Bankruptcy Court had jurisdiction to enter the order disallowing the proofs of claim pursuant to 28 U.S.C. § 157. The District Court had appellate jurisdiction pursuant to 28 U.S.C. § 158(a). We have appellate jurisdiction pursuant to 28 U.S.C. § 1291.

**\*\*2** [1] Appellants raise issues in relation to (1) the order of the California court, (2) the Bankruptcy Court's order confirming the Plan of Reorganization, and (3) the Corrected Designation. With respect to the order of the California court, Appellants contest (a) the court's determination that the government had the authority to settle the *qui tam* action, (b) the court's jurisdiction and impartiality, and (c) the court's "violation" of the automatic stay.

However, we need not analyze this set of issues, as we do not have jurisdiction to **\*96** consider either the merits of the California court's order or its jurisdiction to issue such an order. Had Appellants wished to appeal the order, the Court of Appeals for the Ninth Circuit was the proper court with which to lodge that appeal. *See* 28 U.S.C. § 1294 ("appeals from reviewable decisions of the district and territorial courts shall be taken to the courts of appeals ... from a district court of the United States to the court of appeals for the circuit embracing the district ... ").

[2] We reach a similar conclusion with respect to the several issues raised regarding the Bankruptcy Court's order confirming the Plan of Reorganization. Appellants contest (a) the Bankruptcy Court's application of 31 U.S.C. § 3730(c)(3), (b) the Bankruptcy Court's authority to leave the issue of the government's authority to settle the *qui tam* action to the California court, (c) the Bankruptcy Court's application of 28 U.S.C. § 157(d), and (d) the Bankruptcy Court's determination that the settlement was fair and adequate. We conclude that we do not have jurisdiction to consider issues related to the confirmation order, as Appellants failed to appeal that order. Had Appellants wished to revoke or appeal the order of confirmation, they should have taken action to do so before the applicable deadline. *See* 11 U.S.C. § 1144 (2004) (providing that a court may revoke an order of confirmation if a motion is made to do so within 180 days after the date of entry of the order, "if and only if such order was procured by fraud"); Fed. R. Bankr.P. 8002 (providing that a notice of appeal must be filed with the District Court or Bankruptcy Appellate Panel "within 10 days of the date of entry of the judgment, order, or decree appealed from"). We will not allow Appellants to avoid the consequences of their failure by considering issues related to the confirmation order on appeal from an order disallowing proofs of claim.

[3] Finally, Appellants assert that the District Court erred in granting Debtors' motion to strike the Cor-

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

98 Fed Appx 93
98 Fed Appx 93, 2004 WL 843283 (C A 3 (Del ))
**(Not Selected for publication in the Federal Reporter)**
**98 Fed.Appx. 93, (C.A.3 (Del.))2004 WL 843283**

Page 4

rected Designation. Under Federal Rule of Bankruptcy Procedure 8006, there is no provision for a "Corrected" Desig nation An appellant must file a "designation of the items to be included in the record on appeal and a statement of the issues to be presented" within 10 days of filing a notice appeal of a Bankruptcy Court decision. Fed R Bankr P. 8006. Within 10 days of the filing of this statement, the appellee must file a cross-designation of additional items to be included in the record, and, if the appellee wishes to cross appeal, a statement of issues *Id* If the appellee files a cross-appeal, "a cross appellee may, within 10 days of service of the cross appellant's statement, file and serve on the cross appellant a designation of additional items to be included in the record " *Id* Thus, the appellant is only permitted to file an additional designation if the appellee has filed a cross appeal Here, Appellees did not file a cross appeal, and therefore Appellants were not permitted to file the Corrected Designation of Record and Clarification of Issues on Appeal

**3 [4] Furthermore, as the District Court notes, even if Appellants had been permitted by the rule to file an additional designation, they filed the Corrected Designation too late. Rule 8006 plainly states that the cross appellee must file its designation of additional items within 10 days of service of the cross appellant's statement. Appellants filed the Corrected Designation on December 22, 2002, twenty days after the Appellees filed their Counter Designation on December 2, 2002 Therefore, even if a corrected designation were permitted under Rule 8006, Appellants exceeded the time limitation for doing so. *97 As the District Court explained, Appellants' counsel's excuses for not filing on time-that he was out of the country and that his temporary secretary did not follow office procedure-are not sufficient circumstances to justify the delay In any event, however, the timeliness of the filing of the Corrected Designation is irrelevant, because, as discussed above, Rule 8006 only allows for a cross appellee to file an additional designation in response to a cross appeal. No cross appeal was filed

here.

Accordingly, we will AFFIRM the order of the District Court.

C A 3 (Del ),2004.
In re Vencor Inc.
98 Fed Appx. 93, 2004 WL 843283 (C A 3 (Del ))

END OF DOCUMENT

© 2008 Thomson Reuters/West No Claim to Orig U S Govt. Works.

