IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| RELIANT ENERGY CHANNELVIEW | ) | |
| LP, *et al.*, | ) | Case No. 07-11160 (MFW) |
| | ) | |
| | ) | |
| Kelson Channelview LLC, | ) | |
| | ) | |
| Appellants, | ) | |
| | ) | |
| v. | ) | Civil Action No. 08-409 (JJF) |
| | ) | |
| Reliant Energy Channelview, LP, *et al.*, | ) | |
| | ) | Bankruptcy Appeal No. 08-41 |
| Appellee. | ) | |
| | ) | |

## DEBTORS' REPLY BRIEF IN SUPPORT OF THEIR MOTION TO DISMISS APPEAL OF KELSON CHANNELVIEW LLC (f/k/a KELSON ENERGY IV LLC)

Mark D. Collins (No. 2981)
Robert J. Stearn, Jr. (No. 2915)
Paul N. Heath (No. 3704)
Marcos A. Ramos (No. 4450)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701
Email: collins@rlf.com
        stearn@rlf.com
        heath@rlf.com
        ramos@rlf.com

ATTORNEYS FOR DEBTORS
AND DEBTORS IN POSSESSION

September 5, 2008
Wilmington, Delaware

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

ARGUMENT ................................................................................................................1

I. Kelson's "Bidding Procedures" Authority Is Inapposite................................................1

II. The Order Was Final Under The Third Circuit's Pragmatic Test.........................................4

   A. The Impact of the Break-Up Fee is Not Negligible. ........................................................5

   B. The Order Did Not Contemplate Further Fact-Finding and Completely
      Resolved Issues Related to the Break-Up Fee...................................................................6

   C. Judicial Economy Supports Finality of the Order............................................................7

     1. Mootness. ....................................................................................................................7

     2. Ripeness. ....................................................................................................................9

CONCLUSION...........................................................................................................12

# TABLE OF AUTHORITIES

## CASES

*In re Adelphia Commc's Corp.*,
333 B.R. 649 (S.D.N.Y. 2005)..................................................................................11

*Am. Plant Food Corp. v. United Agri Prods., Inc. (In re Farmland Indus., Inc.)*,
289 B.R. 122 (B.A.P. 8th Cir. 2003)......................................................................2, 3

*In re Continental Airlines, Inc.*,
125 B.R. 399 (D. Del. 1991)..................................................................................8, 9

*County of Morris v. Nationalist Movement*,
273 F.3d 527 (3d Cir. 2001)......................................................................................8

*DDJ Capital Mgmt. v. Fruit of the Loom, Inc. (In re Fruit of the Loom, Inc.)*,
274 B.R. 631 (D. Del. 2002)..................................................................................3, 4

*Dal-Tile Int'l, Inc. v. Color Tile, Inc.*,
203 B.R. 554 (D. Del. 1996)......................................................................................8

*Official Cmt. of Equity Sec. Holders v. Finova Capital Corp. (In re Finova Capital Corp.)*,
2006 U.S. Dist. LEXIS 19141 (D. Del. Apr. 13, 2006)...............................................9

*Official Cmt. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*,
3 F.3d 49 (2d Cir. 1993)........................................................................................1, 2

*In re Paolino*,
1991 WL 284107 (Bankr. E.D. Pa. Jan. 11, 1991) ....................................................4

*Porter v. Mid-Penn Consumer Discount Co. (In re Porter)*,
961 F.2d 1066 (3d Cir. 1992)..............................................................................10, 11

*U.S. v. Laddie F. Jose*,
519 U.S. 54 (1996)...............................................................................................9, 10

*United States Trustee v. Bethlehem Steel Corp. (In re Bethlehem Steel Corp.)*,
2003 WL 21738964 (S.D.N.Y. July 28, 2003) ......................................................3, 10

*Unsecured Creditors Cmt. v. Belgravia Paper Co., Inc. (In re Great N. Paper, Inc.)*,
289 B.R. 497 (D. Me. 2003) ......................................................................................2

*Wright v. Kearney*,
2006 WL 839356 (D. Del. Mar. 29, 2006) ....................................................................................4

**STATUTES**

11 U.S.C. § 1109(b) ....................................................................................................................5

In Appellant's Answering Brief in Opposition to Motion to Dismiss Appeal of Kelson Channelview LLC (f/k/a Kelson Energy IV LLC) ("Answering Brief" or "AB"), Kelson[1] disputes neither the essential facts nor the principles of law which doom its appeal:

- The provisions of the Bankruptcy Court's Order must be analyzed separately for purposes of determining finality.

- In denying Debtors' request for authority to pay the Break-Up Fee to Kelson, the Bankruptcy Court fully and finally decided a discrete legal issue.

- If the provision of the Order denying authority to pay a Break-Up Fee was final, Kelson's appeal *must* be dismissed as untimely.

None of Kelson's arguments, off point authorities or misstatements of fact[2] rebut Debtors' showing that the provision of the Order denying authority to pay the Break-Up Fee was final and immediately appealable. Accordingly, this appeal should be dismissed as untimely.

## ARGUMENT

## I.    KELSON'S "BIDDING PROCEDURES" AUTHORITY IS INAPPOSITE.

Kelson first contends that certain non-Third Circuit cases supposedly "have held that bidding procedures orders are interlocutory." AB 7. Kelson's authority is inapposite: none of those cases involved an order *denying* authority to pay a break-up fee and each case contemplated further proceedings in the bankruptcy court concerning the specific issues on appeal.

For example, in <u>Official Cmt. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)</u>, 3 F.3d 49 (2d Cir. 1993), the bankruptcy court had *approved* the payment of a break-up fee but had not yet determined the amount. <u>See id.</u> at 51-52. The parties "remain[ed] literally millions of dollars apart as to the amount" of the break-up fee. <u>Id.</u> at 53.

---

[1] Terms not defined herein have the meaning ascribed to them in Debtors' Opening Brief in Support of Their Motion to Dismiss Appeal of Kelson Channelview LLC (f/k/a Kelson Energy IV LLC) ("Opening Brief" or "OB").

[2] Most of Kelson's misstatements are not relevant to the matters on appeal and accordingly Debtors do not address those misstatements herein.

For the Second Circuit, this remaining, unresolved issue was critical in analyzing finality. See id. ("for a bankruptcy court order to be final within the meaning of § 158(d), the order need not resolve all of the issues raised by the bankruptcy; but *it must completely resolve all of the issues pertaining to a discrete claim, including issues as to the proper relief*." (emphasis in original)). Under the circumstances, the Second Circuit concluded that the order approving the break-up fee was not final and ordered the parties to "proceed to a final determination by the bankruptcy court as to the break up fee due...." Id. at 54.[3]

Similarly, in Unsecured Creditors Cmt. v. Belgravia Paper Co., Inc. (In re Great N. Paper, Inc.), 289 B.R. 497 (D. Me. 2003), at issue was a bankruptcy court order *approving* the payment of a break-up fee. See id. at 498. The Committee sought an expedited interlocutory appeal on the ground that the break up fee might deter bidders from participating in an auction. Id. The district court concluded that it would be impossible to "know until the bid deadline has passed whether other bidders have been deterred." Id. at 499. With the bid deadline only one day away and the auction just three days thereafter, the district court denied the motion for leave to file an expedited interlocutory appeal, "conclud[ing] that it is better to wait to see what develops during the bidding process, whether there is an auction, and what the consequences are." Id.[4]

Am. Plant Food Corp. v. United Agri Prods., Inc. (In re Farmland Indus., Inc.), 289 B.R. 122 (B.A.P. 8th Cir. 2003), did not even involve a break-up fee.[5] Rather, a winning bidder

---

[3] The Second Circuit also recognized that, where only ministerial tasks remain with respect to the computation of a break-up fee, "[i]t is certainly conceivable that an order approving an agreement for a break up fee could satisfy [the finality] standard." In re Integrated Res., Inc., 3 F.3d at 53.

[4] Kelson misleadingly argues that the district court in Great N. Paper "dismissed as interlocutory the creditors committee's appeal." (AB 8). Actually, the appellant did not argue that the order at issue was final and the district court denied the motion for leave to file an interlocutory appeal. See Great N. Paper, 289 B.R. at 498-99.

[5] Kelson implicitly suggests that, for purposes of determining finality, this Court should consider all of the bidding procedures in the Order, not just the specific ruling that Kelson has appealed (the denial of authority to pay the Break-Up Fee). Kelson's suggestion is contrary to well-established precedent. See OB 6 n.10 ("The mere fact that the Order also dealt with other issues (which may or may not have been final) does not affect the finality of the Bankruptcy Court's denial of Debtor's request for authority to pay the Break-Up Fee." (citing cases)). Kelson cites

2

appealed a bankruptcy court order which required the debtor to re-conduct the auction. See id. at 124-25. Because (a) the bankruptcy court had not resolved the controversy and its remaining tasks were more than ministerial, (b) any delay in proceedings would be minimal and (c) there could be piecemeal appeals, the Bankruptcy Appellate Panel determined that the order reopening the bidding and scheduling a new auction was interlocutory. Id. at 125-26.[6]

In contrast, the provision of the Order on appeal here *denied* Debtors' request for authority to pay the Break-Up Fee and contemplated *no further proceedings* related to the Break-Up Fee. Even Kelson does not contend that any issue remained to be litigated *with respect to the Bankruptcy Court's denial of Debtors' request for authority to pay the Break-Up Fee.* Under these circumstances -- where the Bankruptcy Court's Order fully and finally denied Debtors' request for authority to pay the Break-Up Fee and there was nothing further for the Bankruptcy Court or the parties to do with respect to the Break-Up Fee -- Kelson's case authority is inapposite.

Finally, Kelson's attempt to distinguish DDJ Capital Mgmt. v. Fruit of the Loom, Inc. (In re Fruit of the Loom, Inc.), 274 B.R. 631 (D. Del. 2002) is unavailing. In Fruit of the Loom, this Court held that a bankruptcy court order approving a break-up fee was final and immediately appealable. Id. at 631; see also OB 7 (discussing Fruit of the Loom). Although Kelson asserts that Fruit of the Loom supposedly is "inapposite because it involved the plan confirmation process, not a Section 363(b) sale" (AB 8), Kelson never explains why this purported distinction is meaningful. Instead, Kelson resorts to speculation, suggesting that "it is unclear whether any party actually opposed the appeal as interlocutory" and that this Court supposedly "overlook[ed]

---

no contrary authority, nor could it. Indeed, Kelson itself relies on an opinion -- United States Trustee v. Bethlehem Steel Corp. (In re Bethlehem Steel Corp.), C.A. No. 02-2854, 2003 WL 21738964 (S.D.N.Y. July 28, 2003) -- in which the court separately analyzed different aspects of a single order for purposes of determining finality. See infra, p. 11

[6] Nonetheless, the panel exercised its discretion to hear the appeal. See In re Farmland, 289 B.R. at 126.

3

the numerous other courts that have held that rulings on requests for breakup fees are interlocutory." See AB 8. However, the parties' briefs (which are public documents available through the Bankruptcy Court's CM/ECF filing system)[7] confirm that the parties disputed whether the order was final or interlocutory and cited many of the same (or similar) cases relied on by Kelson here.[8]

In Fruit of the Loom this Court concluded that, under the Third Circuit's flexible standard for determining finality in bankruptcy proceedings, an order approving payment of a termination fee was final even though the termination fee would not be paid (i.e., the issue would be mooted) if the underlying business transaction was consummated. See id. at 632-33. The Order at issue here presents an even more compelling case for finality because it denied -- *forever and regardless of subsequent events* -- Debtors' request for authority to pay a Break-Up Fee to Kelson.

## II.    THE ORDER WAS FINAL UNDER THE THIRD CIRCUIT'S PRAGMATIC TEST.

Kelson agrees that finality is governed by the Third Circuit's pragmatic and functional test. See OB 7-8; AB 6-7. However, Kelson's application of the Third Circuit test flies in the face of the facts and the law.

---

[7] This Court may take judicial notice of matters of public record and pleadings in other cases. See, e.g., Wright v. Kearney, C.A. No. 05-442, 2006 WL 839356, at *2 n.1 (D. Del. Mar. 29, 2006) (court took judicial notice of pleadings on another court's docket); In re Paolino, C.A. No. 85-00759F, 1991 WL 284107, at *12 n. 19 (Bankr. E.D. Pa. Jan. 11, 1991) ("Courts may take judicial notice of the contents of their own dockets").

[8] See Bondholders Motion for Leave to Appeal Order Under 11 U.S.C. §§ 105(a) and 363 and Fed. R. Bank. P. 2002, 6004 and 9023 (1) Granting Reconsideration and (2) Approving Bidding Procedures and Termination Fee, Performance of Pre-closing Obligation, and Form and Manner of Notice Thereof with Respect to Proposed Sale Pursuant to Plan of Reorganization [Dkt. No. 3535], filed December 21, 2001 (Case No. 99-4497) (Bankr. D. Del.) (copy attached as **Ex. A**), pp. 9-11; Response and Opposition of Berkshire Hathaway, Inc. and New FOL, Inc. to Bondholders' Motion for Leave to Appeal Order under 11 U.S.C. §§ 105(a) and 363 and Fed. R. Bankr. P. 2002, 6004 and 9023 (1) Granting Reconsideration and (2) Approving Bidding Procedures and Termination Fee, Performance of Pre-Closing Obligation, and Form and Manner of Notice Thereof with Respect to Proposed Sale Pursuant to Plan of Reorganization [Dkt. No. 3788], filed January 4, 2002 (Case No. 99-4497) (Bankr. D. Del.) (copy attached as **Ex. B**), pp. 4, 9-10.

4

A.    **The Impact of the Break-Up Fee is Not Negligible.**

Kelson argues that the Order was not final because the Break-Up Fee was of "negligible" impact on the Debtors' estates.  See AB 8-9.  This argument is unsupported by case law or logic.  While $15 million might be "negligible" to a well-heeled hedge fund like Kelson, it is not negligible to Debtors or their estates.  Moreover, Kelson's ardent pursuit of this appeal amply demonstrates that even it does not view $15 million as "negligible."  The simple, indisputable facts are that (a) in denying Debtors' request for authority to pay the Break-Up Fee, the Bankruptcy Court permanently preserved $15 million in value for Debtors' estates (thus making those funds available for distribution to Debtors' stakeholders) and (b) $15 million is not negligible.  See OB 8.

Kelson also argues that denial of Debtors' request for authority to pay the $15 million Break-Up Fee supposedly had no impact on Debtors' estates because preserving $15 million benefited shareholders but not creditors.  See AB 8-9.  Even if this argument was correct factually (and it is not), Kelson's ipse dixit contention that a shareholder has no legally cognizable economic interest in a bankruptcy case is contradicted by the Bankruptcy Code itself, which expressly recognizes that a shareholder is a party-in-interest in a bankruptcy proceeding.  See 11 U.S.C. § 1109(b) ("A party in interest, including the debtor, the trustee, a creditors' committee, an equity security holders' committee, a creditor, *an equity security holder*, or any indenture trustee, may raise and may appear and be heard on any issue in a case under this chapter." (emphasis supplied)).  Indeed, the Bankruptcy Court expressly recognized shareholders' interest in this case.  See 4/9 Tr., p. 51:16-25 (Judge Walrath: "the Bankruptcy Court does have the obligation to protect not only creditors, but shareholders.  And this is a happy day that shareholders actually have an interest.  But it's clear that shareholders are parties in interest in bankruptcy cases whose rights are entitled to protection.").

5

B.    **The Order Did Not Contemplate Further Fact-Finding and Completely Resolved Issues Related to the Break-Up Fee.**

Kelson next contends that the Bankruptcy Court's Order denying authority to pay the Break-Up Fee was not final because Debtors had not concluded their auction and the Bankruptcy Court had not yet approved the sale of Debtors' assets. See AB 9-10. This argument cannot withstand even the slightest scrutiny. The Bankruptcy Court's denial of Debtors' request for authority to pay the Break-Up Fee was embodied in the Order, not in the Sale Order. Kelson does not identify a single fact or issue *concerning the denial of authority to pay the Break-Up Fee* that remained to be litigated after entry of the Order. See AB 9-10. Regardless of future events relating to the sale of Debtors' assets, the Bankruptcy Court's March 18, 2008 Order *fully, finally and forever* denied Debtors' request for authority to pay a Break-Up Fee to Kelson. See OB 9.

In a related argument, Kelson contends that "[t]he Bidding Procedures Order did not have a preclusive effect on further litigation" and "was merely procedural." (AB 10). Kelson simply misses the point: this appeal is not about the entirety of the "Bidding Procedures Order" (which Debtors refer to in their briefs as the "Order") or the Sale Order, but rather the discrete ruling embodied in the "Bidding Procedures Order" which denied -- on the merits and forever -- Debtors' request for authority to pay a Break-Up Fee to Kelson. To paraphrase Kelson's own authority, the Bankruptcy Court's ruling completely resolved all of the issues relating to that discrete claim. See AB 10; see also OB 8-9. There was nothing "procedural" about the Bankruptcy Court's substantive ruling, which was made after the Court received evidence and heard argument. See OB 3. Additionally (and not surprisingly), Kelson never explains how the Bankruptcy Court's discrete ruling denying Debtors' request for authority to pay the Break-Up Fee supposedly "could be subject to multiple appeals." (AB 10).

6

C.    **Judicial Economy Supports Finality of the Order.**

Finally, Kelson asserts that judicial economy "militates heavily" against a determination that the Order was final. See AB 10-11. However, instead of addressing Debtors' argument and authority demonstrating that principles of judicial economy favor finality of the Order (see OB 10-11), Kelson offers inconsistent arguments concerning mootness and ripeness (indeed, how can a matter become "moot" if it was never "ripe"?) See AB 10-11. Once again, Kelson's arguments fail when placed under the microscope.

1.    **Mootness.**

Kelson first contends that "[w]here, as here, a bankruptcy court order can be rendered moot by a subsequent order, the first order is interlocutory." (AB 10). No case cited by Kelson supports this blanket statement -- *at most*, mootness is an issue that sometimes is considered by courts in assessing judicial economy, which itself is but one of several criteria under the Third Circuit's pragmatic and functional test. Moreover, Kelson's mootness argument proves too much. Any Break-Up Fee would not have been payable until an alternative transaction closed. See Bid Motion (OB Ex. B), ¶ 19; see also AB 5 ("The Bid Protections provided for a break-up fee of $15 million ... payable upon the closing of an 'Alternative Transaction.'"). However, under the Asset Purchase Agreement ("APA") with the winning bidder, GIM Channelview, closing could not occur until at least 30 days after entry of the Sale Order (unless the parties agreed otherwise). See APA (Ex. A to Sale Order, which is Ex. G to Opening Brief), § 4.1. Because there were conditions to closing (see id., Article 9), it always was possible that the GIM transaction would not close -- even though the Bankruptcy Court entered the Sale Order -- and thus no Break-Up Fee would have been payable. Accordingly, under Kelson's mootness theory, both the Order and the Sale Order were interlocutory until a sale actually closed because subsequent events could render those orders "moot." Yet even Kelson admits that the Sale Order

was final upon entry.  See, e.g., AB 10 ("entry of the Sale Order ... resolved the matter on a final basis").  Clearly, the theoretical potential for "mootness" cannot be dispositive for purposes of determining finality.

Indeed, Kelson's mootness argument puts the proverbial cart before the horse.  The mootness doctrine typically comes into play *after* an appeal has been taken.  See, e.g., County of Morris v. Nationalist Movement, 273 F.3d 527, 533 (3d Cir. 2001) ("If developments occur during the course of adjudication that eliminate a plaintiff's personal stake in the outcome of a suit or prevent a court from being able to grant the requested relief, the case must be dismissed as moot." (citation omitted)).  Here, a timely appeal by Kelson never would have been rendered moot because an alternative transaction in fact closed.

Kelson also overstates the precedential value of its case authority.  In Dal-Tile Int'l, Inc. v. Color Tile, Inc., 203 B.R. 554 (D. Del. 1996), Dal-Tile objected to debtors' motion to establish procedures for determining the validity and value of suppliers' reclamation claims.  The bankruptcy court's order granting that motion did not adjudicate the merits of any reclamation claim.  Id. at 556-57.  This Court concluded that the order was not final because (a) reversal of the bankruptcy court's order would have no impact on the assets of the estate and (b) the bankruptcy court's order did "not resolve the validity, priority or value of" Dal-Tile's reclamation claim, which would be required regardless of the disposition of the procedural matter on appeal.  Id. at 557.  It was only in this context that this Court observed that the issue on appeal could be mooted by the subsequent adjudication on the merits of Dal-Tile's claim.  Id. Of course, here the Order *did* adjudicate the merits of Kelson's claim, and resolved that claim against Kelson preclusively, forever and regardless of subsequent events.  That is the essence of a final decision.  Cf. In re Continental Airlines, Inc., 125 B.R. 399, 402 (D. Del. 1991)

8

("Continental argues that the bankruptcy court's order, finding § 1110 not to apply to sale-leaseback transactions, is not final, because it merely postpones, rather than forecloses, the creditors' rights in their collateral.  This is a mischaracterization.  Section 1110 grants certain creditors the right to be free from the automatic stay of the bankruptcy code.  The bankruptcy court's order in this case deprives appellants of these rights forever....  This is the essence of a final decision.  This court has jurisdiction thereby."  (citation omitted)).

Official Cmt. of Equity Sec. Holders v. Finova Capital Corp. (In re Finova Capital Corp.), C.A. No. 01-0698, 2006 U.S. Dist. LEXIS 19141 (D. Del. Apr. 13, 2006) does not even discuss mootness.  Moreover, the "Clarification Order" at issue in that case granted no relief, maintained the *status quo* and contemplated further fact intensive proceedings in the bankruptcy court concerning the debtor's solvency before any relief could be granted.  Id. at *6.  It was only in this context that this Court concluded that there was a "specter of duplicative appeals, first from the Clarification Order and then from any determination of solvency."  Id.  Here, the Bankruptcy Court conclusively denied the relief requested and no further proceedings were contemplated with respect to that denial.

### 2. **Ripeness.**

Kelson's ripeness argument is a non-starter.  "Finality, not ripeness, is the doctrine governing appeals...."  U.S. v. Laddie F. Jose, 519 U.S. 54, 57 (1996).  In Jose, the court of appeals had dismissed an appeal "as not ripe" because "any detrimental impact the district court's order may have on the IRS's investigation is, at this time, purely speculative."  Id. at 55-56.  Kelson makes the same argument here, arguing that any harm to it was "hypothetical and speculative" until the Sale Order was entered.  See AB 11.  The United States Supreme Court flatly rejected this theory, concluding that the district court order at issue in Jose was final and

9

appealable without any additional ripeness requirement:

> We think it clear, however, that the District Court's final order is indeed final. It is a decision dispositively granting in part and denying in part the remedy requested.... With that disposition, the District Court completed its adjudication.

Jose, 519 U.S. at 56-57. So here. With its denial of Debtors' request for authority to pay the Break-Up Fee to Kelson, the Bankruptcy Court "dispositively ... den[ied] ... the remedy requested" and "completed its adjudication" concerning the Break-Up Fee. Id. There simply was nothing left for the Bankruptcy Court to decide.

The cases Kelson cites in support of its ripeness argument are inapposite -- indeed, none of those cases even discuss "ripeness". In Bethlehem Steel, 2003 WL 21738964, the court did state, as quoted by Kelson, that "[d]eciding an issue now, which may never need to be decided, does not help to advance the litigation." Id. at *4; see also AB 11. However, this statement was made in the context of deciding whether to accept an interlocutory appeal, not a determination of whether an order was final. See Bethlehem Steel, 2003 WL 21738964, at *4. Moreover, the court concluded that a separate provision of the order at issue, which approved an expense reimbursement, was final -- "even though further proceedings in the Bankruptcy Court regarding the reimbursements [were] at least possible" -- because the bankruptcy court's order "was the final word by the Bankruptcy Court on the legality of the reimbursements." Id. at 5. Here, the Order "was the final word by the Bankruptcy Court on the legality of the" Break-Up Fee. Id.; see also OB 3, 8-9.

Similarly, in Porter v. Mid-Penn Consumer Discount Co. (In re Porter), 961 F.2d 1066 (3d Cir. 1992), the court of appeals was discussing criteria applicable to a determination of whether to hear an interlocutory appeal. See id. at 1072 ("deciding an interlocutory appeal may prove unnecessary because the issue may become moot in light of further proceedings in the trial

court."); see also AB 11. And even though the court of appeals was faced with the prospect of multiple appeals, it still concluded that the district court order at issue was final. Id. at 1072-73.

In re Adelphia Commc's Corp., 333 B.R. 649 (S.D.N.Y. 2005) is irrelevant on the face of Kelson's brief. Kelson cites Adelphia for the proposition that "[t]he Bankruptcy Court's determinations on these issues are not final, because they direct the parties to engage in or participate in further proceedings and do not resolve any substantive issue." Id. at 559-60; see also AB 11. Here, the Bankruptcy Court *did not* direct the parties to engage in further proceedings concerning the Break-Up Fee and the Order *did* resolve a substantive issue: the Debtors' request for authority to pay the Break-Up Fee.

*    *    *

At the end of the day, Kelson cannot argue around the fact that the Bankruptcy Court's Order fully and finally decided a discrete legal issue: Debtors' request for authority to pay the Break-Up Fee to Kelson. Because Kelson did not file its appeal until almost three months after the Order was entered, this appeal must be dismissed as untimely.

[*Remainder of page intentionally left blank*]

## CONCLUSION

For all of the foregoing reasons, Debtors respectfully ask the Court to (i) grant their Motion, (ii) dismiss this appeal, (iii) enter an Order substantially consistent with the form of order attached as Exhibit A to their Motion and (iv) grant Debtors such other and further relief as is just and proper.