LEXSEE 2006 U.S. DIST. LEXIS 57022

**In re BRAC GROUP, INC. (f/k/a Budget Group, Inc.), Reorganized Debtor. MICHAEL BELGRAVE, Appellant, v. THE PLAN ADMINISTRATOR FOR BRAC GROUP, INC., Appellee.**

**Case No. 02-12152 (RB), Civil Action No. 05-319-KAJ**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*2006 U.S. Dist. LEXIS 57022*

**March 9, 2006, Decided**

**SUBSEQUENT HISTORY:** Affirmed without opinion by *In re Brac Group Inc., 2006 U.S. App. LEXIS 32479 (3d Cir., Sept. 11, 2006)*

**PRIOR HISTORY:** [*1] Chapter 11.

**COUNSEL:** For Brac Group Inc., formerly known as Budget Group Inc., Debtor: Sean M. Beach, Young, Conaway, Stargatt & Taylor, Wilmington, DE.

For Michael Belgrave, Appellant, Pro se, Cleveland, TX

For Plan Administrator for BRAC, Appellee: Andrew Dieter Cordo, Gregory Alan Taylor, Ashby & Geddes, Wilmington, DE.

**JUDGES:** Kent A. Jordan, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** Kent A. Jordan

**OPINION**

**MEMORANDUM ORDER**

**I. INTRODUCTION**

This is an appeal from a November 6, 2004 Order of the Bankruptcy Court for the District of Delaware approving the Eighteenth Omnibus (Non-Substantive) Objection to Claims Pursuant to *Section 502(b) of the Bankruptcy Code, Bankruptcy Rules 3003* and *3007*, and Local Rule 3007-1 (the "Order"). Michael Belgrave ("Belgrave") filed a Notice of Appeal in the United States Court of Appeals for the Third Circuit on May 4, 2005 (the "Notice of Appeal"), [1] which that Court transmitted here. (Docket Item ["D.I."] 1 at 1.) Before me is a Motion to Dismiss Michael Belgrave's Appeal (D.I. 8, the

"Motion to Dismiss"), and a Motion to Stay Mediation Pending Decision on the Motion to Dismiss the Appeal (D.I. 7; the "Motion [*2] to Stay"), both filed by the Plan Administrator for BRAC Group, Inc. (the "Plan Administrator") Also before me is a Motion filed by Belgrave, which he captioned a Petition for Writ of Certiorari (D.I. 16.) For the reasons that follow, the Motion to Dismiss will be granted, the Motion to Stay will be denied as moot, and the Petition for Writ of Certiorari will be denied.

> 1    The appeal is dated April 25, 2005, but was received by the Court on May 4, 2005. (D.I. 1.)

**II. BACKGROUND**

On November 4, 2004, the Plan Administrator filed the Eighteenth Omnibus (Non-Substantive) Objection to Claims Pursuant to *Section 502(b) of the Bankruptcy Code, Bankruptcy Rules 3003* and *3007*, and Local Rule 3007-1 (the "Eighteenth Omnibus Objection") (D.I. 9 at A10, P 2.) The Eighteenth Omnibus Objection asked the Bankruptcy Court to disallow and expunge certain claims against the bankruptcy estate of BRAC Group, Inc., either because the claims were filed late (D.I. 9 at A3-A4), or because the claims [*3] were filed without any documentation (*Id.* at A5). Belgrave's claim against the estate was part of the latter group of claims. (*Id.*) Belgrave alleges that he objected to the Eighteenth Omnibus Objection on November 17, 2004, and provided "evidence of documentation" of his claim. (D.I. 10 at P 2.) The Court entered the Order approving the Eighteenth Omnibus Objection on December 6, 2004, disallowing and expunging all of the claims, including Belgrave's claim (D.I. 9 at A1-A2.)

An Amended Order was entered on December 16, 2004, correcting only a mistake in the references to the exhibits [2] (*Id.* at A22-A23.) On December 23, 2004 Bel-

grave filed a document captioned "Objection to Order and Amended Order Approving Eighteenth Omnibus (Non-Substantive) Objection to Claims Pursuant to *Section 502(b) of the Bankruptcy Code, Bankruptcy Rules 3003 and 3007,* and Local Rule 3007-1" in the Bankruptcy Court (the "December 23 Objection") (*Id.* at A52.) Belgrave filed the Notice of Appeal on May 4, 2005. (D.I. 1.)

> 2  Specifically, the initial order had improperly referred to the claims that were filed late as being in Exhibit B, when these claims were actually in Exhibit A, and the claims that were filed without documentation as in Exhibit A, when they were actually in Exhibit B. (*See* D.I. 9 at A1-2, A22-23.)