Dated: September 5, 2008
      Wilmington, Delaware

                      _____
                      Mark D. Collins (No. 2981)
                      Robert J. Stearn, Jr. (No. 2915)
                      Paul N. Heath (No. 3704)
                      Marcos A. Ramos (No. 4450)
                      RICHARDS, LAYTON & FINGER, P.A.
                      One Rodney Square
                      920 North King Street
                      Wilmington, Delaware 19801
                      Telephone:  (302) 651-7700
                      Facsimile:  (302) 651-7701
                      Email: collins@rlf.com
                                stearn@rlf.com
                                heath@rlf.com
                                ramos@rlf.com

                      ATTORNEYS FOR DEBTORS
                      AND DEBTORS IN POSSESSION

12

**EXHIBIT A**

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In Re: | ) | Chapter 11 |
| | ) | Case No. 99-4497 (PJW) |
| FRUIT OF THE LOOM, INC., et al., | ) | |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | |
| | ) | |

**BONDHOLDERS' MOTION FOR LEAVE TO APPEAL ORDER UNDER 11 U.S.C.
§§ 105(a) AND 363 AND FED. R. BANK. P. 2002, 6004 AND 9023 (1) GRANTING
RECONSIDERATION AND (2) APPROVING BIDDING PROCEDURES AND
TERMINATION FEE, PERFORMANCE OF PRE-CLOSING OBLIGATION, AND
FORM AND MANNER OF NOTICE THEREOF WITH RESPECT TO PROPOSED
SALE PURSUANT TO PLAN OF REORGANIZATION**

Michael R. Lastowski (DE I.D. No. 3892)
DUANE, MORRIS & HECKSCHER LLP
1100 North Market Street, Suite 1200
Wilmington, Delaware 19801
Telephone: (302) 657-4900
Facsimile: (302) 657-4901
E-mail: mlastowski@duanemorris.com

-and-

HENNIGAN, BENNETT & DORMAN
Bruce Bennett
Sidney P. Levinson
Marjon Ghasemi
601 S. Figueroa Street, Suite 3300
Los Angeles, California 90017
Telephone: (213) 694-1200
Facsimile: (213) 694-1234

Counsel for Bondholders

## TABLE OF CONTENTS

I. INTRODUCTION..................................................................................................... 1

II. STATEMENT OF FACTS......................................................................................... 4

III. STATEMENT OF THE QUESTIONS PRESENTED AND RELIEF SOUGHT................... 8

IV. STATEMENT OF THE REASONS WHY AN APPEAL SHOULD BE GRANTED............ 9

    A. The Order Is Final Under 28 U.S.C. § 158(a), as Applied by the Third Circuit in Bankruptcy Proceedings............................................................................................ 9

    B. Even if the Order is Interlocutory, Leave to Appeal Should be Granted.......................... 11

        1. Controlling Question of Law............................................................................... 11

        2. There is, at a Minimum, a Substantial Ground for Difference of Opinion With Respect to the Controlling Question of Law .................................................... 12

        3. Granting Leave to Appeal Will Materially Advance the Ultimate Termination of this Bankruptcy Case ................................................................................. 15

V. CONCLUSION ..................................................................................................... 16

# TABLE OF AUTHORITIES

Page

## Cases

Calpine Corp. v. O'Brien Environmental Energy, Inc.
  (In re O'Brien Environmental Energy, Inc.),
  181 F.3d 527 (3d Cir. 1999) ................................................................................. 5

Committee of Equity Security Holders v. Lionel Corp. (In re Lionel Corp.),
  722 F.2d 1063 (2d Cir. 1983) ............................................................................ 12

Fireman's Fund Insurance Co. v. Joseph J. Biafore, Inc.,
  526 F.2d 170 (3d Cir. 1975) .............................................................................. 10

F/S Airlines II, Inc., v. Simon,
  844 F.2d 99 (3d Cir. 1991) ................................................................................ 10

In re Amatex Corp.,
  755 F.2d 1034 (3d Cir. 1988) ............................................................................ 10

In re Bertolli,
  812 F. 2d 136 (3rd Cir. 1987) ........................................................................ 3, 11

In re Braniff Airways, Inc.,
  700 F.2d 935 (5th Cir. 1983) ................................................................... 2, 12, 15

In re Brown,
  803 F.2d 120 (3d Cir. 1986) .............................................................................. 10

In re Christian,
  804 F.2d 46 (3d Cir. 1986) ................................................................................ 10

In re Continental Airlines, Inc.,
  932 F.2d 282 (3d Cir. 1991) ............................................................................ 3, 9

In re Copy Crafters Quickprint, Inc.,
  92 B.R. 973 (Bankr. N.D.N.Y. 1988) ................................................................ 13

In re Crowthers McCall Pattern, Inc.,
  114 B.R. 877 (Bankr. S.D.N.Y. 1990) .............................................................. 14

In re Louise's,
  211 B.R. 798 (D. Del. 1997) .......................................................................... 2, 13

In re Marin Motor Oil, Inc.,
    689 F.2d. 445 (3d Cir. 1982),
    cert. denied, 459 U.S. 1206 (1983) ................................................................................. 10

In re Market Square Inn Inc.,
    978 F.2d 116 (3d Cir. 1992)
    (citing Century Glove, Inc. v. First American Bank,
    860 F.2d 94 (3d Cir. 1988)) ........................................................................................... 9

In re Metalsource Corp.,
    163 B.R. 260 (W.D. Penn 1993) .............................................................................. 10, 11

In re Meyertech Corp.,
    831 F.2d 410 (3d Cir. 1987) ..................................................................................... 9, 10

In re Public Service Co. of New Hampshire,
    90 B.R. 575 (Bankr. D.N.H. 1988) ............................................................................. 14

In re Washington-St. Tammany Electric Cooperative, Inc.,
    97 B.R. 852 (E.D. La. 1989) ....................................................................................... 15

Wheeling-Pittsburgh Steel Corp. v. McCune,
    836 F.2d 1034 (3d Cir. 1987) ..................................................................................... 10

**Statutes**

11 United States Code
    §§ 105(a) and 363 ........................................................................................................... 1
    § 158(a) ..................................................................................................................... 8, 11

28 United States Code
    § 158(a) ..................................................................................................................... 3, 11
    § 158(a)(1) ..................................................................................................................... 2

**Rules**

Federal Rules of Bankruptcy Procedures
    2002, 6004 and 9023 (1) ............................................................................................... 1

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In Re: | ) Chapter 11 |
| | ) Case No. 99-4497 (PJW) |
| FRUIT OF THE LOOM, INC., et al., | ) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |
| | ) |
| | ) |

**BONDHOLDERS' MOTION FOR LEAVE TO APPEAL ORDER UNDER 11 U.S.C.
§§ 105(a) AND 363 AND FED. R. BANK. P. 2002, 6004 AND 9023 (1) GRANTING
RECONSIDERATION AND (2) APPROVING BIDDING PROCEDURES AND
TERMINATION FEE, PERFORMANCE OF PRE-CLOSING OBLIGATION, AND
FORM AND MANNER OF NOTICE THEREOF WITH RESPECT TO PROPOSED
SALE PURSUANT TO PLAN OF REORGANIZATION**

I.    INTRODUCTION

Creditors DDJ Capital Management, LLC, Lehman Brothers, Inc., and Mariner

Investments, Inc. (collectively, the "Bondholders"), holders of a majority of the Debtors' 8 7/8%

Senior Notes, file this motion for leave to appeal the "Order Under 11 U.S.C. §§ 105(a) and 363

and Fed. R. Bankr. P. 2002, 6004 and 9023 (1) Granting Reconsideration and (2) Approving

Bidding Procedures and Termination Fee, Performance of Pre-Closing Obligations, and Form

and Manner of Notice Thereof With Respect to Proposed Sale Pursuant to Plan of

Reorganization" (the "Order") entered on December 12, 2001 by the United States Bankruptcy

Court for the District of Delaware.

The genesis of this appeal is an Asset Purchase Agreement (the "Agreement") between

Fruit of the Loom, Inc. and its affiliates (the "Debtors") and Berkshire Hathaway, Inc.

("Berkshire"), under which the Debtors have agreed to sell their businesses to Berkshire for the

sum of $835 million (subject to certain adjustments). The Agreement is contingent upon

confirmation of a plan of reorganization that has not yet been filed by the Debtors. In the event

that creditors of the Debtors vote against any plan proposed by the Debtors, or if the Court

declines to confirm the any such plan, then the Agreement requires the Debtors or certain of its

affiliates to pay a "Termination Fee" to Berkshire in an amount ranging from $22.5 million to $27.5 million, and which will almost certainly be no less than $25 million.

On November 2, 2001, the Debtors filed a motion (the "Bidding Procedures Motion"), requesting approval of the Termination Fee as well as other bidding procedures to govern the auction of the Debtors' businesses. The Bidding Procedures Motion is attached hereto as Exhibit A and incorporated herein by reference. At that time, the Debtors sought approval of a Termination Fee of $30 million. The Bondholders filed an objection to the Bidding Procedures Motion, based primarily upon the point that the Termination Fee was, as a matter of law, an improper intrusion on the plan confirmation process because it imposes an enormous penalty on creditors if they elect to vote against the plan or if the bankruptcy court declines to confirm a plan. The Bondholders' objection to the Bidding Procedures Motion is attached hereto as Exhibit B and incorporated herein by reference. At the hearing on the Bidding Procedures Motion, held November 21, 2001, the bankruptcy court denied the Debtors' Bidding Procedures Motion, finding not only that the Termination Fee was too high, but also that it would have a coercive effect on creditors voting on the unfiled plan. Transcript of hearing held November 21, 2001 is attached hereto as Exhibit F and incorporated herein by reference ("Nov. 21 Tr.") at 127-28.

The Debtors subsequently renegotiated the Agreement with Berkshire to provide for a nominal reduction in the Termination Fee, from $30 million to an amount that will range from $22.5 million to $27.5 million. On November 26, 2001, the Debtors filed a motion requesting that the bankruptcy court reconsider its decision (the "Reconsideration Motion"). At a hearing held December 5, 2001, this Court approved the Termination Fee, as reduced. Although the Court found that the reduction merely lessened, but did not eliminate, the coercive effect of the Termination Fee on the voting process, the Court concluded that creditors must "pay a price" to keep a purchaser on the hook for an extended period of time during the plan confirmation process.

In granting the Reconsideration Motion, the bankruptcy court erred as a matter of law. The threat of a forfeiture of $22.5 million to $27.5 million will influence the plan confirmation

process and will lock in creditors to the liquidation plan that the Debtors have indicated they will file. Under a line of cases that began with <u>In re Braniff Airways, Inc.</u>, 700 F.2d 935 (5th Cir. 1983) and includes this Court's decision in <u>In re Louise's</u>, 211 B.R. 798 (D. Del. 1997), it is impermissible to lock the Debtors into a particular plan mode in advance of the confirmation hearing – particularly where, as here, the plan the Debtors say they intend to propose has not even been filed.

The Bondholders respectfully submit that the Order is final, and that the Bondholders are therefore entitled to appeal as a matter of right under 28 U.S.C. § 158(a)(1). Under the pragmatic test to determine finality of orders in bankruptcy cases followed in the Third Circuit, finality is based upon consideration of "[t]he impact of the issue on the assets of the bankruptcy estate, the necessity for additional fact-finding on remand, the preclusive effect of a decision on the merits, and the furtherance of judicial economy." <u>In re Continental Airlines, Inc.</u>, 932 F.2d 282, 285 (3d Cir. 1991). As discussed below, all of those factors support a ruling that the Order is final.

Even if this Court were to find that the Order is interlocutory, the Bondholders should be granted leave to appeal under 28 U.S.C. § 158(a). Leave is available where an order: (a) involves a controlling question of law, (b) as to which there is a substantial ground for difference of opinion, and (c) an immediate appeal may materially advance the ultimate termination of the bankruptcy case. <u>In re Bertolli</u>, 812 F. 2d 136, 137 (3rd Cir. 1987). The controlling question of law presented in this appeal is whether approval of a break-up fee, which is payable to a purchaser in the event that creditors vote to reject a particular plan of reorganization or the bankruptcy court does not confirm a particular plan of reorganization constitutes an improper intrusion on the plan confirmation process. Additionally, it is undeniable that there is a substantial ground for difference of opinion. As demonstrated below, there is substantial authority, in the Third Circuit and elsewhere, supporting the proposition that such a break-up fee cannot be approved in the manner requested by the Debtors. Indeed, the bankruptcy court itself initially denied the Debtors' Bidding Procedures Motion, and subsequently approved it only after the Debtors filed the Reconsideration Motion and modestly

reduced the amount of the termination fee. Moreover, an immediate appeal will materially advance the ultimate termination of the litigation. In the event that the Termination Fee becomes payable in accordance with the terms of the Asset Purchase Agreement, a prompt appeal will enable the Debtors, or another plan proponent, to know whether the amount of the Termination Fee will be available for distribution under a plan of reorganization.

## II.    STATEMENT OF FACTS

The Debtors manufacture basic apparel products, performing most of its own spinning, knitting, cloth finishing, cutting, sewing and packaging. One of the Debtors, Fruit of the Loom Ltd., commenced a bankruptcy proceeding on December 30, 1999, under the Companies Law of the Cayman Islands in the Grand Court of the Cayman Islands (the "Grand Court").

On November 1, 2001, the Debtors and Berkshire entered into an agreement to sell substantially all of the Debtors' assets to Berkshire for $835 million. The Agreement contemplated that there would be an auction held at which the Debtors would consider higher and better offers. The closing of the sale is contingent upon the confirmation of a yet to be filed liquidation plan.

Under Article VIII of the original Agreement (Exhibit A of the Bidding Procedures Motion (Exhibit A)), the Debtors agreed to pay Berkshire a Termination Fee of $30 million in the event of the following:

- Berkshire terminates the Agreement because another bidder prevails at the auction to be held in early December 2001. Agreement at §§ 8.01(f), 8.01(h), 8.01(i), 8.02(b).

- Berkshire or the Debtors terminate the Agreement because creditors, in these bankruptcy cases or the proceeding before the Grand Court, vote to reject the Debtors' plan. Agreement at §§ 8.01(e), 8.02(b).

- Berkshire terminates the Agreement because this Court confirms another plan that does not contemplate or incorporate the Agreement. Agreement at §§ 8.01(g), 8.02(b).

- Berkshire terminates the Agreement because this Court or the Grand Court enter orders denying Confirmation of the plan or sanction of the Scheme. Agreement at § 8.01(b)(iv), 8.02(b).

- Berkshire terminates the Agreement because, on or before March 29, 2002 (subject to extension until May 31, 2002), this Court has not entered a confirmation order, in a form satisfactory to Berkshire, for a plan that incorporates the transactions under the Agreement. Agreement at §§ 8.01(d), 8.02(b).

- Berkshire terminates the Agreement because, on or before March 29, 2002 (subject to extension until May 31, 2002), the Grand Court has not entered a sanction order, in a form satisfactory to Berkshire, for a scheme of arrangement that incorporates the transactions under the Agreement. Agreement at §§ 8.01(d), 8.02(b).

- No closing occurs prior to April 30, 2002, subject to certain limited extensions of the deadline. Agreement at § 8.01(b)(i).

To date, however, the Debtors have not filed a proposed plan of reorganization and/or scheme or arrangement which implements the Agreement, let alone obtained court approval of a disclosure statement.

Also, on November 2, 2001, the Debtors filed the Bidding Procedures Motion, seeking approval of payment of the Termination Fee to Berkshire if and when required under the Agreement, as well as certain bidding procedures relating to a proposed auction of the Debtors' businesses. The Bondholders filed their objection on November 19, 2001, and raised, among others, the following arguments in support of denial of the motion: (1) the Termination Fee was an unlawful intrusion of the confirmation process through its coercive influence on the votes of creditors and the bankruptcy court; (2) the amount of the Termination Fee did not meet the criteria for break-up fees established by the Third Circuit in Calpine Corp. v. O'Brien Environmental Energy, Inc. (In re O'Brien Environmental Energy, Inc.), 181 F.3d 527 (3d Cir. 1999); and (3) many of the bidding procedures proposed by the Debtors would not facilitate and instead would likely chill competitive bidding.

A hearing on the Bidding Procedures Motion was held on November 21, 2001. At the hearing, this Court held that the $30 million Termination Fee demanded by Berkshire was "too high." Nov. 21 Tr. at 127:5-6 (Exhibit F). This Court expressed the view that the amount of a break-up fee should be commensurate with "the cost of being the stalking horse." Nov. 21 Tr., at 127:11-12 (Exhibit F). Based on that standard, the Court stated that, "I can't believe that the cost of getting there could come even close to $30 million," and further explained:

-5-

> [A] significant element of the breakup fee is the cost of getting
> there and the cost of getting there for an eight hundred or nine
> hundred million dollar deal just cannot approach $30 million.

Nov. 21 Tr. at 127:18-22 (Exhibit F).

The Court denied the Bidding Procedures Motion, not only because the Termination Fee was "too high," but also because "the $30 million could have a coercive effect on the creditors voting on the plan." Nov. 21 Tr. at 128:4-5 (Exhibit F). Based on that concern, the Court held that "if the plan is not approved, it does seem to me that what it should be entitled to should be a lesser number than the breakup fee for it acting as a stalking horse." Nov. 21 Tr. at 128:13-16 (Exhibit F). Accordingly, the Court suggested that "there should be two different breakup fees and the breakup fee for a defeat of the plan should be less than the breakup fee for being a stalking horse." Nov. 21 Tr. at 128:19-21 (Exhibit F).

Following the bankruptcy court's denial of the Termination Fee, the Debtors and Berkshire negotiated a revised Agreement. Under section 8.02(b) as revised, the Termination Fee is to range from $22.5 million to $27.5 million. (Exhibit C). In the event of an overbid by a competing bidder, the break-up fee under the Agreement is $25 million (the "Overbid Termination Fee"). If, on the other hand, the Termination Fee became payable for a reason other than an overbid, for example, because creditors vote to reject the Plan to effectuate the Agreement or the bankruptcy court declines to confirm that Plan, the Termination Fee is $22.5 million to $27.5 million (the "Plan Termination Fee"). The use of the $22.5 million figure as the lower end of the range was apparently intended to suggest that the Plan Termination Fee was less than the Overbid Termination Fee. However, the amount of the Plan Termination Fee increases by $1.25 million each month, beginning on January 1, 2002. Thus, as early as February 1, 2002, the Plan Termination Fee will have already increased to $25 million, and by March 1, 2002, it will have increased to $26.25 million -- an amount greater than the $25 million Overbid Termination Fee.

The Debtors filed "Motion of Fruit of the Loom For Reconsideration Of Denial Of Motion Seeking Approval Of Bidding Procedures And Termination Fee In Connection With Agreement With New FOL Inc. and Berkshire Hathaway, Inc." (the "Reconsideration Motion")

on November 26, 2001, and requested a hearing on shortened notice. The Reconsideration Motion is attached hereto as Exhibit C and incorporated herein by reference. The Bondholders filed an objection to the Reconsideration Motion, arguing that the reduction of the Termination Fee did not materially alter the coercive effect of the Termination Fee on the plan confirmation process. The objection to the Bondholders' Reconsideration Motion is attached hereto as Exhibit D. The Bondholders argued that the continuing threat of a substantial forfeiture, whether in the amount of $25 million, $26.25 million or $27.5 million, would likely have the same coercive effect on voting as the threat of a $30 million forfeiture that led this Court to deny the Bidding Procedures Motion. The Bondholders also noted that the Debtors failed to offer any authority for the proposition that a $25 million to $27.5 million intrusion on the confirmation process in the manner proposed by the Debtors is permissible, and that the published decisions of the courts uniformly held to the contrary, that "lock ups" and other such intrusions on the confirmation process are improper.[1]

At the hearing on the Reconsideration Motion held December 5, 2001, the bankruptcy court approved the Termination Fee as revised. With respect to the Overbid Termination Fee, the Court found that the $25 million figure was "higher than the number I had in mind, but it's not so far off from what I had in mind so as to warrant my rejection of the proposal." Transcript of hearing held December 5, 2001 (Dec. 5 Tr.) is attached hereto as Exhibit B and incorporated herein by reference. Dec. 5 Tr. at 67:17-21. Notably, the bankruptcy court did not find that the $25 million Overbid Termination Fee reflected the actual costs incurred or to be incurred by Berkshire as stalking horse.

Regarding the Plan Termination Fee, the Court expressed the view that payment of a Termination Fee in order to keep a purchaser "on the hook for an extended period of time" is the "price" of having a sale transaction approved under a plan of reorganization, rather than through

---

[1]    The Bondholders observed that the Debtor had failed to address the bankruptcy court's view that the Plan Termination Fee should be less than the Overbid Termination Fee. In response to the final point, certain secured creditors agreed that any portion of the Termination Fee in excess of $22.5 million borne by the estate would be deducted from distributions otherwise payable to such secured creditors. See Transcript of December 5 Hearing (Exhibit G).

a sale Title 11 of the United States Code (the "Bankruptcy Code") Section 363. Significantly, the bankruptcy court did not find that the reduction of the Plan Termination Fee eliminated the coercive effect of that fee on the voting process. Indeed, the bankruptcy court expressly stated that the coercive effect was not eliminated even with the agreement of the bank lenders to alter distribution rights so that certain lenders would absorb any amount of the Termination Fee in excess of $22.5 million. The bankruptcy court decided, however, that this coercive effect was the "price" to keep the purchaser bound by the Agreement.

By order dated December 11, 2001 and entered on the docket on December 12, 2001 (the "Order"), the bankruptcy court granted the Reconsideration Motion and approved the Termination Fee as revised. The Order is attached hereto as Exhibit C and incorporated herein by reference. The Bondholders filed a notice of appeal on December 21, 2001.

## III.   STATEMENT OF THE QUESTIONS PRESENTED AND RELIEF SOUGHT

The Bondholders assert that the Order is final under 28 U.S.C. § 158(a) and therefore subject to immediate appeal. In the event this Court concludes that the Order is interlocutory rather than final, the Bondholders request through this Motion that this Court grant leave to appeal the Order at this time pursuant to 28 U.S.C. § 158(a).

The questions to be presented on appeal are as follows:

1.   Did the bankruptcy court err as a matter of law in approving a Termination Fee that intrudes upon the plan confirmation process and has a coercive effect on creditors voting on such a plan?

2.   Did the bankruptcy court err as a matter of law in approving a Termination Fee in amounts ranging from $22.5 million to $27.5 million, notwithstanding the absence of any evidence in the record that the Termination Fee reflects the costs incurred by Berkshire in this transaction or that the Termination Fee would provide actual benefit to the Debtors' estate.

Pursuant to this appeal, the Bondholders request that this Court find that, as a matter of law, the Debtors cannot be authorized to pay the Termination Fee, and that this Court vacate the Order.

IV.    STATEMENT OF THE REASONS WHY AN APPEAL SHOULD BE GRANTED

    A.    The Order Is Final Under 28 U.S.C. § 158(a), as Applied by the Third Circuit in Bankruptcy Proceedings

In determining the finality of orders in bankruptcy cases, the Third Circuit has adopted a pragmatic view, treating orders as final that may not be considered final in other settings. Factors that the Third Circuit generally considers are:

> The impact of the issue on the assets of the bankruptcy estate, the necessity for additional fact-finding on remand, the preclusive effect of a decision on the merits, and the furtherance of judicial economy.

In re Continental Airlines, Inc., 932 F.2d 282, 285 (3d Cir. 1991), In re Meyertech Corp., 831 F.2d 410, 414 (3d Cir. 1987). Of these factors, the one that that Third Circuit considers the "'most important'... is the impact upon the assets of the bankrupt estate." In re Market Square Inn Inc., 978 F.2d 116, 120 (3d Cir. 1992) (citing Century Glove, Inc. v. First American Bank, 860 F.2d 94, 98 (3d Cir. 1988)).

Here, there is no question that payment of a Termination Fee in the range of $22.5 million to $27.5 million will, by itself, substantially impact the assets of the Debtors' bankruptcy estate. But the threat that such forfeiture could occur if creditors vote to reject the unfiled plan of reorganization or the bankruptcy court declines to confirm the plan will have an even larger impact on the Debtors' assets by locking this bankruptcy case into a particular plan mode that calls for liquidation of the assets rather than reorganization of the Debtors' businesses.

The other factors under the Third Circuit's finality test also favor a ruling that the Order is final. First, there should be no need for additional fact finding on remand. The bankruptcy court has already found that the Termination Fee will have a coercive effect on the voting of creditors on the Debtors' as yet unfiled liquidating plan. Such intrusion on the plan confirmation process is impermissible as a matter of law. Second, the bankruptcy court's ruling with respect to the Termination Fee is preclusive on the merits. Under the Order, the Termination Fee is payable under the terms of the Agreement, which provides that such payment is to be made immediately upon termination of the Agreement, without providing for further order of the bankruptcy court. Order at ¶ 6 (Exhibit E); Agreement at § 8.02(b) (Exhibits A and C). Finally,

treating the Order as final will promote judicial economy by resolving the dispute now, not only in advance of payment of the Termination Fee if the Agreement were terminated, but more importantly, before the parties waste estate funds and proceed far down the road with a confirmation process that has been tainted by the coercive effect of the approved Termination Fee.

In any event, the Third Circuit has deemed orders approving administrative expenses under Section 503(b) of the Bankruptcy Code final even when the amount in question remains undetermined. See F/S Airlines II, Inc., v. Simon, 844 F.2d 99, 104-05 (3d Cir. 1991). For example, in F/S Airlines II, an order approving a broker's application for payment of a Section 503(b) administrative expense was deemed final where the amount of compensation was remanded for further inquiry. Id.

Moreover, the Third Circuit has stated that "because of the unique nature of bankruptcy cases, we have often permitted [final] review of orders that are considered interlocutory in other contexts." In re Brown, 803 F.2d 120, 121-22 (3d Cir. 1986). Whereas in non-bankruptcy cases an order may not be considered final until both liability and damages are established, see Fireman's Fund Insurance Co. v. Joseph J. Biafore, Inc., 526 F.2d 170 (3d Cir. 1975), a bankruptcy order that leaves nothing further for the court to adjudicate, should be considered final. See In re Metalsource Corp., 163 B.R. 260, 264-66 (W.D. Penn 1993). In this regard, the Third Circuit has found the requisite finality in orders: (1) holding that the debtor was a railroad for purposes of bankruptcy law, Wheeling-Pittsburgh Steel Corp. v. McCune, 836 F.2d 1034, 1039 (3d Cir. 1987); (2) denying a motion to dismiss a chapter 7 case, In re Christian, 804 F.2d 46, 47-48 (3d Cir. 1986); (3) denying a right to appoint a legal representative for potential future claimants, In re Amatex Corp., 755 F.2d 1034, 1039-41 (3d Cir. 1988); and (4) granting a creditors committee leave to intervene in an adversary proceeding brought by the bankruptcy trustee, In re Marin Motor Oil, Inc., 689 F.2d 445, 447-49 (3d Cir. 1982), cert. denied, 459, U.S. 1206 (1983).

As in the above cases, with respect to approval of the Termination Fee, the Order leaves no further issues for the bankruptcy court to adjudicate. All that remains is the calculation of the amount of the Termination Fee, which is based solely upon the date that such termination were to take place. Under the relaxed finality standard in bankruptcy cases, courts have found similar orders where the only open issues are calculation and payment of an amount consistent with the terms of the orders, are final and appealable. E.g., Meyertech, 831 F.3d at 412-14 (order treated as final where partially remanded to bankruptcy court for the calculation of an award and for clarification and effectuation of set off rights); Metalsource, 163 B.R. at 266 (approval of "first-day" wage motion where amount of wages had not been calculated was nevertheless treated as final).

In short, the Bondholders are entitled to appeal the Order as a matter of right under 28 U.S.C. § 158(a), and leave to appeal is therefore not necessary.

**B.      Even if the Order is Interlocutory, Leave to Appeal Should be Granted**

Under 28 U.S.C. § 158(a), leave to appeal is available where an order: (a) involves a controlling question of law, (b) as to which there is a substantial ground for difference of opinion, and (c) an immediate appeal may materially advance the ultimate termination of the bankruptcy case. See In re Bertolli, 812 F. 2d 136, 137 (3rd Cir. 1987). The Order, even if it were not deemed final, meets the criteria for interlocutory appeal.