## [*4] III. DISCUSSION

### A. *Motion to Dismiss the Appeal*

*Federal Rule of Bankruptcy Procedure 8002(a)* provides that "[t]he notice of appeal shall be filed with the clerk within ten days of the entry of the judgment, order, or decree appealed from." This ten day time limit "has been strictly construed, requiring strict compliance with its terms. Nor can it be doubted that the rule is jurisdictional in effect ... Failure to file a timely notice of appeal thus deprives the district court of jurisdiction to review the bankruptcy court's order or judgment." *In re Universal Minerals, Inc., 755 F.2d 309, 311-12 (3d Cir. 1985); see also Proteon, Inc. v. Memorex Telex Corp. (In re Memorex Telex Corp.), 241 B.R. 841, 843 (D. Del. 1999)* ("It is well-established that the time limit for filing an appeal from an order of the Bankruptcy Court is jurisdictional in nature.")

The Bankruptcy Court entered the Order from which Belgrave is attempting to appeal on December 6, 2004 and the Amended Order on December 16, 2004. Belgrave did not file his notice of appeal until May 4, 2005, over 140 days after the entry of the Order. This is clearly far outside the ten [*5] day limit of Bankruptcy *Rule 8002(a).*

Additionally, even if the December 23 Objections could be considered a functional notice of appeal, they were not timely filed. The initial order in this case was entered December 6, 2004, seventeen days before the December 23 Objections were filed. Thus, only if the time restarted with the entry of the Amended Order on December 16, 2004 would the Objections have been filed within the ten day limit required by Bankruptcy *Rule 8002.*

The Supreme Court has held, however, that "the mere fact that a judgment previously entered has been reentered or revised in an immaterial way does not toll the time within which review must be sought. Only when the lower court changes matters of substance, or resolves a genuine ambiguity, in a judgment previously rendered should the period within which an appeal must be taken or a petition for certiorari filed begin to run a new. The test is a practical one. The question is whether the lower court, in its second order, has disturbed or revised legal rights and obligations which, by its prior judgment, had been plainly and properly settled with finality." *Federal Trade Commission v. Minneapolis-Honeywell Regulator Co., 344 U.S. 206, 211-212, 73 S. Ct. 245, 97 L. Ed. 245, 49 F.T.C. 1695 (1952);* [*6] *see also Keith v. Truck Stops Corp. of America, 909 F.2d 743, 746 (3d Cir. 1990)* (same). The Amended Order simply corrected mistaken references to the exhibits, and therefore did not change the substantive legal rights of the parties in any way. Thus, the time for appeal began to run when the December 6 Order was entered. Because the December 23 Objections were filed seventeen days after this order was entered, even if they could be considered the functional equivalent of a notice of appeal, they were outside the ten day time limit of Bankruptcy *Rule 8002.*

Belgrave appears to argue that his appeal should not be barred because it fits within one of the exceptions to the ten day time limit of Bankruptcy *Rule 8002(a).* (*See* D.I. 10 at PP 6-10.) Several of the Bankruptcy Rules that Belgrave cites have no applicability to this case.[3] Belgrave also cites the exceptions to the ten day period set out in Bankruptcy *Rule 8002(b) & (c)* (D.I. 10 at PP 7, 9.) Bankruptcy *Rule 8002(b)* provides that if a party files "a timely motion: (1) to amend or make additional findings of fact under *Rule 7052*...; (2) to alter or amend the judgment under *Rule 9023*; (3) for a new trial [*7] under *Rule 9023*; or (4) for relief under *Rule 9024* if the motion is filed no later than 10 days after the entry of judgment[,]" the time for filing an appeal runs from the Bankruptcy Court's disposition of that motion. However, because the November 23 Objections do not ask for additional findings of fact, do not request a new trial, do not request that a judgment be altered or amended,[4] and do not set forth any of the grounds for relief under *Rule 9024*, the November 23 Objections cannot be classified as a motion under any of these sections, and thus, *Rule 8002(b)* is inapplicable here.

> 3  For example, Belgrave cites *Bankruptcy Rule 8001*, regarding Voluntary Dismissal by the appellant, and *Bankruptcy Rule 8011* regarding motion practice in the Bankruptcy Court. (D.I. 10 at PP 6, 10.) Neither of these provisions are applicable here.
>
> 4  The December 23 Objections cannot be considered a motion to alter or amend a judgment, as there is no judgment to amend within the mean-

ing of *Rule 9023.* Even if the December 23 Objections could be considered a motion to alter or amend, however, the Motion would be considered untimely, as the initial Order in this case, which was not substantively altered by the Amended Order, was entered on December 6, 2004. *Bankruptcy Rule 9023* provides that a motion to alter or amend must be filed "no later than 10 days after entry of the judgment." Thus, because the December 23 Objections were filed more than ten days after the entry of the Order, they would be considered untimely under *Rule 9023.*

[*8] Finally, Belgrave appears to assert that his appeal should not be dismissed because of its untimeliness, because its untimeliness is the result of excusable neglect. (D.I. 10 at P 8.) However, *Bankruptcy Rule 8002(c)* provides that a party must request an extension for excusable neglect within ten days of the order, and must file an appeal within twenty days "after the expiration of the time for filing a notice of appeal ." Belgrave has not met either of these conditions, and therefore, his appeal cannot be considered timely due to excusable neglect. Therefore, because Belgrave's appeal was filed outside the ten day period contemplated by *Bankruptcy Rule 8002,* I do not have jurisdiction to consider it, and the appeal must be dismissed.