**1.      Controlling Question of Law**

There can be no dispute that the Bondholders' appeal of the Order involves a controlling question of law. The issue on appeal is whether approval of a Termination Fee in the range of $22.5 million to $27.5 million – an amount that the bankruptcy court has found will have a coercive influence on voting of creditors on a future (though unfiled) plan of reorganization -- constitutes an unlawful intrusion upon the plan confirmation process. If this Court on appeal so holds, then the Order must be reversed and vacated.

2.    **There is, at a Minimum, a Substantial Ground for Difference of Opinion With Respect to the Controlling Question of Law**

The Debtors have never, in support of the Bidding Procedures Motion or otherwise, cited a single published decision that supports approval and payment of a Termination Fee upon the decision of creditors to vote against a plan of reorganization or of a bankruptcy court to deny confirmation of such a plan. In contrast, the Bondholders have cited numerous decisions that demonstrate payment of the Termination Fee is improper.

As the Second Circuit recognized in Committee of Equity Security Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063 (2d Cir. 1983), Section 363 of the Bankruptcy Code does not grant carte blanche authority to approve any sale or transaction outside the ordinary course of business. Instead, "there must be some articulated business justification, other than appeasement of major creditors, for using, selling or leasing property out of the ordinary course of business before the bankruptcy judge may order such disposition under section 363(b)." Id. at 1070. Noting as the Supreme Court did that "it is easy to sympathize with the desire of a bankruptcy court to expedite bankruptcy reorganization proceedings," the Second Circuit found that the bankruptcy court's approval of the sale at issue in that case was an abuse of discretion, and offered the following rationale in support of its ruling:

> In fashioning its findings, a bankruptcy court must not blindly follow the hue and cry of the most vocal special interest groups; rather, he should consider all salient factors pertaining the proceeding and, accordingly, act to further the diverse interests of the debtor, creditors and equity holders alike.

Id. at 1071.

The seminal case in this area of the law is In re Braniff Airways, Inc., 700 F.2d 935 (5th Cir. 1983), where the Fifth Circuit held that Section 363 of the Bankruptcy Code does not authorize a debtor or bankruptcy court to "short circuit the requirements of a reorganization plan by establishing the terms of the plan sub rosa in connection with a proposed transaction." Id. At 940. In Braniff, the proposed sale transaction called for the purchaser to pay $2.5 million to the debtor in exchange for $7.5 million of scrip that could be used only in a future Braniff reorganization and that could be issued only to former Braniff employees or shareholders, or in

-12-

limited circumstances, to creditors. Id. at 939. The sale agreement provided that failure to allocate the scrip in the manner required by the sale agreement would result in forfeiture of the scrip. The Fifth Circuit found that the provision, by creating the threat of forfeiture of assets if the plan terms did not comply with the sale agreement, "had the practical effect of dictating some of the terms of any future reorganization plan." Id. at 940.

As in Braniff, the Termination Fee, if approved by this Court, will create the threat of forfeiture of a substantial asset of the estate – $22.5 million to $27.5 million in cash – if the creditors do not vote to accept a plan that calls for liquidation of the estate through an asset sale to Berkshire, or the Court decides not to confirm the Debtors' forthcoming plan of reorganization for any reason at all. That threat of forfeiture constitutes an improper attempt to influence the voting of creditors, thereby short-circuiting the substantive and procedural requirements of the chapter 11 plan confirmation process.

Courts have repeatedly denied Section 363 motions where the requested relief would effectively allow a party to dictate the chapter 11 plan process, such as through control of the business pending confirmation. In Louise's, 211 B.R. 798, this Court considered the propriety of a settlement under which the debtor proposed, through a two step process, to transfer de facto control of the debtor's business to a creditor outside of the plan confirmation process. The Court found that the proposed settlement "would ultimately lead to a proposed plan of reorganization, the terms of which could reasonably be found to have been pre-determined by virtue of the 'control' provisions of the Settlement Agreement, thereby circumventing a meaningful consideration of the requirements of Chapter 11 regarding confirmation of a reorganization plan." Id. at 802. As in Louise's, the Debtors have proposed a two step process – approval of the Termination Fee followed by the filing of confirmation of a plan.

In In re Copy Crafters Quickprint, Inc., 92 B.R. 973 (Bankr. N.D.N.Y. 1988), the court declined to approve a lease of the debtor's business, pending approval or rejection of a disclosure statement, of the debtor's premises and personalty to a former employee in anticipation of a sale, pursuant to a plan, of its printing and copying business to the former employee. Because the lease would have put the purchaser in charge of the business, the court viewed the lease as "part

-13-

of a sale which is the centerpiece of the proposed plan," and that the "approval of th[e] lease [would] effectively put the court's imprimatur on the sale and confirm the plan long before the hurdles of Chapter 11 are overcome." Id. at 983. The court also noted that the proposed lease "'boot-straps' the sale and 'short-circuits' the Chapter 11" and criticized the debtors "'slam-dunk' approach with regard to the confirmation of plans." Id. at 984.

Similarly, in In re Public Service Co. of New Hampshire, 90 B.R. 575 (Bankr. D.N.H. 1988), the court refused to authorize a partial restructuring of the debtor involving the transfer of control and management of a nuclear plant from a division of the debtor to a separate corporation to be controlled by a board of directors representing each of the joint owners of the plan. In denying the motion, the court held that the transaction would "improperly and indirectly lock the estate into [a] particular plan mode prematurely and without the protection afforded by the procedures surrounding a disclosure statement and confirmation hearing in a plan of reorganization." Id. at 584. The court in Public Service noted that, in analyzing transactions outside the ordinary course of business, "the degree of scrutiny necessarily must be elastic -- becoming more strict and searching the nearer the transaction gets to the heart of the reorganization plan process in terms of channeling that process toward any particular plan option." Id. at 582 (emphasis added).

Locking this estate into a "particular plan mode" is precisely what the Debtors seek to accomplish. In this case, the Debtors and Berkshire have deployed the threat of a $22.5 million to $27.5 million cash forfeiture to channel the creditors and this Court toward a particular but not yet fully described liquidating plan. Authorization of the Termination Fee, particularly when combined with the continuation of the Debtors exclusivity period will severely undermine the plan confirmation process specified by the Bankruptcy Code. The Order Pursuant to 11 U.S.C. § 1121(d), Granting Further Extension of Period to Solicit Acceptance of Plan (entered November 13, 2001) is attached hereto as Exhibit H and incorporated herein by reference.

Even where courts have approved a pre-confirmation transaction, such as a merger of the debtor contingent upon plan confirmation, they have done so only after ensuring that the transaction was not a "lock up" agreement. In In re Crowthers McCall Pattern, Inc., 114 B.R.

-14-

877 (Bankr. S.D.N.Y. 1990), the court considered whether a merger acquisition that was contingent upon confirmation of a plan of reorganization constituted a sub rosa plan. In that case, the court, in deciding that the merger was not a "lock up" agreement, was persuaded in large part by the fact that the debtor's exclusive right to file a plan had terminated, thereby allowing "competing plans" to be filed. Here, however, the Debtors have insisted upon retaining the exclusive right for other creditors to file plans of reorganization, thereby foreclosing creditors from filing competing plans. Over the recent objection of the Bondholders, the bankruptcy court approved an extension of the Debtors' exclusive period to solicit acceptance of a plan until January 31, 2002. Such exclusivity alone gives the Debtors "an enormous advantage over its creditors." In re Washington-St. Tammany Electric Cooperative, Inc., 97 B.R. 852, 856 (E.D. La. 1989). The combination of exclusivity, the Termination Fee, and the bankruptcy court's imprimatur of the Agreement locked in a liquidation plan.[2]

Based upon the above case law and the absence of any contrary authority cited by the Debtors, it is apparent that there is, at a minimum, a substantial ground for difference of opinion that warrants interlocutory appeal of the Order.

### 3.    Granting Leave to Appeal Will Materially Advance the Ultimate Termination of this Bankruptcy Case

The third prong for granting leave to appeal is also satisfied. An interlocutory appeal will materially advance the ultimate termination of both the dispute regarding the Termination Fee, and also the bankruptcy case. As to the particular litigation, resolving the dispute now, before the proposed sale takes place an before a disclosure statement is approved and a plan in connection with the sale is filed, will provide for the quickest, most efficient resolution of the

---

[2]    If there exists any materiality threshold for break-up fees payable when a plan is rejected or not confirmed – and there is nothing in any of the cases to suggest that any such break-up fee is permissible – that threshold must be very low. In Braniff, the Fifth Circuit denied approval of a sale transaction where $7.5 million of scrip valued at $2.5 million would be forfeited unless it was distributed in a particular way pursuant to a future plan. In re Braniff Airways, Inc., 700 F.2d 935, 939 (5th Cir. 1983). Here, the potential forfeiture will be ten times the penalty considered and rejected by the Braniff court.

matter. Moreover, hearing the appeal now rather than later will avoid the unnecessary cost, expense and delay that will result if solicitation of acceptances on the unfiled plan takes place before the appeal is decided. At the same time, the successful reorganization and ultimate termination of the chapter 11 case will be facilitated by a prompt appeal. Given that the voting on any liquidation plan filed by the Debtors will be tainted by the coercive effect of the threat of forfeiture of $22.5 million to $27.5 million, the likelihood that a successful reorganization will follow from any plan filed in connection with the proposed sale and Order is greatly diminished. In short, if the Court determines the Order is interlocutory, the ultimate termination of both the particular dispute and the chapter 11 case will be materially advanced by granting an interlocutory appeal and resolving the issue as quickly as possible.

## V.    CONCLUSION

For the foregoing reasons, the Bondholders request this Court grant the Motion and hear this appeal as promptly as possible.

DATED:  December 21, 2001

Respectfully submitted,

Michael R. Lastowski (DE I.D. No. 3892)
DUANE, MORRIS & HECKSCHER LLP
1100 North Market Street, Suite 1200
Wilmington, Delaware 19801
Telephone: (302) 657-4900
Facsimile: (302) 657-4901
E-mail: mlastowski@duanemorris.com

-and-

HENNIGAN, BENNETT & DORMAN
Bruce Bennett
Sidney P. Levinson
Marjon Ghasemi
601 S. Figueroa Street, Suite 3300
Los Angeles, California  90017
Telephone: (213) 694-1200
Facsimile: (213) 694-1234

Counsel for Bondholders

-16-

**EXHIBIT B**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| FRUIT OF THE LOOM, | ) | Case No.  99-04497 (PJW) |
| INC., et al., | ) | |
| | ) | Jointly Administered |
| Debtors. | ) | |

-------------------------------------------------------

**RESPONSE AND OPPOSITION OF BERKSHIRE HATHAWAY, INC. AND
NEW FOL, INC. TO BONDHOLDERS' MOTION FOR LEAVE TO APPEAL ORDER
UNDER 11 U.S.C. §§ 105 (a) AND 363 AND FED. R. BANK P. 2002, 6004 AND 9023
(1) GRANTING RECONSIDERATION AND (2) APPROVING BIDDING
PROCEDURES AND TERMINATION FEE, PERFORMANCE OF PRE-CLOSING
OBLIGATION, AND FORM AND MANNER OF NOTICE THEREOF WITH
RESPECT TO PROPOSED SALE PURSUANT TO PLAN OF REORGANIZATION**

TO THE HONORABLE PETER J. WALSH,
CHIEF UNITED STATES BANKRUPTCY JUDGE:

Berkshire Hathaway, Inc. and New FOL, Inc. (collectively "Berkshire") by and

through their undersigned attorneys, Werb & Sullivan and  Munger, Tolles & Olson, hereby respond

and object to the Bondholders' Motion for Leave to Appeal Order Under 11 U.S.C. §§ 105 (a) and

363 and Fed. R. Bank. P. 2002, 6004 and 9023 (1) Granting Reconsideration and (2) Approving

Bidding Procedures and Termination Fee, Performance of Pre-Closing Obligation, and Form and

Manner of Notice Thereof with Respect to Proposed Sale Pursuant to Plan of Reorganization

("Motion").

# TABLE OF CONTENTS

Page

I.   INTRODUCTION ........................................................................................ 1

II.  STATEMENT OF FACTS ........................................................................... 3

III. ARGUMENT............................................................................................... 8

    A.  The Order Approving Termination Fee And Bidding Procedures Is Not A
        Final Order Subject To Appeal................................................................ 8

        1.  The Order is Not Final Under the Balancing Test Employed by
            The Courts.................................................................................... 8

        2.  The Cases Cited By Bondholders Are Inapplicable and Do Not
            Support Their Position That the Court Order Is Final ............................. 11

        3.  The Bondholders Do Not Discuss or Distinguish Integrated
            Resources Which Held That A Termination Fee Order Was Not
            Final ........................................................................................... 12

    B.  Even If This Order Is Interlocutory, Leave To Appeal Should Not Be
        Granted............................................................................................. 13

        1.  There Is No Controlling Question of Law ................................................ 14

        2.  Bondholders Have Not Demonstrated a Substantial Ground for
            Difference of Opinion....................................................................... 15

        3.  The Bondholders Do Not Demonstrate That Granting Leave to
            Appeal Will Materially Advance the Ultimate Termination of This
            Bankruptcy Case ............................................................................. 19

IV.  CONCLUSION.......................................................................................... 20

TABLE OF AUTHORITIES

Page(s)

CASES

Beckley Coal Min. v. United Mine Workers of Amer.,
    98 B.R. 690 (D. Del. 1988) ................................................................................................... 19

Brazen v. Bell Atlantic Corp.,
    695 A.2d 43 (Del. Supr. 1997) ......................................................................................... 18, 19

Calpine Corp. v. O'Brien Env'l Energy, Inc.,
    181 F.3d 527(3d Cir. 1999) ............................................................................................. 15, 17

Coopers & Lybrand v. Livesay,
    437 U.S. 463 (1978) ............................................................................................................. 13

Dal-Tile International, Inc. v. Color Tile, Inc.,
    203 B.R. 554 (D. Del. 1996) ........................................................................................... 10, 13

In re 995 Fifth Ave. Assoc., L.P.,
    96 B.R. 24 (Bankr. S.D.N.Y. 1989) ..................................................................................... 14

In re Amatex Corp.,
    755 F.2d 1034 (3d Cir. 1988) ............................................................................................... 11

In re Blatstein,
    192 F.3d 88 (3rd Cir. 1999) ................................................................................................... 9

In re Braniff Airways, Inc.,
    700 F.2d 935 (5th Cir. 1983) ........................................................................................... 15, 16

In re Brown,
    803 F.2d 120 (3rd Cir. 1986) ............................................................................................... 12

In re Christian,
    804 F.2d 46 (3d Cir. 1986) ................................................................................................... 11

In re Columbia Gas Systems, Inc.,
    146 B.R. 106 (D. Del. 1992), *affirmed*, 50 F.3d 233 (3rd Cir. 1995) ................................. 8

In re Copy Crafters Quickprint, Inc.,
    92 B.R. 973 (Bankr. N.D. N.Y. 1988) ........................................................................... 16, 17

In re Delaware & Hudson Ry. Co.,
    96 B.R. 469 (D. Del.), *aff'd* 884 F.2d 1383 (3d Cir. 1989), and *aff'd* 884
    F.2d 1384 (3d Cir. 1989) ..................................................................................................... 13

In re Integrated Resources, Inc.,
    3 F.3d 49 (2d Cir. 1993) ............................................................................................. 4, 12, 18

## TABLE OF AUTHORITIES
### (continued)

Page(s)

In re Louise's, Inc.,
   211 B.R. 798 (Bankr. D. Del. 1997) ................................................................ 16

In re Magic Restaurants Inc.,
   202 B.R. 24 (D. Del. 1996) .............................................................................. 19

In re Marin Motor Oil, Inc.,
   689 F.2d 445 (3d Cir. 1982) cert. denied 459 U.S. 1206 (1983) ..................... 11

In re Market Square Inn, Inc.,
   978 F.2d 116 (3rd Cir. 1992) ............................................................................. 9

In re Meyertech Corp.,
   831 F.2d 410 (3rd Cir. 1987) ............................................................................. 9

In re Public Service Co. of New Hampshire,
   90 B.R. 575 (Bankr. D.N.H. 1988) .................................................................. 17

In re Taylor,
   913 F.2d 102 (3d Cir. 1990) .............................................................................. 9

In re Twenver,
   127 BR 467 (D. Col. 1991) .......................................................................... 9, 15

Kysor Indus Corp. v. Marguax,
   674 A.2d 889 (Del. Super. 1996) ..................................................................... 18

Lee Builders v. Wells,
   103 A.2d 918 (Del. Ch. 1954) ......................................................................... 18

Paramount Communications, Inc. v. QVC Network, Inc.,
   637 A.2d 34 (1993) .......................................................................................... 18

Revlon, Inc. v. MacAndrews & Forbes Holdings,
   506 A.2d 173 (Del. Supr. 1985) ...................................................................... 18

Wheeling-Pittsburgh Steel Corp. v. McCune,
   836 F.2d 153 (3rd Cir. 1987) ........................................................................... 11

## STATUTES

128 U.S.C. § 158(a) ................................................................................... 9, 13

28 U.S.C. § 1292(b) ................................................................................. 13, 19

28 USC § 158(d) ...................................................................................... 11, 12

Bankruptcy Code, § 362(h) ........................................................................... 13

TABLE OF AUTHORITIES
(continued)

Page(s)

Bankruptcy Code, 11 U.S.C. § 105 (a) ........................................................................ 1

Bankruptcy Code, 11 U.S.C. § 363 .......................................................................... 1

Bankruptcy Code, 11 U.S.C. § 363(b) ....................................................................... 15

Bankruptcy Code, 1126(e) ...................................................................................... 10

Fed. R. Bank. P. 2002 ........................................................................................... 1

Fed. R. Bank. P. 6004 ........................................................................................... 1

Fed. R. Bank. P. 9023 ........................................................................................... 1

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

--------------------------------------------------------X
In re:                                        :
                                              :        Chapter 11 Cases
FRUIT OF THE LOOM, INC., et al.,              :
                                              :        No. 99-04497 (PJW)
                                              :
                       Debtors.               :        Jointly Administered
                                              :
--------------------------------------------------------X

RESPONSE AND OPPOSITION OF BERKSHIRE HATHAWAY, INC.
AND NEW FOL, INC. TO BONDHOLDERS' MOTION FOR LEAVE TO APPEAL
ORDER UNDER 11 U.S.C. §§ 105 (a) AND 363 AND FED. R. BANK P. 2002, 6004
AND 9023 (1) GRANTING RECONSIDERATION AND (2) APPROVING
BIDDING PROCEDURES AND TERMINATION FEE, PERFORMANCE OF
PRE-CLOSING OBLIGATION, AND FORM AND MANNER OF NOTICE THEREOF
WITH RESPECT TO PROPOSED SALE PURSUANT TO PLAN OF
REORGANIZATION

I.

INTRODUCTION

Creditors DDJ Capital Management, LLC, Lehman Brothers, Inc., and Mariner

Investments, Inc. ("Bondholders") filed a Notice of Appeal and the Motion with respect to the

"Order Under 11 U.S.C. §§ 105(a) and 363 and Fed. R. Bankr. P. 2002, 6004 and 9023 (1)

Granting Reconsideration and (2) Approving Bidding Procedures and Termination Fee,

Performance of Pre-Closing Conditions, and Form and Manner of Notice Thereof with Respect to Proposed Sale Pursuant to Plan of Reorganization" ("Order") entered on December 12, 2001 by the United States Bankruptcy Court for the District of Delaware, Judge Peter J. Walsh presiding.

The Order approves bidding procedures for conducting an auction sale of the apparel businesses of Fruit of the Loom, Inc. and its affiliates ("Debtors") and grants break-up and termination fees payable to Berkshire under specified circumstances. The Order, which was supported by extensive expert testimony at the hearing, provides that Berkshire will receive a break-up fee in the amount of $25 million if it is overbid at the auction. In addition, since the sale is contingent upon the confirmation of a plan of reorganization (which may be several months after the auction), the Order provides that a termination fee will be payable as provided in the Asset Purchase Agreement ("Agreement") between Debtors and Berkshire ("Agreement") if Berkshire is the successful bidder at the auction, in certain events specified in the Agreement. These triggering events include a termination of the Agreement if a plan of reorganization is not timely confirmed, or if closing of the transactions contemplated by the Agreement does not timely occur, or if certain material uncured or uncurable breaches occur, or if a court order restricts or prohibits transactions contemplated by the Agreement. Depending on the time that the termination fee is triggered, the fee can range from $22.5 million to $27.5 million.

In entering the Order, the court overruled the Bondholders' objections, finding, among other things, that the termination fee is appropriate in this context where a Debtor is proposing to sell its assets the "preferred way," with the disclosure and voting protections afforded to creditors under a plan confirmation process.

By their Motion, the Bondholders are seeking to appeal the bankruptcy court's

highly factual interlocutory Order. As discussed in more detail below, the Motion is not well taken for the following reasons. First, the Order is not a final order in that there is no impact on the assets of the bankruptcy estate, and there would be significant additional fact finding necessary if the matter was remanded. Moreover, judicial economy would not be served by allowing an appeal.

Second, this interlocutory order involves no controlling issue of law and there is no substantial ground for a difference of opinion, and an appeal would not materially advance the ultimate termination of the case. Therefore, an interlocutory appeal should not proceed.

# I.

## STATEMENT OF FACTS

On November 1, 2001, the Debtors and Berkshire entered into the Agreement to sell the Debtors' apparel business for $835 million in cash (subject to adjustment). The Agreement provides that an auction will be held during which time the Debtors will consider higher and better offers for the business in accordance with detailed bidding procedures. In the event that Berkshire is overbid at the auction, it will receive a break-up fee. In the event that Berkshire is the successful bidder, Berkshire will be required in accordance with the terms of the Agreement to consummate the acquisition under a plan of reorganization until as late as May, 2002. The Debtors chose to pursue a plan of reorganization instead of a straight sale after notice in order to afford their creditors the opportunity to review a disclosure statement describing the sale and then vote their claims to approve or disapprove the transaction. Since Berkshire would be contractually bound to close the transaction if the plan was confirmed within certain time periods, but the Debtors are not similarly obligated to sell to Berkshire, Berkshire negotiated a termination fee that would be payable, as provided in the Agreement, in specified circumstances

including the following:

     1.    A plan of reorganization is not timely confirmed;

     2.    closing of the transactions contemplated by the Agreement does not timely occur;

     3.    certain material uncured or uncurable breaches occur; and

     4.    a court order restricts or prohibits transactions contemplated by the Agreement (collectively, with the other circumstances specified in the Agreement, the "Termination Events").

Certainly, Berkshire is on solid ground in negotiating for these fees. There is significant and ample precedent for break-up and termination fees in bankruptcy cases. See, e.g., In re Integrated Resources, Inc., 3 F.3d 49, 53-54 (2d Cir. 1993). In addition, as set forth more fully below, outside of bankruptcy, termination or cancellation fees are quite common in the corporate sale or merger context.

On November 2, 2001, the Debtors filed the bidding procedures motion, seeking approval of the break-up and termination fees as well as bidding procedures relating to the proposed auction. The Bondholders objected. The hearing on the bidding procedures motion was held on November 21, 2001. At the hearing, the Court denied the motion on the basis that the break-up fee and the termination fee were too high.

After the hearing on the bidding procedures motion, the Debtors and Berkshire renegotiated the Agreement to provide that the break-up fee in the case of an overbid at the auction would be $25 million and that the termination fee, if triggered by any of the Termination Events, would be in the range of $22.5 million to $27.5 million. In addition, the agent for the secured banks agreed that it would cover any effect on the distribution to unsecured creditors

resulting from a termination fee in excess of $22.5 million. This negotiation resulted in a

termination fee equal to less than 2.7% of the $835 million transaction (subject to adjustment).

The Debtors filed a motion for reconsideration of the bidding procedures Motion,

incorporating these changes. Consistent with their actions to date in these cases, the

Bondholders also objected to the reconsideration motion.

The hearing on the motion for reconsideration was held on December 5, 2001[1],

and the bankruptcy court overruled the Bondholders' objections and approved the motion as

requested. In approving the motion in its modified form, Judge Walsh found that it was

appropriate to consider the two fees separately – a breakup fee and a termination fee. As to the

former, Judge Walsh stated:

> "And so I am satisfied that the fact that the $25 million figure is
>
> within the range of the percentage-wise of the types of fees that I
>
> have approved on numerous occasions, I will accept that aspect of
>
> the procedure; that is, the breakup fee." [Transcript at 67:23 - 68:3]

With respect to the termination fee, the fee that would become payable if any of

the Termination Events occurred, Judge Walsh ruled:

> "With respect to the other aspect, I will label it as the termination
>
> fee -- that is, a fee payable if Berkshire Hathaway's offer is not
>
> accepted. And I say offer in the sense that except for a narrowly
>
> phrased MAC provision, Berkshire Hathaway is committed to this
>
> deal for an extended period of time. And that, obviously, is an
>
> exposure which I think a businessperson would be entitled to seek

---

[1] Relevant pages from the transcript of the December 5, 2001 hearing (herein after referred to as "Transcript") are attached hereto as Exhibit "A" and are incorporated herein by reference.

compensation for." [Transcript at 68:4 - 12 ]

\* \* \*

"In this case, the debtor and Bershire [sic] Hathaway have decided

to do it the 'right way,' that is to have the transaction as a part of a

plan so that the voters can vote not only on the distribution, but on

the underlying transaction itself which will produce the

distributions. And I guess I have characterized it as the 'right

way,' maybe a better way to characterization [sic] it is that's the

preferred way in terms of carrying out the Bankruptcy Code

concept of having the creditors and parties in interest to be able to

vote on the transaction and that's done through the plan. And

where it can be done in that fashion, I think it's certainly desirable

to do so. [Transcript at 69:2 - 15]

\* \* \*

" . . . if you want to do it the preferred way, and you want to keep a

purchaser on the hook for an extended period of time, you have to

pay the price. And under the circumstances, I think this price is

appropriate." [Transcript at 70.23 – 71:4]

The bankruptcy court relied on the extensive expert testimony of David Schulte in

reaching this conclusion. Mr. Schulte likened Berkshire's commitment to buy to a "put " option

held by the Debtors, the price of which is the termination fee:

"This commitment functions very much like a put or a one-way

street in favor of the estate and its creditors, in which Berkshire

Hathaway is standing there and offering to put up what really is more than $900 million when you take into account the working capital and other adjustments and the spare assets, but 835 plus of its own cash. And standing there having made this agreement with creditors and the debtor in September and was agreeing to leave that commitment in place for a process that might have lasted as long as the end of April and now it's been extended to the end of May. That's a six-month commitment which functions as a put option in the sense that the buyer is committed to buy, but no one is committed to sell."

[Transcript at 18:16 – 19:6]

*   *   *

"Berkshire has no control over that. Berkshire might find better investment opportunities between now and then, but they're committed to do this, the creditors [sic] is committed to do nothing. That's the sense in which it's a one-way street, that's the sense in which this is a put option in favor of the estate. Any option, the pricing of the value of any option is a function of its duration and a function of the opportunity cost of capital."