## B. *Motion to Stay Mediation*

The Plan Administrator moved to stay mediation while the Motion to Dismiss was pending. Because I will grant the Motion to Dismiss here, the Motion to Stay is now moot, and will be denied.

## C. *Petition for Writ of Certiorari*

Belgrave's Petition for Writ of Certiorari reiterates, verbatim, all of the claims he makes in his response to the Motions to Dismiss and Stay. (D.I. 16.) A writ of certiorari is "issued by [*9] an appellate court, at its discretion, directing a lower court to deliver the record in the case for review." Black's Law Dictionary 220 (7th ed. 1999.) There is nothing in the Bankruptcy Rules allowing a party to appeal an order of a bankruptcy court to a district court using a writ of certiorari. Furthermore, Belgrave cannot escape the jurisdictional bar to his appeal simply by changing the caption on his arguments from an appeal to a Petition for Writ of Certiorari. Therefore, for the reasons discussed above, Belgrave's Petition for Writ of Certiorari will be denied.

## IV. CONCLUSION

Accordingly, IT IS HEREBY ORDERED that the Motion to Dismiss (D.I. 8) is GRANTED, the Motion to Stay (D.I. 7) is DENIED as moot, and Belgrave's Petition for Writ of Certiorari (D.I. 16) is DENIED.

Kent A. Jordan

UNITED STATES DISTRICT JUDGE

March 9, 2006

Wilmington, Delaware

## CERTIFICATE OF SERVICE

I, Marcos A. Ramos, do hereby certify that on July 18, 2008, a copy of the foregoing **Debtors' Opening Brief in Support of their Motion to Dismiss Appeal of Kelson Channelview LLC (f/k/a Kelson Energy IV LLC)** was served on the attached service list in the manner indicated thereon.

_____
Marcos A. Ramos (No. 4450)

**Local Via Hand Delivery  -  Non-Local Via First Class Mail**

Ian Connor Bifferato
Garvan F. McDaniel
Bifferato Gentilotti LLC
800 N. King Street, Plaza Level
Wilmington, DE 19801

Andrew K. Glenn
Kasowitz, Benson, Torres & Friedman LLP
1633 Broadway
New York, NY 10019

Jonathan B. Alter
Bingham McCutchen LLP
One State Street
Hartford, CT 06103

Robert J. Dehney
Curtis Miller
Morris, Nichols, Arsht & Tunnell LLP
P.O. Box 1347
1201 N. Market Street, 18th Floor
Wilmington, DE 19899-1347
rdehney@mnat.com

Bonnie Glantz Fattell
Blank Rome LLP
1201 Market Street, Suite 800
Wilmington, DE 19801-4226

Mark S. Finkelstein
Jeffery R. Koch
Shannon Martin Finkelstein & Alvarado, P.C.
2400 Two Houston Center
909 Fannin Street
Houston, TX 77010

Laura Davis Jones
Pachulski, Stang, Ziehl & Jones LLP
P.O. Box 8705
919 N. Market Street, 16th Floor
Wilmington, DE 19899-8705

Bonnie Steingart
Brian D. Pfeiffer
Fried, Frank, Harris, Shriver & Jacobson LLP
One New York Plaza
New York, NY 10004

Mark S. Kenney
Office of the United States Trustee
844 King Street, Suite 2313, Lockbox 35
Wilmington, DE 19801-3519

David B. Stratton
Evelyn J. Meltzer
Pepper Hamilton LLP
P.O. Box 1709
Hercules Plaza, Suite 5100
1313 Market Street
Wilmington, DE 19899-1709

Francis J. Lawall
Bonnie MacDougal Kistler
Pepper Hamilton LLP
3000 Two Logan Square
Eighteenth & Arch Streets
Philadelphia, PA 19103-2799

Gregory Werkheiser
Morris Nichols Arsht & Tunnell
P.O. Box 1347
1201 North Market Street
Wilmington, DE 19899

Lawrence M. Handelsman
Harold A. Olsen
Sherry J. Millman
Stroock & Stroock & Lavan
180 Maiden Lane
New York, NY 10038