[Transcript at 19:17 – 20:1]

Unsatisfied with the Order, the Bondholders filed their Notice of Appeal and the Motion on December 21, 2001. In the Motion, the Bondholders allege that their appeal is from a

final order, but if the court finds to the contrary, they seek a finding that their appeal qualifies as a proper interlocutory appeal. The Bondholders allege the following questions on appeal:

1.    Did the bankruptcy court err as a matter of law in approving a Termination Fee that intrudes upon a plan confirmation process and has a coercive effect on creditors voting on such plan?

2.    Did the bankruptcy court err as a matter of law in approving a Termination Fee in amounts ranging from $22.5 million to $27.5 million, notwithstanding the absence of any evidence in the record that the Termination Fee reflects the costs incurred by Berkshire in this transaction or that the Termination Fee would provide actual benefit to the Debtor's estate.

As set forth in greater detail below, the appeal is not properly taken, either from a final order or as an interlocutory appeal. The Order is firmly based on substantial evidence adduced at the hearing as well as substantial legal precedent. The Motion should be denied.

## II.

## ARGUMENT

**A.    The Order Approving Termination Fee And Bidding Procedures Is Not A Final Order Subject To Appeal**

1.    The Order is Not Final Under the Balancing Test Employed by The Courts.

An appeal may be taken to the district court or bankruptcy appellate panel from a final judgment, order or decree as a matter of right.[2] The Court's December 11, 2001 Order approving bidding procedures and termination fee is not a final order subject to appeal.

_____

[2] Berkshire Hathaway does not dispute the existence of subject matter jurisdiction, but "the Court, however, must make its own assessment to determine whether appellate jurisdiction exists." In re Columbia Gas Systems, Inc., 146 B.R. 106 (D. Del. 1992), affirmed, 50 F.3d 233 (3rd Cir. 1995).

28 U.S.C. § 158(a) provides in pertinent part that:

> The district courts of the United States shall have jurisdiction to
> hear appeals (1) from final judgments, orders and decrees; . . . (3)
> with leave of the court, from other interlocutory orders and
> decrees; . . . and with leave of the court, from interlocutory orders
> and decrees of bankruptcy judges....

Under 28 U.S.C. § 158(a), the court employs a balancing test of relevant factors to determine the finality of orders of the Bankruptcy Court: "the impact upon the assets of the bankrupt estate, the necessity for further fact finding on remand, the preclusive effects of our decision on the merits of further litigation, and whether the interest of judicial economy would be furthered." In re Market Square Inn, Inc., 978 F.2d 116, 120 (3rd Cir. 1992), *quoting* In re Meyertech Corp., 831 F.2d 410, 414 (3rd Cir. 1987). Evaluation of these factors in this case leads to the conclusion that the order of the Bankruptcy Court is not a final order.[3]

The most important of the above factors is the impact upon the assets of the bankruptcy estate. In re Blatstein, 192 F.3d 88, 94 (3rd Cir. 1999). Here, the order has no impact on the assets of the Debtor's estate. It merely establishes a procedure for auction of the Debtor's assets and it decrees that a proposed purchaser (Berkshire) will receive a break up or termination fee if it is not the successful bidder or if a Termination Event occurs. The termination fee may never be paid if the Agreement is approved and the transaction consummated between the Debtors and Berkshire. In In Re Twenver, 127 BR 467 (D. Col. 1991), the Bankruptcy Court issued an order approving the payment of a topping fee to a potential purchaser of the debtor's assets. An appeal was taken and the district court held that

---

[3] Moreover, a final order is one which resolves a discrete set of issues, leaving no related issues for later determination. In re Taylor, 913 F.2d 102, 104 (3d Cir. 1990).

the order was not final because the order only resolved the theoretical question of whether, if the potential purchaser satisfied certain conditions, it would be entitled to the fee. Here, the termination fee promotes a sale of the assets but does not, by itself, impact the assets, their value or distribution; rather, the fee helps the estate realize that value by promoting an auction and sale as the bankruptcy court determined.

Second, if the Court does reverse the order, there will be a need for additional fact finding on remand as to the propriety of the termination fees, the acceptable ranges of such fees, the benefit conferred upon the estate by the termination fee and whether the termination fee of approximately 2.7% could have any coercive effect on creditor voting.

Lastly, the interest of judicial economy will not be furthered if the Bondholders are granted leave to appeal this single component of the plan. This appeal will not further the interest of judicial economy because the issues presented here may become moot. *See* Dal-Tile Intl., Inc. v. Color Tile, Inc., 203 B.R. 554, 557 (D. Del. 1996).[4]  Indeed, because any number of parties may seek to challenge the plan, the proper procedure in the interests of judicial economy should be for the appeal of any such issues to occur after confirmation, not before.

The Bondholders allege that the termination fee may have an improper effect on the reorganization process.  If the fee has an impact on the plan confirmation process, the proper time to raise the issue is at confirmation, not now. Thus, an appeal of this order would be premature and completely speculative.

---

[4] Further, the Bondholders can still challenge the effect of the termination fee on plan approval during the plan approval process.  Section 1126(e) of the Bankruptcy Code provides that the unsecured bondholders may challenge whether any entity's acceptance of the proposed plan was solicited or procured in good faith.  Therefore, this Court does not need to determine the effect of the termination fee on plan approval at this time.

2.   The Cases Cited By Bondholders Are Inapplicable and Do Not Support Their

Position That the Court Order Is Final

The Bondholders cite numerous cases allegedly demonstrating that the order

entered by this Court is final: Wheeling-Pittsburgh Steel Corp. v. McCune, 836 F.2d 153 (3d Cir.

1987); In re Christian, 804 F.2d 46 (3d Cir. 1986); In re Amatex Corp., 755 F.2d 1034 (3d Cir.

1985); and In re Marin Motor Oil, Inc., 689 F.2d 445 (3d Cir. 1982) cert. denied 459 U.S. 1206

(1983) (Motion p. 10).  None of the cases cited by the bondholders involve a termination fee, a

breakup fee, or even a liquidated damages provision.

In Wheeling-Pittsburgh, the court determined that the lower court's ruling that

debtor was a railroad would require the payment of personal injury claims as administrative

expenses.  This ruling, given the circumstances of the case, had a great impact on debtor's assets.

In In re Christian, the court of appeals looked at whether the district court's ruling, which denied

dismissal of a chapter 7 proceeding, was final under 28 USC § 158(d).  The court took a

pragmatic approach and determined that it was final, otherwise "the entire bankruptcy

proceedings must be completed before it can be determined whether they were proper in the first

place." Id. at 48.  If the court waited until final disposition of the case, it would have wasted

significant judicial resources.

Both In re Amatex Corp. and In re Marin Motor Oil, Inc. are distinguishable as

they essentially involve the right to intervene.  Under Third Circuit law, an order denying a right

to intervene is considered final and appealable.  The issues raised by the Order and Motion have

no similarities to the issues raised in intervention.

3.   The Bondholders Do Not Discuss or Distinguish Integrated Resources Which

Held That A Termination Fee Order Was Not Final

Most notably, the unsecured bondholders do not cite or even distinguish the

Second Circuit's decision in In re Integrated Resources, Inc., 3 F.3d 49, 53-54 (2d Cir. 1993). In

Integrated Resources, the debtor accepted a letter of intent from Bankers Trust to fund the

company's contemplated reorganization. The letter of intent provided that Bankers Trust would

receive a termination fee ranging from $500,000 to $900,000 in the event that the funding was

not ultimately consummated. The debtor later declined to pursue the funding proposal with

Bankers Trust and Bankers Trust claimed its right to a termination fee. The Bankruptcy Court

denied the Creditors' Committee's objection to the termination fee and the district court

affirmed. The Second Circuit subsequently dismissed the Committee's appeal, holding that the

Bankruptcy Court's order was not "final." The court held that:

> for a bankruptcy court order to be final within the meaning of
>
> § 158(d), the order need not resolve all of the issues raised by the
>
> bankruptcy; but it must completely resolve all of the issues
>
> pertaining to a discrete claim, including issues as to the proper
>
> relief.

Id. at 53.

In the instant action, the termination fee has not been triggered, nor is there a

calculation of what the termination fee would be. In contrast, in Integrated Resources, the parties

agreed that the termination fee was due and owing, but only disputed the amount of that fee. In

this case, none of the events that would trigger the payment of the termination fee to Berkshire

has occurred. See also In re Brown, 803 F.2d 120, 122-3 (3rd Cir. 1986) (district court order

finding that defendant had violated the automatic stay and remanding to the Bankruptcy Court

for determination of damages under § 362(h) is not a final order).

Therefore, the unsecured bondholders cannot establish a basis under 28 U.S.C.

§ 158(a) for an appeal as of right of the December 11, 2001 order.

**B.    Even If This Order Is Interlocutory, Leave To Appeal Should Not Be Granted**

An appeal from an interlocutory order of the bankruptcy court may only be taken

with the permission of the district court or bankruptcy appellate panel. The Delaware bankruptcy

courts have held that the standards set forth in 28 U.S.C. § 1292(b) governing interlocutory

appeals in district courts to United States Court of Appeals shall apply to bankruptcy actions

because § 158(a) does not itself provide criteria for determining when leave to appeal should be

granted. In re Delaware & Hudson Ry. Co., 96 B.R. 469, 472 (D. Del.), *aff'd* 884 F.2d 1383 (3d

Cir. 1989), and *aff'd* 884 F.2d 1384 (3d Cir. 1989). Under § 1292(b), an interlocutory appeal

may be had when the order at issue

> (1) involves a controlling question of law upon which there is (2)
>
> substantial grounds for difference of opinion and (3) when an
>
> immediate appeal from the order may materially advance the
>
> ultimate termination of the litigation.

Dal-Tile Intl., Inc. v. Color Tile Inc., 203 B.R. 554 (D.Del. 1996) (citing Delaware & Hudson, 96

B.R. at 473.) Additionally, a court will entertain an appeal under § 1292(b) only when an

appellant demonstrates that exceptional circumstances justify departure from the basic policy of

postponing review until after the entry of final judgment. Id. at 557 (citing Coopers & Lybrand

v. Livesay, 437 U.S. 463, 475 (1978)). None of these factors is present here.

1.    There Is No Controlling Question of Law

The Motion does not demonstrate that there is any controlling question of law. The Bondholders cite no authority or even a legal basis to support their allegation that the termination fee will have a coercive influence on the voting of creditors and that this issue is "a controlling issue of law." This assertion lacks substantiation in case law. Rather, whether a termination fee will be coercive and influence voting is a factual matter, not a legal matter. Further, as to the interlocutory nature of the appeal of an order approving a topping fee, the Twenver Court stated:

> In my opinion, whether the fee is justified is a question of fact depending upon the circumstances at issue. See In re 995 Fifth Ave. Assoc., L.P., 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) It does not appear to be a controlling question of law as to which there is a substantial basis for difference of opinion. Courts have generally recognized that "breakup fees are not illegal where they enhance rather than hamper bidding. Breakup fees and other strategies may 'be legitimately necessary to convince a "white knight" to enter the bidding by providing some form of compensation for the risks it is undertaking.' (citations omitted) . . . . In addition, immediate appeal of the April 15 order will do little to further the administration of this case.  As explained above, there is no certainty that Pennsylvania BancShares will be paid a topping fee. The three contingencies outlined in the order must be met. Again, Twenver's only justification on this score is that approval of the

topping fee has a "chilling effect" on other bidders.  This bare

speculation is insufficient to justify an interlocutory appeal.

In In re Twenver, supra, 127 B.R. at 470.

Further, as discussed below, the Third Circuit in Calpine Corp. v. O'Brien Envtl.

Energy, Inc., 181 F.3d 527 (3d Cir. 1999) held that termination fees are proper in certain

circumstances.  The Bondholders have not provided any contrary law and therefore there are no

substantial grounds for difference of opinion on the law in this circumstance.

2.    Bondholders Have Not Demonstrated a Substantial Ground for Difference of
      Opinion

The Bondholders claim that there is a substantial ground for difference of opinion

with respect to the controlling question of law.  The bondholders cite a number of cases that

allegedly support this proposition.  However, none of the cases discusses a termination fee or

breakup fee similar to the circumstances presented here.

In re Braniff Airways, Inc., 700 F.2d 935 (5th Cir. 1983), involved a transaction

in which the debtor proposed to sell $7.5 million of scrip in exchange for $2.5 million cash, and

it specified how the scrip could be allocated and used in a subsequent plan.  The Court rejected

this arrangement for "establishing the terms of the plan sub rosa in connection with a sale of

assets".  In re Braniff, 700 F. 2d at 939.  The Court does not object to any lock-up effect of the

scrip transaction, but objects to the attempt to allocate assets outside of a plan: "The provision

not only changed the composition of Braniff's assets, the contemplated result under §363(b), it

also had the practical effect of dictating some of the terms of any future reorganization plan".  Id.

at 939.  Braniff also rejects the transaction  because it "would leave nothing but fixed equipment

and little prospect or occasion for further reorganization", so that the transaction was "in fact a

reorganization". Id. at 940. The Bondholders cannot seriously argue that the potential payment of $22.5 million by the estate has the effect of a reorganization because (as in Braniff) it renders the remaining assets valueless. Indeed, the Bankruptcy Court found just the opposite when it concluded that the termination fee was justified and maximized the value of the estate. See December 11, 2001 Order, at 4-5.

The only Third Circuit case addressed in the Motion, In re Louise's, Inc., 211 B.R. 798 (Bankr. D. Del. 1997), is also inapplicable. The Louise's Court rejected a proposed Rule 9019 compromise because it found that the proposal exceeded the boundaries of a Rule 9019 compromise and is really a disguised plan of reorganization by which debtor's largest creditor was seeking to protect its interest over that of other creditors and the debtor. In re Louise's, 211 B.R. 798, 801-802. The court stated that were it to permit the settlement agreement, the result would be a "de facto transfer of control of the Debtor to a creditor outside the plan confirmation process. . . ." Id. at 802. The Bondholders try to analogize Louise's to the instant case by stating that they both involve a two step process (Motion p. 13). There is simply no two step process in this situation. A two step process involves a step which first results in a circumvention of meaningful chapter 11 reorganization followed by the plan process. The transaction between Berkshire and the Debtors and the termination fee have no such implication and there is no evidence that this fee would result in a de facto transfer of control to Berkshire. In fact, the court determined that such a fee preserves the value of the estate by allowing the vote on the Agreement and the potential sale. See December 11, 2001 Order, at 4.

In In re Copy Crafters Quickprint, Inc., 92 B.R. 973 (Bankr. N.D. N.Y. 1988), the court declined to approve a lease of the debtor's business that was packaged as part of a sale prior to confirmation or the filing of a plan. The court denied the transaction because the debtor

did not offer any proof indicating that the lease was motivated by a good business reason. Id. at 984-985. Rather, the court found that the timing of the Chapter 11 filing and the motion for the approval of the lease clearly indicated that the debtor company was seeking the protection of Chapter 11, while at the same time trying to circumvent its requirements. Id. at 985. The Bondholders cannot argue that the debtor is attempting to circumvent the Chapter 11 process with the termination fee. Indeed, the bankruptcy court determined otherwise when it found that the provisions of the Agreement are reasonable and appropriate. See December 11, 2001 Order, at 5.

Finally, in In re Public Service Co. of New Hampshire, 90 B.R. 575 (Bankr. D.N.H. 1988), the debtor company sought to restructure control of a nuclear plant and transfer it to a separate corporation which had been formed in contemplation of the transfer. Id. at 575. The termination fee can not be compared to a transaction out of the ordinary course of business which would result in the complete transfer of management and operational control to a separate entity prior to the filing of a plan of reorganization.

The Third Circuit in Calpine Corp. v. O'Brien Env'l. Energy, Inc., 181 F.3d 527 (3d Cir. 1999) specifically held that termination fees are proper so long as they provide some "benefit to the debtor's estate." Id. at 536. "Such a benefit could be found if assurance of a break-up fee promoted more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." Id. at 537. The court also held that "if the availability of break up fees and expenses were to induce a bidder to research the value of the debtor and convert that value to a dollar figure on which other bidders can rely, the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which debtor is sold will reflect its true worth." Id. Indeed, the hearing before the

bankruptcy court demonstrated that Berkshire is fulfilling both of these functions and Bondholders do not cite any law to the contrary.

Not surprisingly, the Bondholders choose to ignore the broad support for termination fees in both the bankruptcy and nonbankruptcy contexts. See, e.g., In re Integrated Resources, Inc., 3 F.3d 49, 53-54 (2d Cir. 1993). In addition, outside of bankruptcy, termination or cancellation fees are quite common in the corporate sale or merger context. Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc., 506 A.2d 173, 184 (Del. Sup. 1985); Paramount Communications, Inc. v. QVC Network, Inc., 637 A.2d 34, 50 (Del. Sup.1994) (termination fee of $100 million was upheld). They are used to reimburse the prospective buyer for lost opportunities and also for expenditures in pursuing the transaction. Kysor Indus Corp. v. Margaux, Inc., 674 A.2d 889, 897 (Del. Super. 1996) (termination fee of 2.8% of offer was reasonable). "Because termination fees include uncertain costs due to lost opportunities, a measure of the damages is uncertain." Id.[5]

---

[5] In Brazen v. Bell Atlantic Corp., 695 A.2d 43 (Del. Supr. 1997), the Supreme Court of Delaware held that the proper analysis for determining the validity of a termination fee was to analyze it as a liquidated damages clause employing a test different from the "business judgment" rule. In Lee Builders v. Wells, 103 A.2d 918, 919 (Del. Ch. 1954), the Court of Chancery articulated the following two-prong test for analyzing the validity of the amount of liquidated damages:

> Where the damages are uncertain and the amount agreed upon is reasonable, such an agreement will not be disturbed.

In Brazen, the court found that the termination fee of $500 million passed both prongs of the Lee Builders test. Brazen v. Bell Atlantic Corp., supra, 695 A.2d at 50. In Brazen, Bell Atlantic and NYNEX negotiated a fee amount and a fee structure that took into account the following:

(a)    the lost opportunity costs associated with the contract to deal exclusively with each other;

(b)    the expenses incurred during the course of negotiating the transaction;

(c)    the likelihood of a higher bidder emerging for the acquisition of either party; and

(d)    the size of termination fees in other merger transactions.

3.    The Bondholders Do Not Demonstrate That Granting Leave to Appeal Will

Materially Advance the Ultimate Termination of This Bankruptcy Case

The Bondholders also fail to satisfy the third prong of § 1292(b).  The

Bondholders do not cite any authority that demonstrates that an appeal would provide a material

advancement of the termination of this case.  The simple question is: will granting this appeal

facilitate the primary goal of a chapter 11 proceeding, that is the successful reorganization of the

debtor?  (Beckley Coal Min. v. United Mine Workers of Amer., 98 B.R. 690, 693 (D. Del.

1988))  The simple answer is no, it will not facilitate the successful reorganization of the

company.

The failure to meet this prong is enough to reject this motion.  The court in In re

Magic Restaurants Inc., 202 B.R. 24, 26 (D. Del. 1996) found that although there was a

controlling question of law presented, the debtor failed to sufficiently demonstrate that

exceptional circumstances exist which justify the need for immediate review.  Although the

debtor asserted that determining the issue now would save time and avoid having to resolve other

factual and legal matters, the debtor did not sufficiently establish an urgency that set "this case

apart from the typical case."  The Magic court stated, in sum:

> A party seeking to pursue an interlocutory appeal must
>
> demonstrate, in the context of the factors cited above, some
>
> circumstance or reason that distinguishes the case from the

---

Id. at 48-49.

In Brazen, the plaintiff argued that the termination fee was coercive and that it was so enormous that it influenced a merger vote.  The Court found plaintiff's argument unpersuasive since the termination fee was not egregiously large and since the mere fact that the stockholders knew that voting to disapprove the merger may result in activation of the termination fee does not by itself constitute stockholder coercion.  Id. at 50.

procedural norm and establishes the need for immediate review.

Id.

## III.

### CONCLUSION

The Bondholders have failed to allege or demonstrate the existence of exceptional

circumstances that warrant granting an interlocutory appeal. There is no reason to grant an

interlocutory appeal and their request for an appeal must be denied.


Dated:  Wilmington, Delaware
       January 4, 2002

               By: /s/ Duane D. Werb, Esq.
               Duane D. Werb (No. 1042)
               Werb & Sullivan
               300 Delaware Ave., 10th Floor
               P.O. Box 25046
               Wilmington, DE 19899
               Telephone: (302) 652-1100
               Telecopier: (302) 652-1111


                    - and -

               Thomas B. Walper (CA State Bar No. 96667)
               MUNGER, TOLLES & OLSON LLP
               355 South Grand Avenue, 35th Floor
               Los Angeles, CA 90071-1560
               (213) 683-9100
               Co-Counsel for Berkshire Hathaway, Inc.

**EXHIBIT C**

Westlaw.

Not Reported in F.Supp.2d                                                                                               Page 1
Not Reported in F.Supp.2d, 2003 WL 21738964 (S.D.N.Y.)

**H**In re Bethlehem Steel Corp.
S.D.N.Y.,2003.
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
In re BETHLEHEM STEEL CORPORATION, et al.,
Debtors.
UNITED STATES TRUSTEE Appellant,
v.
BETHLEHEM STEEL CORPORATION and United
Steel Workers of America, Appellee.
**No. 02 Civ. 2854(MBM).**

July 28, 2003.

United States Trustee appealed from an order of the
Bankruptcy Court, authorizing Chapter 11 debtor and
certain of its direct and indirect subsidiaries to
reimburse its employees' union for certain
professional fees and expenses. The District Court,
Mukasey, J., held that court did not err in authorizing
debtor to reimburse union for certain professional
fees and expenses incurred in undertaking the due
diligence and analysis that would be required in order
for union to participate in discussions regarding the
restructuring of the debtor, including negotiations
regarding possible modifications to the existing labor
and benefits agreements with the union.

Affirmed.

West Headnotes

**[1] Bankruptcy 51 ☞3767**

51 Bankruptcy
    51XIX Review
        51XIX(B) Review of Bankruptcy Court
            51k3766 Decisions Reviewable
                51k3767 k. Finality. Most Cited Cases
Portion of bankruptcy court order authorizing
Chapter 11 debtor to pay its employees' union's
investment banker a "success fee" only after the
confirmation of a plan or sale of all or substantially
all of debtor's assets, and "review and determination
of the application [for the fee] by the Court" was a
nonfinal order which was not immediately
appealable; however, portion of order authorizing

debtor and certain of its direct and indirect
subsidiaries to reimburse union for certain
professional fees and expenses was final and
immediately reviewable. 28 U.S.C.A. § 158(a)(1);
Bankr.Code, 11 U.S.C.A. § 363(b)(1).

**[2] Bankruptcy 51 ☞3159**

51 Bankruptcy
    51IX Administration
        51IX(E) Compensation of Officers and Others
            51IX(E)2 Professional Persons in General
                51k3159 k. Items and Services
Compensable. Most Cited Cases
Bankruptcy court did not err in authorizing Chapter
11 debtor to reimburse its employees' union for
certain professional fees and expenses incurred in
undertaking the due diligence and analysis that would
be required in order for union to participate in
discussions regarding the restructuring of the debtor,
including    negotiations    regarding    possible
modifications to the existing labor and benefits
agreements with the union; paying union's expenses
was a good business decision and would help develop
a reorganization plan. Bankr. Code, 11 U.S.C.A. §§
105(a), 363(b).

Tracey Hope Davis, Department of Justice Trial
Attorney, Office of the United States Trustee, New
York, New York, for Appellant.
Joseph A. Guzinski, General Counsel, Paul W.
Bridenhagen, Trial Attorney, Executive Office for the
United States Trustee, Washington D.C., for
Appellant.
Harvey R. Miller, Michele J. Meises, John C. NG.,
Weil Gotshal & Manges, New York, New York, for
Appellee Bethlehem Steel Corp.
Babette A. Ceccotti, Robin H. Gise, Cohen Weiss &
Simon, New York, New York, for Appellee United
Steel Workers of America.

OPINION AND ORDER

MUKASEY, J.
*1 The United States Trustee ("U.S.Trustee") appeals
from an order of the Bankruptcy Court dated January
7, 2002, authorizing Bethlehem Steel Corporation

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                                                Page 2
Not Reported in F.Supp.2d, 2003 WL 21738964 (S.D.N.Y.)

and certain of its direct and indirect subsidiaries (collectively "Bethlehem"), as debtors in possession, to reimburse the United Steel Workers of America ("USWA") for certain professional fees and expenses. For the reasons stated below, the order of the Bankruptcy Court, to the extent that it allows reimbursement of up to $1.4 million in fees and expenses, is affirmed.

I.

On October 15, 2001, Bethlehem commenced a case under Chapter 11 of the Bankruptcy Code. After that date, Bethlehem continued to operate its business as a debtor in possession under § 1107(a) and § 1108 of the Bankruptcy Code.

On November 29, 2001, Bethlehem moved pursuant to § 105(a) and § 363(b) of the Bankruptcy Code for authority to reimburse the USWA for certain costs and expenses. According to Bethlehem's motion, it employed approximately 13,200 persons, approximately 80 percent of whom were covered by one master collective bargaining agreement and several plant-specific agreements and settlement agreements with the USWA. (R., Ex. 1, at 2)[FN1]

> FN1. All references to U.S. Trustee's Designation of the Contents of the Record on Appeal will be cited as "R."

Bethlehem asked for authorization to make payments according to the terms of two letters ("USWA Letter" and "Keilin Letter"), attached to Bethlehem's motion. In the USWA Letter, dated November 5, 2001, Bethlehem agreed to reimburse the USWA for work performed by lawyers, accountants, actuaries, and others on an attached list of professionals.[FN2](R., Ex. 1, USWA Letter at 1) The professionals would be used by the USWA to "undertake the due diligence and analysis that will be required in order for [the USWA] to participate in discussions regarding the restructuring of the Company, including, but not limited to, negotiations regarding possible modifications to the existing labor and benefits agreements with the USWA."(Id.)

> FN2. The letter agreement was entered into by Robert S. Miller, Jr., Chairman and CEO of Bethlehem, and Leo W. Gerard, USWA's President. (R., Ex. 1, USWA Letter)

The reimbursement would be based on "each professional's usual and customary rates" and "subject to an overall cap of $1.5 million for the period commencing October 15, 2001, and ending April 15, 2002, or upon payment of $1.5 million, whichever occurs later."(Id.) In addition, the USWA Letter stated:

> Each professional and the Union shall submit to the Company and any committee of creditors appointed by the Office of the United States Trustee, consistent with the guidelines for professional compensation adopted by the United States Bankruptcy Court for the Southern District of New York, a written statement describing the professional services performed, the persons who performed the services, the time expended by each such person together with that person's billing rate, and a detailed explanation for all disbursement for which reimbursement is requested. If no objection is interposed to the submitted statement, the Company shall pay the reimbursement requested. If any objection is interposed to any portion of a submitted statement, pending resolution of that objection, the Company shall not pay the disputed item. The Company and interested parties shall make every effort to amicably resolve any disputes as soon as practicable. If the dispute is not resolved within five business days after any objection is interposed, any party may request that the Bankruptcy Court resolve the dispute.

*2 (Id.)

The USWA Letter said also that Bethlehem agreed to pay a "success fee" of $5 million to the USWA's investment banker, Keilin & Co., payable when a plan was confirmed. The Keilin Letter described this compensation agreement in greater detail, and included various indemnification provisions.[FN3](R., Ex. 1, Keilin Letter)

> FN3. The Keilin Letter, attached to Bethlehem's motion, is unsigned and undated.

The U.S. Trustee opposed Bethlehem's motion before the Bankruptcy Court, arguing, as she does here, that § 363(b) cannot be used to authorize the reimbursements. (R., Ex. 2) The Official Committee

Not Reported in F.Supp.2d                                                                    Page 3
Not Reported in F.Supp.2d, 2003 WL 21738964 (S.D.N.Y.)

of Unsecured Creditors ("the Committee"), took the position [FN4] that it was "necessary and appropriate for the USWA to receive competent and comprehensive advice and counsel," (R., Ex. 3, at 3), and in "light of the critical role that the USWA must play in a successful reorganization of the Debtors' estates," the Committee did not object to "the Debtors' reimbursement of the USWA for $1.5 million in professional fees and disbursements over the first six months of the case,"(*id.* at 4). However, the Committee argued that Keilin should be allowed a success fee only "to the extent that Keilin helps achieve a favorable result in these cases that is supported by the USWA," and "[a]ny success fee must be reasonable."(*Id.*) The Committee recommended that the success fee be subject to review by the Bankruptcy Court under the same standards set forth in § 330 of the Bankruptcy Code. (*Id.*)

> FN4. The Committee's response said that the USWA was a member of the Committee, but did not participate in the Committee's consideration of Bethlehem's motion, due to its "conflicting interests." (R., Ex. 3, at 2 n.1)

Judge Lifland held a hearing on December 19, 2001. (R., Ex. 5) At the hearing, he heard from the U.S. Trustee, the Committee, Bethlehem, and the USWA. In addition, the pre-petition lender group expressed support for Bethlehem's motion. (R., Ex. 5, at 47)

At the hearing, the Bankruptcy Court said:

I do consider that this is a unique case and I understand the tensions that exist. I understand the needs of the case and the very important public interest that is represented by the unions in this case, because ultimately, in some form or other, the taxpayer is going to have to pick up some of the obligations that are represented by shortfalls in connection with this case....

But in any event, there is this public interest, and I think there is this need to take a practical approach and approve this kind of retention, bearing in mind again that under 503(b), should there be such an application, there is a potential of those applications being offset by this advance payment.

(R., Ex. 5, at 59-60) The Court said later in the hearing: "[U]nder 363 today, there is sufficient justification for me to consider this unique application, combined with Section 105. Given the public interest, that goes beyond merely the union, it goes to its members, the retirees, a good part of the tax base of many important communities in the United States."(*Id.* at 67)

On January 7, 2002, the Bankruptcy Court issued an Order (the "Order"), authorizing Bethlehem to reimburse the USWA for "its reasonable professional costs and expenses in accordance with the terms" of the USWA and Keilin Letters. (R., Ex. 4, at 2) However, the Order made several modifications to the Letters. The Order said that the reimbursement could "not exceed $1.4 million exclusive of any Success Fee"(*id.* at 2), and it removed the USWA's in-house professionals from the list of those whom Bethlehem was authorized to reimburse, (*id.*). The Order directed that the various reimbursement statements be filed with the attorneys for the agent for pre-chapter 11 lenders, in addition to the entities set forth in the USWA Letter. (*Id.* at 3) The Bankruptcy Court adopted the terms of the Letters regarding the success fee, but incorporated changes suggested by the Committee. In particular, the Order said that Bethlehem was authorized to pay Keilin a fee of up to $5 million, but only upon 1) confirmation of a plan or the sale of all or substantially all of Bethlehem's assets, which is "supported by the USWA" and 2) "review and determination of the application [for the fee] by the Court pursuant to Section 330 of the Bankruptcy Code, after the confirmation or sale."(*Id.* at 3) Finally, the Order subjected the indemnification provisions of the Keilin letter to various conditions, including that any requests under the provisions by Keilin would be reviewed by the Court. The Order stated: "The Court shall retain exclusive jurisdiction to construe and enforce the terms of the Keilin Letter, Exhibit 'A2', any Application made by Keilin and this order."(*Id.* at 5)

II.

**\*3** [1]Title 28, Section 158(a), of the United States Code governs appeals to district courts from bankruptcy courts. Section 158(a)(1) gives district courts jurisdiction to hear appeals "from final

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 21738964 (S.D.N.Y.)

judgments, orders and decrees" of bankruptcy courts. 28 U.S.C. § 158(a)(1). Although neither party has raised the issue, this court is obligated as a threshold matter to determine whether it has jurisdiction. *See* *In re Masterwear Corp.,* No. 98 Civ. 0688, 1998 WL 879694, at *2 (S.D.N.Y. Dec. 16, 1998); *see also* *In re Integrated Resources, Inc.,* 3 F.3d 49, 52 (2d Cir.1993) (raising the question of appellate jurisdiction *sua sponte* ).

"For purposes of appeal, the concept of 'finality' is more flexible in the bankruptcy context than in ordinary civil litigation ."*In re Palm Coast, Matanza Shores Ltd. P'ship,* 101 F.3d 253, 256 (2d Cir.1996). The Second Circuit has explained:

> Properly understood, the relaxed approach to finality in bankruptcy cases is appropriate "[b]ecause bankruptcy proceedings often continue for long periods of time, and discrete claims are often resolved at various times over the course of the proceedings."*In re Chateaugay Corp.,* 880 F.2d 1509, 1511 (2d Cir.1989). This "pragmatic approach to finality" does "not overcome the general aversion to piecemeal appeals," however. *In re Chateaugay Corp.,* 922 F.2d 86, 90 (2d Cir.1990). We merely seek to avoid a situation where an otherwise "final" order-*e.g.,* an order resolving all of the claims asserted within a discrete adversary proceeding-is rendered "nonfinal" simply because it arises in the context of a bankruptcy proceeding.

*In re AroChem Corp.,* 176 F.3d 610, 619 (2d Cir.1999); *see also* *In re Kurtzman,* 194 F.3d 54, 57 (2d Cir.1999) (per curiam) ("We have previously explained that 'orders in bankruptcy cases may be immediately appealed if they finally dispose of discrete disputes within the larger case.' " (quoting *In re AroChem Corp.,* 176 F.3d at 620)); *In re Fugazy Express, Inc.,* 982 F.2d 769, 776 (2d Cir.1992) ("[F]or a bankruptcy court order to be final ... the order need not resolve all of the issues raised by the bankruptcy; but it must completely resolve all of the issues pertaining to a discrete claim, including issues as to the proper relief.").

The U.S. Trustee apparently appeals from the entire Order, although her papers focus on the portion of the Order authorizing payment of $1.4 million.[FN5]In any event, for the reasons stated below, the portion of the

Order dealing with Keilin's success fee is not final and will not be reviewed here.

> FN5. The U.S. Trustee mentions the success fee twice in her papers. Both references state that, with the exception of the success fee, the Order authorized the payment of professionals without further order by the Bankruptcy Court. (U.S. Trustee's Br. at 4 n.4, 11 n.5) The U.S. Trustee acknowledges that the Bankruptcy Court "reserved the right to review the success fee of up to $5 million for Keilin & Co." (*Id.* at 4 n. 4)

The Order provides that Bethlehem is authorized to pay Keilin a success fee only after the confirmation of a plan or sale of all or substantially all of Bethlehem's assets, and "review and determination of the application [for the fee] by the Court pursuant to Section 330 of the Bankruptcy Code."[FN6](R., Ex. 4, at 3) Thus, the Order clearly provides that further review by the Bankruptcy Court is necessary before any success fee payment is authorized.

> FN6.Section 330 allows the bankruptcy court to award "reasonable compensation" to professional persons employed under § 327 or § 1103. *See* 11 U.S.C. § 330. Neither party asserts that Keilin was retained under § 327 or § 1103. However, it appears that the Bankruptcy Court intended to apply the criteria for "reasonable compensation" contained in § 330 in reviewing the success fee.

*4 A finding that the portion of the Order dealing with the success fee is interlocutory is consistent with the holding in *In re Integrated Resources, Inc.,* 3 F.3d 49 (2d Cir.1993). In that case, the Second Circuit held that the Bankruptcy Court's order, which approved a break-up fee arrangement between the debtor and a potential funder of a reorganization plan, was interlocutory.*Id.* at 52.Bankers Trust, the potential funder, and Integrated, the debtor, entered into a "Letter of Intent," which said that Bankers Trust would receive reimbursement for expenses incurred in connection with its business review of Integrated, and required Integrated to pay Bankers Trust a break-up fee in an amount that depended on certain future events. *Id.* at 51.The Bankruptcy Court approved the agreement after the parties lowered the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 21738964 (S.D.N.Y.)

amount to be paid by Integrated. *Id. at 52.*While the order was being appealed, negotiations between Bankers Trust and Integrated ended, and the parties disagreed about how much Integrated owed Bankers Trust. *Id.* The Second Circuit said:

> It is certainly conceivable that an order approving an agreement for a breakup fee could satisfy this standard [of finality]. The parties made clear at oral argument, however, that even assuming the validity of the compensation provisions of the Letter of Intent, Integrated Resources and Bankers Trust remain literally millions of dollars apart as to the amount owing to Bankers Trust thereunder.

*Id.* at 53.The Court said further: "The bankruptcy court explicitly retained jurisdiction 'over any matters related to or arising from the implementation of' the order approving the compensation provisions of the Letter of Intent."*Id.* at 54.The Court concluded, "Accordingly, the parties should proceed to a final determination by the bankruptcy court as to the breakup fee due to Bankers Trust (if any) under the Letter of Intent."*Id.*

Similarly, in the present case, the Bankruptcy Court explicitly retained jurisdiction to "construe and enforce the terms of the Keilin Letter, ... any Application made by Keilin, and this order."(R., Ex. 4, at 5) As with the break-up fee in *Integrated Resources,* whether the success fee will be paid depends on whether certain future events occur. In addition, in the present case, the amount of money authorized to be paid as a success fee will not be determined until the Bankruptcy Court reviews Keilin's fee application under the criteria set forth in § 330. Thus, as in *Integrated Resources,* the amount of money owed, if any, is far from settled. As the Order does not permit the payment of the success fee until there are further proceedings in the Bankruptcy Court, it is not final.<sup>FN7</sup>

> FN7. In *In re AroChem Corp.,* 176 F.3d 610 (2d Cir.1999), the Second Circuit held that the Bankruptcy Court's denial of a motion to disqualify a Chapter 7 trustee's counsel was a final order for purposes of the appeal. The Second Circuit relied on its opinion in *In re Palm Coast, Matanza Shores Ltd. P'ship.* 101 F.3d 253, 256 (2d Cir.1996), which had held that the Bankruptcy Court's order

authorizing a trustee to retain a firm was final. The *AroChem* Court noted:

> We are aware that *Palm Coast* may cut against the grain of prior Circuit precedent. *See, e.g.,In re Prudential Lines,* 59 F.3d at 331 (restricting notion of "discrete dispute" to something more than "mere [ ] competing contentions with respect to separable issues") (citation and internal quotation marks omitted).... Nonetheless, once *Palm Coast* was decided it became binding precedent....

> *AroChem,* 176 F.3d at 620 n. 6. To the extent that *Palm Coast* and *AroChem* may show a more flexible approach to finality than *Integrated Resources* and other earlier Second Circuit cases, under the standards of the more recent cases, the portion of the Order dealing with the success fee still is not final. A key factor determining whether the bankruptcy court's decision was final in *AroChem* and *Palm Coast* was that the court did not suggest that its order would be reconsidered. However, in the present case, the Order specifically provides that there will be further review of the success fee before it can be paid.

Under 28 U.S.C. § 158(a)(3), a district court can consider an interlocutory bankruptcy court order with "leave of the court." In construing this section, courts have adopted the standard set forth in 28 U.S.C. § 1292(b), which ordinarily governs appeals from interlocutory district court orders to the courts of appeals. *See, e.g.,In re Worldcom, Inc.,* No. M-47, 2003 WL 21498904, at *9 (S.D.N.Y. Jun. 30, 2003); *In re Masterwear Corp.,* No. 98 Civ. 0688, 1998 WL 879694, at *3 (S.D.N.Y. Dec. 16, 1998). Under § 1292(b), leave to appeal an interlocutory order may be granted when the order (1) "involves a controlling question of law," (2) as to "which there is substantial ground for difference of opinion," and (3) "an immediate appeal from the order may materially advance the ultimate termination of the litigation."28 U.S.C. § 1292(b).Section 1292(b) is meant to be applied rarely: "Only 'exceptional circumstances [will] justify a departure from the basic policy of postponing appellate review until after the entry of a

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                                Page 6
Not Reported in F.Supp.2d, 2003 WL 21738964 (S.D.N.Y.)

final judgment." ' *Klinghoffer v. S.N.C. Achille Lauro,* 921 F.2d 21, 25 (2d Cir.1990) (quoting *Coopers & Lybrand v. Livesay,* 437 U.S. 463, 475, 98 S.Ct. 2454, 57 L.Ed.2d 351 (1978)). In the case at hand, assuming the U.S. Trustee is appealing the portion of the Order dealing with Keilin's success fee, she cannot meet all three requirements of § 1292(b). Resolving this issue now will not "materially advance the ultimate termination of the litigation." The Order stated that the success fee would be authorized only in certain circumstances, which may or may not occur. Deciding an issue now, which may never need to be decided, does not help to advance the litigation. Furthermore, I see no "exceptional circumstances" that would justify immediate review.

**\*5** In addition, the doctrine enunciated in *Cohen v. Beneficial Industries Loan Corp.,* 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949), allows appeal from certain interlocutory bankruptcy court orders if they "[1] conclusively determine the disputed question, [2] resolve an important issue completely separate from the merits of the action, and [3 are] effectively unreviewable on appeal from a final judgment ." *AroChem,* 176 F.3d at 618 (quoting *Firestone Tire & Rubber Co. v. Risjord,* 449 U.S. 368, 375, 101 S.Ct. 669, 66 L.Ed.2d 571 (1981)) (internal quotation marks omitted). At the very least, this appeal does not meet the third requirement.

However, the portion of the Order authorizing the payment of $1.4 million is final and must be reviewed here. The USWA Letter stated that the reimbursement of fees and expenses would be "subject to an overall cap of $1.5 million for the period commencing October 15, 2001, and ending April 15, 2002, or upon payment of $1.5 million, whichever occurs later."(R., Ex. 1, USWA Letter at 1) The Order changed this amount to $1.4 million (R., Ex. 5, at 3), and gave no indication that this amount would be adjusted or reconsidered at some future date.

The USWA Letter, which was adopted by the Order, does provide that Bethlehem will not reimburse the USWA until certain statements are filed by the professionals. (R., Ex. 1, USWA Letter at 1) If any party objects to an item and the parties cannot resolve the dispute, the dispute will be resolved by the Bankruptcy Court. (*Id.*) Under the terms of the USWA Letter, Bethlehem will not make the payment

until the dispute is resolved. (*Id.*) These provisions weigh against finding that this portion of the Order is final, because they show that further proceedings in the Bankruptcy Court regarding the reimbursements are at least possible.

However, I do not read the Order as contemplating that the U.S. Trustee can object again to the legality of authorizing fee reimbursements under § 363(b), as this issue was already debated by the parties and conclusively resolved by the Bankruptcy Court in the January 7, 2002 Order. That Order was the final word by the Bankruptcy Court on the legality of the reimbursements.

Furthermore, the January 7, 2002 Order does not condition authorization for reimbursement of the professionals on further proceedings in the Bankruptcy Court. As in *Palm Coast,* where the Second Circuit found that an order was final, "[n]othing in the order of the bankruptcy court ... indicates any anticipation that the decision will be reconsidered." *Palm Coast,* 101 F.3d at 256; *see also AroChem Corp.,* 176 F.3d at 620 ("[N]either the bankruptcy court nor the district court suggested that its order would be reconsidered."). A finding that the Order was not final with respect to the reimbursement agreement would mean that the U.S. Trustee could not appeal until after reimbursement was actually made. At that point there might not be a new order from which to appeal-if the parties did not bring a dispute to the Bankruptcy Court for resolution. As the Order allows reimbursement without further order by the Bankruptcy Court, it is final for purposes of this appeal, and must be reviewed by this court under 28 U.S.C. § 158(a)(1).

### III.

**\*6** A district court reviews the bankruptcy court's findings of fact for clear error, and reviews conclusions of law *de novo. See AroChem,* 176 F.3d at 620. The U.S. Trustee's appeal raises a purely legal question-whether subsections 503(b)(3)(D) and (b)(4) preclude a bankruptcy court from authorizing reimbursement by the debtor under § 363(b) of a creditor's professional fees. This court reviews that question *de novo. See In re Air Crash Off Long Island, New York, on July 17, 1996,* 209 F.3d 200, 202 (2d Cir.2000) (questions of statutory construction are reviewed *de novo* ).

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 21738964 (S.D.N.Y.)

[2] The Bankruptcy Court authorized the reimbursement pursuant to § 363(b) of the Bankruptcy Code, which provides that a bankruptcy court may authorize a debtor to "use, sell, or lease, other than in the ordinary course of business, property of the estate,"11 U.S.C. § 363(b)(1), and under § 105(a), which gives the court authority to issue "any order, process, or judgment that is necessary and appropriate to carry out the provisions of this title,"11 U.S.C. § 105(a).

The U.S. Trustee argues that subsections 503(b)(3)(D) and (b)(4) of the Bankruptcy Code provide specifically for reimbursement of creditors' professional fees by the estate. These subsections allow such fees to be classified as administrative expenses, and paid by the estate, but only if the expenses were incurred in making a "substantial contribution to the case." [FN8]Courts have defined a "substantial contribution" as one that substantially and directly benefits the estate. *See, e.g.,In re Hooker Invs., Inc.,* 188 B.R. 117, 120-21 (S.D.N.Y.1995) (relevant factors in determining whether an applicant has made a substantial contribution are "whether the services in question were provided to benefit all parties in the case; whether the services conferred a direct, significant and demonstrably positive benefit upon the estate; and whether the services were duplicative of services performed by others"); *In re Alert Holdings Inc.,* 157 B.R. 753, 757 (Bankr.S.D.N.Y.1993) ("[E]fforts undertaken by creditors solely to further their own self-interest are not compensable under section 503(b). The integrity of § 503(b) can only be maintained by strictly limiting compensation to extraordinary creditor actions which lead directly to tangible benefits to the creditors, debtor or estate.") (citations omitted). The U.S. Trustee argues that "[i]n essence, the Debtors' Motion contends that the USWA will have to retain professionals to advise it in its negotiations with the Debtors" but "it is well established that the costs and expenses incurred by a creditor in representing itself are not legitimate administrative expenses."(U.S. Trustee's Br. at 10).

FN8. Section 503 provides:

(b) After notice and a hearing, there shall be allowed administrative expenses ..., including-

...

(3) the actual, necessary expenses other than compensation and reimbursement specified in paragraph (4) of this subsection, incurred by -

...

(D) a creditor, an indenture trustee, an equity security holder, or committee representing creditors or equity security holders other than a committee appointed under 1102 of this title, in making a substantial contribution in a case under chapter 9 or 11 of this title;

...

(4) reasonable compensation for professional services rendered by an attorney or an accountant of an entity whose expense is allowable under paragraph (3) of this subsection, based on the time, the nature, the extent, and the value of such services, and the cost of comparable services other than in a case under this title, and reimbursement for actual, necessary expenses incurred by such attorney or accountant;

....

11 U.S.C. § 503. Administrative expense claims allowed pursuant to Section 503 are accorded first priority status in a bankruptcy case and are paid directly from the bankruptcy estate before other claims, including claims of unsecured creditors. 11 U.S.C. § 507(a)(1). The reorganization plan must provide for the full payment of administrative expenses. 11 U.S.C. § 1322(a)(2).

According to the U.S. Trustee, the "sole statutory avenue for an individual creditor to have its professional fees reimbursed is as an administrative expense."(U.S. Trustee's Br. at 6) The U.S. Trustee argues that authorizing reimbursement of the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                    Page 8
Not Reported in F.Supp.2d, 2003 WL 21738964 (S.D.N.Y.)

professional fees and expenses at the beginning of the case allows the USWA to avoid the substantial contribution requirement of subsections 503(b)(3)(D) and (b)(4). With this arrangement, the USWA guarantees that its expenses will be paid regardless of whether it contributes to a successful reorganization. (U.S. Trustee's Reply Br. at 6) The U.S. Trustee argues that by relying on the general provisions of § 105(a) and § 363(b), the Order "threatens to create an exception that will swallow the Bankruptcy Code's detailed language limiting administrative expenses and professional fees."(U.S. Trustee's Br. at 5)

*7 The U.S. Trustee points out that there are specific sections of the Bankruptcy Code that deal with the payment of professional fees. The debtor in possession can retain professionals under § 327, and official committees of creditors and equity security holders can employ professionals under § 1103. These professionals can be paid "reasonable compensation" from the estate upon approval by the bankruptcy court according to specific criteria set forth in § 330. Thus, according to the U.S. Trustee, there are specific procedures and standards in the Bankruptcy Code for payment of professional fees, and these procedures and standards cannot be avoided by authorizing fees under the broad language of § 363(b) and § 105(a).

Bethlehem and the USWA (the "appellees") respond that the Bankruptcy Court acted within its discretion to approve the arrangement under § 105(a) and § 363(b), and that subsections 503(b)(3)(D) and (b)(4) do not bar such an arrangement. The appellees argue that a request to use the debtor's funds under § 363(b) is allowed if the debtor shows a good business reason for the transaction. The appellees argue that payment of these fees was necessary for the USWA to participate fully in negotiations to modify the collective bargaining agreements, and these modifications were vital to a successful reorganization.

Bethlehem points out that the Committee supported the reimbursement arrangement (Bethlehem's Br. at 2) and asserts that the "economic stakeholders and the Bankruptcy Court determined that the relief granted by the Order would enhance, benefit, and serve the interests of all parties" (id. at 15). Bethlehem argues that its "ability to reorganize should not be shackled by an inflexible, literalist

statutory interpretation that is constructed by an entity that does not hold an economic interest in the reorganization of the Debtors."(Id. at 17)

The USWA argues that subsections 503(b)(3)(D) and (b)(4) were "inappropriate to the relief sought in the Motion" because Bethlehem sought "authority to make the fee payments now, and not at the end of the case."(USWA's Br. at 11) The USWA argues also that this is not a case where a creditor seeks to recover costs and fees incurred by "representing itself" as a creditor collecting on its claims in a bankruptcy case. Rather, the USWA argues that it is engaged in an effort to restructure its labor agreements with Bethlehem "going forward." (Id. at 12) According to the USWA, the "focus of the parties' efforts is prospective" and is "not simply an effort to recover on pre-petition claims."(Id.)

The appellees emphasize that the USWA is not just any creditor, but rather the entity representing the largest constituency of unsecured creditors and the union representing most of Bethlehem's workers. (Bethlehem's Br. at 18) The appellees point to "similar orders entered in other chapter 11 cases of steel industry companies that involve the USWA."(Id. at 16 (citing In re Republic Techs. Int'l, LLC, Ch. 11 Case No. 01-51117 (Bankr.N.D.Ohio Dec. 4, 2001); In re LTV Steel Co., Inc., Ch. 11 Case No. 00-43866 (Bankr.N.D.Ohio Mar. 21, 2001)).FN9

> FN9. The Order in *Republic Technologies* is attached to USWA's brief. (USWA's Br., Ex. 1) The Order in *LTV Steel* is attached to Bethlehem's motion filed with the Bankruptcy Court. (R., Ex. 1) It does not appear that either of these orders was reviewed by a district court.

*8 Bethlehem compares the present arrangement to the authorization of break-up fee FN10 agreements under § 363(b) and cites this court's opinion in *In re Integrated Resources, Inc.,* 147 B.R. 650 (S.D.N.Y.1992). (Bethlehem's Br. at 11) Bethlehem also compares the present case to cases involving reimbursement requests for due diligence costs incurred by prospective purchasers of debtors' assets. Bethlehem says, "Interestingly, the U.S. Trustee rarely objects to the concept of presale reimbursement agreements" and cites several cases including *Integrated Resources.*(Bethlehem's Br. at

Not Reported in F.Supp.2d                                             Page 9
Not Reported in F.Supp.2d, 2003 WL 21738964 (S.D.N.Y.)

14)

> FN10. "A break-up fee, or more appropriately a termination fee, is an incentive payment to a prospective purchaser with which a company fails to consummate a transaction." *In re Integrated Resources, Inc.,* 147 B.R. 650, 652 (S.D.N.Y.1992).

In *Integrated Resources,* the debtor in possession, Integrated, sought authorization from the Bankruptcy Court to enter into a break-up fee and expense reimbursement agreement with Bankers Trust, a potential funder of a reorganization plan. The Bankruptcy Court approved the agreement, apparently pursuant to § 363(b). *See In re Integrated Resources, Inc.,* 135 B.R. 746, 750 (Bankr.S.D.N.Y.1992).[FN11] This court affirmed the Bankruptcy Court's order, without specific reference to § 363(b). *In re Integrated Resources, Inc.,* 147 B.R. 650 (S.D.N.Y.1992).

> FN11. The Bankruptcy Court did not discuss § 363(b), except to say: "When a sale of the debtor's assets outside the ordinary course of business is proposed, Code § 363, bankruptcy courts will carefully scrutinize the use of break-up fees." *Integrated Resources,* 135 B.R. at 750. The Second Circuit's opinion in the case said that "Integrated filed a motion seeking the bankruptcy court's approval of the compensation provisions of the Letter of Intent pursuant to 11 U.S.C. §§ 105 and 363(b)." *In re Integrated Resources,* 3 F.3d 49, 51 (2d Cir.1993). The Second Circuit dismissed the appeal in that case for lack of jurisdiction. *Id.* at 51.

In her reply brief, the U.S. Trustee acknowledges that one element of the compensation arrangement in *Integrated Resources* was the reimbursement of Bankers Trust's professional fees incurred in connection with conducting its due diligence. However, the U.S. Trustee says, "Although the professional fees were not analyzed separately under section 503, the substantial contribution standard was effectively applied."(U.S. Trustee's Reply Br. at 5)

That argument stretches *Integrated Resources* beyond

recognition. The Bankruptcy Court and this court in *Integrated Resources* did not mention subsections 503(b)(3)(D) or (b)(4), the "substantial contribution" standard, or administrative expenses. The debtor in possession, Integrated, brought the motion under § 363(b) for authorization to enter into the fee agreement with Bankers Trust. Bankers Trust did not seek the fees directly by means of an application under subsections 503(b)(3)(D) and (b)(4). Indeed, it appears that Bankers Trust was not a creditor,[FN12] and thus could not have applied for reimbursement under those provisions.

> FN12. The Bankruptcy Court refers to Bankers Trust as a "third party plan funder." *Integrated Resources,* 135 B.R. at 748.

"It has become increasingly common in section 363 sales of significant portions of an estate's assets for the prospective buyer to demand a breakup fee or other protection in the event that the sale is not consummated." 3 *Collier on Bankruptcy* § 363.03[7] (15th ed.2002).[FN13] Several bankruptcy courts have refused to approve break-up fee and expense reimbursement agreements between debtors in possession and potential buyers. However, these courts have not held that they lack statutory authority under the Bankruptcy Code to permit such payments; rather, they have withheld approval because the agreements were found not in the best interests of various parties. *See, e.g., In re APP Plus, Inc.,* 223 B.R. 870 (Bankr.E.D.N.Y.1998) (Chapter 11 trustee moved for order authorizing sale of substantially all of debtor's assets and authorization of break-up fee and topping fee arrangement; Bankruptcy Court approved break-up fee arrangement but refused to approve topping fee agreement); *Matter of Tiara Motorcoach Corp.,* 212 B.R. 133 (Bankr.N.D.Ind.1997) (debtor moved under § 363 for authorization of the sale of certain assets and approval agreement to pay a break-up fee; Bankruptcy Court refused to approve the break-up fee agreement, finding that it was not in the best interests of the estate, creditors and equity holders); *In re Am. W. Airlines,* 166 B.R. 908, 913 (Bankr.D.Ariz.1994) (applying § 363(b) and holding that "payment of the contemplated break-up fee, in any amount, is not in the best interest of the estate, the creditors or the equity holders" but expense reimbursement provisions "are in the best interests of

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 21738964 (S.D.N.Y.)

the estate" and would be approved).

FN13. This treatise argues:

> In negotiated <u>section 363(b)</u> sales, as with nonbankruptcy sales of assets, it may sometimes be necessary to offer incentives to bidders in order to maximize the price obtained. In general, the trustee or debtor in possession, who has a fiduciary duty to represent the estate's interests, should be able to exercise judgment with respect to bidding incentives. Consequently, although a court should certainly review the trustee's or debtor in possession's agreement to provide bidding incentives, the court should approve such agreements unless they are unreasonable or appear more likely to chill the bidding process than to enhance it.

> 3 *Collier on Bankruptcy* § 363.03[7] (15th ed.2002) (footnotes omitted).

**\*9** The Third Circuit, in *In re O'Brien Environmental Energy, Inc.,* 181 F.3d 527 (3d Cir.1999), refused to approve payment of a break-up fee. Initially, the Bankruptcy Court refused to approve a break-up fee and expense agreement between a potential buyer (Calpine) and the debtor in possession, O'Brien. However, the Court said that it might be willing to permit Calpine to seek the fees at the end of the process. After Calpine lost the auction for the debtor's assets, Calpine filed an application for payment of a break-up fee and expenses. The Bankruptcy Court denied that application. Calpine appealed both orders. The appellees asserted that Calpine lacked standing to challenge the earlier order because only O'Brien had statutory authority to move for approval of the compensation provisions at the earlier hearing, and thus only O'Brien could appeal the denial of the approval. *Id.* at 530.The Third Circuit agreed that Calpine lacked standing to challenge this order. *Id.* at 531.

However, the Third Circuit did consider Calpine's challenge to the later order. The Court began its discussion by stating that there was "some confusion concerning the legal basis on which Calpine made and is prosecuting" its motion. *Id.* at 531-32.The

Court said, "Neither Calpine nor the Bankruptcy Court have cited any support for the proposition that courts may create a right to recover from the bankruptcy estate where no such right exists under the Bankruptcy Code."*Id.* at 532.The Third Circuit said: "[W]e decline the invitation to develop a general common law of break-up fees. We instead consider whether any provision of the Bankruptcy Code, as it is currently written, authorizes the award of break-up fees and expenses to an unsuccessful bidder at the plan-based sale of a debtor's assets."*Id.* at 532.The Court found that the "most likely source of authority for Calpine's motion appears to be 11 U.S.C. § 503," and it decided to "treat Calpine's arguments as addressing whether it is entitled to receive break-up fees and expenses under that provision."*Id.* at 532.According to the Court, section 503(b)(1)(A) applied, which allows "the actual, necessary costs and expenses of preserving the estate" to be treated as administrative expenses. Applying this section, the Third Circuit concluded that "awarding break-up fees and expenses to Calpine was not actually necessary to preserve the value of O'Brien's estate" and affirmed the Bankruptcy Court's decision to deny approval of the arrangement.

*O'Brien* deals with the case of an unsuccessful bidder seeking payment of a fee from the estate after the bidding had concluded. *O'Brien* did not address whether, under § 363(b), a bankruptcy court can authorize a debtor in possession to enter into a reimbursement agreement with a potential buyer. However, the opinion can be read as holding that § 503(b) is the only source for approval of the payment of these fees. To the extent that *O'Brien* does so hold, the case is helpful to the U.S. Trustee-although she does not cite it.

**\*10** *O'Brien* may be correct that the only way an unsuccessful bidder can itself seek payment of a break-up fee and expenses from the estate is under 503(b). However, I think the better view is that pursuant to § 363(b), a bankruptcy court may authorize a debtor in possession to enter into a reimbursement agreement with a potential buyer. *See* 3 *Collier on Bankruptcy* § 363.03[7] (arguing that bankruptcy courts should approve these agreements unless they are unreasonable or appear more likely to chill the bidding process than to enhance it).

The break-up fee cases are examples of courts

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                            Page 11
Not Reported in F.Supp.2d, 2003 WL 21738964 (S.D.N.Y.)

allowing (or refusing to allow) the debtor in possession to reimburse the expenses of potential buyers in connection with a sale of the estate's assets under § 363(b). The cases are relevant by way of analogy, but do not address the precise question at issue here-whether reimbursement of a creditor's professional fees can be allowed under § 363(b). Neither party cites, and I have not found, any district or circuit court case addressing this question. For the reasons described below, I conclude that subsections 503(b)(3)(D) and (b)(4) do not preclude reliance on § 363(b) to authorize a debtor in possession to reimburse a creditor's professional fees.

Section 363(b) and subsections 503(b)(3)(D) and (b)(4) serve different purposes in bankruptcy proceedings. Section 503 allows entities that incurred certain expenses to request payment from the estate. See 11 U.S.C. § 503(a) ("An entity may timely file a request for payment of an administrative expense...."). Under subsections 503(b)(3)(D) and (b)(4), a creditor can file an application with the bankruptcy court for payment of already-incurred professional fees. After notice and a hearing, if the bankruptcy court determines that the creditor incurred expenses "in making a substantial contribution in a case," then the court will allow the creditor's reasonable professional fees to be treated as administrative expenses. See 11 U.S.C. § 503(b)(3)(D) & (b)(4).

Section 363, on the other hand, governs the use of funds by the debtor in possession while it operates its business after the bankruptcy petition is filed. Under § 363(c), a debtor in possession "may use property of the estate in the ordinary course of business without notice or a hearing." 11 U.S.C. § 363(c). Under § 363(b), a debtor in possession "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b). Thus, under § 363(b), if the debtor in possession wants to use funds from the estate for a transaction outside the ordinary course of business, the debtor must obtain advance approval from the bankruptcy court.

Section 363(b) does not permit the debtor in possession to use funds solely to benefit a creditor. If the payment of a creditor's fees were simply aimed at helping the creditor promote its own self-interest, the payment would not be permitted under § 363(b). The

bankruptcy court may not authorize the use of funds under § 363(b) unless it finds "a good business reason" for the expenditure. See In re Lionel Corp., 722 F.2d 1063, 1071 (2d Cir.1983) ("The rule we adopt requires that a judge determining a § 363(b) application expressly find from the evidence presented before him at the hearing a good business reason to grant such an application."). In Lionel, the Second Circuit said that the "the history surrounding the enactment in 1978 of current Chapter 11 and the logic underlying it buttress our conclusion that there must be some articulated business justification, other than appeasement of major creditors, for using, selling or leasing property out of the ordinary course of business before the bankruptcy judge may order such disposition under section 363(b)." Id. at 1070.

*11 In Lionel, "the only reason advanced for granting the request to sell Lionel's 82 percent stock interest in Dale was the Creditors' Committee's insistence on it," id. at 1071, and the Court found this reason "insufficient as a matter of fact because it is not a sound business reason and insufficient as a matter of law because it ignores the equity interests required to be weighed and considered under Chapter 11," id. The Court added that "[i]n fashioning its findings, a bankruptcy judge must not blindly follow the hue and cry of the most vocal special interest groups; rather, he should consider all salient factors pertaining to the proceeding and, accordingly, act to further the diverse interests of the debtor, creditors and equity holders, alike." Id.

The case at hand does not present a situation where a creditor incurs expenses in attempting to collect on pre-petition claims and then seeks reimbursement from the estate. That situation is covered by § 503, and expenses will be paid only if the creditor's actions were helpful to the estate.

By contrast, in the present case, Bethlehem determined that paying the USWA's expenses was a good business decision and would help develop a reorganization plan. The Committee agreed that it was "necessary and appropriate for the USWA to receive competent and comprehensive advice and counsel" and that it was "appropriate for the Debtors to reimburse the USWA for the reasonable cost of such advice and counsel."(R., Ex. 3, at 3) The pre-petition lenders group agreed. (R., Ex. 5, at 47) Finally, the Bankruptcy Court determined that the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                Page 12
Not Reported in F.Supp.2d, 2003 WL 21738964 (S.D.N.Y.)

reimbursement arrangement was "in the best interests of the Debtors and all parties in interest."(R., Ex. 4, at 2)

The authorization of certain types of payments under § 363(b) is not prohibited simply because there is another section of the Bankruptcy Code related to the same type of payment. The U.S. Trustee objects that relying on § 363(b) to authorize the reimbursements "threatens to create an exception that will swallow the Bankruptcy Code's detailed language limiting administrative expenses and professional fees."(U.S. Trustee's Br. at 5) However, subsections 503(b)(3)(D) and (b)(4) are not rendered meaningless simply because in certain unique circumstances a bankruptcy court approves a debtor's motion to enter into an agreement to reimburse a creditor for professional fees. In most cases, a debtor will make no such motion, as it will not be in its business interest to do so-or the court will refuse approval under § 363(b). Thus, in most cases, if a creditor wants to be reimbursed, it must file an application under subsections 503(b)(3)(D) and (b)(4). Those provisions continue to serve a purpose.

In sum, subsections 503(b)(3)(D) and (b)(4) do not bar a bankruptcy court from allowing a debtor in possession to reimburse a creditor for professional fees-provided, of course, that the standard for allowing transactions under § 363(b) has been met.

**\*12** In addition, under the circumstances present here, the Bankruptcy Court did not err in its application of § 363(b).[FN14] To approve a transaction under § 363(b), the bankruptcy court must find that there is a good business reason to allow the transaction. In this case, the Bankruptcy Court found that the reimbursement arrangement was "in the best interests of the Debtors and all parties in interest."(R., Ex. 4 at 2)

> FN14. Bankruptcy court orders approving transactions under § 363(b)-assuming that the transaction is of a type that as a matter of law can be approved under this section-are reviewed by examining whether there is clear error in the bankruptcy court's finding that there was a good business reason to allow the transaction. If the decision is supported by the record, the appellate court will find that the order was not an abuse of

discretion. See *In re Chateaugay Corp., 973 F.2d 141, 145 (2d Cir.1992)* ("The bankruptcy court was within its discretion, based on its consideration of all the factors ... to determine that a good business reason existed to proceed with the sale now even if the preferred stock amount does not ultimately benefit creditors. The finding that delay may so diminish the value of Aerospace's assets that creditors will lose more than the value of the preferred stock is supported by the record and justifies the bankruptcy court's decision."); *Lionel, 722 F.2d at 1071* ("Thus, the approval of the sale of Lionel's 82 percent interest in Dale was an abuse of the trial court's discretion."); *see also Stephens Indus. v. McClung, 789 F.2d 386, 388-89 (6th Cir.1986)* ("Accordingly, we review the Bankruptcy Court's order authorizing the sale of the assets [pursuant to § 363(b) ] under an abuse of discretion standard.... In determining whether the Bankruptcy Court abused its discretion, this Court reviews the Bankruptcy Court's findings of fact under the 'clearly erroneous' standard. We review the Bankruptcy Court's conclusions of law, however, *de novo.* "(citations omitted)).

The U.S. Trustee does not explicitly challenge that finding. The U.S. Trustee's papers argue only that subsections 503(b)(3)(D) and (b)(4) preclude the use of § 363(b), under any circumstances, to authorize a professional fee reimbursement arrangement between a creditor and debtor. Indeed, in her Statement of the Issue and Standard of Appellate Review, at the beginning of her brief, the U.S. Trustee forswears any fact-based argument, as follows:

> This issue on appeal is statutory construction, *i.e.,* whether very specific requirements for compensation of a creditor in the case pursuant to section 503(b)(3)(D) and 503(b)(4) can be ignored in favor of sections 363(b) and 105(a) of the Bankruptcy Code. In appeals that principally involve statutory construction, the standard of review is *de novo.*

(U.S. Trustee's Br. at 2) (citation omitted)

To be sure, the U.S. Trustee does state: "The Debtor's

Not Reported in F.Supp.2d                                                                    Page 13
Not Reported in F.Supp.2d, 2003 WL 21738964 (S.D.N.Y.)

reliance on Section 363(b) presents the dangers addressed in *Lionel.*The Debtors agreed to USWA's demand for reimbursement of professional fees. Although no reasons are offered other than USWA's request, it is reasonable to assume that the Debtors hoped to pacify an important creditor."(U.S. Trustee's Br. at 14) However, the U.S. Trustee does not assert that the Bankruptcy Court's holding that the arrangement was "in the best interests of the Debtors and all parties in interest" (R., Ex. 4 at 2) was clearly erroneous or unsupported by the record. Moreover, the U.S. Trustee's airy claim that "no reasons are offered [for the fee reimbursements] other than USWA's request" is simply wrong. The USWA argued in its letter why it needed the money to help evaluate and negotiate the terms of a plan, and Bethlehem and the Committee and the pre-petition lenders agreed that the USWA's reasoned request was sound. In addition, in the proceedings before the Bankruptcy Court, the U.S. Trustee argued that § 363(b) did not provide a statutory basis for authorizing the reimbursement arrangement, and it does not appear from the record that she argued in the alternative that Bethlehem lacked a good business reason for entering into the agreement with the USWA. (*See* R., Ex. 2 & Ex. 5, at 39-44) Neither below nor here has the U.S. Trustee suggested that the Bankruptcy Court proceedings offended *Lionel* s requirement that the finding of a "good business reason" be based on "evidence presented before ... [the court] at the hearing."*Lionel, 722 F.2d at 1071.* There was no dispute about underlying facts; it was the legal conclusions flowing from those facts that were disputed. In any event, in this case, Bethlehem determined for reasons summarized in the USWA Letter referred to on page 2, *supra,* that making the payments was in its business interest and the Committee and the pre-petition lenders agreed. The Bankruptcy Court's finding that the transaction was in the best interests of Bethlehem and all parties in interest was not clearly erroneous, and the decision to authorize the payments was not an abuse of discretion.

*13 Finally, the U.S. Trustee argues that the Bankruptcy Court's reliance on § 105 was an abuse of discretion because "section 105 cannot be used to escape the limitations on administrative expenses imposed by section 503."(U.S. Trustee's Br. at 15) I agree that § 105 must be used in a manner that is consistent with the Bankruptcy Code. *See* 2 Collier on Bankruptcy § 105.01[2] (15th ed. 2002) ("Section

105 does not allow the bankruptcy court to override explicit mandates of other sections of the Bankruptcy Code .... " (citing *Norwest Bank Worthington v. Ahlers,* 485 U.S. 197, 206, 108 S.Ct. 963, 99 L.Ed.2d 169 (1988))). However, because § 363(b) provides a basis for allowing the reimbursement agreement, the use of § 105 in connection with § 363(b) to issue the Order was not an abuse of discretion.

For the reasons stated above, the Order of the Bankruptcy Court, to the extent that it allows reimbursement of up to $1.4 million in fees and expenses, is affirmed.

S.D.N.Y.,2003.
In re Bethlehem Steel Corp.
Not Reported in F.Supp.2d, 2003 WL 21738964 (S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Westlaw.

Not Reported in B.R.                                                                                                    Page 1
Not Reported in B.R., 1991 WL 284107 (Bkrtcy.E.D.Pa.), Bankr. L. Rep. P 73,883

In re Paolino
Bkrtcy.E.D.Pa.,1991.

United States Bankruptcy Court, E.D. Pennsylvania.
In re PAOLINO.
**No. 85-00759F.**

Jan. 11, 1991.

Opinion

BRUCE I. FOX, Bankruptcy Judge:
**\*1** Before me are a number of issues which were heard
and taken under advisement. The resolution of most of
these disputes will turn upon the answer to one question:
What portion of the postpetition earnings of Richard
Paolino's medical practice is property of the estate within
the meaning of 11 U.S.C. § 541(a)(6). That question arose
through an adversary proceeding brought by the debtors
against the chapter 11 trustee and Pennsylvania Blue
Shield, the resolution of which is now before me. A short
discussion of this proceeding's history will put the other
disputes in perspective.

I.

Dr. Paolino initiated this litigation by filing an action
which requested a determination that postpetition
Pennsylvania Blue Cross or Blue Shield payments then
held by the trustee were not property of the estate
pursuant to § 541. The complaint sought turnover of these
funds to the debtor. The trustee's answer included a
counterclaim seeking turnover of other and certain
postpetition income which he claimed as estate property
pursuant to § 541(a)(6).

In preparing for this litigation the trustee served
interrogatories upon the plaintiff, as well as request for
the production of documents. As explained more fully in
*In re Paolino,* 87 B.R. 366 (Bankr.E.D.Pa.1988), the
debtor did not respond to these requests for discovery, and
refused to comply with the various orders I entered
compelling the plaintiff to respond. I therefore was
constrained to dismiss Dr. Paolino's complaint.
Fed.R.Civ.P. 37(b) (incorporated in these proceedings by
Bankr.R. 7037).[FN1] At that time I scheduled the trustee's
counterclaim for a hearing, and noted that if discovery as

to the counterclaim was not provided by a date certain I
would entertain a motion for further sanctions.

Dr. Paolino did not, in fact, comply with these discovery
requests and the trustee moved for further sanctions,
including default judgment on the counterclaim. By
unpublished memorandum and order dated August 12,
1988 I entered judgment as to liability on the
counterclaim in favor of the defendant trustee pursuant to
Fed.R.Civ.P. 37(b)(2)(c) and 55(b). However, I was
unable at that time to ascertain the appropriate relief to be
granted on the counterclaim. The trustee had requested
turnover, pursuant to § 542, of certain postpetition income
of Dr. Paolino emanating from two sources: rental income
and earnings from his medical practice. See 11 U.S.C. §
541(a)(6). I therefore scheduled a hearing on the scope of
relief; that is, to determine the extent of the estate
property derived from these two income sources. I noted
in that memorandum that since the plaintiff, "by his
failure to comply with court ordered discovery, may have
frustrated the trustee's ability to prove the relief to which
he is entitled, 'any doubts about the actual assessment of
damages [on the trustee's counterclaim] will be resolved
against the' plaintiff." *In re Paolino,* memorandum at 4,
citing *Chesa International, Ltd. v. Fashion Associates,
Inc.,* 425 F.Supp. 234, 238 (S.D.N.Y.), *aff'd without
op.,*573 F.2d 1288 (2d Cir.1977).

**\*2** The hearing to determine the scope of postpetition
estate property was subsequently held, and the
determination of the extent of the debtor's liability (on the
question of estate property) is now before me for
resolution. The resolution of this issue will aid resolution
of the related disputes, which involve payment of
administrative and priority claims.[FN2]

II.

A.

The debtor does not dispute that postpetition revenues
generated from various rental properties rightfully are
subject to turnover to the chapter 11 trustee. Indeed, at the
hearing the debtor stipulated to the admittance of
documentary evidence that showed that he had received,
through 1987, net postpetition rental income of
$11,579.78. (See also debtor's proposed finding of fact, ¶

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in B.R.                                                                                          Page 2
Not Reported in B.R., 1991 WL 284107 (Bkrtcy.E.D.Pa.), Bankr. L. Rep. P 73,883

32.) What is disputed, then, is the amount of net rental income received by the debtor in 1988.

The trustee had attempted, unsuccessfully, to obtain by way of discovery from the debtor the amount of gross revenues and expenses on these properties for calendar year 1988. In the facts of the debtor's non-cooperation, the trustee posits that it is appropriate to arrive at an estimated net income figures for 1988 by basing that income upon the net sums received in previous years. Thus, using an average monthly net rental income figure of $340.58 (which is arrived at by dividing $11,579.78 by 34 months, the length of time over which that sum was earned), the net rental income figure for the period January 1, 1988 through September 30, 1988 is suggested to equal $3,065.22. Trustee's Memorandum at 3.

The debtor's response is that this approach "fails to consider the fact that substantial assets which formed the basis of the trustee's estimation of asset value, which is turn is used as a base figure to determine rental income from those assets, were foreclosed upon and removed from the debtor's estate during 1988. The net result of these foreclosures was a substantial loss of property which heretofore had generated rental income." Debtor's Memorandum, at 3-4. The debtor argues that the amount of actual revenue generated, and net income received, was substantially less in 1988 than in previous years, and thus is substantially less than $3,065.22. Therefore, the debtor asks that I award the trustee no turnover of rental income for 1988. (Specifically, the debtor argues that I "ought to enter judgment in the amount of at most $11,579.78, since this is the maximum figure to which the Trustee has shown entitlement." Id., at 4.)

As I stated in my memorandum of August 12, 1988, the plaintiff's failure to comply with court ordered discovery hampered the trustee's presentation. Therefore, to the extent the trustee has the burden on a particular issue, I will look favorably upon the trustee's evidence in meeting that burden, resolving doubts about the assessment of damages against the plaintiff. Thus, I cannot accept the debtor's argument that the trustee has shown no entitlement to funds received in 1988. The trustee did attempt to get information about the properties from sources other than the debtor. He subpoenaed bank records and mortgages, and he examined information received from the appraiser. N.T. at 64. The debtor implicitly is arguing that it is unreasonable for the trustee to suggest a figure of $3,065.22, when the trustee is aware of loss of assets from the estate that had generated this

income. From this, he posits that no other money should be subject to turnover. However, the debtor does not make it clear to me which assets were foreclosed upon and removed from the property. The record also shows that the debtor possibly purchased other properties, from which he earns rental property. N.T. at 67-68. The debtor had the opportunity to present testimony on this question, but refused to present figures or other evidence relating to the rental income earned in 1988. As the debtor leaves the basis of his objection to speculation, and as the trustee presented a reasonable estimation for 1988 net income, I shall accept the figure offered and enter judgment ordering turnover of net rental income in the amount of $14,645.00, as requested by the trustee.

*3 The above analysis admittedly looks with favor upon the trustee's evidence and arguments, for the reasons cited. I find further support for this approach from the provisions of the Bankruptcy code that set forth the duties of a debtor in bankruptcy, 11 U.S.C. § 521. Subsections 521(3) and (4) require the debtor to "cooperate with the trustee as necessary to enable the trustee to perform the trustee's duties under this title," and to "surrender to the trustee all property of the estate and any recorded information, including books, documents, records, and papers relating to property of the estate...." [FN3] See, e.g., In re Neuman, 88 B.R. 30 (S.D.N.Y.1988); In re Kent, 92 B.R. 540 (Bankr.S.D.Fla.1988). The debtors in the instant bankruptcy case repeatedly have refused to cooperate with the trustee, and their antagonism has made it difficult for the trustee to perform his duties (including, but not limited to, determining the extent of estate property). The debtors' failure to fully comply with § 521 renders appropriate an analytical approach which favors the trustee's presentation of his case. [FN4]

### B.

The other income source, the debtor's osteopathic medical practice, is certainly the more problematic of the two. Where, as here, an individual debtor reorganizes through a chapter 11 plan, the postpetition earnings of that debtor are not property of the estate. Section 541(a)(6) provides that estate property includes the "proceeds, product, offspring, rents, or profits of or from property of the estate, except such as are earnings from services performed by an individual debtor after the commencement of the case." Compare 11 U.S.C. § 1306(a)(2). Thus, the parties agree that I must determine what portion of the postpetition earnings of the debtor's medical practice is attributable to the services of Dr.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in B.R.

Not Reported in B.R., 1991 WL 284107 (Bkrtcy.E.D.Pa.), Bankr. L. Rep. P 73,883

Page 3

Paolino, and what portion remains property of the Paolino's bankruptcy estate. The amount earned "from services performed by [Dr. Paolino]" is not estate property; the balance is estate property, however, and must be turned over to the bankruptcy trustee.

The trustee suggests that the decision _In re Cooley,_ 87 B.R. 432 (Bankr.S.D.Tex.1988) should guide the attribution question.[FN5] There, a physician filed for relief under chapter 11 with the intention of liquidating his assets. The _Cooley_ court noted that the § 541(a)(6) earnings exception should be applied consistently, regardless of whether the individual debtor was liquidating or reorganizing. Therefore, that court read with disfavor the Court of Appeals decision of _In re FitzSimmons,_ 725 F.2d 1208 (9th Cir.1984), stating that the Ninth Circuit relied heavily on the fact that the debtor before it contemplated reorganization rather than liquidation. The bankruptcy court in _Cooley_ was of the opinion that the application and interpretation of section 541(a)(6) should not vary because of an individual's choice to reorganize or liquidate under Chapter 11, and therefore the Ninth Circuit's reliance on reorganization principles to interpret narrowly the earnings exception omitted consideration of the effect of liquidation and the right to a fresh start on the scope of the exception. _In re Cooley,_ 87 B.R. at 440. The court therefore rejected the Ninth Circuit's approach to the extent "that it requires a valuation of an individual's personal or 'hands-on' services." [FN6] _Id.,_ at 441. Instead, the court formed a different analytic approach, one which it believed would not construe the earnings exception too narrowly in the context of liquidation, and one which "seems best to guard against the potential conflict with the prohibition against involuntary servitude and to ensure protection of an individual's fresh start," as well as remain faithful to the plain meaning of section 541(a)(6). _Id._

*4 Under _Cooley,_ the burden of production rests with the debtor to show that, under the earnings exception, the debtor is 1) an individual, 2) who performs services, 3) which generates earnings, 4) postpetition. Upon proving these elements the burden of persuasion then falls upon the trustee to show that the purported earnings are actually the proceeds, product, offspring, rents or profits derived from § 541(a)(1) estate property or assets (such as business invested capital, accounts receivable, goodwill, and employment contracts). _Id._ As the trustee implicitly urges that I adopt this approach, tempering my analysis with the recognition that the debtor hindered the trustee's ability to present its case, and as the debtor does not urge

otherwise, I shall accept the parties' recommendation. That is, as liability has been established and the debtor has met his initial burden of production, the trustee must show that Dr. Paolino's earnings are actually derived from estate property. I shall view the trustee's evidence in a favorable light. _See Chesa International, Ltd. v. Fashion Associates, Inc.,_ 425 F.Supp. at 238 ("The well-known and ancient doctrine [states] that when a party frustrates proof of damages, either by withholding facts or through inaccurate recordkeeping, any doubts about the actual assessment of damages will be resolved against that party,"citing, inter alia, _Westinghouse Elec. & Mfg. v. Wagner Elec. & Mfg. Co.,_ 225 U.S. 604 (1912)). _Accord, Louis Vuitton S.A. v. Spencer Handbags Corp.,_ 765 F.2d 966, 973 (2d Cir.1985); _Polo Fashions, Inc. v. Rabanne,_ 661 F.Supp. 89, 97 (S.D.Fla.1986).

In order to meet his burden, the trustee must first establish the scope of section 541(a)(1) assets or property interests, and then prove the extent to which these assets contribute to the postpetition income stream of Dr. Paolino's medical practice. _In re Cooley,_ 87 B.R. at 441. The trustee chose to accept the valuation of the medical practice, as offered by the debtors in their schedules of assets and liabilities, in their initial determination of estate property. The debtors' schedule B-2 values the medical practice as a business, on the date of filing, at $648,000.00; the value of surgical, x-ray and other medical equipment is listed at $180,619.00. _See_ Ex. T-1; N.T. at 14-15. The trustee's acceptances of these figures as the valuation of this business assumes that the former figure was arrived at by the common practice of valuating a service business by establishing a multiple of income, to which fixed assets (minus any liabilities on those assets) are added. N.T. at 15-16. The debtor disputes the use of these figures, stating that the witness, "an allegedly trained Certified Public Account," Plaintiff's Memorandum at 6, should have known that it would be error to base an analysis on figures "which he could neither substantiate nor verify." _Id. See also_ N.T. at 26-27. The debtor thus argues that his own initial estimate of assets is fatally flawed, and it cannot provide a basis for deriving any rate of return on estate assets, as it renders the trustee's income claim meaningless.

*5 I find, however, that the inclusion of the debtors' valuations in their schedules should be viewed as an admission, at least for the purpose of resolving this dispute. Certainly, as intimated by the debtor, this "subjective" valuation might be inflated. The coverage is just as possible, however, as the debtors conceivably may

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in B.R.                                                                                    Page 4
Not Reported in B.R., 1991 WL 284107 (Bkrtcy.E.D.Pa.), Bankr. L. Rep. P 73,883

have attempted, early in these involuntary proceedings, to minimize their reported assets. As noted above, the trustee did attempt to glean information about the medical practice assets from the debtor, which information could have assisted him in arriving at, perhaps, a more realistic value of these assets. These attempts at discovery were repeatedly ignored by the debtor. Thus, the debtor's argument that the trustee did not "in any fashion whatsoever attempt [ ] to derive a realistic value for the assets subject to and available for independent inspection" is disingenuous. I shall accept the figure of $828,619.00 as representing the value of the property surrounding the medical practice that adhered to the estate on the date the order for relief was entered.

It was noted at the trial on the damage component that this figure, based upon unknown factors or calculations, may or may not contain an element of "goodwill," whether that goodwill be denominated personal or business. N.T. at 58-59. This is significant, because the debtor concedes that the trustee is entitled to receive "a reasonable investment return" to the extent the income is generated by the estate's business goodwill, as opposed to Dr. Paolino's personal goodwill.[FN7] The trustee conceded at trial that some part of the valuation figure "probably is attributable to personal goodwill." N.T. at 59. He argues that the frustration of his attempts at discovery should yield a lenient view towards his burden of providing this component.

Where the *Cooley* court found it "difficult to view the goodwill attributable to the medical practice as anything but the personal goodwill of Dr. Cooley ...,"*In re Cooley,* 87 B.R. at 443, I here find it difficult to attribute the goodwill component of Dr. Paolino's medical practice as anything other than business goodwill. Dr. Cooley was described in that opinion as an internationally recognized heart surgeon, whose reputation and "personal referral network on a local, national, and international level among cardiologists and other physicians" created personal goodwill. *Id.,* at 435. Dr. Paolino, on the other hand, conducts a local osteopathic medical practice. There was no evidence presented to suggest that the debtor's skills and reputation as a medical practitioner were such that would generate referrals from other physicians, either locally or from a larger area. Dr. Paolino presented no basis upon which I could conclude that he has created a medical practice that exists in any measure due to his personal goodwill. Further, it is not at all clear that such a component is even recognized by applicable state law. Therefore, I conclude that the goodwill component of the debtor's medical practice, whatever that amounts to, shall be considered strictly business goodwill, which is property of the estate generating estate property. *In re FitzSimmons,* 725 F.2d at 1211.

*6 The trustee's position is that the estate is entitled to receive a reasonable investment return on the value of the estate's interest in the medical practice and the office equipment, furnishings and supplies during the duration of the bankruptcy. To determine this return the trustee looked to the total valuation of the medical practice as offered by the debtor in his schedules, and determined that an investor purchasing this business could reasonably expect a rate of return on the business of 9.25% [FN8] per year. This rate of return yields an annual income stream of $76,647.26 from the assets. Therefore, the trustee suggests that the debtor pay to him $76,600.00 per year for each year of the medical practice's operation over the life of the bankruptcy.

This approach makes sense if one considers that the trustee arguably could have sold the entire medical practice (with supplies and equipment) as assets of the estate, thereby receiving certain funds into the estate. These monies would then have been available for distribution to creditors. By allowing the debtor to continue, undisturbed, with his medical practice, thereby continuing uninterrupted his ability to earn a living, the trustee argues the estate should not be penalized by not receiving any income from these estate assets, but should be receiving a reasonable rate of return.

I emphasize that this "reasonable rate of return" is a figure that allows Dr. Paolino to continue receiving a substantial income from the profits generated by the medical practice. This is illustrated by the second approach utilized by the trustee to corroborate the result reached by the first approach. Under this other analysis the trustee attempted to value the personal services of Dr. Paolino utilizing a publication of an entity known as Robert Morris Associates. N.T. at 18. This annual publication is a compilation of the financial statements of various industries as reported to that entity. The "statement studies" for physicians with total assets of less than one million dollars revealed that a physician's median salary (specifically, the salary of an "officer" physician of a medical practice) in 1985 was 35.3% of the practice's gross receipts, and 32.9% of receipts in 1986. *Id.,* at 20.[FN9] As the trustee had access to financial statements from Dr. Paolino's medical practice accountants for the years 1985 and 1986, N.T. at 21, he was able to arrive at

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in B.R.                                                                                                          Page 5
Not Reported in B.R., 1991 WL 284107 (Bkrtcy.E.D.Pa.), Bankr. L. Rep. P 73,883

an estimate of the net amount earned by Dr. Paolino for the years 1985 and 1986. These amounts were compared with the "reasonable salary" as reported by Robert Morris Associates, revealing that Dr. Paolino received an excess of approximately $60,000.00 in 1985 and $76,000.00 in 1986 over the normative salary. N.T. at 23-24.[FN10] The trustee asserts that these figures are close enough to the rate of return figure ($76,600.00) to lend that sum credibility.

Given the other facts of record regarding this particular medical practice, I do find that the rate of return/"overage" figures reasonably represent that portion of the income stream not "earned" by Dr. Paolino. I accepted the value of the medical equipment (clearly estate property, *see, e.g., In re Cooley,* 87 B.R. at 442) at $180,619.00.[FN11] It seems reasonable to expect that this equipment could annually generate approximately 12% of its value in income, or an amount of about $21,674.00. *See In re Cooley,* 87 B.R. at 442 (12% accepted as fair rate of return on the investment of fixed assets).

*7 Additionally, Dr. Paolino was paying other doctors from between $10,000.00 and $20,000.00 annually for services provided to his own patients. I find it reasonable to assume that Dr. Paolino was able to earn from these doctors' services twice the amount paid to these employees. The debtor asserts that, because the trustee was unable to show what these other doctors generated in terms of gross revenue for the estate, the trustee should be prohibited from receiving any amount that the estate "earned" by virtue of the doctors' employment by the debtor. I disagree. Again, the debtor could have produced evidence of the billing or receipts for services rendered by these physicians, but chose to not reveal that information. It does not seem unreasonable to decide that the medical practice received in gross revenues a figure double the amount paid to these doctors for their services. Thus, it appears that the medical practice was receiving between $20,000.00 and $40,000.00 annually for services clearly provided by persons other than the debtor. These two factors alone (the return on the equipment and the return from services provided by the other physicians), when viewed in a light most favorable to the trustee, reveal an income stream of up to $61,674.00 annually that was not "earned" by Dr. Paolino.[FN12] While this sum is $14,926.00 less than that requested by the trustee, I find this difference relatively insignificant when compared with the medical practice's gross receipts, net earnings, amount claimed as estate property and the debtor's annual "salary." As Dr. Paolino prohibited the trustee from

investigating with any precision his medical practice, I easily conclude that the slightly larger figure appropriately is assessed.[FN13]

### C.

While the debtors and the trustee have ably addressed the factually difficult issue of the computation of the postpetition earnings of the husband debtor which represents estate property, neither discusses the conceptually difficult question of the length of time which such payments must be made. It is this issue which lurks underneath the question of confirmation, annual payments to the trustee, and even the allowance of postpetition claims. The difficulty may be described thusly:

If annual payments of $76,600.00 represent a return to the trustee, (and so to unsecured creditors), of the debtors' use of estate property to generate income, do these annual payments continue for as long as the debtor continues with his medical practice? If so, there could be a lifetime of payments made by virtue of an involuntary chapter 11 petition, since there is no limit in chapter 11, (unlike chapter 13), on the length of a plan. Is it possible that 11 U.S.C. § 303, in authorizing involuntary chapter 11 petitions, could obligate a self-employed professional debtor to tender payments to creditors for the balance of his professional life? If the answer is no, and that an end date must be established for the plan, how is it fixed? Depreciation of the estate assets is one possibility, but some assets, such as real estate and goodwill may not depreciate. Limiting the recovery of all unsecured creditors to the percentage of value their total claims had to the total value of uncollateralized assets as of the inception of the case-that is, unsecured creditors receive only that which they would have received in a chapter 7 liquidation, *accord*11 U.S.C. § 1129(a)(7)(A)(ii)-seems upon initial reflection the conceptually correct answer in an involuntary chapter 11 case, but is impossible to realize unless one does not discount to present value the unsecured claims, or one uses a discount less than the 9.25% granted to the trustee here.

*8 If I am reading Ex. T-1 correctly, the debtors initially scheduled $987,518.20 in unsecured claims and $828,619.00 in unencumbered assets.[FN14] If so, and if these figures are accurate,[FN15] then in a chapter 7 liquidation, unsecured creditors of these debtors would not be entitled to postpetition interest by virtue of 11 U.S.C. § 726(a). *E.g. In re Kentucky Lumber Co.,* 860 F.2d 674 (6th Cir.1988) (unless the debtor is solvent,

Not Reported in B.R.                                                                                                 Page 6
Not Reported in B.R., 1991 WL 284107 (Bkrtcy.E.D.Pa.), Bankr. L. Rep. P 73,883

unsecured creditors do not receive postpetition interest). Therefore, assuming that these debtors were insolvent as of the order for relief, and that the amount unsecured creditors would receive in a chapter 7 case is the ceiling as well as the floor which a true chapter 11 reorganization plan proposal by a nondebtor party in an involuntary case can provide, the trustee would be entitled to receive his annual payment for a period not greater than that necessary to repay all unsecured creditors the amount of the-nondiscounted value of unencumbered assets. As the parties do not address this important issue, I do not fix the length of any plan proposed by the trustee. I am content to have any of these assumptions challenged at a later date by any party in interest. However, it is important for the parties to focus upon this issue.

III.

Having determined that portion of the medical practice's income which is to be designated as estate property as opposed to income generated by the debtor's services, I may now turn to resolving the next set of issues. Various creditors have filed administrative or priority claims against the estate, which are opposed by the trustee. Essentially, the trustee objects to these proofs of claim, all of which involve postpetition taxes goods and services provided postpetition to the medical practice, on the basis that these claims are rightfully held against Dr. Paolino personally, and not against the bankruptcy estate. That is,

the trustee would now have me hold that, because Dr. Paolino operated the medical practice and generated these bills, he should be responsible for their payment.

The trustee's approach to determining the "earnings exception" assumed that the debts of the medical practice were paid before distribution was made to Dr. Paolino or the estate. That is, by equating the "rate of return" sum to the amount of money generated by services not performed by Dr. Paolino, the trustee attempted to determine the medical practice's "earnings overage." In verifying that figure, the trustee utilized the net amount garnered by the practice, offset by a reasonable annual draw by Dr. Paolino. Thus, the trustee must assume that the expenses incurred by the medical practice will be paid from the gross receipts of that business, before the profits (to either the estate or the debtor) are calculated.

Consistent with this, I find that the various claims that are asserted must be paid from estate funds and not by Dr. Paolino personally. Although I discuss the individual claims in more detail below, I find that each of the claims are rightfully asserted against the estate and are to be paid in the amounts claimed.[FN16]

*9 The following claims have been objected to by the chapter 11 trustee:

| Proof of Claim No. | Claimant | Amount Claimed |
|---|---|---|
| 19 | Leaseservice | $ 8,947.04 |
| 21 | General Electric Co. | $ 7,992.40 |
| 25 | IRS | $112,092.31 |
| 42 | Commonwealth of PA | $ 32,081.59 |
| 45 | IRS | $ 92,088.63 |
| 40 | National Health Laboratories, Inc. | $ 15,230.90 |

I shall discuss the three non-governmental claims first.

The burden of proving these claims for administrative expenses is, of course, on the claimants. *E.g., In re Baldwin-United, 43 B.R. 443 (S.D.Ohio 1984); In re Massetti, 95 B.R. 360, 363 (Bankr.E.D.Pa.1989); In re Patch Graphics, Inc., 58 B.R. 743 (Bankr.W.D.Wis.1986).* That burden is met by a

preponderance standard. *In re Sinclair, 92 B.R. 787 (Bankr.S.D.Ill.1988).* For the claims to be allowed as administrative expenses of the estate under § 503(b) they must represent actual and necessary costs and expenses of preserving the estate.

I find that claimants Leaseservice, General Electric Co. and National Health Laboratories, Inc. have met their burden by showing that the debts arose postpetition, in

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in B.R.                                                                 Page 7
Not Reported in B.R., 1991 WL 284107 (Bkrtcy.E.D.Pa.), Bankr. L. Rep. P 73,883

connection with transactions between the claimants and the debtor, which generated income for the medical practice, and that the claims represent debts incurred in order to benefit the operation of the debtor's business. *Accord, In re Airlift International, Inc.,* 97 B.R. 664 (Bankr.S.D.Fla.1989), *aff'd,* 120 B.R. 597 (S.D.Fla.1990); *In re Keegan Utility Contractors, Inc.,* 70 B.R. 87 (Bankr.W.D.N.Y.1987). There is no suggestion that these claims arose during the "gap" period of this involuntary case. *In re Dakota Lay'd Eggs,* 68 B.R. 975 (Bankr.D.N.D.1987). I also find that these creditors were "induced" by the Dr. Paolino to provide the goods and services.

The thrust of the trustee's objection to these claims is, basically, that it would be unfair to require the estate to bear as administrative expenses the costs of a business that the trustee neither operated nor controlled. This is, admittedly, an unusual situation in that the chapter 11 debtor has continued to operate his business postpetition, as a debtor-in-possession, even though a trustee was appointed by this court to oversee the bankruptcy case. The trustee has allowed the debtor to continue postpetition with the medical practice, unfettered and without supervision. Normally it is the chapter 11 trustee which operates the business. 11 U.S.C. § 1108.

The trustee's decision to not interfere with the medical practice does not absolve the estate of the duty to pay the allowed administrative expenses. The trustee argues that he is "in a role equivalent to a third-party investor or trade creditor" with respect to the estate. Memorandum of Trustee, at 7. That is, the trustee likens his position *vis-a-vis* the debtor to that of other creditors, in that he too must await payment from the debtor. I do not find this position tenable. The trustee has certain duties to perform, and is to act in the best interests of the estate and creditors. Merely because the trustee decided to not operate the business is no justification for allowing his duties to lapse. The operating costs of this medical practice must be paid, and the estate is required to pay them. Whether the trustee pays these costs from funds of the estate already in his possession, or whether the trustee may take some action against the debtor to require that future gross earnings be applied towards these debts, (*see* footnote 16 supra) is immaterial to the determination that the estate, and not Dr. or Mrs. Paolino personally, must pay.[FN17]

**\*10** The Internal Revenue Service (IRS) has filed two proofs of claim in this case; one is for prepetition taxes in the amount of $122,029.31, *see* Ex. 4, and the other is for

postpetition taxes in the amount of $92,088.83. *See* Ex. B. The sum claimed as priority, prepetition taxes includes sums for taxes owed, penalties and prepetition interest. Of this total, $26,433.28 is claimed as an unsecured priority, and $95,596.03 is claimed as secured. An attachment to Ex. A lists the prepetition dates on which the notice of tax liens assertedly were filed, and the office location where filed.[FN18]

The Commonwealth of Pennsylvania's proof of claim No. 42 is in the total amount of $32,081.59. Of this total, $13,787.37 is claimed as secured, statutory lien claims, $1,460.58 is claimed as a priority, and $16,833.64 is claimed as administrative, postpetition taxes. These sums all include interest on the underlying taxes owed.

With regard to the priority tax claims, both state and federal, the trustee argues that any prepetition penalties should be disallowed seventh priority status, as he asserts that no evidence was offered to show that the penalties are in compensation for actual pecuniary loss. *See* 11 U.S.C. § 507(a)(7)(G). The trustee posits that since prepetition interest is also claimed, the penalties must be considered punitive in nature (the actual pecuniary loss being recovered by the interest claimed), citing *In re New England Carpet Co.,* 26 B.R. 934 (Bankr.D.Vt.1983).

Indeed, it has been held that the fact that interest is charged in addition to other penalties may indicate that the penalties are punitive in nature, in the absence of evidence to the contrary, since (as the trustee argues) the pecuniary loss would be compensated by the interest. *See, e.g., In re Hinderberg,* 108 B.R. 407, 417-18 (Bankr.N.D.N.Y.1989); *In re Standard Johnson Co.,* 90 B.R. 41 (Bankr.E.D.N.Y.1988); *In re Jackson,* 80 B.R. 213 (Bankr.D.Colo.1987); *In re Healis,* 49 B.R. 939 (Bankr.M.D.Pa.1985).

I note that the IRS does not disagree with this position in its posthearing memorandum. Instead, the government only acknowledges that penalties upon its unsecured priority tax claims are to be treated as general, unsecured claims. Indeed, the lack of priority does not alter the propriety of the penalty itself. *E.G., In re New England Carpet Co.* The IRS does not argue for the propriety of granting a seventh position priority to tax penalties on its apparently secured tax claims, to which interest has been claimed. I find that the penalties claimed are punitive in nature, and may not be granted priority status.

The trustee also argues that the interest claimed on the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in B.R.                                                                                                                Page 8
Not Reported in B.R., 1991 WL 284107 (Bkrtcy.E.D.Pa.), Bankr. L. Rep. P 73,883

postpetition, administrative tax claims should be disallowed, citing *In re American Internat'l Airways, Inc.,* 77 B.R. 490 (Bankr.E.D.Pa.1987). However, since that decision was rendered there has been other judicial consideration of whether postpetition interest should be treated as an administrative expense. *See In re Flo-Lizer, Inc.,* 916 F.2d 363 (6th Cir.1990); *In re Mark Anthony Construction, Inc.,* 886 F.2d 1101 (9th Cir.1989); *In re Allied Mechanical Services, Inc.,* 885 F.2d 837 (11th Cir.1989). *See also United States v. Friendship College, Inc.,* 737 F.2d 430 (4th Cir.1984). These cases interpreted § 503(b)(1) in a manner consistent with the treatment of § 64(a)(1) of the Bankruptcy Act by *Nicholas v. United States,* 384 U.S. 678 (1966), and concluded that postpetition interest is rightfully treated as an administrative expense. ("Like § 503(b) of the Code, § 64(a)(1) of the Act did not specify whether post-petition interest qualified for priority treatment as an administrative expense." *In re F.A. Potts & Co.,* 114 B.R. 92, 94 n. 3 (Bankr.E.D.Pa.) (Twardowski, Ch. J.), *rev'd on other gnds,*115 B.R. 66 (E.D.Pa.1990)).

**\*11** Accordingly, it has been recently held in this district that the United States, as a creditor, was entitled to postpetition interest on its claim for administrative expenses. *See In re F.A. Potts & Co.,* 114 B.R. at 94. I agree with this conclusion, and find that the interest is properly treated as an administrative expense. *Accord* Rustolo, *Recovery of Interest on Postpetition Taxes Under Section 503 of the Bankruptcy Code,* 64 Am. Bank. L.J. 427 (Fall, 1990).

IV.

The remaining issues are the debtors' objection to the trustee's proposed plan of reorganization, and the trustee's objection to the debtors' discharge of bankruptcy, pursuant to 11 U.S.C. § 727(a).

I easily conclude that the plan cannot be confirmed, because it does not provide for administrative expenses to be paid in full on the plan's effective date. 11 U.S.C. § 1129(a)(9). The trustee agreed at the hearing that I cannot confirm his proposed plan; thus, confirmation will be denied.

With respect to the trustee's objection to the debtors' discharge in bankruptcy, pursuant to § 727(a), I conclude that discharge cannot, at this point, be denied pursuant to this subsection of the bankruptcy code. This section is made applicable in chapter 11 proceedings for individuals

by virtue of § 1141(d)(3). This subsection states:

(d)(3) The confirmation of a plan does not discharge a debtor if–

(A) the plan provides for the liquidation of all or substantially all of the property of the estate;

(B) the debtor does not engage in business after consummation of the plan; and

(C) the debtor would be denied a discharge under section 727(a) of this title if the case were a case under chapter 7 of this title.

Thus, the trustee argues that the debtors "should be denied a discharge under Sections 727(a) and 1141(d)(3) of the Bankruptcy Code unless the Court confirms a plan under Section 1129 of the Code which (i) does not provide for the liquidation of all or substantially all of the property of the estate and/or (ii) Paolino engages in business after consummation of such plan." Memorandum, at 8-9. This argument acknowledges that the provisions of § 1141(d)(3) are stated in the conjunctive, and therefore all three conditions must be satisfied for the denial of discharge under that subsection. *See In re Rich-Morrow Realty Co., Inc.,* 100 B.R. 893, 895 n. 2 (Bankr.N.D.Ohio 1989). *Accord In re Pfliger,* 57 B.R. 467 (Bankr.D.N.D.1985) (as debtor proposed a plan of continuing operations and not liquidation, creditor may not proceed under § 1141(d)(3)(C).

It has therefore been held that where there is no proposed plan submitted for consideration, the issue of nondischargeability would not be ripe for resolution. *Matter of Rich-Narrow Realty Co.; In re Miller,* 80 B.R. 270 (Bankr.W.D.N.Y.1987). This result makes sense where it is the terms of the proposed plan that will determine whether discharge should be denied under § 1141(d)(3). Without knowing the precise terms of a future plan proposed by the trustee or another party in interest, (i.e. liquidation as opposed to reorganization, and whether the debtor intends to remain in business after consummation of the plan) I cannot make a determination of whether the provisions of § 1141(d)(3) are met.

**\*12** Here, the trustee's proposed plan of reorganization was denied confirmation for failing to provide for payment in full of administrative expenses on the effective date of the plan. The docket reveals [FN19] that no

Not Reported in B.R.                                                                                                      Page 9
Not Reported in B.R., 1991 WL 284107 (Bkrtcy.E.D.Pa.), Bankr. L. Rep. P 73,883

other proposed plan of reorganization has been filed with this court. Thus, I conclude that the issue is not ripe for resolution. The trustee's motion to deny discharge under the provisions of §§ 1141(d)(3) and 727(a) will be denied without prejudice.

An order consistent with this memorandum shall issue.

FN1. The funds received from Pennsylvania Blue Shield by the trustee, in the approximate amount of $50,000.00, accordingly remained in the trustee's possession.

FN2. Also before me are the trustee's objection to discharge, pursuant to § 727(a), and the debtor's objection to confirmation of the trustee's plan. These issues will be discussed *infra*.

FN3. This section is made applicable in chapter 11 bankruptcy cases by virtue of 11 U.S.C. § 103(a).

FN4. The trustee, in the current litigation, is required to reconstruct to the best of his abilities the debtors' income from rental property and the medical practice. It is appropriate for the trustee to use any reasonable means for determining these amounts, where the debtors have failed to supply this information and refuse to make available books and records which would reveal the information. *Accord, e.g., Goodmon v. Commissioner,* 761 F.2d 1522 (11th Cir.1985) (Internal Revenue Service entitled to determine deficiency in taxes due by any method it deems appropriate when taxpayer's books and records are incomplete or otherwise inadequate); *Moore v. Commissioner,* 722 F.2d 193 (5th Cir.1984) (IRS may use any reasonable means to reconstruct taxpayer's income when taxpayer has failed to file a return); *Denison v. Commissioner,* 689 F.2d 771 (8th Cir.1982) (same).

FN5. The *Cooley* approach probably represents a less favorable interpretation of § 541(a)(6) for a trustee than does the approach of *In re FitzSimmons,* 725 F.2d 1208 (9th Cir.1984). As the trustee supports the *Cooley* reasoning, I will not attempt to decide whether *Cooley* or *FitzSimmons* is the more persuasive.

FN6. The *Cooley* court did agree with the approach taken in *FitzSimmons* which identified § 541(a)(1) property interests which in turn generated the subsection (a)(6) postpetition "profits," such as the business invested capital, accounts receivable, goodwill, and employment contracts. *In re Cooley,* 87 B.R. at 441. Where the two approaches essentially differ is on the application of the burden of proof. Under *FitzSimmons,* the debtor may exclude from the estate only the postpetition income that debtor demonstrates is derived from his or her individual efforts, with the residue viewed as estate property. Under *Cooley,* the trustee must demonstrate the postpetition proceeds derived from the estate's assets with the residue viewed as the result of the debtor's personal services.

FN7. It is not readily apparent, however, that the law of the Commonwealth of Pennsylvania distinguishes between personal and business goodwill. *See Ullom v. Ullom,* 384 Pa.Super. 514, 559 A.2d 555 (1989); *Beasley v. Beasley,* 359 Pa.Super. 20, 518 A.2d 545 (1986), *app. denied,* 516 Pa. 631, 533 A.2d 90 (1987). *Compare In re Cooley,* 87 B.R. at 442 (distinguishing personal goodwill from business goodwill, *citing Geebreght v. Geesbreght,* 570 S.W.2d 427, 435 (Tex.Civ.App.Ft. Worth 1978, *writ dism'd*) (difference exists, under Texas state law, between personal goodwill of an individual and the goodwill of a business)). Under *Butner v. United States,* 440 U.S. 48 (1979), state law defines the property interests which make up the debtor's bankruptcy estate.

FN8. This rate of return figure was arrived at by averaging the returns on investments from money market accounts, one year certificates of deposit and 30 month certificates of a certain date. N.T. at 16. The debtor objects to the utilization of the return on short term liquid investments as representing the return of an investor on an on-going medical practice. In his memorandum the debtor states that this rate of return is applied inappropriately, where it "completely ignore[s] the actual values of the medical practice, its track record and history, and a host of economic factors which specifically influence the rate of return on assets which Dr. Paolino's practice may actually have yield ..."

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in B.R.                                                                                                                Page 10
Not Reported in B.R., 1991 WL 284107 (Bkrtcy.E.D.Pa.), Bankr. L. Rep. P 73,883

*Id.,* at 6. Again, however, the debtor's refusal to cooperate in discovery vitiates his argument. The rate of return suggested is not unreasonable on its face. Furthermore, in chapter 11 cases it is understood that, in determining present value, market factors such as the ones relied on by the trustee are to be utilized to determine the appropriate rate of return. *See generally 5 Collier on Bankruptcy* § 1129.03 at 1129-81-85 (15th ed. 1990).

FN9. The Robert Morris Associates publication did not provide an industry classification for osteopaths. The category of "physician" was chosen as the one most closely approximating the debtor's business. I do not agree with the debtor's implicit argument that I should disregard this analysis because the trustee did not utilize surveys which specifically address the practice of a physician engaged in osteopathic medicine. Memorandum, at 7.

FN10. That is, in 1985 net earnings of Dr. Paolino from the medical practice were in the approximate amount of $250,000.00; the RMA study revealed a reasonable salary for that year in the amount of $190,000.00. For 1986 the respective figures were $256,000.00 and $180,000.00. N.T. at 24-25. The difference between the net earnings and RMA salary figures were $60,000.00 in 1985 and $76,000.00 in 1986. (Gross receipts from Dr. Paolino's practice in 1985 equalled $548,000.00; 35.3% of that figure yields, precisely, $189,914.00. Gross receipts for 1986 were $547,000.00, yielding a median salary of $179,963.00.)

Considering the amount of gross receipts received annually by this medical practice and considering the ample annual salary determined to be "earned" by the debtor, the trustee's request for an annual return to the estate of $76,600.00 is a relatively modest one.

FN11. It is true, as the debtor fairly points out, that the trustee's analysis does not consider depreciation on this equipment. Indeed, it is possible that the equipment is no longer in use by the debtor, as it could have been repossessed, or sold. The debtor presented no evidence on these points, however. I shall assume for this discussion that the equipment remains in the debtor's control, and remains in use. I shall also not be concerned with factoring into the analysis any depreciation, as it is equally possible that the debtor upgrades this equipment with some frequency.

FN12. Again, the argument could be raised that Dr. Paolino alone operated the medical equipment at issue, and thus "earned" this income generation. As the other physicians were working at this medical practice, which likely employed nurses and possibly other personnel qualified to operate this machinery, and given the debtor's lack of evidence on this point, I conclude that the above described sum is reasonable.

FN13. I appreciate the fact that I am imposing upon the debtor the necessity of paying a fixed sum annually to the trustee without knowing in advance the future earnings of the medical practice. I also appreciate the concern underlying the section 541(a)(6) earnings exception to estate property, which is gleaned from the policy concerns Congress expressed with respect to chapter 13 bankruptcy cases. Congress expressly avoided the potential conflict with the Thirteenth Amendment's prohibition against involuntary servitude by requiring that chapter 13 be strictly voluntary. This result is necessary since the chapter 13 debtor's postpetition earnings are included as property of the estate. 11 U.S.C. § 1306(a)(2). That concern is likewise reflected in the earnings exception of § 541(a)(6). Thus, Congress acted "to protect against creditors impressing an individual debtor to work for the estate, as well as to protect an individual Chapter 11 debtor's right to a fresh start." *In re Cooley,* 87 B.R. at 438,citing *Powell v. United States Cartridge Co.,* 339 U.S. 497 (1950); *Local Loan Co. v. Hunt,* 292 U.S. 234 (1934). *See also In re Noonan,* 17 B.R. 793, 800 (Bankr.S.D.N.Y.1982).

Here, it is evident that some funds generated by the medical practice (which is estate property) constitute estate property and not the debtor's postpetition earnings. Again, the debtor's resistance to discovery makes quantifying this sum problematic. It would be

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in B.R.                                                                                                      Page 11
Not Reported in B.R., 1991 WL 284107 (Bkrtcy.E.D.Pa.), Bankr. L. Rep. P 73,883

burdensome to the estate to require the trustee to prove to the best of his abilities, every year this case continues in bankruptcy, the extent of the medical practice's gross earnings, net earnings, and "overage" due the estate. Given the debtor's reluctance to assist, it is conceivable that the trustee in future years would have no better information available than he has received to date.

FN14. The debtors also listed approximately $400,000.00 in cash held by court appointed custodians. I assume that such cash was collateral for certain creditors and was not reachable by unsecured creditors. *Accord In re Aspen Data Graphics, Inc.,* 109 B.R. 677, 682 (Bankr.E.D.Pa.1990).

FN15. As mentioned above, the trustee has utilized the asset value figures for purposes of this dispute. It therefore is appropriate to also use them to determine the length of the chapter 11 plan.

FN16. Actually, the dispute between the debtors and the trustee over postpetition claims only has meaning if these expenses are classified as estate expenses and if such a classification does not extend the total of annual payments due from Dr. Paolino. In other words, the issue of who is responsible for payment of these services, the debtors or the trustee, is irrelevant if the trustee can pass on their cost to Dr. Paolino through longer plan payments. In discussing the payments due to unsecured creditors and the length of the plan, I did not consider the issue of administrative creditors. I will address this issue in the context of any dispute over the terms of a proposed plan.

FN17. Although there was no evidence submitted on this point, I may safely assume that the medical practice, prepetition, incurred debts for similar services from these or other entities. That is, as the trustee's formulation for determining an annual amount of estate property not "earned" by the debtor's services considered that the operating expenses were paid from the gross earnings, I find it consistent and appropriate to order the estate to pay these postpetition administrative expenses.

FN18. The trustee did concede at the hearing that notices of lien had been filed, but argued that no evidence was presented regarding what property of the estate, if any, secures these claims. However, the objection to the claim filed by the trustee did not raise this issue as a basis for its objection. Thus, I do not have before me an objection to the secured status of the claims.

FN19. Courts may take judicial notice of the contents of their own dockets. *See* Fed.R.Evid. 201 (as incorporated by Bankr.R. 9017); *In re Digby,* 47 B.R. 614, 620 (Bankr.N.D.Ala.1985); *In re Brown,* 37 B.R. 516 (Bankr.E.D.Mo.1984). *See also* Russell, *Bankruptcy Evidence Manual,* §§ 201.1 *et seq.* (1990).

Bkrtcy.E.D.Pa.,1991.
In re Paolino
Not Reported in B.R., 1991 WL 284107 (Bkrtcy.E.D.Pa.), Bankr. L. Rep. P 73,883

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Westlaw.

Not Reported in F.Supp.2d                                                        Page 1
Not Reported in F.Supp.2d, 2006 WL 839356 (D.Del.)

Wright v. Kearney
D.Del.,2006.
Only the Westlaw citation is currently available.
United States District Court,D. Delaware.
Errick M. WRIGHT, Petitioner,
v.
Rick KEARNEY, Warden, and Attorney General of
the State of Delaware, Respondents.
**No. Civ.A.05-442-GMS.**

March 29, 2006.

Errick Wright, petitioner, pro se.
Thomas E. Brown, Deputy Attorney General,
Delaware Department of Justice, Wilmington,
Delaware, for respondents.

MEMORANDUM OPINION

SLEET, J.

I. INTRODUCTION

*1 Petitioner Errick M. Wright ("Wright") was
detained at the Sussex Violation of Probation Center
when he filed a petition for a writ of habeas corpus
("petition") pursuant to 28 U.S.C. § 2254. (D.I.2.)
For the reasons that follow, the court will dismiss his
petition.

II.    FACTUAL    AND    PROCEDURAL
BACKGROUND

On May 18, 2004, a Superior Court jury convicted
Wright of three counts of theft and one count of
criminal mischief. (D.I. 15, Del.Super. Ct. Dkt. in ID
No. 0310003717.) The Superior Court sentenced
Wright to an aggregate period of four years in prison,
suspended for probation. (D.I. 15, Sentence Order
(Del.Super. Ct. June 25, 2004)). Twice thereafter, in
January and June 2005, the Superior Court
determined that Wright violated the terms of his
probation. The sentence imposed for the June 2005
violation of probation included a requirement for
Wright to participate in an anger management
program. On June 21, 2005, Wright filed a notice of
appeal in the Delaware Supreme Court. (D.I. 19,

Del.Supr. Ct. Dkt. in No. 270,2005).

III.    EXHAUSTION    AND    PROCEDURAL
DEFAULT

Pursuant to the Antiterrorism and Effective Death
Penalty Act of 1996 ("AEDPA"), a federal court may
consider a habeas petition filed by a state prisoner
only "on the ground that he is in custody in violation
of the Constitution or laws or treaties of the United
States."28 U.S.C. § 2254(a). A petitioner must
exhaust all means of available relief under state law
before a federal court can grant habeas relief. 28
U.S.C. § 2254(b); O'Sullivan v. Boerckel, 526 U.S.
838, 842-44 (1999); Picard v. Connor, 404 U.S. 270,
275 (1971). AEDPA states, in pertinent part:

An application for a writ of habeas corpus on behalf
of a person in custody pursuant to the judgment of a
State court shall not be granted unless it appears that-

(A) the applicant has exhausted the remedies
available in the courts of the State; or

(B)(i) there is an absence of available State corrective
process; or

(ii) circumstances exist that render such process
ineffective to protect the rights of the applicant.

28 U.S.C. § 2254(b)(1).

A petitioner satisfies the exhaustion requirement by
demonstrating that the habeas claim was "fairly
presented" to the state's highest court, either on direct
appeal or in a post-conviction proceeding. See
Lambert v. Blackwell, 134 F.3d 506, 513 (3d
Cir.1997) (citations omitted); Coverdale v. Snyder,
2000 WL 1897290, at *2 (D.Del. Dec. 22,
2000)." 'Fair presentation' of a claim means that the
petitioner 'must present a federal claim's factual and
legal substance to the state courts in a manner that
puts them on notice that a federal claim is being
asserted.' " Holloway v. Horn, 355 F.3d 707, 714 (3d
Cir.2004)(citing McCandless v. Vaughn, 172 F.3d
255, 261 (3d Cir.1999)).

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                    Page 2
Not Reported in F.Supp.2d, 2006 WL 839356 (D.Del.)

A petitioner's failure to exhaust state remedies will be excused if state procedural rules preclude him from seeking further relief in state courts.*Lines v. Larkins,* 208 F.3d 153, 160 (3d Cir.2000); *Wenger v. Frank,* 266 F.3d 218, 223 (3d Cir.2001); *see Teague v. Lane,* 489 U.S. 288, 297-98 (1989). Although the failure to exhaust state remedies may be excused, unexhausted claims are still procedurally defaulted. *Lines,* 208 F.3d at 160. Federal courts may not consider the merits of procedurally defaulted claims unless the petitioner demonstrates either cause for the procedural default and actual prejudice resulting therefrom, or that a fundamental miscarriage of justice will result if the court does not review the claim. *McCandless v. Vaughn,* 172 F.3d 255, 260 (3d Cir.1999); *Coleman v. Thompson,* 501 U.S. 722, 750-51 (1991); *Caswell v. Ryan,* 953 F.2d 853, 861-62 (3d Cir.1992).

*2 To demonstrate cause for a procedural default, a petitioner must show that "some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule."*Murray v. Carrier,* 477 U.S. 478, 488 (1986). A petitioner can demonstrate actual prejudice by showing "not merely that the errors at ... trial created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions."*Id.* at 494.

Alternatively, a federal court may excuse a procedural default if the petitioner demonstrates that failure to review the claim will result in a fundamental miscarriage of justice. *Edwards v. Carpenter,* 529 U.S. 446, 451 (2000); *Wenger v. Frank,* 266 F.3d 218, 224 (3d Cir.2001). A petitioner demonstrates a miscarriage of justice by showing a "constitutional violation has probably resulted in the conviction of one who is actually innocent."*Murray,* 477 U.S. at 496. Actual innocence means factual innocence, not legal insufficiency, *Bousley v. United States,* 523 U.S. 614, 623 (1998), and is established if no reasonable juror would have voted to find the petitioner guilty beyond a reasonable doubt. *Sweger v. Chesney,* 294 F.3d 506, 522-24 (3d Cir.2002).

## IV. DISCUSSION

Wright filed the instant petition for habeas relief on June 27, 2005, while he was serving his VOP sentence at the Level IV VOP Center. The court

therefore has jurisdiction over the petition because Wright's detention at Level IV satisfies the "in custody" requirement contained in § 2254(a).

Wright's petition asserts several complaints regarding his June 2005 VOP sentence. Distilled to their core, the claims challenge the requirement regarding his attendance at anger management classes on the basis that it violates his Fifth Amendment rights and that the requirement constitutes an "unusual punishment" under the Eighth Amendment. (D.I. 2, at ¶¶ 8-10.)

Wright filed his appeal of the VOP sentence in the Delaware Supreme Court on June 21, 2005, and he filed the instant petition on June 27, 2005. When the State filed its answer on October 7, 2005, Wright's appeal was still pending in the Delaware Supreme Court. (D.I.14.) Understandably, the State argued that the petition should be dismissed for failure to exhaust state remedies. The court has discovered,[FN1] however, that Wright moved the Delaware Supreme Court in December 2005 to voluntarily dismiss the appeal pursuant to Delaware Supreme Court Rule 29(a). Wright's appeal was subsequently dismissed on December 16, 2005.

> FN1. On February 8, 2006, the court obtained an updated copy of the docket for Wright's VOP appeal from the Delaware Supreme Court. The court takes judicial notice of the Delaware Supreme Court docket for *Wright v. State,* No.270,2005.

By voluntarily dismissing his state appeal, Wright deprived the Delaware Supreme Court of a full and fair opportunity to address his habeas claims. *See Picard v. Connor,* 404 U.S. 270, 276 (1971). He cannot re-instate his appeal, because the time to appeal his VOP sentence has expired. *See* Del.Supr. Ct. R. 6(a)(imposing a 30 day time period in which to appeal a criminal sentence). Wright also cannot challenge the anger management requirement contained in his VOP sentence in a post-conviction proceeding filed pursuant to Delaware Superior Court Criminal Rule 61, because such a motion would be barred by Rule 61(i)(3), absent a demonstration of cause for the procedural default and prejudice resulting therefrom. *See, e.g., State v. Wingate,* 2004 WL 772335, at *3 (Del.Super.Ct. Mar. 15, 2004); *State v. Evans,* 2002 WL 555068, at *1 (Del.Super.Ct. Apr. 9, 2002)(noting that claims not

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 839356 (D.Del.)

Page 3

raised during the VOP hearing, the sentencing, or on appeal are barred by Rule 61(i)(3) absent cause and prejudice). Consequently, Wright procedurally defaulted his habeas claims, and federal habeas review will be precluded absent a showing of cause and prejudice, or a miscarriage of justice.

*3 Wright has not provided the court with any explanation for voluntarily dismissing his appeal regarding his VOP sentence. The court has also reviewed the record, and is unable to discern any cause for this procedural default. Wright's failure to establish cause eliminates the court's obligation to address the issue of prejudice. Additionally, because Wright has not provided any colorable claim of actual innocence, the miscarriage of justice exception does not excuse his procedural default. Accordingly, the court will deny Wright's habeas petition as procedurally barred.

V. CERTIFICATE OF APPEALABILITY

When a district court issues a final order denying a § 2254 petition, the court must also decide whether to issue a certificate of appealability. *See* Third Circuit Local Appellate Rule 22.2. A certificate of appealability is appropriate when a petitioner makes a "substantial showing of the denial of a constitutional right" by demonstrating "that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."28 U.S.C. § 2253(c)(2); *Slack v. McDaniel,* 529 U.S. 473, 484 (2000).

Further, when a federal court denies a habeas petition on procedural grounds without reaching the underlying constitutional claims, the prisoner must demonstrate that jurists of reason would find it debatable: (1) whether the petition states a valid claim of the denial of a constitutional right; and (2) whether the court was correct in its procedural ruling. *Slack,* 529 U.S. at 484.

The court concludes that Wright's petition does not warrant federal habeas relief. Reasonable jurists would not find this conclusion to be debatable. Consequently, the court declines to issue a certificate of appealability.

VI. CONCLUSION

For the reasons stated, Wright's petition for habeas relief pursuant to 28 U.S.C. § 2254 is denied. In addition, Wright's motion for access to a full law library (D.I.5.), his motion to be released from custody pending the disposition of his habeas petition (D.I.20.), and his motion for a default judgment against the State (D.I.21.) will be denied as moot. An appropriate order shall issue.

ORDER

For the reasons set forth in the Memorandum Opinion issued this date, IT IS HEREBY ORDERED that:

1. Errick M. Wright's petition for the writ of habeas corpus, filed pursuant to 28 U.S.C. § 2254, is DISMISSED, and the relief requested therein is DENIED. (D.I.2.)

2. The following motions are DENIED as moot:

a. Motion for the court to order that he be allowed access to a full law library. (D.I.5.)

b. Motion to be released from custody pending the disposition of Wright's habeas petition. (D.I.20.)

c. Motion for default judgment against the State. (D.I.21.)

3. The court declines to issue a certificate of appealability because Wright has failed to satisfy the standards set forth in 28 U .S.C. § 2253(c)(2).

D.Del.,2006.
Wright v. Kearney
Not Reported in F.Supp.2d, 2006 WL 839356 (D.Del.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

LEXSEE 2006 U.S. DIST. LEXIS 19141

**IN RE: FINOVA CAPITAL CORP., Reorganized Debtor. OFFICIAL COMMIT-
TEE OF EQUITY SECURITY HOLDERS, Appellant, v. FINOVA CAPITAL
CORP., Appellee.**

**Misc. Case No. 06-040-JJF**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*2006 U.S. Dist. LEXIS 19141; 46 Bankr. Ct. Dec. 104*

**April 13, 2006, Decided**

**PRIOR HISTORY:**    [*1] Chapter 11, Bankruptcy
Case No. 01-0698-PJW. Jointly Administered.

**COUNSEL:** William D. Sullivan, Esquire of BU-
CHANAN INGERSOLL PC, Wilmington, Delaware. Of
Counsel: Mark D. Silverschotz, Esquire and James M.
Andriola, Esquire of ANDERSON KILL & OLICK,
P.C., New York, New York, Attorneys for Appellant.

Mark D. Collins, Esquire and Michael J. Merchant, Es-
quire of RICHARDS, LAYTON & FINGER, P.A., Wil-
mington, Delaware. Of Counsel: Jonathan M. Landers,
Esquire; Janet M. Weiss, Esquire and Jessica I. Basil,
Esquire of GIBSON, DUNN & CRUTCHER LLP, New
York, New York, Attorneys for Appellee.

**JUDGES:** Joseph F. Farnan, District Judge.

**OPINION BY:** Joseph F. Farnan

**OPINION**

*MEMORANDUM OPINION*

**Farnan, District Judge.**

Pending before the Court is a Motion For Leave To
Appeal Bankruptcy Court's Order Regarding Debtor's
Motion Requesting Clarification Of Confirmed Chapter
11 Plan (D.I. 1) filed by the Official Committee Of Eq-
uity Securities Holders ("the Equity Committee"). In
response, the Reorganized Debtor, Finova Capital Cor-
poration ("Finova") has filed a Motion To Strike Notice
Of Appeal And Answer In Opposition To Motion Of The
Official Committee Of Equity Securities Holders For
Leave To [*2] Appeal Bankruptcy Court's Order Re-
garding Debtors' Motion Requesting Clarification Of
Confirmed Chapter 11 Plan (D.I. 3). For the reasons dis-
cussed, the Court will deny the Equity Committee's Mo-

tion For Leave To Appeal and grant Finova's Motion To
Strike Notice Of Appeal.

**I. Parties' Contentions**

By its Motion, the Equity Committee requests leave
to appeal the Bankruptcy Court's February 1, 2006 Order
Regarding Debtors' Motion Requesting Clarification Of
Confirmed Chapter 11 Plan (the "Clarification Order").
Applying the pragmatic and flexible approach taken by
the Third Circuit with regard to the question of finality in
bankruptcy proceedings, the Equity Committee contends
that the Clarification Order is a final, appealable order
because (1) it involves a purely legal decision concerning
contract interpretation, and (2) no further work is re-
quired by the Bankruptcy Court because the ruling
sought by the Equity Committee does not require a de-
termination as to the solvency of Finova. However, even
if the Court were to conclude that the Order was not fi-
nal, the Equity Committee contends that leave to appeal
should be granted under *28 U.S.C. § 158(a)* [*3] , be-
cause the Clarification Order involves a controlling legal
question of contract interpretation, over which there is a
substantial difference of opinion, and resolution of this
issue will materially advance the ultimate termination of
this litigation.

In response, Finova contends that the Clarification
Order is not a final order. In seeking clarification from
the Bankruptcy Court, Finova argued that under the con-
firmed Plan, payments to the holders of equity interests
could not be made if the payments would render Finova
insolvent, would be a fraudulent conveyance or would be
illegal under the applicable law. Finova also argued that
it is currently insolvent and that its insolvency would
continue indefinitely, and therefore, the amount of the
payments due under the Plan should revert back to Fi-
nova to be used for Finova's expenses. Although the
Bankruptcy Court agreed with Finova that payments to

2006 U.S. Dist. LEXIS 19141, *; 46 Bankr. Ct. Dec. 104

the holders of equity interests could not be made if those payments would render Finova insolvent, would be a fraudulent conveyance or would be illegal under the applicable law, the Bankruptcy Court declined to consider whether Finova was currently insolvent and further declined to order **[*4]** the relief Finova requested. Thus, Finova contends that the Clarification Order is not a final order, because (1) it leaves work to be done by the Bankruptcy Court in terms of a solvency hearing, and (2) it grants no relief to Finova and merely maintains the *status quo*. Finova also contends that appeal of this Order under the interlocutory standards is not appropriate, because the Order implicates factual questions on solvency and will not advance the case. Finova contends that even if the Equity Committee prevails on this appeal, the Equity Committee would need to bring an adversary proceeding to compel the turnover of the funds, and therefore, litigation in this case would be ongoing. In these circumstances, Finova contends that the Equity Committee has not established exceptional circumstances justifying an interlocutory appeal.

## II. DISCUSSION

In determining whether an order of the Bankruptcy Court is final, the Court is required to take a flexible, pragmatic approach. *See e.g. In re Armstrong World Indus., Inc., 432 F.3d 507, 2005 WL 3544810, *3 (3d Cir. Dec. 29, 2005)*. Although no specific combination of factors is dispositive on the question of finality, the **[*5]** Court should consider, among other things: (1) whether the order leaves additional work to be done by the Bankruptcy Court, (2) whether the order implicates purely legal issues, (3) the impact of the Bankruptcy Court's order upon the assets of the debtor's estate, (4) the necessity for further fact-finding on remand to the Bankruptcy Court, (5) the preclusive effect of the District Court's decision on the merits of subsequent litigation; and (6)

the furtherance of judicial economy. *U.S. v. Pelullo, 178 F.3d 196, 200-201 (3d Cir. 1999)*.

Applying these standards to the Clarification Order, the Court concludes that the Clarification Order is not a final appealable order. The Bankruptcy Court's Order grants no relief in favor of Finova, and has the effect of maintaining the *status quo* in this action until such time as solvency determinations are made with respect to Finova. In this regard, the Bankruptcy Court contemplated further proceedings, and these proceedings are fact intensive in nature. Given the specter of duplicative appeals, first from the Clarification Order and then from any determination of solvency, the Court is further persuaded that the interests **[*6]** of judicial economy will not be served by entertaining an appeal of the Clarification Order at this juncture.

In addition, the Court concludes that the Equity Committee has not demonstrated that this case is distinguishable from the normal variety of cases such that an immediate interlocutory appeal is warranted. *See e.g. Bowie Produce Co. v. Magic Am. Cafe (In re Magic Restaurants), 202 B.R. 24, 25 (D. Del. 1996)*. The Plan was confirmed four years ago, and the Bankruptcy Court's Clarification Order maintains the *status quo* that has been in place since that time. Accordingly, the Court declines to permit an interlocutory appeal of the Clarification Order. Having concluded that the Clarification Order is not appealable at this juncture, the Court will grant Finova's request to strike the notice of appeal.

## III. Conclusion

For the reasons discussed, the Court will deny the Equity Committee's Motion For Leave To Appeal Bankruptcy Court's Order Regarding Debtor's Motion Requesting Clarification Of Confirmed Chapter 11 Plan and grant Finova's Motion To Strike Notice Of Appeal.

An appropriate Order will be entered.

## CERTIFICATE OF SERVICE

I, Marcos A. Ramos, do hereby certify that on September 5, 2008, a copy of the foregoing **Debtors' Reply Brief in Support of their Motion to Dismiss Appeal of Kelson Channelview LLC (f/k/a Kelson Energy IV LLC)** was served on the attached service list in the manner indicated thereon.

_____
Marcos A. Ramos (No. 4450)

**Local Via Hand Delivery  -  Non-Local Via First Class Mail**

Ian Connor Bifferato
Garvan F. McDaniel
Bifferato Gentilotti LLC
800 N. King Street, Plaza Level
Wilmington, DE 19801

Andrew K. Glenn
Kasowitz, Benson, Torres & Friedman LLP
1633 Broadway
New York, NY 10019

Jonathan B. Alter
Bingham McCutchen LLP
One State Street
Hartford, CT 06103

Robert J. Dehney
Curtis Miller
Morris, Nichols, Arsht & Tunnell LLP
P.O. Box 1347
1201 N. Market Street, 18th Floor
Wilmington, DE 19899-1347
rdehney@mnat.com

Bonnie Glantz Fattell
Blank Rome LLP
1201 Market Street, Suite 800
Wilmington, DE 19801-4226

Mark S. Finkelstein
Jeffery R. Koch
Shannon Martin Finkelstein & Alvarado, P.C.
2400 Two Houston Center
909 Fannin Street
Houston, TX 77010

Laura Davis Jones
Pachulski, Stang, Ziehl & Jones LLP
P.O. Box 8705
919 N. Market Street, 16th Floor
Wilmington, DE 19899-8705

Bonnie Steingart
Brian D. Pfeiffer
Fried, Frank, Harris, Shriver & Jacobson LLP
One New York Plaza
New York, NY 10004

Mark S. Kenney
Office of the United States Trustee
844 King Street, Suite 2313, Lockbox 35
Wilmington, DE 19801-3519

David B. Stratton
Evelyn J. Meltzer
Pepper Hamilton LLP
P.O. Box 1709
Hercules Plaza, Suite 5100
1313 Market Street
Wilmington, DE 19899-1709

Francis J. Lawall
Bonnie MacDougal Kistler
Pepper Hamilton LLP
3000 Two Logan Square
Eighteenth & Arch Streets
Philadelphia, PA 19103-2799

Gregory Werkheiser
Morris Nichols Arsht & Tunnell
P.O. Box 1347
1201 North Market Street
Wilmington, DE 19899

Lawrence M. Handelsman
Harold A. Olsen
Sherry J. Millman
Stroock & Stroock & Lavan
180 Maiden Lane
New York, NY 10038